UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| SCOTIA DEVELOPMENT LLC, ET AL., | ) | JOINTLY ADMINISTERED |
| Debtors | ) | |
| | ) | Case No. 07-20027-C-11 |
| | ) | Chapter 11 |
| | ) | |
| | ) | Honorable Richard S. Schmidt |

**EXPEDITED MOTION OF THE CALIFORNIA RESOURCES AGENCY, CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, CALIFORNIA DEPARTMENT OF FISH AND GAME, CALIFORNIA WILDLIFE CONSERVATION BOARD, CALIFORNIA STATE WATER RESOURCES CONTROL BOARD, AND THE CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, NORTH COAST REGION TO TRANSFER VENUE TO THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

A HEARING WILL BE CONDUCTED ON THIS MATTER ON FEBRUARY 15TH, 2007, AT 10:00 A.M. BEFORE THE HONORABLE RICHARD S. SCHMIDT, 515 RUSK AVENUE, COURTROOM 400, 4TH FLOOR, HOUSTON, TX, 77002.  IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING.  YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-THREE DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING UNLESS YOU DID NOT RECEIVE THIS NOTICE IN TIME TO DO SO.  IN THAT SITUATION, FILE YOUR RESPONSE AS SOON AS POSSIBLE.  IN ADDITION TO FILING YOUR RESPONSE WITH THE CLERK, YOU MUST GIVE A COPY OF YOUR RESPONSE TO THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.

1

The California Resources Agency, the California Department of Forestry and Fire Protection (Department of Forestry), the California Department of Fish and Game (Department of Fish and Game), the California Wildlife Conservation Board (Wildlife Board), the California Regional Water Quality Control Board, North Coast Region (Regional Board), and the State Water Resources Control Board (State Board) (collectively "the California State Agencies") hereby move this Court under 28 U.S.C. §§ 1408 and 1412, 11 U.S.C. § 105(a) (the Bankruptcy Code), and Rule 1014 of the Federal Rules of Bankruptcy Procedure (the Bankruptcy Rules) for an entry of an order transferring and changing venue of the above-captioned jointly administered bankruptcy proceeding (the Bankruptcy Case) to the Northern District of California, Oakland Division (California Bankruptcy Court).[1]  In support of this Motion to Transfer Venue (Motion), the California State Agencies respectfully submit the following:

## INTRODUCTION

1.  On January 18, 2007, Scotia Development LLC (Scotia Development) filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas.  Five related entities simultaneously filed voluntary Chapter 11 petitions, also in this Court, including The Pacific Lumber Company (PALCO), Britt Lumber Co., Inc. (Britt), Salmon Creek LLC (Salmon Creek), Scotia Inn, Inc. (Scotia Inn), and Scotia Pacific Company LLC (SCOPAC) (collectively, the "Debtors").  In their petitions, these five related entities asserted venue in this Court on the ground that they are

---

[1]By filing this Expedited Motion to Transfer Venue, the California State Agencies are making a special and limited appearance.  The California State Agencies do not waive their immunity under the Eleventh Amendment and expressly reserve all rights to assert their sovereign immunity in this proceeding.

2

affiliates of Scotia Development.  (See Voluntary Petitions of Debtors PALCO Case No. 07-20028 [Docket # 1], Britt Case No. 07-20029 [Docket #1], Salmon Creek Case No. 07-20030 [Docket #1] and Scotia Inn Case No. 07-20031 [Docket # 1] and SCOPAC Case No. 07-20032 [Docket #1].)  Notably, all of these affiliates list California as their state of residence, not Texas. On January 19, 2007, this Court ordered these estates to be jointly administered.

      2.  The California State Agencies hereby move this Court to transfer the Bankruptcy Cases to the proper venue, the California Bankruptcy Court.  The facts show that the Debtors manufactured venue through the formation of Scotia Development as a limited liability company in Corpus Christi, Texas.  Scotia Development was formed for the purpose of enabling the Debtors to file their bankruptcy petitions in this Court.  Based on a review of the pleadings filed in this case so far, Scotia Development has no significant business activity or purpose.  Its creation was calculated to provide its affiliates with a hook to file in this Court rather than in the California Bankruptcy Court.  The Debtors' actions in manufacturing venue constitute bad faith and blatant forum shopping, which should not be countenanced by this Court.  Allowing venue to remain in this Court will undermine the integrity of the bankruptcy laws and impose severe burdens on creditors and other parties in interest to assert and protect their claims against these Debtors.

      3.  Venue is not proper under 28 U.S.C. § 1408(2) when venue has been manufactured.

      4.  In the alternative, this Court should, in the interest of justice *or* for the convenience of parties, transfer venue under 28 U.S.C. § 1412.  The facts supporting transfer on these grounds are abundant and compelling:

- a number of creditors and potential creditors, including the moving parties hereto, are located in Northern California;

- most witnesses would be located in California;

- five of the six Debtors reside in California, with four of the six residing in Oakland, Alameda County, California, specifically where the Oakland Division of the United States Bankruptcy Court for the Northern District of California is situated;

- the timberland that is the Debtors' main asset is located in Northern California;

- the Debtors' operations are regulated under the laws of the State of California;

- of the Debtors' 88 "critical vendors" 65 of them reside in California, while only one resides in Texas;

- the Debtors list only one creditor in their List of 20 Largest Creditors that resides in Texas (Scotia Development's landlord), while 17 of them reside in California; and

- while Scotia Development is nominally listed as a moving party, none of the Debtors' "first day" motions seek any significant relief for Scotia Development.

