UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| In re | Jointly Administered |
| Scotia Pacific Development LLC, et al., | |
| Debtors-in-Possession. | Case No. 07-20027-C-11 |
| | Chapter 11 |

THIS PLEADING APPLIES ONLY TO
**SCOTIA PACIFIC COMPANY LLC**, CASE NO. 07-20032

**NOTEHOLDER COMMITTEE'S AMENDED NOTICE OF
MOTION AND NOTEHOLDER COMMITTEE MOTION FOR
(A) DETERMINATION THAT SCOTIA PACIFIC COMPANY LLC
IS A SINGLE ASSET REAL ESTATE DEBTOR, AND
(B) ORDER REQUIRING THAT SCOTIA PACIFIC COMPLY WITH THE
REQUIREMENTS OF BANKRUPTCY CODE § 362 (d)(3)**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 20 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

The motion is attached hereto.

Dated:  February 6, 2007

GARDERE WYNNE SEWELL LLP


By:    /s/ John P. Melko
    John P. Melko ( 13919600)
    1000 Louisiana, Suite 3400
    Houston, TX 77002-5007
    Telephone: (713) 276-5727
    Facsimile: (713) 276-6727

and

BINGHAM MCCUTCHEN LLP

    Evan D. Flaschen (304232)
    Gregory W. Nye (300188)
    Kurt A. Mayr (425858)
    One State Street
    Hartford, CT  06103-3178
    Telephone: (860) 240-2700
    Facsimile: (860) 240-2800

    *Attorneys for the Ad Hoc Committee of*
    *Timber Noteholders*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| IN RE: | § | **JOINTLY ADMINISTERED** |
| | § | |
| **SCOTIA DEVELOPMENT LLC, ET AL.,** | § | **Case No. 07-20027-C-11** |
| | § | |
| Debtors. | § | **Chapter 11** |

---

THIS PLEADING APPLIES ONLY TO
**SCOTIA PACIFIC COMPANY LLC**, CASE NO. 07-20032

---

**NOTEHOLDER COMMITTEE'S AMENDED MOTION FOR
(A) DETERMINATION THAT SCOTIA PACIFIC COMPANY LLC
IS A SINGLE ASSET REAL ESTATE DEBTOR, AND
(B) ORDER REQUIRING THAT SCOTIA PACIFIC COMPLY WITH
THE REQUIREMENTS OF BANKRUPTCY CODE § 362(d)(3)**

From Bankruptcy Code § 101(51B):

> The term "single asset real estate" means ***real property constituting a single property or project*** … which generates substantially all of the gross income of a debtor … and on which ***no substantial business is being conducted by a debtor other than the business of operating the real estate and activities incidental***.

From Scotia Pacific Company LLC's ("**Scopac**") first day affidavit and SEC filings:

> Scopac owns about 200,000 acres of timberland and has the exclusive right to harvest timber on about 12,000 additional acres of timberland owned by Palco and its affiliates.   ...  Palco performs the actual harvesting [of Scopac's timberland].... Scopac primarily pays the obligations owing under the Timber Notes with proceeds of timber sales from the harvesting of its timber.... Scopac derives substantially all of its revenue from the sale of logs to Palco.

Combining the foregoing:

> Scopac's ***only asset*** is a real property project consisting of timberland and timber rights.  Scopac's ***only business*** and ***only source of income*** is the sale of its timber.  Scopac's ***primary purpose*** is to pay the obligations owing under the Timber Notes.

In short, ***Scopac is a textbook example of a single asset real estate debtor.***

The Ad Hoc Committee of Timber Noteholders (the member of which, as of the date hereof, hold, in the aggregate, more than 90% in principal amount outstanding of the Timber Notes, the "**Noteholder Committee**")[1] in the above captioned chapter 11 case, respectfully submits this amended motion (the "**Motion**") seeking (1) a determination that Scopac is a "single asset real estate" debtor within the meaning of Bankruptcy Code § 101(51B) and (2) an order requiring that Scopac comply with the requirements of Bankruptcy Code § 362(d)(3).  In support of this Motion, the Noteholder Committee submits the following:

## BACKGROUND

### A.   Scopac Was Formed for the Sole Purpose of Issuing the Timber Notes

1.     The Pacific Lumber Company ("**Palco**") desired to raise substantial funding.  In order to do so, Palco created a "special purpose" subsidiary—Scopac—and transferred to Scopac approximately 200,000 acres of "virtually contiguous" timberlands in Humboldt County in Northern California (and the contractual right to harvest on approximately 12,000 more acres of timberland owned by its affiliates) (collectively, the "**Timberland**").[2]

---

[1]   The current members of the Noteholder Committee include:  Angelo, Gordon & Co. L.P., on behalf of certain managed accounts and funds; Avenue Investments, L.P.; Avenue International, Ltd.; Avenue Special Situations Fund III, L.P.; Avenue-CDP Global Opportunities Fund, L.P. US; Avenue Special Situations Fund IV, L.P.; Banc of America Securities, Inc.; Camulos Master Fund LP; CarVal Investors LLC; Citigroup Global Markets Inc.; CSG Investments, Inc.; Deutsche Bank Securities Inc.; D. E. Shaw Laminar Portfolios, L.L.C.; Davidson Kempner Capital Management LLC, on behalf of certain affiliated investment funds; funds managed by GSO Capital Partners LP; Intermarket Corp.; J.P. Morgan Securities Inc.; Lehman Brothers Inc.; Murray Capital Management (on behalf of certain managed accounts and funds); Northeast Investors Trust; Par IV Capital; Phoenix Investment Partners; Plainfield Special Situations Master Fund Limited; QDRF Master Ltd; QVT Financial LP; RockView Capital; and TCW Credit Mortgage.  Undersigned counsel to the Noteholder Committee will shortly be filing the statement required to be filed by Bankruptcy Rule 2019.

