UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| SCOTIA DEVELOPMENT LLC, *et al.* | § | Case No.  07-20027-C-11 |
| | § | Jointly Administered |
| Debtor. | § | (Chapter 11) |

**SCOTIA PACIFIC COMPANY LLC'S RESPONSE AND OBJECTION TO
MOTIONS TO TRANSFER VENUE
[Related Docket Nos. 184, 231, 293 and 294]**

Scotia Pacific Company LLC ("Scopac") files this Response and Objection to Motions to

Transfer Venue (the "Response") and in support thereof respectfully states as follows:

## I. <u>SUMMARY OF ARGUMENT</u>

1.      The motions to transfer venue currently before the Court are unfounded and based

upon (i) a misapprehension of the location of Scopac's principal place of business and (ii) a

misplaced focus on the location of Scopac's primary assets to the exclusion of all other facts.

Motivating such filings are the questionable claims, if any, possessed by the members of the

Committee and the California State Agencies (each as defined herein) and, more importantly, the

questionable motives behind the venue dispute.  Further, the glaring omission in each motion is

any reference to the Noteholders in this case, who represent the single largest category of claims

in excess of $700 million secured by substantially all prepetition assets of Scopac.  The inability

to continue to service+e such debt and the liquidity issues facing Scopac and its affiliates

contributed to the current financial crisis.  This financial crisis can only be resolved by a

financial restructuring of Scopac.  Resolution of the Noteholders' claims will be one of the most

critical elements of Scopac's plan of reorganization.  This is a case of national scope, with much

wider implications than the purely localized concerns raised by the Movants.  The negotiation of

Scopac's restructuring will be effected by Scopac's Board of Managers (the "Scopac Board"), as provided in Scopac's organizational documents.  The Scopac Board is located in the Southern District of Texas, as are each of its constituent members.  If the object of a chapter 11 case is the reorganization of the debtor, then the interests of all the parties, governmental or otherwise, are best served by retaining venue of Scopac's case in the location where the restructuring efforts will occur.  Venue of Scopac's pending chapter 11 case is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1408 and transfer of the case is neither in the interests of justice, nor for the convenience of the parties.  Accordingly, the motions to transfer venue must be denied.

## II. <u>BACKGROUND</u>

2.     On January 18, 2007 (the "Petition Date"), Scopac filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

3.     Scopac continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.     Scopac is a special purpose Delaware limited liability company wholly owned by The Pacific Lumber Company ("Palco").  Scopac was organized by Palco in May 1998 to facilitate the sale of certain collateralized notes (the "Timber Notes").  Scopac also has a secured revolving credit facility with Bank of America, which is available to pay up to one year's interest on the Timber Notes (the "Scopac Line of Credit").  Scopac owns about 200,000 acres of private timberland (the "Scopac Timberlands") and has the exclusive rights to harvest timber on about 12,000 additional acres of private timberland owned by Palco and its affiliates (the "Scopac

Timber Rights").[1]   The Scopac Timber Property is collateral for the Timber Notes and the Scopac Line of Credit.  Part of Scopac's business is the sale of logs harvested from the Scopac Timber Property, which logs have historically been sold exclusively to Palco pursuant to a New Master Purchase Agreement described below.  Palco harvests the timber, transports the logs, directly or through subcontractors, and converts the logs into marketable lumber in sawmills owned by Palco and a subsidiary of Palco.  Scopac primarily pays the obligations owing under the Timber Notes with proceeds of these log sales.

5.     As of the Petition Date, there are approximately $714 million of Timber Notes outstanding, as well as approximately $36 million of additional secured revolving credit debt outstanding under the Scopac Line of Credit.  As a result of increasing regulatory restrictions and limitations on the harvesting of its timber since this debt was issued in 1998, Scopac's revenues have been significantly reduced and its operating costs have increased.  Accordingly, even though Scopac has reduced its outstanding Timber Notes from $867 million in 1998 to $714 million, its cash flow from operations are not sufficient to service its semi-annual interest payments on the Timber Notes.

6.     Scopac's annual interest payments on the Timber Notes alone are approximately $54 million.  The timber industry in general and Scopac's operations specifically have become increasingly unpredictable and negatively impacted by substantial and expanding regulatory constraints, ongoing litigation challenges, additional legislative impacts, negative judicial decisions, adverse weather, and low log prices.

---

[1]  The timber in respect of the Scopac Timberlands and the Scopac Timber Rights is collectively referred to as the "Scopac Timber" and the timberlands in respect of the Scopac Timber are referred to as the "Scopac Timber Property."

7.     Scopac has also been negatively impacted by:  (i) litigation relating to the harvesting practices on the Scopac Timber Property and the approval of Scopac's timber harvest plans ("THPs"), which must be approved before Scopac Timber can be harvested; and (ii) regulatory and legislative burdens and limitations imposed by the California North Coast Regional Water Quality Control Board (the "North Coast Water Board") and State Water Board that are different from and in addition to the requirements under the habitat conservation plan ("HCP") approved as part of the Headwaters Agreement (as defined below).

8.     Palco also wholly owns Scotia Development LLC, a Texas limited liability company ("SDLLC"), Salmon Creek LLC ("Salmon Creek"), Britt Lumber Co., Inc. ("Britt"), and Scotia Inn Inc. ("Scotia Inn") (collectively, the "Debtors").  Palco is a wholly owned subsidiary of MAXXAM Group Inc. ("MGI").  MGI is an indirect wholly owned subsidiary of MAXXAM Inc., a publicly traded corporation ("MAXXAM").  MGI, Palco, SDLLC, Britt, Salmon Creek, Scotia Inn and Scopac make up MAXXAM's forest products group, which operates in several principal aspects of the forest products industry — the growing and harvesting of redwood and Douglas-fir timber, the milling of logs into lumber and the manufacture of lumber into a variety of finished products and marketing products and assets held for sale.  Housing, construction and remodeling are the principal markets for the lumber products of Palco and Britt.

9.     Although Scopac and its affiliate debtors are members of the same corporate family, pursuant to its Agreement of Limited Liability Company dated July 1, 1998 (the "Scopac LLC Agreement") and the Indenture governing the Timber Notes (as supplemented and now in effect, "the "Indenture"), Scopac carefully maintains its separateness from Palco and other

affiliates.[2]  In addition, prior to the Petition Date, the Scopac Board had a special committee of Independent Managers with full authority and power, among other things, to take all actions and exercise all powers of the Board with respect to transactions or actions of Scopac that involved a conflict of interest, whether actual or apparent, between Palco and Scopac (the "Special Committee").[3]

10.    Scopac maintains extensive business relationships with Palco.  These business relationships have been formalized through several written agreements pursuant to which Scopac sells logs to Palco, Palco renders a variety of services to Scopac, and Scopac renders certain services to Palco.  The various written agreements that govern the business relationships and dealings between Scopac and Palco include, but are not limited to: (i) the New Master Purchase Agreement between Scopac and Palco (governing the sale to Palco by Scopac of logs harvested from the Scopac Timber; the "Purchase Agreement"); (ii) the New Services Agreement (the "Services Agreement") and the New Additional Services Agreement (the "Additional Services Agreement") between Palco and Scopac (pursuant to which Palco provides a variety of operational, management and related services to Scopac with respect to the Scopac Timber Property, and Scopac provides certain services to Palco); (iii) the New Environmental Indemnification Agreement between Palco and Scopac (providing for the indemnification of Scopac by Palco for certain environmental liabilities incurred in connection with the Scopac Timber Property); and (iv) the New Reciprocal Rights Agreement among Palco, Scopac and

---

[2] The Indenture is dated July 20, 1998 and is by and between Scopac and The Bank of New York, as successor trustee (the "Trustee"), pursuant to which Scopac issued $867.2 million in aggregate principal amount of Timber Notes, which were issued in three classes:  6.55% Series B Class A-1 Timber Collateralized Notes due 2028 (the "Class A-1 Notes"), 7.11% Series B Class A-2 Timber Collateralized Notes due 2028 (the "Class A-2 Notes") and 7.71% Series B Class A-3 Timber Collateralized Notes due 2028 (the "Class A-3 Notes").  The holders of the Timber Notes are collectively referred to as the "Noteholders".

[3] As of the Petition Date, the board was reduced to three members, two of whom are outside Independent Managers, who make any conflict decisions.

Salmon Creek (providing for reciprocal rights of ingress and egress through, and a number of other rights in respect of, the parties' respective properties).

11.     Scopac depends on the real estate expertise provided by SDLLC to sell certain timberland properties, as well as various non-timberland properties, such as ranch lands and recreational areas to generate additional liquidity.

12.     Beginning in or around June 2005 through September 2005, Scopac expended considerable effort in an unsuccessful attempt to restructure the Timber Notes through negotiations with a group of Noteholders and its professionals.  Scopac has also engaged in continuous, but unsuccessful, efforts to obtain relief and accommodation from various regulatory actions that have substantially reduced its timber harvest and increased its costs.  Scopac has also engaged in a systematic process of reducing expenditures by laying off employees and scaling back and/or shutting down operations.  However, it is limited in its ability to further reduce its operating costs absent a restructure of the Timber Notes or significant regulatory relief that would result in an immediate and substantial increase in harvest levels.

13.     Prior to the Petition Date, Scopac initiated a land sale program to sell certain timberland properties, as well as various non-timberland properties, such as ranch lands and recreational areas (the "Land Sale Program") and enlisted real estate experts employed by one of its affiliated companies, MCO Properties Inc. (providing services to Scopac through SDLLC), to lead these sales efforts.  Proceeds of the Land Sale Program assisted Scopac in making the July 2006 interest payment, but did not produce sufficient funds to permit Scopac to make the next interest payment under the Timber Notes, due on January 20, 2007.

14.     Scopac did not have the ability to make the payment on the Timber Notes due on January 20, 2007, and it filed its voluntary petition for relief, following the filing by SDLLC, in the Southern District of Texas.

### III.  MOTIONS TO TRANSFER VENUE

15.     On February 5, 2007, the California Resources Agency, the California Department of Forestry and Fire Protection, the California Department of Fish and Game, the California Wildlife Conservation Board, the California Regional Water Quality Control Board, North Coast Region, and the State Water Resources Control Board (collectively, the "California State Agencies") filed their Motion to Transfer Venue (Docket No. 184) asserting that venue in the Southern District of Texas is improper and that venue should be transferred to the Northern District of California, Oakland Division (the "California State Agencies' Motion").

16.     On February 8, 2007, the Official Unsecured Creditors' Committee (the "Committee") filed its Motion to Transfer Venue of the Debtors' Bankruptcy Cases to the United States Bankruptcy Court for the Northern District of California, Oakland Division (Docket No. 231) (the "Committee's Motion").

