**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
(CORPUS CHRISTI DIVISION)**

| | | |
|---|---|---|
| IN RE:  SCOTIA DEVELOPMENT, LLC | § | |
| *Et Al.* | § | Chapter 11 |
| | § | Jointly Administered |
| Debtors | § | Case No 07-20027-C-11 |

**PALCO DEBTORS' OMNIBUS RESPONSE IN OPPOSITION TO THE
MOTIONS TO TRANSFER VENUE FILED BY THE CALIFORNIA STATE AGENCIES,
THE OFFICIAL CREDITORS COMMITTEE, THE UNITED STATES TRUSTEE,
HUMBOLDT COUNTY, CALIFORNIA,  CITY OF RIO DELL, AND
LASALLE BANK
[Docket Nos. 184, 231, 275, 293, 294 and 304]**

**TO THE HONORABLE RICHARD SCHMIDT, UNITED STATES BANKRUPTCY
JUDGE:**

Scotia Development Company LLC ("Scotia Development"), The Pacific Lumber Company

("Palco"), Britt Lumber Co., Inc. ("Britt"), Salmon Creek LLC ("Salmon Creek") and Scotia Inn

Inc. ("Scotia Inn") (collectively the "Palco Debtors" and together with Scotia Pacific Company

LLC ("ScoPac"), the "Debtors") file this their Response to the Motions to Transfer Venue (the

"Response") filed by:  (i) California Resources Agency, the California Department of Forestry and

Fire Protection, the California Department of Fish and Game, the California Wildlife Conservation

Board, the California Regional Water Quality Control Board, North Coast Region ("North Coast

Water Board"), and the State Water Resources Control Board ("State Water Board") (collectively,

the "California State Agencies" or the "State Agencies");  (ii)  the Official Creditors Committee

appointed in this case (the "Committee");  (iii)  the United States Trustee ("UST");  (iv)  LaSalle

Bank National Association ("LaSalle Bank"), and  (v)  Humboldt County, California,  and in

support of the Response, the Palco Debtors state as follows:

# I.

## PRELIMINARY STATEMENT

1.      The Palco Debtors are not strangers to the Southern District of Texas.[1]  The venue

motions (collectively the "Venue Motions") of the California State Agencies, the Committee and

the UST and to a lesser extent, LaSalle (collectively, the "Movants") misrepresent the facts

pertinent to venue of these affiliated cases and to the bankruptcy reorganization of the Debtors

and should be denied by the Court.

2.      On January 18, 2007, Scotia Development filed for bankruptcy protection in this

Court. It should be indisputable that Scotia Development's choice of venue was "proper":

- Scotia Development is a Texas limited liability company.

- Scotia Development's principal assets include (i)  two agreements under which it, (among other things) assists Palco and ScoPac in marketing certain real estate owned by Palco and timber and real estate assets owned by ScoPac and  (ii)  two paid-up options to purchase real property in Corpus Christi, within the Southern District of Texas.

- Scotia Development also maintains its only office in Corpus Christi, within the Southern District of Texas.

- Scotia Development's principal place of business is in the Southern District of Texas.

- Two of the three members of Scotia Development's Board of Managers and its president reside in the Southern District of Texas where all major business decisions are made.

---

[1]      Each Debtor, in greater or lesser amount, has its corporate "nerve center" in the Southern District of Texas. *See*, the detailed discussion, *infra*; *See, also*, the ScoPac Brief in Opposition to the Venue Motions, which is incorporated herein by reference.

In short, the Southern District of Texas is the only appropriate venue for a bankruptcy filing by Scotia Development under applicable law.

3.     The Southern District is also a proper venue for the bankruptcy cases of Palco, Britt, Salmon Creek, Scotia Inn, and ScoPac.  Each of these entities is an affiliate of Scotia Development as that term is defined in 11 U.S.C. § 101.   Likewise, as to ScoPac, Britt, Scotia Inn, and Salmon Creek, under the same rationale as more fully set forth *infra* (and in ScoPac's Response to the Venue Motions), their principal place of business is clearly the Southern District of Texas and each of the other Debtors are affiliates of these Debtors as that term is defined in 11 U.S.C. § 101.

4.     As a threshold issue, and notwithstanding the elevated rhetoric of "manufactured" venue, this Court should consider the "weight" that should be given to these Movants' standing in light of the relevant facts, including  (i)   that the  California State Agencies have practically no actual claims at all[2],  (ii)  the Committee, as currently constituted, is controlled by entities <u>without any business relationship with the Debtors</u>, but, instead, only active litigation against the Debtors,

---

[2]     The State of California could identify only $872.00 in liquidated debts in its motion to transfer venue and concedes that its interest in this case is primarily that of a regulator.  California does not need a change of venue to protect its regulatory authority.  Section 362(b)(4) of the Bankruptcy Code provides that the automatic stay does not apply to California's police power.  In addition, section 959(a) of title 28 of the United States Code clearly authorizes California to assert its regulatory power in a California court.  Moreover, a significant dispute between the Debtors and California, namely the Debtors' lawsuit against California to enforce the "Headwaters Agreement", is already being litigated in a California state court.

The State of California and certain of the State Agencies are not creditors, but defendants in a suit brought by the Debtors to enforce the Headwaters Agreement and to recover damages for the State of California's refusal to comply with the contract terms.  That suit is pending in California.  These Agencies are only "parties in interest" to this reorganization, with the on-going (un-stayed) right to supervise the Debtors under the Headwaters Agreement in California, and bring any police power or regulatory action in California*,* notwithstanding the venue of these Debtors' bankruptcy cases.  Environmental oversight is not stayed by 11 U.S.C. § 362 by its express terms.  Venue has no impact on the right to bring, or the venue of, any such action in California.

and so cannot possibly be representative of creditors holding real claims,[3] and (iii) the UST has to date deferred the appoint "real" creditors with a "real" interest in the financial reorganization of these Debtors.[4]  In short, these Movants do not represent either the interests of unsecured creditors or the reorganization process. Movants' representative capacity is in sharp contrast to the more than 65 joinders in the Debtors' Opposition to the Venue Motions by unsecured creditors (holding real claims after having furnished real material, labor, supplies or expertise to the Debtors in excess of $2 million).

5.      Despite the fact that the venue of these cases is undoubtedly proper in the Southern District of Texas, the Movants (other than LaSalle Bank) demand that this Court transfer venue to the United States Bankruptcy Court for the Northern District of California (Oakland Division) (the "California Bankruptcy Court").   Because these Movants do not represent the interests of unsecured creditors, the Court should provide little (if any) weight to the Movants' misplaced arguments.

6.      The Movants request that venue be transferred on two main grounds, neither of which has merit.  First, the Movants argue that Scotia Development is a "sham" created for the single purpose of venue by Scotia Development and its lawyers.  This argument is without merit. Scotia Development has a legitimate business purpose, a legitimate business existence, and an economic interest to protect, all directly related to the Southern District of Texas.  Corpus Christi

---

[3]      Three of the four members of the Committee (as now constituted) are actively suing the Debtors to stop or greatly limit logging.  Although these litigants have no cognizable claims, two of these Committee members, EPIC (the "Interim" Chairman), and the Steelworkers' Union, are suing the Debtors to have the Sustained Yield Plan ("SYP") declared null and void in what the Debtors believe ***is an ongoing effort to stop all logging***.  These suits are discussed in detail, *infra*.

[4]      After having represented in open court almost a month ago that the Committee should be, and would be, reconstituted to include trade creditors, the UST has steadfastly refused the many requests of creditors to be appointed to the Committee, opting to leave the Committee controlled by litigation parties.

boasts some of the least expensive developable ocean and beach front property in the coastal United States and is currently growing at an impressive rate. Palco has a whole town to sell (the town of Scotia, California) without sufficient internal expertise either (i) to deal with the processes needed to get to a sale (i.e., annexation, platting, *etc.*), or (ii) to negotiate contracts and actually sell real property. Scotia Development has extensive and relevant expertise in both. This parallel approach is the most effective way to seek and develop new investment opportunities in South Texas and to realize the greatest value for the California assets.

7.     Second, the Movants argue that venue is improper because "just about everything associated with these companies is located in California," and "the vast majority of the Debtors' creditors and vendors are located in California." [*See*, Committee's Venue Motion, ¶¶ 1-2]. These statements are wrong. In the first place, the fundamental decisions regarding reorganization will be made by the Boards or Directors and Boards of Managers for these Debtors; the center of activity of these Boards is the Southern District of Texas. And with respect to creditors, these cases are national in scope and the large bulk of the number of creditors, and the overwhelming dollar amount of claims, are located ***outside*** of California. Simply put, the California Bankruptcy Court is no more or less convenient a forum than the Southern District of Texas (or, for that matter, Delaware, the domicile for the majority of these Debtors) for the bulk of the Debtors' creditors.

8.     As an example, the Timber Notes, representing $714 million of the outstanding debt against ScoPac (approximately 90% of all ScoPac debt), are publicly traded and are widely held. The professionals of the *ad hoc* committee of Timber Noteholders (who claim to represent a substantial portion of the Timber Note holders) are located in Connecticut, and the indenture trustee and its professionals are located in Houston and New York. Similarly, the overwhelming

bulk of the debt against Palco ($140 million) is also held by non-California creditors (Marathon Structured Finance ("Marathon") and LaSalle Bank). Marathon and its professionals are located in New York, and LaSalle Bank and its professionals are located in Chicago. Marathon, LaSalle Bank and the holders of Timber Notes have not indicated they oppose venue in the Southern District of Texas to date, and in fact LaSalle Bank has filed papers supporting venue in the Southern District of Texas.

9. Finally, in what can only be characterized as a disingenuous argument that the California State Agencies and the Committee should know is not only misleading but untrue, both suggest that the local "mom and pop" creditors located in Scotia or near the operations of Palco, Britt, ScoPac and Scotia Inn will be disenfranchised from this case unless it is sent to the California Bankruptcy Court. Keep in mind there are no "mom and pop" local creditors on the Committee and that the Committee has made not a single request to expand its membership to fairly represent these unsecured creditors with real claims – opting to take all actions to date on behalf of a litigant-controlled Committee.

10. Moreover, the forum suggested by the Movants - Oakland - is at best a four-plus hour drive from Scotia, and there is no convenient commercial air service between Scotia and the Bay Area. These mom and pop creditors (purportedly the concern of the California State Agencies and the Committee) would have to take a day off work and travel over 8 hours just to attend a single hearing in Oakland. Depending on the length of that hearing, any such trip would likely also involve an overnight stay. Accordingly, vendor participation will most likely occur by phone and video conferencing (all initiated and easily accomplished as a matter of every day, every hearing practice in the Southern District of Texas) regardless of whether venue lies in the Southern District of Texas or in the California Bankruptcy Court. Participation by phone can

occur just as easily from the Southern District of Texas as it can in the California Bankruptcy Court. The isolated location of the Debtors' timber operations will dictate that the Debtors' officers located in California will no doubt frequently participate in court hearings by phone regardless of the venue of these cases. The current state of telephone and video conferencing technology makes such participation possible from almost any location.

11.    Interestingly, while the Debtors' vendors are not located in close proximity to the California Bankruptcy Court, two of the members of the Committee—EPIC and the Steel Workers Union—are, just as are the offices of the California State Agencies. The convenience of two disputed creditors, and California State Agencies whose ability to enforce their police powers are not stayed, should not control this Court's decision on venue.

12.    In the final analysis, venue should remain with this Court. This is a national case and one in which unsecured creditors with relatively smaller claims will be able to rely on ease of access (*i.e.* phone, video-conferencing) and should have of a truly representative Committee. The Debtors' other creditors (holding claims of close to $1 billion) and other parties in interest and their representatives are located throughout the United States and in most instances in places other than (northern) California. In this case, all creditors have and will need, regardless of where venue lies, inexpensive and reliable ways to participate in bankruptcy court proceedings other than personal attendance. The California Bankruptcy Court is simply no more convenient a forum than this one.

## II.

## SUMMARY OF THE ARGUMENTS

**A.    Three opinions particularly represent the dominant facts and controlling law of this case:**

*In re of Commonwealth Oil Refining Co., Inc.* 596 F.2d 1239 (5th Cir. 1979).[5]

*In re Peachtree Lane Association, Ltd.* 206 B.R. 913 (N.D. Ill, 1997).

*In re Eagle Pointe Ltd,* 350 B.R. 84 (Bankr. N.D. Indiana, 2006).

