UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re: | § | Jointly Administered |
| | § | |
| SCOTIA DEVELOPMENT LLC, *et al.*, | § | Case No. 07-20027-C-11 |
| | § | |
| Debtors. | § | (Chapter 11) |

### SCOPAC'S FINAL ORDER AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE
[Related Docket No. 17]  # 372

This matter came on for consideration upon the Motion for Final Order Authorizing Scopac's Use of Cash Collateral (the "Motion") filed by Scotia Pacific Company LLC, a debtor and debtor in possession in the above-captioned jointly administered chapter 11 bankruptcy cases ("Scopac"), seeking, inter alia, authority for Scopac (i) to use Cash Collateral and the funds in the SAR Account (each as defined below); and (ii) to provide adequate protection to Bank of America National Trust and Savings Association ("BofA"), the Trustee under the Indenture dated July 20, 1998 between Scopac and State Street Bank and Trust Company, its successor being the Bank of New York Trust Company, as amended (the "Indenture"), (the "Trustee"), on its own behalf and on behalf of BofA and the holders of the Timber Notes (defined below) to the extent of any postpetition decrease in the value of the interest of BofA, the Trustee and the Noteholders in the Prepetition Collateral (as defined below) within the meaning of Section 361 and Section 363 of the Bankruptcy Code.

### I. SUPPORT FOR MOTION; RELIEF REQUESTED

1.  In support of the Motion, Scopac presented the Affidavit of Gary L. Clark in Support of First Day Motions, sworn to on January 19, 2007 (the "Clark Affidavit"), and the Affidavit of Jeffery Barrett filed and sworn to on March 1, 2007 (the "Barrett Affidavit",

CTDOCS/1683848.2

together with the Clark Affidavit, the "Affidavits"). Based upon the Affidavits, pleadings, evidence adduced by the parties, and representations of counsel, and it appearing that the relief requested in the Motion is in the best interests of Scopac, its estate, and all parties in interest, the Court hereby (i) grants the relief requested in the Motion to facilitate the reorganization of Scopac's business (ii) finds that all objections have been resolved by this order, withdrawn, or the extent not withdrawn have been overruled, and (iii) finds and orders as follows:

## II. STATEMENT OF JURISDICTION

2. This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 1334 and 157. Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A), (K), (M), and (O).

## III. NOTICE

3. Sufficient and adequate notice of the Motion and the hearing thereon was provided pursuant to Federal Rules of Bankruptcy Procedure 2002, 4001(b), and 9006, and as required by Sections 361 and 363 of the Bankruptcy Code. No further notice of, or hearing on, the relief sought in the Motion is necessary or required.

## IV. FACTUAL BACKGROUND

4. On January 18, 2007 (the "Petition Date"), Scopac filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

5. Scopac continues to operate its business and manage its properties as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

6. No trustee or examiner has been appointed in Scopac's case. A joint creditors' committee has been appointed to serve for all six of the debtors whose cases have been administratively consolidated under the caption above (the "Committee").

7. Scopac owns (i) approximately 200,000 acres of timberlands in Humboldt County, California along the northern California coast, which timberlands are comprised of redwoods, Douglas fir and other conifers (the "Scopac Timberlands") and (ii) the exclusive right to harvest on approximately 12,200 acres of timberlands owned by The Pacific Lumber Company ("Palco") and Salmon Creek LLC (the "Scopac Timber Rights" and together with the Scopac Timberlands, the "Scopac Timber").

8. Scopac's business requires working capital to fund payroll and payroll taxes and to pay normal operating expenses.

### V. THE PREPETITION SECURED OBLIGATIONS

9. In July 1998, pursuant to the Indenture, Scopac issued $867.2 million aggregate principal amount of secured notes, in three classes: (i) 6.55% Series B Class A-1 Timber Collateralized Notes due 2028, aggregating $160.7 million (the "Class A-1 Notes"); (ii) 7.11% Series B Class A-2 Timber Collateralized Notes due 2028 aggregating $243.2 million (the "Class A-2 Notes"); and (iii) 7.71% Series B Class A-3 Timber Collateralized Notes due 2028 aggregating $463.3 million (the "Class A-3 Notes," together with the Class A-1 Timber Notes and the Class A-2 Timber Notes, the "Timber Notes"). The Timber Notes are due at various times through July 20, 2028. The Timber Notes are obligations solely of Scopac and do not constitute obligations of, and are not guaranteed by, Palco or any other entity.

10. Interest and certain payments are due to be paid to the holders of the Timber Notes (the "Noteholders") semiannually, on January 20 and July 20 of each year (each, a "Note Payment Date").

