# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| SCOTIA DEVELOPMENT, LLC | § | CASE NO: 07-20027 |
| Debtor(s) | § | |
| | § | CHAPTER 11 |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW and FINAL ORDER

On this day came on for consideration (i) the Motion and Amended Motion of the Ad Hoc Committee of Timber Noteholders (the "Ad Hoc Committee") seeking (A) Determination that Scotia Pacific Company LLC is a Single Asset Real Estate Debtor, and (B) Order Requiring that Scotia Pacific Comply with the Requirements of Bankruptcy Code Section 362 (d)(3) (the "SARE Motion"); (ii) the Joinder of Bank of New York as Indenture Trustee to the SARE Motion; (iii) the Response and Objection of Scotia Pacific Company LLC ("Scopac") to the SARE Motion; (iv) the Ad Hoc Committee's Reply in Support of the SARE Motion; (v) the Brief and Joinder of Pacific Lumber Company ("Palco") and (vi) Scopac's Surreply in Opposition to the SARE Motion. The Court having heard the evidence and arguments of counsel, makes the following findings of fact and conclusions of law:[1]

### FINDINGS OF FACT

**A.    SCOPAC'S COMMERCIAL OPERATIONS**

1.    Scopac owns approximately 200,000 acres of private timberland (the "Scopac Timberlands") and has the exclusive right to harvest timber on about 10,500 additional acres of private timberland owned by Palco and another one of its subsidiaries (the "Scopac Timber

---

[1]    Any finding of fact shall constitute a finding of fact even if it is stated as a conclusion of law; any conclusion of law shall constitute a conclusion of law even if it is stated as a finding of fact.

Rights"). Collectively, the Scopac Timberlands and the Scopac Timber Rights constitute the Scopac Timber.

2.      The Scopac Timber consists of nine watersheds. Each watershed is a distinct area with distinct issues. The topography of the various watersheds varies significantly. Each watershed presents different issues regarding hydrology, environmental concerns, and wildlife preservation. Each watershed obtains separate permits from and is treated separately by regulatory authorities. Moreover, each watershed utilizes different harvesting methods and rates of harvest. The watersheds can therefore be defined as different or separate projects

3.      Scopac's active, ongoing, and day-to-day business is to manage the entire life cycle, from the planning and layout of Timber Harvest Plans ("THPs"), through the submission, negotiation, approval and implementation of THPs, to the sale of logs resulting from the harvest of timber, to the supervision and assistance in the actual harvest of the timber by Palco, to the site preparation, replanting and vegetation control of harvest sites, through the management of timber stands during the decades in which the trees grow to maturity, all on approximately 210,000 acres of timberlands ("Scopac's Silvicultural Operations").

4.      Scopac's scientists and foresters use their interdisciplinary skills to incorporate federal, state and local laws and regulations, as well as contractual obligations, to address erosion control, road construction and mitigation, water quality, threatened and endangered plants, threatened and endangered animals, ecosystem biodiversity, watershed specific forest management, forest regeneration and productivity, fire suppression and control of invasive plant and animal species, while also developing long term business plans, programs for cost reduction, and revenue maximization. But for these employee efforts no timber on the Timber lands could be harvested.

2 / 25

5.      Scopac currently has over 60 employees, including scientists and foresters. Scopac's specialists are held to rigorous education and certification standards.  Of Scopac's scientists and foresters, four have Ph.D. degrees and five more have masters' degrees.

6.      The science team includes Certified Aquatic Scientists, Certified Wildlife Biologists, Registered Geologists, Certified Engineering Geologists and numerous individuals with specific certifications, such as those necessary to conduct valid surveys for northern spotted owls and marbled murrelets, and to observe and provide for the protection of approximately 17 endangered species.  But for these employee efforts, no timber from the Timberlands could be harvested.

7.      Within the forestry team are individuals with training and certifications in forest cruising and inventory, harvest planning, forest growth and yield modeling, road layout and design, harvest system layout and design, reforestation, pesticide use and application, database management and operation of Scopac's Geographic Information System (the "GIS").

8.      The forestry team employed by Scopac includes nine Registered Professional Foresters ("RPFs") who underwent a rigorous apprenticeship and licensing process supervised by the State of California before they could achieve this status.

9.      An RPF is a person who holds a valid license as a forester from the California Board of Forestry and Fire Protection.  RPFs are knowledgeable in a wide range of studies such as biology, ecology, entomology, geology, hydrology, dendrology, silviculture, engineering, business administration, forest economics and other natural resource subjects.

10.      Scopac's RPFs maintain the sustainability of Scopac's forest resources like timber, forage, wildlife and water to meet the needs of the public, while protecting the biological

integrity and quality of the forest environment. RPFs are well-versed in federal, state and local

laws affecting forestry practices in California in order to administer them properly.

