IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| SCOTIA DEVELOPMENT, LLC | § | CASE NO: 07-20027 |
| Debtor(s) | § | |
| | § | CHAPTER 11 |

## MEMORANDUM OPINION AND ORDER ON MOTION TO TRANSFER VENUE

Before the court are the Motions to Transfer Venue filed by the California State Agencies, the Official Creditor's Committee, the United States Trustee, Humboldt County, California and the City of Rio Dell, California (the "Movants"), seeking transfer of this case to the Northern District of California. Movants allege 1) that venue is improper in the Southern District of Texas and 2) if venue is proper, venue should be transferred for the convenience of the parties or in the interest of justice.

The court conducted a hearing at which the debtors called three witnesses and introduced exhibits. Movants introduced exhibits but elected not to call any witnesses. After careful consideration and for the purpose of this Motion only, the Court makes the following findings.

### BACKGROUND

Scotia Development, LLC, a Texas Corporation ("Scotia Development") filed its Chapter 11 petition in the Southern District of Texas, Corpus Christi Division, followed by the petitions of The Pacific Lumber Company, a Delaware Corporation ("Palco"), Britt Lumber Co., Inc., a California Corporation ("Britt"), Salmon Creek LLC, a Delaware Corporation ("Salmon Creek"), Scotia Inn Inc., a Delaware Corporation ("Scotia Inn") and Scotia Pacific Company LLC, a Delaware Corporation ("ScoPac") (collectively the "Debtors"). All of the Debtors are subsidiaries of Maxxam, Inc., a Delaware Corporation ("Maxxam") whose principal place of

business is in the Southern District of Texas.

The Debtor Palco is owned 100% by Maxxam through two other subsidiaries, Maxxam Group Holding Inc, ("MGH") and Maxxam Group Inc. ("MGI"), both of which are Delaware Corporation with principal places of business in the Southern District of Texas.

The Debtors comprise the forest products group of Maxxam and have been owned and operated by Maxxam since 1985.  In addition, Maxxam also owns a race track, real estate projects in many areas, and previously owned United Savings and Kaiser Aluminum.  These holdings were accumulated by the principal owner of Maxxam, Charles E. Hurwitz, a resident and domiciliary of Houston, Texas, who was characterized by the Houston Chronical as "Houston's only World-Class Corporate raider" in its Business Section on May 29, 1988. Maxxam operates its business through a series of special interest corporations.  While they are separate corporations that carefully maintain their individual corporate structure, it is clear that they act as group of Maxxam, are controlled Maxxam, and, as will be set out in more detail below, are supported by the corporate staff of Maxxam.

Palco has owned and managed private commercial timberlands in Humboldt County, California for more than 130 years.  Palco also owns the real estate, housing, and all improvements of the town of Scotia, California.  In addition to its timber operations in California, Palco has, in the past, owned timber rights in New Mexico, owned seventy percent (70%) of a lumber company in New Mexico, had subsidiaries with manufacturing operations in other states (including Texas), maintained a lumber sales office in Houston, Texas, and invested (through its subsidiary Salmon Creek) in two office buildings in Houston, Texas, a drug store in Houston, Texas and two motels in the Houston area.  Palco also sells energy generated from its cogeneration plant, utilizing wood byproducts from its milling operations.  Such sales typically

constitute less than 10% of Palco's revenue.

Scopac is a special purpose Delaware limited liability company organized by Palco in May, 1998, to facilitate the sale of certain collateralized notes (the "Timber Notes"). Scopac owns approximately 200,000 acres of private timberland (the "Scopac Timberlands") and has the exclusive right to harvest timber on about 10,500 additional acres of private timberland owned by Palco and another one of its subsidiaries (the "Scopac Timber Rights"). Collectively, the Scopac Timberlands and the Scopac Timber Rights constitute the Scopac Timber Property.

Part of Scopac's business is the sale of logs harvested from the Scopac Timber Property, which logs are sold to Palco pursuant to a Master Purchase Agreement. Through its subcontractors, Palco harvests the timber and transports the logs to sawmills owned by Palco and Britt, where the logs are converted into marketable lumber. Scopac primarily pays the obligations owing under the Timber Notes with proceeds of these log sales.

Palco and Britt are co-borrowers, and Debtors Scotia Development, Salmon Creek and Scotia Inn are guarantors, under (i) a Revolving Credit Agreement (as amended) dated July 18, 2006 with LaSalle Bank National Association ("LaSalle") and Marathon Structured Finance ("Marathon") as lenders (collectively, the "Lenders"), which provides for borrowings up to $60 million, and (ii) a Term Loan Agreement, dated as of July 18, 2006 with Marathon as lender, which provides for borrowings up to $85 million (collectively, the "Credit Agreements").

As of the Petition Date, an aggregate of approximately $125 million (including $14 million in letters of credit) was outstanding under the Revolving Credit Agreement, the Term Loan Agreement, and the letters of credit. Under an Indenture dated July 20, 1998, by and between Scopac and the Bank of New York, as successor trustee (the "Trustee"), Scopac issued an aggregate principal amount of $867.2 million in Timber Notes, which were issued in three

classes: 6.55% Series b Class A-1 Timber Collateralized Notes due 2028 (the "Class A-1 Notes"), 7.11% Series B Class A-2 Timber Collateralized Notes due 2028 (the "Class A-2 Notes"), and 7.71% Series B Class A-3 Timber Collateralized Notes due 2028 (the "Class A-3 Notes")(collectively the "timber Notes").  The holders of the Timber Notes are collectively referred to as the "Noteholders".  As of the Petition Date, Scopac owed approximately $714 million on the Timber Notes.