Under these circumstances, the interest of justice or convenience of the parties militates in favor of transfer of venue to the proper forum.  As most of Debtors' creditors reside in Northern California, it would be more efficient for the estate and fair to the parties if the case were transferred.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction to consider this motion under 28 U.S. C. §§ 1408 and 1412, 11 U.S.C. § 105(a), and Federal Rules of Bankruptcy 1014.  This motion is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

## STATEMENT OF FACTS

### A.  The California State Agencies

6.  The California State Agencies are separate regulatory agencies of the State of California.  These agencies have regulatory authority over Debtors' activities related to timber harvesting and other activities that may impact the environment in California.

7.  The Resources Agency is one of seven cabinet level agencies within the California State Government.  Cal. Govt. Code § 12800.  The Resources Agency consists of dozens of departments, boards, commissions and conservancies related to natural resources, include the Departments of Fish and Game and Forestry and Fire Protection.  *Id.* § 12805.  The Secretary of the Resources Agency has the power of general supervision over, and is directly responsible to the Governor for, the operation of each department, office and unit within the Resources Agency.  *Ibid.*  The Secretary of the Resources Agency shall exercise the authority vested in the Governor in respect to the functions of each department, office or other unit within the Resources Agency.  *Id.* § 12850.4.  The Secretary for the Resources Agency has a variety of other statutory authorities and responsibilities, including regulatory authority under the California Environmental Quality Act ("CEQA") (Cal. Pub. Res. Code § 21000 et. seq.) and the Wild and Scenic Rivers Act.  *See, e.g., id.* § 21084.  The Resources Agency has, among other things, entered into various arrangements with MAXXAM, Inc., PALCO, SCOPAC, and Salmon Creek in connection with the regulatory authority of the Resource Agency and its constituent organizations.

8.  The Department of Forestry and Fire Protection is responsible for fire protection and for managing, maintaining, and enhancing California's forests.  Cal. Pub. Res.

Code § 713. Part of this responsibility includes reviewing and approving timber harvesting plans that comply with the law.[2] The Department of Forestry issued the timber harvesting plans under which PALCO operates.[3] The Department of Forestry reviews applications for timber harvest plans and issues timber harvesting permits that are typically issued requiring mitigation measures. For example, timber harvesting plans often require the landowner to take measures to mitigate the adverse effects of the harvesting. These mitigation measures include erosion control, prescribed maintenance for erosion controls, restocking requirements, or repair to bridges and culverts. These important measures are required as part of Debtors' approved timber harvesting plans and require payment to contractors.

9. The Department of Fish and Game holds the State's fish and wildlife resources in trust for the people of the State of California. Cal. Fish & Game Code § 1802. As such, the Department of Fish and Game has jurisdiction over the conservation, protection, restoration, enhancement, and management of fish, wildlife, native plants, and habitat necessary for biologically sustainable populations of these species under the California Endangered Species Act (*id.* § 2050 et seq.) and other State laws, including, but not limited to California Fish and Game Code sections 1600 et seq., 3503.5, 3511, and 1900 et seq.

10. The Wildlife Conservation Board is a separate and independent board within

---

[2]A landowner who wishes to harvest timber for commercial purposes in California must submit a timber harvesting plan to the Department of Forestry for review and approval before harvesting can commence. Cal. Pub. Res. Code § 4581. A timber harvesting plan contains, among other things, the method of harvest, plus measures to prevent excessive erosion and any mitigation measures deemed necessary by the Department of Forestry. *Id.* § 4582.

[3]To date, PALCO has 298 approved, but not completed, timber harvesting plans on file with the Department of Forestry.

the Department of Fish and Game that has the authority and funding to select, authorize, and allocate funds for the purchase of land and waters suitable for recreation purposes and the preservation, protection and restoration of wildlife habitat within the State of California. *Id.* § 1300 et seq.

11.   The State Water Resources Control Board and the Regional Board are the principal state agencies with primary responsibility for the coordination and control of water quality. Cal. Wat. Code § 13001. They regulate the discharge of waste, including, inter alia, discharges of sediment resulting from timber harvesting, in to waters of the state through issuance of waste discharge requirements or condition waivers of waste discharge requirements and monitoring requirements. *Id.* §§ 13263, 13269, 13267. *See, e.g., Pacific Lumber Co. v. State Water Resources Control Bd.*, 37 Cal.4th 921 (Cal. 2006).

12.   Under two Regional Board orders issuing watershed-wide waste discharge requirements, PALCO is required to pay an annual fee of $872.00 per timber harvesting plan to the Regional Board. There are 20 timber harvesting plans enrolled under the watershed-wide waste discharge requirements. PALCO must also pay an annual fee of $872.00 per timber harvesting plan to the Regional Board for the 80 plans enrolled under the general waste discharge requirements. In addition, the Regional Board has issued three Cleanup and Abatement Orders[4] against PALCO that require PALCO to cleanup sediment discharge at 1400 cleanup sites, and one Order requiring the replacement of drinking water supplies that were damaged or destroyed

---

[4]The Regional Board has also issued Cleanup and Abatement Orders under California Water Code section 13304(a) to PALCO. Under this section, the Regional Board may issue such an order against anyone who discharges waste into the waters of the State or who threatens to discharge waste in violation of any waste discharge requirement or order or other prohibition that creates or threatens to create a condition of pollution or nuisance.

by excessive sediment and nuisance flooding.

      13.  All these agencies are headquartered in Sacramento, California, with the exception of the Regional Board, which is headquartered in Santa Rosa, California.

      14.  The California State Agencies' interest in this Bankruptcy Case is great.  In their bankruptcy filings, Debtors have asserted that their operations have been "negatively impacted" by the "continued regulatory constraint."  *See, e.g.*, Application for Authority to Employ Howard Rice et al. [Docket # 68], ¶ 19.  This statement strongly suggests that Debtors will attempt to use the bankruptcy forum as a vehicle to relieve themselves of their regulatory obligations.  Thus, the California State Agencies with jurisdiction to regulate the operations of the Debtors, must be very active and vigilant in the bankruptcy proceeding to ensure that the Debtors comply with 28 U.S.C. § 959(b) and applicable federal and state laws, especially laws enacted to protect the public welfare and environment.