[2]   *See* Affidavit of Gary L. Clark In Support of First Day Motions (Docket #11, the "**Clark Affidavit**") at ¶¶ 5-7 ("Scopac is a special purpose Delaware limited liability company . . . organized by Palco in May 1998 to facilitate the sale of certain collateralized notes.").  The Clark Affidavit is attached as Exhibit A to the Declaration of Kurt A. Mayr In Support of Ad Hoc Committee of Timber Noteholders' Motion For (A) Determination That Scotia Pacific Company LLC Is a Single Asset Real Estate Debtor, and (B) Order Requiring That Scotia Pacific Comply With the Requirements of

2.      Through this transfer of the Timberland, Palco created a stand-alone subsidiary that could then borrow funds in the capital markets on a "pure play" basis, meaning that investors in the $876 million of timber collateralized notes issued by Scopac (the "**Timber Notes**") were assured that they were making an investment solely tied to the Timberland, that Scopac would conduct no business other than the sale to Palco parties of the right to harvest the Timberland, and that Scopac would have no material creditors other than the investors in the Timber Notes and a small bank facility (see below) for cash management purposes. *See* Clark Affidavit at ¶¶ 5-7.

3.      Without this special purpose structure, Palco/Scopac would either have been required to pay a much higher interest rate on the Timber Notes or been simply unable to raise $867 million in the first instance.

4.      The Timber Notes "are senior secured obligations of Scopac" and were structured to be repaid through the income generated by the Timberland through the harvesting and sale of timber. *See id.* at ¶ 5 ("Scopac primarily pays the obligations owing under the Timber Notes with proceeds of timber sales from the harvesting of its timber."), ¶ 17 ("The Timber Notes were structured to link . . . the deemed depletion of [the Timberland] to the required amortization of the Timber Notes.").

5.      According to the Stand & Poor's Global Timber Property Securitizations report (May 1, 2003) (the "**S&P Report**"), the Scopac timber securitization was the first of its kind, which spearheaded the market for timber securitizations. *See* Mayr Decl., Ex. B (S&P Report) at

---

Bankruptcy Code § 362(d)(3) (the "**Mayr Declaration**" or "**Mayr Decl.**"), which the Noteholder Committee is filing contemporaneously with this Motion. *See also* Mayr Decl. Ex. C (Scopac 10-K dated March 14, 2006) ("The Company owns . . . approximately 204,000 acres of virtually contiguous commercial timberlands in Humboldt County along the northern California coast.").

3

2 ("The first rated timber securitization was a publicly rated issuance by Scotia Pacific LLC.").

The S&P Report describes the purpose and market expectation of such transactions as follows:

> The sponsor of the transaction [i.e., Palco] is usually a timber or forest products concern that wants to diversify its funding options, to seek low-cost, long-term financing, or to avail itself of off-balance-sheet financing....   In a timber securitization, the requisite timberland is purchased from the sponsor by an SPE [or "special purpose entity"] that is a wholly or partially owned subsidiary of the sponsor.  The purchase price is funded by the proceeds of a debt offering by the SPE....   The debt is secured by the land and the revenues to be derived from the timber harvests over the life of the debt.  The sponsor may enter into a management agreement with the SPE on arm's-length terms to operate and manage the timberland....   The objective of the transaction is to allow timber-generated cash flow to service the rated debt, even under stress scenarios....   The transaction's legal framework should work to isolate the cash from the credit risk of the sponsor....
>
> [T]he timber business only requires limited management compared with a manufacturing or service business.  Activities include seed selection, replanting, fertilization, pruning, brush clearing, harvest planning, and sales.  In the timber business, purchasers are responsible, often at their own expense, for the harvesting and removal of product under the supervision of the sponsor.

S&P Report at 1-2.

6.      As noted above, Scopac also has a senior secured bank line of credit (the "**Line of Credit**"), based on the fact that the interest payments on the Timber Notes were payable only twice a year.  Palco pays Scopac in the ordinary course of business for Palco's harvesting of the Timberland, and it would be economically expensive and inefficient to save the cash for six months until needed to make a Timber Note interest payment.  Instead, Scopac drew down on the Line of Credit when it needed to make an interest payment on the Timber Notes, then periodically repaid the Line of Credit on a current basis as it received payments from Palco.  *See* Clark Affidavit ¶¶ 20-22 ("Advances under the Line of Credit are used to finance up to one year's interest payments due on the Timber Notes.").

4

B.    **Scopac's Sole "Business" Is To Own the Timberland and Pay the Timber Notes**

7.    As a special purpose timber securitization entity, Scopac's sole business purpose is to hold title to the Timberland and to make payments on the Timber Notes through the income generated by the Timberland.  While Scopac describes its "business" as simply the "harvesting of timber from [the Timberland] and the selling of its timber to Palco," its business is actually even more limited than that—as Scopac admits, Palco performs all of the actual business of harvesting and removing the timber from the Timberland.  *Id*. ¶ 5 ("Palco performs the actual harvesting . . .and converts the logs into marketable timber.").