17.     On February 14, 2007, the United States Trustee (the "UST") filed a Motion to Transfer Cases to the Northern District of California (Docket No. 293) (the "UST Motion").[4]

18.     On February 14, 2007, LaSalle Bank National Association ("LaSalle") filed its Response to the California State Agencies and Committee Motion to Transfer Venue and Motion Pursuant to Bankruptcy Local rule 1014 for Intradistrict Transfer (Docket No. 294) (the "LaSalle Motion").  The LaSalle Motion asserts that the Debtors' cases are properly filed in the Southern

---

[4] The California State Agencies, the Committee and the UST are collectively referred to herein as the "Movants." The California State Agencies' Motion, the Committee's Motion and the UST Motion and the joinders by certain governmental agencies and entities are collectively referred to herein as the "Motions to Transfer Venue."

District of Texas, but requests that they should be transferred intradistrict to the Houston Division.

### IV.  <u>VENUE IS PROPER IN THE SOUTHERN DISTRICT OF TEXAS</u>

19.     Venue in chapter 11 cases is governed by 28 U.S.C. § 1408.  Pursuant to section 1408(1), the venue of a chapter 11 case is proper when the case is commenced in the district in which the debtor is domiciled or maintains its principal place of business.  In pertinent part, the statute provides:

> Except as provided in section 1410 of this title, a case under title 11 may be commenced in the district court for the district –
>
> (1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement…

28 U.S.C. § 1408(1).

20.     Accordingly, Scopac could have properly filed its bankruptcy case in any of the following locations: (i) the District of Delaware (Scopac's domicile); (ii) the Southern District of Texas (Scopac's principal place of business); or (iii) the Northern District of California (location of Scopac's principal assets).  After consideration of each of these alternatives, Scopac elected to file in the Southern District of Texas.[5]  As described in more detail below, venue is proper in the Southern District of Texas because it is the location of (i) Scopac's principal place of business and (ii) SDLLC's domicile and principal place of business.  Contrary to the allegations of the Movants, the Southern District of Texas was not chosen to prejudice any creditor or to avoid any particular forum.

---

[5]  A debtor's choice of venue is given substantial deference.  *In re Manville Forest Products Corp.*, 896 F.2d 1384, 1391 (2d Cir. 1990) (district in which the case is pending is presumed to be correct district).

A.   **SCOPAC'S PRINCIPAL PLACE OF BUSINESS IS LOCATED IN THE SOUTHERN DISTRICT OF TEXAS**

21.     When determining where a debtor's principal place of business is located, courts have utilized the "major business decisions" test.  Such test focuses on the place where the debtor's significant business decisions are reached.  *In re Peachtree Lane Assocs., Ltd.*, 206 B.R. 913, 918 (N.D. Ill. 1997).  Other courts have stated that a corporate debtor's principal place of business is generally considered the location of the "nerve center" or the "financial heart" of the business.  *See In re Oklahoma City Assocs.*, 98 B.R. 194, 198 (Bankr. E.D.  Pa. 1989) (citing *In re Dock of the Bay, Inc.*, 24 B.R. 811, 814-15 (Bankr. E.D.N.Y. 1982); *In re Lakeside Utilities*, 18 B.R. 115 (Bankr. D. Neb. 1982)).  This has been held to be so even where the physical location of the Debtor's assets is elsewhere.  *In re Landmark Capital Co.*, 19 B.R. 342, 347 (Bankr. S.D.N.Y. 1982) ("[T]he place where the debtor makes its major business decisions constitutes the principal place of business of a debtor, notwithstanding the physical location of its assets or production facilities").

22.     In *Peachtree*, the Seventh Circuit stated that the debtor's principal place of business is the place where the debtor conducts the "most important, consequential, or influential" business.  *In re Peachtree Lane Assocs., Ltd.*, 150 F.3d 788, 793 (7th Cir. 1998) (citing *Comm'r of Internal Revenue Service v. Soliman*, 506 U.S. 168, 174 (1993)).

23.     Determining the location of Scopac's principal place of business is a question of fact.  *Matter of Commonwealth Oil Refining Co.*, 596 F.2d 1239, 1241 (5th Cir. 1979).  It is the Movants' burden to prove that Scopac's major business decisions are made in a location other than the Southern District of Texas.  *Peachtree*, 206 B.R. at 923.

24.     In a case nearly identical to the one at bar, the Fifth Circuit in *Commonwealth* held that the debtor's principal place of business was San Antonio, Texas, regardless of the fact

that the debtor's primary asset – a refinery – was located in Puerto Rico. *Commonwealth*, 596 F.2d at 1241. Similar to the Movants in this case, the Government of Puerto Rico and the Puerto Rico Water Resources Authority moved to transfer venue asserting that the debtor's principal place of business was Puerto Rico. *Id.* In denying the motion to transfer venue, the bankruptcy court and the Fifth Circuit noted that most of the debtor's important decision makers lived in San Antonio, Texas, not Puerto Rico. *Id.* at 1242. The court also held that the location of a debtor's assets was not particularly relevant to the analysis of the principal place of business. *Id.* at 1246.

25.     In *Commonwealth*, the Fifth Circuit noted the importance of retaining venue in the location where the financial restructuring would take place and where the persons who will make the key decisions in such restructuring are located:

> a corporate arrangement or reorganization is primarily a financial proceeding. The debtor is maintained as a going enterprise and its finances are put back in order. Where the corporation transacts its corporate business is a logical place for venue in such proceedings.

*Id.* (citation omitted).

26.     The heart of Scopac's chapter 11 case will be formulation and negotiation of a plan of reorganization. The people charged with that responsibility – the managers on the Scopac Board – are located in the Southern District of Texas. While Scopac's day-to-day operations are handled in California, the true "nerve center" of its business – Scopac's Board - is located in the Southern District of Texas. It is the Southern District of Texas, rather than the Northern District of California, in which the financial reorganization of Scopac will occur. *See id.* at 1246-47 (noting that "general supervision of a corporation's business can constitute a corporation's principal place of business").

27.     Scopac's management and governance is controlled by the Scopac LLC Agreement. Scopac's business and affairs are managed under the direction of the Scopac Board.

Scopac LLC Agreement at § 3.1.  The Scopac Board has three members: J. Kent Friedman, Jack M. Webb, and Sid C. Weiss.  Mr. Webb and Mr. Weiss are the Independent Managers (who formerly constituted the Special Committee).  All members of the Scopac Board reside in the Southern District of Texas.

28.     Scopac's LLC Agreement specifically provides that the Scopac Board has exclusive authority over and must approve certain important business decisions including: (i) incurring any indebtedness, (ii) consolidating or merging into another entity, (iii) selling substantially all of the assets, (iv) filing bankruptcy, (v) amending the Scopac LLC Agreement, (vi) admitting or permitting withdrawal of any member, and (vii) dissolving or liquidating the company.  Scopac LLC Agreement at § 3.3.  The Scopac Board is responsible for final approval and control of Scopac's operations, including significant deviations from Scopac's normal operations.

29.     Such managerial dichotomy is reflected in Scopac's cash management systems.  Scopac has seven bank accounts, but only two are located in California.  These California accounts are only allotted $400,000.00 per month to be used for paying Scopac's daily operating expenses and payroll.  Scopac's other five accounts are maintained with the Bank of New York in Dallas, Texas.  All of Scopac's significant debt obligations to the Noteholders and Bank of America are paid through these accounts in Dallas, Texas.  *See* Scopac's Emergency Motion for an Order Authorizing Continued Use of (1) Bank Accounts; (2) Cash Management System; (3) Investment Policy; and (4) Business Forms at ¶¶ 27 – 31.

30.     In addition to the activities described above, Scopac receives a significant amount of general administrative service and support from MAXXAM and certain other non-debtor affiliates, all of which are headquartered in the Southern District of Texas.  Specifically,

individuals at MAXXAM and other non-debtor affiliates have provided since Scopac's inception, and continue to provide, assistance to Scopac in the following areas:

- Legal Services
  - Minutes and other corporate secretary services
  - Contracts and agreements (drafting and review)
  - Loan documents (drafting and review)
  - Litigation monitoring and coordination
  - Assistance with Confidential Information Memoranda
  - Maintenance and document retention of key contracts and financing documents
- Risk Management Services
  - Evaluation of restructuring and liquidity alternatives
  - Financial modeling and analysis
- SEC reporting and compliance
  - Preparation of Scopac 10-K, 10-Qs, Form 8-Ks and other 1934 Act reports
  - Debtors' compliance with Sarbanes-Oxley Act requirements (§ 404, etc.)
  - External and internal auditor coordination
- Accounting Services
  - Technical accounting assistance
  - Assistance with quarterly and annual closings
  - Assistance with accounting for employee benefits (Workers Comp, OPEB and Pension)
  - Accounting for income taxes
  - Assistance with preparation of Palco/Britt stand-alone financial statements
  - Assistance with preparation of Palco Retirement Plan financial statements
- Income Tax Reporting and Compliance Services
  - Preparation of consolidated federal income tax returns
  - Coordination of income tax agency inquiries and audits
- Treasury and Cash Management Services
  - Monitoring and maintenance of investment accounts
  - Correspondence and coordination with Scopac Indenture Trustee
  - Correspondence and coordination with Marathon
  - Coordination of Letters of Credit issuances and renewals
  - Coordination of bank accounts
  - Coordination of Indenture Trustee changes
- Real Estate Expertise
  - Assistance with Scopac Land Sale program
  - Assistance with Palco Asset Sale program
  - Consultation regarding conversion of company-owned town
  - Consultation regarding home financing alternatives
- Insurance Services
  - Coordination and purchasing of insurance policies including workers' compensation, auto, liability, property and director and officer insurance
  - Coordination of insurance claims processing services and monitoring

- o Cost allocation services
- Benefits
  - o Coordination with Fidelity regarding 401(k) plan
  - o Coordination with Fidelity regarding pension matters
  - o Preparation of Form 5500s related to employment benefit plans
  - o Formulation of benefit alternatives

31. As noted above, the MAXXAM non-debtor affiliates have also provided support to Scopac in connection with its Land Sale Program. As the harvest levels of Scopac's timber reached all time lows in or about 2005, revenues began to suffer a similar decline. It became apparent to Scopac that it would not be able to satisfy its debt obligations to the Noteholders. To raise additional capital in order to make the required interest payments to the Noteholders, Scopac initiated its Land Sale Program with the goal of selling certain non-strategic timberlands and other real property.

32. Scopac did not have the personnel or the internal expertise to effectuate the Land Sale Program; therefore, in 2006, certain personnel from MAXXAM's real estate group began to assist Scopac with the Land Sale Program. These employees are all located in the Southern District of Texas, and the services they provide to Scopac are carried out through MAXXAM's Houston office and, subsequent to its formation, SDLLC.