13.    These cases are described in detail below.

**B.    The Statutes That Control:**

**1.    Venue of Scotia Development, LLC in the Southern District of Texas is "proper" under 28 U.S.C § 1408, <u>as a matter of law</u>.**

14.    Scotia Development  (i) is a Texas limited liability company (its legal domicile is Texas) located in and operating its business enterprise in the Southern District of Texas since June 2006, with special and specific real estate expertise in both Scotia, California and Corpus Christi, Texas; (ii) whose office is located in Corpus Christi, Texas; (iii) whose assets are located in the Southern District of Texas;  and, (iv) whose principal place of business is in the Southern District of Texas.  Pursuant to § 1408(1), the venue of a chapter 11 case is proper when the case is commenced in the district in which the debtor is domiciled or maintains its principal place of business.  Important here is the fact that the legal test for evaluating the "principal place of business" for venue purposes, Courts apply the "major business decisions" test that focuses on the place where a debtor's ***significant decisions are reached***. . . .  ***(The test is not) an "operational" test that looks to the place where the majority of the debtor's dealings with the***

---

[5]    The Fifth Circuit holdings in Commonwealth applies to venue motions under the Bankruptcy Code and current rules.  *In re Pope Vineyards*, 90 B.R. 252 (Bankr S.D. Tex, 1988).

*public take place.*"[6]   Similarly, ScoPac, Britt, Scotia Inn, and Salmon Creek have their principal

place of business in the Southern District of Texas.

> ### 2.   Venue of Scotia Development, LLC and its Affiliates in the Southern District of Texas is "proper" under 28 U.S.C § 1408, <u>as a matter of law</u>.

15.   The venue of a debtor's chapter 11 case is also proper when the case is

commenced in the same district in which the chapter 11 case of an affiliate of the debtor is

pending.  Section 1408(2) provides, in pertinent part:

> A case under title 11 may be commenced in the district court for the district in which there is pending a case under title 11 concerning such person's affiliate, general partner or partnership.

By virtue of the pending cases of (i)  Scotia Development, and (ii)  ScoPac, Britt, Scotia Inn, and

Salmon Creek, the venue of all relevant Debtors is proper by virtue of their status as affiliates to

these Debtors.

> ### 3.   The Fact-Intensive Analysis of the Convenience of the Parties and the Interest of Justice Standards Demonstrates that Venue Should be Retained in the Southern District of Texas.

16.   Where the "affiliate" filing was "proper", the only venue inquiry involves the

discretionary determinations by this Court of the "convenience of the *parties*" (no single group is

favored under this test) and "in the interest of justice."[7] [*See*, Arguments and Authorities below].

These Venue Motions fail on both these counts.

---

[6]      *In re Peachtree Lane Associates, Ltd*, 206 B.R. 913, 918 (N.D. Ill, 1997) [Emphasis added] citing and relying on the Fifth Circuit in *Matter of Commonwealth.*

[7]      The basic factors governing the transfer of venue of a bankruptcy case were set out in *Puerto Rico v. Commonwealth Oil Refining Co. (Matter of Commonwealth Oil Refining Co.),* 596 F.2d 1239, 1241 (5th Cir. 1979), which has been widely adopted and applied.  Pursuant to this balancing test, a court considering whether a transfer of venue would be in the interest of justice or for the convenience of the parties must consider (1) the proximity of creditors of every kind to the court; (2) the proximity of the debtor to the court; (3) the proximity of the witnesses necessary to the administration of the estate; (4) the location of the assets; (5) the economic administration of the estate; and (6) the necessity for ancillary administration if bankruptcy should result.  *Id*.

17.     It is clear from the actual facts of these cases that there is no single "most convenient" venue for all the parties:

•     The Timber Noteholders, owed in excess of $700 million, are located all over the country.  The Timber Noteholders have approximately 90% of the overall debt of ScoPac.  On a consolidated basis the Timber Noteholders have approximately 70% of the overall debt of all of the  jointly administered Debtors in this case.

•     The Noteholders' Ad Hoc Committee's counsel is located in Connecticut.

•     The Indenture Trustee for the Timber Noteholders is located in New York.

•     One of Palco's two secured creditors Marathon, with a claim of approximately $125 million is located in New York, and has a venue choice of law[8] in its secured loan documents of New York.

•     Palco's other secured creditor, LaSalle Bank, with a claim of approximately $15 million, (as a participant in part of the Marathon debt) is located in Illinois -- Marathon and LaSalle, together holding approximately $140 million in secured debt, represent approximately 70% of the overall debt against the Palco Debtors.  LaSalle Bank has filed its own motion that, while seeking an intra-division "transfer" of venue based on wrong fact assumptions, asserts that venue is proper in the Southern District of Texas in any event.

•     Under the principal place of business test applied in the Fifth Circuit (the "major business decisions" test, or the "nerve center" test), ScoPac, Scotia Development, Britt, Salmon Creek and Scotia Inn all clearly could have filed in the Southern District of Texas where

---

[8]     Although the Bankruptcy Code was drafted to enable the collection of assets in a single forum, courts have balanced this policy with the intention of the parties in electing a forum to resolve disputes. See **M/S Bremen v. Zapata Off-Shore Co**., 407 U.S. 1, 92 S. Ct. 1907, 32 L. Ed. 2d 513, 1972 A.M.C. 1407 (1972) (forum selection clauses are prima facie valid and should be enforced unless enforcement is unreasonable); **In re Diaz Contracting, Inc**., 817 F.2d 1047 (3d Cir. N.J. 1987).

all but one of the directors/managers for these Debtors reside and all Board-level decisions are made.[9]  While the Palco Board is more geographically dispersed, there is also a strong argument that its principal place of business is also the Southern District of Texas.

- The Venue Motions ignore one other very important fact -- the Debtors appear to be solvent.  Consequently, equity, located in the Southern District of Texas, has an important role and interest in the reorganization process.

- The Debtors' non-Debtor affiliates (including the real estate group, accounting, risk management groups), also located in the Southern District of Texas, provide many general and administrative services to the Debtors on a daily basis.   The services all, or substantially all, occur in the Southern District of Texas.

- Proximity to events, witnesses, and the litigation pending in the United States Federal Court for the Southern District of Texas regarding the "Debt for Nature"[10]

---

[9]   *See*, ***Matter of Commonwealth Oil Refining Co.***, 596 F.2d 1239, 1241 (5th Cir. 1979) cert den.

[10]   The factual basis of the Southern District of Texas dealing with the "Debt for Nature" scheme to stop the harvesting of the California redwood trees is a historical fact.  In a remarkable and extraordinarily detailed findings of fact made by the Honorable Judge Lynn Hughes, United States District Judge for the Southern District of Texas, the Debtors' centrality in the FDIC's suit in Houston against their upstream affiliates becomes apparent.  Originally, MAXXAM's investment in a Texas thrift, USAT, had nothing to do with the Debtors, but, in "early 1986, MAXXAM bought Pacific Lumber, which soured the USAT investment in the eyes of the federal authorities.  Op. 7-12.  USAT's chief regulator bemoaned that "that 'it would have made (and would continue to make) his life easier if Charles Hurwitz had never heard of Redwood trees'…." *Id*. at 13.  The political pressure only mounted when, in "August 1993, Congressman Dan Hamburg of California introduced a bill that would authorize the federal government to buy Pacific Lumber's redwoods." *Id*. at 20.  The politicians believed (erroneously) "that the 'principals' of Pacific Lumber—presumably Hurwitz—had bought the company with Drexel bonds and caused United Saving's failure." *Id*.  So, the FDIC began investigating their suggestion "that the FDIC trade its claims against Hurwitz for 3000 acres of redwood forests owned by Pacific Lumber." *Id*. at 22.  By 1995, "People from the White House, Forest Service, Interior Department, OTS, FDIC, and the Vice President's office were now part of the plan to bring actions against Hurwitz and MAXXAM to wring the redwoods from them." *Id*. at 33.   The original plan was sue to "seiz[e] the redwoods," but it quickly "shifted" to "the development of an aggressive and high profile damages case in which the redwoods become a bargaining chip in negotiating a resolution." *Id*.  In response to the FDIC's argument that the "debt-for-nature" effort was "irrelevant" to the case, Judge Hughes concluded, "With this, the FDIC persists in its predilection for deceit.  The record shows that the swap was the only reason for this suit." *Id*. at 108.

underpinnings of Judge Hughes' opinion and judgment in favor of MAXXAM, Inc. (reciting the attempt to extort the assets of Palco and its affiliates) is linked to the Southern District of Texas.

• Modern Technology has greatly impacted the "Convenience of the Parties" analysis. These Venue Motions do not accurately discloses the true nature of the unsecured creditors of this estate and ignore the fact that a transfer of venue alone will not further the ability of these small, localized creditors' participation in this Chapter 11 case. Technology has totally adjusted the application of case authorities on "convenience of the parties." Even a few years ago, without digital transfer of documents; email; convenient, inexpensive and reliable in-court conference calling; efficient teleconferencing;  digital video depositions; and digital transfer of video depositions and massive instant document transfers - the actual *situs* for the convenience of the parties analysis was far more important because the "location" of hard documents, and court-bound participants and witnesses mandated where and how those documents and witnesses could be utilized.  Not so in today's world of digital communications of word and media.  More particularly, not so in the Southern District of Texas, where every courtroom hearing is accessible by telephone;  depositions and related discovery are often ordered and conducted by telephone, and for the convenience of parties, courtroom

---

The District Court's 175 pages of findings of fact and conclusions of law awarded in excess of $72,000,000.00 in cost recovery sanctions in favor of the Debtors' affiliate, concluding:

> (The FDIC) set about using their agency's authority to compel an illegal result wholly unconnected with their legitimate responsibilities and they lied about it all under oath. Whether getting the redwoods was tied to craven submission to a congressional bully or to personal ideology, they were not content with stealing from Hurwitz. Through this case they sought to "cause him pain." They sought to humiliate him.
>
> As George Bernard Shaw said, "power does not corrupt men; fools, however, if they get into a position of power, corrupt power. [footnote omitted] These people discarded the mantle of the American Republic for the cloak of a secret society of extortionists. If the vice president called, they responded. If a congressman called, they responded. If a lobbyist called, they responded. They heeded every call but that of duty and honor. ***Id***.

testimony has been allowed by telephone.  These factors are a critical, but undisclosed element involved in any venue change suggested by the Venue Motions. Not mentioned by the California State Agencies or the Committee, so quick to champion this purported venue need, is the uniqueness of the location of Palco's mill and ScoPac's land (where the vast number of the employee, small vendor and supplier creditor bodies purportedly to be protected by a venue move are located).  Palco's facilities and these small creditors are located over 4 hours away by car from the bankruptcy court located in Oakland, California, requiring an 8-plus hour round-trip drive (and most likely an overnight stay) to attend any hearing "in person."  On the other hand, this Bankruptcy Court allows attendance by telephone at every hearing and video-conferencing when requested and available.  To the extent venue is transferred, the same situation and solution will (presumably) be in place.  In fact, there is no "undue burden" placed on any creditor group, and in particular on any of the smaller Scotia California-based vendors, suppliers, and service creditors primarily because this case is venued in a forum willing to furnish such technology on a day to day, hearing to hearing, basis so critical for creditor participation.  Additionally, the Debtors will be providing at its Scotia California location all of its interested creditors a conference room and free call-in on all "court call" hearings at the Palco facility, and when available, a video-conference hook-up to the Courtroom in real time.

17.    Comparing an 8-plus hour drive (considering just the cost of fuel) required for any of the  small and purportedly disenfranchised California creditors to participate in person, to the current venue made electronically available in real time to all creditors, small or large, assures that these smaller creditors are far more likely to attend and participate in a conference room call in their home town or local area, or attend (by paying a fraction of the fuel costs for a call in "court call" access) by phone (both methods are far less expensive than a day off work,

fuel for the trip and an over-night stay, in Oakland, California).   Absolutely no "undue burden" can be shown by the current venue of these cases, and no improvement results from a change of that venue.

> • The documents of the Debtors are not digitally more convenient if venue is in California – the Debtors' records and documents may be accessed in any state of the nation (digital transfer of documents are instantaneous) and a venue in California will not result in quicker transfer of information.

> • As mentioned above, the California Bankruptcy Court can at best only supply the same technology convenience to full participation in this reorganization case by creditors as the currently venued Bankruptcy Court, which clearly shows no undue burden by retention.

18.    Considering the "interest of justice" analysis, California State Agencies are placed in no undue burden by participation in this Chapter 11 case in the Southern District of Texas. This Bankruptcy Court is as qualified as any bankruptcy court to deal with environmental issues, and is in fact now handling the largest environmental Chapter 11 case ever filed --- with, as mentioned, millions of dollars of actual California-based environmental damage claims.   No possible handicap exists to this Court's ability to understand the rights, needs, and legitimate reorganization positions of the State of California, the United States, the Timber Noteholders, the secured creditors, the unsecured creditors and equity holders.   The California State Agencies now have the right to litigate any issues regarding non-compliance with State agency rules in the California State courts (the automatic stay does not prevent "police power" actions against the Debtors).   The State of California does not have an interest in this estate as an unsecured creditor, No undue burden is place on the State of California in its oversight role.