11. A group of Noteholders (the "Ad hoc Committee") has retained counsel and has appeared in this case through such counsel. The Ad hoc Committee has identified its members to Scopac and represented to the Court that, as of March 1, 2007, the members of the Ad hoc

Committee own or control more than ninety percent (90%) in principal amount outstanding of the Timber Notes.

12. The Trustee, on behalf of the Noteholders, holds a claim (as defined in Section 101 of the Bankruptcy Code) against Scopac with respect to the Timber Notes in an aggregate amount, as of the Petition Date, of approximately $713,800,000 in unpaid principal, plus interest and additional sums for reasonable costs, reasonable attorneys' fees and other amounts authorized under the Indenture and the Deed of Trust (as defined below), the Bankruptcy Code and applicable law (the "Timber Notes Claim"). Without limitation as to the foregoing or to other amounts, the Trustee and the Ad hoc Committee assert that the Timber Notes Claim also includes the Prepayment Premium (as defined in the Indenture).

13. Additionally, Scopac is the borrower under a one-year, renewable line of credit pursuant to a Credit Agreement dated as of July 20, 1998 (as amended, the "Scopac Line of Credit") by and between Scopac and BofA, as lender and as agent for itself and any other lender parties thereto. Advances under the Scopac Line of Credit are used to finance up to one year's interest payments due on the Timber Notes. The maximum amount Scopac may borrow is equal to one year's interest on the aggregate outstanding principal balance of the Timber Notes (the "Required Liquidity Amount"). The maximum amount available on the BofA loan was approximately $17,279,085 as of the Petition Date. On May 18, 2006, the Scopac Line of Credit was extended to July 6, 2007.

14. BofA holds a claim (as defined in Section 101 of the Bankruptcy Code) against Scopac with respect to funds advanced under the Scopac Line of Credit in an aggregate amount, as of the Petition Date, of $36,214,344 in unpaid principal, plus interest and additional sums for reasonable costs, reasonable attorneys' fees and other amounts to the extent authorized under the

Scopac Line of Credit and Deed of Trust, the Bankruptcy Code and applicable law (the "Prepetition BofA Claim"). The Prepetition BofA Claim and the Timber Notes Claim are referred to collectively as the "Prepetition Claims."

15. The Prepetition Claims are secured by perfected, jointly-held senior liens and security interests in substantially all of Scopac's assets pursuant to the Deed of Trust, Security Agreement, Financing Statement, Fixture Filing and Assignment of Proceeds dated as of July 20, 1998 (as amended, the "Deed of Trust"), from Scopac to Fidelity National Title Insurance Company for the benefit of the Trustee, including: (i) the Scopac Timber; (ii) approximately $40,000,000 in funds contained in the Scheduled Amortization Reserve Account as defined in the Indenture (the "SAR Account"); (iii) approximately $2,500,000 in funds held in other accounts at BoNY; (iv) certain computer hardware and software, including a geographic information system containing information on numerous aspects of the Scopac Timberlands (subject to certain rights of concurrent use by Palco); (v) certain other assets, all as more fully described in the Deed of Trust (collectively, the "Prepetition Collateral").[1] The proceeds and product of the Prepetition Collateral constitute cash collateral (as that term is defined in the Bankruptcy Code) (the "Cash Collateral").

16. Nothing contained herein (a) constitutes a finding of fact or conclusion of law as to the amount, validity, enforceability, perfection, priority or allowance of the Prepetition Claims and the Prepetition Collateral, (b) binds the Committee or any other party in interest from challenging the amount, validity, enforceability, perfection, priority or allowance of the Prepetition Claims and the Prepetition Collateral amount or any party in interest from responding

---

[1] Notwithstanding the fact that both the Trustee and BofA hold the same lien on a joint basis, Scopac asserts that the Indenture provides that BofA's right to payment is senior to the Timber Notes Claim in certain circumstances.

to any such challenge, and (c) independently confers (i) standing on any party, or (ii) creates any substantive right to challenge the amount, validity, enforceability, perfection, priority or allowance of the Prepetition Claims and the Prepetition Collateral amount.

17. Notwithstanding any provision of the Indenture, the Trustee is directed to permit use of Cash Collateral, specifically including the SAR Account, consistent with the provisions of this Order, and the Trustee shall not suffer any liability to any Noteholder, or any other party, and shall be held harmless from any such liability that could exist or arise as a result of the entry of this Order, the giving of effect to this Order and as a result of any action of the Trustee taken to give effect to and implement the terms of this Order. Nothing in this Order shall be considered or constitute a determination of the extent, validity or priority of the liens and encumbrances of BNY, the Noteholders and BofA with respect to their interests in the SAR account.