11.    Scopac's RPFs perform a wide variety of activities, such as organizing and

directing systems of control for forest fires, insect pests and tree diseases. They also work with

Scopac's large and highly experienced science team to: (i) determine the environmental impacts

of Scopac's management decisions; (ii) plan for maintenance of wildlife habitat; (iii) prescribe

thinning for immature stands of trees and removal of defective trees for stand improvement; (iv)

measure the volume, species composition, size and defect levels in standing timber; (v) appraise

market value of properties sold or offered for sale by Scopac; (vi) prepare spatially specific 1

year, 5 year, and 10 year harvest plans; (vii) develop watershed specific forest and wildlife

management "prescriptions" based on intensive watershed analysis studies; (viii) monitor

Scopacs's roads and harvest areas for erosion and maintenance needs; and (ix) help supervise the

sale and harvest of logs from the Scopac Timber.

12.    Scopac's remaining employees provide administrative support for the Science and

Forestry employees, provide security for the Scopac Timber, and manage leases and rights of

way including ranching leases and road agreements. A majority of Scopac's employees assist in

some way with the preparation of THPs, which are discussed in more detail below, as well as

with Scopac's other diverse operations.

**B.    Scopac's Silvicultural Operations.**

13.    Scopac performs a number of advanced and sophisticated silvicultural

management processes that are specific to forests of harvestable age and size, such as the forests

on many portions of the property containing Scopac Timber. Scopac's Silvicultural Operations

can be understood through a series of complex steps, consisting of: (i) compliance with the

4 / 25

California Forest Practice Rules ("FPRs"); (ii) habitat conservation plan ("HCP") compliance; (iii) compliance with the Clean Water Act and the California Porter-Cologne Act; (iv) harvest planning; (v) THP layout, development and drafting; (vi) THP submission and approval by the California Department of Forestry and Fire Protection ("CDF"); (vii) submission of plans and documentation to obtain additional THP approvals from the North Coast Regional Water Quality Control Board ("Regional Water Board") and the California Department of Fish and Game ("DFG"); (viii) implementation of THPs; (ix) site preparation, replanting and vegetation management; (xi) monitoring and inventory management and (xii) state closure of THPs through the regulatory stocking and completion process.

> **(1) Scopac's Employees Ensure Compliance With the General Regulations of the Forest Practice Rules, HCP, Clean Water Act and the Porter-Cologne Act and Assist the Various Agencies in Creating the Industry Best Practices.**

14.    Under California law, numerous and complicated laws and regulations, on the federal, state and local level, govern timber harvest operations, which require numerous actions and steps before cutting a single tree. Scopac's employees monitor compliance with these state and federal laws and regulations, as well as contractual obligations, including: (i) the FPRs, (ii) the HCP and (iii) the Clean Water Act and Porter-Cologne Act.

15.    Scopac's employees must monitor threatened and endangered wildlife species, threatened and endangered plant species, fish, sediment, and water quality as well as measure, assess, prevent, or mitigate "cumulative watershed effects" to ensure compliance with various regulatory requirements.

16.    Scopac must employ a large number of highly specialized and credentialed professionals to meet these requirements, and, unless Scopac meets these requirements, it cannot generate <u>any</u> income from the Scopac Timber.

17.     The State of California regulates the harvesting of timber on private lands. California's first Forest Practice Act ("FPA") was adopted by the California Legislature during World War II and created a then-simple requirement that any person who intended to cut "merchantable" timber must first notify the State Forester.  The FPA has evolved steadily since the 1940s and the FPRs, which implement the FPA, have been developed by the State Board of Forestry and undergo constant revision.

18.     When the Timber Notes were issued in 1998, restrictions on harvesting primarily consisted of the FPRs.  In 1999, pursuant to the Headwaters Agreement entered into among the United States, California and company entities, federal and state regulators approved the HCP and a sustained yield plan ("SYP") relating to substantially all of the Scopac Timber.  The HCP included certain Interim Measures (the "Interim Measures"), which again covered virtually all of the Scopac Timber.  These Interim Measures initially restricted harvesting on a significant portion of the Scopac Timber.

19.     Under the HCP, Scopac may seek exceptions to the Interim Measures and free up restricted lands through either: (i) the watershed analysis process or (ii) an adaptive management provision.  Watershed analysis requires Scopac to perform very detailed and advanced science-based watershed studies with the assistance of science and forestry contractors and with the participation of the federal and state agencies to develop "watershed-specific" environmental protections in Scopac's nine different watersheds located within the property containing Scopac Timber.  Watershed analysis proceeds slowly due to its technical complexity, the enormous amount of scientific data and analyses that are required, and because Scopac employees must engage in very detailed and protracted negotiations with federal and California state agencies. Watershed analysis is currently complete in five of Scopac's watersheds – and under way in the

remaining four.  The resulting watershed specific "prescriptions" can and have sometimes resulted in measures more restrictive than those of the Interim Measures. However, because the Interim Measures were so restrictive to Scopac's ability to harvest timber from its lands, the net effect has been that every set of agency-approved watershed-specific prescriptions has freed up significant timber volume for Scopac – nearly 600 million board feet to date.  Only as a result of efforts of Scopac's employees, through watershed analysis, have these 600 million board feet of timber become available for sale.