Scopac also has a secured revolving credit facility with Bank of America, which is available to pay up to one year's interest on the Timber Notes (the "Scopac Line of Credit").  As of the Petition Date, Scopac owed approximately $36 million of additional secured revolving credit debt under the Scopac Line of Credit to Bank of America.  The Scopac Timber Property is collateral for the Timber Notes and the Scopac Line of Credit.

As a result of increasing regulatory restrictions and limitations on the harvesting of its timber since debt was issued in 1998, Scopac's revenues were significantly reduced while its operating costs increased.  Scopac's average harvest level from 1998 – 2004 was 153 MMBF, but in 2005 and 2006 the harvest levels had declined to approximately 145 and 99 MMBF, respectively.  Scopac's annual interest payments on the Timber Notes are approximately $54 million.  Accordingly, even though Scopac reduced the amount outstanding under the Timber Notes from $867 million in 1998 to $714 million, its current cash flow from operations is not sufficient to service its semi-annual interest payments on the Timber Notes.

The Debtors were also negatively impacted by: (i) litigation relating to the harvesting practices on the Scopac Timber Property and the approval of Scopac's timber harvest plans ("THPs"), which must be approved before Scopac Timber can be harvested; and (ii) regulatory and legislative burdens and limitations imposed by the California North Coast Regional Water

Quality Control Board and State Water Board that are different from and in addition to the requirements under the habitat conservation plan ("HCP") approved as part of the Headwaters Agreement.

Scopac maintains extensive business relationships with Palco.  The business relationships are formalized through several written agreements pursuant to which Scopac sells logs to Palco, Palco renders a variety of services to Scopac, and Scopac renders certain services to Palco.  The various written agreements that govern the business relationships and dealings between Scopac and Palco include, but are not limited to: (i) the New Master Purchase Agreement between Scopac and Palco (governing the sale to Palco by Scopac of logs harvested from the Scopac Timber; the "Purchase Agreement"); (ii) the New Services Agreement (the "Services Agreement") and the New Additional Services Agreement (the "Additional Services Agreement") between Palco and Scopac (pursuant to which Palco provides a variety of operational, management and related services to Scopac with respect to the Scopac Timber Property, and Scopac provides certain services to Palco; (iii) the New Environmental Indemnification Agreement between Palco and Scopac (providing for the indemnification of Scopac by Palco for certain environmental liabilities incurred in connection with the Scopac Timber Property); and (iv) the New Reciprocal Rights Agreements among Palco, Scopac and Salmon Creek (providing reciprocal rights of ingress and egress through, and a number of other rights in respect of, the parties' respective properties).

Beginning in June 2005, through September 2005, Scopac expended considerable effort in an unsuccessful attempt to restructure the Timber Notes through negotiations with a group of Noteholders and its professionals.  Scopac also engaged in continuous, but unsuccessful, efforts to obtain relief and accommodation from various regulatory actions that have substantially

reduced its timber harvest and increased its costs.  Both Palco and Scopac engaged in a

systematic process of reducing expenditures by laying off employees and scaling back and/or

shutting down operations.  However, Scopac is limited in its ability to further reduce its

operating costs absent restructuring of the Timber Notes or significant regulatory relief that

would result in an immediate and substantial increase in harvest levels.

In early 2006, Palco initiated its asset sale program to sell the town of Scotia, California

and certain other assets (the "Palco Asset Sale Program").  The Palco Asset Sale Program was

implemented to reduce Palco's overall debt level.  Palco also enlisted Shawn Hurwitz, James

Shanks and Eric Heacock, real estate experts employed by Maxxam, to assist in the Palco Asset

Sale Program.

In 2006, Shawn Hurwitz, James Shanks and Eric Heacock assisted the Debtors in the

Palco Asset Sale Program and the Scopac Land Sale Program.  All of these individuals' offices

are located in the Southern District of Texas.

In June 2006, Debtor Scotia Development was formed to capture the business activities

of the Maxxam real estate experts working on the Scopac Land Sale Program and the Palco

Asset Sale Program, to investigate the real estate market in South Texas.  Palco and Scopac

lacked the real estate expertise necessary to execute the programs.

Scotia Development opened an office in Corpus Christi, Texas to have a presence in an

area of Texas which might provide investment and development opportunities.  Scotia

Development entered into a Development and Sales Assistance Agreement with Palco and a

Sales and Marketing Assistance Agreement with Scopac, each dated September 1, 2006

(collectively, the "Development Agreements"), which  contemplate, among other things, that

Scotia Development will, from time to time, provide assistance in marketing Scopac's and

Palco's timberlands and other real property for sale or other disposition.   In connection with the work provided under the Development Agreements, as of the Petition Date, Palco and Scopac owed Scotia Development $310,729 and $140,534, respectively.

The formation of Scotia Development followed the same development regimen used by Maxxam real estate group in the past regarding other new market areas – a new market is identified, a separate entity is formed to capture the business activities, the investment opportunities are subsequently explored to determine if there is a viable project, and, once a specific project has been identified, funding alternatives are evaluated and a decision is made whether to move forward on the project.   There are numerous examples of similar separate legal entities.

Scotia Development (and other non-debtor affiliates prior to the formation of Scotia Development) explored investment opportunities in the Coastal Bend region of Texas.  Scotia Development executed two option contracts for real estate along the Texas Gulf Coast. The services provided by Scotia Development were designed to assist the Debtors in paying their secured creditors.

Debtors' cash flow was not sufficient to sustain their debt obligations.  Scotia Development assisted in the Scopac Land Sale Program and Palco Asset Sale Program, in order to assist the Debtors in reducing the outstanding debt held by Marathon, LaSalle, and paying interest to the Noteholders.