      15.  Debtors' choice of venue in Texas, rather than California where they have operated for over 130 years, where they have substantially all of their assets and employees, and where the regulators and vast majority of creditors are located, is clearly an attempt to blunt the participation of the California State Agencies and California creditors in this proceeding.  In addition to regulating the activities of the Debtors, the California State Agencies have pre-petition claims against these Debtors.  The California State Agencies, as well as other state governmental units have begun the process of identifying the claims held against these Debtors.

      16.  Several California statutes pertain to timber harvesting, including the Z-Berg-Nejedly Forest Practices Act of 1973 (Cal. Pub. Res. Code § 4511 et seq.), the Porter-Cologne Water Quality Act (Cal. Wat. Code § 13000 et. seq.), CEQA, and various sections from the

California Fish and Game Code. The various California State Agencies must administer and enforce these statutes when approving timber harvesting in California. Additionally, the harvesting activities of the Debtors must comply with environmental management plans and agreements formed under and administered within theses California statutes.

**B. The Debtors Reside and Conduct Material Operations in California**

17. This Bankruptcy Case concerns six jointly-administered cases involving Debtors PALCO, Britt, Salmon Creek, Scotia Inn, SCOPAC, and Scotia Development. PALCO, Britt, Salmon Creek, SCOPAC, and Scotia Inn all reside in and have mailing addresses in Northern California. Only Scotia Development, which was formed recently, on June 5, 2006, lists a residence outside of California.

18. PALCO is located at 449 15th Street, Suite 401, Oakland, California, 94612 (mailing address P.O. Box 37, Scotia, California, 95565). *See* PALCO Voluntary Petition [Docket #1]. This location is blocks from the California Bankruptcy Court. PALCO lists its "County of Residence or of the Principal Place of Business" as Alameda County, California. Moreover, PALCO lists its "Location of Principal Assets of Business Debtor" as Humboldt County, California.

19. Britt is a California corporation listing the same address, principal place of business, and location of assets as PALCO. *See* Britt Lumber Voluntary Petition [Docket #1]. Britt is located at 449 15th Street, Suite 401, Oakland, California, 94612 (mailing address P.O. Box 37, Scotia, California, 95565). This street address is blocks from the California Bankruptcy Court. Britt lists its "County of Residence or of the Principal Place of Business" as Alameda County, California. Moreover, Britt lists its "Location of Principal Assets of Business Debtor" as

9

Humboldt County, California.

20. Salmon Creek lists the same address, principal place of business, and location of assets as PALCO. *See* Salmon Creek Voluntary Petition [Docket #1]. Salmon Creek is located at 449 15th Street, Oakland, California, 94612 (mailing address P.O. Box 37, Scotia, California, 95565). The street address is blocks away from the California Bankruptcy Court. Salmon Creek also lists its "County of Residence or of the Principal Place of Business" as Alameda County, California. Moreover, Salmon Creek lists its "Location of Principal Assets of Business Debtor" as Humboldt County, California.

21. Scotia Inn is located at 100 Main Street, Scotia, California, 95565. *See* Scotia Inn Voluntary Petition [Docket #1]. Scotia Inn lists its "County of Residence or of the Principal Place of Business" as Humboldt County, California. Moreover, Scotia Inn lists its "Location of Principal Assets of Business Debtor" as Humboldt County, California.

22. SCOPAC is located at 449 15th Street, Suite 401C, Oakland, California, 94612. *See* SCOPAC Voluntary Petition [Docket # 1]. This location is blocks from the California Bankruptcy Court. Scotia Pacific lists its "County of Residence or of the Principal Place of Business" and its "Location of Principal Assets of Business Debtor" as Alameda County, California.

23. Each of the Debtors has filed lists of its 20 largest creditors. Of those creditors, 17 reside in California, according to the Debtors. Not counting Scotia Development's landlord, none of the listed creditors reside in Texas. Scotia Development lists only two creditors, one residing in California and the other, apparently a landlord, residing in Corpus Christi, Texas.

24. Although the Debtors are vague in their motion for authority to pay pre-petition claims of critical vendors, it appears from the amended list of such critical vendors that the Debtors are seeking such relief with respect to only PALCO and Britt. Only one of the listed critical vendors is listed with an address in Texas. To the contrary, 65 of the 88 listed critical vendors are listed with addresses in California.[5] Scotia Development apparently has no critical vendors.

25. The amended Exhibit to the Debtors' Motion to Prohibit Utilities from Altering Service [Docket #45] lists 13 utilities that provide "critical" utility service to the Debtors, but only one of them, AT&T -- presumably a telephone service, is listed for Scotia Development in the paltry sum of $242. The remaining 12 critical utilities are for PALCO and Britt and are not located in Texas. This strongly suggests that Scotia Development maintains a mere "phone booth" presence in Texas – a small office with a phone. From information voluntarily provided by the Debtors to the U.S. Trustee, the office is only 344 square feet, is leased month-to-month for $548.68 per month. Interestingly, Scotia Development entered into this lease seven days after filing its corporate papers with the Secretary of State. This office is, literally, a phone booth used to manufacture venue in Texas for the Bankruptcy Case. *See* Exh. A, Lease Agreement, attached to Declaration of Tiffany Yee.

26. Notably, the Debtor's Emergency Motion to Pay Prepetition Compensation and Benefits [Docket # 12] mentions in detail only PALCO and Britt Lumber. Although Scotia

---

[5]The PALCO list of critical vendors also includes five California state agencies: the Board of Equalization, Department of Toxic Substance Control, State Water Resources Control Board, California Air Resources Board, and California Regional Water Quality Control Board, North Coast Region.