8.    In fact, Scopac's limited liability agreement (the "**LLC Agreement**") and the indenture for the Timber Notes (the "**Indenture**") expressly restrict Scopac's business to the limited purpose of collecting income generated by the Timberland (and other potential related timberland assets) to pay down the Timber Notes and the Line of Credit and actions "incidental thereto."[3]  Section 2.5 of the LLC Agreement, entitled "Purposes and Powers", provides:

The purpose of the Company is

(i) the operation, management, sale and maintenance of the Company Owned Timberlands, the Company Timber Rights and the Company Timber as provided by the Operative Documents,

(ii) the execution, delivery and performance of the Operative Documents, the Line of Credit Agreement and the new Additional Services Agreement,

(iii) issuing and selling Timber Notes and any Additional Timber Notes pursuant to the Indenture,

(iv) issuing any Nonrecourse Timber Acquisition Indebtedness and acquiring property secured by such Nonrecourse Timber Acquisition Indebtedness,

(v) acquiring Additional Timber Property,

---

[3]  The LLC Agreement and the Indenture are attached as Exhibits D and E, respectively, to the Mayr Declaration.

(vi) sales of Company Owned Timberlands, Company Timber Rights or Company Timber or transfers of Company Owned Timberlands or Company Timber Rights in exchange for Substitute Timber Property in accordance with the procedures set forth in Article 6 of the Indenture, and

(vii) *actions reasonably incidental to the foregoing* which do not, individually **or** in the aggregate, have a Material Adverse Effect.

Notwithstanding any other provision of this Agreement, the Certificate of Formation, and any provision of law that otherwise so empowers the Company, *for so long as any Timber Notes, any Additional Timber Notes or any Indebtedness under the Line of Credit Agreement shall remain outstanding, the Company shall not engage in any business or activity other than those set forth* in this Section 2.5 and those otherwise permitted by the Indenture.

Mayr Decl. Ex. D (emphasis added; clauses broken out for convenience of review)

9.      Similarly, § 4.14 of the Indenture, entitled "No Other Business", <u>prohibits</u> Scopac

from engaging in any business beyond that contemplated by the LLC Agreement:

Except for sales of Company Owned Timberlands, Company Timber Rights or Company Timber or transfers of Company Owned Timberlands or Company Timber Rights in exchange for Substitute Timber Property in accordance with the procedures set forth in Article 6 of this Indenture, *the Issuer will not engage in any business that is not related directly to* (i) the operation, management, sale or maintenance of the Company Owned Timberlands, the Company Timber Rights and the Company Timber as provided by the Operative Documents, (ii) the execution, delivery and performance of the Operative Documents, the Line of Credit Agreement and the New Additional Services Agreement, (iii) issuing and selling Timber Notes and any Additional Timber Notes pursuant to this Indenture, (iv) issuing any Nonrecourse Timber Acquisition Indebtedness and acquiring property secured by such Nonrecourse Timber Acquisition Indebtedness, (v) acquiring Additional Timber Property or (vi) *actions reasonably incidental to the foregoing* which do not, individually or in the aggregate, have a Material Adverse Effect.

Mayr Decl., Ex. E (emphasis added).

10.     Thus, when Scopac solicited the investors for the Timber Notes, it's prospectus

succinctly described itself as:

…a special purpose Delaware limited liability company, [that] was organized by Pacific Lumber to facilitate the Offering [of the Timber Notes] and is wholly owned by Pacific Lumber. *The business of [Scopac] is limited to the ownership and operation of the Mortgaged Property*, the issuance and sale of the Timber Notes, the purchase of certain additional properties (which may be subject to certain non-recourse purchase money

6

indebtedness), the issuance of certain additional debt secured by the Mortgaged Property *and matters incidental thereto*.

Mayr Decl. Ex. F (Form S-4 dated Sept. 21, 1998) at 22 (emphasis added). And the prospectus later states that Scopac "is a special purpose ... company established to facilitate the offering of the Timber Notes, and as of the date of this Prospectus, has no material assets other than the Mortgaged Property." *Id.* at 93. This is still the case today. *See* Clark Affidavit ¶ 21 (describing Scopac's assets).

11.    Scopac's public disclosures relating to the Timber Notes (including its 1998 SEC registration statement and every annual 10-K filing since that date) have uniformly represented that Scopac "derives *substantially all of its revenue* from the sale of logs to Palco."[4]  *See also* S&P Report at 7 ("Substantially all of the [Scopac] transaction's revenues are derived from the sale of harvested timber to its parent.").