33. Similar types of asset sales may be critical components of Scopac's plan of reorganization, and the business decisions and work relating to those sales will be performed by the Scopac Board and others located in the Southern District of Texas.

34. The Debtors, which constitute MAXXAM's forest products group, are one of MAXXAM's largest investments and MAXXAM has significant interest in the Scopac bankruptcy case. Scopac is not just the owner and operator of timberlands, but an investment of MAXXAM. MAXXAM's investment in Scopac is also deserving of recognition and a factor to be considered by this Court. *Peachtree*, 206 B.R. at 924.

35.     The business decisions made by the Scopac Board and the services provided by MAXXAM and its non-debtor affiliates in the Southern District of Texas are precisely the type of activities that courts analyze to determine a debtor's principal place of business.  *See Peachtree*, 150 F.3d at 791 (the court held that the debtor's principal place of business was in Illinois because the executives located there had final budgetary approval, made decisions regarding the debtor's largest secured creditor, and decided that the debtor should file bankruptcy); *Commonwealth*, 596 F.2d at 1242-43 (the Fifth Circuit found the debtor's principal place of business to be San Antonio because the people in charge of operations in Puerto Rico did not have authority to "substantially deviate" from production schedules, preparation of tax returns and financial reports was handled in San Antonio, and the people responsible for the negotiations of a potential work-out were located in San Antonio); *In re Eagle Pointe, Ltd.* 350 B.R. 84, 90 (Bankr. N.D. Ind. 2006) (the bankruptcy court found the debtor's principal place of business to be in Indiana where final budget approval was made, where financing decisions were made, and where the debtor's formation documents provided that critical decisions were to be made).

36.     Based on the foregoing, it is clear that the Southern District of Texas is the "most important, consequential, or influential" place where Scopac conducts its business.  It is here where Scopac's major business decisions are made and it is here where the "financial heart" of Scopac's business is located.  Therefore, venue is proper in such district pursuant to 28 U.S.C. § 1408.

**B.** **V**ENUE FOR **SDLLC** IS **P**ROPER IN THE **S**OUTHERN **D**ISTRICT OF **T**EXAS

37.     The Movants contend, without statutory support, that SDLLC's venue in the Southern District of Texas is improper, indeed, an alleged "sham."   Such assertions are unfounded and ignore the language of the venue statutes.

38.     Section 1408(2) provides that "a case under title 11 may be commenced in the district court for the district in which there is pending a case under title 11 concerning such person's affiliate,[6] general partner or partnership."  28 U.S.C. § 1408(2).

39.     It is undisputed that SDLLC is a Texas limited liability company with its principal place of business at 921 North Chaparral, Suite 104, Corpus Christi, Texas 78401.  The principal place of business has been in Corpus Christi, Texas since June 5, 2006.  Accordingly, venue of SDLLC's chapter 11 case is proper in the Southern District of Texas.

40.     Scopac is wholly owned by Palco.  Palco owns SDLLC, Salmon Creek, Britt, and Scotia Inn.  Palco is a wholly owned subsidiary of MGI, which is an indirect wholly owned subsidiary of MAXXAM.

41.     Scopac, Palco, Salmon Creek, Britt and Scotia are all affiliates of SDLLC.

42.     As an affiliate of SDLLC, venue of Scopac's chapter 11 case is proper in the Southern District of Texas.

---

[6] Pursuant to section 101(2) of the Bankruptcy Code, an "affiliate" includes:

> (A) an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor; and

> (B) a corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor.

11 U.S.C. § 101(2)(A) and (B).

43.     The Movants allege that SDLLC was created to "manufacture" venue in the Southern District of Texas.  This is incorrect.  In early 2006, South Texas was identified as a viable real estate market by MAXXAM's real estate arm when it began looking for viable projects along the eastern coast of South Texas.  At the same time, Scopac's Land Sale Program became an increasingly important part of Scopac's debt service plan, but Scopac lacked the real estate expertise necessary to execute the land sales.  SDLLC was formed to identify real estate opportunities in the South Texas market and to assist Scopac (and Palco) with its Land Sale Program.

44.     The cases cited by the California State Agencies also fail to support their position that the Debtors' cases were filed in the Southern District of Texas for an improper purpose.  The lead case cited by the California State Agencies, *In re Columbia Western, Inc.*, 183 B.R. 660 (Bankr. D. Mass. 1995), has no applicability to the present request to transfer venue.   In *Columbia Western*, the court held that the debtor filed its case in an improper district because its domicile, residence, principal place of business and assets were all located in the District of Oregon during a greater portion of the 180 days preceding commencement of the case. *Columbia Western*, 183 B.R. at 662.  The remainder of the court's analysis focused on whether it had the power to retain the case even if venue was improper.  *Id*.  The court did not discuss the improper purpose arguments.

45.     In the remaining cases cited in their motion, the California State Agencies rely upon misplaced quotes wholly removed from their proper context.  A more complete review of these cases demonstrates their inapplicability to the matter before the Court.  *See In re L.F. Popell Co.*, 221 F. Supp. 534 (S.D.N.Y 1963) (*Popell* is case decided under the Bankruptcy Act in which the court held venue was improper because the debtor's domicile and principal place of

business were located in Florida); *In re Handel*, 242 B.R. 789 (Bankr. D. Mass. 1999) (*Handel* is

a chapter 7 case in which the court denied a creditor's motion to transfer venue and its motion to

stay pending appeal because the debtor had established his residence in Massachusetts); *In re*

*McTague*, 198 B.R. 428 (Bankr. W.D.N.Y. 1996) (*McTague* involved an analysis of 11 U.S.C. §

109 to determine if the debtor had enough "property" in the United States to qualify as a debtor

under the Bankruptcy Code); *Bank of America, N.T. & S.A. v. World of English, N.V.*, 23 B.R.

1015, 1023 (N.D. Ga. 1982) (the court held that the eligibility requirements of 11 U.S.C. § 109

were satisfied by the debtors); *In re Scott Cable Commc'ns, Inc.*, 263 B.R. 6 (Bankr. D. Conn.

2001) (the court transferred venue *sua sponte* because the Internal Revenue Service brought a

post-confirmation adversary proceeding in Connecticut to equitably subordinate certain claims

even though the debtor's bankruptcy case was pending in Delaware); *In re Taflan*, 312 B.R. 588

(N.D. W. Va. 2004) (the court dismissed a chapter 13 case stating that venue was improper when

the debtor was domiciled and resided in Ohio); *In re Sorrells*, 218 B.R. 580 (10th Cir. BAP

1998) (the bankruptcy appellate panel reversed the bankruptcy court and held that venue was

improper in the Western District of Oklahoma because the debtors had no connection to the

Western District of Oklahoma).

46.     Similarly, the cases of *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir.

1988) and *In re Yukos Oil Co.*, 321 B.R. 396 (Bankr. S.D. Tex. 2005), cited by the Committee,

do not support the argument that Scopac's filing in the Southern District of Texas was made in

bad faith.  In *Piccadilly*, the court dismissed the bankruptcy case as a bad faith filing because the

debtor admittedly filed in order to take whatever actions it could to forestall a pending

foreclosure on its single asset.  *Piccadilly*, 849 F.2d at 1395.  The debtor also admitted that the

case was filed in Florida to prejudice the secured creditors located in Kentucky.  *Id*.  The factors

considered by the court in *Piccadilly* are not applicable to this case. Scopac and its affiliate Debtors own numerous assets, have numerous secured and unsecured creditors, and have hundreds of employees as opposed to the debtor in *Piccadilly*. *Id*. at 1395. Scopac's real property was not the subject of an immediate foreclosure and the intent of the bankruptcy filing was not to delay or frustrate the secured creditors as the debtor admitted in *Piccadilly*. *Id*.

47.     This case is also dramatically different from the dynamics presented in *Yukos*. In *Yukos*, the bankruptcy court held that Yukos was a proper debtor under section 109 of the Bankruptcy Code over which the bankruptcy court had jurisdiction. *Id*. at 407. In such case, the debtor filed its voluntary petition for relief in the Southern District of Texas after transferring $480,000 to an account in Texas one week before the filing. *Yukos*, 321 B.R. at 402. The filing came on the heels of the arrest of Yukos' chief executive officer and the retroactive assessment of $27.5 billion in taxes by the Russian government. *Id*. at 401. While the court found that the section 109 eligibility requirements were satisfied, based on the totality of the circumstances, the bankruptcy court dismissed the *Yukos* case, citing to the act of the state doctrine and issues of comity as justification for its actions. *Id*. at 411. None of those matters have any application here.

48.     The cases cited by the Movants do not support their position that venue in the Southern District of Texas is a sham or that SDLLC is a "phone booth debtor." The evidence shows that SDLLC was created to explore and facilitate development opportunities with respect to commercial, industrial and residential properties in California and Texas as well as to (i) assist Scopac with respect to its Land Sale Program and (ii) assist Palco in the work required to enable Palco to sell homes and other property in Scotia, California. Following SDLLC's formation in June 2006, it opened an office in Corpus Christi, Texas, which had been identified as the primary

area of interest for future acquisitions and development.  SDLLC believes that the real estate along the Texas Gulf Coast is under-priced when compared to other coastal regions in the United States and the substantial development taking place in such areas.  SDLLC (and other non-debtor affiliates prior to the formation of SDLLC) have explored investment opportunities in this region resulting in SDLLC's execution of two option contracts for real estate along the Texas Gulf Coast.

49.    SDLLC also entered into a Development and Sales Assistance Agreement with Palco and a Sales and Marketing Assistance Agreement with Scopac, each dated September 1, 2006 (collectively, the "Development Agreements").  The Development Agreements contemplate that SDLLC will, from time to time, provide assistance in marketing Scopac's and Palco's timberlands and other real property for sale or other disposition.

50.    It is clear that SDLLC was formed for a legitimate business purpose aimed at maximizing Scopac's financial options and identifying a new real estate market.  It was not created to prejudice any particular creditor or to gain an advantage in any certain venue.  The language of section 1408 is clear - venue of SDLLC's case is proper in the Southern District of Texas.

## C.    THE INTENT OF 28 U.S.C § 1408

51.    The United States Supreme Court has stated that statutory analysis must begin with the language of the applicable statute.  *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (stating "Congress 'says in a statute what it means and means in a statute what it says there'") (citing *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992)).

52.      In this case, section 1408 clearly provides for venue in the Southern District of Texas.  By alleging that such venue is improper, the Movants have not asked the Court to interpret the venue statute, but to rewrite it.  However, when Congress has refused to act, courts cannot legislate in its place.  *United States Lines, Inc. v. United States (In re McLean Indus.)*, 196 B.R. 670, 677 (S.D.N.Y. 1996) (stating "Congress [has] spoken by its silence, [and] this Court is not empowered to rewrite the statute").