# III
## RELEVANT BACKGROUND FACTS
### A.    The Affiliate Group

19.    Palco wholly owns Scotia Development, Salmon Creek, Britt, Scotia Inn, and ScoPac.  Palco is wholly owned by MAXXAM Group Inc., a Delaware corporation with its principal place of business in Houston, Texas ("MGI").  MAXXAM Inc. ("MAXXAM"), a publicly traded company, also with its headquarters in Houston, Texas, is the ultimate upstream parent of the Debtors. As illustrated in the Judge Hughes opinion, MAXXAM and its affiliates (in particular Palco and ScoPac) could not have expected what these affiliates ultimately experienced when MAXXAM consummated its tender offer for Palco's stock in 1985.  Since shortly after that time, MAXXAM and various of the Debtors have been at times locked in intransigent litigation with various governmental agencies and other litigants, including the FDIC, the Humboldt County District Attorney, the State of California, EPIC, Steelworkers' Union, and various other environmental groups regarding not only their right to harvest timber from lands which these Debtors own, manage, and count on to conduct their business, but their right to own the redwoods at all.

### B.    The Headwaters Agreement

20.    After several years of voluntary abatement of timber harvesting on certain of its timberlands and extensive negotiations, Palco filed two "takings" lawsuits against the United States and the State of California.  On September 28, 1996, MAXXAM and Palco, on behalf of its subsidiaries and affiliates, entered into an agreement for the settlement of these two "takings" lawsuits and providing the framework for the acquisition of certain timberlands of Palco and its affiliates by the United States of America and the State of California (the "Headwaters Agreement").

21.    In March 1999, Palco, ScoPac and Salmon Creek consummated the Headwaters Agreement with the United States and the State of California.  The Headwaters Agreement is named for the "headwaters" forest area in Humboldt County consisting of approximately 5,600 acres of old growth redwood timberlands formerly owned principally by Palco and Salmon Creek (the "Headwaters Timberlands").  The Headwaters Timberlands were transferred to the United States government in exchange for (i) an aggregate of $300 million, (ii) approximately 7,700 acres of other timberlands, and (iii) approval by the federal and state governments of a habitat conservation plan ("HCP") and the Sustained Yield Plan ("SYP") (together, the "Environmental Plans") relating to substantially all of the timberlands of ScoPac.  During the past seven years, Palco and ScoPac have spent tens of millions of dollars on scientific studies and environmental mitigations related to implementation of the Headwaters Agreement and compliance with the Environmental Plans.

### C.    Formation of ScoPac.

22.    ScoPac, a wholly owned subsidiary of Palco, was organized by Palco in May 1998 to facilitate the sale of the certain collateralized notes (the "Timber Notes").  ScoPac is a special purpose Delaware limited liability company.  ScoPac also has a secured revolving credit facility with Bank of America, which is available to pay up to one year's interest on the Timber Notes (the "ScoPac Line of Credit").

23.    Palco has owned and managed private commercial timberlands in Humboldt County, California for more than 130 years.  ScoPac owns about 200,000 acres of private timberland (the "ScoPac Timberlands") and has the exclusive rights to harvest timber on about 12,000 additional acres of private timberland owned by Palco and its affiliates (the "ScoPac Timber Rights").  The timber in respect of the ScoPac Timberlands and the ScoPac Timber

Rights is collectively referred to as the "ScoPac Timber" and the timberlands in respect of the ScoPac Timber are referred to as the "ScoPac Timber Property."[11]  Palco performs the actual harvesting of timber and the transport of the resulting logs, directly or through subcontractors, and converts the logs into marketable lumber in sawmills owned by Palco and Britt.  ScoPac primarily pays the obligations owing under the Timber Notes with proceeds of log sales.

24.     Housing, construction and remodeling are the principal markets for the lumber products of Palco and Britt (which owns and operates a sawmill in nearby Arcata, California).  Because of various management and sale agreements for ScoPac's trees, ScoPac maintains extensive business relationships with Palco evidenced by several important contracts and agreements.[12]  The failure of Palco to perform under the Purchase Agreement or the Services Agreement may, as provided in the Indenture, cause all principal and interest on the Timber Notes to become immediately due and payable.

25.     Although ScoPac maintains extensive business relations with Palco and certain other affiliates, ScoPac continues to maintain its corporate separateness, submits any conflicts with affiliates to a Special Committee composed of its two Independent Managers, and is solely

---

[11]     As of the Petition Date, there are approximately $714 million of Timber Notes outstanding, as well as approximately $36 million of additional secured revolving credit debt outstanding under the ScoPac Line of Credit.

[12]     These business relationships have been formalized through several written agreements pursuant to which ScoPac sells logs to Palco, Palco renders a variety of services to ScoPac, and ScoPac renders certain services to Palco.  The various written agreements that govern the business relationships and dealings between ScoPac and Palco include, but are not limited to: (i) the New Master Purchase Agreement between ScoPac and Palco (governing the sale to Palco by ScoPac of logs harvested from the ScoPac Timber; the "Purchase Agreement"); (ii) the New Services Agreement (the "Services Agreement") and the New Additional Services Agreement (the "Additional Services Agreement") between Palco and ScoPac (pursuant to which Palco provides a variety of operational, management and related services to ScoPac with respect to the ScoPac Timber Property, and ScoPac provides certain services to Palco); (iii) the New Environmental Indemnification Agreement between Palco and ScoPac (providing for the indemnification of ScoPac by Palco for certain environmental liabilities incurred in connection with the ScoPac Timber Property); and (iv) the New Reciprocal Rights Agreement among Palco, ScoPac and Salmon Creek (providing for reciprocal rights of ingress and egress through, and a number of other rights in respect of, the parties' respective properties).

responsible for payment of any and all amounts owing on the Timber Notes and the ScoPac Line of Credit.

26.    ScoPac currently has three members of its Board of Managers.  All three members reside in Houston, Texas.

### D.    The Interference With the Headwaters Agreement

27.    As a result of increasing regulatory limitations placed on the harvesting of its timber since this debt was created in 1998, Palco's and ScoPac's revenues have been significantly reduced.  Accordingly, even though ScoPac has reduced its outstanding Timber Notes from $867 million in 1998 to $714 million today, its cash flow from operations are not sufficient to service the semi-annual interest payments on the Timber Notes, due to the significant reduction in harvest levels.  The timber industry in general and ScoPac's operations specifically have become increasingly unpredictable and negatively impacted by substantial and expanding regulatory constraints, ongoing litigation challenges, additional legislative impacts, negative judicial decisions, adverse weather, and low log prices.

### 1.    The Committee Members' On-going Litigation Against the Debtors Business

28.    In understanding the concept of fairness brought to this Court by the Committee, the background and brief history of the control-group of this four person committee is important. It cannot be overlooked that three of the four members of the Committee are actively suing ScoPac, Palco, **and** the California State Agencies to effectively shut down ScoPac by stopping or severely limiting the ability to harvest timber. Notwithstanding the momentous and historic resolution of the issues among Palco, ScoPac, the State of California and the United States evidenced by the Headwaters Agreement, EPIC and the Steelworkers Union have engaged in

protracted litigation seeking to set aside various portions of the Headwaters Agreement. Moreover, in filing such lawsuits, these Committee members have sought to have the Headwaters Agreement substantially curtailed so as to be wholly unlike the agreement these Debtors entered into.

29.    In March 1999, EPIC, one of the Committee members, filed suit against ScoPac and its affiliates[13] (the "EPIC-SYP/Permits lawsuit") before the Superior Court in Humboldt County, California (No. CV-990445).   This action alleged, among other things, various violations of the California Forest Practice Act, the California Endangered Species Act, the California Fish and Game Code and the California Environmental Quality Act, and challenged the validity and legality of the SYP, HCP and certain of its state permits.   EPIC effectively sought to shut down ScoPac and Palco by seeking injunctive relief against ScoPac that would prevent implementation of its Timber Harvest Plans ("THPs") and, thereby, its ability to cut and sell timber.  Without such sales, neither Palco nor ScoPac would have cash with which to operate its business and successfully reorganize.

30.    On the same day as the EPIC-SYP/Permits Lawsuit was filed, the Steelworkers' Union filed a similar action,[14] (the "Steelworkers' Suit"), before the Humboldt County Superior Court (No. CV-990452) challenging the validity and legality of the SYP.[15]   The Steelworkers'

---

[13]     This suit is styled *Environmental Protection Information Association, Sierra Club v. California Department of Forestry and Fire Protection, California Department of Fish and Game, The Pacific Lumber Debtor, Scotia Pacific Company LLC, Salmon Creek Corporation, et al.*
[14]     Styled *United Steelworkers of America, AFL-CIO, CLC, and Donald Kegley v. California Department of Forestry and Fire Protection, The Pacific Lumber Debtor, Scotia Pacific Debtor LLC and Salmon Creek Corporation*

[15]  The EPIC-SYP/Permits Lawsuit and the Steelworkers' Suit were consolidated for trial. After the trial court vacated certain of ScoPac's permits and approvals, the Court of Appeal overturned the trial court. EPIC and the Steelworkers Union appealed and the California Supreme Court granted review; the parties have completed briefing and are awaiting oral argument.  A concurrent action in which ScoPac and the

Union is not a union having any connection with these Debtors, just as EPIC is not a creditor owed a debt as a result of any service, sale, or financial arrangement with these Debtors.

31.     Next, in July 2001, EPIC filed another suit against ScoPac and certain other of its affiliates in an action styled *Environmental Protection Information Center v. The Pacific Lumber Company, Scotia Pacific Company LLC* (the "Bear Creek Lawsuit") in the United States District Court for the California Bankruptcy Court (No. C01-2821), which suit was later amended to add the Environmental Protection Agency as a defendant.  The Bear Creek Lawsuit alleges that harvesting and other forestry activities under certain of ScoPac's approved THPs will result in discharges of pollutants in violation of the Clean Waters Act ("CWA").  Contrary to the terms of the Headwaters Agreement, EPIC has asserted that the CWA requires ScoPac to obtain a permit from the North Coast Water Board before beginning timber harvesting and road construction activities and is seeking to enjoin these activities until such permit has been obtained.

32.     Next, on November 2, 2004, EPIC also filed an action styled *Environmental Protection Information Center v. U.S. Fish & Wildlife Service, NOAA Fisheries, et al.* in the U.S. District Court for the Northern District of California (No. C04-4647).  This lawsuit alleges that two federal agencies have violated certain federal laws and related regulations in connection with their oversight of the HCP and the related incidental take permits issued by the federal government (the "Federal Permits").  EPIC also alleges that the Federal Permits for the northern spotted owl were unlawfully issued and that ScoPac violated California's unfair competition law by using false advertising and making misleading environmental claims.

---

state agencies appealed the trial court's award of $6 million in attorneys' fees  (assessed against ScoPac and the California State Agencies) is pending before the California Court of Appeal, but has been abated pending a decision by the California Supreme Court on the merits.

33.    Other than such lawsuits, neither EPIC nor the Steelworkers' Union have any other direct, business or financial interest in ScoPac or the Palco debtors.   EPIC's and the Steelworkers' Union's litigation strategy, however, is motivated solely by their stated desire to set aside the Headwaters Agreement and effectively shut down the operations of ScoPac and Palco.  Such motives are circumspect at best, and are best illustrated by the following quote from their public website:

> Through the infamous Headwaters "Deal," Maxxam/Pacific Lumber obtained a 120-year logging plan and permits to kill marbled murrelets, northern spotted owls, and numerous other imperiled species that are listed as threatened or endangered under the Endangered Species Act. The company also received a "blanket" permit to alter streambeds throughout its 210,000-acre ownership. EPIC filed suit on March 31, 1999 to challenge these plans and permits, including the amount of destruction marbled murrelet habitat they authorize and the deficient manner in which the cumulative impacts of logging such a vast number of acres of ancient forest were analyzed. The suit also challenges the poor standards it sets for a broad, ownership-wide streambed alteration agreement.[16]

34.    The third Committee member of a total of four, Steve Cave, is a plaintiff in a personal injury suit filed against ScoPac and certain of its affiliates on November 20, 2002, in Humboldt County Superior Court under Case No. DR020719 styled *Steve Cave, et al. v. Gary Clark, et al.* (the "Cave Action").  The Cave Action alleges, among other things, that logging practices on the ScoPac Timber Property by the Debtors have contributed to an increase in flooding along Freshwater Creek (which runs through the ScoPac Timber Property), resulting in personal injury and damage to the plaintiffs' properties, notwithstanding the fact that such properties are located in a historical floodplain.  In the Cave Action, the plaintiffs seek to recover $780,000 in alleged property damages and $1,000,000 for emotional distress.

---

[16]    *See* The Environmental Protection Information Center, *Litigation on Maxxam/Pacific Lumber's State Permit to Kill: The Sustained Yield Plan (SYP) and Incidental Take Permit (ITP) Case*, http://www.wildcalifornia.org/projects/headwatersforest.