18. The agreements and arrangements authorized in this Order have been negotiated in good faith, at arms-length, are fair and equitable under the circumstances, and are enforceable pursuant to their terms. BofA, the Trustee, the Ad hoc Committee, the Committee and Scopac have acted in good faith (including, without limitation, as that term is used in Bankruptcy Code Section 363) in the negotiation and preparation of this Order, have been represented by counsel, and intend to be and are bound by its terms.

19. Notwithstanding any provision herein to the contrary, the Committee, shall have a ninety (90) day period, commencing on the date hereof to investigate the amount of the Prepetition Claims and the extent, validity or priority of BofA's and the Trustee's liens upon the Prepetition Collateral. Absent the filing of an objection or complaint, the Prepetition Claims shall be deemed allowed claims, and the liens, security interests and pledges granted by Scopac

to or for the benefit of BofA and the Trustee in the Prepetition Collateral pursuant to the Indenture, Scopac Line of Credit and Deed of Trust shall constitute valid, enforceable and perfected liens, security interests and pledges without the need for BofA or the Trustee to take any further action or make any filings, all rights or causes of action which otherwise could have been asserted by any such party in interest shall be deemed waived, released and forever barred, and the same shall be binding on any successor Chapter 7 or Chapter 11 trustee appointed in Scopac's Chapter 11 case. Notwithstanding anything contained herein to the contrary, in the event that an Event of Default occurs or this Order is terminated and not renewed with provisions substantially the same as the provisions of this paragraph 25 before the Committee has completed its investigation or review of the Indenture, the Scopac Line of Credit and Deed of Trust and liens supporting the Prepetition Collateral, the liens, security interests, pledges and superpriority rights granted herein or in the Indenture, Scopac Line of Credit and Deed of Trust to BofA and the Trustee shall be subject and subordinate to an aggregate amount of $150,000 for the Committee's investigation of the Prepetition Claims and the extent, validity and priority of BofA's and the Trustee's liens upon the Prepetition Collateral. In no event shall any Cash Collateral (as that term is defined in the Bankruptcy Code) in which BofA and the Trustee have an interest (the "Cash Collateral") be used to pay professional fees or disbursements incurred in connection with the filing, preparation or prosecution of any claims or causes of action against BofA or the Trustee challenging or raising any defense to the Prepetition Claims or any lien, pledge or security interest of BofA or the Trustee; *provided, further*, that nothing herein shall preclude Scopac from reimbursing any fees and expenses incurred by any statutory committee in investigating or reviewing the Indenture, the Scopac Line of Credit, the Deed of Trust and the liens supporting the Prepetition Collateral incurred on or after 120 days after the Petition Date.

## VI. USE OF CASH COLLATERAL

20.     Without the use of Cash Collateral, Scopac will not have the funds necessary to pay post-petition payroll, payroll taxes and expenses of Scopac's business. Thus, Scopac requires the use of Cash Collateral as provided herein.

21.     Scopac has requested BofA, the Trustee and the Ad hoc Committee to permit the use of Cash Collateral in order to provide necessary funds to avoid harm to Scopac's estate.

22.     The use of Cash Collateral, to the extent authorized by this Order, is in the best interest of, and will benefit, Scopac, its creditors and its estate. Scopac's ability to operate its business and have any realistic prospect to reorganize depends upon its access to financing. The relief requested in the Motion is necessary, essential and appropriate for the preservation of Scopac's estate and the operation of its business.

23.     Good, adequate, and sufficient cause has been shown to justify the granting of the relief requested in the Motion. The use of Cash Collateral by Scopac as set forth in this Cash Collateral Order will avoid harm to Scopac, its estate and assets.

24.     Each of BofA and the Trustee (on behalf of BofA and all of the holders of the Timber Notes including the members of the Ad hoc Committee), as the holder of secured claims against Scopac, is entitled to adequate protection of its interests, if any, in the Prepetition Collateral and the Cash Collateral under Section 363(e) of the Bankruptcy Code; provided, however, that the Replacement Liens shall have the same scope, validity, perfection, relative priority, and enforceability as BofA's and the Trustee's prepetition security interests.

25.     Scopac may use Cash Collateral solely in accordance with the budget attached hereto as Exhibit "A," as same may be modified from time to time in writing with the prior written consent of BofA, the Ad hoc Committee, the Committee and the Trustee (as so modified from time to time, the "Initial Budget") approved herein, which is attached hereto; provided,

however, that Scopac, in connection with further requests for approval of use of Cash Collateral beyond the period specified in the Initial Budget, intends to develop a further detailed budget (together with any subsequent budgets, the "Additional Budgets"). In addition, Scopac may use Cash Collateral to the extent reasonably necessary to pay expenses incurred to preserve Scopac's assets from sudden and catastrophic loss and to preserve life and property in the event of any fire, environmental incident or other extraordinary event, provided that if any such expenditures of Cash Collateral are made, Scopac will provide BofA, the Trustee, counsel for the California State Agencies, counsel for the Federal Agencies, counsel for the Committee and counsel for the Ad hoc Committee with immediate notice thereof. Scopac will provide copies of any Additional Budgets to the California State Agencies and the Federal Agencies.