20.      Watershed analysis therefore clearly represents an ongoing process that not only makes timber available for Scopac to sell, but also allows Scopac to use the best possible science and forestry knowledge and information to manage its lands.  Watershed analysis requires specialized expertise and extensive field investigation and analysis.  Scopac employs highly-specialized scientists and foresters who specifically manage and perform watershed analysis, potentially allowing additional restricted lands to become available for harvest.  The watershed analysis process is also envisioned to be an ongoing process, such that new scientific knowledge or understanding can be incorporated into watershed prescriptions in the future.

21.      Scopac also intermittently seeks changes to the HCP's Interim Measures through a mechanism under the HCP, known as adaptive management, to streamline HCP implementation and incorporate new scientific or regulatory developments.  As with watershed analysis, adaptive management requires scientists and RPFs with specialized expertise to do the requisite science and forestry work to support the adaptive management changes that are requested of and must be approved by the federal and state agencies overseeing the implementation of the HCP.  The adaptive management changes made to date have significantly improved HCP implementation, fixed oversights in the HCP, and reduced THP costs.  None of

these economic or operational benefits would have been achieved without the creative, specialized and technical work of Scopac's science and forest teams.

22.    The Federal Clean Water Act, and California's comparable Porter-Cologne Act, impose requirements on Scopac to limit the discharge of pollutants to streams and rivers, and to utilize "best management practice" approaches to reduce erosion.  Until 2003, forestry operations on Scopac's lands that were conducted as part of approved THPs were deemed to be in compliance with these Acts.  The California state legislature passed a law that invalidated these water quality "waivers," with the effect that Scopac had to begin obtaining a second set of THP permits, either a General Waste Discharge Requirement ("GWDR") or a Watershed Wide Waste Discharge Requirement ("WWDR") permit from the Regional Water Board.  Scopac employees must prepare and submit Erosion Control Plans (ECPs") for approval to the Regional Water Board, which, in turn, require Scopac to utilize a variety of erosion control procedures in its THPs, and to develop and supervise a road construction and mitigation program that is implemented in the field by Palco personnel.

23.    Like the FPRs and HCP, the GWDRs and WWDRs require Scopac employees with specialized knowledge and experience to prepare the permit applications and ECPs, and to implement all necessary requirements in the field.  Without the creative, specialized and technical efforts of its employees, these permits could not be obtained, and Scopac would be unable to derive any timber income from its property.

24.    For many of its THPs, Scopac's employees must also prepare and submit an application to DFG for a Streambed Alteration Agreement ("SAA").  This permit allows Scopac to alter the bed and banks of streams to, for example, allow the installation of bridges and culverts necessary to construct and maintain the road system that allows harvested trees to be

8 / 25

transported to timber mills.  The SAA requires specialized knowledge and experience in road

construction and erosion control techniques, and, at times, negotiation with DFG on site-specific

mitigations or construction elements.

### (2)    Scopac's Employees Plan the Harvest of Scopac's Timber.

25.    The various regulatory constraints noted above dictate where on Scopac Timber it

is permissible to harvest trees, but the scheduling of that harvest, the design of the roads and

logging systems to achieve that harvest, and the selection of the appropriate types of harvest all

remain to be done by Scopac's employees.  These tasks begin with the harvest planning process,

in which Scopac's forestry team, and particularly its RPFs, lay out and map areas that will be

harvested in each year for the next decade.  These "10 year plans" are based on aerial

photographs, datasets and GIS maps that show the age and volume of various tree stands and the

road systems leading to or near these stands; maps showing which timber is available for harvest

under the various regulatory programs, maps showing the locations of northern spotted owls,

ospreys, eagles, rare plants and other species as determined by Scopac science surveys, and maps

showing the location of geologically unstable areas.  The foresters also conduct extensive field

investigations of forest stands to determine, on the ground, the suitability of areas for harvest.

With all of these information sources in hand, the foresters hand draw areas of proposed harvest

for each year of the 10 year planning horizon using their specialized knowledge and expertise to

select and sequence these areas to maximize the volume of timber that will be harvested, while

satisfying all the restrictions and requirements to protect the environment.   Additionally, when

harvest actually occurs, Scopac employees supervise the harvesting to insure compliance with

the applicable rules, regulations, THPs and programs.

26.     Given its complexity, and importance of the task to Scopac's economic use of its timberlands, this task requires weeks to accomplish, and it must be repeated each year in order to incorporate new information (e.g., owl movements) and new harvesting opportunities provided by changes in watershed prescriptions or the timber market.