When Scotia Development was formed, it was contemplated that it would be the parent company of Palco.  The corporate structure was intended to make Scotia Development the entity instrumental in Palco's debt reduction plan and therefore the entity where Palco's equity value should reside.  Accordingly, Scotia Development was established as a wholly-owned subsidiary

of MGI, the same entity that owns Palco.

On January 18, 2007, the day before bankruptcy filing, MGI assigned its membership interests in Scotia Development to Palco. The business reason for the assignment was to facilitate future dealings between the Scotia Development, Palco and Scopac, with the least chance of disruption following the chapter 11 filings. As a subsidiary of Palco, Marathon and LaSalle would have full visibility into the books, records and business activities of Scotia Development. By virtue of the assumption of the debt owed to Marathon and LaSalle by Scotia Development, there would be less cause for concern regarding the possible transfer of value away from entities that were obligors prior to the assumption.

As a result of becoming a subsidiary of Palco, Scotia Development was required to guarantee the obligations to Palco and Britt to Marathon and LaSalle in the amount of approximately $125 million. On January 18, 2007, Scotia Development executed assumption agreements guaranteeing this debt. The guarantee was viewed as a balance sheet neutral transaction to Scotia Development because the Debtors believe that the value of the collateral securing the Marathon and LaSalle Credit Agreements exceeded the amount of indebtedness. Additionally, it was considered remote that the guarantee would be called upon.

Prior to assumption of the Marathon and LaSalle debt, Scotia Development had among other obligations, debts of $50,000 to Black and Veatch, $7,258 to Lakerfield Development, LLC, and affiliate payables to MCO for efforts related to Palco's Asset Sale Program in excess of $140,000. Once it became apparent that Palco and Scopac would be required to file for bankruptcy, the Board of Directors of Scotia Development made the decision to file for Bankruptcy.

Palco and Scopac depend on the real estate expertise provided by Scotia Development to sell assets included in the Palco Asset Sale Program and the Scopac Land Sale Program. Proceeds from the Scopac Land Sale Program assisted Scopac in making the July, 2006, interest payment, but did not produce sufficient funds to permit Scopac to make the next interest payment under the Timber Notes, due on January 20, 2007.  The Scopac Land Sale Program generated proceeds of approximately $13.1 million in 2006. The Palco Asset Sale Program and the Scopac Land Sale Program are expected to continue during the Debtors' bankruptcy cases and the proceeds will be used to fund the Debtors' plan(s) of reorganization. At all times since its creation in June, 2006, Scotia Development was an affiliate of all the Debtors.

## DISCUSSION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1334 and 157. Motions to change venue are core matters. *In re Enron Corp.*, 274 B.R. 327, 342 (Bankr. S.D.N.Y.  2002).

## 1.    VENUE IS PROPER IN SOUTHERN DISTRICT OF TEXAS

While many of the parties allege that venue is improper, the unrefuted facts presented at the hearing demonstrate that venue is proper in the Southern District of Texas. Venue is proper in a district:

> (1)    in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district; or

> (2)    in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

- - 28 U.S.C. §1408

Scotia Development is a Texas Limited Liability Company whose principal assets are located in the Southern District of Texas.  Scotia Development's principal place of business is in the Southern District of Texas.  Scotia Development maintains its only office in the Southern District of Texas.  Two of the three members of Scotia Development's Board of Managers reside in the Southern District of Texas.   The company was incorporated approximately eight months before its bankruptcy filing as a special purpose corporation with a valid business purpose independent of venue selection.  At the time of incorporation Scotia Development was wholly owned by Maxxam through MGI.  Scotia Development provided real estate expertise to Scopac and Palco.  At all times following its incorporation Scotia Development was an affiliate of the Debtors. The Bankruptcy Code defines affiliate as:

> (B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities.("the Affiliate Rule")

- - 11 U.S.C. §101(2)

On the face of the statute and pursuant to its plain meaning, venue is proper in the Southern District of Texas for Scotia Development and therefore is proper for all affiliated Debtors. The language of the bankruptcy venue statute is difficult to read any other way. Congress permitted venue for a corporation in the state of its incorporation, in the location of its principal place of business, in the location of its assets, and in any district where an affiliate corporation has filed.

Movants argue that venue is improper because Scotia Development was incorporated 233 days before its Chapter 11 filing, citing a recent oral opinion of Judge Robert D. Drain of the Southern District of New York in *In re Winn-Dixie Stores, Inc.*  Case No. 05-11063 (Bankr.

S.D.N.Y. 2005).  Although *Winn-Dixie* was transferred to Florida, the court found that venue was proper in New York despite the fact that *Winn Dixie's* only tie to New York was an affiliate corporation incorporated <u>the day before filing</u>.  The court used its discretion to transfer the case "in the interest of justice" - - not because venue was improper.[1]

The Affiliate Rule came to the Bankruptcy Code from the Bankruptcy Act.  In *Capitol Motor Courts v. Le Blanc Corp.* 201 F.2d 356 (2d Cir. 1953); *cert denied,* 345 U.S. 957 (1953), the Second Circuit Court of Appeals interpreting the similar Act provision approved venue in New York for a Louisiana Corporation with all of its assets in Louisiana based upon the first filing of an affiliate incorporated in New York forty days prior to the bankruptcy filing.

Movants also argue that the transfer of Scotia Development stock from MGI to Palco on the day before bankruptcy should infer bad faith and render venue improper.  While the conduct of a debtor the day before filing is certainly subject to scrutiny, here the transaction did not affect Scotia Development's status as an affiliate of the remaining Debtors and therefore had no impact on venue.  Scotia Development was an affiliate before and after the transfer.