Development is nominally listed as a moving party, there is no specific description of the number of its employees or the existence and description of any employee compensation or benefit plans. The Debtors' statement is that Scotia Development has no salaried employees. SCOPAC filed a separate motion for similar relief [Docket # 97], but it that too makes no mention Scotia Development. The vast majority of the 500-plus employees reside in California.

27.    The only significant mention of Scotia Development in the Debtors' first day motions so far is to say that it was "created in 2006 for the purpose of exploring and facilitating development opportunities with respect to commercial, industrial and residential properties, including raw land, in California and Texas. It is a party to development contracts with both Scopac and PALCO, and owns option rights to real property on the Texas Gulf Coast." *See, e.g.,* Affidavit of Gary L. Clark [Docket # 11], p. 4, ¶ 13. That paragraph is repeated in virtually all of the Debtors' motions, but that is all that is disclosed about Scotia Development, other than the information on the Voluntary Petition and List of 20 Largest Creditors already mentioned.

28.    In short, the Debtors' own filings show that they have no connection to Texas except for the wholly owned subsidiary under Texas law a mere seven and a half months prior to the petition date, and a month after Debtors first contact bankruptcy counsel in Texas. *See* Debtor's Application for Approval of Retention of Jordan, Hyden et al. [Docket #18], p. 3, ¶ 7.

29.    According to Debtors' filings, PALCO owns 210,000 acres of virtually contiguous commercial timberlands in Humboldt County, California, either directly or through SCOPAC or Salmon Creek. *See* Application for Authority to Employ Howard Rice [Docket #68], p. 5 ¶ 11. PALCO owns most of this timberland through SCOPAC, its subsidiary as SCOPAC owns 200,000 acres. PALCO owns 8,500 acres, while Salmon Creek owns the

remaining 1,300 acres. *Ibid.* Based on the Debtors' filings in this Court, the State believes that

these California timberlands and lumber mill are the Debtors' main assets.

30. The Debtors have stated that the "regulatory limitations" placed on their

timber harvests have caused them to become highly leveraged. According to the Debtors, much

of their cash flow goes toward debt service. *See* Application for Authority to Employ Howard

Rice, Docket # 68, p. 7 ¶ 19.

**C. The Headwaters Forest Agreement of 1996**

31. Before the parties entered into the Headwaters Forest Agreement of 1996, the

Headwaters Forest, located in Humboldt County, California, was one of the largest old-growth

redwood forest remaining in private ownership. PALCO's harvesting of this old-growth timber

led to considerable litigation and protest. *Envt'l Prot. Info. Ctr. v. California Dept. of Forestry

and Fire Prot.*, 37 Cal.Rptr.3d 31, 38-39, rev. granted, 132 P.3d 210 (No. S140547, March 29,

2006). As a result of this litigation, PALCO was enjoined from harvesting a particular stand of

old-growth timber that was the habitat for the marbled murrelet. In response to this limitation,

PALCO sued both the state and federal governments alleging unlawful taking of property. *Id.* at

39.

32. PALCO entered into the Headwaters Forest Agreement of 1996 with various

agencies of the State of California and the United States. *Ibid.* As part of this agreement,

PALCO agreed to dismiss its takings lawsuits and sell the portion of its property called the

Headwaters Forest and other property to the State of California and the United States to create a

permanent wildlife preserve and "to conserve and study the land, fish, wildlife, and forests

occurring on such land while providing public recreation opportunities and other management

13

needs." Pub. L. 105-83, 11 Stat. 1543, 1613 (Nov. 14, 1997). PALCO further agreed to modify

its Habitat Conservation Plan (HCP) to provide additional protections for threatened and

endangered species. In exchange, PALCO received at total of almost $500 million dollars of

public money – $245.5 million from specific agencies of the State of California and $250

million from the United States.

33. Under the Headwaters Forest Agreement, PALCO would be allowed to

harvest its remaining timberlands in satisfaction of certain of its regulatory obligations, subject to

the specified State agencies's and the United States's review and approval of certain plans and

permits. These plans and permits include, but are not limited to, timber harvesting plans under

the Forest Practice Act, the HCP and its Implementing Agreement, the Sustained Yield Plan, an

Environmental Impact Statement and Environmental Impact Report, and an Incidental Take

Permit.

**D. The Habitat Conservation Plan**

34. The HCP was a prerequisite to the issuance of the federal incidental take

permit and was intertwined with certain State agencies's approvals of PALCO's harvesting under

state law. For example, the HCP was combined with the Sustained Yield Plan for environmental

review and was also incorporated in the state Incidental Take Permit. Further certain State

agencies, the United States, and PALCO entered into an Implementing Agreement to carry out

the HCP.

35. The HCP is a 50-year plan, designed to protect covered wildlife and sensitive

plant species from anticipated harm resulting from PALCO's timber operations. The HCP

establishes operating programs to conserve and enhance habitats of identified species. *Envt'l*

14

*Prot. Info. Ctr. v. Calif. Dept. of Forestry and Fire Prot.*, 37 Cal.Rptr. at 42.  Under state law and the HCP, PALCO must submit a timber harvest plan before it harvests any timber.  Through the HCP, PALCO must implement specific measures developed to avoid, minimize, and mitigate their impacts to covered species and their habitats resulting from PALCO's timber harvesting and other land management activities.  The HCP allows for modification of these measures by the federal and state wildlife agencies following completion of a watershed analysis by the California resources agencies.

36.  As part of the issuance of the HCP, PALCO, SCOPAC, and Salmon Creek were required to post a security, which it did in the form of a certificate of deposit with Bank of America in the amount of $2,412,715.00, with the State of California and the United States as beneficiaries.