12.    The only reason that Scopac has any non-ministerial employees at all is "forest stewardship," for which it employs a small number of foresters, wildlife and fisheries biologists, and botanists to protect the Timberland from "forest fires, erosion, insects and other damage" and to "oversee[] reforestation activities and implement[] and monitor[] environmental and regulatory compliance." *See* Mayr Decl., Ex. C (10-K dated March 14, 2006); Clark Affidavit

---

[4]  *See* Mayr Decl. (Ex. C) (10-K dated March 14, 2006) ("[Scopac] derives substantially all of its revenue from the sale of logs to Palco."); *Id.* (Ex. G) (10-K dated March 16, 2005) (same); *Id.* (Ex. H) (10-K dated March 30, 2004) (same); *Id.* (Ex. I) (10-K dated March 31, 2003) (same); *Id.* (Ex. J) (10-K dated April 1, 2002) ("[Scopac] derives substantially all of its revenue from the sale of logs to Pacific Lumber."); *Id.* (Ex. K) (10-K dated March 30, 2001) (same); *Id.* (Ex. L) (10-K dated March 13, 2000) (same); *Id.* (Ex. M) (10-K dated March 31, 1999) (same); *Id.* (Ex. F) (Form S-4 dated September 21, 1998) ("It is expected that the Company will continue to derive substantially all of its revenue from the sale of logs to Pacific Lumber."); *Id.* (Ex. N) (Form 424B3 dated March 22, 1999 Supplement to Prospectus, at S-8) ("Substantially all of the Company's revenues have been and are expected to continue to be derived from the sale of logs harvested from the Company Timber….").

7

¶ 45.[5]  In addition, Scopac maintains a "GIS" computer database regarding the Timberland.  *See*

*id.  See generally* S&P Report at 2 ("[T]he timber business only requires limited management

compared with a manufacturing or service business….  In the timber business, the purchasers of

the product are often responsible, often at their own expense, for the harvesting and removal of

product under the supervision of the sponsor.").

13.    The harvesting and other activities performed by Palco's employees on the

Timberland are not attributable to Scopac.  Indeed, the parties expressly agreed in their contracts

regarding the sale of timber that "[Palco], at its own expense agrees to cut and remove [the

timber]" and "all employees, agents, contractors and subcontractors hired by [Palco] to perform

any obligations of [Palco] hereunder [(i.e., the harvest and removal of timber and maintenance of

Timberland)] shall not be deemed to be the employees, agents, contractors and subcontractors of

[Scopac]."  *See* Mayr Decl. Ex. O (New Master Agreement, dated July 20, 1998) at §§ 7.1 &

9.1.; *id.* Ex. P  (Agreement for Lump Sum Purchase of Company Timber, dated Jan. 10, 2006) at

§§ 6.1 & 8.1.

14.    Moreover, Scopac was designed to be a "bankruptcy remote" entity such that a

bankruptcy of Palco should not necessarily cause a bankruptcy of Scopac.  *See* S&P Report at 7

(describing Scopac as a "bankruptcy-remote wholly owned subsidiary" of Palco).

**C.    Scopac's Bankruptcy Pleadings Reinforce
That Scopac is a Single Asset Real Estate Debtor**

15.    Scopac's filings in this Court further evidence the special purpose and limited

"single asset" nature of its operations.  Scopac has not requested any of the relief that one would

expect for significant chapter 11 operating debtor with almost $1 billion of liabilities.  Aside

from seeking relief to pay $242,173 of prepetition employee claims, Scopac has not sought any

---

[5]    Scopac's SEC filings have included a virtually identical description of Scopac's "forest
sterwardship" activities regarding the Timberland.  *See* Mayr Decl. Exs. F -M.

further typical first-day relief from this Court (e.g., freight and shipper payments, prepetition tax payments, DIP financing etc), although Scopac has just filed a critical vendor motion that seeks authority to pay $198,000 primarily to professionals that it employs to assist in its "forest stewardship" activities (e.g., preparing regulatory reports and the "GIS" software licensor).

16.     Scopac's filings also clearly demonstrate that the claims of secured creditors under the Timber Notes and the Line of Credit (which, according to Scopac, together amount to $750 million) dwarf the amount of unsecured claims in this case.  According to Scopac, its twenty largest unsecured creditors hold claims totaling $13.2 million.  *See*  Mayr Decl., Ex. Q (Scopac List of 20 Largest Unsecured Creditors).  However, $13 million of this amount relates to three disputed litigation/judgment creditor claims, while the other 17 creditors hold *small unsecured claims totaling only $169,549.94*.  If Scopac's critical vendor relief is granted, the already tiny purported unsecured creditor class should virtually disappear.

17.     According to Scopac, its chapter 11 filing was necessitated by the fact that it could not generate sufficient income from the Timberland to cover its repayment obligations under the Timber Notes.  *See* Clark Affidavit ¶¶ 10, 38.  Faced with a potential default under the Timber Notes, Scopac admittedly "*commenced this chapter 11 case to avoid foreclosure proceedings by the indenture trustee of the Timber Notes*."  *Id.* ¶ 10 (emphasis added).

## **ARGUMENT**

18.     This is a "single asset real estate" case that is subject to the fast-track procedure mandated by Congress pursuant to Bankruptcy Code § 362(d)(3).  As a threshold matter, the Noteholder Committee observes that Scopac bears both the burden of production and persuasion that it is *not* a "single asset real estate" debtor subject to § 362(d)(3).  *See* 11 U.S.C. § 362(g) (party opposing request for relief from stay under § 362(d) has burden of proof on all issues

9

other than debtor's equity in property"); *In re 234-6 West 22nd St. Corp.*, 214 B.R. 751, 765 (Bankr. S.D.N.Y. 1997) (noting that after party-in-interest makes "prima facie case" then burden is on debtor "to go forward with evidence . . . [as well as] the burden of ultimate persuasion."); *In re Domestic Fuel Corp.*, 70 B.R. 455, 459 (Bankr. S.D.N.Y. 1987)(same).  As demonstrated below, based upon its own numerous admissions, Scopac cannot possibly meet this burden.[6]

## A.      Scopac is a Single Asset Real Estate Debtor

19.      This case is unquestionably a "single asset real estate" case as that term is defined in Bankruptcy Code § 101(51B).  Under the definition as relevant here, the real property at issue must (a) constitute a "single property or project," (b) that "generates substantially all of the gross income of a debtor," (c) on which "no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental." *Id*   Scopac satisfies all three elements.