53.      In drafting section 1408(1), Congress made its intentions very clear.  The statute provides that venue is proper (i) in the district of the debtor's principal place of business, (ii) in its state of incorporation (domicile), or (iii) in the district of the location of the debtor's principal assets.  *See* 28 U.S.C. § 1408(1).  If Congress intended proper venue to be only where the debtor's assets, employees, creditors or books and records are located, it would have said so in the statute.  Congress clearly intended to allow a debtor to choose its venue from a number of options.

54.      Likewise, in section 1408(2), Congress expressly allows a debtor to select the same venue of an affiliate's case even if none of the debtor's employees, books, records, or assets are located in the district where such affiliate case was filed.  *See* 28 U.S.C. § 1408(2).

55.      Any inference from the Movants that Congress intended to place limitations on venue beyond what is outlined in the statute is without merit or support.  Congress recently devoted considerable time and resources to substantial revision of the Bankruptcy Code.  Despite such sweeping changes, the venue provisions were left unchanged.

56.      Finally, section 1412 does nothing to refute the presumption that a debtor, over the objection of its creditors, can prosecute its chapter 11 case in a venue other than where its headquarters, senior officers, and books and records are located.  If Congress intended to confer

the automatic right to transfer venue, section 1412 would read that the court "shall" transfer a case to such venue on request of a party in interest.  The Bankruptcy Code does not contain such language.

57.    If Scopac and the other debtors have complied with section 1408, which they have in this case, the only remedy available to the Movants is found in 28 U.S.C. § 1412 (relating to venue transfer and discussed below).

### V.    <u>TRANSFER IS NOT APPROPRIATE UNDER 28 U.S.C. § 1412</u>

58.    Having conclusively established that venue of Scopac's case is proper under 28 U.S.C. § 1408, the question is whether such venue should nonetheless be transferred to the Northern District of California, Oakland Division, pursuant to 28 U.S.C. § 1412.  The Court should deny such request.

59.    It is well established that when venue is proper, a debtor's choice of forum is to be accorded substantial weight and deference.  *See In re Del. & Hudson Ry. Co.*, 96 B.R. 467, 469 (Bankr. D. Del. 1988), *appeal denied*, 96 B.R. 469 (D. Del.), *aff'd*, 884 F.2d 1383 (3d Cir. 1989).  "A debtor's choice of forum is entitled to great weight if venue is proper."  *See Enron,* 274 B.R. at 342.  "[I]f the movant has not proved by the preponderance of the evidence that the preceding [interests of justice] factors weigh in favor of the transfer, then plaintiff's choice of forum remains the proper venue."  *In re Harnischfeger Indus., Inc.,* 246 B.R. 421, 442 (N.D. Ala. 2000); *see In re Enron Corp.,* 274 B.R. at 327, 342 (S.D.N.Y. 2002) ("Where a transfer would merely shift the inconvenience from one party to the other, or where after balancing all the factors, the equities leaned but slightly in favor of the movant, the [debtor's] choice of forum should not be disturbed.").

60.     In such circumstances, the power to change venue should be used cautiously.  *See Commonwealth*, 596 F.2d at 1241; *In re Enron Corp.* 274 B.R. at 342; *In re Toxic Control Tech., Inc.*, 84 B.R. 140, 143 (Bankr. N.D. Ind. 1988).

61.     The party requesting a change of venue bears the burden of proving by a preponderance of the evidence that a transfer of venue pursuant to 28 U.S.C. § 1412 is necessary to achieve the statutory purposes of the Bankruptcy Code.  *Norton v. Encompass Services Corp. (In re Encompass Services Corp.)*, 301 B.R. 836, 839 (S.D. Tex. 2003) (*citing In re Manville Forest Products Corp.*, 896 F.2d 1384, 1390 (2d. Cir. 1990); *Commonwealth*, 596 F.2d at 1241 (citing *In re Fairfield P.R., Inc.*, 333 F. Supp. 1187, 1189 (D. Del. 1971)); *In re Windtech, Inc.*, 73 B.R. 448, 450 (Bankr. D. Conn. 1987).

62.     28 U.S.C. § 1412 provides that "[a] district court ***may*** transfer a case or proceeding under title 11 to a district court for another district, ***in the interest of justice*** or ***for the convenience of the parties***."   (emphasis added).   Although section 1412 allows for significant discretion in deciding whether to transfer venue of a particular case or proceeding, courts have identified certain factors that govern and guide such a determination.  In identifying such factors, however, many courts consider the "in the interest of justice" and "for the convenience of the parties" factors as overlapping, but nonetheless try to draw a distinction between the two prongs.  *See, e.g., Matter of Continental Airlines Inc.*, 133 B.R. 585, 587-88 (Bankr. D. Del. 1991); *In re Thomson McKinnon Securities Inc.*, 126 B.R. 833, 835-36 (Bankr. S.D.N.Y. 1991).  Conflation of the dual analyses is understandable, given that "the facts and circumstances which inform one evaluation will almost always bear on the other as well."  *In re LaGuardia Associates, L.P.*, 316 B.R. 832, 839 (Bankr. E.D. Pa. 2004).   Under those circumstances, a single argument is attractive insofar as the issues overlap to the point that

analyzing them in the disjunctive would result in considerable repetition. *Id.* In their respective motions, the Movants fail to differentiate their argument between section 1412's two factors. Nonetheless, "ease of drafting" is no excuse for proper prating of the statute, and Scopac will consider each of the factors in turn.

## A.   TRANSFER IS NOT IN THE INTEREST OF JUSTICE

63.    Transfer of Scopac's pending chapter 11 case to the Northern District of California, Oakland Division, would work a manifest injustice upon the creditor body as a whole by ignoring the situs of Scopac's reorganization efforts. Those efforts, as described above, are located in the Southern District of Texas. Scopac's financial reorganization, including preservation of Scopac's extensive timber and other assets, is best accomplished by maintaining venue in the Southern District of Texas. Consequently, the Movants' motions should be denied.

64.    The "interest of justice" analysis is not well defined. It is a "broad and flexible standard which must be applied on a case-by-case basis," *In re Grumman Olson Industries, Inc.*, 329 B.R. 411, 437 (Bankr. S.D.N.Y. 2005), and contemplates consideration of whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness. *Enron*, 274 B.R. at 349.

### *Efficient administration of the bankruptcy estate*

65.    In determining whether transfer of venue is in the interests of justice, "[t]he factor given the most weight is the promotion of the economic and efficient administration of the estate." *Enron,* 274 B.R. at 343. (citing *Commonwealth,* 596 F.2d at 1247 ("[T]he most important consideration is whether the requested transfer would promote the economic and efficient administration of justice.")). The clearest explication of this element is found in the Fifth Circuit case of *Matter of Commonwealth Oil Refining Co.*, 596 F.2d 1239 (5th Cir. 1979).

66. In determining that transfer of the bankruptcy case to Puerto Rico was not in the interests of justice, the Fifth Circuit stated as follows:

> The main concern that this implicates is the importance of CORCO to the welfare and economic stability of Puerto Rico and its people. Because CORCO is a major supplier of petroleum products to Puerto Rico, both the economy and the people of Puerto Rico are vitally concerned with the outcome of the Chapter XI proceeding. The government contends that the overwhelming concern of Puerto Rico with the continued operations of CORCO require a transfer of this case to Puerto Rico. **We disagree.** Without belittling in the least the extent of Puerto Rico's interest in CORCO, **that interest is served by maintaining CORCO as a functioning refinery. This can best be accomplished in San Antonio. The troubles of CORCO are financial. The people who can solve those problems are in San Antonio.**

*Commonwealth*, 596 F.3d at 1248 (emphasis added).

67. *Commonwealth* is directly on point. In that case, the government of Puerto Rico and the Puerto Rico Water Resources Authority challenged venue of Commonwealth's bankruptcy case in San Antonio because, *inter alia*, Commonwealth's most substantial asset (an oil refinery) was located in Puerto Rico, was subject to substantial regulation in Puerto Rico, most of Commonwealth's products were sold to Puerto Rican customers, and Commonwealth was important to the people and economy of Puerto Rico. Notwithstanding all of those factors, the Fifth Circuit held that the interest of justice required retention of venue in San Antonio where Commonwealth's financial restructuring would actually take place. *Commonwealth*, 596 F.2d at 1248.

68. Here, as in *Commonwealth*, the Court is faced with motions to transfer venue of a pending chapter 11 case to the state and the district in which the debtor's principal assets are located. In support of such motion, the Movants cite to Scopac's long-standing ties to the state of California, focusing on the location of Scopac's timber, the interest of the state and the public

in "activities on timberland" and such bodies' interest in the "outcome of this Bankruptcy Case as it affects the environment in which they live and the economy upon which they rely." California State Agencies' Motion at 24.   Indeed, the Committee states that Scopac and its affiliates are "a California institution."  Committee Motion at 10.

69.     Given (i) the stated importance of Scopac to the welfare and economic stability of California and its citizens and (ii) the "vital concern" shared by Californians and their government in the outcome of this case, such interests are, without dispute, best served by maintaining Scopac as a functioning entity in compliance with the regulatory structure governing its business.  However, in order to continue its operations, Scopac must resolve its financial troubles as embodied by the Bank of America and the public debt held by the multitudes of Noteholders located across the country.  The resolution of this financial crisis will take place in the Southern District of Texas, regardless of the Movants' actions.  The Scopac Board is located in the Southern District of Texas and they are the persons charged with making Scopac's "most important, consequential or influential decisions."

70.     As stated above and as provided for in Scopac's organizational agreements, the Scopac Board is responsible for managing Scopac's operations, authorizing Scopac to incur any indebtedness, filing bankruptcy, selling substantially all Scopac's assets, or taking any action in contravention or modification of the multitude of agreements governing Scopac's relationships with its creditors.  The Southern District of Texas is the location of Scopac's principal place of business – the "nerve center" from which all substantial decisions regarding the conduct of Scopac's operations are made.  It follows, *a fortiorari*, that Scopac's financial restructuring will be resolved one way or the other by the Scopac Board in the Southern District of Texas.  The interests of justice dictate that venue remain in such location.

### *Judicial Economy*

71.     Consideration of the efficient administration of the estate and judicial economy factors should take into account the "learning curve" of the court, including "consideration of the time and effort spent by the current judge and the corresponding effect on the bankruptcy case in transferring venue." *Enron Corp.*, 274 B.R. at 349.

72.     There can be no dispute that delay resulting from a transfer of venue in this case will occasion disruption in the administration of Scopac's estate, if for no other reason than as a result of the "shuffling of papers" and other bureaucratic steps requisite to any such transfer.  As such, judicial economy is furthered by retaining this case in the Court in which it is currently located.