35.     Remarkably, both EPIC and Steve Cave are represented on the Committee by their counsel, Sharon Duggan and William Bertain, respectively, both of whom represented their respective clients in the on-going litigation described above.  Given (i) the long history and the nature of the litigation brought by EPIC, the Steelworkers' Union and Steve Cave,  (ii) such parties' lack of any real financial stake in the reorganization of these Debtors, and  (iii)  the refusal of the Committee to seek additional "real creditors" on its Committee, it is apparent that the Committee's Motion is yet another tactic in the overall litigation strategy of three of its four members to severely curtail or completely shut down logging operations on the ScoPac Timber Property, thereby greatly impairing the ability to reorganize these cases.  No other creditor groups will be served if this were to occur, with the un-represented unsecured creditors and the Timber Noteholders bearing the brunt of such a deleterious result.

36.     More compelling to the issue of fundamental fairness is the fact that three of the four members of the Committee (and therefore, the Committee itself) are clearly and obviously motivated by litigation.  These controlling members have invested nothing in the pre-petition Debtors' operations, have no desire to deal with these Debtors except in court, and seek only cessation of harvesting or money (or both) from these Debtors' estate (and, of course, money from the unsecured creditors whose interest the UST and the Committee have fiduciary duties to protect).

37.     In addition to the foregoing, the Palco Debtors, as well as ScoPac, have also been negatively impacted by:  (i) litigation relating to the harvesting practices on the ScoPac Timber Property and the approval of ScoPac's THPs, which must be approved before ScoPac Timber can be harvested and (ii) regulatory and legislative burdens and limitations imposed by the North Coast Water Board and State Water Board that are different from and in addition to the

requirements under the habitat conservation plan ("HCP") approved as part of the Headwaters Agreement, and which have increasingly limited the harvest of ScoPac Timber (significantly reducing its revenue), and increased ScoPac's costs.

### 2.    Palco and ScoPac's Suit Against the State of California

38.    Palco and ScoPac have invested many millions of dollars in compliance with and in reliance on the Headwaters Agreement, including Palco building a modern lumber mill capable of milling and manufacturing the at the level of harvesting provided for by the Headwaters Agreement.   After years of litigation by the State of California agencies, on December 20, 2006, Palco and ScoPac filed a lawsuit against the State of California to recover damages for breach of the Headwaters Agreement. The lawsuit, filed in California Superior Court in Fresno, alleges that the State of California's actions have, among other things, restricted ScoPac's ability to harvest its timberlands to a degree that prevents both Palco and ScoPac from remaining economically viable.  Palco and ScoPac allege that the State of California has, among other things, breached its contractual agreements with respect to the management and harvest of ScoPac's and Palco's timberlands. That suit is pending in California.   Thus, instead of the State of California being a creditor of the Palco Debtors, the State of California is likely the future source of one of the largest accounts receivable due the Palco Debtors.

### E.    MAXXAM Inc. Affiliate Services and the Real Estate Group.

39.    Scotia Development's management and governance is controlled by the Scotia Development's agreement of Limited Liability Company (the "Scotia Development LLC Agreement").   Pursuant to Section 3.1 of the Scotia Development LLC Agreement, Scotia Development's business and affairs are managed under the direction of Scotia Development's Board of Managers, which has three members: J. Kent Friedman, Shawn Hurwitz and George

O'Brien.  Two of those three members reside in the Southern District of Texas.  So also, the Board members of Britt Lumber, Salmon Creek and Scotia Inn are Friedman, S. Hurwitz, and O'Brien.  Scotia Development's President, James Shanks, resides in the Southern District of Texas.

40.  MAXXAM Inc., which is headquartered in the Southern District of Texas, and certain of its affiliates furnish considerable general and administrative assistance and other services to its Debtor affiliates, as is common among large corporate groups.  Specifically, MAXXAM provides assistance, in varying degrees, to the Palco Debtors in the following areas:

- Legal Services;
- Risk Management Services;
- Accounting Services;
- Income Tax Reporting and Compliance Services;
- Treasury and Cash Management Services;
- Benefit Services.

The employees and professionals coordinating and accomplishing these services are all located in the Southern District of Texas.

41.  The MAXXAM affiliates include a "real estate group" of affiliates and has special expertise in the purchase, sale and development of real estate.  Palco's debt covenants require the sale of substantial assets and this is how Palco will reduce it debt.  Palco does not have such internal expertise, and therefore relies on Scotia Development to provide these skills and focus.  Palco actually owns the real estate, housing, and all improvements of the town of Scotia, California.  It is one of the few remaining company towns in the United States.  As a result of the actions of the State of California and others, the Palco Debtors and ScoPac were struggling to

maintain income sufficient to service their debt and stay in business, and divestiture of at least some of their assets was necessary.  Accordingly, Palco determined that it would be beneficial for a number of reasons to divest its company town, but did not have sufficient internal expertise in such a large complex project.  The expertise of MAXXAM's real estate group was therefore brought to the fore – similarly, certain personnel from MAXXAM's real estate group began to assist ScoPac with the Land Sale Program.  Individuals providing this assistance are located in the Southern District of Texas, and the services they provide to Palco and ScoPac were being carried out through MAXXAM's real estate group until the formation of Scotia Development.

### F. Scotia Development is Formed.

42.  In early 2006, South Teas was identified as a viable real estate market by MAXXAM's real estate group when it began looking for viable projects along the coast of South Texas.  At the same time, ScoPac's Land Sale Program became an increasingly important part of ScoPac's debt service plan, but ScoPac lacked the real estate expertise necessary to execute the land sales.  Scotia Development was formed to identify real estate opportunities in the South Texas market and to assist Scopac with its Land Sale Program, and Palco with its "Asset Sale Program."  This project reflected the real estate group's decision that not only were new markets necessary for investments, but that the sale of an entire town was a project that needed dedicated attention.  Immediately thereafter, Scotia Development sent James Shanks to Scotia, California to assist with the complex process of annexation of Scotia to the adjacent town of Rio Dell, and to  Corpus Christi to explore the new potential market of North Padre Island and Corpus Christi, Texas.   Scotia Development opened an office in Corpus Christi to have a presence in an area of Texas which might provide investment and development opportunities and entered into a development and sales assistance agreement with Palco and a sales assistance agreement with

ScoPac. Scotia Development's contractual agreements with Palco and ScoPac, among other things, contemplate Scotia Development providing assistance in the marketing, sale or other disposition of timber and other real property interests from time to time identified by Palco and ScoPac.

43.     The formation of Scotia Development followed the same development regimen used by the MAXXAM real estate group in the past regarding other new market areas – a new market is identified, and the economics are subsequently explored in detail to determine if there is a viable project. [17]

### G.     The Reason For the Scotia Development and Palco Debtor Flings

44.     The Debtors were forced to file for bankruptcy protection on January 18, 2007, in order to prevent the loss of substantially all of their assets.  In the course of preparation for doing so, the Palco Debtors and ScoPac properly and legally reviewed the multiple proper venues for their filings, including Texas, Delaware, New York, Illinois and California, and settled upon the Southern District of Texas.  As to Scotia Development, its bankruptcy case could have been filed in no other venue than the Southern District of Texas, absent a prior filing elsewhere by one of the other affiliates.  Therefore the filing of Scotia Development's case in this venue was, without question, entirely proper.

---

[17]     In the same vein, Scotia Development President, James Shanks, is a Vice President of MAXXAM Property Company, Vice President-Scotia Development of Beltway Assets Holdings, LLC; Vice President-Scotia Development of BlueWater Funding, Inc.; Vice President-Scotia Development of Courts at Palmas, Inc.; Vice President-Scotia Development of Lakepointe Assets Holdings, LLC; Vice President-Scotia Development of MCO Mirada LLC; Vice President-Scotia Development of Mirada Property Company; Vice President-Scotia Development of Motel Assets Holdings, LLC; Vice President-Scotia Development of Palmas Country Club, Inc.; Vice President-Scotia Development of Palmas Del Mar Properties, Inc.; Vice President-Scotia Development of PCCI Resources, Inc.; Vice President-Scotia Development of Pharmacy Assets Holdings, LLC; Vice President-Scotia Development of PMO Condominium, Inc.; Vice President-Scotia Development of RM Villas LLC; Vice President-Scotia Development of Surfside Scotia Development Corporation; and President of the Palmas Del Mar Utility Corporation, and the Palmas Del Mar Architectural Review Board, Inc.

45.    Likewise, the "proper" venues available for the other Palco Debtors range across the United States.  They chose the Southern District of Texas, but could have filed in respective states of incorporation or formation (Delaware, Texas or California);  Texas (as the location of their principal place of business under applicable law for Scotia Development, ScoPac, Britt and Salmon Creek); California, or perhaps New York (where the choice of venue provided by their loan and security agreements or the Timber Note indenture).  While there were many proper venues, the choice of the Southern District of Texas was the most appropriate due to it being home to Scotia Development, its location relative to **all** of the Palco Debtors' creditors and proximity to the location of most of the members of the Debtors' Boards of Managers and Directors, proximity to the ultimate equity owner's location, the economic efficiency with which the case may proceed in this venue, and most importantly, the venue's ability to meet the overarching goal of these companies' successful financial rehabilitation and avoidance of liquidation.

### H.    Location of Creditors

46.    Palco and Britt are co-borrowers, and Scotia Development, Salmon Creek and Scotia Inn are guarantors, under (i) a Revolving Credit Agreement dated as of July 18, 2006 with LaSalle Bank and Marathon as lenders (collectively, the "Lenders"), which provides for borrowings up to $60 million,[18] and (ii) a Term Loan Agreement, dated as of July 18, 2006 with Marathon as lender, which provides for borrowings up to $85 million (collectively, the "Credit Agreements").  As of the Petition Date, an aggregate of approximately $140 million (including

---

[18]    LaSalle Bank and Marathon each have 50% of the commitment liability under the Revolving Credit Agreement, except with respect to letters of credit, as to which LaSalle issues 100%.

$14 million in letters of credit) was outstanding under the Revolving Credit Agreement and Term Loan Agreement, and letters of credit respectively.

47.     Marathon is a distressed securities hedge fund and part of Marathon Asset Management LLC headquartered in New York City with offices in London and Hong Kong. LaSalle is the largest bank headquartered in Chicago and operates in 23 states.  LaSalle's parent company, LaSalle Bank Corporation is an indirect subsidiary of Netherlands-based ABN AMRO Bank N.V.

48.     The Credit Agreements with Marathon and LaSalle designate New York courts as having jurisdiction and venue.  Counsel for LaSalle and Marathon reside in Chicago and New York respectively.  Thus, the largest creditors by far of the Palco Debtors are just as conveniently located to Corpus Christi as they are to California—perhaps even more so.

**H.     Location of the Committee**

49.     The United States Trustee has created a joint Committee of unsecured creditors and the Committee has selected Pachulski, Stang, Ziehl, Young, Jones, & Weintraub as its counsel.  As part of the agreement with the Pachulski  firm, Maxim Litvak of the firm will not bill the estate for travel time or expenses to the Southern District of Texas (effectively the same as if a local law firm).   Therefore, the Palco Debtors' unsecured creditors will be fully represented as if they had retained Southern District of Texas counsel, limiting the costs to the estate.

50.     Although not representative of the Committee, the unsecured creditors are largely trade creditors who are based, <u>not in Oakland, California</u>, but in Scotia California, more than a four hour drive away from the Creditors' Committee counsel's closest office in San Francisco, California.   However, Palco's list of twenty largest unsecured creditors includes Stonegate

International, located in Dallas, Texas; Landlord Resources, located in Corpus Christi, Texas; and Pacific Coast Trading located in Reno, Nevada.  The list of ScoPac's 20 largest unsecured creditors includes Aetna in Kansas, DR Systems in Canada, IBM in Canada, Met Life in Illinois, and NCASI in North Carolina.

## I.      Location of Witnesses

51.     This venue serves to aid the administration of this case in several ways including the close proximity of witnesses located in Houston (including individuals who provide services to the Debtors and who may be called at various stages of the proceeding on any number of matters).[19]   The California State Agencies' regulatory proceedings remain in California, un-stayed by these Chapter 11 cases.  So also, the litigation by the Debtors against the State of California remains in California, and is likewise un-stayed.  No undue burden is placed on any State or United States regulator by venue in the Southern District of Texas.  In fact, the State of California and the United States are currently and actively participating in bankruptcy proceedings in the Southern District of Texas in another pending Chapter 11 case involving hundreds of millions of dollars of actual environmental claims in California, Washington and Idaho with not only no objection to venue, but more importantly, with a track record of proceeding in an efficient and fair manner to liquidate the actual claims.

---

[19]     Three of these individuals sought to be deposed by the Movants in the Venue Motions reside in the Southern District of Texas.

## IV.
## THE PALCO DEBTORS' ARGUMENT AND AUTHORITY

### A.    The Original Filing Venue Is Proper For All Debtors in the Southern District of Texas

52.    Scotia Development was lawfully organized as a Texas limited liability company on June 5, 2006, and opened its principal place of business in the Southern District of Texas, where its office was opened in the same locale as it intends to develop real estate.