26. Scopac's right to use Cash Collateral under this Order may be extended beyond the term of the Initial Budget, under an Additional Budgets, with the consent of BofA, the Trustee, the Ad hoc Committee and the Committee without a Court hearing or further order of the Bankruptcy Court. All provisions of this Order shall apply to any such further Cash Collateral usage.

27. In the event that Scopac, BofA, the Trustee, the Ad hoc Committee and the Committee are unable to reach an agreement on an Additional Budget, then Scopac's right to use Cash Collateral shall cease when the term of the then current budget ends, pending a further order of the Bankruptcy Court. Scopac may move the Bankruptcy Court for interim authority to use Cash Collateral on five (5) business day's notice.

## VII. ADEQUATE PROTECTION; OTHER PAYMENTS

28. As adequate protection of the interests, if any, of BofA, the Trustee and the Noteholders in the Prepetition Collateral and Cash Collateral, this Court grants each of BofA and the Trustee, on its own behalf and on behalf of BofA and the Noteholders, a first priority,

perfected replacement lien and security interest in all the property of Scopac of the same type as the Prepetition Collateral in which BofA and the Trustee do not have a lien because of the operation of Section 552 of the Bankruptcy Code and in the Cash Collateral of Scopac, to the extent of the postpetition diminution of its interests in the Prepetition Collateral and the Cash Collateral (the "Replacement Liens"). Each of BofA and the Trustee, on its own behalf and on behalf of BofA and the Noteholders, is also granted a superpriority cost of administration priority claim under 11 U.S.C. § 507(b) to the extent of the postpetition diminution of its interests in the Prepetition Collateral and the Cash Collateral. BofA's and the Trustee's superpriority administrative claims under 11 U.S.C. § 507(b), if any, granted hereunder shall be subject to the fees and expenses of the Office of the United States Trustee and the Clerk of the United States Bankruptcy Court for the Southern District of Texas (collectively, the "Trustee Fees").

29.    As additional adequate protection, and to the extent Scopac has funds to do so, Scopac, without further order of or application to the Court, shall pay to BofA all interest (calculated at the non-default interest rate) fees and expenses that become due subsequent to the Petition Date under the Scopac Line of Credit when such fees become due thereunder and shall pay to the Trustee all fees and expenses that become due subsequent to the Petition Date under the Indenture when such amounts become due, *provided, however*, that as set forth more fully in paragraph 33 below, to the extent that in any reporting period Scopac's aggregate expenses other than professional fees exceed 110% of the amount budgeted for such expenses for such period (an "Expense Overage Period"), the amount of interest paid by Scopac pursuant to this paragraph shall be increased by one percent per annum for the reporting period immediately following such Expense Overage Period. Scopac reserves the right to contend at any time after entry of this

order that the value of Prepetition Collateral does not exceed the total amount of the secured obligations.

30. No costs or expenses of administration or other costs or expenses of Scopac that have been or may be incurred in its Chapter 11 case shall be charged either against BofA's or the Trustee's Prepetition Collateral or Cash Collateral pursuant to Section 506(c) of the Bankruptcy Code without the prior express written consent of BofA, Trustee, or the Noteholders. The California State Agencies and the Federal Agencies reserve the right to request copies of the financial information Scopac is providing to BofA, the Trustee and their respective counsel, and counsel to the Ad Hoc Committee.

## VIII. REPORTING REQUIREMENTS

31. Scopac shall timely deliver to each of BofA, the Trustee and their respective counsel, the Committee and counsel to the Ad hoc Noteholder Committee (collectively, the "Reporting Recipients") (i) any and all information required by the Scopac Line of Credit documents when due thereunder; (ii) on a monthly basis, a financial report consisting of Scopac's balance sheet and income statement as of the end of such period, which financial reports shall be prepared in such form and detail as financial reports prepared by Scopac prepetition, (iii) copies of all monthly operating reports delivered to the office of the United States Trustee and to the Committee within two (2) days after such filing; (iv) on a weekly basis, a report of the difference between budgeted and expended Cash Collateral, and (v) on a monthly basis, a report on the balance in the SAR Account, including a report on whether any funds in the SAR Account had been used. The California State Agencies reserve the right to request copies of the financial information Scopac is providing to BofA, the Trustee and their respective counsel, and counsel to the Ad Hoc Committee.