27.     Harvest planning cannot be accomplished successfully without a very accurate and spatially explicit database of the timber inventory on Scopac's lands.  This inventory identifies the age, species, and volume of trees that are present in various parts of property containing Scopac Timber.  Development and maintenance of this inventory is a complex and specialized activity that is conducted by Scopac personnel and contractors that they manage. Forest "inventory" is performed in part by using the GIS, a complicated proprietary database.  In addition, specialized foresters monitor and collect stand level data in the field using statistically valid sampling techniques.  These stand level data are used to update the GIS, which allows Scopac to keep this inventory updated and to measure tree growth and field stand conditions. Maintenance of the forest inventory also requires Scopac's employees to model tree growth and yield using extremely complex computer simulation models that are proprietary and were developed using both published studies and extensive contractor assistance from experts in this field.  In total, this inventory work alone requires five employees plus numerous outside contractors.

28.     As noted, the inventory conceptually provides a landscape level map of trees that are sufficiently mature to harvest, and also identifies which of these "stands" of trees should be harvested first to maximize forest productivity and economic net present value.  But the GIS-created and modeled inventory cannot "see" many site-specific restrictions, for example, the roosting locations of the various endangered species on the Scopac Timber or the location of

endangered plants. Scopac's field employees must observe and report on these matters in order for Scopac's information to be current and accurate so that the foresters can consider both forest stand conditions and environmental restrictions in their harvest planning efforts.

### (3)    Scopac's Forestry Team Lays Out, Develops and Drafts the THPs.

29.    Once an area has been identified for harvesting in the 10 year harvest plan, very considerable work must then be conducted to develop the detailed road and harvest specifics for that area as well as the necessary wildlife, plant and erosion protections. Ultimately, all of these details, along with considerable public disclosure of information such as past harvest and cumulative effects, is developed into and submitted to the state and federal agencies as a THP. More simply, Scopac scientists and RPFs go from general inventory level harvest plan to the site-specific planning that Scopac believes meets the FPRs and all HCP requirements, is good forestry, is environmentally protective and will be profitable for Scopac. There are multiple internal stages to laying out a particular THP and the process includes (among other things) wildlife surveys, stream surveys and forest measurements. This is the single biggest task of Scopac's scientists and RPFs, as the THPs are 250-300 pages in length, might cover as much as 600-700 acres per THP, and require agency and public review and input.

### (4)    Scopac's Employees Submit THPs and Obtain Agency Approval.

30.    Once Scopac has completed a THP, a regulatory process begins, whereby state agencies and the general public comment on and suggest changes to Scopac's proposed THP. Specifically, Scopac submits proposed THPs for a *first review* by CDF, which takes between 1 and 4 days. This first review can result in rejection of a THP by CDF until certain changes are made. Once first review is passed, CDF accepts the THP for "filing". CDF then makes copies of the THP and sends them to various state and federal agencies for their review, and makes

11 / 25

them available for review and copying by interested members of the public.  CDF also sets a "pre-harvest inspection" date, or PHI, in which all interested members of the state and federal agencies join CDF and Scopac teams in the field to walk through and review the specific harvesting activities that are proposed in the THP.

31.    Following the PHI, state and federal agencies are allowed to, and regularly do, provide written comments on the THP, including their specific recommendations on how the THP should be modified to meet regulatory requirements or to reduce environmental impacts. Scopac's forestry team must respond to these reports and recommendations.  This process often includes a series of negotiations between Scopac and the agencies have requested the changes. Ultimately, this process of accommodating agency concerns is completed when the THP is scheduled for additional review, in which the agencies provide final comments and recommendation and express whether they believe the THP should be approved.  The general public may attend second review, which is held in CDFs offices and typically takes 1-2 hours, and can express their own recommendations regarding the plan and plan approval.  At the end of second review CDF decides whether to recommend the THP for approval or disapproval.  If recommended for approval, the THP is typically signed by CDF within 15 days following the close of the public comment period.

32.    After the THP makes it through the first series of reviews and is approved by CDF, Scopac must obtain a GWDR permit, or in specialized locations noted below, a WWDR permit, from the Regional Water Board.  The ECP required to obtain these permits has specific mitigations and requirements whereby Scopac must demonstrate minimization of erosion.  These ECP conditions may require substantial roadwork and sediment mitigation efforts.  Obtaining the

GWDRs and WWDRs requires specialized expertise in science and forestry as well as specialized experience in roads and sediment mitigation techniques.