Movant further argue that Scotia Development did not need to file bankruptcy.  Movants allege that the only reason Scotia Development filed for bankruptcy was its agreement to guarantee debt of its affiliates.  Again this argument misses the mark and is not supported by the record.  The guarantee is a contingent liability and is balance sheet neutral.  More important, Scotia Development's primary assets are obligations from Palco and Scopac and its principal business opportunities were the sales of affiliated Debtors' assets.  In addition, Scotia Development is significant to the reorganization of the Debtors.  With insufficient income to pay the Timber Notes and secured bank obligation, the sale of assets will be critical to the

---

[1] Curiously, the Southern District of Texas United States Trustee takes the position that venue of this case is improper, while the Southern District of New York United States Trustee took the contrary position in *Winn-Dixie* and opposed transfer.

reorganization of the Debtors.  Whether or not Scotia Development guaranteed debt, it appropriately qualifies as a debtor.

Finally, Movants complain that the size of Scotia Development should disqualify it as an affiliate for venue purpose.  With exaggeration and theatrical flair usually reserved for farse, movants classified Scotia Development's Corpus Christi office as a "phone booth" with one phone and rented furniture.[2]  Again these facts are irrelevant.  Venue is district wide.  Even without all of the Corpus Christi connections, venue is proper in the Southern District of Texas.[3]  At the time Scotia Development filed its bankruptcy petition, the Southern District was its only appropriate venue selection.

The Debtors argue that even without the Affiliate Rule, venue is proper in the Southern District of Texas, citing the factual similarities of Palco and Scopac to the refinery in *In re Commonwealth Oil Ref. Co., Inc., supra*.  The *Commonwealth* debtor owned a refinery in Puerto Rico.  The home office, however, was in San Antonio, Texas.  The Fifth Circuit Court of Appeals found that *Commonwealth*'s principal place was San Antonio, Texas.  Palco and Scopac have significant ties to the Southern District of Texas such that this Court could find it is their principal place of business. However, the Court need not reach the issue because the Court has found venue proper under the Affiliate Rule.

Venue selection is an appropriate decision made by a debtor with the assistance of counsel.  As Judge Drain said in *Winn-Dixie*, it is not "improper to file within a district that Congress has expressly created for one.  In fact it may well be a duty to do so based on one's analysis of all the facts at hand." *In re Winn-Dixie Stores, Inc*., Case No. 05-11063-rdd, April 12, 2005, p. 170, ll.6-11. Here, Movants who asserted that venue is improper in the Southern District

---

[2]   True, the office is small, however it is about the size of the Corpus Christi Division Bankruptcy Judge's first office.
[3]   See, *Smith v. Colonial Penn Insurance Co.*, 943 F.Supp. 782 (S.D.Tex. 1996).

of Texas disregarded the law and the facts, such that this Court has seriously considered but now declines to impose Rule 11 sanctions. There is no evidence of forum shopping and the facts presented demonstrate that venue is entirely proper in the Southern District of Texas.

**2.     TRANSFER FOR THE CONVENIENCE OF PARTIES OR IN THE INTEREST OF JUSTICE.**

Having established that venue is proper in the Southern District of Texas, the Court now turns its attention to the more pertinent question before it - - whether venue should nevertheless be transferred. 28 U.S.C. § 1412 provides:

> A district court may transfer a case or proceeding under title 11 to a district court for another district in the interest of justice or for the convenience of the parties.

Movants bear the burden of proof to show by a preponderance of the evidence that venue should be transferred. *In re Commonwealth Oil Ref. Co., Inc.,* 596 F.2d 1239, 1240 (5th Cir. 1979), *cert. denied,* 444 U.S. 1045 (1980); *In re Peachtree Lane Assocs., Ltd.,* 150 F.3d 788 (7th Cir. 1999); *In re Enron Corp.,* 284 B.R. 376 (Bankr. S.D.N.Y. 2002). A plaintiff's choice of forum should be respected unless it is clearly outweighed by other considerations. *Schexnider v. McDermott Intern., Inc.,* 817 F.2d 1159, 1163 (5th Cir. 1987); *Howell v. Tanner,* 650 F.2d 610, 616 (5th Cir. 1981).

The criteria for determining whether to transfer a title 11 case are:

(1)     the proximity of creditors of every kind to the court;

(2)     the proximity of the debtor to the court;

(3)     the proximity of the witnesses necessary to the administration of the estate;

(4)     the location of the assets;

(5)     the economic administration of the estate;

(6)     the necessity for ancillary administration should liquidation result;

(7)     the choice of the debtor;

(8)     the choice of the creditors;

(9)     forum shopping;

- - *Commonwealth Oil Ref. Co., Inc.*; 596 F.2d at 1247; *In re Enron Corp.,* 274 B.R. 327 (Bank. S.D.N.Y. 2002).

In applying the *Commonwealth* standards the Court must assess the bankruptcy estate and attempt to predict the issues that will arise in the case.  In *Commonwealth* the court believed that while the assets, employees and many trade creditors were in Puerto Rico, the debtor needed to reorganize its finances and not its assets, employment contracts or operations.  The Court therefore focused on the financial nerve center in San Antonio and found that San Antonio was more convenient to the debtor and financial creditors.

Here, the Debtors had at least three venue choices: the District of Delaware, the Southern District of Texas and the Northern District of California.  After considering the various venue alternatives, the Debtors elected to file in the Southern District of Texas. No party requested transfer to Delaware.