## E.  Sustained Yield Plan

37.  The Forest Practice Rules (Cal. Code Regs., tit. 14 § 896 et seq.) prescribe the preparation and approval of sustained yield plans.  A sustained yield plan is a long-range plan that a landowner may submit to address environmental issues over a large landscape.  *Id.* § 1091.1(b); *Envt'l Prot. Info. Ctr. v. Calif. Dept. of Forestry and Fire Prot.,* 37 Cal.Rptr. at 44. The Headwaters Forest Agreement required PALCO to submit a Sustained Yield Plan to the Department of Forestry for its and the public's review.

## F.  Incidental Take Permit

38.  The California Department of Fish and Game issued an Incidental Take Permit to PALCO pursuant to California Fish and Game Code §§ 2081(b) and (c).  By issuing an Incidental Take Permit, the California Department of Fish and Game allows the "taking" of an

15

endangered or threatened species incidental to an otherwise lawful activity. *See* Cal. Fish & Game Code § 2081(b); *see also* Cal. Code Regs., tit. 14, § 783 et seq.

39. PALCO's Incidental Take Permit was conditioned upon PALCO's implementation and adherence to the conservation measures and prescriptions contained in the HCP and PALCO's compliance with the Implementation Agreement for the HCP.

## ARGUMENT

### A.  Venue Is Improper Under 28 U.S.C. § 1408(2) Because the Debtors Have Manufactured Venue

40. Under section 1408 of Title 28 of the United States Code, venue is proper where an entity has resided for the longest period of time within 180 days immediately preceding the bankruptcy filing. On first blush it appears that venue in this Court is met on the mere technicality of Scotia Development's formation in Texas. A closer look reveals that the Debtors have "manufactured" venue in this Court shortly before filing their petitions to avoid filing in the California Bankruptcy Court.

41. On June 5, 2006, just 227 days before the filing of the bankruptcy petition, Scotia Development filed a Certificate of Formation of an Limited Liability Company. *See* Certificate of Filing, Exh. B to Declaration of Tiffany Yee. Scotia Development's petition lists only two unsecured creditors:  an engineering firm in Los Angeles, and a property management company. The amount owed to the property management company is only $500.00 and is most likely for an office set up as part of the Debtors' manufacture of venue. *See* Scotia Development's List of 20 Largest Unsecured Creditors [Docket #1]. In addition, Scotia Development apparently has no critical vendors, as none are listed in the Debtors' critical vendors motion.

16

42.   Despite being listed as a moving party in the critical vendors motion of Debtors, no vendor of Scotia Development is identified.  Moreover Scotia Development apparently has no need for the use of cash collateral, and has only one utility that is "critical" enough to list in the motion to prohibit utilities form altering service.  However, PALCO and Britt list 12 such utilities.  Similarly, Scotia Development is again nominally listed as a moving party in the Debtor's motions regarding employee compensation and benefits.  However, there is no mention of any employee compensation or benefits for Scotia Development.  In short, Scotia Development is a mere shell created to allow Debtors to file bankruptcy in a forum distant from its regulators and creditors.

43.   Additionally, Scotia Development seems to have few real ties to Texas except for its business formation.  A look on its website confirms this assertion.  According to its website, the purpose of Scotia Development is:

> To assist Pacific Lumber and its subsidiaries in the marketing of non-strategic properties they own in the vicinity of Scotia, CA.
>
> To potentially development property in and around Scotia, CA.
>
> To look for development opportunities elsewhere.

Scotia Development's "property development" occurs in California – specifically, Northern California.  No information is given on "development opportunities elsewhere," because there likely is none.  The only contacts provided for this entity are in California.  *See* Material from www.scotiadevelopment.com, Exh. C to Declaration of Tiffany Yee.  Additionally, Gary L. Clark is listed as Vice President and Chief Financial Office of Scotia Development, roles he also plays for the other affiliates located in California.  Finally, Scotia Development has no salaried employees (*see* Declaration of Gary L. Clark, [Docket #11], p. 7, n.4), which is not surprising,

17

given the entity's apparent lack of business purpose. As these facts make clear, Scotia

Development was formed in Texas for the sole purpose of manufacturing venue for it and its

affiliates in a jurisdiction inconvenient to the parties and witnesses. In short, Debtors improperly

manipulated venue and, as such, these cases should be transferred to the proper venue -- the

California Bankruptcy Court.

       44. Debtors have publicly stated that bankruptcy was imminent on and off for

years. Given the significant amount of prior preparation that an orderly chapter 11 bankruptcy

filing for the number and size of the Debtors takes, it is clear that the Debtors have been

preparing to file these cases in advance of the formation of Scotia Development. Accordingly,

the only reasonable conclusion to be drawn from the facts is that the Debtors have engaged in

blatant forum shopping to severely hamstring creditor and the California State Agencies'

involvement in these cases. The Debtors know the geographic location of the body of their

creditors. By requiring the creditors to participate in a distant court without their consent, the

Debtors seek to minimize their impact on the Debtors' restructuring efforts. Venue in Texas

virtually ensures that the creditors will be disenfranchised from complete and effective

participation in these bankruptcy cases. *See, e.g., In re Columbia Western, Inc.*, 183 B.R. 660,

664, n.11 (Bankr. D. Mass. 1995) ("Creditors frequently find it difficult to finance an objection

because of financial pressures caused by the filing of the case itself. Increasing the physical

distance between those creditors and the forum may eliminate the ability of those to object .").

The Debtors are taking advantage of the fact that absent full and vigorous involvement by the

broad range of creditor constituencies, including the California State Agencies concerning its

regulatory enforcement obligations, they will be able to advance their own interests at the

18

expense of the creditors, including the California State Agencies, not to mention the goals and
policies of the Bankruptcy Code.