20.      *First*, Scopac is a "special purpose" vehicle established for the purpose of holding ownership to, and collecting gross income generated by, the Timberland.  Scopac admits that the Timberland consists of more than 200,000 "virtually contiguous" acres and it therefore clearly constitutes a "single project" within the meaning of § 101(51B).  It is irrelevant that, for title purposes, the Timberland technically comprises more than one parcel of land, because the parcels are operated as a single project under a common plan to sell timber.  Courts construe the term "single property or project" to apply to situations where the debtor's sole asset is a group of

---

[6]  While single asset real estate cases frequently involve developed land and residential property, the legal concept is equally applicable to raw land.  *See In re KKEMKO, Inc.*, 181 B.R. 47, 51 (S.D. Ohio 1995) (single asset real estate includes raw land); *In re Prairie Hills Golf & Ski Club*, 255 B.R. 228, 229 (Bankr. D. Neb. 2000) (same); *In re Oceanside Mission Assoc.*, 192 B.R. 232, 235-36 (Bankr. S.D. Cal. 1996) ("Interpreting the statute to exclude raw land does not appear to serve the purpose of the statutory scheme."); H.R. Rep. No. 109-31, 109th Cong. 1st Sess. (2005) (statement regarding 2005 amendment to "single asset real estate" definition that "[a]s the name implies, the principal asset in this type of case consists of some form or real estate, such as undeveloped land.").

buildings or properties that are commonly operated as a single property or project by the debtor. *See In re Cambridge Woodbridge Apartments*, LLC, 292 B.R. 832,834, 839 (Bankr. N.D. Ohio 2003) (holding 180 separate apartment units divided among 15 buildings to be "single asset real estate"); *In re Philmont Dev. Co.*, 181 B.R. 220, 225 (E.D. Pa.) (1995) (debtor's ownership of group of semi-detached houses held to be "single project" because "[t]o do otherwise would render the phrase 'single project' ... inoperative"); *In re KKEMKO,* 181 B.R. at 51 (stating that Congress intended "single asset real estate" definition to mean "a building or buildings which were intended to be income producing, or raw land" (emphasis added)); *In re 83-84 116th Owners Corp.*, 214 B.R. 530 (Bankr. E.D.N.Y. 1997) (debtor's ownership of co-operative housing project held to be "single asset real estate"); *The Whitfield Co. v. Tad's Real Estate Co., Inc. (In re Tad's Real Estate Co., Inc.)*, 1998 WL 34066143, at **1-2 (Bankr. S.D. Ga. Mar. 23, 1998) (64 lots with five rented houses constitutes "single asset real estate" under 11 U.S.C. § 101(51B)); *see also Commercial Real Estate Defaults, Workouts, and Reorganizations*, SJ076 ALI - ABA 525 (Jan. 2004) (noting that courts "hold[] that separate parcels, if used together, will be covered by the [single asset real estate] definition."); John J. Rapisardi, *Scope of "Single Asset Real Estate" Cases Under the Bankruptcy Code*, 235 N.Y.L.J.  (Jan. 23, 2006) ("[E]ven debtors with diverse ownership structures may be unable to avoid 'single asset real estate' treatment as some courts have found that multiple properties owned by the same debtor nevertheless may constitute a 'single project' within the meaning of § 101(51B).").   Evidence of a single project can be found where, as here, the real property investments are made with the same financing source.  *See In re Philmont*, 181 B.R. at 224 (noting that single loan for investment in series of semi-detached houses evidences "single project").

11

21.      **Second**, Scopac has consistently admitted that the revenue derived from the Timberland generates "substantially all" of Scopac's revenue (and therefore its gross income as well).  *See supra* n.4 and accompanying text.  Similarly, Scopac's ownership of certain real property rights to harvest timber from another 12,000 acres owned by its affiliates is also part of a "single project" pursuant to which Scopac generates income derived from the sale of timber harvested from real property.

22.      **Third**, Scopac does not conduct any substantial business on the Timberland other than the business of operating the real property and activities incidental.  Based upon Scopac's own public disclosures it is clear that all Scopac does is "operate" the Timberland by permitting Palco to harvest and sell the timber from the land.  It does nothing else.  In fact, Scopac's own organizational document—the LLC Agreement—and the Indenture pursuant to which it issued the Timber Notes, both expressly ***prohibit*** Scopac from engaging in any other business, and not a single Scopac public filing or Scopac bankruptcy pleading has ever asserted that Scopac has engaged or could engage in any other business.