73.     Contrary to the Movants' arguments, this Court has made considerable progress in becoming familiar with this case and the business and operations of Scopac and its affiliates. The Court has considered and granted a multitude of first and second day motions, including interim use of cash collateral and payment of certain critical trade creditors.   While the controversy surrounding such determinations has not been great, this Court's learning curve is substantially less **at this moment** in time than that of a bankruptcy judge sitting in Oakland, California or any other court.  *See Eagle Pointe*, 350 B.R. at 92 (stating that venue transfer depends on facts that exist at the time of such consideration).  Such a learning curve, when coupled with the bureaucratic burdens imposed upon the Court in effecting a venue transfer, militates against any potential economy that may foreseeably result from such judicial reassignment.

### *Timeliness*

74.     Scopac does not dispute the timeliness of the Movants' respective motions to transfer venue.

### *Fairness*

75.     The interests of fairness demand retention of Scopac's pending case in the Southern District of Texas.

76.     First, prosecution of the Motions to Transfer Venue filed by the Movants is motivated by self-serving agendas without regard to the other constituencies in Scopac's case. Notably absent from either motion is any reference to the Noteholders, Scopac's single largest constituent.  Such absence is not surprising given the utter lack of any cognizable claim by the California State Agencies against Scopac, and the contingent litigation claims which serve as the backbone for the standing of the individual Committee members.

77.     Specifically, the California State Agencies assert that they are separate regulatory agencies of the State of California with authority over Scopac's "activities related to timber harvesting and other activities that may impact the environment in California."  California State Agencies' Motion at 5.  Other than the California State Agencies' stated interest in ensuring that Scopac "compl[ies] with 28 U.S.C. § 959(b) and applicable federal and state laws, especially laws enacted to protect public welfare and environment," they have failed to identify any "claim" against Scopac.  California State Agencies' Motion at 8.  Scopac and the Court are faced merely with the specter of the possibility that Scopac **may** take some action that **may** undermine the California State Agencies' regulatory authority, despite inclusion in the cash collateral orders entered in this case that nothing in such orders would relieve Scopac of any obligations under federal, state or local police or regulatory laws or under 28 U.S.C. § 959(b).  *See* First, Second

and Third Interim Orders Authorizing Scopac's Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code and Setting Hearing.

78.     Thus, rather than concrete facts, the California State Agencies assert that this Court should consider the potential injustices that Scopac **may** seek to impose upon on the citizens of California by modification of the current regulatory scheme governing Scopac, with this Court serving as the medium for manifesting such vague prophecies of doom.

79.     Unfortunately for the Movants, in determining whether to transfer venue, a Court is not to consider "mights," rather it must focus on "concrete facts that exist at the time that the motion [to transfer venue] is considered." *Eagle Pointe*, 350 B.R. at 92.  As stated by the court in *Eagle Pointe*:

> A meteor the size of a small automobile "might" penetrate the earth's atmosphere and obliterate the court complex in South Bend, Indiana or in Detroit, Michigan; a fire in the cafeteria of either of those two courts might cause the shutdown of either facility for a number of months; a *pro se* litigant "might" file a multi-million dollar wrongful eviction action against the debtor.  Transfer of venue consideration by the Court focuses on what is, and not what might be.

*Id.*

80.     There is no evidence that any regulatory interest of a governmental authority in proximity to a court in the Northern District of California is implicated in Scopac's case insofar as those interests "will generate any dispute which must be decided by a court in this Chapter 11." *Id.* at 97.  The implication that a bankruptcy court in California  "will be somehow more attuned to the issues which might arise in [Scopac's] case in [Texas]" is unfounded and impugns this Court and the practitioners who appear before it.  *See id.*

81.     Further, not only are the California State Agencies not creditors of Scopac, they are defendants in a suit brought by Scopac. On December 20, 2006, Palco and Scopac filed a

lawsuit against the State of California for breach of the Headwaters Agreement (as defined below), seeking both declaratory relief and monetary damages.  The lawsuit, filed in California Superior Court in Fresno, alleges that the State of California's actions have, among other things, restricted Scopac's ability to harvest its timberlands to a degree that prevents both Palco and Scopac from remaining economically viable.  Palco and Scopac allege that the State of California has, among other things, breached its contractual agreements with respect to the management and harvest of Scopac's and Palco's timberlands.

82.     Under such circumstances, traditional notions of fairness dictate that the interest of justice will be best served by retaining venue of Scopac's case in the Southern District of Texas.

83.     Three of the four members of the Committee are actively suing both Scopac **and** the California State Agencies to effectively shut down the operations of Scopac by stopping or severely limiting its ability to harvest timber.  Moreover, in filing such lawsuits, these Committee members have sought to have the Headwaters Agreement nullified.

84.     On September 28, 1996, MAXXAM and Palco, on behalf of Scopac and its affiliates, entered into an agreement for the settlement of Palco's two "takings" lawsuits then pending against the United States and the State of California, and providing the framework for the acquisition of certain timberlands of Palco by the United States of America and the State of California (the "Headwaters Agreement").  The Headwaters Agreement provided that the parties use their best efforts to achieve the transfer of certain timberlands to the United States and the State of California in exchange for $300 million, other properties and the expedited development and submission (i) by the United States of an incidental take permit to be based on a multi-

species habitat conservation plan covering Palco's timberlands and timber harvesting rights, and (ii) by California of a sustained yield plan covering the Palco timberlands.

85.     In March 1999, Palco, Scopac and Salmon Creek consummated the Headwaters Agreement with the United States and the State of California.  Pursuant to the Headwaters Agreement, forest groves in Humboldt County consisting of approximately 5,600 acres of old growth redwood timberlands owned principally by Palco and Salmon Creek (the "Headwaters Timberlands") were transferred to the United States in exchange for (i) $300 million, (ii) approximately 7,700 acres of other timberlands, and (iii) approval by the federal and state governments of a habitat conservation plan ("HCP") and a sustained yield plan ("SYP") (together, the "Environmental Plans") relating to the substantial portion of the Scopac Timber Property.  California also agreed to offer to purchase other timberlands owned by Scopac and Palco (which purchases were subsequently consummated).  During the past seven years, Palco and Scopac have spent tens of millions of dollars on scientific studies and environmental mitigation related to implementation of the Headwaters Agreement and compliance with the Environmental Plans.  In connection with the consummation of the Headwaters Agreement, $169 million of the cash consideration was deposited into a newly-established account, the Scheduled Amortization Reserve Account ("SAR Account"), for the purpose of supporting principal payments on the Timber Notes.

86.     Notwithstanding this momentous and historic resolution of the issues among Palco, Scopac, the State of California and the United States, the Environmental Protection Information Association ("EPIC") and the United Steelworkers of America, two committee members, have engaged in protracted litigation seeking to set aside the Headwaters Agreement.

87.     In March 1999, EPIC, one of the Committee members, filed suit against Scopac and its affiliates in an action styled *Environmental Protection Information Association, Sierra Club v. California Department of* Forestry *and Fire Protection, California Department of Fish and Game, The Pacific Lumber Debtor, Scotia Pacific Company LLC, Salmon Creek Corporation, et al*. (the "EPIC-SYP/Permits lawsuit") before the Superior Court in Humboldt County, California (No. CV-990445).    This action alleged, among other things, various violations of the California Forest Practice Act, the California Endangered Species Act, the California Fish and Game Code and the California Environmental Quality Act, and challenged the validity and legality of the SYP, HCP and certain of its state permits.    EPIC effectively sought to shut down Scopac by seeking injunctive relief against Scopac that would prevent implementation of its THPs and, thereby, its ability to cut and sell timber.    Without such sales, Scopac would have no cash with which to operate its business and successfully reorganize in this case.

88.     On the same day as the EPIC-SYP/Permits Lawsuit was filed, the United Steelworkers of America ("USWA"), also a committee member, filed a similar action, styled *United Steelworkers of America, AFL-CIO, CLC, and Donald Kegley v. California Department of Forestry and Fire Protection, The Pacific Lumber Debtor, Scotia Pacific Debtor LLC and Salmon Creek Corporation* (the "USWA Lawsuit"), before the Humboldt County Superior Court (No. CV-990452) challenging the validity and legality of the SYP.[7]

---

[7]  The EPIC-SYP/Permits Lawsuit and the USWA Lawsuit were consolidated for trial. After the trial court vacated certain of Scopac's permits and approvals, the Court of Appeal overturned the trial court.  EPIC and the United Steelworkers of America appealed and the California Supreme Court granted review; the parties have completed briefing and are awaiting oral argument.  A concurrent action in which Scopac and the state agencies appealed the trial court's award of $6 million in attorneys' fees  (assessed against Scopac and the state agencies) is pending before the California Court of Appeal, but has been abated pending a decision by the California Supreme Court on the merits.

89.     In July 2001, EPIC filed suit against Scopac and certain other of its affiliates in an action styled *Environmental Protection Information Center v. The Pacific Lumber Debtor, Scotia Pacific Debtor LLC* (the "Bear Creek Lawsuit") in the United States District Court for the Northern District of California (No. C01-2821), which suit was later amended to add the Environmental Protection Agency as a defendant.   The Bear Creek Lawsuit alleges that harvesting and other forestry activities under certain of Scopac's approved THPs will result in discharges of pollutants in violation of the Clean Waters Act ("CWA").   EPIC has asserted that the CWA requires Scopac to obtain a permit from the North Coast Water Board before beginning timber harvesting and road construction activities and is seeking to enjoin these activities until such permit has been obtained.

90.     Other than lawsuits, neither EPIC nor the USWA have any other direct, business or financial interest in Scopac or its affiliated debtors.   The Debtors dispute any claims that may be asserted by EPIC or USWA.

91.     A third Committee member, Steve Cave, is a plaintiff in a personal injury suit filed against Scopac and certain of its affiliates on November 20, 2002, in Humboldt County Superior Court under Case No. DR020719 styled *Steve Cave, et al. v. Gary Clark, et al.* (the "Cave Action").   The Cave Action alleges, among other things, that logging practices on the Scopac Timber Property have contributed to an increase in flooding along the Elk River watershed (which runs through the Scopac Timber Property), resulting in personal injury and damage to the plaintiffs' properties, notwithstanding the fact that such properties are located in a historical floodplain.   In the Cave Action, the plaintiffs seek to recover $780,000 in alleged property damages and $1,000,000 for emotional distress.

92.     Given (i) the long history and the nature of the litigation brought by EPIC, the USWA and Steve Case and (ii) such parties' lack of any real financial stake in the reorganization of Scopac and its affiliates, it is apparent that the vote to authorize the filing of the Committee's Motion is another litigation tactic to severely curtailing or completely shutting down logging operations, thereby impairing Scopac's ability to reorganize.  No other creditor groups will be served if this were to occur, with the Noteholders bearing the brunt of such a deleterious result.

93.     As such, traditional notions of justice, fairness and fair play dictate that venue remain in the Southern District of Texas.