### B.    Venue Pursuant To 28 U.S.C. Sections 1408  -- Venue is "proper" as a matter of law.

53.    Every venue analysis in chapter 11 filings starts with Section 1408, title 28 U.S.C. Pursuant to § 1408(1), the venue of a chapter 11 case is "proper" when the case is commenced in the district in which the debtor (i)  is domiciled,  *or* (ii) maintains its principal place of business[20] *or* where its principal assets are located.  *See, e.g. Matter of Commonwealth Oil Refining Co.*, 596 F.2d 1239, 1241 (5th Cir. 1979), *cert denied*, 444 U.S. 1045 (1980).  These "venue privileges" . . .  "personal to a litigant"[21] are statutorily disjunctive Section 1408 provides:

> A case under title 11 may be commenced in the district court for the district in which the ***domicile***, residence, ***principal place of business*** in the United States, or ***principal assets*** in the United States of the person or entity that is the subject of such cases have been located for the 180 days immediately preceding such commencement…  28 U.S.C. § 1408(1). [Emphasis Added.]

---

[20] Principal place of business is anywhere the entity has assets or subsidiaries, or, as here for Scotia Development, where the "nerve center", (without regard to assets) is located. *See, e.g.  Matter of Commonwealth Oil Refining Co.*, 596 F.2d 1239, 1241 (5th Cir. 1979).

[21]    *In re Consolidated Companies*,113 B.R. 269 (Bankr. N.D. Tx, 1989).

### (i)    Domicile

54.    This disjunctive statute gives three venue choices to every debtor.   As among these groups of Debtors, the choices based on domicile were: (i) Texas [Scotia Development only];  (ii)  California [Britt only];  or (iii)  Delaware [as to all other Palco Debtors].

### (ii)    Principal Place of Business

55.    The concept of the "principal place of business" is not tied to the Debtors' "principal assets" in any regard, although it may be in the same locale.    Most all courts addressing this issue rely on the ***Matter of Commonwealth's*** test to determine ". . . where general operations are supervised" [*See, e.g., **Eagle Pointe Limited***, 350 B.R. 85, 87-88 (Bankr N.D. Indiana, 2006, *citing and quoting **Commonwealth***) and not where the day-to-day operations occur.  This test is frequently called "the 'major business decisions' test (sometimes referred to as the 'nerve center test.'"  ***In re Peachtree Lane Associates, Ltd***, 206 B.R. 913, 918 (N.D. Ill, 1997) citing and relying on ***Matter of Commonwealth***:

> First, the court selected the legal test for evaluating the principal place of venue, applying the "major business decisions" test that focuses on the place where a debtor's significant decisions are reached. . . .  ***(The test is not) an "operational" test that looks to the place where the majority of the debtor's dealings with the public take place.*** " *Id.* at 918.  [Emphasis Added.]

"Proper" venue as to the principal place of business, thus, follows neither the assets, nor the day to day operations, nor the place where the dealings with the public take place, but the location where a debtor's significant decisions are made -- in this case, the Southern District of Texas for all of the Debtors other than Palco and arguably for Palco.

### (iii)    Principal Assets

56.    Of course with respect to Scotia Development, its only assets match its principal place of business, both being the Southern District of Texas. Each of these alternative venue

choices are "proper" venue no matter the election motive – and any argument that the bankruptcy case must follow the location of the assets simply is not the law. ***Matter of Commonwealth Oil Refining Co.***, 596 F.2d 1239, 1241 (5th Cir. 1979). At its essence, there can be no real argument but that the Southern District of Texas fails to qualify as "proper" venue in these cases for all, or at a minimum, most all, of these Debtors, including most particularly and irrefutably Scotia Development and ScoPac.

### C.     The Affiliate Filings Are All Proper Venue

57.     Likewise, in section 1408(2), Congress expressly allows a debtor to select the venue of an affiliate's title 11 case even if none of the debtor's employees, books, records, or assets are located in the district where such affiliate case was filed. *See* 28 U.S.C. § 1408(2). Section 1408(2) provides, in pertinent part:

> A case under title 11 may be commenced in the district court for the district in which there is pending a case under title 11 concerning such person's affiliate, general partner or partnership. 28 U.S.C. § 1408(2).

That Scotia Development's venue is "proper" under 28 U.S.C. § 1408(1) cannot be argued. For Accordingly, venue for all of the other affiliate filings of these Debtors is "proper" pursuant to 28 U.S.C. §§1408(1) and (2).

58.     Conversely, Scotia Development is an affiliate[22] of each of the other filing Debtors, and its ability to perform its business is closely tied to the success of the affiliate Debtors

---

[22] Pursuant to section 101(2) of the Bankruptcy Code, an "affiliate" includes:
(A) an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor; and
(B) a corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor.

in realizing the value of their California assets.  Scotia Development's financial interests are directly tied to the sale of the California assets on behalf of Palco and ScoPac.

### D.    The Allegations of "Manufactured" Venue.

59.    These Venue Motions themselves actually disclose their own weakness – instead of acknowledging that venue is legally "proper" and advancing the arguments of discretionary transfer of venue ("in the interest of justice" and "the convenience of the parties" to which they claim to be so deserving) and because those discretionary venue facts are patently weak at best, (and because the true motives of the Venue Motions are likewise at best unclear), the Venue Motions attack Scotia Development and its lawyers as having "manufactured" venue in the Southern District of Texas, as if no other business purpose could conceivably have been involved other than to abuse the bankruptcy system.   The condescension of such a position sheds the best light on the motives of the authors and champions of these Venue Motions.  When considering that even were venue found to be not proper, "in the interest of justice" and for 'the convenience of the parties" this Court could, and factually should, retain venue.  *See*, *In re Lazaro*, 128 B.R. 168 (Bankr W.D. Tex. 1991);  *In re Leonard*, 55 B.R. 106, 108-09 (Bankr D.D.C. 1985);  *In re Boeckman*, 54 B.R. 110 (Bankr. D.S.D. 1985).[23]

60.    Notwithstanding the legion of case law that repeatedly recognizes the congressional policy giving multiple venue choices to the same entity, with the right to "plan"

---

11 U.S.C. § 101(2)(A) and (B).

[23]    The Courts generally recognize that since a case could be transferred to an improper venue under 28 U.S.C. § 1412 for the convenience of the parties, it would be illogical to read 28 U.S.C. § 1408 as precluding retention by an improper venue for the parties convenience.  In fact as these cases point out, the same result could be achieved by transferring a case to a proper venue, the coutt in which could then entertain a § 1412 motion and send the case back to the original, "improper" venue.   See, e.g. *In re Deabel, Inc*. 193 B.R. 739, 743 (Bankr E.D. Penn., 1996).

venue of its corporate existence at any stage of its corporate life (from birth to dissolution), the Venue Motions attempt to paint a nefarious scheme that somehow results in burdening the California State Agencies and litigation-controlled Committee with an unfair venue – the Southern District of Texas – in favor of what the Venue Motions suggest is the correct choice – the California Bankruptcy Court.   As noted in detail above, the Venue Motions are wrong on their facts, assumptions and conclusions.   As noted below, they are likewise wrong on the law.

61.     Interestingly, the Committee cites this Court to cases that in fact acknowledge that the venue of these cases is legally "proper."  First, the Committee cites ***Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.),*** 849 F.2d 1393, 1394 (11th Cir. 1988), in support of their request to dismiss the Debtors' chapter 11 cases.  In that case, the debtor's sole asset was an apartment building located over 700 miles from the location of the courtroom.  At the time the chapter 11 petition was filed, the apartment was the subject of a state foreclosure action, and the court found that "the Debtor's financial problems involve essentially a dispute between the Debtor and the Secured Creditors which can be resolved in the pending State Court Action." ***Id.*** at 1394. The debtor also admitted that the case was filed in Florida to prejudice the secured creditors located in Kentucky. ***Id.*** In that instance, the court determined that, <u>although venue was technically proper</u>, the debtor's decision to file in that venue "may" be evidence of bad faith. Nothing even similar to those facts exist here.

62.     The Committee also cites to ***In re Yukos Oil Co.,*** 321 B.R. 396 (Bankr. S.D. Tex. 2005) to support the proposition that, "even assuming that the Debtors could technically meet the requirements of 28 U.S.C. § 1408 … there is absolutely no legitimate basis to sustain venue in this Court."  Creditor Committee's Motion at 15.  However, the facts of ***Yukos*** are so far off the

mark of these Chapter 11 cases, so as to be a meaningless reference.[24]  Nevertheless, even under the drastic facts of *Yukos*, the bankruptcy court held that the debtor was a proper debtor under Section 109 of the Bankruptcy Code and that the bankruptcy court had jurisdiction over the case. *Id*. at 407.

63.     The lead case cited by the California State Agencies, *In re Columbia Western, Inc.*, 183 B.R. 660 (Bankr. D. Mass. 1995), has no applicability to the present request to transfer venue.  In *Columbia Western*, the court held that the debtor filed its case in an improper district because its domicile, residence, principal place of business and assets were all located in the District of Oregon during a greater portion of the 180 days preceding commencement of the case. *Columbia Western*, 183 B.R. at 662.  The remainder of the court's analysis focused on whether it had the power to retain the case even if venue was improper.  *Id*.  The court did not discuss the bankruptcy as a bad faith filing.

---

[24]     *Yukos* involved a chapter 11 filing by a Russian company involved primarily in oil and gas in Russia. In addition, substantially all of *Yukos* affiliates were Russian companies, substantially all of the assets of the affiliates and subsidiaries were in Russia, and Yukos and its subsidiaries had approximately 100,000 employees, almost all located in Russia.  *Id*. at 400.  In dismissing the chapter 11 case, the court noted:

> The reorganization contemplated in Yukos' plan is not a financial reorganization. Indeed, since most of Yukos' assets are oil and gas within Russia, its ability to effectuate a reorganization without the cooperation of the Russian government is extremely limited. The funds which created jurisdiction in this court were transferred to banks in the United States less than one week prior to the filing of the petition, and were transferred for the primary purpose of attempting to create jurisdiction in the United States Bankruptcy Court.
>
> Yukos seeks to substitute United States law in place of Russian law, European Convention law, and/or international law, and to use judicial structures within the United States in an attempt to alter the creditor priorities that would be applicable in the law of other jurisdictions. Yukos appears to hope to subordinate its tax debt, and to transfer causes of action it believes it holds, into a trust for continued litigation.

Yukos has commenced or attempted to commence proceedings in several other forums, including the European Court of Human Rights, and in arbitration. In addition, Yukos has proceedings which appear to remain pending in Russia, and additionally may have access to a bankruptcy proceeding in the arbitrazh courts of Russia. Id. at 400-411.

64.     In the remaining cases cited in the Venue motions, the California State Agencies rely upon misplaced quotes wholly removed from their proper context.  A more complete review of these cases demonstrates their inapplicability to the matter before the Court.[25]   In fact, none of the cases cited in the Venue Motions support their position that venue in the Southern District has been "manufactured" or is a "sham."

### E.     Venue Disputes In Large Chapter 11 Cases

65.     This is a case of national scope, and for a number of reasons, many of which are set out in Honorable Judge Hughes opinion, of national interest.  The Headwaters Agreement was signed by the President of the United States, by the Governor of California, and only after approval by both the California and Federal Congresses.

66.     Historically, bankruptcy courts rarely have transferred venue in large chapter 11 cases.[26]  This reflects an ongoing practical reality in such cases: There is often no one forum that is

---

[25]     *See In re L.F. Popell Co.*, 221 F.Supp. 534 (S.D.N.Y 1963) (*Popell* is case decided under the Bankruptcy Act in which the court held venue was improper because the debtor's domicile and principal place of business were located in Florida); *In re Handel*, 242 B.R. 789 (Bankr. D. Mass. 1999) (*Handel* is a chapter 7 case in which the court denied a creditor's motion to transfer venue and its motion to stay pending appeal because the debtor had established his residence in Massachusetts); *In re McTague*, 198 B.R. 428 (Bankr. W.D.N.Y. 1996) (*McTague* interpreted 11 U.S.C. § 109 to determine if the debtor had enough "property" in the United States to qualify as a debtor under the Bankruptcy Code); *Bank of America, N.T. & S.A. v. World of English, N.V.*, 23 B.R. 1015, 1023 (N.D. Ga. 1982) (the court held that the eligibility requirements of 11 U.S.C. § 109 were satisfied by the debtors); *In re Scott Cable Commc'ns, Inc.*, 263 B.R. 6 (Bankr. D. Conn. 2001) (the court transferred venue *sua sponte* because the Internal Revenue Service brought a post-confirmation adversary proceeding in Connecticut to equitably subordinate certain claims even though the debtor's bankruptcy case was pending in Delaware); *In re Taflan*, 312 B.R. 588 (N.D. W. Va. 2004) (the court dismissed a chapter 13 case stating that venue was improper when the debtor was domiciled and resided in Ohio); *In re Sorrells*, 218 B.R. 580 (10th Cir. BAP 1998) (the bankruptcy appellate panel reversed the bankruptcy court and held that venue was improper in the Western District of Oklahoma because the debtors had no connection to the Western District of Oklahoma).