## IX. **PROFESSIONAL FEES/ADMINISTRATION**

32.   Any provision of this Order, the Scopac Line of Credit or the Deed of Trust to the contrary notwithstanding, the liens granted to BofA, the Trustee and the Noteholders pursuant to this Order, and the superpriority cost of administration claims granted pursuant to this Order, shall be subject and subordinate to a carve-out (the "Carve-Out") for the payment of allowed consultant and professional fees and disbursements incurred by the consultants and professionals retained, pursuant to Bankruptcy Code §§ 327 or 328, by Scopac and any committee appointed under 11 U.S.C. § 1102, in an amount not to exceed the aggregate amount (the "Pre-Default Carve-Out Amount") of all (i) unpaid consultant and professional fees and disbursements incurred, accrued or invoiced from the Petition Date until the Default Point (defined below); and (ii) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court, *provided, however*, in no event shall the Carve-Out include professional fees and disbursements incurred in connection with the actual filing of any claims or causes of action against BofA or the Trustee challenging or raising any defense to the Prepetition Claims or any liens of BofA or the Trustee; *provided, further*, that nothing herein shall preclude Scopac from reimbursing any fees and expenses incurred by the Committee in investigating or reviewing the Prepetition Claims or any liens of BofA, the Trustee or the Noteholders to the extent permitted by paragraph 28 hereof. Scopac shall be permitted to pay compensation and reimbursement of expenses incurred up to the Default Point in accordance with the Budget, allowed and payable under Sections 328, 330 and 331 Bankruptcy Code, as the same may be payable, and the amounts so paid shall be free and clear of the liens and superpriority administrative claims of BofA and the Trustee. As used herein, "Default Point" means the earlier of the date this Order expires and the date when an Event of Default (as such term is defined in paragraph 33 below) has occurred and BofA, the Trustee and the Noteholders have

given notice pursuant to paragraph 34 of this Order and have obtained a further Order of this Court terminating Scopac's right to use Cash Collateral.

33.  Scopac shall pay on a monthly basis the reasonable fees of BofA and the Trustee, including the reasonable fees and expenses of their respective counsel. Counsel for BofA and the Trustee shall submit bills to Scopac on a monthly basis, and Scopac shall have ten days after receipt of such monthly bills to object to fees, expenses and other matters set forth therein. Any unresolved disputes with respect to such bills shall be resolved by this Court. Scopac is authorized to pay any such fees and expenses to which no objection is filed.

## X. EVENTS OF DEFAULT/REMEDIES

34.  The term "Event of Default" means the occurrence and continuance of any of the following events: (i) Scopac fails or refuses to pay any interest pursuant to paragraph 28 of this Order and such failure or referral continues for fourteen days after notice from BofA and the Trustee, (ii) the conversion of Scopac's case to one under Chapter 7 of the Bankruptcy Code, (iii) the dismissal of Scopac's case, (iv) appointment of a Chapter 11 trustee in Scopac's case, (v) appointment of an examiner having extended powers relating to the operation of Scopac's business; (vi) the lifting of the stay under Section 362 of the Bankruptcy Code as to any material asset of Scopac, (vii) Scopac's actual revenues during any period from the commencement date of any budget period through the last date of that same budget period fall more than 10% below Scopac's revenue projections for that same period; *provided however*, that in the event such revenues are not met, Scopac may cure any default by decreasing expenses by 10%; or (viii) Scopac's expenditure of Cash Collateral with respect to any line item in the Budget (other than professional fees and taxes) during any period from the date hereof through the last date of any budget period in an aggregate amount in excess of 110% of the amount budgeted during that period for such line item and Scopac's failure to cure the same within fourteen (14) days after

such failure first occurred; *provided, however*, that, to the extent the amount budgeted for such line item or items (other than taxes) for any period exceeds the amount actually expended for such item or items during such period, the amount equal to the lesser of (a) 10% of the amount of such line item for such period and (b) the amount of such excess, may be allocated by Scopac to any line item or items for which expenditures during such period exceeded the budget.

35. Upon the occurrence and during the continuance of an Event of Default under clauses (i) through (viii) of paragraph 34 hereof, Scopac's right to use Cash Collateral hereunder terminates upon not less than five (5) business days' notice to both Scopac and Committee from the Trustee and the Noteholders; provided that upon notice of any Event of Default, Scopac may move the Bankruptcy Court for interim authority to use Cash Collateral on five (5) business days notice.

36. This Order shall have no effect on the Ad hoc Committee's right (or the right of any party in interest) to seek compensation under 11 U.S.C. § 503 of the Bankruptcy Code.

## XI. OTHER TERMS

37. This Cash Collateral Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the Replacement Liens upon Scopac's property without the need for filing or recording any financing statements or other documents that may otherwise be required under Federal or state law in any jurisdiction.