33.     Most of the Scopac Timber requires THP approval and a General Waste Discharge Requirement Permit.  Certain specific areas of the Scopac Timber, however, require special permitting that applies only to Scopac and not to any other landowner.  In the Elk and Freshwater watersheds, where Scopac currently obtains approximately 1/3 of its annual harvest, a WWDR is required.  The WWDR has two tiers, each with its own level of additional regulation and mitigation requirements and requires very advanced scientific analysis.  The WWDR process was crafted by the Regional Water Board after nearly a dozen public hearings and quasi-judicial administrative hearings over a period of three years in which Scopac's top scientists, and world class experts hired by Scopac, presented extensive evidence and testimony demonstrating sediment and erosion processes and rates in these watersheds; the location, causes and frequency of flooding of roads and structures; and the scientific basis for reducing management-related landslides and other sediment inputs in future harvesting operations.  Nothing like this had ever been demanded of a timber company in California before, and to date no other company has had to develop as much scientific analysis and testimony to receive discharge permits from the Regional Water Board.  All of this work was required to get the Regional Water Board to lift a harvesting moratorium on certain Scopac Timber, which moratorium was denying Scopac the right to harvest approximately 30 million board feet per year of volume in the Elk and Freshwater watersheds.  Without this world class work by Scopac's scientists and consulting experts, Scopac today would be harvesting 30 million board feet less than it did prior to obtaining these WWDR permits in May of 2006.  Even now, Scopac's foresters and scientists

13 / 25

must conduct studies and analysis to confirm that each THP for which it is requesting WWDRs

meets all relevant scientific and regulatory requirements.

34.    Finally, certain areas require SAAs or "1600 Permits". As noted above, the SAA

permit deals specifically with issues attendant to stream crossings and is issued by California

Department of Fish and Game. Although these permits are not always needed, when they are

required, Scopac must submit detailed plans on stream crossings, including engineering data and

field inspections.

### (5)    Scopac's Employees Oversee and Monitor Implementation of THPs.

35.    Once the THPs are approved and the requisite permits have been obtained,

Scopac and Palco begin the process of implementing the THPs ("Implementation"). This

implementation follows the "blueprint" established in the THP by Scopac's science and forestry

teams. Specifically, within each THP, Scopac employees:

a.    set up extensive plans on how logging will occur;

b.    design roads and landings used for staging and removal of logs after felling;

c.    determine the feasibility and ideal positioning for logging equipment, such as cable yarders, including, where necessary three-dimensional cross-section analyses to ensure adequate deflection[2];

d.    identify the location and necessary flagging in the field of all areas subject to special restrictions (e.g., streamside buffers); and

e.    establish all necessary measures that must be implemented during or after harvest to reduce erosion, fire risk, and other hazards.

---

[2]    When timber is harvested with a yarder Scopac runs an analysis to obtain three-dimensional profiles of the hillside, to determine whether the cables from the yarder will reach the harvested trees, and whether there is enough "deflection" or clearance so that the trees clear the hillside as they are dragged back to the yarder. This process consists of considerable planning, analysis and computer modeling by Scopac's employees, the results of which have led to Scopac's cost reductions and maximization of profits.

36.     Either Palco employees or independent contractors selected by Scopac are responsible for harvesting timber, building and maintaining the roads and landings used for staging and removal of logs after felling, and implementing measures during or after harvest to reduce erosion, fire risk, and other hazards.

37.     Then, Scopac's foresters and scientists assist Palco personnel in monitoring the entire logging and harvesting process in the field to ensure compliance with the THP and relevant regulations.  Finally, Scopac plans, supervises and either conducts or assists with all post-harvest requirements including site preparation in which the harvested ground is prepared for replanting through broadcast burning, raking, etc.; replanting; and any vegetation control including use of a variety of herbicides and herbicide treatments to control undesirable plants and invasive weed species.

38.     Palco staff are responsible for replanting through broadcast burning, raking, etc.; replanting; and any vegetation control including use of a variety of herbicides and herbicide treatments to control undesirable plants and invasive weed species.  Palco staff are also responsible for installing erosion control measures and materials prior to the onset of the winter rainy season, including erosion control measures for roads.

39.     Scopac personnel also provide substantial assistance to Palco staff in installing erosion control measures and materials prior to the onset of the winter rainy season, including erosion control measures for roads.  Scopac's scientists and foresters also continue to monitor the harvested lands to ensure regulatory compliance, particularly with erosion control and water quality protection from sediment pollutants, as well as to protect Scopac's Timber against forest fires, insect pests, and the invasion and growth of replanted areas by invasive or unwanted plants.

## C.    Scopac's Other Commercial Operations

40.    In addition to the various harvest-related services described above, Scopac manages a myriad of other activities occurring on its property.  Specifically, Scopac employees manage lease space for cell phone towers and an FAA radio beacon.  The property containing Scopac Timber also has various recreational areas, including campsites utilized by the Boy Scouts and Girl Scouts, an independent church camp and an archery range.  Moreover, there are operating cattle ranches and grazing leases on the property containing Scopac Timber.  Finally, river gravel is mined from area rivers and hard rock is mined from various locations on the Scopac Timber by Palco personnel.  Scopac employees provide necessary surveying, biological review, and other essential support activities for these mining activities.