As in *Commonwealth,* the Debtors' chapter 11 cases require financial restructuring. Neither during the bankruptcy nor in any proposed plan will the debtors restructure their operations. The cutting of timber must continue to comply with approved Timber Plans and permits and must comply with the laws and regulation of California and the United States. The Debtor filed a pre-petition law suit in California seeking to allow the additional harvesting of timber. That lawsuit continues in California and could only be transferred to the Southern District of Texas by the trial judge. A plan of reorganization cannot restructure the environmental laws and regulations of California and the United States. This case does not involve the rejection of a union contract or any significant employment disputes. On the

contrary, the important issues in this case are financial. During the bankruptcy the debtor must arrange for DIP financing and adequately protect secured creditors. Any plan of reorganization must provide for reasonable repayment of the secured debts.  Negotiations for DIP financing, repayment provisions or replacement financing will likely take place in Houston, New York and Chicago. The case may involve a number of preference actions. If any preference actions are filed, however, each adversary would have its own venue. Moreover, most preference actions are likely to settle.

No evidence was presented to refute Debtors' assertion that they are solvent.  Thus liquidation is unlikely.  If the case converts to chapter 7, transfer may be appropriate.

Although significant environmental and regulatory issues involving the Debtors exist, it is unlikely that the Bankruptcy Court will be involved in deciding those issues.  On the contrary, the State of California is a co-defendant with the Debtor in the environmental litigation which is pending in California and presumably will be tried in California.

The case at bar will not require the estimation or determination of State or Federal environmental claims.  While Oakland, California would certainly be more convenient to the California regulators, the only issue between the Debtors and California at this time is a claim of less than $1,000.  The State of California acknowledges that the Debtors work well with the regulators and are in compliance with regulations and permits.   If the Debtors were to violate California environmental or timber laws or regulations during this bankruptcy, California is free to initiate enforcement action in California.  11 U.S.C. §362(b)(4). This Court previously ruled that the regulation of water and the environment is a matter within the police powers of the State and Federal Government. *In re D & A Realty, Inc.,* 179 B.R. 831 (Bankr. S.D.Tex. 1994).

### a. Scopac Secured Creditors

Scopac's largest creditor constituency is the Noteholders.  The Noteholders also represent the single largest creditor constituency in these cases, making up approximately 70% of the overall debt of the Debtors.  The Noteholders are located all over the United States.

At trial, Scopac was able to identity approximately 113 individual Noteholders.  Only one was domiciled in the Northern District of California.  The Noteholders are predominantly located in New York and travel from New York to the Southern District of Texas is significantly shorter than to the Northern District of California.  The central, geographic location of the Southern District of Texas should, therefore, be significantly more convenient to the Noteholders than the Northern District of California.  The Northern District of California is no more convenient to the Noteholders than the Southern District of Texas.

The Indenture Trustee for the Timber Notes is the Bank of New York and its representative responsible for oversight of the Timber Notes is Chris Mathews.  Mr. Mathews is located in the Bank of New York's office in Houston, Texas.  The Indenture Trustee is represented by Thompson & Knight, LLP through that firm's office in Texas and New York.

In addition, an Ad Hoc Committee of Noteholders representing approximately 90% of the outstanding Timber Notes has appeared in this case.  Of the twenty-seven (27) individual members of the Ad Hoc Committee, seventeen (17) are located in New York.  One of the members is located in Texas and one is located in California.

The Timber Notes are registered securities which are subject to SEC reporting and registration requirements. The SEC filings are available to Timber Note purchasers. The public filings set out the connection between Scopac and Maxxam. Indeed, some of the filings are jointly prepared and filed with and by Maxxam. Not only did the Timber Noteholders know

about the connection between Scopac and Maxxam (and thus the connection to the Southern District of Texas), but they likely relied upon the fact that Scopac and Palco are controlled by Maxxam and Hurwitz when purchasing the Notes.

The Ad Hoc Committee of Noteholders took no position on venue until one business day prior to the venue hearing.  Counsel for the committee admitted that their decision to support transfer was a tactical one made after failure to reach agreement with the Debtors over the payment of the committee's attorneys' fees.

### b. Palco Secured Creditors

The Palco Debtors' largest secured creditor, Marathon, is a hedge fund and part of Marathon Asset Management LLC, which is headquartered in New York City.  Marathon took no position on venue. The Palco Debtors' other secured creditor, LaSalle, is headquartered in Chicago.  LaSalle supported venue in the Southern District of Texas, but asked for a transfer to the Houston Division.

The Credit Agreements with Marathon and LaSalle contain forums election clauses designating New York courts as having jurisdiction and venue over disputes concerning the agreements.  With respect to Scopac, only the Deed of Trust is governed by California law, while the Creditor Agreement and Indenture are both governed by New York law. The Northern District of California is not more convenient for the Palco secured creditors than the Southern District of Texas.

### c. Unsecured Creditors

As of the Petition Date, Scopac had approximately $455,000 in unsecured claims. Scopac has since paid approximately $198,000 to certain critical vendors under the Court's Order Granting Scotia Pacific Company, LLC's Emergency Motion for Authority to Pay

/ 29                                   17

Prepetition Claims of Critical Vendors.  Scopac estimates that is currently has approximately $257,000 in prepetition claims outstanding.

Seventeen of Scopac's twenty largest creditors are trade/general creditors, and most of these creditors are owed less than $10,000.  Ten (10) of those creditors are located in or around Humboldt, California.