45. The "manufacture" of a debtor's eligibility results in improper venue,
warranting the transfer of that debtor's case. In *In re Columbia Western, Inc.*, an Oregon
corporation filed a bankruptcy petition in the District of Massachusetts two days after transferring
a large sum of money into a Massachusetts bank and executing a month to month lease for office
space from which it did not operate. *In re Columbia Western, Inc.*, 183 B.R. at 661. Acting on a
motion to transfer venue of the case to another venue, the Bankruptcy Court found that venue
was improper under section 1408 and transferred the case to Oregon. *Id.* Specifically, the court
noted that:

> The Court disregards the conveniently recent transfer to
> Massachusetts of the Debtor's funds and the lease of the empty
> office space. Any argument that those acts have relevance would
> not be made in good faith.

*Id.* at 665, n.12; *see also in re L.F. Popell Co.*, 221 F.Supp. 534, 535 (D. S.D.N.Y 1963)
(granting under the Bankruptcy Act a motion to transfer the Chapter XI proceeding to the District
of Florida since debtor simply leased a furnished apartment in a residential New York City
building); *cf Capital Motor Courts v. Le Blanc Corp.*, 201 F.2d 356, 359 (2d Cir. 1953) (denying
transfer upon finding that a corporation incorporated in New York shortly before the petition date
was not in bad faith since the financial heart and body of business were located in New York).

46. Additionally, when faced with a motion to dismiss or transfer venue, the
Bankruptcy Court for the District of Massachusetts found that venue was proper when the debtor
in that case maintained a residence in Massachusetts in which he had resided in for 30 to 35
percent of the year for the prior twelve years. However, the court specifically noted that had his

19

"residence" been created strictly for the purpose of creating venue, then that "residence" would not be given any legal effect. *In re Handel*, 242 B.R. 789, 793, n.7 (Bankr. D. Mass. 1999) ("And a residence created for the purpose of creating venue should be disregarded for any purpose.").

47.   Moreover, several courts, when making a determination as to whether a party meets the requirements of 11 U.S.C. § 109 to be a debtor, have indicated that actions taken solely for creating eligibility may constitute bad faith. *See, e.g., In re McTague*, 198 B.R. 428, 432-33 (Bankr. W.D.N.Y. 1996) ("if property has been specifically placed or left in the United States for the sole purpose of creating eligibility that would not otherwise exist, then dismissal might be appropriate on other grounds, such as bad faith filing . . ."); *Bank of America, N.T. & S.A. v. World of English, N.V.*, 23 B.R. 1015, 1023 (N.D.Ga. 1982) ("There being no evidence that the bank account was transferred from Japan to California merely to create jurisdiction for a future bankruptcy proceeding involving the Debtors . . ., the Court concludes that Debtors have satisfied the eligibility requirements of 11 U.S.C. § 109.").

48.   Because actions taken by the Debtors strictly to create venue in this District should not be given any legal effect, venue is not appropriate in the Bankruptcy Court for the Southern District of Texas.  Given its role as a court of equity, there should be no question of a bankruptcy court's ability to disregard the legal effect of any inequitable conduct.  As noted by *In re Scott Cable Communications, Inc.*:

> Section 105(a) was enacted to permit courts a measure of
> flexibility from the literal language of the Code to carry the
> drafters' intent, recognizing that under isolated circumstances, a
> literal reading might thwart its purpose.  Section 105 appropriately
> has been invoked by other bankruptcy courts "to prevent the abuses
> of process which may accompany forum shopping."

*In re Scott Cable Communications, Inc.*, 263 B.R. 6, 8 (Bankr. D. Conn. 2001) (citations omitted).  Thus, actions taken by a debtor strictly to create venue or jurisdiction should not be given any legal effect.  The Debtors therefore fail to meet the requirements for venue in this District under 28 U.S.C. § 1408(2), and pursuant to Bankruptcy Rule 1014(a)(2), the Debtors' bankruptcy cases should be transferred to the Northern District of California, Oakland Division. *See e.g., In re Tafan*, 312 B.R. 588 (N.D. W.Va. 2004) ("Thus, if a venue is improper, the bankruptcy court must either dismiss the action or transfer it in the interest of justice or for the convenience of the parties.").  If venue is contested and improper, the majority of courts have held that rather than retaining the improperly venued case, a bankruptcy court must dismiss the case or transfer it. *United States Trustee v. Sorrells (In re Sorrells)*, 218 B.R. 580, 586 (10th Cir. BAP 1998) (citing numerous cases in support).

**B. Even if the Court Finds Venue to Be Proper Under 28 U.S.C. § 1408(2), The Interests of Justice or the Convenience of the Parties Dictate that the Court Transfer these Cases**

49.   Should this Court find venue to be met on a technicality, the principles of both law and equity still support the transfer of venue to the Northern District of California, Oakland Division.  Rule 1014 of the Bankruptcy Rules and 28 U.S.C. § 1412 provide the basis for the transfer of a bankruptcy case to another venue.

50.   28 U.S.C § 1412 provides that:

A district court may transfer a case or proceeding under Title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.

51.   Similarly, Federal Rule of Bankruptcy Procedure 1014 provides:

If a petition is filed in a proper district, on timely motion of a party in interest, and after hearing on notice to the petitioners, the United State Trustee, and other entities as directed by the Court, the case

may be transferred to any other district if the Court determines that
the transfer is in the interest of justice or for the convenience of the
parties.

Fed. R. Bankr. P. 1014(a)(1).  Thus, there are two primary issues that must be considered by a

court when deciding a request to transfer venue: 1)  the interest of justice and 2)  the convenience

of the parties.

### 1.  The Interests of Justice Dictate Transferring Venue

52.  The interests of justice standard is a "broad and flexible standard that must be

applied on a case by case basis."  *In re Eclair Bakery Ltd.*, 255 B.R. 121, 141 (Bankr. S.D.N.Y.

2000).  Accordingly, in determining whether the interests of justice factor supports the transfer of

venue, a variety of factors may be considered, including fairness and the integrity of the

bankruptcy system.  *Id.* at 142.