23.      Upon closer inspection, Scopac's activities are actually even more limited.  As required by the LLC Agreement and the Indenture, Scopac has entered into agreements pursuant to which Palco performs all essential activities for the harvest and maintenance of the Timberland, including the removal of timber, maintenance of roads and all other regulatory and legal activities related thereto.  Scopac on the other hand, has simply entered into contracts with Palco (and affiliates) for the sale of timber and maintenance of the Timberland.  Otherwise all Scopac does is simply perform "forest stewardship" activities which relate to monitoring and preserving the real property to the extent that those activities are not already performed by

12

Palco.[7]  Even if Scopac itself actually performed the essential activities of harvesting the timber, it would clearly still only engage in the business of operating the property for profit as contemplated by § 101(51B) of the Bankruptcy Code.  However, here it is even clearer because Scopac performs only the most minimal "forest stewardship" activities and has entered into contracts to passively generate income from the Timberland.  Indeed, Scopac and Palco have contractually agreed that the activities of Palco's employees is not attributable to Scopac.  *See supra* ¶ 13.

24.     The limited services that Scopac performs for Palco under the Additional Services Agreement (*see* Clark Affidavit ¶ 27 (describing agreement)) is not a business distinct from Scopac's operation of the Timberland to generate income.  "The issue under section 101(51B) is not whether the debtor in possession "conducts a business" in connection with the project, but whether that business is ***substantial*** or not."  *In re 83-8 116th Owners Corp.*, 214 B.R. 530, 533 (Bankr. E.D.N.Y. 1997) (emphasis in original).  Scopac admits that these incidental activities are performed at cost and therefore do not amount to any substantial portion of Scopac's business.  *See* Clark Affidavit ¶ 27 ("The Additional Services Agreement provides that Palco shall pay Scopac a fee for such services equal to Scopac's actual cost of providing such services….").  More importantly, these services are simply part of the overall consideration that Scopac provides to Palco as part of its "business" of selling timber to Palco.

25.     Accordingly, Scopac is a "single asset real estate" debtor within the meaning of Bankruptcy Code § 101(51B) of the Bankruptcy Code.

---

[7] The fact that Scopac has contractual rights regarding the operation of the real property for profit does not affect its qualification as a "single asset real estate" case.  Virtually all single asset real estate cases involve debtors who have entered into contracts with third parties in connection with their business of generating income from the real property/project (e.g., landlords enter into leases with tenants and contracts with property managers).

**B.**     **The § 362(d)(3) "Fast Track" Applies to this Case**

26.     Section 362(d)(3) of the Bankruptcy Code codifies a clear Congressional policy that "single asset real estate" cases should not obstruct actions by secured creditors against such real property unless the debtor strictly complies with the requirements of that section.  Section 362(d)(3) mandates that

> the court **shall** grant relief from the stay ... with respect to a stay of an act against single asset real estate under subsection (a) by a creditor whose claim is secured by an interest in such real estate, **unless**, not later than the date that is 90 days after the entry of the order for relief ... or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later,
>
> (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or
>
> (B) the debtor has commenced monthly payments ... in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate.

11 U.S.C. § 362(d)(3) (emphasis added).

27.     Congress enacted § 362(d)(3) -- and its statutory sibling, § 101(51B) -- as part of the Bankruptcy Reform Act of 1994 (Pub. L. No. 103-394) to "provide special circumstances under which creditors of a single asset real estate debtor may have the stay lifted…." 140 Cong. Rec. H. 10,764 (daily ed. Oct. 4, 1994) (floor statement regarding section 218 of the Bankruptcy Reform Act of 1994); David B. Young, *Overview of Changes to the Automatic Stay Under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005*, 887 PLI/COMM. 441, 454 (April 24-25, 2006) ("The Bankruptcy Reform Act of 1994 sought to address the problems of single asset real estate Chapter 11 filings, which some courts have viewed as ***especially prone to abuse, if not abusive per se***." (emphasis added)).

28.     Indeed, single asset real estate cases are often found to be classic bad faith bankruptcy filings subject to dismissal under § 1112(b) of the Bankruptcy Code.  *See*, *e.g.*, *In re*

14

*C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1310 (2d Cir. 1997) (dismissing single asset real estate case pursuant to § 1112(b)).  The Noteholder Committee reserves its right to move for dismissal or abstention of Scopac's chapter 11 case (or take any other action necessary to protect their interests) if the Court's ruling on this Motion does not provide sufficient relief to protect the interests of the holders of the Timber Notes.

29.     Section 362(d)(3)'s primary purpose is to place single asset real estate cases "on an expedited track." *In re Philmont*, 181 B.R. at 223; *see In re KKEMKO, Inc.*, 181 B.R. 47, 49 (Bankr. S.D. Ohio 1995) (same); *In re Oceanside Mission Assoc.*, 192 B.R. 232, 235 (Bankr. S.D. Cal. 1996) ("Sections 101(51B) and 362(d)(3) are designed to require debtors with 'single asset real estate' to act in an expedited fashion.").  It is designed "to afford secured creditors a relatively easy way to obtain relief from stay: all they have to do is show that the debtor has failed to perform under 362(d)(3) rather than engaging an appraiser and fighting over value." *In re Oceanside*, 192 B.R. at 238.