**B.     TRANSFER IS NOT FOR THE CONVENIENCE OF THE PARTIES**

94.     In *Commonwealth*, the Fifth Circuit created the standard for determining if a change of venue is appropriate under "the convenience of the parties" prong.  Following *Commonwealth*, a number of courts have applied the following six factors in making a determination of convenience of the parties:

(a)  the proximity of creditors of every kind to the court;

(b)  the proximity of the debtor to the court;

(c)  the proximity of the witnesses necessary to the administration of the estate;

(d)  the location of the assets;

(e)  the economic administration of the estate; and

(f)  the necessity for ancillary administration.

596 F.2d at 1247; *See also Eagle Pointe*, 350 B.R. at 92; *In re Condor Exploration, LLC*, 294 B.R. 370, 378 (Bankr. D. Colo. 2003); *Enron*, 274 B.R. at 343.

### *Proximity of Interested Parties to the Court*

95.     The factors described in (a), (b) and (c) are addressed in this subsection.   An analysis of the proximity of Scopac, all of its creditors, the potential witnesses and other parties in interest weighs in favor of retaining jurisdiction in the Southern District of Texas.

96.     Scopac's largest creditor constituency is the Noteholders.   In the Motions to Transfer Venue, the Movants completely ignore the very existence of the Noteholders, who are located all across the United States.

97.     As of the filing of this Response, Scopac has been able to identify approximately 106 individual Noteholders.   The Noteholders are located throughout the United States as detailed below:

| | | | | | |
|---|---|---|---|---|---|
| Arizona | 1 | Idaho | 1 | Ohio | 4 |
| Bermuda | 1 | Illinois | 3 | Oklahoma | 1 |
| California | 8[8] | Indiana | 2 | Oregon | 1 |
| Canada | 1 | Massachusetts | 1 | Pennsylvania | 2 |
| Delaware | 1 | Maryland | 1 | Rhode Island | 1 |
| England | 2 | Michigan | 2 | Tennessee | 1 |
| Florida | 1 | Minnesota | 6 | Texas | 6 |
| Georgia | 1 | North Carolina | 1 | Utah | 1 |
| Grand Cayman Is. | 2 | New Jersey | 1 | Washington | 1 |
| Iowa | 3 | New York | 32 | Wisconsin | 1 |
| | | | | Unknown | 16 |
| | | | | **Total** | **106** |

98.     As indicated above, the Noteholders are predominantly located in New York, and travel from New York to the Southern District of Texas is significantly shorter than to the Northern District of California.   The central, geographic location of the Southern District of Texas is, therefore, significantly more convenient to the Noteholders than the Northern District of California.

---

[8] Of the California Noteholders identified, only 1 is located in the Northern District of California.

99.    The Indenture Trustee for the Timber Notes is the Bank of New York, and its representative responsible for oversight of the Timber Notes is Chris Mathews.  Mr. Mathews is located in the Bank of New York's office in the Southern District of Texas.  The Indenture Trustee is represented by Thompson & Knight, LLP through that firm's offices in Texas and New York.

100.    In addition, an Ad Hoc Committee of Noteholders representing approximately 90% of the outstanding Timber Notes has appeared in this case and is represented by (i) Bingham McCutchen, LLP in Hartford, Connecticut and (ii) Gardere Wynne Sewell, LLP in Houston, Texas.  Of the twenty-seven (27) individual members of the Ad Hoc Committee, seventeen (17) are located in New York.  One of the members is located in Texas and one is located in California.

101.    Ignoring the approximately $700 million of debt owed by Scopac to the Noteholders, who are located across the United States, the Movants instead focus on themselves. However, neither the California State Agencies, nor the City of Rio Dell are creditors of Scopac, and the three primary members of the Committee hold judgments that have been either been vacated by the California courts or are disputed claims that are in the infant stages of litigation.

102.    Seventeen of Scopac's twenty largest creditors are trade/general creditors, and most of these creditors are owed less than $10,000.00.  Ten (10) of the creditors are located in or around Humboldt County, California, which is approximately a five (5) hour drive to the bankruptcy court for the Northern District of California, Oakland Division.  Given the distance, it is likely that such creditors would not actually attend such hearings, choosing to instead appear telephonically.  Such telephonic appearances are at least as easily made in the Southern District of Texas as they are in the Northern District of California.  Indeed, given this Court's long-

standing flexibility on telephonic appearances, Scopac would argue that such appearances are, in fact, more convenient before this Court than elsewhere.

103.    The other creditors on Scopac's twenty largest list are scattered around the country, including Leawood, Kansas; British Columbia, Canada; Quebec, Canada; Palatine, Illinois; Portland, Oregon; and Research Triangle Park, North Carolina.  The Northern District of California is not more convenient for these creditors.

104.    No trade creditors have joined Movants in the Motions to Transfer Venue**.**  However, at least sixty-six (66) trade creditors located in or around Scotia, California support the Debtors *opposition* to the transfer of venue from the Southern District of Texas.

105.    Further, as stated above, all three members of the Scopac Board are located in the Southern District of Texas.

106.    The Movants try to emphasize that the witnesses should be close to the courthouse.  In the *Enron* case, the bankruptcy court noted:

> [Most of the Debtors' officers] will not be required to attend hearings before this Court. Rather, the certain participants in the proceedings before this Court will be the professionals retained in these cases.  Subject to court approval, appearances required by the officers (or other management) can be addressed by telephonic and video conferencing capabilities.  The limited appearances that may be required of the principals will nevertheless allow them to continue with the management of the businesses.

*Enron*, 274 B.R at 347. (footnotes omitted).

107.    Such analysis is equally applicable here.  It will be the professionals that attend the majority of the hearings, and most of the players in the bankruptcy case have counsel in Texas or New York.

108.    In *Enron*, the court also addressed the state agencies who asserted an interest in that bankruptcy case, noting that most of the non-judicial enforcement that concerned such state

agencies would still occur in Texas and, to the extent the state agencies needed to appear in the bankruptcy case (in New York), they could utilize the alternative methods of participation provided by the court. *See Enron*, 274 B.R at 347. Here, such regulatory activities will continue to occur in California, regardless of the bankruptcy venue.

109.    This Court has already informed the parties of its willingness to allow telephonic participation when possible. The dockets for the Debtors' bankruptcy cases are also accessible through the Court's website by obtaining a PACER password. *See Enron*, 274 B.R. at 347 (noting that the PACER website would allow all interested parties to track the bankruptcy case docket sheet). Moreover, Logan & Company, Scopac's proposed claims and noticing agent, will maintain a public website dedicated to the pleadings, claims and other documents filed in Scopac's case, which may be obtained by any party free of charge from anywhere in the world with access to the internet. As such, there are already procedures in place to ensure that all creditors and parties no matter where located, will have access to this case and this Court.

110.    When witnesses and professionals find it necessary to appear in person, flights in and out of the Southern District of Texas are readily available. Southwest Airlines has at least eight (8) daily flights from Houston to Corpus Christi. *See* Southwest Airlines – Schedules, http://www.southwest.com/pdf_schedules/CRP/20070217R7.crp.pdf.    Continental Airlines services the Corpus Christi airport with twelve (12) non-stop flights each day from Houston's Bush Intercontinental Airport. *See* Continental Airlines – Flight Schedule, http://www.continental.com/web/en-US/apps/travel/timetable/results.aspx. The Corpus Christi International Airport is also serviced by American Airlines and Delta Airlines.

111.   Taken together, the accessibility of the Bankruptcy Court in the Southern District of Texas to creditors, professionals, witnesses and other parties is more convenient than the Bankruptcy Court in the Northern District of California.

### *Location of the Debtor's Assets*

112.   Scopac has, among other assets: (i) the approximately 200,000 acres of timberland and 12,000 acres of timber rights located in Humboldt County, California and (ii) the cash and cash equivalents held in the SAR Account.   As of the Petition Date, there was approximately $42.4 Million in cash and cash equivalents held in the SAR Account.   There was also an additional $2.4 Million of Class A-1 Notes held in the SAR Account.   The SAR Account is maintained at the Bank of New York Trust Company in Dallas, Texas.   As described above, Scopac also maintains numerous books and records (public filings, insurance, tax, board minutes) in the Southern District of Texas.

113.   The location of a debtor's assets is often of less importance when compared to the location where the actual chapter 11 reorganization will take place.   Consequently, a number of courts have retained jurisdiction and venue of bankruptcy cases in locations far removed from the situs of the debtor's principal assets.   *See Commonwealth*, 596 F.2d 1239 (court retained jurisdiction in the Western District of Texas even though the principal asset (petroleum refinery) was located in Puerto Rico); *Eagle Pointe*, 350 B.R. 84 (court retained jurisdiction in the Northern District of Indiana even though the principal asset (apartment complex) was located near Ann Arbor, Michigan); *Peachtree*, 150 F.3d 788 (court retained venue in the Northern District of Illinois even though the debtor's asset (an apartment complex) was located in Texas); *Safety-Kleen Corp.*, Case No. 00-2303 (PJW), Bench Decision (Bankr. D. Del. July 11, 2000) (court retained jurisdiction in Delaware even though the debtor's headquarters, assets, books,

records and employees were in South Carolina); *In re Garden Manor Assocs., L.P.,* 99 B.R. 551, 553 (Bankr. S.D.N.Y. 1988) (court retained venue in New York even though the debtor's sole asset was an apartment complex in Arizona).

114.   Given *Commonwealth* and its progeny, the location of Scopac's assets is not dispositive of this Court's decision to transfer venue.

### *Economic and Efficient Administration of the Estate*

115.   According to the Fifth Circuit in *Commonwealth*, the most important factor to be considered in evaluating the "convenience of the parties" prong of 28 U.S.C. § 1412 is "whether the requested transfer would promote the economic and efficient administration of the estate." 596 F.2d at 1247.   Under this factor, the Movants argue that their favored venue poses lower costs to both Scopac and creditors in terms of both time and money.   However, upon reflection of the facts in this case, it is apparent that the actual reorganization will take place in the Southern District of Texas.

116.   "The heart of a Chapter XI proceeding is working up a financial plan of arrangement acceptable to all relevant parties." *Id.*  As described above, the people charged with this responsibility, the members of the Scopac Board, are all located in the Southern District of Texas.

117.   When negotiating its plan of reorganization, Scopac will have to negotiate with the Noteholders, Bank of America, its trade creditors, and MAXXAM as the ultimate equity interest holder of Scopac.   MAXXAM will have a voice in the restructuring of this estate because Scopac's creditors are oversecured.   MAXXAM's principal place of business is in the Southern District of Texas and Scopac's negotiations with MAXXAM will occur in the Southern District of Texas. *See Commonwealth*, 596 F.2d at 1248 (noting that equity interest holders must

be considered in venue transfer analysis and that the location of the largest constituency of the debtor's equity interest holders was a factor to be considered in the convenience of the parties).