[26]     Venue of corporate Chapter 11 debtor's case will not be transferred from Southern District of New York to Southern District of Texas, pursuant to 28 USCA § 1412 and Bankruptcy Rule 1014, even though that is where major shareholder's bankruptcy is pending, debtor is incorporated in Texas, and debtor's offices and majority of employees are in Texas, where proximity of creditors favors retaining case in New York, debtor's president and executive who makes all management and financial decisions

convenient for every party.[27]   However, the historical case law and treatment of venue selection rights remains constant, as does the congressional policy behind the venue choices belonging to the Debtor, unchanged even by the 2005 overhaul of the Bankruptcy Code by Congress and even though there were efforts to change the rules governing strategic venue selection to greatly limit the choices.[28]   Congress, with the opportunity to do so, intentionally did not change the venue rules in the Bankruptcy Code or the venue practice that has formed through decades of bankruptcy court and appellate jurisprudence.   *See*, **United States Lines, Inc. v. United States (In re McLean Indus.)**, 196 B.R. 670, 677 (S.D.N.Y. 1996) (stating "Congress [has] spoken by its silence, [and] this Court is not empowered to rewrite the statute"). Notwithstanding the protests and implications of "manufactured" venue, Congress did not limit the legal right to make a venue selection among those properly determine by Congress to be available.

---

now resides in New York, secured creditors are in New York, books from Houston could easily be transported to New York, inventory is stored in New Jersey and Connecticut, and economic administration in best interests of creditors would be more readily accomplished in New York. **In re Suzanne de Lyon, Inc.**, 125 B.R. 863 (Bankr. S.D. N.Y. 1991).

[27]   Venue of Chapter 11 corporate bankruptcy case will not be transferred from District of Maryland, where bankruptcy case of shareholders is pending, to South Carolina pursuant to Bankruptcy Rule 1014 and 28 USCA § 1412, even though debtor's primary assets are 2 radio stations operating out of South Carolina which are or have been managed by South Carolina residents, debtor files tax returns in South Carolina, and other than corporate minute book and shareholder records, no other property of debtor is located outside of South Carolina, because administration of closely related bankruptcy cases of debtor and its shareholders will be more expensive and difficult if they are separated, although half of secured creditors are located in South Carolina, others are located throughout country, ability of creditors to file claims is not prejudiced, business decisions are made in Maryland where shareholders live, fact that radio stations are located in South Carolina will have minimal impact upon administration of bankruptcy case because laws governing stations are standard, and economic administration of estate will be best served by retaining case in Maryland. **In re Ridgely Communications, Inc.**, 107 B.R. 72, (Bankr. D. Md. 1989).

[28]   For example, Sen. John Cornyn (R-Texas) proposed the "Fairness in Bankruptcy Litigation Act of 2005"  (the "Proposed Act") because of perceptions of venue abuse.  The Proposed Act would have made venue proper only where the debtor's principal place of business or its principal assets were located (and would have excluded its state of incorporation, if different). [S. 314, 109th Cong. §1 (2005).][28] Although proposed as stand-alone legislation, the Proposed Act was offered as an amendment to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), but withdrawn as an amendment before BAPCPA became law.

67. It is also clear that 28 U.S.C Section 1412 does nothing to refute, much less reduce, the presumption that a debtor, over the objection of its creditors, can prosecute its chapter 11 case in a "proper" venue. If Congress had intended to confer the automatic right to transfer venue, section 1412 would read that the court **shall** transfer a case to such venue on request of a party in interest. The Bankruptcy Code does not contain such language.

### F. Transfer Of A Case With Proper Venue

68. Section 1412, 28 U.S.C. provides that "[a] district court *may* transfer a case or proceeding under title 11 to a district court for another district, *in the interest of justice* or *for the convenience of the parties*." (emphasis added). *See In re Consolidated Companies*, 113 B.R. 269, 274 (Bankr. N.D. Tex. 1989); *see, also*, Fed. R. Bankr. P. 1014/

69. Although section 1412 allows for significant discretion in deciding whether to transfer venue of a particular case or proceeding, courts have identified certain factors that govern and guide such a determination. In identifying such factors, however, many courts consider the "in the interest of justice" and "for the convenience of the parties" factors as overlapping, but nonetheless often make a distinction between the two prongs. *See, e.g., Matter of Continental Airlines Inc.*, 133 B.R. 585, 587-88 (Bankr. D. Del. 1991); *In re Thomson McKinnon Securities Inc.*, 126 B.R. 833, 835-36 (Bankr. S.D.N.Y. 1991). Conflation of the dual analyses is understandable, given that "the facts and circumstances which inform one evaluation will almost always bear on the other as well." *In re LaGuardia Associates, L.P.*, 316 B.R. 832, 839 (Bankr. E.D. Pa. 2004). Under those circumstances, a single argument is attractive insofar as the issues overlap to the point that analyzing them in the disjunctive would result in considerable repetition. *Id.* In their respective motions, the Movants fail to differentiate their argument between § 1412's two factors.

(i)      **Movants Have The Burden of Proof -- The Debtor's Choice of Venue Should Be Given Substantial Weight When Compared to the "Proof"**

70.     First, the burden is on the entity requesting a change of venue to demonstrate by a preponderance of the evidence that the case should be transferred elsewhere. ***Matter of Commonwealth Oil Refining Co.***, 596 F.2d at 1241.[29]   It is well established that when venue is proper, a debtor's choice of forum is to be accorded substantial weight and deference. ***See In re Consolidated Companies***, 113 B.R. at 274; ***In re Del. & Hudson Ry. Co.,*** 96 B.R. 467, 469 (Bankr. D. Del. 1988), *appeal denied*, 96 B.R. 469 (D. Del.), *aff'd*, 884 F.2d 1383 (3d Cir. 1989).[30]

71.     Second, this discretionary power to change venue should be used sparingly and cautiously.  *See **Commonwealth***, 596 F.2d at 1241; ***In re Enron, Corp.***, 274 B.R. 327, 342 (Bankr. S.D.N.Y. 2002); ***In re Toxic Control Tech., Inc.***, 84 B.R. 140, 143 (Bankr. N.D. Ind. 1988). "[W]here, after balancing all factors, the equities lean but slightly in favor of the movant, the plaintiff's choice of forum should not be disturbed." ***DeRosa v. C.P.P. Corp. (In re Legend Indus. Inc.)***, 49 B.R. 935, 938 (Bankr. E.D.N.Y. 1985); *see also **In re The Bennett Funding Group, Inc.***, 259 B.R. 243, 251 (N.D.N.Y. 2001) ("Plaintiffs choice of forum is normally entitled to substantial weight and should not be disturbed unless the balance of the factors is strongly in

---

[29]      ***Gulf State Exploration Co. v. Manville Forest Prod. Corp. (In re Manville Forest Prod. Corp.)***, 896 F.2d 1384, 1390 (Bankr. S.D.N.Y. 1988), *aff'd* 99 B.R. 543 (S.D.N.Y. 1989), *aff'd* 896 F.2d 1384 (2d Cir. 1990); ***In re Windtech, Inc.***, 73 B.R. at 450*; **In re Raytech Corp.***, 222 B.R. 19, 25-26 (Bankr. D. Conn. 1998);  ***Norton v. Encompass Services Corp.***, 301 B.R. 836, 839 (S.D. Tex. 2003) (*citing **In re Fairfield P.R., Inc.,*** 333 F. Supp. 1187, 1189 (D. Del. 1971)); ***In re Windtech, Inc.***, 73 B.R. 448, 450 (Bankr. D. Conn. 1987).

[30]      "A debtor's choice of forum is entitled to great weight if venue is proper." *See Enron,* 274 B.R. at 342.  "[I]f the movant has not proved by the preponderance of the evidence that the preceding [interests of justice] factors weigh in favor of the transfer, then plaintiff's choice of forum remains the proper venue." *Harnischfeger Indus.,* 246 B.R. at 442; *see Enron,* 274 B.R. at 342 ("Where a transfer would merely shift the inconvenience from one party to the other, or where after balancing all the factors, the equities leaned but slightly in favor of the movant, the [debtor's] choice of forum should not be disturbed.").

favor of the defendant.") (citations omitted)); *Great Am. Res., Inc*., 85 B.R. 444, 446 (Bankr. N.D. Ohio 1988).

### (ii)     The Fifth Circuit Standards and The Convenience of the Parties

72.     The Fifth Circuit in *Matter of Commonwealth Oil Refining Co.*, 596 F.2d at 1241, is instructive to the outcome of this case.  *Commonwealh* established what has become the standard for analyzing the "convenience of the parties" under section 1412 (note, however, this opinion pre-dates "technology" that has modified the weight of several of these categories).  When considering requests to change venue on that basis, courts generally follow the Fifth Circuit's balancing test, weighing:

(1)     the proximity of creditors to the actual courthouse;

(2)     the proximity of the debtor to the courthouse;

(3)     the proximity of the witnesses necessary to the administration of the estate;

(4)     the location of the debtor's assets;

(5)     the economic administration of the estate;  and

(6)     the necessity for ancillary administration if liquidation should result.

*Puerto Rico v. Commonwealth Oil Refining Co. (Matter of Commonwealth Oil Refining Co.)*. 596 F.2d 1239. 1247 (5th Cir. 1979).

73.     In *Commonwealth*, the Fifth Circuit affirmed the retention of in San Antonio, Texas, despite the fact that the debtor's primary assets – a petroleum and petrochemical refinery – was located in Puerto Rico, its majority of creditors were located in Puerto Rico, and the local environmental and other regulatory bodies wanted administration in Puerto Rico.  The Fifth Circuit analyzed the facts and determined that San Antonio, Texas, was the location (i)  best

suited <u>to solve the financial problems of the debtor</u> and  (ii)  to be <u>the least disruptive to the</u> <u>operations of the debtor</u>.  *Id*. at 1248.  In determining that transfer of the bankruptcy case to Puerto Rico was not in the interests of justice, the Fifth Circuit stated as follows:

> The main concern that this implicates is the importance of CORCO to the welfare and economic stability of Puerto Rico and its people.  Because CORCO is a major supplier of petroleum products to Puerto Rico, both the economy and the people of Puerto Rico are vitally concerned with the outcome of the Chapter XI proceeding.  The government contends that the overwhelming concern of Puerto Rico with the continued operations of CORCO require a transfer of this case to Puerto Rico.  ***We disagree.***  Without belittling in the least the extent of Puerto Rico's interest in CORCO, ***that interest is served by maintaining CORCO as a functioning refinery.  This can best be accomplished in San Antonio.  The troubles of CORCO are financial.  The people who can solve those problems are in San Antonio.***

*Commonwealth*, 596 F.3d at 1248 (Emphasis added).

74.     Here, as in ***Commonwealth***, the Court is faced with motions to transfer venue of a pending chapter 11 case to the district in which the debtor's principal assets are located.  In support of such motion, the Movants cite to the Debtors' long-standing ties to the state of California, focusing on the location of it lumber mill, the interest of the state and the public in "activities on timberland" (which are operated by Palco) and such bodies' interest in the "outcome of this Bankruptcy Case as it affects the environment in which they live and the economy upon which they rely."  [*See*, California State Agencies' Motion at 24]. Indeed, the Committee states that Palco and ScoPac and its affiliates are "a California institution." [*See*, Committee Motion at 10].  Aside from the fact that the California State Agencies purport to have less than $850.00 in actual claims announced to date, and realizing that their regulatory rights will not be stayed or adversely impacted by the bankruptcy case no matter where the cases are venued, asset location it is simply not a controlling venue fact.  The Fifth Circuit echoed this in

fact holding that the location of the company's assets *were less important* because the case was a reorganization case and not a liquidation.[31]

75.    ***Commonwealth*** also identified the most important among these factors as "whether the requested transfer would promote the economic and efficient administration of the estate." 596 F.2d at 1247.  *See, also **In re Windtech, Inc.***, 73 B.R. 448, 451 (Bankr. D. Conn. 1987).  As noted above in detail, Scotia, California's geographic location dictates a need to utilize technology to administer any case no matter which United States District has venue, and a change of venue could not possibly improve that circumstance over the procedures and processes employed by the Southern District of Texas to afford every creditor a telephone attendance of all proceedings and electronic access to all filings.  Id. at 1247   Any transfer would simply match the process and procedures already in place to assure access to the Court, pleadings, and proceedings.   Under those circumstances, the Fifth Circuit mandates that venue be retained.

76.    In addition, as demonstrated in the ***Enron*** chapter 11 cases, courts may deny requests to transfer venue based on the traditional legal standards and on very practical standards reflecting modern technology, modern travel,[32] including:

(1)    Deference to the debtor's venue selection (if proper under §1408) [a traditional factor];

---

[31]    As the court stated, "CORCO's assets are in Puerto Rico.  This is of little importance in a (reorganization) proceeding where the goal is financial rehabilitation not liquidation." *Id*. at 1248.