38. The terms and provisions of this Cash Collateral Order and any actions taken pursuant hereto, shall survive entry of any order that may be entered (i) converting to Chapter 7 or dismissing Scopac's case (ii) any asset of Scopac passing out of the estate by foreclosure (and any lien created by this Order shall specifically survive any such foreclosure), or (iii) confirming or consummating any plan of reorganization in Scopac's case. The terms and provisions of this Cash Collateral Order as well as the priorities in payment, liens, and security interests granted

pursuant to this Cash Collateral Order shall continue in any superseding case under the Bankruptcy Code of Scopac.

39.     The provisions of this Cash Collateral Order shall inure to the benefit of Scopac, BofA, the Trustee, the Ad hoc Committee, and the Committee and they shall be binding upon Scopac, BofA, the Trustee, the Ad hoc Committee and the Committee together with their respective successors and assigns, including any trustees or other fiduciaries hereafter appointed as legal representatives of Scopac or with respect to property of the estate of Scopac, whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case, and shall also be binding upon all creditors of Scopac and other parties in interest.

40.     If an order is entered, whether sua sponte by the Court or otherwise, dismissing or converting Scopac's case, such order shall recognize that such dismissal or conversion shall not affect or diminish BofA's, the Trustee's and the Ad Hoc Committee's respective rights, priorities or remedies granted hereunder.

41.     Scopac's counsel shall serve a copy of this Cash Collateral Order on all of the following parties: (i) the Office of the United States Trustee, (ii) the attorneys for BofA, (iii) the attorneys for the Trustee; (iv) the attorneys for the Ad hoc Committee; (v) all creditors known to Scopac who may have liens against Scopac's Cash Collateral, (vi) the United States Internal Revenue Service, (vii) the United States Securities and Exchange Commission, (viii) the Committee, and (ix) all parties in interest who have filed a notice of appearance.

42.     To the extent any findings may constitute conclusions, and vice versa, they are hereby deemed as such.

43.     Subject to the change of venue motions now pending before this Court, it hereby expressly retains jurisdiction over all persons and entities, co-extensive with the powers granted

to the United States Bankruptcy Court under the Bankruptcy Code, to enforce the terms of this Cash Collateral Order and to adjudicate any and all disputes in connection therewith.

44. Any use of Cash Collateral since the Petition Date is hereby authorized pursuant to the applicable provisions of Section 363(c) of the Bankruptcy Code and Fed. R. Bankr. P. 4001(b)(2) as necessary to avoid immediate and irreparable harm to the estate, and all adequate protection provided for herein is enforceable to the extent of any use of the Prepetition Collateral or Cash Collateral by Scopac, without limitation.

45. Nothing in this Order shall relieve Scopac of any obligations under federal, state or local police or regulatory laws or under 28 U.S.C. § 959(b).

46. The Motion is approved and granted on the basis provided herein.

SIGNED: March 9, 2007

---
THE HONORABLE RICHARD S. SCHMIDT
UNITED STATES BANKRUPTCY JUDGE

Scotia Pacific Company LLC
Weekly Cash Flow Projections Through June 1, 2007

($ in 000's)