41.    Scopac occasionally works with Palco's staff who sell logs to other mills in order to arrange for harvested timber from Scopac's lands to be delivered directly to third parties. Scopac also provides all science, forestry, GIS, database, forest inventory and related services for timberlands owned by Palco and its subsidiaries, both because this expertise resides within Scopac, not Palco, and because Scopac holds the timber rights to essentially all timberland owned by Palco and its subsidiaries.

42.    Scopac is engaged in very considerable activity on its property including science, forestry, replanting, erosion control and avoidance, watershed analysis, agency and public disclosure, harvest planning, monitoring, and THP development and implementation.

43.    Without all of these actions and activities, and by extension without the very highly specialized and experienced professionals that work for Scopac, there would be no income from the Scopac Timber.

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334. This is a core matter

pursuant to 28 U.S.C. §157(b)(2)(A), (G), (M), and (O)..

**A. Scopac is not a Single Asset Real Estate Debtor Because its Revenues are the Product of Commercial Endeavors of its Employees, not the Passive Receipt of Investment Income.**

**1. Scopac is an Active Business Operation and Therefore Cannot Be Found to Be A Single Asset Real Estate Debtor.**

1. Scopac is clearly engaged in an active economic enterprise on its, and others

property. At a bare minimum, Scopac performs or assists with the following non-exhaustive list

of activities on a regular, and in many cases daily, basis:

a. Timberlands analysis and inventory

b. Compliance with the FPRs

c. HCP compliance

d. Clean Water Act and Porter-Cologne Act analysis and compliance

e. THP layout, development and drafting

f. THP submission and approval

g. Water quality permit preparation, submission, and compliance including ECP

   development and implementation.

h. SAA permit preparation, submission and compliance

i. Implementation of THPs, including road planning, design and engineering, logging

   system planning, design and engineering, and supervision of harvesting to ensure

   compliance with THP and regulations.

j. Post-harvest site preparation, replanting and vegetation management efforts

k. THP stocking and "completion" requirements to obtain state closure of THPs

l.  A very large number of individual programs, initiatives and responses in a variety of specialized fields including many of the items discussed above such as watershed analysis, scientific studies and testimony to obtain permits, litigation support, harvest planning, monitoring, etc.

m.  Build and maintain roads.

n.  Remediate stream beds following harvesting.

These activities are extensive and require hands-on supervision by teams of experts.  The majority of Scopac's employees have four-year college degrees in one of the many disciplines necessary to ensure that the Scopac Timber is managed profitably, reliably, and in compliance with the federal, state, and local rules and regulations -- all of which must be done if Scopac is to be able to sell logs profitably.  But for these extensive employee activities, the revenues of Scopac would not occur.

2.  Scopac is a complex and active commercial enterprise.  Scopac has a number of employees engaged in activities necessary to the production of revenue.

**B.**  **SCOPAC DOES NOT SATISFY THE STATUTORY CRITERIA FOR A SINGLE ASSET REAL ESTATE DEBTOR.**

3.  Section 101(51B) of the Bankruptcy Code, as amended, defines "single asset real estate" as:

> [R]eal property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of the debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental.

- - 11 U.S.C. § 101(51B).

Most courts adopt a practical approach in interpreting this section,  "including within its ambit only those debtors who have no revenue from their property except the passive collection of rent

from tenants and excluding from its reach those entities that undertake and pursue various sorts of active economic, commercial, and business activities on the property." *In re Club Golf Partners, L.P.*, Case No. 07-40096, ¶5, p.2 (Bankr. E.D.Tex., Feb. 15, 2007).

> **1. Scopac Does Not Own Property Constituting a "Single Property or Project" Because Scopac's Timber Operations Are Spread Out Across a Diverse Landscape and its Timber Rights are Not Appurtenant to the Land and are Not Real Estate Under Either the Bankruptcy Code or California Statute.**

4.      Bankruptcy law, not state law, determines what constitutes "real estate" for the purposes of Section 101(51B). *See In re Kkemko*, Inc., 181 B.R. 47, 50 (Bankr. S.D. Ohio 1995) (looking to bankruptcy law and not state real property law and holding that moorings appurtenant to debtor's real property were not real estate for the purposes of Section 101(51B)).

5.      Scopac does not merely hold or operate a single property or project. Scopac owns approximately 200,000 acres of real property, and the right to harvest on land owned by third parties. Although the term "single property or project" is not defined, it cannot be read to include the diverse scope of Scopac's timer operations.

6.      Scopac's timber operations are spread across nine watersheds.

7.      Scopac's timber operations consist of multiple sites at various stages of harvest. Each site is governed by a separate and distinct THP. As a result, the harvest sites cannot be operated together as a single project.