As of the Petition Date, Palco had approximately $70,000,000 in unsecured claims.  Of this amount, the largest claim of approximately $21,000,000 relates to Palco's pension plan, which is administered by Fidelity Investments in Westlake, Texas.  Since the Petition Date, Palco has paid approximately $2,200,000 to certain critical vendors under the Court's Order Approving Palco and Certain Subsidiaries Motion for Authority to Pay Prepetition Claims of Critical Vendors and Second Interim Order Approving Palco and Certain Subsidiaries Motion for Authority to Pay Prepetition Claims of Critical Vendors.  The Palco Debtors estimate that they currently have approximately $67,800,000 in prepetition claims outstanding.

As of the Petition Date, Britt has approximately $362,000 in unsecured claims.  Britt has since paid approximately $230,000 to certain critical vendors under the Court's Order Approving Palco and Certain Subsidiaries Motion for Authority to Pay Prepetition Claims of Critical Vendors and Second Interim Order Approving Palco and Certain Subsidiaries Motion for Authority to Pay Prepetition Claims of Critical Vendors.  Britt estimates that is currently has approximately $132,000 in prepetition claims outstanding.

The drive from Humboldt County, California to Oakland, California, where the movants seek to have this case transferred, takes approximately five (5) hours.  If the Debtors' trade creditors located in or around Humboldt County, California desire to participate in the hearings in this case, they are unlikely to attend in person, choosing to instead appear telephonically.

Appearance by telephone can be accomplished just as easily with this Court. In fact, the Debtors have already provided facilities for telephonic appearances in Humboldt County, California.

The other creditors on the Palco Debtors' twenty largest lists are scattered all over the country, including Leawood, Kansas; British Columbia, Canada; Quebec, Canada; Palatine, Pennsylvania; Westlake, Texas; Dallas, Texas; Albany, New York; Reno, Nevada; Mercer Island, Washington; and Chicago, Illinois.  The Southern District of Texas is equally convenient or more convenient for these creditors.

Prior to filing their bankruptcy petitions, the Debtors enjoyed a good relationship with trade creditors and had few disputes as to the amounts owed to the trade creditors.  The Debtors' chapter 11 cases are financial restructurings.  The Debtors did not file their chapter 11 cases in the Southern District of Texas in order to gain leverage or tactical advantages over their trade creditors. The Debtors solicited and obtained from approximately 30 trade creditors documents purporting to join Debtors' objection to transfer venue. Movants countered with a list of approximately 10 unsecured creditors that request transfer. Neither of these efforts are particularly helpful in assessing the wishes of the unsecured creditors. Normally, a Court would rely on the position of the Official Unsecured Creditors Committee. Here the Committee appointed by the U. S. Trustee is dominated by three parties with lawsuits against the Debtors who are not trade creditors and whose motives are more related to legal strategy than convenience of all of the unsecured creditors.

Two of the four members of the Committee, the Environmental Protection Information Center ("EPIC") and the United Steel Workers of America (the "Steelworkers") are actively suing Scopac, Palco, and the California State agencies to effectively shut down Scopac by stopping or severely limiting ability to harvest timber. Other than the lawsuits, neither EPIC nor

the Steelworkers' have any other direct, business or financial interest in Scopac or the Palco debtors. The Steelworkers is not a union having any connection with the Debtors. EPIC's and the Steelworkers' litigation strategy, however, is motivated by their stated desire to set aside the Headwaters Agreement and effectively shut down the operations of Scopac and Palco.

The EPIC and Steelworkers Lawsuits are filed in the Humboldt County Superior Court. They challenge the validity and legality of the California Department of Forestry's sustained yield plan that was part of the consideration the Debtors received in the Headwaters Agreement. Palco, Scopac, and Salmon Creek were named as "real parties in interest" rather than as defendants or respondents. Plaintiffs prevailed in the trial court, but the trial court judgment was overturned on appeal in its entirety.

Although the complaint does not seek money damages from any party, California law allows Plaintiffs that sue and prevail "in the public interest" to recover attorney's fees as so-called "private attorneys general." See Cal. Code of Civ.Proc. §1021.5. After issuing its judgment on the merits—but before the appellate court review and reversal – the lower trial court awarded plaintiff attorneys' fees. Those fees are the sole basis of the claims of EPIC and the Steelworkers.

Under California law, an award of attorneys' fees for a party that prevailed "in the public interest" is entirely dependant a finding that the party prevailed in the underlying lawsuit. It is a well-established principle that "an order awarding costs falls with a reversal of the judgment on which it is based". *Allen v. Smith* , 94 Cal. App. 4th 1270, 1284; 114 Cal.Rptr.2d 898 (Cal.App.4[th] Dist. 2002); *Purdy v. Johnson*, 100 Cal. App. 416, 421; 280 P. 181 (Cal. App. 1st Dist. 1929) ("The successful party is never required to pay the costs incurred by the unsuccessful party."). This principle also holds true for an award of attorneys' fees under California Code of

Civil Procedure Section 1021.5.  *See, e.g., Merced County Taxpayers' Assn. v. Cardella,* 218
Cal. App. 3d 396, 402 (Cal. App. 5th Dist. 1990).

The attorneys' fee award was contested, was also timely appealed, and its validity or
invalidity is contingent upon the conclusion of the EPIC lawsuit on the merits.  Debtors have
also fully preserved their right to contest the amount of the fee award on appeal, should that
become necessary.

On December 12, 2005, the First District Court of Appeal for the State of California
issued a decision and opinion reversing the lower court's decision in the EPIC and Steelworkers
Lawsuit in its entirety.  The Court of Appeals decision is before the California Supreme Court.
The ancillary attorneys' fees award by the trial court is not currently enforceable, and if the
California Supreme Court affirms the Court of Appeal, the attorney fees award will be vacated.
The matter is fully briefed to the California Supreme Court and is awaiting assignment and
scheduling for oral argument.