### a.  Dangers of Forum Shopping

53.  Transferring this case will serve the interest of justice as it would discourage

forum shopping, which is what Debtors attempted to do here.  In *In re Abacus Broadcasting

Corp.*, 154 B.R. 682 (Bankr. W.D. Tex. 1993), the court vehemently disavowed the debtor's

attempt to forum shop by filing its bankruptcy case in El Paso, Texas, even though its business,

radio stations, was conducted in Utah and its employees resided in Utah:.

> Then there is the issue of forum shopping.  How much deference
> should be given to a forum selected primarily by the lawyers for
> the debtors, for their own convenience or concern for
> remuneration?  How much deference should be given to a debtor's
> concern that it get what it perceives to be a "debtor's judge"?
> Whenever a creditor raises the venue question, none at all.  Forum
> shopping has never been favored by federal courts, and courts are
> quick to discern the evil in all its disguises.  In bankruptcy, too
> often the tactic is masked by pious pronouncements about the
> debtor's "right" to select the most advantageous of several possible

22

> forums, in order to advance the prospects of reorganization. That
> rationale, however, should in the usual instance, be taken with
> several grains of salt. Too many corporations with familiar
> household names are operating in bankruptcy under the name of
> some obscure subsidiary whose venue happens to coincide with
> either the debtor's or the debtor's lawyers perception of the most
> favorable judicial forum in which to operate.

*In re Abacus Broadcasting Corp.*, 154 B.R. at 686 (citations omitted). Given the courts'

discouragement of forum shopping, combined with the difficulty to the creditors in participating

in a distant court, this Court should transfer the case.

> b.  Interests of the Forum in the Matter

54.  Moreover, courts look to whether either forum (the current or prospective)

has an interest in seeing the bankruptcy adjudicated in its forum. *See, e.g., In re Enron Corp.*,

317 B.R. 629, 639 (Bankr. S.D.N.Y. 2004); *TIG Ins. Co. v. Smolker*, 264 B.R. 661, 668 (Bankr.

C.D. Cal. 2001). Here, the California State Agencies respectfully allege that the state of Texas

has ties to the Debtors only through Scotia Development's filing of limited liability papers just

months before the filing of these bankruptcy cases. Debtors ties have, for over 130 years, been in

California, which has substantial connection to Debtors and a significant regulatory authority in

their affairs.

55.  This Bankruptcy Case is important to the California State Agencies because

the Debtors may attempt to affect the terms by which PALCO agreed to abide under the

Headwaters Project Agreement. Further, this Bankruptcy Case involves and will require

substantial analysis of California's environmental laws and the duties the Debtors have under

these laws. In short, the California State Agencies suspect that this proceeding will test both the

authority of the regulatory agencies of the State of California to enforce its laws through its

police power and its ability to hold the Debtors to the agreements they made pursuant to the Headwaters Project Agreement. Further, the Debtors received $245.5 million in state money (plus another $250 million in federal money) as part of this agreement, an agreement they now claim hinders their operations. Given these facts, it should come as no surprise that the California State Agencies have a great interest in the adjudication of this Bankruptcy Case.

56. The Court should consider the public's interest in this case as well. The Debtors' activities on timberland greatly interest Californians – those who oppose timber harvesting, as well as those who believe harvesting supports California's economy. Timber harvesting, especially in Northern California, affects many lives and often implicates the balance between environmental and business interests. Californians, no doubt, will be interested in the outcome of this Bankruptcy Case as it affects the environment in which they live and the economy upon which they rely. As the Court can see, this case is of great importance not only to the California State Agencies, but also to businesses, environmental groups, and the public in general.

### 2. The Convenience of Parties Dictates Transferring Venue

57. As noted by the Court of Appeals for the Second Circuit, [t]he purpose of statutory venue requirements is to ensure that a case is filed in a forum that is convenient for the parties in interest. *United States of America v. Laird*, 412 F.2d 16, 20 (2d Cir. 1969). Courts balance several factors when determining the convenience of parties:

      a. The proximity of creditors of every kind to the court;

      b. The proximity of the debtor to the court;

      c. The proximity of witnesses necessary to the administration of

the estate;

d.  The location of the assets;

e.  The economic administration of the estate; and

f.  The necessity for ancillary administration if bankruptcy should

result.

*In re. Commonweath Oil,* 596 F.2d 1239, 1247 (5th Cir. 1979); *In re Pope Vineyards,* 90 B.R.

252, 255 (Bankr. S.D. Tex 1988).  An evaluation of all of these factors weighs in favor of

transferring these cases to the California Bankruptcy Court.

### a.  The Proximity of Creditors of Every Kind to the Court

58.  The first factor, the proximity of creditors to the Court, favors transfer.  As

described above, the California State Agencies regulate the day-to-day operations of Debtors,

which have the material assets and employees.  The California State Agencies also have claims

or potential claims against Debtors related to the Debtors' obligations arising from the

Headwaters Forest Project and under state law.  These state agencies are all headquartered in

Sacramento, California, with offices in specific regions, with the exception of the Regional

Board, which is headquartered in Santa Rosa, California.  Witnesses for the California State

Agencies who might be called to testify to matters pertinent to issues that arise in the bankruptcy

proceeding live in California and many reside within 100 miles from the California Bankruptcy

Court.

59.  Furthermore, the list of creditors submitted with Debtors' petitions shows that

most of the creditors reside in California, not Texas.  For example, 17 of the 20 largest unsecured

creditors listed on PALCO's list have California addresses.  No address is specified for EPIC or

Sierra Club, but the legal work relative to their 4.3 million dollar claim has been conducted by an attorney in Oakland, California. Likewise, no address is specified for the United Steelworkers of America, but their attorney is located in San Francisco, according to SCOPAC's list of 20 largest unsecured creditors. Of the remaining two creditors on PALCO's list, one has a Nevada address and one an Oregon address – none has a Texas address.