30.     To further advance this policy, Congress recently expanded the scope of § 362(d)(3) by eliminating a prior condition under § 101(51B) that excluded all debtors with secured claims exceeding $4 million.  *See* COLLIER ON BANKRUPTCY ¶ 362.07[5][a] (1996) (noting that 2005 amendments eliminated $4 million cap).  The House Report relating to this amendment observed that this change was specifically designed to sweep larger cases into the expedited relief applicable to single asset real estate cases in order to prevent bankruptcy abuse such as what Scopac is attempting here:

> A single asset real estate chapter 11 case presents special concerns.... The largest creditor in a single asset real estate case is typically the secured lender who advanced funds to the debtor to acquire the real property.  Often a single asset real estate debtor resorts to filing for bankruptcy relief for the sole purpose of staying an impending foreclosure proceeding or sale commenced by the secured lender.  Foreclosure actions are filed when the debtor lacks sufficient cash flow to service the debt and maintain the property....  If unsecured

15

creditors exist, they have only nominal claims against the single asset real estate debtor....
The present $4 million cap prevents the use of the expedited relief procedure in many
commercial property reorganizations, and effectively provides an opportunity for a
number of debtors to abusively file for bankruptcy in order to obtain the protection of the
automatic stay against their creditors.  As a result of this amendment, creditors in more
cases will be able to obtain the expedited relief from the automatic stay which is made
available under § 363(d)(3) of the Bankruptcy Code.

H.R. Rep. No. 109-31, 109th Cong. 1st Sess. (2005);  *See* COLLIER ON BANKRUPTCY

¶ 362.07[5][b] (2006) ("The purpose of section 362(d)(3) is to address perceived abuses in single

asset real estate cases, in which debtors have attempted to delay mortgage foreclosures even

when there is little chance that they can reorganize successfully."); John J. Rapisardi, *Scope of*

*"Single Asset Real Estate" Cases Under the Bankruptcy Code*, 235 N.Y.L.J. (Jan. 23, 2006)

("As a result of a simple change to the definition of 'single asset real estate' ... even large

reorganizations involving heavily leveraged debtors with substantial real estate holdings may be

subject to the 'fast track' SARE proceedings.").[8]

31.    Section 362(d)(3) recognizes that chapter 11 is not to be used to permit

speculation in real estate at the expense of secured lenders.  *See In re 234-6 West 22nd St. Corp.*,

214 B.R. 751, 760 (Bankr. S.D.N.Y. 1997) ("[A] debtor shows [its] bad faith when it uses

bankruptcy protection for risk-free speculation in the single [real estate] asset.").  Not only does

this case squarely fit within the definition of a single asset real estate case and therefore

automatically qualify for § 362(d)(3) expedited relief, the circumstances of this case also present

the precise scenario that Congress sought to address in its recent amendment:  (a) Scopac is a

debtor whose only substantial asset is a real property project that it generates substantially all of

its income; (b) Scopac has pledged this real property as security for its secured debt, which

---

[8]    At least one jurist has found "single asset real estate" cases to present such unique
circumstances that he suggested that they should be removed from Chapter 11 entirely and placed into a
new simplified and expedited bankruptcy proceeding under a new chapter to title 11.  *See* The Honorable
Alexander L. Paskay, *Reorganizing Single Asset Real Estate*, AM. BANKR. INT. L. REV. 538 (Winter
1996).

16

dwarfs the amount of purported unsecured claims against Scopac's estate; (c) the income that Scopac derives from this asset has declined so that it is unable to meet its obligations to secured creditors; and (d) Scopac admittedly filed this action to prevent foreclosure.  This is a classic two-party dispute that does not belong in bankruptcy and is unquestionably eligible for "fast-track" treatment to avoid any further injury to the legitimate interests and expectations of Scopac's secured lenders.  *See In re C-TC 9th Ave. P'Ship*, 113 F.3d at 1311-12 (holding that filing single asset real estate bankruptcy that is really a two party dispute filed to avoid foreclosure with no meaningful unsecured creditors constitutes "bad faith" abuse of bankruptcy process).

**C.     Scopac Has No Basis for Denying that § 362(d)(3) Applies**

32.     At the January 24, 2007 interim cash collateral hearing, the Noteholder Committee's counsel first alerted this Court that this Motion would be forthcoming.  Scopac responded that it was not a single asset real estate debtor because, in addition to owning the Timberland, it owned "timber harvesting rights" as to some Palco timberland.  As noted above, the issue isn't whether a debtor owns a single parcel of land or a single type of real estate.  The focus is whether Scopac operates a "single project" and derives "substantially of its gross income" from that project.  Scopac's income is solely derived from selling the right to harvest timber, and the fact that a few of the trees are apparently owned by Palco is irrelevant, particularly when the Timber Notes are secured by those very timber rights in addition to the Timberland itself.  Indeed, California law explicitly recognizes that harvest rights appurtenant to timber, like the timber itself, constitute "real property" under California law.  *See*, *e.g.*, Cal. Rev. & Tax. Code § 104; Cal. Code Regs. Tit. 18, § 121 ("real property" includes "all standing timber

whether planted or of natural growth and whether or not owned by the owner of the land … and any rights or privileges that are appurtenant to standing timber….").

33.     Scopac will presumably argue that, in effect, its case is too large and complicated for it to be realistic for Scopac to file a plan within 90 days of the petition date (as required by § 362(d)(3)(A)) "that has a reasonable possibility of being confirmed within a reasonable time." Scopac may couple this with a "promise" that it intends to market the Timberland for sale and a request that it should be given the time to do so because it will somehow be in "everyone's" best interests.  But Bankruptcy Code § 362(d)(3) is mandatory, not permissive.  *See Nationsbank v. LDN Corp. (In re LDN Corp.)*, 191 B.R. 320, 327 (Bankr. E.D. Va. 1996)("[R]elief under section 362(d)(3) [is] mandatory where its provisions are not strictly complied with"); *In re Pensignorkay*, 204 B.R. 676, 683 (Bankr. E.D. Pa. 1997) (same); COLLIER ON BANKRUPTCY ¶ 362.07[5] (stating that stay relief "must be granted" unless § 362(d)(3) requirements are complied with and noting that "legislative intention was to terminate the stay when the debtor neither proposes a viable plan nor makes payments to the secured party."); Rapisardi, *supra* ("[C]ourts generally have lifted the stay when the debtor failed to accomplish either of [the § 362(d)(3)] alternative[s] within the governing period.").