118.    It is undisputed that counsel for each of the relevant creditors and parties in interest will be the ones who actually negotiate the plan of reorganization in this case.  Most of the significant players in that regard, including the Noteholders, the Indenture Trustee and MAXXAM, have already retained counsel in the Southern District of Texas.  For those parties that choose to maintain counsel outside of this district, it is their choice to do so.  *See generally Eagle Pointe*, 350 B.R. at 94.  For the professionals in New York, Connecticut, and other states in the Northeast, the Southern District of Texas is equally or more convenient for them as the Northern District of California.

119.    Moreover, this bankruptcy case does not involve any issues unique to California law that cannot be addressed by this Court.  The Credit Agreement[9] and Indenture are governed by the laws of the State of New York.  Only the Deed of Trust[10] is governed by the laws of the State of California.  Bankruptcy courts frequently interpret the law of other jurisdictions.

120.    Thus, this Court is equally capable of interpreting the law and administering this bankruptcy case as the bankruptcy court in the Northern District of California.  *See Eagle Pointe*, 350 B.R. at 96.

121.    Retaining this bankruptcy case in the Southern District of Texas will provide Scopac its greatest chance of creating a workable plan of reorganization and will allow this estate to be most economically and efficiently administered.

---

[9]  Credit Agreement among Scotia Pacific Company LLC, Bank of America National Trust and Saving Association, as Agent, and The Other Financial Institutions Party Hereto, dated as of July 20, 1998 (and all amendments thereto) (the "Credit Agreement").

[10]  Deed of Trust, Security Agreement, Financing Statement, Fixture Filing and Assignment of Proceeds from Scotia Pacific Company LLC to Fidelity National Title Insurance Company for the Benefit of State Street Bank and Trust Company, dated June 20, 1998 (the "Deed of Trust").

### *The Necessity for Ancillary Administration*

122.    This issue is not a factor in this case.  As the court noted in *Commonwealth*, "(a)nticipation of the failure of the Chapter XI proceeding is an illogical basis upon which to predicate a transfer." 596 F.2d at 1248 (quoting *In re Fairfield P.R., Inc.*, 333 F. Supp. 1187, 1191 (D. Del. 1971); *See also Eagle Pointe*, 350 B.R. at 95 (stating that "[t]here was no concrete evidence at the time of the hearing that 'what if' [proposed by the movant] would create any realistic need for an 'ancillary administration'").

## VI.  <u>CONCLUSION</u>

123.    In this case, the Court is presented with Motions to Transfer Venue filed by the Committee and the California State Agencies premised almost entirely on the argument that because Scopac's principal assets are located in California and the people and government of that state have an interest in the outcome of this case, venue should be transferred to the Northern District of California.  However, Movants ignore the financial realities facing Scopac, including the more than $700 million in secured debt held by Noteholders across the country and disregard the location of Scopac's principal place of business in the Southern District of Texas, the place where the Scopac Board sits and where the ultimate outcome of this reorganization will occur. Venue is proper in the Southern District of Texas, and any transfer of venue to the Northern District of California would serve neither the interests of justice nor the convenience of the parties.  The Motions to Transfer Venue should be denied.

WHEREFORE, Scopac request entry of an order (i) denying the Movants' Motions to Transfer Venue and (ii) granting Scopac such other and further relief as the Court deems just and proper.

Respectfully submitted this 23rd day of February, 2007.


                              /s/ John F. Higgins
                         _____
                         John F. Higgins
                         State Bar No. 09597500
                         James Matthew Vaughn
                         State Bar No. 24028088
                         Thomas A. Woolley
                         State Bar No. 24042193
                         **_PORTER & HEDGES, L.L.P._**
                         1000 Main Street, 36th Floor
                         Houston, TX  77002
                         Telephone:     713.226.6000
                         Facsimile:     713.226.6248
                         Email: jhiggins@porterhedges.com
                                 mvaughn@porterhedges.com
                                 twoolley@porterhedges.com


                              -and-


                         Kathryn A. Coleman
                         Eric J. Fromme
                         **_GIBSON, DUNN & CRUTCHER LLP_**
                         200 Park Avenue, 47th Floor
                         New York, NY 10166
                         Telephone:     212.351.3889
                         Facsimile:     212.351.4035
                         Email: Kcoleman@gibsondunn.com
                                 EFromme@gibsondunn.com

                         **BANKRUPTCY   COUNSEL   TO   SCOTIA
                         PACIFIC COMPANY LLC**

                         **CERTIFICATE OF SERVICE**

        I hereby certify that a true and correct copy of the foregoing instrument was served by
electronic mail where indicated with an asterisk (*) and first class United States mail, postage
prepaid, on the 23rd day of February 2007, on the parties listed on the attached Exhibit "1."


                              /s/ John F. Higgins
                         _____
                         John F. Higgins

**Exhibit "1"**
**Standard Service List – Scotia Pacific Lumber Company LLC**

**Debtor**
Gary L. Clark*
Scotia Pacific LLC
125 Main Street
Scotia, CA 95565-0000

**Debtor's Attorneys**
John F. Higgins
James Matthew Vaughn
Porter & Hedges, L.L.P.
1000 Main Street, 36th Floor
Houston, TX 77002

Kathryn Coleman*
Gibson Dunn & Crutcher LLP
200 Park Avenue, 47th Floor
New York, NY 10166

Eric J. Fromme*
Gibson Dunn & Crutcher LLP
Jamboree Center
4 Park Plaza, Suite 1400
Irvine, CA 92614

**Debtors**
Scotia Development LLC
921 N. Chaparral, Suite 104
Corpus Christi, TX 78401

Salmon Creek LLC
P.O. Box 37
Scotia, CA 95565

Scotia Inn Inc.
100 Main Street
Scotia, CA 95565

Britt Lumber Co., Inc.
449 15th Street, Suite 401
Oakland, CA 94612

The Pacific Lumber Company
P.O. Box 37
Scotia, CA 95565

**Debtors' Counsel**
Shelby A. Jordan*
Harlin C. Womble, Jr.*
Nathaniel Peter Holzer*
Jordan, Hyden, Womble, Culbreth & Holzer
500 N. Shoreline Blvd., Suite 900
Corpus Christi, TX 78471

Jeffrey Schaffer*
Gary M. Kaplan*
Howard Rice Nemerovski, et al.
Three Embarcadero Center, 7th Floor
San Francisco CA 94111

**U.S. Trustee**
Christine A. March*
United States Trustee
606 N. Carancahua, Suite 1107
Corpus Christi, TX 78476

**Committee of Unsecured Creditors**
Environmental Protection Information Center, Interim Chairman
c/o Sharon E. Duggan
370 Grand Avenue, Suite 5
Oakland, CA 94610

John Miller, Interim City Manager
City of Rio Dell
675 Wildwood Ave.
Rio Dell, CA 95562

Pacific Coast Trading, Inc.
c/o Miles T. Crail
1690 Green Ash Road
Reno, NV 89511

United Steelworkers
c/o David Jury
Five Gateway Center, Suite 807
Pittsburgh, PA 15222

Steve Cave
2332 Wrigley Road
Eureka, CA 95503

**Counsel for Committee of Unsecured Creditors**
Maxim B. Litvak*
John D. Fiero*
Kenneth H. Brown*
Pachulski Stang Ziehl Young Jones & Weintraub
150 California Street, 15th Floor
San Francisco, CA 94111-4500

**Governmental Entities**
Susan Combs, Comptroller
LBJ State Office Bldg.
111 E. 17th Street
P.O. Box 13528
Austin, TX 78711

966883_5

Securities Exchange Commission
Attn: Merri Jo Gillette, Regional Director
175 W. Jackson Blvd., Suite 900
Chicago, IL 60604-2908

Internal Revenue Service
P.O. Box 21126
Philadelphia, PA 19114

Internal Revenue Service
1919 Smith Street
Stop 5022 HOU
Houston, TX 77002

U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530-0001

U.S. Attorney's Office
Southern District
Donald J. Degabrielle, Jr.
Judy A. Robbins
P.O. Box 61129
Houston, TX 77208-1129

Kimberly A. Walsh
Assistant Attorney General
Bankruptcy & Collections Division
P.O. Box 12548
Austin, TX 78711-2548
**Counsel for The Comptroller of Public Accounts of the State of Texas**

Employment Development Dept.
Bankruptcy Group MIC 92E
P.O. Box 826880-0001
Sacramento, CA 94280-0001

Michael M. Stahl
Lisa Lund
U.S. Environmental Protection Agency
Office of Compliance
1200 Pennsylvania Avenue, NW
Washington, DC 20640-0001

Walker Smith
Randy Hill
U.S. Environmental Protection Agency
Office of Civil Enforcement
1200 Pennsylvania Avenue, NW
Washington, DC 20640-0001

Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
401 M Street, S.W.
Washington, DC 20460

Arizona Department of Revenue
P.O. Box 29079
Phoenix, AZ  85038-9079

State of California
Franchise Tax Board
P.O. Box 2952
Sacramento, CA  95812-2952

Kentucky Revenue Cabinet
Department of Revenue
200 Fair Oaks Lane
Frankfort KY 40620

Louisiana Department of Revenue
P.O. Box 91011
Baton Rouge, LA  70821-9011

Michigan Department of Treasury
430 W. Allegan Street
Lansing, MI  48922

Missouri Director of Revenue
P.O. Box 3020
Jefferson City, MO  65105-3020

Corporation Income Tax
P.O. Box 700
Jefferson City, MO 65105-0700

Ohio Treasurer of State
Ohio Department of Taxation
P.O. Box 804
Columbus, OH  43216-0804

West Virginia State Tax Department
Bankruptcy Unit
P.O. Box 766
Charleston, WV  25323-0766

Stephanie Tom Coupe
State of California
Department of Fish and Game
1416 Ninth Street, 12th Floor
Sacramento, CA  95814
**Department of Fish and Game**

Department of Fish and Wildlife Service
Attn:  Anne Badgely, Regional Director
**RETURNED MAIL**

Pacific Region, Region 1 Offices
Attn:  Ren Lohoefener, Regional Director
911 NE 11th Ave
Portland, OR 97232

California and Nevada Operations:
Steve Thompson, California and Nevada Operations
(CNO) Manager
Kenneth McDermond, Deputy Operations Manager
2800 Cottage Way
Sacramento, CA 95825
**U.S. Department of the Interior**
**U.S. Fish and Wildlife Service**

National Marine Fisheries Services
US Department of Commerce
Attn: Dr. William Hogarth
        Deanna Harwood, Office of Counsel
501 W. Ocean Blvd., Suite 4200
Long Beach, CA  90802
**U.S. Department of Commerce National Oceanic**
**and Atmospheric Administration; National**
**Marine Fisheries Service, Southwest Regional**
**Office**