[32]    Venue has been found to be proper under the affiliate rule where a wholly owned subsidiary filed in the same district as its parent corporation  ***In re World of English, N.V.***, 16 B.R. 817, 819-20, (Bankr. N.D. Ga. 1982)] where a corporation filed in the same district as another debtor corporation where an individual stockholder owned in excess of 20% of the stock of each corporation; ***In re Queen City Grain Co.***, 32 B.R. 346, (Bankr. S.D. Ohio 1983)] and where an individual debtor who owned greater than 20% of the stock of the debtor corporation filed in the same district as the corporation. ***In re Ryan***, 38 B.R. 917, 920, (Bankr. N.D. Ill. 1984)

(2)      The court's "learning curve" related to the case;[33]

(3)      The convenience of the original venue for core constituents and their legal and financial advisors;

(4)      ***The ability of creditors located outside the venue to access court documents electronically and participate in hearings telephonically***; and

(5)      The support of the creditors' committee and/or a key creditor constituency for the original venue.

*See,* ***In re Enron Corp***., 274 B.R. 327, 343-51 (Bankr. S.D.N.Y. 2002), as amended by ***In re Enron Corp.***, 317 B.R. 629 (Bankr. S.D.N.Y. 2004). [Emphasis added].    Examining each of these criteria illustrate that this proper venue should not be altered.

### *1.      Proximity of Creditors*

77.      When determining the proximity of creditors, courts must consider the actual number of creditors and the dollar value of their respective claims.  *See **In re Enron Corp.***, 274 B.R. 327, 345 (Bankr. S.D. N.Y. 2002); ***Matter of Commonwealth Oil Refining Co., Inc***., 596 F.2d at 1248.  And the views of secured creditors to be of particular significance on this issue.  *See* ***In re Suzanne de Lyon, Inc***., 125 B.R. 863, 868 (Bankr. S.D. N.Y. 1991); and ***In re Uslar***, 131

---

[33]      Just last June the Board of Governors of the Federal Reserve System empirically proved that bankruptcy creditors benefit from oversight by only one judge.  *See Covitz, Han, and Wilson,* ***Are Longer Bankruptcies Really More Costly?*** FINANCE AND ECONOMICS DISCUSSION SERIES DIVISIONS OF RESEARCH & STATISTICS AND MONETARY AFFAIRS FEDERAL RESERVE BOARD, WASHINGTON, D.C. (www.federalreserve.gov/Pubs/FEDS/2006/200627/200627pap.pdf) ("***Our results show that  . . . the switching of judges during the case, or the existence of more than one judge simultaneously, worsens the outcome for creditors and increases the likelihood of a firm reentering bankruptcy***.").  [Emphasis Added.]

B.R. 22, n. 3 (Bankr. E.D. Pa. 1991) (secured versus unsecured status irrelevant – all claims are considered).

78.     Moreover, courts also consider the convenience in reaching the court, as well as its physical location.  In *In re Del. & Hudson Ry. Co*., 96 B.R. 467 (Bankr. D. Del. 1988), the New York State Department of Transportation ("DOT") filed a motion to transfer venue of a chapter 11 railroad case from Wilmington, DE to Albany, NY.  The bankruptcy court denied the motion even though (i) the debtor operated seven freight yards and three equipment repair facilities in New York; and (ii) smaller creditors, local regulatory agencies, former employees and corporate officers were located in New York.  *Id*. at 468-69.  In so doing, the court noted that the majority of creditors, in terms of both number and money, were scattered throughout the northeast and that Wilmington was in the middle of the northeast rail corridor and within 20 minutes of an international airport, while the transportation schedules in and out of Albany would make one day hearings virtually impossible.  *Id.; see also In re Interlink Home Health Care, Inc*., 283 B.R. 429, n. 28 (Bankr. N.D. Tex. 2002) (the convenience of the forum is as significant as the location of creditors).

79.     To demonstrate the importance of creditors' proximity to the court, the State of California cites to *In re Columbia Western, Inc.,* 183 B.R. 660 (Bankr. D. Mass. 1995) where the court observed "[c]reditors frequently find it difficult to finance an objection because of financial pressures caused by the filing of the case itself.  Increasing the physical distance between those creditors and the forum may eliminate the ability of those to object." *Id*. at 664, n. 11.  However, in *Columbia*, the Court found that venue in Massachusetts was improper where debtor's domicile, residence, principal place of business and principal assets were located in Oregon during a greater

portion of the 180 days preceding commencement of the chapter 11 case and affiliate of debtor had a case pending in Oregon.   None of these facts exist here.

80.     As important, most courts recognize that the proximity of creditors is of less importance in cases of national scope because no one location is convenient for all parties.  ***See In re Ross***, 312 B.R. 879, n. 6 (Bankr. W.D. Tenn. 2004), <u>*aff'd,*</u> ***In re MacDonald***, --- B.R. ----, 2006 WL 3332845 (W.D. Tenn. Oct 31, 2006) (in context of discussion of proper venue for individual chapter 13 and 7 cases, noting "the reality in today's bankruptcy world is that most creditors are national ones, relying upon electronic filings of pleadings in more bankruptcy courts.  Outside of the need in some instances for creditors to have an attorney appear in the bankruptcy court, it may be of little concern to creditors where the individual debtor's case is filed…"); ***Huntington Nat'l Bank v. Indus. Pollution Control, Inc. (In re Indus. Pollution Control, Inc.)***, 137 B.R. 176, 181 (Bankr. W.D. Pa. 1992) (retaining venue of case in Pennsylvania where transfer to Ohio would be more convenient to Ohio creditors while less convenient to others); ***In re Campbell***, 242 B.R. 740 (Bankr. M.D. Fla. 1999) (court refused to transfer chapter 11 case of individual debtor from Florida to Virginia over bank's objection, noting that bank was the only unsecured creditor in Virginia and was a large bank with a national presence holding the vast majority of debtor's unsecured debt); *see also* ***In re Enron Corp.,*** 274 B.R. at 347 (noting that the dockets of all cases pending before the court were available on Pacer, and that the burden of travel could be reduced by permitting telephonic and video conferencing).

81.     When considering this factor, courts have consider the location of the debtor's equity holder. ***Matter of Commonwealth Oil***, 596 F.2d at 1248 (location of stockholders was a factor used for proximity of creditors' test). *See, also,* ***In re Island Club Marina, Ltd.***, 26 B.R. 505, 507 (Bankr. N.D. Ill. 1983) (considering the proximity of the limited partners when analyzing

an application for change of venue); *In re One-Eighty Investments, Ltd.*, 18 B.R. 725, 728 (Bankr. N.D. Ill. 1981) ("The proximity of the limited partners, however, is to be considered by the Court just as the proximity of creditors is.").

### 2.      Proximity of the Debtor to the Court

82.      The State of California and the Creditors' Committee have asserted that the Debtors are forum shopping.  To support their position, they cite to *In re Abacus Broadcasting Corp.*, 154 B.R. 682 (Bankr. W.D. Tex. 1993), where the court granted an order transferring venue from Texas to Utah over the objection of the debtor's owner, explaining:

> venue was permissible in El Paso, but … that it was more appropriately placed in Salt Lake City, given that is the location of the radio stations and their employees. The court specifically noted that, for an operation such as a radio station, it made much more sense to locate the bankruptcy in a venue where the judge presiding would more likely have active familiarity with the community and the milieu in which the station operated, for such a judge would be in a much better position to gauge the likelihood of an effective reorganization.

*Id*. at 683.   *Abacus* was not a case of national size, but totally localized in assets, operations, creditors and economic impact, with the Debtor's creditors, principal place of business, and principal asset in another "more convenient" venue for the Court.  Such facts have no application to the Palco Debtors and the real connection to the Southern District of Texas and this Court.

### 3.      Proximity of Witnesses Necessary to the Administration of the Estate

83.      With respect to this factor, the "concern is with the corporation's employees who must appear in court…"  *Matter of Commonwealth Oil*, 596 F.2d at 1248.  As noted in *In re Enron Corp.*, 274 B.R. at 348 the location of books and records is not a major concern because with modern technology that information can be transported via electronic mail.  The Movants place too much emphasis on the need to have witnesses close to the courthouse mainly because a

venue change will not aid in practically bringing witnesses tied to Scotia, California (or creditors tied to Scotia, California) closer to the Courthouse.   In the *Enron* case, the bankruptcy court also noted the practical facts of a large case:

> [Most of the Debtors' officers] will not be required to attend hearings before this Court.  Rather, the certain participants in the proceedings before this Court will be the professionals retained in these cases.  Subject to court approval, appearances required by the officers (or other management) can be addressed by telephonic and video conferencing capabilities. The limited appearances that may be required of the principals will nevertheless allow them to continue with the management of the businesses.

*Enron*, 274 B.R at 347. (footnotes omitted).  Such analysis is equally applicable here.  It will be the professionals that attend the majority of the hearings, and most of the players in the bankruptcy case have counsel in Texas or New York.   And this Court routinely permits, and even encourages, attendance by telephone, including "listen only" attendance by any creditor or party in interest, or even the new media.  A venue change cannot improve on what this Court's normal and routine practice already is.

84.       In *Enron*, the court also addressed the state agencies who asserted an interest in that bankruptcy case, noting that most of the non-judicial enforcement that concerned such state agencies would still occur in Texas and, to the extent the state agencies needed to appear in the bankruptcy case (in New York), they could utilize the alternative methods of participation provided by the court.  *See Enron*, 274 B.R at 347.  Here, such regulatory activities will continue to occur in California, regardless of the bankruptcy venue.

### *4.       Location of the Assets*

85.       Commonwealth, and many other cases recognize that the location of assets in a chapter 11 case is not particularly important for determining proper venue.  *See **In re Enron Corp.,*** 274 B.R. at 347-48 ("The location of the assets is not as important where the ultimate goal

is rehabilitation rather than liquidation.").[34] The location of the assets is of much greater importance in a chapter 7 case, since liquidation of the assets is a vital element in the administration of the estate.  *See **Matter of Commonwealth***, 596 F.2d at n. 19.

### 5.   *Economic Administration of the Estate*

86.    As noted above, this is the most important of these factors.  *See **Commonwealth Oil Refining Co.,*** 596 F.2d at 1247.  The economic administration of the case includes the need to obtain financing and the location of the sources of such financing and the management personnel in charge of obtaining it.  *See, e.g., **In re Land Steward, L.C***., 293 B.R. 364 (Bankr. E.D. Va. 2002); **Huntington Nat'l Bank v. Indus. Pollution Control, Inc. (In re Indus. Pollution Control, Inc.),*** 137 B.R. 176, 182 (Bankr. W.D. Pa. 1992); ***In re Garden Manor Assocs., L.P.,*** 99 B.R. 551, 554-55 (Bankr. S.D.N.Y. 1988) (court denied motion to transfer even when sole asset was located in another jurisdiction because ability to raise capital, renegotiate loan terms and likely sources of capital were located in current venue).

87.    Consideration of the efficient administration of the estate and judicial economy factors should take into account the "learning curve" of the court, including "consideration of the time and effort spent by the current judge and the corresponding effect on the bankruptcy case in transferring venue."  ***In re Enron Corp***., 274 B.R. at 349.

> "Our results show that  .  .  .  the switching of judges during the case, or the existence of more than one judge simultaneously, worsens the outcome for

---

[34]      ***In re Baltimore Food Systems, Inc.***, 71 B.R. 795, 800-01 (Bankr. D. S.C. 1986) (venue proper where executives, operational and financial control in state where bankruptcy filed, despite fact physical facilities and assets in another state); ***In re Pubco Corp.***, 27 B.R. 139, 141 (Bankr. E.D. Pa. 1983) (location of assets of little importance to debtor, a holding company whose principal assets consist of the stock of four companies not in Chapter 11 as well as two other debtors); ***In re One-Eighty Investments, Ltd.,*** 18 B.R. at 729 (noting that in reorganization, location of assets not particularly important).

creditors and increases the likelihood of a firm reentering bankruptcy." [Emphasis Added.][35]

There can be no dispute that delay resulting from a transfer of venue in this case will occasion disruption in the administration of the Debtors' estates, if for no other reason than as a result of the "shuffling of papers" and other bureaucratic steps requisite to any such transfer.[36]  As such, judicial economy is furthered by retaining this case in the Court in which it is currently located.  Under this factor, the presence of affiliates can, and should be, considered.  ***See In re Pope Vineyards,*** 90 B.R. 252 (Bankr. S.D. Tex. 1988).  If the debtor is affiliated with another debtor-entity (or even a significant non-debtor entity) this factor is generally considered where the intertwined relationship of the debtors suggest proceedings in one district will enhance the economics of the administration of the cases.  *See **In re Waits***, 70 B.R. 591, 593 (Bankr. S.D.N.Y. 1987) ("A significant factor to be considered in this case is the intertwined relationships of the affiliated debtors.").  This is a sub-part and element of the "nerve center" test.[37]

---

[35]    *See Covitz, Han, and Wilson*, ***Are Longer Bankruptcies Really More Costly?*** FINANCE AND ECONOMICS DISCUSSION SERIES DIVISIONS OF RESEARCH & STATISTICS AND MONETARY AFFAIRS FEDERAL RESERVE BOARD, WASHINGTON, D.C.
(www.federalreserve.gov/Pubs/FEDS/2006/200627/200627pap.pdf)

[36]    One consideration is whether transferring venue would result in fragmentation of the bankruptcy proceedings to the detriment of the creditors and the estates.  ***See In re Infiltrator Sys., Inc.***, 248 B.R. 715, 716 (Bankr. D. Conn. 2000) (explaining "that the creditor's claim of inconvenience is more than offset by the interests of other creditors to preserve the assets of the debtor's estate"); ***Gerstl v. Galanis (In re Galanis),*** 6 B.R. 900, 905-06 (Bankr. D. Conn. 1980) (explaining that "[t]aking into account the acknowledged national scope of [debtor's] business operations any factor increasing the likelihood of fragmented proceedings militates against practical and economical administration of the estate").