| | 3/9/07 | 3/16/07 | 3/23/07 | 3/30/07 | 4/6/07 | 4/13/07 | 4/20/07 | 4/27/07 | 5/4/07 | 5/11/07 | 5/18/07 | 5/25/07 | 6/1/07 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Cash Receipts** | | | | | | | | | | | | | |
| Log Sales Post-Petition (1) | $ - | $ - | $ 1,406 | $ - | $ - | $ - | $ 5,118 | $ - | $ - | $ - | $ 4,424 | $ - | $ - |
| Log Sales Pre-Petition (2) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Cash Collections | - | - | 1,406 | - | - | - | 5,118 | - | - | - | 4,424 | - | - |
| **Payroll and Benefits** | | | | | | | | | | | | | |
| Payroll, net | 110 | - | 120 | - | - | 120 | - | 120 | - | 120 | - | 120 | - |
| Medical and Pharmacy (Palco Reimbursement) | 30 | - | - | - | - | 30 | - | - | - | 30 | - | - | - |
| Additional Payroll-related Payments (Palco Reimbursement) | 50 | - | - | - | - | 50 | - | - | - | 50 | - | - | - |
| Payroll Taxes/401k (Palco Reimbursement) | 78 | 80 | - | 80 | - | - | 80 | - | 80 | - | 80 | - | 80 |
| Subtotal | 268 | 80 | 120 | 80 | - | 200 | 80 | 120 | 80 | 200 | 80 | 120 | 80 |
| **Operating Expenses (3)** | | | | | | | | | | | | | |
| Roads, Reforestation, and Enviro. Compliance (Palco Remb.) (4) | - | - | 286 | - | - | - | 686 | - | - | - | 720 | - | - |
| Insurance (MAXXAM Reimbursement) | - | 25 | - | - | - | - | 75 | - | - | - | 25 | - | - |
| Property Taxes | - | - | - | - | - | - | - | - | 209 | - | - | - | - |
| Timber Yield and Use Taxes | - | - | - | - | - | - | - | - | 230 | - | - | - | - |
| Building Lease (Palco Reimbursement) | 20 | - | - | - | - | 20 | - | - | - | 20 | - | - | - |
| Other Operating Expenses Paid for by Palco (Palco Reimbursement) (5) | 120 | - | - | - | - | 120 | - | - | - | 120 | - | - | - |
| Other Operating Expenses (6) | 200 | 313 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Subtotal | 340 | 338 | 486 | 200 | 200 | 340 | 911 | 200 | 639 | 340 | 945 | 200 | 200 |
| **Bank of America Interest** | - | - | 530 | - | - | - | 270 | - | - | - | - | 270 | - |
| **Pre-Petition** | | | | | | | | | | | | | |
| Roads, Reforestation, and Enviro. Compliance (Palco Remb.) (2)(4) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Payroll, net | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Medical and Pharmacy (Palco Reimbursement) (2) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Payroll Taxes/401k (Palco Reimbursement) (2) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Pre-Petition (7) | - | 34 | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal | - | 34 | - | - | - | - | - | - | - | - | - | - | - |
| **Restructuring Fees** | | | | | | | | | | | | | |
| Restructuring Fees (Professional Fees) | - | 100 | 170 | - | - | - | - | 270 | 1,390 | 300 | - | 830 | - |
| DIP Lender Work-fee | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal | - | 100 | 170 | - | - | - | - | 270 | 1,390 | 300 | - | 830 | - |
| **Total Outflows** | 608 | 552 | 1,306 | 280 | 200 | 540 | 1,261 | 590 | 2,109 | 840 | 1,025 | 1,420 | 280 |
| **Net Cash Flow** | (608) | (552) | 100 | (280) | (200) | (540) | 3,857 | (590) | (2,109) | (840) | 3,399 | (1,420) | (280) |
| **Beginning Book Cash** | 1,973 | | | | | | | | | | | | |
| **Ending Book Cash** | $ 1,365 | $ 813 | $ 913 | $ 633 | $ 433 | $ (107) | $ 3,750 | $ 3,160 | $ 1,051 | $ 211 | $ 3,610 | $ 2,190 | $ 1,910 |

(1) Payment will be subject to netting of roads, reforestation, and environmental compliance expenses incurred by Palco on behalf of ScoPac
(2) Payment subject to Court order
(3) Pre-petition amounts may still be included within these categories and therefore are still subject to identification and reclassification
(4) Payment will be netted against log sale collections from Palco
(5) Reflects other expenses incurred by Palco on behalf of ScoPac. Includes equipment leases, copier leases, cellular phone bills, fuel, etc.
(6) Includes THP preparation fees, costs of watershed analyses, other ordinary course professional services fees and SG&A. Estimates are based on expenditure run-rates
   To the extent forecasted expenditures are less than amounts actually paid, this may not be a result of permanent differences, but rather may be caused by timing differences resulting from
   late receipt of invoices with payment expected to occur in the following weeks.  Included in the week of March 16, 2007 is $113,000 to be paid to Deloitte & Touche for completion of the Debtor's audit
(7) Included in the week ending March 16, 2007 is $34,000 of pre-petition amounts owed to Deloitte & Touche pending Court approval