8.      Pursuant to the California U.C.C., cutting timber is considered a sale of goods. Section 2017 of the California U.C.C. provides:

> A contract for the sale apart from the land of growing crops or other things attached to realty and capable of severance without material harm thereto . . . or of timber to be cut *is a contract for the sale of goods* within this division whether the subject matter is to be severed by the buyer or by the seller even though it forms part of the realty at the time of contracting, and the parties can by identification effect a present sale before severance."

19 / 25

Cal. Comm. Code § 2017 (emphasis added).

9.      Accordingly, pursuant to both California statute and applicable bankruptcy case law, Scopac's holdings do not constitute a single property or project.

**2.  The Active Entrepreneurial Labor of Scopac's Employees Generate Scopac's Revenue, not Merely Passive Ownership of the Timberlands.**

10.     Scopac's revenue is derived from its employees' labor, not the property itself.

11.     Where a debtor is actively using property in its operations any revenue generated is attributable to the operation and not the property.  *See In re Club Golf Partners*, L.P., Case No. 07-40096 (Bankr. E.D. Tex., Feb. 15, 2007); *In re Prairie Hills Golf & Ski Club, Inc.*, 255 B.R. 228, 229 (Bankr. D. Neb. 2000) (attributing the debtor's income to various enterprises occurring on the debtor's property); *In re Larry Godwin Golf, Inc.*, 219 B.R. 391, 392 (Bankr. M.D.N.C. 1997); *In re Majestic Motel Assocs.*, 131 B.R. 523 (Bankr. D. Me. 1991).  Thus, the Court in *Club Golf Partners* correctly noted that the Bankruptcy Code denotes "that it is the property itself, not the fruit of the worker's labor and management's services, that is responsible to substantially all of the gross income."  Thus, a debtor is not a single asset real estate debtor where its "real estate does not generate the revenue; revenue is the product of the efforts of management and workers conducted on the lands, bringing in the customers and selling services and goods to them."

12.     Scopac's revenues are the product of its substantial and expansive commercial, silvicultural and scientific operations by its employees which occur on its property.  Scopac's revenues are not comparable to revenues generated from the property (i.e. rent ) because Scopac engages in a myriad of complex procedures and operations, including preparing, designing and implementing THPs for every log to be harvested.

13.    If Scopac's employees were to stop working, then Scopac would cease generating revenue.  Thus, Scopac clearly does not meet this element of the definition of single asset real estate. The property is not being held for resale or merely collecting rents and Scopac has owned the properties for many years. "[A] debtor that not only owns real estate but also operates a variety of revenue-producing activities on it, employs third-party employees, without whom nothing would happen on the property, enjoys revenues from a variety of active commercial activities on the property that are dependent on the entrepreneurial efforts and hard work of its principals and its other employees, and does not simply lease its property to tenants as the owner of true single asset real estate such as an apartment house does, does not fall within the scope of the definition of 'single asset real estate' in Code § 101(51b) and is not subject to §362(d)(3)." *In re Club Golf Partners, L.P.*, Case No. 07-40096, ¶9, p.4 (Bankr. E.D.Tex., Feb. 15, 2007).

## 3. Scopac Operates a Substantial Commercial Business on the Property.

14.    Scopac is also engaged in a "substantial business" other than operating the real property. This Court agrees with Judge Rhoades' interpretation of the definition "according to an active-versus-passive criterion that inquires into the nature of revenue generation on and by the property, that is, whether the revenue is the product of entrepreneurial, active labor and effort—and thus is not single asset real estate—or is simply and passively received as investment income by the debtor as the property's owner—and thus is single asset real estate." *In re Club Golf Partners, L.P.*, Case No. 07-40096, ¶12, p.4 (Bankr. E.D.Tex., Feb. 15, 2007). "Real property that, for the generation of revenues, requires the active, day-to-day employment of workers and managers other than or additional to the principals of the debtor, and that would not generate substantial revenue without such labor and efforts, should not be regarded as single asset real estate." *Id.*

21 / 25

15.    At the heart of the single asset real estate analysis is the question of "whether the real estate is used in the operation of a business or whether it is simply held for income." *Prairie Hills Golf & Ski Club, Inc.*, 255 B.R. at 229, *citing In re Kkemko, Inc.*, 181 B.R. at 51. A debtor who actively operates a business on its property, even when the operation of such business centers around the use of a debtor's property, does not constitute a "single asset real estate" debtor. *See, e.g., In re CBJ Development, Inc.*, 202 B.R. 467, 472 (9th Cir. BAP 1996)(finding that hotel operations were not the mere "operation of a property" because it required (i) a substantial number of employees; (ii) actively maintaining each of the rooms, (iii) cleaning bed sheets and towels; and (iii) providing basic amenities to guests, specifically phone service; moreover, the hotel operated a gift shop and restaurant); *In re Whispering Pines Estate, Inc.*, 341 B.R. 134, 136(Bankr. D.N.H. 2006) (hotel operations, even without restaurant and gift shop, constitute more than "the business of operating the real property"); *Prairie Hills Golf & Ski Club, Inc.*, 255 B.R. at 229 (operation of golf and ski facilities connected to residential land developments is not merely operating property); *Larry Goodwin Golf, Inc.*, 219 B.R. at 393 (operation of a golf course and pool with concession stand is not merely operating property).