EPIC filed two other lawsuits in the United States District Court for the Northern District
of California. The lawsuits allege that harvesting and other forestry activities under certain of
Scopac's approved THPs will result in discharge of pollutants in violation of the Clean Waters
Act and that two federal agencies violated certain federal laws and related regulations in
connection with their oversight of the HCP and the related incidental take permits issued by the
federal government.

A third Committee Member, Steve Cave, is a plaintiff in a personal and property injury
suit filed against Palco, Scopac, and several non-debtor entities and individuals that are located
in the Southern District of Texas, including Charles Hurwitz, Maxxam and MGI (the "Cave
Action"). The Cave Action alleges, among other things, that Debtors' logging practices on the

Scopac Timber Property contributed to an increase in flooding along Elk River (which runs through the Scopac Timber Property), resulting in personal injury and damage to the plaintiff's properties, notwithstanding the fact that such properties are located in a historical floodplain.  In the Cave Action, the plaintiffs seek to recover $780,000 in alleged property damages and $1,000,000 for emotional distress.  The action has not been tried.

EPIC, the Steelworkers and Steve Cave are legitimate parties in interest and may well turn out to be creditors. However, in view of their litigation history and dominance of the Creditor's Committee, it is difficult for this court to assign any more weight to the Creditor Committee's position in this motion than that of these three individual parties in interest. That is, the Creditors' Committee at the hearing represents the unique interests of EPIC, the Steelworkers, and Steve Cave, not Debtors' unsecured creditors as a whole. Following the hearing, the U.S. Trustee reconstituted the Creditors Committee.

EPIC, the Steelworkers and Steve Cave have the only significant disputed unsecured claims.  The Bankruptcy Court may be asked to estimate these claims but is unlikely to try the claims.  Estimation procedures can be designed to minimize the inconvenience of this forum to these three potential creditors.

### d. The Debtors

Certain of the Debtors' Officers are located in the Southern District of Texas, including: James Shanks (President of Scotia Development), Bernie Birkel (Secretary for all the Debtors), Emily Madison (Assistant Secretary for all the Debtors), Valencia McNeil (Assistant Secretary for all the Debtors) and Norma Romo Robertson (Assistant Secretary for all the Debtors). Moreover, all three members of Scopac's Board of Managers are located in the Southern District of Texas.  Scopac's Board of Managers and the Palco Board meetings take place in the 20th Floor

Board Room of the offices of Maxxam located at 1330 Post Oak Blvd., Houston, Texas.

The Board of Scopac and the Palco Debtors convened and conducted approximately 58 regular and special meetings from 2005 through the Petition Date to consider and/or approve the following:

* status of the Debtors' respective business operations and finances;

* California environmental regulatory approvals sought by the Debtors;

* evaluation of the Debtors' respective liquidity situations and formulation of plans for dealing with shortfalls;

* potential bankruptcy filings by some or all of the Debtors;

* refinancing of the Palco credit facilities;

* issues concerning the California Water Board;

* status of THP's and Scopac's continuing harvest issues;

* status of watershed analyses, watershed-wide waste discharge requirements and their current status;

* retention of investment bankers;

* CDF timber harvest limitations and options for increasing harvest levels;

* public filing requirements with the SEC, such as Form 8-K's, 10-K's and 10-Q's;

* restructuring of the Timber Notes;

* filing of lawsuits against the State of California asserting violations of the Headwaters Agreement;

* status of litigation affecting the Debtors;

* evaluation of timber harvest forecasts;

* disputes among the Debtors and the California Regional Water Boards;

    *       evaluation of DIP financing;

    *       Palco workers compensation issues;

    *       Palco early payments to Scopac for timber purchases;

    *       annual timber harvesting plans;

    *       stormproofing or roads under HCP;

    *       results of operations; and

    *       sales of assets, including Scopac ranch lands and timber.

Two of the three managers for Scotia Development, Salmon Creek, and Scotia Inn are located in Houston, Texas.  James Shanks, President of Scotia Development, is located in Houston, Texas.

The Scopac Board and the Boards of Directors of the Palco Debtors are the persons that will make the important management decisions regarding the financial restructuring of the Debtors in these bankruptcy cases and the Southern District of Texas is much more convenient for their participation than the Northern District of California.  Many of the meetings to discuss the Debtors' plan of reorganization will occur in the Southern District of Texas.

Scopac has, among other assets: (i) approximately 200,000 acres of timberland and 10,500 acres of timber rights located in Humboldt County, California and (ii) the cash and cash equivalents held in the SAR Account.  As of the Petition Date, there was approximately $42.4 Million in cash and cash equivalents held in the SAR Account.  There was also an additional $2.4 Million of Class A-1 Notes held in the SAR Account.  The SAR Account is maintained at the Bank of New York Trust Company in Dallas, Texas.

In addition, of Scopac's seven bank accounts, only two are located in California.  The California accounts are only allotted $400,000,00 per month to be used for paying Scopac's daily

operating expenses and payroll.  Scopac's other five accounts are maintained with the Bank of New York in Dallas, Texas.  All of Scopac's significant debt obligations to the Noteholders and Bank of America are paid through Dallas, Texas accounts.

The Debtors also maintain numerous books and records (e.g., public filings, insurance, tax, board minutes), as well as the Debtors loan and security agreements, in the Southern District of Texas.