60. Similarly, 14 of SCOPAC's 20 largest unsecured creditors have California addresses, but none has Texas addresses. And 15 of Britt's 20 largest unsecured creditors reside in California, but none in Texas. Finally, even Scotia Development, the entity formed just 227 days before the Bankruptcy Case was filed, lists one California creditor with a $10,000 claim. Its other creditor, a Texas company is, on information and belief, a property management company that is leasing Scotia Development an office in a strip mall in Corpus Christi. On information and belief, the California State Agencies allege that this lease agreement is part of Scotia Development's attempt to establish itself as a resident of Texas solely for venue purposes.

61. Transferring the case to the California Bankruptcy Court would serve the convenience of the parties given the proximity of most of the creditors to that court, compared to the proximity of these creditors to this Court. As this Court found in *In re Pope Vineyards*, "The creditors are closer in proximity to a court in California than to a court in Texas. Consideration of this factor leads to the conclusion that venue is more proper in the Northern District of California than in the Southern District of Texas." (*In re Pope Vineyards*, 90 B.R. at 256.) In sum, transfer of the Bankruptcy Case is proper under this factor.

b. The Proximity of the Debtor to the Court

62. Transfer is proper considering the proximity of the debtors to the court as

well.  Here, PALCO, SCOPAC, Britt Lumber, and Salmon Creek all reside in Oakland, where the California Bankruptcy Court is located, while Scotia Inn resides in Scotia, California.  Only Scotia Development "resides" in Texas, where it has an office and a phone.  As stated above, the facts set forth in Debtors' own filings demonstrate that Scotia Development was formed for the purpose of establishing venue of a bankruptcy proceeding in this Court.  Again, as this Court determined in *In re Pope*, "[i]t is elementary to conclude that the debtor is closer in proximity to a court in its home district, the Northern District of California ... than to this district, the Southern District of Texas ..." (*Id.* at 256.)

c.  The Proximity of the Witnesses Necessary to the Administration of the Estate

63.  As five of the six Debtor-entities in the Bankruptcy Case reside in Northern California, the California State Agencies maintain, on information and belief, that most of the decision makers, managers, and employees who would be witnesses necessary to the administration of the estate also reside in Northern California.

64.  Entity records on file with the California Secretary of State further indicate that George O'Brien, President of Scotia Inn, is also located in California.  Thus, given this potential witnesses' address, transfer is proper.  *See State of Designation by Foreign Corporation*, Exh. D to Declaration of Tiffany Yee.

65.  Information available on PALCO's website, www.palco.com, indicates that George O'Brien became president of PALCO in July 2006.  *See Information from www.palco.com*, Exh. E to Declaration of Tiffany Yee.

66.  While the members, managers, or partners of SCOPAC are listed as having Texas addresses, the Court should still transfer the case in light of the other factors discussed.

27

On information and belief, the California State Agencies allege that most of the witnesses necessary to the administration of the case reside within a closer proximity to the California Bankruptcy Court than to this Court.[6] Thus, based on this factor, transfer is warranted.

### d.  The Location of the Assets

67.  The location of the Debtors' assets, the timberland and the lumber mill, is in Northern California.  Thus, transfer is proper considering this factor.

### e.  The Economic Administration of the Estate

68.  This factor is the most important consideration.  *Commonwealth Oil*, 596 F.2d at 1247; *In re Pope Vineyards*, 90 B.R. at 258.  Here, as in *In re Pope Vineyards*, the economic administration of the estate would be promoted by a transfer to California.  First, most of the creditors and, presumably, their representatives, are located in California.  Second, on information and belief, most of the witnesses for all parties most likely reside in California.  For the majority of the creditors and witnesses, traveling to the California Bankruptcy Court will take less time than traveling to this Court.  Thus, arranging agreeable hearing dates and times amongst all the parties will be easier if the case is transferred, and matters would most likely be decided more rapidly.  These California creditors and witnesses cannot easily appear at every meeting or hearing, nor can they easily appear to testify.  *In re Abacus Broadcasting Corp.,* 154 B.R. at 684.  Thus, transfer will lead to the most economic administration of the estate.

### f.  The Necessity for Ancillary Administration if Bankruptcy Should Result

69.  This Court determined this factor less important than the others.  The

---

[6] While the California State Agencies offer that the facts weigh heavily in favor of transferring venue, if the Court needs more information, the California State Agencies respectfully ask the Court for adequate time in which to conduct discovery on this issue.

California State Agencies do not have enough information to state whether Debtors will liquidate, but believes that such action is unlikely. And, as the Court stated in *In re Pope Vineyards*, "in the unlikely event of liquidation, the case would best be pending where the assets are located." *In re Pope Vineyards*, 90 B.R. at 259.

## CONCLUSION

70. For the reasons stated, the California State Agencies respectfully request that this Court transfer venue of the Bankruptcy Case to the United States Bankruptcy Court for the Northern District of California, Oakland Division. Additionally, the California State Agencies request that any requirement of a memorandum of law accompany any motion, be waived.

DATED: February 5, 2007

Submitted and prepared by:

Michael W. Neville
Tiffany Yee
Deputy Attorneys General
Office of the Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: 415/703-5523
Fax: 415/703-5480
E-mail: Michael.Neville@doj.ca.gov
          Tiffany.yee@doj.ca.gov

          -and-

Steven H. Felderstein
Paul J. Pascuzzi
Felderstein Fitzgerald Willoughby & Pascuzzi LLP
400 Capitol Mall, Suite 1450
Sacramento, CA 95814-4434
Telephone: 916/329-7400
Fax: 916/329-7435
E-mail: sfelderstein@ffwplaw.com
          ppascuzzi@ffwplaw.com