34.     Even if § 362(d)(3) were not permissive, Scopac simply cannot be heard to complain that it should be given more time.  In fact, Scopac has actually had at least 2 years to market the Timberland or to develop a plan of reorganization with its lead counsel, Gibson, Dunn & Crutcher, which "[s]ince February 9, 2005" has been employed "in connection with [Scopac's] restructuring ***and the possible commencement of this Chapter 11 case***."  *See* Docket No. 153 (Scopac's Application to Employ Gibson, Dunn & Crutcher LLP, filed February 1, 2007), at ¶ 25 (emphasis added).  Scopac also retained Texas bankruptcy counsel more than 7

months ago specifically in anticipation of a chapter 11 filing in this very Court, as evidenced by Scopac's initial retention of Porter & Hedges "on June 27, 2006 to assist the company in connection with its restructuring efforts with its creditors *and a potential chapter 11 filing*." *See* Docket No. 154 (Scopac's Application to Retain Porter & Hedges, L.L.P., filed February 1, 2007), at ¶ 22.

35.     Scopac may also argue that its business is too intertwined with Palco to reorganize Scopac independently.  Nonsense.  Scopac grows trees -- that's it.  Whether Scopac is owned by Palco or by Scopac's secured creditors, the trees will still grow.  And whether the newly independent Scopac seeks to sell the harvesting rights to its trees to Palco or to one of the many other lumber mills in or near Humboldt Country, Scopac will still be able to operate its business.  *See* S&P Report at 2 ("Standard & Poor's understands that timber property management and forestry services are readily available in the marketplace.").  And even if Scopac's secured creditors decide to do nothing other than let the trees grow for a few years while they seek to repair the relationships with the California regulators, legislators and environmental organizations that Palco has utterly destroyed, they should be entitled to do so. That's what the "single asset real estate" provisions are all about—the debtor should either pay the secured creditors currently, propose a quickly confirmable plan, or turn over the keys and let the secured creditors decide for themselves what they want to do with their collateral.

36.     Palco and Scopac seek to position themselves as the victims of overzealous regulators, legislators and environmental "tree huggers."    In fact, all of the California constituents agree that *responsible, sustainable harvesting of Scopac's Timberlands is a good thing*, not an evil, as Palco is one of the largest employers in Humboldt County.  The key words, however, are "responsible" and "sustainable," and what the California constituents strenuously

19

object to is *over*-harvesting of new-growth timber and *irresponsible* harvesting of old-growth timber, particularly Scopac's ancient redwood stands:

> In the years since the 1985 takeover of [Palco] by Charles Hurwitz and Maxxam, that Texas company has reaped huge benefits by logging off California's valuable redwoods, by selling off [Palco's] assets, by reducing worker's benefits, and by profiting half a billion dollars from the Headwaters Deal purchase of Headwaters Reserve, the 7500-acre protected area.  With all that money, they could have paid off their junk bond debt; they could have re-instituted sustainable logging on their 200,000 acres and ensured jobs and saw timber in perpetuity.  But they didn't.  They sent the money to Houston, not Humboldt. The light at the end of the tunnel is that the company could emerge from reorganization to be a Hurwitz-free and Maxxam-free company capable of making better business decisions than those that benefit only 5 people at the top.

*Pacific Lumber files for Bankruptcy*, January 19, 2007, available at http://www.headwaterspreserve.org/html/updates_update_66.html.

20

WHEREFORE, the Noteholder Committee respectfully requests that this Court grant this Motion and issue an order (a) determining Scopac to be a "single asset real estate" debtor within the meaning of Bankruptcy Code § 101(51B) of the Bankruptcy Code, (b) requiring that Scopac strictly comply with the requirements of Bankruptcy Code § 362(d)(3), and (c) granting such other relief as the Court deems just and appropriate under the circumstances.

Dated:  February 6, 2007                    GARDERE WYNNE SEWELL LLP


                                            By:____/s/ John P. Melko_____
                                                John P. Melko (13919600)
                                                1000 Louisiana, Suite 3400
                                                Houston, TX 77002-5007
                                                Telephone: (713) 276-5727
                                                Facsimile: (713) 276-6727

                                            and

                                            BINGHAM MCCUTCHEN LLP

                                                Evan D. Flaschen (304232)
                                                Gregory W. Nye (300188)
                                                Kurt A. Mayr (425858)
                                                One State Street
                                                Hartford, CT  06103-3178
                                                Telephone: (860) 240-2700
                                                Facsimile: (860) 240-2800

                                            *Attorneys for the Ad Hoc Committee of Timber Noteholders*


CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of February, 2007 a true and correct copy of the foregoing instrument was forwarded to all parties listed on the attached Service list.

                                            /s/ John P. Melko_____
                                            John P. Melko

21