Lisa Roberts
John Clancey
1655 Heindon Road
Arcata, CA  95521
**U.S. Department of Commerce National Oceanic**
**and Atmospheric Administration; National**
**Marine Fisheries Service**

The Resources Agency
Secretary of Resources
Attn:  Mary Nichols
1416 Ninth Street, Suite 1131
Sacramento, CA  95814

Department of Forestry and Fire Protection
Norman Hill, Chief Counsel
Ginevra Chandler, Chief Counsel
P.O. Box 944246
Sacramento, CA 94244-2460

Tom Osipovich, Unit Chief
Joe Fassler, Forest Inspector
118 S. Fortuna Boulevard
Fortuna, CA  95540
**State of California – Department of Forestry and**
**Fire Protection, Humboldt Del Norte Unit**

Wildlife Conservation Board
W. John Schmidt, Executive Director
**RETURNED MAIL**

Wildlife Conservation Board
John P. Donnelly, Executive Director
1807 13th Street, Suite 103
Sacramento, CA 95814
**State of California; Wildlife Conservation Board**

Sacramento Fish & Wildlife Office
Lynn Cox, Deputy Solicitor General
2800 Cottage Way, Room W-2605
Sacramento, CA  95825
**U.S. Department of the Interior**
**U.S. Fish and Wildlife Service**

Arcata Fish & Wildlife Office
Mike Long
Amedee Brickey
James Bond
1655 Heindon Road
Arcata, CA  95521
**U.S. Department of the Interior**
**U.S. Fish and Wildlife Service**

Ted Cobb, Assistant Chief Counsel
1001 "T" Street
P.O. Box 100
Sacramento, CA  95814
**California Environmental Protection Agency**
**State Water Resources Control Board**

Robert Klamt, Chief, Timber Harvest Division
5550 Skylane Boulevard, Suite A
Santa Rosa, CA  95403
**California Environmental Protection Agency**
**State Water Resources Control Board**
**North Coast Regional Water Control Board**

Rick Martin, Director
North Coast Unified Air Quality Mgmt. District
2300 Myrtle Avenue
Eureka, CA  95501
**North Coast Unified Air Quality Management**
**District**

California Forest Products Commission
Attn: Donn Zea, President
853 Lincoln Way, Suite 208
Auburn, CA  95603

Alan Tenenbaum
National Bankruptcy Coordinator
Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044
**Counsel for the United States on behalf of the Department of the Interior and NOAA**

Keith W. Rizzardi
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Station
P.O. Box 7369
Ben Franklin Station
Washington, DC 20044-7369
**Counsel for the Department of the Interior and Department of Commerce**

Margarita Padilla
Mary Hackenbracht
Irene Tamura
Deputy Attorney General
Office of the California Attorney General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
**Counsel for the California Department of Fish and Game, the California Department of Forestry and Fire Protection, the North Coast Region Water Quality Control Board, the California State Water Resources Control Board and the California Wildlife Conservation Board**

Michael Neville*
Tiffany Yee
Deputy Attorney General
Office of the California Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
**Counsel for the California Department of Fish and Game, the California Department of Forestry and Fire Protection, the North Coast Region Water Quality Control Board, the California State Water Resources Control Board and the California Wildlife Conservation Board**

Larry Ludka
Assistant U.S. Attorney
U.S. Attorney Office
Southern District of Texas
800 North Shoreline Blvd., Suite 500
Corpus Christi, TX 78476-2001
**Counsel for the United States Department of the Interior and Department of Commerce**

Paul V. Gallegos*
Humboldt County District Attorney
825 Fifth Street, 4th Floor
Eureka, CA 95501
**Counsel for People of State of California**

Secured Creditors
The Bank of New York Trust Company, N.A.
John Stohlmann
600 North Pearl St., Suite 420
Dallas, TX 75201
**Indenture Trustee**

Bank of America
Clara Yang Strand
333 South Hope Street
Los Angeles, CA 90071

Counsel to Secured Creditors
Evan M. Jones*
Brian M. Metcalf*
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899
**Counsel for Bank of America**

Evan D. Flaschen*
Kurt A. Mayr*
Gregory W. Nye
Bingham McCutchen
One State Street
Hartford, CT 06103-3178
**Counsel to Ad Hoc Committee of Bondholders**

John P. Melko*
Gardere Wynne Sewell LLP
1000 Louisiana, Suite 3400
Houston, TX 77002
**Counsel for The Ad Hoc Committee of Timber Noteholders**

Rhett G. Campbell
Diana M. Woodman
Matthew R. Reed
Thompson & Knight LLP
333 Clay Street, Suite 3300
Houston, TX 77002
**Counsel for The Bank of New York Trust
Company, N.A., Indenture Trustee**

Ira L. Herman
Thompson & Knight LLP
919 Third Avenue, 39th Floor
New York, NY 10022-3915
**Counsel for The Bank of New York Trust
Company, N.A., Indenture Trustee**

**Twenty Largest Unsecured Creditors**
Ben Cohoon
401 8th Street
Fortuna, CA 95540

Blair Forest Consulting
1225 Central Avenue #3
Mckinleyville, CA 95519

California Forest Products Commission
853 Lincoln Way, Suite 208
Auburn, CA 95603

Carl Anderson
2370 Fran Street
Eureka, CA 95501

D.R. Systems
2599 McCullough Road
Nanaimo B.C.
Canada

David Gillott
Tall Trees Forestry
P.O. Box 413
Blue Lake, CA 95525

Deloitte & Touche LLP
333 Clay Street
Houston, TX 77002

Fernbridge Tractor & Equip. Co.
20 Depot Road
Fernbridge, CA 95540

Hohman & Associates
P.O. Box 733
Hydesville, CA 95547-0733

Humboldt Fish Action Council
c/o Fisheries Biology Department
Humboldt State University
1 Harpst Street
Arcata, CA 95519

IBM Corporation
275 Viger East
Montreal, QC
Canada

Laco Associates
21 West 4th Street
P.O. Box 1023
Eureka, CA 95501

Les Schwab Tire Center
275 N. Fortuna Bl.
Fortuna, CA 95540

Maxey Forestry
P.O. Box 4858
Arcata, CA 95518

NCASI
P.O. Box 13318
Research Triangle Park, NC 279909-3318

Pacific Watershed Associates
P.O. Box 4433
Arcata, CA 95518

Ray Miller
3147 Dolbeer Street, #13
Eureka, CA 95503

SHN Consulting Engineers and Geologists
812 W. Wabash
Eureka, CA 95501

Timberland Res. Consultants
165 S. Fortuna Bl. Suite 4
Fortuna, CA 95540

TSI
262 Sunnybrook Drive
Fortuna, CA 95540

**Interested Parties and Parties Requesting Notice**
Alan Gover
White & Case LLP
1155 Avenue of the Americas
New York, NY 10036-2787
**Counsel for MAXXAM Group, Inc.**

Craig H. Averch
Roberto J. Kampfner
White & Case LLP
633 West Fifth Street, 19th Floor
Los Angeles, CA 90071
**Counsel for MAXXAM Group, Inc.**

Vincent E. Lazar*
Michael S. Terrien
Phillip W. Nelson
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611
**Counsel for LaSalle Bank, N.A. and LaSalle Business Credit, LLC**

Henry J. Kaim*
Mark W. Wege*
Bracewell & Giuliani LLP
711 Louisiana, Suite 2300
Houston, TX 77002-2781
**Counsel for LaSalle Bank N.A. and LaSalle Business Credit, LLC**

Vicky Namken
IBM Corporation
13800 Diplomat
Dallas, TX 75234
**Counsel for International Business Machines Credit LLC and International Business Machines Corporation**

Bruce G. MacIntyre
Perkins Coie LLP
1201 Third Avenue, 40th Floor
Seattle, WA 98101-3099
**Counsel for Green Diamond Resource Company**

Andrew Herenstein
Patrick Bartels
Quandrangle Group LLC
375 Park Avenue, 14th Floor
New York, NY 10152

David Neier*
Winston & Strawn LLP
200 Park Avenue
New York, NY 10166
**Counsel for Marathon Structured Finance Fund L.P.**

Eric E. Sagerman*
Winston & Strawn
333 South Grand Avenue, Suite 3800
Los Angeles, CA 90071
**Counsel for Marathon Structured Finance Fund L.P.**

John D. Penn*
Haynes and Boone LLP
201 Main Street, Suite 2200
Fort Worth, TX 76102
**Counsel for Marathon Structured Finance Fund L.P.**

David E. Martinek*
Dun & Martinek LLP
2313 I Street
Eureka, CA 95501
**Counsel for City of Rio Dell**

Steven H. Felderstein*
Paul J. Pascuzzi*
Felderstein Fitzgerald Willoughby & Pascuzzi
400 Capitol Mall, Suite 1450
Sacramento, CA 95814
**Counsel for State of California ex rel. Edmund G. Brown, Jr., A.G., CA Resources Agency, CA Dept. of Fish & Game, CA Dept. of Forestry & Fire Protection, North Coast Region Water Quality Control Board, CA State Water Resources Control Board, and CA Wildlife Conservation Board**

Michael A. Axel
KeyBank National Association
127 Public Square, Second Floor
Cleveland, OH 44114-1306
**Counsel for Key Equipment Finance Inc.**

Theresa J. Betro
1200 K Street, N.W.
Washington, DC 20005-4026
**Counsel for Pension Benefit Guaranty Corporation**

CWY Credit Bankruptcy Department
Con-Way Freight
5555 Rufe Snow Drive, Suite 5515
North Richland Hills, TX 76180

Daniel A. Zazove
Perkins Coie LLP
131 S. Dearborn St., Suite 1700
Chicago, IL 60603
**Counsel for Mendocino Forest Products Company, LLC**

Aetna – Middletown
11300 Tomahawk Creek Parkway, Suite 300
Leawood, KS  66211

Environmental Protection Information Ctr.
c/o Brian Gaffney
Law Offices of Brian Gaffney
605 Market Street, Suite 505
San Francisco, CA  94105

Humboldt Del Norte IPA
3100 Edgewood Road
Eureka, CA  95502

Metlife
Dept. CH 10579
Palatine, IL  60055-0579

National Benefit Resources
Attn. Pat Scallen
6300 Olson Memorial Highway
Golden Valley, MN 55427-4946

William G. Bertain
Law Offices of William G. Bertain
1310 Sixth Street
Eureka, CA  95501
**Counsel for Steve Cave, Edyth Johnson, Alan
Cook and 56 other individuals**

SWRCB
5550 Skylane Blvd. #A
Santa Rosa, CA  95403

United Steelworkers of America, et al.
c/o Jonathan Weissglass
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108

Elizabeth Weller
Linebarger Goggan Blair & Sampson, LLP
2323 Bryan Street, Suite 1600
Dallas, TX 75201
**Counsel for Dallas County**