[37]    ***In re Eleven Oak Tower Ltd. Partnership***, 59 B.R. 626, 628-29 (Bankr. N.D. Ill. 1986) (listing as a factor "the existence of any 'intertwined relationships' between the instant debtor and his affiliates or other debtors before the court"); ***In re Ridgely Comm., Inc.***, 107 B.R. 72, 78 (Bankr. D. Md. 1989) (An additional factor is employed in cases involving affiliated debtors, as in the case *sub judice*, that is "whether the intertwined relationship of debtors requires proceedings in one district.") (citation omitted).

ii. **In the Interest of Justice – the Commonwealth Analysis Supports Venue in the Southern District of Texas**

88. The clearest explication of the standard for the "interest of justice" is found in the Fifth Circuit case of ***Matter of Commonwealth Oil Refining Co.***, 596 F.2d 1239 (5th Cir. 1979). As the Fifth Circuit in ***Commonwealth*** advised, the interest of justice is not necessarily served by administering a bankruptcy case in a local venue where the people and government most connected to the Debtor's daily activities are located. The court stated that such an "interest is served by maintaining CORCO as a functioning company. This can best be accomplished in San Antonio." ***Commonwealth Oil Refining Co.,*** 596 F.2d at 1248.[38]

89. In determining whether transfer of venue is in the interests of justice, again "[t]he factor given the most weight is the promotion of the economic and efficient administration of the estate" illustrating the significant overlap of these two standards. *See*, ***Enron,*** 274 B.R. at 343. (*citing* ***Commonwealth***, 596 F.2d at 1247 ("[T]he most important consideration is whether the requested transfer would promote the economic and efficient administration of justice.")). Contrary to the Movants' arguments, this Court has made considerable progress in becoming familiar with this case and the business and operations of ScoPac and its affiliates. The Court has considered and granted a multitude of first and second day motions, including interim use of cash collateral and payment of certain critical trade creditors. While the controversy surrounding such determinations has not been great, this Court's learning curve is substantially less **at this**

---

[38]     The standard for analyzing the "interests of justice" is less well defined. It has been described as a "broad and flexible standard" that involves "a consideration of whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness and fairness." ***Gulf States Explorations Co. v. Mamille Forest Prods. Corp. (In re Mamille Forest Prods. Corp.)***. 896 F.2d 1384, 1391 (2d Cir. 1990). The "interest of justice" analysis is not well defined. It is a "broad and flexible standard which must be applied on a case-by-case basis," *In re Grumman Olson Industries, Inc.*, 329 B.R. 411, 437 (Bankr. S.D.N.Y. 2005), and contemplates a consideration of whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness. *Enron*, 274 B.R. at 349.

**moment** in time than that of a bankruptcy judge sitting in Oakland, California or any other court. *See Eagle Pointe*, 350 B.R. at 92 (stating that venue transfer depends on facts that exist at the time of such consideration).  Such a learning curve, when coupled with the bureaucratic burdens imposed upon the Court in effecting a venue transfer in a large Chapter 11 case, militates against any potential economy that may foreseeable result from such judicial reassignment.

90.      Given (i) the stated importance of the Palco Debtors and ScoPac to the welfare and economic stability of California and its citizens and (ii) the "vital concern" shared by Californians and their government in the outcome of this case, such interests are, without dispute, best served by maintaining the Palco Debtors as a functioning entity in compliance with the regulatory structure governing its business.  In order to continue its operations, ScoPac must resolve its financial troubles, including a restructure of the public debt currently held by the multitudes of Timber Noteholders located across the country.  Palco to a lesser degree also has creditors spread throughout the country.  The decisions and actions by the Debtors that lead to resolution of these cases will occur, to a substantial degree, in the Southern District of Texas, regardless of the venue of these cases.

### 1.     *Timeliness*

91.      The Palco Debtors do not dispute the timeliness of the Movants' respective Venue Motions.   In fact, the Palco Debtors suggest that these Venue Motions were  (i)   the result of a "knee jerk" reaction  of the California State Agencies (that could muster only $800 in actual claims against Debtors with almost one billion in claims) before considering the fact that all they already have., as a regulator or supervisor of the environment, the California forum for all police power;  and  (ii)  the result of opportunistic litigants suddenly handed control of a Committee supposedly representing unsecured creditors, and seizing the opportunity to further their

liquidation goals (or recovery leverage) to advance their own particular motives, notwithstanding the fiduciary duties involved in their involvement.

### 2.      *Fairness*

92.     The interests of justice must include the interest of fairness.  In this case, fairness compels retention of ScoPac's pending case in the Southern District of Texas.

93     First, prosecution of the Motions to Transfer Venue filed by the Committee and the California State Agencies is motivated by self-serving agendas without regard to the other constituencies in either the Palco Debtors' cases or ScoPac's case – venue in the California Bankruptcy Court is convenient only to the litigation members of the Committee and the offices of the California State Agencies, both notably in San Francisco.  Also notably absent from either motion is any reference to the Timber Noteholders, ScoPac's single largest constituent and the source of ScoPac's financial distress.  Such absence is not surprising given the utter lack of any cognizable claim by the California State Agencies against these Debtors and the contingent litigation claims which serve as the backbone for the standing of the individual Committee members.

94.     Specifically, the California State Agencies assert that they are separate regulatory agencies of the State of California with authority over Palco's and ScoPac's "activities related to timber harvesting and other activities that may impact the environment in California."  [See, California State Agencies' Motion at 5].  Other than the California State Agencies' stated interest in ensuring that these Debtors "comply with 28 U.S.C. § 959(b) and applicable federal and state laws, especially laws enacted to protect public welfare and environment," they are unable to point to a single claim they possess against ScoPac, and almost no claims at all against the Palco Debtors.  [*See*, California State Agencies' Motion at 8].    Cutting to the chase of the Venue

Motions, it is the States concern that possibly these Debtors **may** take some action in this case that may undermine the California State Agencies' regulatory authority, despite:  (i)  there being no automatic stay preventing the California State Agencies from dealing with such future event, if ever it arises, in the State of California;  (ii)   the voluntary inclusion in the cash collateral orders entered in this case that nothing in such orders would relieve these Debtors of any obligations under federal, state or local police or regulatory laws or under 28 U.S.C. § 959(b);[39] and (iii)  the fact that the past six (6) year history of these Debtors' operations, spending millions of dollars a year in compliance, has resulted in less than $850.00 in unsecured claims purportedly owing to the California State Agencies. Hardly a track record that would engender fear in a reasonable mind.   These unarticulated potential injustices that these Debtors **may** seek to impose upon on the citizens of California by modification of the current regulatory scheme governing these Debtors, with this Court serving as the medium for manifesting such vague prophecies of doom, is simply not logical nor recognizable as a legal basis to support a venue change.

95.     In determining whether to transfer venue, a Court is not required top examine the "mights," rather it must be focused on "***concrete facts that exist at the time that the motion [to transfer venue] is considered***."  *Eagle Pointe*, 350 B.R. at 92.  [Emphasis Added.]  As stated by the court in *Eagle Pointe*:

> A meteor the size of a small automobile "might" penetrate the earth's atmosphere and obliterate the court complex in South Bend, Indiana or in Detroit, Michigan; a fire in the cafeteria of either of those two courts might cause the shutdown of either facility for a number of months; a *pro se* litigant "might" file a multi-million dollar wrongful eviction action against the debtor.  ***Transfer of venue consideration by the Court focuses on what is, and not what might be***.

*Id*.  [Emphasis added.]

---

[39]     *See* Second Interim Order Authorizing ScoPac's Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code and Setting Hearing [Docket No. 74] at ¶ 32.

96.     Finally, the concept in the Venue Motions that regulators have an interest in being in proximity to the California Bankruptcy Court because that Court "will be somehow more attuned to the issues which might arise in [these Debtors'] cases in [Texas]" is unfounded and for the most part irrelevant.  *See, e.g.* **Eagle Pointe** at 97.  The Fifth Circuit in **Commonwealth** acknowledged the same.  Although it is clear that the California State Agencies and the litigant-controlled Committee's desire the California Bankruptcy Court, it cannot be argued that the Southern District of Texas is less attuned to the issues of these constituencies, or is not capable of handling the legal and practical matters arising in these reorganization cases, or that California operates other than under our Constitution and constitutionally valid laws, rules and regulations that this Court will understand and appropriately enforce.

### V.
### CONCLUSION

97.     The Venue Motions are not representative of the facts, of the applicable law, nor of the true needs or desires of those creditors and parties in interest. The Venue Motions do not champion the allegedly disenfranchised, but champion agendas of regulatory agencies the target of litigation by the Debtors, and a litigant-controlled Creditors' Committee.  The Committee is controlled by three litigants without a single cent invested in their dealings with these Debtors. EPIC and the Steelworkers' Union are suing the Debtors to materially stop timber harvesting – while Cave is suing for "emotional distress" claiming that his purchased in an existing flood plane land has been flooded by the Debtors' timber harvesting.  In face of these facts, neither the UST or the lawyers representing the Committee have sought to re-constitute this Committee. Humboldt County, California sued and lost.  Under such circumstances, traditional notions of

fairness dictate that the interest of justice will be best served by retaining venue of Debtors' cases in the Southern District of Texas.

98.     These Motions ignore the financial realities of these Debtors, including  (i)  the more than $715 million in secured debt held by Noteholders across the country due by ScoPac; (ii)  $140 million in secured debt owed by Palco Debtors; and  (iii)  the true needs of the "mom and pop" real creditors who do not want to see their employer, their purchaser of their product and services, litigated to death by EPIC, the Steelworkers' Union, Cave or, for that matter, the State of California.   More importantly, configured as they are, little weight should be given to these Movants whose access to this Court room is clothed with fiduciary obligations to the unsecured creditors that the Committee is ignoring.

99.     Finally, the Venue Motions completely disregard reality of the location of Scotia Development's legitimate business purpose, and the principal place of business of these Debtors in the Southern District of Texas.

100.     Venue, thus, is proper in the Southern District of Texas, and any transfer of venue to the California Bankruptcy Court would serve neither the interests of justice nor the convenience of the parties.  The Motions to Transfer Venue, therefore, should be denied.

WHEREFORE, the Palco Debtors request entry of an order (i) denying each of the Movants' Motions to Transfer Venue, and (ii) granting the Palco Debtors such other and further relief as the Court deems just and proper.

Respectfully submitted this 23rd day of February, 2007.

Respectfully submitted,


/s/   Shelby A. Jordan
Shelby A. Jordan

State Bar No. 11016700; Adm. No. 2195
Harlin C. Womble
State Bar No. 21880300; Adm. No. 8959
Nathaniel Peter Holzer
State Bar No. 00793971; Adm. No. 21503
***JORDAN, HYDEN, WOMBLE, CULBRETH, &***
***HOLZER, P.C.***
500 North Shoreline Drive, Suite 900
Corpus Christi, TX 78471
Telephone:    361.884.5678
Facsimile:    361.888.5555
Email:  sjordan@jhcwlaw.com
         hwomble@jhwclaw.com
         pholzer@jhwclaw.com


Jeffrey L. Schaffer
California State Bar No. 91404
Gary M. Kaplan
California State Bar No. 155530
***HOWARD, RICE, NEMEROVSKI, CANADY,***
***FALK & RABKIN, A Professional Corporation***
Three Embarcadero Center, 7th Floor
San Francisco, CA  94111-4024
Telephone:    415.434.1600
Facsimile:    415.217.5910
Email:  gmkaplan@howardrice.com

**BANKRUPTCY COUNSEL TO SCOTIA
DEVELOPMENT, LLC, THE PACIFIC
LUMBER COMPANY, BRITT LUMBER CO.,
INC., SALMON CREEK, LLC, AND SCOTIA
INN, INC.**


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been or will be served on the venue notice parties via e mail and on those listed on the attached Service List by e mail, or by U.S. mail, first class, postage prepaid, or via electronic transmission via the ECF system on February 23 or February 26, 2007.


*/s/ Nathaniel Peter Holzer*
Nathaniel Peter Holzer