**ScoPac Professional Fees**

ScoPac Professional Fee 13 Week Forecast

| Incurred / Billed (see GEN. NOTE 1) | Note | Week Ended -> | 6<br>9-Mar | 7<br>16-Mar | 8<br>23-Mar | 9<br>30-Mar | 10<br>6-Apr | 11<br>13-Apr | 12<br>20-Apr | 13<br>27-Apr | 14<br>4-May | 14<br>11-May | 14<br>18-May | 14<br>25-May | 14<br>1-Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Porter & Hedges | | Fees Billed | - | - | - | - | 200,000 | - | - | - | 200,000 | - | - | - | 200,000 |
| | | Expenses Billed | - | - | - | - | 10,000 | - | - | - | 10,000 | - | - | - | 10,000 |
| Gibson Dunn | | Fees Billed | - | - | - | - | 250,000 | - | - | - | 250,000 | - | - | - | 250,000 |
| | | Expenses Billed | - | - | - | - | 15,000 | - | - | - | 15,000 | - | - | - | 15,000 |
| Blackstone | | Fees Billed | - | - | - | - | 150,000 | - | - | - | 150,000 | - | - | - | 150,000 |
| | | Expenses Billed | - | - | - | - | 25,000 | - | - | - | 25,000 | - | - | - | 25,000 |
| Creditors' Committee Legal | (1) | Fees Billed | - | - | - | - | 25,000 *175,000* | - | - | - | 25,000 *175,000* | - | - | - | 25,000 *175,000* |
| | (1) | Expenses Billed | - | - | - | - | 5,000 | - | - | - | 5,000 | - | - | - | 5,000 |
| Creditors' Committee Financial (Chanin) | (1) | Fees Billed | - | - | - | - | 62,500 | - | - | - | 62,500 | - | - | - | 62,500 |
| | (1) | Expenses Billed | - | - | - | - | 5,000 | - | - | - | 5,000 | - | - | - | 5,000 |
| Bondholders' Financial (Houlihan Lokey) | (2) | Fees Billed | - | - | - | - | 150,000 | - | - | - | 150,000 | - | - | - | 150,000 |
| | (2) | Expenses Billed | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Bondholders' Legal (Bingham McCutchen) | (2) | Fees Billed | - | - | - | - | 200,000 | - | - | - | 200,000 | - | - | - | 200,000 |
| | (2) | Expenses Billed | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Claims Agent | | Fees Billed | - | - | - | - | 50,000 | - | - | - | 50,000 | - | - | - | 50,000 |
| | | Expenses Billed | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Indenture Trustee | | Fees Billed | - | - | - | - | 150,000 | - | - | - | 150,000 | - | - | - | *100,000* 150,000 |
| | | Expenses Billed | - | - | - | - | 15,000 | - | - | - | 15,000 | - | - | - | 15,000 |
| Bank of America Legal (O'Melveny and Myers) | | Fees Billed | - | - | - | - | 100,000 *150,000* | - | - | - | 100,000 *150,000* | - | - | - | 100,000 *150,000* |
| | | Expenses Billed | - | - | - | - | 5,000 | - | - | - | 5,000 | - | - | - | 5,000 |
| Appraisal Fee | | | - | - | - | - | - | - | - | - | - | 300,000 | - | - | - |
| Total Accrued Professionals | | | - | - | - | - | 1,317,500 | - | - | - | 1,317,500 | 300,000 | - | - | 1,317,500 |

**Cash Paid (see GEN. NOTE 1)**

Fees paid at 80%
Expenses paid at 100%

| | | | 6<br>9-Mar | 7<br>16-Mar | 8<br>23-Mar | 9<br>30-Mar | 10<br>6-Apr | 11<br>13-Apr | 12<br>20-Apr | 13<br>27-Apr | 14<br>4-May | 14<br>11-May | 14<br>18-May | 14<br>25-May | 14<br>1-Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Porter & Hedges | | | - | - | - | - | - | - | - | - | 380,000 | - | - | 170,000 | - |
| Gibson Dunn | | | - | - | - | - | - | - | - | - | 510,000 | - | - | 215,000 | - |
| Claims Agent | | | - | - | - | - | - | - | - | 100,000 | - | - | - | 50,000 | - |
| Subtotal - Legal | | | - | - | - | - | - | - | - | 100,000 | 890,000 | - | - | 435,000 | - |
| Blackstone | | | - | - | - | - | - | - | - | - | 340,323 | - | - | 145,000 | - |
| Creditors Committee Legal and Financial (1) | | | - | - | - | - | - | - | - | - | 160,000 | - | - | 80,000 | - |
| Bondholders' Legal and Financial (2) | | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Indenture Trustee | | | - | - | 65,000 | - | - | - | - | 65,000 | - | - | - | 65,000 | - |
| O'Melveny and Myers | | | - | - | 105,000 | - | - | - | - | 105,000 | - | - | - | 105,000 | - |
| Appraisal Fee | | | - | - | - | - | - | - | - | - | - | 300,000 | - | - | - |
| Total Professionals Cash Paid | | | - | - | 170,000 | - | - | - | - | 270,000 | 1,390,323 | 300,000 | - | 830,000 | - |

Notes

GENERAL NOTE 1. Order requires "on or before the 20th day of each month, following the month for which comp is sought,           must submit a *monthly statement.* " and "         at the expiration of the twenty (20) day period, the Debtor         will pay 80% of the fees . ". The schedule here presumes that after each month end, advisors promptly provide invoices, and such invoices will be paid on the 21st day following receipt of such invoice
(1) Reflects 10% of Creditors' Committee legal fees allocated to ScoPac. Assumes no payment for professional fees occurs prior to the weeks ending 4/27 or 5/11, which includes catch-up payments for expenses incurred since the filing date
(2) Not paid currently

3/5/2007 10:27 PM

2