16.    Passive activities that fall within the meaning of section 101(51B) of the Bankruptcy Code are limited to those "passive types of activities [such as] the mere receipt of rent and truly incidental actives such as arranging for maintenance or perhaps some marketing activity, or 'mowing the grass and waiting for the market to turn.'"  In contrast, significant day-to-day activity on the property constitutes substantial business. *See In re CBJ Development, Inc.*, 202 B.R. at 472 (noting that a hotel is not single asset real estate because management of a hotel "requires substantially more day to day activity than does operation of an apartment complex" which only requires minimal maintenance that is primarily limited to common areas).  Moreover

where a debtor "constructs and maintains roads to the golf ski and residential areas, mows and removes snow from the golf course and residential area, continues to develop the golf and ski areas," operates concessions and operates farmland, the debtor is engaged in substantial business. *Prairie Hills Golf & Ski Club, Inc.*, 255 B.R. at 230.

17.     Scopac's activities include protection of the forest from forest fires, erosion, insects and other damage, overseeing reforestation activities, and monitoring and implementing environmental and regulatory compliance.  These activities alone are sufficient to remove Scopac from the category of a passive investment vehicle.

18.     Moreover, Scopac's business is not consistent with this Court's understanding of the single asset real estate provisions of the Bankruptcy Code.  Single asset real estate debtors purpose is to hold property long enough to recognize gain from the sale of the property.  Scopac engages in significant day-to-day operations that are necessary to maximize the value of the Scopac Timber and to ensure future development of Scopac's assets.  Each activity is designed not to maintain the status quo of the property but to increase the value of the Scopac Timber. These activities are sufficient to constitute "significant business" under the applicable case law. *See Prairie Hills Golf & Ski Club, Inc.*, 255 B.R. at 229; *Larry Goodwin Golf, Inc.*, 219 B.R. at 392; *In re CGE Shattuck LLC*, 1999 WL 33457789 at *8 ("As the Debtor's business activities evidence, the operation of a golf course involves significant income-producing activities that exist independently of the operation of the real estate.").

19.     Scopac's Silvicultural Operations are an interdisciplinary mix of science, forestry, and business management.  Scopac's operations incorporate botany, wildlife biology, fisheries, hydrology, geology, geomorphology, forestry, engineering, and business management.  Scopac's scientists and foresters use their interdisciplinary skills to address federal, state and local and

laws and regulations, and contractual obligations, relating to erosion control, road construction, water quality, threatened and endangered plants, threatened and endangered animals, ecosystem biodiversity, site preparation, tree planting, and vegetation management, while also developing long term business plans, cost reductions, and revenue maximization.

20.     Significant operations must occur in order for Scopac to generate revenue. Scopac does not passively sit and collect rent or wait for the real estate market to turn around.

21.     To expand the definition of "single asset real estate" to include this business would expand the Code section to include all farms and ranches other than family farms, mining operations and most mineral or oil and gas owner/operators. None of those businesses were contemplated by the drafters of the Code to be included in the definition. The genesis of the Code section is found in the early abuses of real estate investors during the volatile market of the 1980's and 1990's. See, *In re Club Golf Partners, L.P.*, Case No. 07-40096, ¶4, p.2 (Bankr. E.D.Tex., Feb. 15, 2007).

22.     Because there is no clear definition of single property or single project, the Court must look at the whole business enterprise and ask "What does it look like?" If the business does not own or acquire property merely with an eye for holding it and flipping it when the market turns, or idly sit and collect rent, it cannot fit the definition of single asset real estate. Here, the business was purchased with the intent to operate it. In fact Scopac has been operating for many years, utilizing many employees with a broad range of experience and education.

23.     For the reasons set forth above, the Court finds that Scopac is not a Single Asset Real Estate debtor.

24.     As such, 11 U.S.C. §363(d)(3) is not applicable to Scopac and the Court will not order relief from the automatic stay on those grounds.

24 / 25

25.     The SARE Motion should therefore be denied.


It is therefore ORDERED that the Motion and Amended Motion of the Ad Hoc

Committee of Timber Noteholders (the "Ad Hoc Committee") seeking (A) Determination that

Scotia Pacific Company LLC is a Single Asset Real Estate Debtor, and (B) Order Requiring that

Scotia Pacific Comply with the Requirements of Bankruptcy Code Section 362 (d)(3) (the

"SARE Motion") and the Joinder of Bank of New York as Indenture Trustee to the SARE

Motion are hereby DENIED.


SIGNED <u>04/05/2007</u>.


RICHARD S SCHMIDT
United States Bankruptcy Judge