In addition to the activities described above, the Debtors receive a significant amount of general administrative service and support from Maxxam and certain other non-debtor affiliates, all of which are headquartered in the Southern District of Texas.  Specifically, individuals at Maxxam and other non-debtor affiliates provide assistance to the Debtors in the following areas:

- Legal Services

  * Minutes and other corporate secretary services

  * Contracts and agreements (drafting and review)

  * Loan documents (drafting and review)

  * Litigation monitoring and coordination

  * Assistance with Information Memoranda

  * Maintenance and document retention of key contracts and financing Documents

- Risk Management Services

  * Evaluation of restructuring and liquidity alternatives

  * Financial modeling and analysis

- SEC reporting and compliance

  * Preparation of Scopac 10-K, 10-Qs, Form 8-Ks and other 1934 Act Reports

    \*        Debtors' compliance with Sarbanes-Oxley Act requirements (§ 404, etc.)

    \*        External and internal auditor coordination

- Accounting Services

    \*        Technical accounting assistance

    \*        Assistance with quarterly and annual closings

    \*        Assistance with accounting for employee benefits (Workers Comp, OPEB and Pension)

    \*        Accounting for income taxes

    \*        Assistance with preparation of Palco/Britt stand alone financial statements

    \*        Assistance with preparation of Palco Retirement Plan financial statements

- Income Tax Reporting and Compliance Services

    \*        Preparation of consolidated federal income tax returns

    \*        Preparation of consolidated state income tax returns

    \*        Coordination of income tax agency inquiries and audits

- Treasury and Cash Management Services

    \*        Monitoring and maintenance of investment accounts

    \*        Correspondence and coordination with Scopac Indenture Trustee

    \*        Correspondence and coordination with Palco's lenders

    \*        Coordination of Letters of Credit issuances and renewals

    \*        Coordination of bank accounts

    \*        Coordination of Indenture Trustee changes

-Real Estate Expertise

    \*        Assistance with Scopac Land Sale Program

    \*        Assistance with Palco Asset Sale Program

    \*  Consultation regarding conversion of company-owned town

    \*  Consultation regarding home financing alternatives

-Insurance Services

    \*  Coordination and purchasing of insurance policies including worker's compensation, auto, liability, property and director and officer insurance

    \*  Coordination of insurance claims processing services and monitoring

    \*  Cost allocation services

-Benefits

    \*  Coordination with Fidelity regarding 401(K) plan

    \*  Coordination with Fidelity regarding pension matters

    \*  Preparation of Form 5500's related to employment benefit plans

    \*  Formulation of benefit alternatives

Maxxam has historically provided the services listed above on a cost-reimbursed basis to the Debtors.  Beginning in August 2005 for Scopac and December 2005, for the Palco Debtors, Maxxam ceased seeking reimbursement for these services.  The average annual cost of these services, based on historical averages, is approximately $400,000/year for Scopac and $800,000/year for the Palco Debtors.  The individuals performing these services are based in Houston, Texas.

Individuals employed by Maxxam non-debtor affiliates also provided support to Palco in connection with the Palco Asset Sale Program and to Scopac in connection with the Scopac Land Sale Program.  As the harvest levels of Scopac's timber reached all time lows in or about 2005, revenues began to suffer a similar decline and it became apparent to Scopac that its cash flow from operations would not be sufficient to pay all of the interest due on the Timber Notes for the next several years.  To raise additional liquidity, Scopac initiated the Land Sale Program with the

goal of selling certain timberlands and other real property.

Palco and Scopac did not have the personnel or the internal expertise to effectuate the Palco Asset Sale Program or the Scopac Land Sale Program. Therefore, in 2005 and throughout 2006, certain personnel from Maxxam's real estate group and, subsequent to its formation, Scotia Development, assisted Palco and Scopac.  These employees are all located in the Southern District of Texas.

Individuals employed by Maxxam and certain of its non-debtor affiliates will also be instrumental in the Debtors' bankruptcy cases by assisting in (i) the preparation and review of the Debtors' Schedules and Statements of Financial Affairs, (ii) the review of budgets and financial projections, (iii) the review of monthly operating reports, (iv) interactions with outside professionals, and (v) the coordination of information required for a financial restructuring.

The forest products group is one of Maxxam's largest investments and Maxxam has a significant interest in these bankruptcy cases.  In 2005 and throughout 2006, Palco experienced significant operating cash shortfalls.  From September 2005 to date, MGI loaned approximately $40 million to Palco which Palco used for operating purposes.

The Debtors have important operational challenges ahead of them in their efforts to effectuate an operational turnaround.  The Debtors incurred significant operating losses in 2006 and project operating losses in 2007.  The Debtors project to have an operating profit in 2008. The Debtors' employees need to remain focused on generating operating profits during this turnaround period.

The development of financial restructuring alternatives is a time consuming process that requires extensive information, analysis and consultation.  The Debtors do not have sufficient internal resources to dedicate to this effort.   The Debtors rely extensively on individuals

employed by Maxxam non-Debtor affiliates to provide information, analysis and consultation. The Debtors do not have sufficient internal resources to dedicate to this effort. A financial restructuring of Scopac will require extensive analysis, consultation with professionals and experts and approval by Scopac's Board of Managers. All of the Managers live in the Southern District of Texas.

### CONCLUSION

For the reasons stated herein, the Court finds that venue is proper in the Southern District of Texas and should not be transferred in the interests of justice or for the convenience of the parties. Movants presented insufficient evidence of inconvenience to overcome the presumption in favor of Debtors' choice of forum and the case should remain here. Accordingly, the Motion to Transfer Venue should be denied.

It is therefore ORDERED that the Motion to Transfer Venue is hereby DENIED.

SIGNED 04/20/2007.

RICHARD S SCHMIDT
United States Bankruptcy Judge