# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| | § | |
| IN RE: | § | JOINTLY ADMINISTERED |
| | § | |
| SCOTIA DEVELOPMENT LLC, | § | Case No. 07-20027-C-11 |
| ET AL, | § | |
| Debtors. | § | Chapter 11 |

## MEMORANDUM OF LAW OF MENDOCINO REDWOOD COMPANY, LLC AND MARATHON STRUCTURED FINANCE FUND L.P. (A) IN SUPPORT OF CONFIRMATION OF THEIR FIRST AMENDED JOINT PLAN OF REORGANIZATION FOR THE DEBTORS AND (B) IN OPPOSITION TO CONFIRMATION OF COMPETING PLANS

# TABLE OF CONTENTS

**Page**

Table of Authorities ........................................................................................ iv

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     SUPPORT FOR MRC/MARATHON PLAN ............................................ 2

III.    FACTUAL BACKGROUND ..................................................................... 9

       A.    The Competing Plans ..................................................................... 9

       B.    The MRC/Marathon Plan ............................................................. 10

       C.    The Debtors' Plan ......................................................................... 12

       D.    The Palco Alternative Plan ........................................................... 12

       E.    The Scopac Alternative Plan ........................................................ 13

       F.    The Indenture Trustee Plan .......................................................... 14

IV.     VOTING RESULTS ................................................................................ 18

       A.    The MRC/Marathon Plan ............................................................. 18

       B.    The Debtors' Plans ....................................................................... 19

       C.    The Indenture Trustee Plan .......................................................... 20

V.      THE MRC/MARATHON PLAN SHOULD BE CONFIRMED BECAUSE
       IT ALONE COMPLIES WITH THE CONFIRMATION STANDARDS IN
       SECTION 1129 OF THE BANKRUPTCY CODE .................................. 20

       A.    The MRC/Marathon Plan Satisfies The Requirements
            of 11 U.S.C. § 1129(a)(1) .......................................................... 21

       B.    The MRC/Marathon Plan Satisfies The Requirements
            of 11 U.S.C. § 1122 .................................................................... 22

       C.    The MRC/Marathon Plan Satisfies The Requirements
            of 11 U.S.C. § 1123(a) ............................................................... 29

       D.    The MRC/Marathon Plan Proponents Have Complied
            With The Provisions of 11 U.S.C. § 1129(a)(2) ......................... 35

## TABLE OF CONTENTS
(continued)

**Page**

E.   The MRC/Marathon Plan Has Been Proposed In Good Faith
     And Not by Any Means Forbidden by Law in Accordance
     With 11 U.S.C. § 1129(a)(3) ................................................................37

F.   The MRC/Marathon Plan Provides For Court Approval
     of Payment For Services And Expenses Pursuant to
     11 U.S.C. § 1129(a)(4) ........................................................................39

G.   All Necessary Information Regarding Directors And The Officers
     of The Reorganized Entities Under The MRC/Marathon Plan Has
     Been Disclosed as Required by 11 U.S.C. § 1129(a)(5) .......................39

H.   The Requirements of 11 U.S.C. § 1129(a)(6) Are Inapplicable ...........40

I.   The MRC/Marathon Plan is in the Best Interests of Creditors And
     Equity Interest Holders as Required by 11 U.S.C. § 1129(a)(7) ..........41

J.   The MRC/Marathon Plan Provides For Payment in Full of All
     Allowed Priority Claims Pursuant to 11 U.S.C. § 1129(a)(9) ..............44

K.   The MRC/Marathon Plan Has Been Accepted by at Least One
     Impaired Class That is Entitled to Vote as Required by
     11 U.S.C. 1129(a)(10) ........................................................................46

L.   The MRC/Marathon Plan is Feasible Under 11 U.S.C. § 1129(a)(11) ...47

M.   The MRC/Marathon Plan Provides For Full Payment of
     Statutory Fees Under 11 U.S.C. § 1129(a)(12) ....................................50

N.   The Requirements of 11 U.S.C. § 1129(a)(13) Have Been Met ............50

O.   The Requirements of 11 U.S.C. § 1129(a)(14) through (16)
     Are Inapplicable ................................................................................51

P.   The MRC/Marathon Plan Satisfies The Requirements For
     Confirmation Over The Objection of Non-Consenting Classes
     ("Cramdown") Under 11 U.S.C. § 1129(b) ..........................................51

VI.  THE COMPETING PLANS SHOULD NOT BE CONFIRMED ....................63

A.   The Debtors' Plan ..............................................................................64

B.   The Palco Alternative Plan ................................................................65

## TABLE OF CONTENTS
(continued)

|  |  |  | **Page** |
|---|---|---|---|

1. The Palco Alternative Plan May Not Be Confirmed Because It Lacks A Consenting Impaired Class ........................................65

2. The Palco Alternative Plan is Not Confirmable Because It Seeks to Cram Down Marathon's Palco Term Loan Claim in a Manner Prohibited by Court Order ...........................66

3. The Palco Alternative Plan May Not be Confirmed Because Its Proposed Exit Financing is Speculative at Best.....................66

C. The Scopac Alternative Plan.................................................................67

1. The Scopac Alternative Plan is Not Fair and Equitable With Respect to Unsecured Creditors.........................................67

2. The Scopac Alternative Plan is Inferior to the MRC/ Marathon Plan...................................................................67

D. The Indenture Trustee Plan.................................................................68

1. The Indenture Trustee Plan May Not be Confirmed Because It Does Not Assume the Debtors' Pension Plan.........................68

2. The Indenture Trustee Plan Does Not Result in The Best And Highest Value for Creditors ..............................................69

3. The Indenture Trustee Plan May Not be Confirmed to the Extent it Requires Assumption of The New Master Purchase Agreement...................................................................70

Conclusion ..........................................................................................71

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Andrew v. Coopersmith (In re Downtown Inv. Club III),*
    89 B.R. 59 (B.A.P. 9th Cir. 1988) ......................................................................36

*Assocs. Comm. Corp. v. Rash,*
    520 U.S. 953 (1997) .......................................................................................60

*Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle St. P'ship (In re 203
    North LaSalle St. P'ship),*
    526 U.S. 434 (1999) .......................................................................................41

*Corestates Bank, N.A. v. United Chemical Technologies, Inc. (In re United Chemical
    Technologies, Inc.),*
    202 B.R. 33 (Bankr. E.D. Pa. 1996) ................................................................42

*Hanson v. First Bank of South Dakota, N.A.,*
    828 F.2d 1310 (8th Cir. 1987) .......................................................................37

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enterprises (In re Briscoe Enterprises.,
    Ltd., II),*
    994 F.2d 1160 (5th Cir. 1993) ................................................................ passim

*In re Allegheny Int'l, Inc.*
    118 B.R. 282 (Bankr. W.D. Pa. 1990) .............................................................65

*In re Anderson Oaks (Phase I) Ltd. P'ship,*
    77 B.R. 108 (Bankr. W.D. Tex. 1987) ........................................................46, 65

*In re Arnold,*
    806 F.2d 937 (9th Cir. 1986) .........................................................................56

*In re Aztec Co.,*
    107 B.R. 585 (Bankr. M.D. Tenn. 1989) .........................................................53

*In re Bernhard Steiner Pianos USA, Inc.,*
    292 B.R. 109 (Bankr. N.D. Tex. 2002)......................................................22, 26-27

*In re Buttonwood Partners Ltd.,*
    111 B.R. 57 (Bankr. S.D.N.Y. 1990) ...............................................................53

*In re Cellular Info. Sys., Inc.,*
    171 B.R. 926 (Bankr. S.D.N.Y. 1994) .............................................................21

*In re Chapel Gate Apartments, Ltd.*,
    64 B.R. 569 (Bankr. N.D. Tex. 1986)...................................................................39

*In re Clarkson*,
    767 F.2d 417 (8th Cir. 1985) .......................................................................47

*In re D&F Constr., Inc.*,
    865 F.2d 673 (5th Cir. 1989)........................................................................54

*In re Drexel Burnham Lambert Group, Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) ........................................................ passim

*In re Eagle Bus. Mfg., Inc.*,
    134 B.R. 584 (Bankr. D. Tex. 1991), *aff'd*, 158 B.R. 421 (S. D. Tex. 1993)..........................29

*In re Fowler*,
    903 F.2d 694 (9th Cir. 1990) .......................................................................59

*In re General Homes Corp. FGMC Inc.*,
    134 B.R. 853 (Bankr. S.D. Tex. 1991) ......................................................24, 25

*In re Genesis Health Ventures Inc.*,
    266 B.R. 591 (Bankr. D. Del. 2001) ...............................................................53

*In re Greate Hotel & Casino Inc.*,
    251 B.R. 213 (Bankr. D.N.J. 2000) ...............................................................53

*In re Ingleside Assocs.*,
    136 B.R. 955 (Bankr. E.D. Pa. 1992) .............................................................65

*In re IPC Atlanta Ltd. P'ship.*,
    142 B.R. 547 (Bankr. N.D. Ga. 1992) ............................................................48

*In re Jasik*,
    727 F.2d 1379 (5th Cir. 1984) ................................................................37, 38

*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987)........................................................................22

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, 843
    F.2d 636 (2d Cir. 1988).........................................................................36, 48

*In re Kliegl Bros. Universal Electric Stage Lighting*,
    149 B.R. 306 (Bankr. E.D.N.Y. 1992)............................................................28

*In re Lakeside Global II, Ltd.*,
    116 B.R. 499 (Bankr. S.D. Tex. 1989) ...............................................46, 47, 65

*In re Lambert,*
194 F.3d 679 (5th Cir. 1999) ............................................................. 59

*In re Leslie Fay Companies, Inc.,*
207 B.R. 764 (Bankr. S.D.N.Y. 1997) ......................................... 37, 48

*In re Made In Detroit, Inc.,*
299 B.R. 170 (Bankr. E.D. Mich. 2003), *aff'd,* 414 F.3d 576 (6th Cir. 2005) ................... 67

*In re Madison Hotel Assocs.,*
749 F.2d 410 (7th Cir. 1984) ............................................................. 37

*In re Mayer Pollock Steel Corp.,*
174 B.R. 414 (Bankr. E.D. Pa. 1994) ............................................... 48

*In re Mirant,*
334 B.R. 800 (Bankr. N.D.Tex. 2005) .......................................... 59, 60

*In re Monarch Beach Venture, Ltd.,*
166 B.R. 428 (C.D. Cal. 1993) ......................................................... 21

*In re Orlando Investors L.P.,*
103 B.R. 593 (Bankr. E.D. Pa. 1989) ............................................... 48

*In re Payless Cashways, Inc.,*
215 B.R. 409 (Bankr. W.D. Mo. 1997) ............................................. 25

*In re Premiere Network Servs., Inc.,*
333 B.R. 130 (Bankr. N.D. Tex. 2005) .......................................... 22, 27

*In re Resorts Intern, Inc.,*
145 B.R. 412 (Bankr. D.N.J. 1990) .................................................. 36

*In re Richard Buick, Inc.,*
126 B.R. 840 (Bankr. E.D. Pa. 1991) ............................................... 21

*In re Rochem Ltd.,*
58 B.R. 641 (Bankr. D.N.J. 1985) .................................................... 53

*In re Rolling Green Country Club,*
26 B.R. 729 (Bankr. D. Minn. 1982) ................................................ 47

*In re S&W Enterprise,*
37 B.R. 153 (Bankr. N.D. Ill. 1984) ................................................. 21

*In re San Felipe Voss, Ltd.,*
115 B.R. 526 (S.D. Tex. 1990) ..................................................... 60, 62

*In re Seatco, Inc.,*
   259 B.R. 279 (Bankr. N.D. Tex. 2001) ............................................................47

*In re Sentry Operating Co. of Tex. Inc.,*
   264 B.R. 850 (Bankr. S.D. Tex. 2001) ........................................................52, 53

*In re Sierra-Cal.*
   210 B.R. 168 (Bankr. E.D. Cal. 1997) ..........................................................41

*In re Sun Country Dev., Inc.,*
   764 F.2d 406 (5th Cir. 1985) ................................................................37, 61

*In re Texaco,*
   84 B.R. 893 (Bankr. S.D.N.Y. 1988) ............................................................49

*In re Toy & Sports Warehouse, Inc.,*
   37 B.R. 141 (Bankr. S.D.N.Y. 1984) ............................................................37

*In re Wabash Valley Power Ass'n,*
   72 F.3d 1305 (7th Cir. 1995) ............................................................24, 25, 27

*In re Wiggles,*
   7 B.R. 373 (Bankr. N. D. Ga. 1980) ............................................................37

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.,*
   987 F.2d 154 (3d Cir. 1993)............................................................22

*Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd.
   P'Ship),*
   115 F.3d 650 (9th Cir. 1997) ............................................................53

*Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint
   Venture),*
   995 F.2d 1274 (5th Cir. 1991) ............................................22, 23, 25, 26

*Pizza of Hawaii, Inc. v. Shakey's Inc. (In re Pizza of Hawaii, Inc.),*
   761 F.2d 1374 (9th Cir. 1985) ............................................................49

*Public Finance Corp. v. Freeman (In re Freeman),*
   712 F.2d 219 (5th Cir. 1983) ............................................................33

*Ryan v. Loui (In re Corey),*
   892 F.2d 829 (9th Cir. 1989) ............................................................37

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. Inc. (In re U.S.
   Truck Co. Inc.),*
   800 F.2d 581 (6th Cir. 1986) ............................................................27, 28

*Till v. SCS Credit Corp.*,
   541 U.S. 465 (2004)..........................................................................................59, 60

## STATUTES

11 U.S.C. § 101 *et seq.*..........................................................................................13, 66

11 U S.C. § 330 ..........................................................................................................45

11 U S.C. § 331 ..........................................................................................................45

11 U.S.C. § 364 ..........................................................................................................64

11 U S.C. § 365 ....................................................................................................35, 50

11 U S.C. § 502 ..........................................................................................................45

11 U S.C. § 503 ..........................................................................................................45

11 U.S.C. § 507 *et seq.*..................................................................................44, 45, 46

11 U.S.C. § 510(a) ......................................................................................................25

11 U S.C. § 1111(b)(1)(A)(i) ................................................................................11, 56

11 U S.C. § 1114 ............................................................................................50, 68, 69

11 U.S.C. § 1122 ..................................................................................................*passim*

11 U.S.C. § 1123 *et seq.*......................................................................................*passim*

11 U S.C. § 1125 ........................................................................................................36

11 U S.C. § 1126 ........................................................................................................36

11 U.S.C. § 1129 *et seq.*......................................................................................*passim*

11 U S.C. § 1141 ........................................................................................................51

29 U.S.C. § 1082 ........................................................................................................50

28 U.S.C. § 1930 ........................................................................................................50

## OTHER AUTHORITIES

H.R. Rep. No. 95-595 (1978)................................................................................21, 36

S. Rep. No. 95-989 (1978), reprinted in 1978 U.S.C.C.A.N. 5787 .........................21, 36

7 Collier on Bankruptcy ¶ 1122.03[4] (15 ed. rev. 2007)...........................................25

7 Collier On Bankruptcy ¶ 1129.03[2] at 1129-26 (15th ed. rev. 2007) .......................35

Mendocino Redwood Company, LLC ("MRC") and Marathon Structured Finance Fund L.P. ("Marathon"), (collectively, "MRC/Marathon Plan Proponents"), submit this Memorandum of Law in Support of Confirmation of their First Amended Joint Plan of Reorganization [Docket No. 2404] (the "MRC/Marathon Plan") for the Debtors and in opposition to confirmation of the competing plans (collectively, the "Competing Plans"[1]) filed by the Debtors and by The Bank of New York Trust Company, N.A. as Indenture Trustee (the "Indenture Trustee") for the Holders of Scopac Timber Notes (the "Noteholders").[2]

## I.

## PRELIMINARY STATEMENT

1.      The MRC/Marathon Plan is the only confirmable plan that will resolve all of the Debtors' Chapter 11 cases (the "Cases") and reorganize all of the Debtors.[3]  Moreover, the MRC/Marathon Plan is the only plan that satisfies the confirmation standards set forth in section 1129 of the Bankruptcy Code.  In addition, the MRC/Marathon Plan is the only plan that adequately addresses key environmental, employment and economic concerns, including those raised by U.S. Senator Dianne Feinstein, U.S. Congressman Mike Thompson, and Governor Arnold Schwarzenegger.  The MRC/Marathon Plan, unlike any other plan, will ensure that the Debtors are controlled by an experienced, environmentally responsible operator with a proven

---

[1]      The Competing Plans are the Debtors Plan, the Palco Alternative Plan, the Scopac Alternative Plan and the Indenture Trustee Plan, each as defined below.

[2]      All terms not otherwise defined herein shall have the meaning ascribed to them in the respective plans to which they relate.

[3]      As a threshold matter, the Court should only consider three of the Competing Plans for confirmation, the MRC/Marathon Plan, the Scopac Alternative Plan and the Indenture Trustee Plan.  The Debtors Plan and the Palco Alternative Plan are not confirmable as a matter of law.  The Debtors Plan required the voting acceptance of Marathon and the Noteholders, which acceptance was not obtained.  In addition, the Palco Alternative Plan failed to obtain the voting acceptance of any non-insider impaired class.  Therefore, those plans are unconfirmable as a matter of law.

track record.   The MRC/Marathon Plan is the only plan that has the support of the Official

Committee of Unsecured Creditors (the "Committee"), and has received overwhelming support

of the Debtors' creditors, except the Noteholders.   The MRC/Marathon Plan, unlike any other

plan that has been proposed, will maintain the economic vitality of Northern California by

preserving business operations, going-concern value, jobs, and pensions.   In addition, the

MRC/Marathon Plan does not have any financing or due diligence contingency.   The

MRC/Marathon Plan does not pay creditors in full, but, unlike any of the other plans, assures all

creditors a *substantial* recovery.

## II.

## SUPPORT FOR MRC/MARATHON PLAN

2.     The MRC/Marathon Plan has the widest support of any plan and is viewed as the

best plan by the community, elected representatives of the State of California, and others.   As set

forth in the Ballot Report[4] Classes 3, 4, 5, 7, and 8 have voted overwhelmingly to accept the

MRC/Marathon Plan.   *See* Ballot Report, Exhibit A.   These accepting Classes include the

affirmative vote of the only unsecured creditors who will likely transact business with the

Reorganized Entities in the future (i.e., the Holders of the Palco Trade Claims, Palco General

Unsecured Claims (Class 7) and the Scopac Trade Claims (Class 8)).[5]   By way of contrast, the

Holders of the Palco Trade Claims, Palco General Unsecured Claims and Scopac Trade Claims

---

[4]     The Declaration of Kathleen M. Logan Certifying Voting On, and Tabulation Of, Ballots Accepting and Rejecting the Respective Plans of Reorganization Proposed By (1) Mendocino Redwood Company, LLC and Marathon Structured Finance Fund L.P.; (2) The Bank of New York Trust Company, N.A., Indenture Trustee for the Timber Notes; and (3) the Debtors and Maxxam Inc., Maxxam Group Holdings Inc., and Maxxam Group Inc. dated March 31, 2008 [Docket No. 2581] is referred to herein as the "Ballot Report."

[5]     Further, the only non-insider, non-plan proponent that has voted to accept any competing plan is Scopac's Class 4 (Line of Credit Claims). This class has accepted every other plan to which it is eligible to vote, including the MRC/Marathon Plan. Further, creditors of this class will be paid in full in every proposed plan and have little to no risk.

overwhelmingly voted to *reject* all of Competing Plans.   Similarly, the Debtors' General Unsecured Creditors (Noteholders aside) overwhelmingly indicated that they preferred the MRC/Marathon Plan over the Competing Plans. *See* Ballot Report, Exhibit F.

　　　　3.　　　The MRC/Marathon Plan is the only plan that the Committee supports. *See* Disclosure Statement, Exhibit AA, Solicitation Letter of Official Committee of Unsecured Creditors.[6] ·The Committee supports the MRC/Marathon Plan and urged General Unsecured Creditors to vote in favor of the MRC/Marathon Plan (which they did overwhelmingly) for the following reasons:

> ➢ The MRC/Marathon Plan provides for an immediate cash payment to unsecured creditors in the amount of $10,600,000, providing them with substantial recoveries.

> ➢ The MRC/Marathon Plan provides for a re-consolidation of the Mill with the commercial Timberlands in a new company that will be (i) well funded (ii) commercially viable and (iii) run by MRC, an experienced and respected timber operator.

> ➢ The MRC/Marathon Plan will ensure the sustainability of the Mill and will preserve jobs.

> ➢ The MRC/Marathon Plan will provide trade creditors with the opportunity to continue to do business with a viable reorganized company.

> ➢ The MRC/Marathon Plan will assume and continue the Debtors' Pension Plan -- allowing current and future retirees to receive full benefits.

> ➢ The MRC/Marathon Plan provides for (i) the creation of a Litigation Trust controlled by unsecured creditors for the purpose of pursuing certain litigation actions that could provide additional recoveries to unsecured creditors, and (ii) $500,000 in seed money for the Litigation Trust.

*See id.*

---

[6]　　　The Joint Disclosure Statement in Support of the Respective Plans of Reorganization Proposed By (1) Mendocino Redwood Company, LLC and Marathon Structured Finance Fund L.P.; (2) The Bank of New York Trust Company, N.A., Indenture Trustee for the Timber Notes; and (3) the Debtors and Maxxam Inc., Maxxam Group Holdings Inc., and Maxxam Group Inc. dated February 29, 2008 [Docket No. 2401] is referred to herein as the "Disclosure Statement."

4.     Further, the Committee urged General Unsecured Creditors to vote against the Competing Plans for the following reasons:

> The Indenture Trustee Plan does not provide a global solution. If confirmed, the Committee believes that the Palco Debtor's general unsecured creditors would receive very little, if any, recovery on their Claims. In addition, the Mill would likely be shut-down and perhaps liquidated, along with the town of Scotia and the Debtors' remaining assets.

> The Committee disagrees with the Indenture Trustee's estimates of recoveries to Scopac's unsecured creditors. Under the MRC/Marathon Plan, recoveries to Scopac's unsecured creditors are estimated to be 75% to 90%, but the Debtors' Pension Plan would be assumed. The Indenture Trustee Plan does not provide for the assumption of the Pension Plan, thereby creating an additional unsecured claim of approximately $20 million and significantly diluting recoveries to general unsecured creditors.

> The Committee does not believe that Debtors' various plans are workable as each requires additional borrowing or presumes that there is sufficient value in the Debtors' assets for equity to receive a recovery. The Committee does not believe that the Debtors' proposals are legally or economically feasible given the Debtors' existing debts.

> Under the Debtors Plan and the Palco Alternative Plan, unsecured creditors would have to wait at least seven years before they are paid on the principal amount of their claims and under the Scopac Alternative Plan, Palco and indirectly Maxaam would receive distributions ahead of general unsecured creditors.

*See id.*

5.     The Times-Standard, the largest newspaper for the Scotia region, has stated that "Mendocino/Marathon have the best plan." *See Mendocino/Marathon Have the Best Plan*, Times-Standard (March 30, 2008), www.times-standard.com/opinion/ci_8747640 ("We prefer to examine the plans from the perspective of what's best for the community and the environment, and thus – along with Palco's unsecured creditors -- we support Mendocino Redwood's proposal . . . we encourage Judge Schmidt to give his highest consideration to the Mendocino Redwood/Marathon plan.") (annexed hereto as Exhibit A).

4

6.      The North Coast Journal of Humboldt, California has also voiced its support for

the MRC/Marathon Plan as the best plan and has noted the that the MRC/Marathon Plan is

supported by "the great majority" of its readers:

> We were inclined to support the plan sponsored by the Marathon
> Capital Group and the Mendocino Redwood Company. That plan
> would keep Pacific Lumber together as a company and scale way
> back on the often insane rate of cut that the Houston-based
> Maxxam Corp. has imposed on the people of Humboldt County
> and the state of California. It would stop the cutting of old-growth
> redwood and Douglas fir trees, and it would make the company
> eligible to be recognized by the Forest Stewardship Council, the
> industry leader in sustainable forestry certification. At the same
> time, it would keep the mill operational and ensure that the Pacific
> Lumber pensioners are taken care of.
>
> As it happened, the great majority of readers backed us up on our
> initial decision. "It makes the most sense to me," wrote an
> education professional who wished to remain anonymous. "I think
> it is the best plan for the workers, the forests and the North Coast
> region."

Hank    Sims,    *The    $85    Question*,    North    Coast    Journal    (March    27,    2008),

www.northcoastjournal.com/032708/towndandy0327.html (annexed hereto as Exhibit B).

7.      Further, some 25 local families who own and manage over 400,000 acres of

timberland in Humboldt and Mendocino Counties (the "Supporting Families") have expressed

their support for the MRC/Marathon Plan:

> Preserving The Pacific Lumber Company business as an integrated
> enterprise is critical to the health and wellbeing of the local
> community and economy. Additionally, ensuring an ongoing, well-
> managed sawmill operation in Humboldt County is essential to our
> Families timber management business. MRCs plan provides an
> opportunity to bring stability and long term health to The Pacific
> Lumber Company and forestland owners throughout the redwood
> region.

Letter of Supporting Families dated March 18, 2008 (annexed hereto as Exhibit C).

8.  Indeed, the Debtors' own officers also recognize the value of the MRC/Marathon Plan. As acknowledged by Scopac's Vice-President, Dr. Jeffrey C. Barrett, the MRC/Marathon Plan has a number of positive features:

> The No. 1 positive is that it maintains the manufacturing and timberlands together as one entity . . . I think the plan has a reasonable chance of being well received by the community, Humboldt County . . . I also think . . . that many of the management perspectives would be purposefully longer term . . . and I think that's an excellent way to manage a timberland . . . Thinking long-term is a great way to manage that kind of long-term asset, and I think it's a strength of the plan, if I understand the management philosophy that will be brought to bear.

Deposition of Jeffrey C. Barrett, Ph.D., Vice-President of Scopac, dated March 12, 2008 (the "Barrett Deposition") at 160-61.

9.  Gary Clark, Vice-President of Finance and Administration and Chief Financial Officer for both Scopac and Palco holds the MRC/Marathon Plan and the MRC proposed management team in high regard, and understands the economic importance of restructuring the Debtors' business enterprise as a whole, rather than a portion of it:

> Well, I think it's important for the trees to have a place to go, a sawmill. I think it's important for the sawmill to have a source for raw material, which is the trees. Scotia's sawmill is ideally located in the center of Scopac timberlands. That's kind of a perfect match. I believe that MRC has done a good job of running their business. I know those guys. I think they are good guys. I believe they would keep the company -- I don't know if they would rename it or what they would do, but I think that an important thing for the employees of the company is that they would keep the company running and a lot of people would end up with jobs. . .
>
> I think it would be good for the industry. I think they would be good guys.

Deposition of Gary Clark, Vice-President of Finance and Administration and CFO of Scopac and Palco, dated March 14, 2008 (the "Clark Deposition") at 107-08.

6

10.     The MRC/Marathon Plan is also the only plan that falls squarely within the ideal structure envisioned by political leaders from the State of California.  Senator Dianne Feinstein states that any plan of reorganization:

> must adhere to the following principles:  (1) The reorganization plan must uphold the Habitat Conservation Plan . . . (2) Timber operations can proceed while sustaining environmental protections . . . (3) Maintain the economic vitality of the region . . .

Statement of Position of U.S. Senator Dianne Feinstein filed February 19, 2008 [Docket No. 2312].

11.     U.S. Congressman Mike Thompson states that:

> it is critical that any reorganization of Pacific Lumber Company adheres to the following principals:  1) Maintain the timberlands in a single ownership as working commercial forestlands; 2) Maintain the mill operation in order to protect jobs and livelihoods of the people and community of Scotia and Humboldt, CA; 3) Fulfill _**all**_ commitments associated with the Habitat Conservation Plan . . .; 4) Ensure that the timberlands and mill are operated by an entity(ies) with a proven track record utilizing sustainable management of California's redwood forests and with full knowledge and experience in the operation of a mill; 5) Limit or restrict the reliance on the expenditure of additional public funds on any plan that is finally adopted.

Statement of Position of U.S. Congressman Mike Thompson filed February 22, 2008 [Docket No. 2335].

12.     Congressman Thompson went further, sending a letter to this Court on April 3, 2008 which provides in part:

> I am writing to support the Mendocino Redwoods Company Plan which is before the Court.
>
> There are several compelling reasons to support the MRC proposal: 1) MRC has put forth the most comprehensive plan that addresses both management of the timberlands and operations at the Scotia sawmill; 2) the creditors committee, made up of Humboldt County businesses, vendors and individuals, voted overwhelmingly in support of the MRC plan – of the 227 unsecured creditors, 222 voted in support; 3) the MRC plan does not rely upon additional expenditures of state and federal funds.

7

Mendocino Redwoods Company is a proven and trusted California operator, with a good reputation in Mendocino and Humboldt Counties. They have portrayed exemplary forest practices on their existing properties, earning Forest Stewardship Counsel (FSC) certification on the lands that they manage in Mendocino County. They are industrial timberland owners, they operate a sawmill, and they know the business. Their plan provides a level of assurance the people of Humboldt County can rely upon, rather than decisions driven by the board rooms of New York or Houston.

Finally, there is further concern that if the case goes to auction, the mill will be forced to shut down during the 5-7 months it takes to complete the sale. The local job loss and loss of revenue would be very difficult to overcome for any future operator.

Letter from Congressman Mike Thompson dated April 3, 2008 (annexed hereto as Exhibit D).

13.     Governor Arnold Schwarzenegger similarly states:

[O]ur strong position [is] that any reorganization preserves the state and federal governments' interest in Pacific Lumber's timberlands and adheres to the following principles:  1. Manage the timberlands in accordance with state and federal laws . . . 2. Manage the timberlands in a manner that complies with all required regulatory permits and other authorizations . . . 3. Preserve the timberlands by maintaining a level of commercial harvest that will ensure sustainable, high-quality timber production over the long term while preserving and enhancing watershed and wildlife protection. 4. Minimize adverse impacts to the local economy and preserve as many local employment opportunities as possible. 5. Maximize the greenhouse gas reduction benefits that could be generated in timberland management.

State of California's Position by Governor Arnold Schwarzenegger For Proposed Plans of Reorganization dated January 29, 2008 [Docket No. 2201].

14.     The Board of Supervisors for the County of Humboldt has set forth similar principals, including that any plan:

[m]aintain the Pacific Lumber Company in a single ownership as working commercial forestlands . . . Fulfill all commitments associated with the Habitat Conservation Plan that accompanied the Headwaters Agreement . . . Maintain the skilled work force . . .

> Acknowledge the standards of environmental stewardship . . .
> Continue the operation of the Mill . . .

Letter from the County of Humboldt Board of Supervisors to The Honorable Judge Richard Schmidt dated March 11, 2008 (annexed hereto as Exhibit E).

15.     The Greater Eureka Chamber of Commerce "strongly recommends" the MRC/Marathon Plan because they believe it "most closely assures…the best interests of [their] community."    Greater Eureka Chamber of Commerce Statement in Support of the MRC/Marathon Plan [Docket No. 2529].    Additional support from the community will be presented during the Confirmation Hearing.

## III.

## FACTUAL BACKGROUND

### A.    The Competing Plans

16.     Acceptances were solicited for the following plans of reorganization that have been filed in these Cases:

(a)    the MRC/Marathon Plan;

(b)    the Second Amended Joint Plan of Reorganization  proposed by the Debtors and MAXXAM Inc., MAXXAM Group Holdings Inc., and MAXXAM Group Inc. (the "MAXXAM Entities") [Docket No. 2208] (as amended by the Third Amended Joint Plan of Reorganization for the Debtors [Docket No. 2507], the "Debtors Plan");

(c)    the First Alternative Plan of Reorganization for the Palco Debtors proposed by the Debtors and the MAXXAM Entities [Docket No. 2209] (the "Palco Alternative Plan");

(d)    the First Alternative Plan of Reorganization for Scotia Pacific Company LLC proposed by the Debtors and the MAXXAM Entities [Docket No. 2210] (as amended by the Amended First Alternative Plan of Reorganization for Scotia Pacific Company LLC [Docket No. 2502], the "Scopac Alternative Plan"); and

(e)     the First Amended Chapter 11 Plan for Scotia Pacific Company, LLC proposed by the Bank of New York Trust Company, N.A., the Indenture Trustee for the Timber Notes (the "Indenture Trustee") [Docket No. 2402] (the "Indenture Trustee Plan").

**B.     The MRC/Marathon Plan**

17.     The MRC/Marathon Plan proposes to reorganize the Debtors by integrating the commercial timberland and sawmill operations into a new entity, presently referred to as Newco MRC will manage Newco in a responsible and sustainable manner pursuant to a business plan developed by MRC. *See* Disclosure Statement § 6.1. MRC and its affiliates are experienced and environmentally responsible operators of an integrated commercial redwood timberland, sawmill and lumber distribution operation located in nearby Mendocino county. *See id.* MRC and Marathon also propose to restructure the town of Scotia by forming an entity presently referred to as Townco. *Id.* Townco will allow residents the opportunity to purchase their homes. *See id.*

18.     The MRC/Marathon Plan will reduce the amount of debt owed by the Debtors to a level that is serviceable and consistent with the value of the Timberlands. *See id.* In addition, the MRC/Marathon Plan will provide substantial recoveries to all creditors, and will preserve jobs, pension benefits, business operations and going-concern value. *See id.*

19.     The principal elements of the MRC/Marathon Plan are as follows:

(a)     MRC will contribute $200 million in cash to Newco, and Marathon will contribute an additional $25 million in cash to Newco. Marathon will also convert in excess of $160 million of senior secured pre-petition and post-petition debt owed to Marathon into equity.[7] $7.5 million of these funds will be utilized to improve the operations of the Mill.

(b)     MRC and Marathon will bring in a new, experienced management team from MRC with a proven track record of success in the redwood forest and lumber business. The commercial timberland and sawmill operations

---

[7]     Marathon will receive a 100% equity interest in Townco and a 15% equity ownership interest in Newco (subject to adjustment) in exchange for its claims and a <u>further</u> contribution of $25 million in cash to Newco.

will be integrated and managed by MRC, and lumber distribution activities will be added to the sawmill operations.

(c)     Newco will benefit from approximately $10 million annually of savings from synergies that will be realized as a result of MRC sharing its management, relationships and infrastructure with Newco.

(d)     MRC will immediately seek Forest Stewardship Council certification of the Timberlands and will implement the same forestry practices on the Timberlands that have been successfully employed on MRC's 230,000 acres in Mendocino County over the last almost ten years (*See* www.fscus.org and www.mrc.com).

(e)     Newco will be run in an environmentally responsible manner. The MRC/Marathon Plan assumes all environmental obligations, without any modification, including the Habitat Conservation Plan resulting from the Headwaters Agreement.

(f)     The debt obligations of the Debtors will be reduced by a total of approximately $625 million and, as a result, Newco and Townco will be able to responsibly service their debt obligations going forward.

(g)     Trade creditors are projected to receive cash in the amount of approximately 75-90% of their claims and will be eligible for further distributions.[8]

(h)     The Noteholders will receive $175 million cash, plus New Timber Notes issued in the approximate principal amount of $325 million (subject to adjustment) secured by the Timberlands and will be eligible for further Distributions from the Litigation Trust on account of their unsecured deficiency claims.[9]

(i)     Newco will assume responsibility for the Debtors' Pension Plan.

(j)     The town of Scotia will be reorganized and residents will be offered the opportunity to purchase their homes.

(k)     Bank of America's claim against Scopac for approximately $37.6 million will be paid in full in cash on the Effective Date, except for the payment of

---

[8]     Holders of Palco Trade Claims, Palco General Unsecured Claims, and Scopac Trade Claims shall receive an estimated 75-90% recovery on account of their Claims and will be eligible for further Distributions based on recoveries by the Litigation Trust in which they will share *pro rata* with holders of Scopac General Unsecured Claims.

[9]     The Noteholders did not make an election under section 1111(b)(1)(A)(i) of the Bankruptcy Code.

default interest, which shall be paid over time in twelve monthly installments.

(l)     All Allowed administrative and administrative priority claims of all Debtors will be paid in full.

(m)    Certain of the Debtors' litigation assets will be pursued by a Litigation Trustee for the benefit of all unsecured creditors.

*See id.; see also id.* § 6.2.

## C.     The Debtors' Plan

20.     The Debtors Plan is not confirmable as a matter of law. The Debtors admittedly have not received the necessary votes for confirmation. All parties agree that the Debtors' Plan is not confirmable absent voting consent from Marathon and other of the Debtors' creditors. *See* Disclosure Statement § 8.3 ("[The] Debtors Plan cannot be imposed on the Debtors' creditors, because it does not meet the standards for 'cramdown' under the Bankruptcy Code."). Marathon does not consent to the Debtors Plan. Further, the Noteholders have voted to reject the Debtors Plan. *See* Ballot Report, Exhibit C. Accordingly, the Debtors Plan cannot be confirmed.

## D.     The Palco Alternative Plan

21.     Confirmation of the Palco Alternative Plan is similarly dependent upon Marathon's consent to the treatment proposed with respect to its Term Loan Claim. Marathon does not consent to its treatment under the Palco Alternative Plan. Indeed, the Debtors are seeking to cram down Marathon's Term Loan without Marathon's consent, which constitutes a DIP Event of Default. *See* DIP Order ¶15(d).[10]

---

[10]     The Final Order (I) Authorizing Debtors to Incur Postpetition Senior Secured Indebtedness, (II) Granting Security Interests and Superpriority Claims, (III) Authorizing Debtors to Use Dip Cash Collateral, (IV) Providing Adequate Protection to Prepetition Secured Lenders, (V) Directing Payment of Certain Prepetition Secured Indebtedness, and (VI) Providing Related Relief dated July 31, 2007 [Docket No. 1165] is referred to herein as the "DIP Order."

22.     In addition, the Debtors have failed to obtain an impaired non-insider consenting class for their Palco Alternative Plan.[11]  *See* Ballot Report, Exhibit D.  Unsecured creditors voted overwhelmingly to **reject** the Palco Alternative Plan.  *Id.*  Accordingly, the Palco Alternative Plan cannot be confirmed.

### E.     The Scopac Alternative Plan

23.     Under the Scopac Alternative Plan, title to the Producing Timberlands will be transferred to Noteholders in full satisfaction of their claims subject to an as-of-now non-existent log purchase agreement that would purportedly guarantee Palco the ability to purchase specified quantities of timber at market prices for three years.  *See* Scopac Alternative Plan § 4.3.

24.     Unsecured creditors voted overwhelmingly to **reject** the Scopac Alternative Plan.  As set forth in the Ballot Report, Classes 3, 5, 6 and 8, all but one of the non-insider impaired classes under the Scopac Alternative Plan voted to reject the Scopac Alternative Plan.  *See* Ballot Report, Exhibit E.

25.     The Scopac Alternative Plan has all the flaws of the Indenture Trustee Plan (set forth below in greater detail).  The Scopac Alternative Plan, like the Indenture Trustee Plan, would separate the commercial Timberlands from the Mill, thereby imperiling both the town of Scotia and the Mill.  Only an integrated commercial timberland and sawmill operation as provided for in the MRC/Marathon Plan will ensure for the long-term viability of the town of Scotia and the Mill.

---

[11]     The only impaired consenting classes under the Palco Alternative Plan that voted to accept were Class 5 (Palco Inter-Debtor Claims) and Class 7 (Non-Debtor Affiliate Claims).  Neither Class 5 nor Class 7 may serve as an impaired consenting class for purposes of confirmation, however, because they are each composed of claims by affiliates, who are "insiders" under the Bankruptcy Code.  *See* 11 U.S.C. §§ 101(31) ("The term 'insider' includes – . . . (E) affiliate . . .") and 1129(a)(10) ("If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider").

26.     In addition, the Scopac Alternative Plan is based on the extreme position that the commercial Timberlands, standing alone, are worth more than the $800 million owed to the Noteholders.  The evidence at the Confirmation Hearing will demonstrate that the value of the commercial Timberlands is, in fact, approximately $430 million.

## F.     The Indenture Trustee Plan

27.     The Indenture Trustee Plan is a liquidation plan, for only a single debtor, Scopac, and for the benefit of only one creditor group, the Noteholders.  The Indenture Trustee Plan contemplates a lengthy marketing period followed by an auction and sale of Scopac's assets that, as admitted by the Indenture Trustee, will not yield a price sufficient to pay the Noteholders in full and at which the Indenture Trustee may credit bid.  A Plan Agent will be appointed to liquidate Scopac's assets.  *See* Indenture Trustee Plan § 8.1.  The Plan Agent will:  (i) serve as Litigation Trustee of a Litigation Trust and prosecute Scopac's existing and potential litigation claims;[12] (ii) recover funds through avoidance actions, potentially including upstream payments to Scopac's parent companies; (iii) conduct orderly sale(s) of Scopac's Estate Property (regardless of whether a lead bidder is named); (iv) serve as the Liquidating Trustee of a Liquidating Trust to liquidate any remaining assets; and (v) distribute proceeds to creditors.  *See id.* §§ 8.5 and 16.4.  Under the Indenture Trustee Plan, the Indenture Trustee will also voluntarily carve out or, if it is successful in a credit bid, fund up to $1.45MM from proceeds of sale(s) to distribute to holders of Allowed Unsecured Claims.  *See id.* § 4.5.

---

[12]     The Indenture Trustee has identified former Governor Pete Wilson as the Plan Agent.  The Noteholder Litigation Trust includes the Headwaters Litigation brought by the Debtors against the State of California.  Governor Wilson, however, negotiated the Headwaters Agreement for the State of California.  He is therefore potentially conflicted from being the Litigation Trustee.  Moreover, since the Indenture Trustee Plan contemplates that the Plan Agent also serve as Litigation Trustee, Governor Wilson could be conflicted from being the Plan Agent as well.

28.     In proposing the Indenture Trustee Plan the Indenture Trustee suddenly asserts that the value of the Timberlands is approximately $600 million when just a few months ago Houlihan Lokey Howard & Zukin Capital, Inc., the Indenture Trustee's investment banker ("Houlihan"), stated that its preliminary estimates valued Scopac at $375-$500 million based on a discounted cash flow and comparable company analysis. *See* Declaration of Christopher Di Mauro dated September 7, 2007, ¶ 20 [Docket No. 1564-2] (the "Di Mauro September 2007 Declaration"). Additionally, in September 2007, Houlihan cited UBS Securities LLC's prior efforts to market Scopac in late 2004 as evidence of the low value:

> Despite conducting a broad and thorough process and contacting 111 parties, including conservation groups, financial sponsors, high net worth individuals and strategic buyers, the UBS marketing effort was unable to generate any offer in excess of the value of the Timber Notes and was abandoned.

*See* Di Mauro September 2007 Declaration, ¶ 20.

29.     The Indenture Trustee has now changed its tune and asserts that the value range of the Timberlands is approximately $575-$670 million. *See* Houlihan Valuation Presentation for Scotia Pacific Company LLC dated March 14, 2008 (the "Houlihan 2008 Scopac Valuation") at 4. As support for the new inflated valuation, Houlihan again used a discounted cash flow and comparable company analysis. It also relied upon three preliminary, non-binding bids made on or prior to January 30, 2008, the date on which the Indenture Trustee filed its initial plan. *Id.* at 16-43; *see also* Transcript of March 25, 2008 Deposition of Christopher Di Mauro at 132 (the "Di Mauro Deposition") and Exhibits 4-6 thereto. Evidence introduced at the Confirmation Hearing will demonstrate that the Houlihan 2008 Scopac Valuation overstates value of the Timberlands.

30.     Finally, the liquidation contemplated by the Indenture Trustee Plan will likely lead to severe adverse consequences with respect to the economic stability of the town of Scotia,

employees and creditors of the Palco Debtors, the residents of Scotia, the Northern California region, and the environment, including the following:

(a)    The liquidation harms creditors, employees and Scotia residents. Although some key individuals are identified (i.e., certain Noteholders will be members of the Board of Directors and former California Governor Pete Wilson will serve as Plan Agent) the Indenture Trustee Plan does not ensure that such key individuals, including the board of directors and the "Plan Agent," are actually qualified to operate the Timberlands. This is critical, as maintenance of reasonable harvest levels is essential to the continued operation of the Mill.

(b)    The liquidation of Scopac will greatly reduce the odds of the Mill being successfully operated over the long term. As a result, unsecured creditors of Palco will recover little value, trade creditors of Palco will lose the opportunity for business with Palco in the future, and residents of the town of Scotia will face a dramatic change in their way of life.

(c)    The liquidation will impact the Debtors' compliance with environmental obligations because it will be impossible to identify the ultimate purchaser of the Timberlands and whether that purchaser will respect the CC&Rs associated with AB1986. The CC&Rs associated with AB 1986 must be a senior lien to provide all stakeholders in Palco's lands with a public and binding commitment that the HCP from the Headwaters Agreement will be honored under all circumstances in the future. Governor Schwarzenegger, Senator Feinstein and Congressman Thompson have all filed pleadings in the Bankruptcy Court stating that the HCP must be honored in all respects by the successor to the Debtors. Because the Debtors have in the past repeatedly disappointed many by failing to comply with their obligations under various environmental and financing agreements, stepping off into the unknown regarding who will control future operations is not a wise path.

(d)    The liquidation will reduce recoveries to other Scopac creditors, namely unsecured creditors with claims estimated at $1.45 million, because the Indenture Trustee Plan will result in the rejection of the Debtors' Pension Plan. Rejection of the Pension Plan will result in claims in the amount of $21.7 million by the PBGC (as defined below)[13] against Scopac, which will in turn substantially dilute recoveries to unsecured creditors to only a few pennies on the dollar.

---

[13]    *See Consolidated Objections of Creditor Pension Benefit Guaranty Corporation to Confirmation of Certain Proposed Plans of Reorganization,* ¶ 22 [Docket No. 2536].

(e)     It appears the Effective Date of the Indenture Trustee Plan will not occur for at least 5-8 months.  Di Mauro Deposition at 58 ("A: But from commencement of the marketing process to signing an agreement with a stalking horse would be three or four months.  Q: And how long to obtain court approval of the stalking horse bid and bidding procedures? Five to six months.").  The Indenture Trustee fails to disclose who will provide financial support for Scopac during this critical time, thus allowing Scopac to continue to operate and maintain its value as a going concern.

31.     Moreover, the Indenture Trustee Plan, by separating Scopac from Palco, will likely lead to a significant decline in revenue and mounting losses.  Gary Clark addressed this stating:

> My comment was based on the fact that if Scopac . . was continuing under the noteholder plan . . . and Palco did not survive as an entity running a sawmill . . . then what you have in effect is 75 million more feet of Redwood and doug fir logs placed on the marketplace than there is today.  Therefore, I believe that would cause the prices that are already very low to be driven down significantly lower.  Because there are only three sawmills in California that buy Redwood logs, four [counting] Palco.

Clark Deposition at 147-148, ll. 14-25 and 1-10.

32.     Dr. Barrett addressed this as well during his deposition on March 12, 2008 (the "Barrett Deposition") when he stated:

> I believe that a decoupling of the timberlands from the Mill would ultimately be a very bad outcome for Scopac.  I think that Scopac would quickly find that the log prices that it was receiving would fall, maybe precipitously, because there would be more log supply than there would be manufacturing demand for logs.  That's the primary reason.  Secondary reason is that I believe that a timberlands and a manufacturing facility can work together to optimize each other's operations.  And that although that takes a longer period of time to do, that relative to the future of our joint company, that is a desirable benefit of us remaining together.

Barrett Deposition at 169-70, ll. 23-25 and 1-10.

33.     The New Master Purchase Agreement currently insulates Scopac because it requires Palco to purchase logs at prices well in excess of market prices. *See* Clark Deposition at

117 ("hauling SBE price for Redwood is 954 a thousand.  Market price is probably, if you could sell them – there's a plethora of inventory out there right now . . .  We think the current market is . . . somewhere around 650 to 700 delivered.").  The Indenture Trustee Plan thus proposes to assume the New Master Purchase Agreement to require Palco to continue to purchase logs well above market prices.  The difficulty with this plan, however, is that it is unworkable.  Palco cannot be forced into assuming the agreement and likely will not assume an agreement with such onerous terms.  Thus, if Scopac is reorganized as a stand-alone company, its revenues likely will decline by at least 25%, and perhaps more, due to the dramatic decline in log prices over the last six months.

34.      The Indenture Trustee Plan thus risks harm to the town of Scotia, the Mill, the environment, all of the Debtors, their creditors, and their employees.

## IV.

## VOTING RESULTS

### A.     The MRC/Marathon Plan

35.      As shown in the Ballot Report, the MRC/Marathon Plan has been accepted by more than 95% of unsecured creditors in number and more than 99% in dollar amount, excluding Timber Noteholders.  The voting results are as follows:

| Class | Accepting | | Rejecting | |
|---|---|---|---|---|
| | No. Claimants | Amount Held | No. Claimants | Amount Held |
| 3 - DIP Loan Claim | 1 | $75,700,497.33 | 0 | $0.00 |
| 4 - Term Loan Claim | 1 | $85,000,000.00 | 0 | $0.00 |
| 5 - Scopac Loan Claims | 4 | $36,374,900.85 | 0 | $0.00 |
| 6 - Timber Note Secured Claims | 6 | $355,000.00 | 124 | $688,279,517.00 |
| 7 - Palco UNS/Trade Claims | 195 | $289,903,000.58 | 4 | $145,864.68 |
| 8 - Scopac Trade Claims | 26 | $241,382.25 | 1 | $1,088.68 |
| 9 - Scopac UNS Claims | 7 | $7,883,730.14 | 125 | $688,309,517.00 |

*See* Ballot Report, Exhibit A.

**B.**    **The Debtors' Plans**

36.    The Debtors' Plan is unconfirmable as a matter of law because Marathon does not consent to it.  The Palco Alternative Plan is similarly unconfirmable because Marathon does not consent to the proposed treatment of its Term Loan Claim, plus it has failed to attain acceptance by an impaired, non-insider class.  *See* Ballot Report, Exhibit D.  The Scopac Alternative Plan is thus the only plan worthy of further discussion with respect to voting results.

37.    The Scopac Alternative Plan was uniformly rejected by holders of Class 5 – Scopac General Unsecured Claims and by holders of Class 8 – Scopac Convenience Class Claims and was rejected by over 97% of the Timber Noteholders.  *See id.*, Exhibit E.  The only non-insider impaired consenting class voting to accept the Scopac Alternative Plan is Bank of America (Class 4) who also voted to accept the MRC/Marathon Plan and who will receive the exact same treatment under the MRC/Marathon Plan.  *See id.*  The following is a summary of the balloting results of the Scopac Alternative Plan as stated in the Balloting Report:

| Class | Accepting | | Rejecting | |
|---|---|---|---|---|
| | **No. Claimants** | **Amount Held** | **No. Claimants** | **Amount Held** |
| 3 - Timber Noteholder Claims | 3 | $90,000.00 | 125 | $688,384,517.00 |
| 4 - Line of Credit Claims | 4 | $36,374,900.85 | 0 | $0.00 |
| 5 - UNS/Trade Claims | 0 | $0.00 | 9 | $7,887,974.04 |
| 6 - Palco Debtors Claims | 0 | $0.00 | 0 | $0.00 |
| 7 - Non-Debtor Affiliate Claims | 1 | $296,407.27 | 0 | $0.00 |
| 8 – Convenience Claims | 0 | $0.00 | 22 | $73,227.03 |

*See* Ballot Report, Exhibit E.

C.      **The Indenture Trustee Plan**

38.     The Indenture Trustee Plan was also overwhelmingly rejected by Scopac's unsecured trade creditors.  In fact, over 90% of the holders of Class 3, General Unsecured Claims, holding over 99% of the dollar amount of claims voted in Class 3, voted to reject the Indenture Trustee Plan.  The Indenture Trustee Plan is, therefore, supported by merely one group, the constituency it represents.  The following is a summary of the balloting results as provided in the Ballot Report:

| Class | Accepting | | Rejecting | |
|---|---|---|---|---|
| | No. Claimants | Amount Held | No. Claimants | Amount Held |
| 2(b) - Timber Noteholder Claims | 114 | $697,078,000.00 | 23 | $2,506,517.00 |
| 2(c) – Caterpillar Claim | 0 | $0.00 | 0 | $0.00 |
| 3 - Scopac UNS/Trade Claims | 2 | $8,975.95 | 28 | $7,952,012.19 |
| 4 - Contingent Claims | 0 | $0.00 | 0 | $0.00 |

*See* Ballot Report, Exhibit B.

**V.**

**THE MRC/MARATHON PLAN SHOULD BE CONFIRMED
BECAUSE IT ALONE COMPLIES WITH THE
CONFIRMATION STANDARDS IN SECTION 1129 OF THE BANKRUPTCY CODE**

39..    In order for the MRC/Marathon Plan to be confirmed MRC and Marathon, as plan proponents, must prove that the MRC/Marathon Plan satisfies the confirmation standards set forth in section 1129 of the Bankruptcy Code.  The evidence presented at the Confirmation Hearing will demonstrate that those standards have been met.

40.     As proponents of the MRC/Marathon Plan, MRC and Marathon bear the burden of establishing by a preponderance of the evidence that all elements necessary for confirmation

under section 1129 of the Bankruptcy Code have been met. *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enterprises (In re Briscoe Enterprises., Ltd., II)*, 994 F.2d 1160, 1163-65 (5th Cir. 1993), ("preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown"); *see also In re Monarch Beach Venture, Ltd.*, 166 B.R. 428, 432 (C.D. Cal. 1993) (same); *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 937 (Bankr. S.D.N.Y. 1994) ("a plan proponent must demonstrate that its plan satisfies § 1129(b) by a preponderance of the evidence"); *In re Richard Buick, Inc.*, 126 B.R. 840, 851 (Bankr. E.D. Pa. 1991) (debtor has ultimate burden of proving presence of all elements of section 1129 necessary to sustain confirmation order).

## A.   The MRC/Marathon Plan Satisfies the Requirements of 11 U.S.C. § 1129(a)(1)

41.   Section 1129(a)(1) of the Bankruptcy Code requires that "the plan compl[y] with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). Courts have interpreted this as compliance with sections 1122 (governing classification of claims) and 1123 (governing the contents of a plan) of the Bankruptcy Code. *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ( "[t]he legislative history of § 1129(a)(1) explains that this provision embodies the requirements of §§ 1122 and 1123, respectively, governing classification of claims and contents of the Plan."); *In re S&W Enterprise*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("provisions [subsection 1129(a)(1)] was most directly aimed at were sections 1122 and 1123"); S. Rep. No. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787 (stating that "[p]aragraph (1) [of § 1129(a)] requires that the plan comply with the applicable provisions of Chapter 11, such as sections 1122 and 1123, governing classification and contents of [a] plan"); H.R. Rep. No. 95-595, *supra* at 412 (1978) (same).

**B.**     **The MRC/Marathon Plan Satisfies the Requirements of 11 U S.C. § 1122**

42.     Section 1122 of the Bankruptcy Code governs classification of claims and interests under a plan. To satisfy this provision, classification must be based on the nature of the claim or interests classified. A claim or interest should be included in a specific class only if it is substantially similar to the other claims and interests in that class. *See In re Premiere Network Servs., Inc.*, 333 B.R. 130, 133 (Bankr. N.D. Tex. 2005). The Bankruptcy Code, however, "does not address the problem of putting similar claims in different classes." *Id.*

43.     Provided there are good reasons for the classification of the claims, a plan proponent has flexibility in determining a plan's classification structure. *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993) (classification of claims or interests in a bankruptcy plan must be reasonable); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir. 1987) (agreeing with the general view that permits the grouping of similar claims in different classes). In particular, the Fifth Circuit has found that separate classification of similar claims is permitted if there are "good business reasons." *In re Briscoe*, 994 F.2d at 1167 (noting that *Greystone* decision did not prohibit separate classification). *See also Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1279 (5th Cir. 1991) (declining separate classification of claims, but recognizing that good business reasons may exist to separately classify similar claims); *In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109, 114 (Bankr. N.D. Tex. 2002) (separate classification of unsecured creditor was justified because creditor was integral to business of the reorganized debtor).

44.     The MRC/Marathon Plan classifies Claims and Interests into the following twelve Classes:

22

(a)     Class 1          Other Priority Claims

(b)     Class 2          Secured Tax Claims and Other Secured Claims

(c)     Class 3          Palco DIP Loan Claim

(d)     Class 4          Palco Term Loan Claim

(e)     Class 5          Scopac Loan Claim

(f)     Class 6          Scopac Timber Note Secured Claims

(g)     Class 7          Palco Trade Claims and Palco General Unsecured Claims

(h)     Class 8          Scopac Trade Claims

(i)     Class 9          Scopac General Unsecured Claims

(j)     Class 10         Inter-Debtor Claims

(k)     Class 11         Non-Debtor Affiliate Claims

(l)     Class 12         Interests in the Debtors

45.     There can be no dispute that this classification structure places each Claim and Interest in a Class with other substantially similar Claims or Interests, including separating Claims against the Palco Debtors from Claims against Scopac. *See In re Greystone III Joint Venture*, 995 F.2d at 1279 ("'substantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class.").

46.     Certain Claims with common priority and rights, however, have been placed into different classes. The MRC/Marathon Plan (a) separates contractually subordinated claims from secured and unsecured claims, and (b) with respect to Class 8 (Scopac Trade Claims)[14] and Class

---

[14]     A "Scopac Trade Claim" is defined as "a General Unsecured Claim against Scopac for goods, supplies, equipment, or services utilized by Scopac in the operation of its business, which shall include claims of former employees . . . provided, however, that the term . . . shall not include (i) Claims asserted by former Insiders, (ii) the Palco DIP Loan Claim, and (iii) the Palco Term Loan Claim." MRC/Marathon Plan, Appendix A.

9 (Scopac General Unsecured Claims),[15] separately classifies these Claims for business reasons and non-creditor interests in the future viability of the business. These Claims may be separately classified because reasonable grounds exist to separately classify them. *See In re General Homes Corp. FGMC Inc.*, 134 B.R. 853, 863 (Bankr. S.D. Tex. 1991). Separate classification is reasonable if falls into one of the following three categories: (i) the separate classification is based upon a good business reason; (ii) the separate classification is based upon disparities in legal rights; or (iii) the separate classification is based upon creditors' sufficiently different interests in the plan. *See, e.g., In re Wabash Valley Power Ass'n*, 72 F.3d 1305, 1321 (7th Cir. 1995).

47.    Separate Classification of Contractually Subordinated Claims (Classes 10 and 11). Certain Debtor and non-debtor affiliates of the each of the Debtors may hold General Unsecured Claims against certain Debtors. These are referred to in the MRC/Marathon Plan as "Inter-Debtor Claims" (Class 10) and "Non-Debtor Affiliate Claims" (Class 11). *See* Disclosure Statement, Exhibit A-2. These Insider Claims are properly classified as separate from other General Unsecured Claims because they are subject to subordination. In particular, they are subordinate in right of payment to the prior payment of all "Obligations" (as defined in the Palco Term Loan Agreement and Palco Revolving Loan Agreement) by agreement. *See* Subordinated Intercompany Note dated July 18, 2006 by and among Palco, Britt Lumber Co., Inc., Salmon Creek LLC, Scotia Inn Inc. and Maxxam Group Inc. (the "Subordinated Intercompany Note"). These Insider Claims are also dissimilar from all other General Unsecured Claims because the Holders of these Claims are *expressly required* to distribute amounts that would otherwise go to

---

[15]    A "Scopac General Unsecured Claim" is defined as "a General Unsecured Claim against Scopac, including, but not limited to, any Claim by Holders of Scopac Timber Notes on account of the Scopac Timber Notes that is not a Secured Claim . . ." MRC/Marathon Plan, Appendix A.

them to Holders of senior Claims until the senior Claims are paid in full.  *See* Subordinated Intercompany Note ("In the event that . . . any payment or distribution of assets of any Debtor . . . shall be received by any Payee on account of this Note before all Senior Obligations are paid in full, such payment or distribution shall be received and held in trust for and shall be paid over to the Agents for application to the payment of the Senior Obligations until all of the Senior Obligations shall have been paid in full in cash . . .").[16]  As a result, "[s]eparate classification of senior and subordinated debt is permitted, even though both the holders of senior claims and the holders of subordinated claims may have general unsecured claims against the debtor."  7 Collier on Bankruptcy ¶ 1122.03[4] (15 ed. rev. 2007); *see also In re Payless Cashways, Inc.*, 215 B.R. 409, 411 (Bankr. W.D. Mo. 1997) (suggesting that subordinated notes should be separately classified).  A plan may separately classify when disparities exist between the rights of holders of different claims.  *See In re Wabash Valley Power Ass'n Inc.*, 72 F.3d at 1321; *In re Greystone III Joint Venture*, 995 F.2d at 1279; *In re General Homes Corp.*, 134 B.R. at 863.  The separate classification under the MRC/Marathon Plan of the Inter-Debtor Claims (Class 10) and Non-Debtor Affiliate Claims (Class 11) is thus permissible under section 1122(a) of the Bankruptcy Code.

48.    Separate Classification of Scopac Trade Claims (Class 9).  The Scopac Trade Claims (Class 9) have been separately classified from other Scopac General Unsecured Claims (Class 8) because:  (i) there are good business reasons to separately classify them, and (ii) the Holders of Scopac Trade Claims have sufficiently different interests in the MRC/ Marathon Plan vis-à-vis the Holders of the Scopac General Unsecured Claims.  *See In re Briscoe*, 994 F.2d at

---

[16]    The agreement to subordinate is enforceable under the Bankruptcy Code.  *See* 11 U.S.C. § 510(a) ("A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law.").

1167 (permitting separate classification of City of Fort Worth's unsecured claim from other unsecured claims based upon, among other things, the debtor's need to continue good relations with the city); *see also In re Greystone III Joint Venture*, 995 F.2d at 1279 (recognizing that there may be good business reasons to separately classify).

49.     The business reasons are obvious. The timber industry is insulated and close knit. As such, Newco will rely on the continued operation and goodwill of existing trade creditors. Dr. Barrett, Scopac's Vice-President has commented on the importance of the plan being "well received by the community." *See* Barrett Deposition at 174, ll. 6-14 (discussing the positives of the MRC/Marathon Plan, and stating "I do think the plan has a reasonable chance of being well received by the community, Humboldt County, perhaps by the agencies, and it would be, I think, in the company's best interest to – to have improved relations, or perhaps a better was to say it is it could be could for the company to have a honeymoon with a community that in many ways appears to have soured on the current ownership of the company.").

50.     In the present case, the Timberlands, due to their geographic locale and the nature of the lumber industry, are in a small market with a limited number of players with respect to trade creditors. As a result, the trade community's opinion with respect to management will undoubtedly have a significant impact on the Newco's ability to conduct business in the future. The existing trade creditors' institutional knowledge of the business will be invaluable to a seamless transition to Newco and will assist Newco in attracting capable new vendors. Moreover, the positive employee and community morale garnered by the treatment of existing creditors will be invaluable to Newco's future success. Without separate classification, these critical business goals will not be achieved, as trade creditors would be hopelessly diluted by the Noteholders' unsecured deficiency claim. These facts are similar to those presented in *In re*

*Bernhard Steiner Pianos USA, Inc,*. 292 B.R. at 114 where the court approved the separate classification of entities that had consigned their pianos to the debtor, who operated a piano store, from other unsecured creditors. The court found that the debtor had presented an adequate business justification because the consignment business was fragile, the market was "local and small, and adverse local community opinion" was important to avoid. *Id.*

51.     The MRC/Marathon Plan classification structure is reasonably geared towards achieving the necessary goodwill because it provides funds that should be sufficient to provide Holders of Allowed Scopac Trade Claims essentially the same recovery as Holders of Allowed Palco Trade Claims. *See Disclosure Statement* § 6.2(b) (estimating 75-90% recovery for Scopac Trade Claims and Palco Trade Claims). The Holders of the Scopac Trade Claims also have interests that are substantially different from other creditors. Such Holders are trade creditors and former employees who have "a different stake in the future viability" of Scopac's business. As such, their interests justify separate classification of the unsecured claims, primarily the Noteholders' deficiency claim. *See In re Premiere Networks, Inc.*, 333 B.R. at 134 ("A creditor with a 'different stake in the future viability' of the reorganized debtor has a non-creditor interest that may justify separate classification of its claim"); *see also In re Wabash Valley*, 72 F.3d at 1321; *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. Inc. (In re U.S. Truck Co. Inc.)*, 800 F.2d 581, 587 (6th Cir. 1986). The future viability of the Mill, the town of Scotia, and the geographic area in general is of paramount importance to these parties.

52.     Trade creditors' interests differ from those of other unsecured creditors because of their interest in having ongoing business relationships with Newco. Their interest is thus in the structure of the plan, the identity of future management, and the continuance of the Mill. This is also similar to what was before the Fifth Circuit in *Briscoe*. The trade creditors, like the city

with a separately classified claim in *Briscoe*, have interests to protect other than mere repayment. *In re Briscoe*, 994 F.2d at 1167.

53.     In addition to the trade creditors, the former employees of Scopac have a non-creditor interest in the assumption of the Pension Plan.   Conversely, Indenture Trustee and Noteholders have no such interest in connection with the Noteholders' deficiency claim.   These facts are similar to the facts before the Sixth Circuit in *U.S. Truck* where the court allowed separate classification of a union's unsecured claim even though the class was created for the purpose of securing the acceptance of an impaired class.   In that case, teamsters were placed in a separate class because the teamsters were also concerned with their ongoing employment relationship.   *See In re U.S. Truck Co. Inc.*, 800 F.2d at 587 ("The Teamsters Committee may choose to reject the plan not because the plan is less than optimal to it *as a creditor*, but because the Teamsters Committee *has a noncreditor interest* – e.g., rejection will benefit its members in the ongoing employment relationship.") (emphasis added); *see also In re Kliegl Bros. Universal Electric Stage Lighting*, 149 B.R. 306, 309 (Bankr. E.D.N.Y. 1992) (approving separate classification of union class from unsecured creditors even though creditors alleged the classification scheme was designed solely to create a consenting impaired class because the debtors ability to operate as a union shop was critical to its ability to function in the industry). The former employees of Palco and Scopac have a unique interest in continued pension obligations and not merely a recovery on their current claims.

54.     Here separate classification was not necessary to obtain the vote of an impaired consenting class.   As noted above, Impaired Classes 3, 4, 5 and 7 which were not impacted by the separate classification of Classes 8 and 9 overwhelmingly voted to accept the MRC/Marathon Plan.

55.    The classification scheme has thus met the requirements of section 1122 of the Bankruptcy Code.

**C.    The MRC/Marathon Plan Satisfies the Requirements of 11 U.S.C. § 1123(a)**

56.    Section 1123 of the Bankruptcy Code sets forth the mandatory and permissive contents required for a plan.  The MRC/Marathon Plan fulfills these requirements as set forth below.

57.    The MRC/Marathon Plan Designates Classes of Claims and Interests – 11 U.S.C. § 1123(a)(1).  Section 1123(a)(1) of the Bankruptcy Code requires that a plan designate classes of claims, other than claims of a kind specified in sections 507(a)(2) (administrative expense claims), 507(a)(3) (claims arising during the "gap" period in an involuntary case), or 507(a)(8) (priority tax claims) of the Bankruptcy Code.  *See* 11 U.S.C. § 1123(a)(1); *see also In re Eagle Bus. Mfg., Inc.,* 134 B.R. 584, 596 (Bankr. D. Tex. 1991), *aff'd,* 158 B.R. 421 (S. D. Tex. 1993) ("Administrative and Priority Tax Claims are not classified because section 1123(a)(1) of the Bankruptcy Code does not require the classification of such Claims, and because they must receive the treatment specified in section 1129(a)(9) of the Bankruptcy Code and cannot be otherwise impaired.").

58.    As set forth above, the MRC/Marathon Plan designates eleven Classes of Claims and one Class of Interests, all other than the specified Administrative Claims and Tax Claims, and therefore complies with section 1123(a)(1) of the Bankruptcy Code.

59.    The MRC/Marathon Plan Specifies Unimpaired Classes – 11 U.S.C. § 1123(a)(2).  Section 1123(a)(2) of the Bankruptcy Code requires that a plan "specify any class of claims or interests that is not impaired under the plan."  11 U.S.C. § 1123(a)(2).  The MRC/Marathon Plan

specifies the Classes of Claims and Interests that are Unimpaired.  The following Classes of Claims are classified as Unimpaired under the MRC/Marathon Plan:

      (a)    Class 1      Other Priority Claims

      (b)    Class 2      Secured Tax Claims and Other Secured Claims

60.    The requirements of section 1123(a)(2) of the Bankruptcy Code therefore have been satisfied.

61.    <u>The MRC/Marathon Plan Adequately Specifies the Treatment of Impaired Classes – 11 U.S.C. § 1123(a)(3).</u>  Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify the treatment of any class of claims or interests that are impaired under the plan." 11 U.S.C. § 1123(a)(3).  The following Classes of Claims and Interests are classified as Impaired under the MRC/Marathon Plan:

      (a)    Class 3      Palco DIP Loan Claim

      (b)    Class 4      Palco Term Loan Claim

      (c)    Class 5      Scopac Loan Claim

      (d)    Class 6      Scopac Timber Note Secured Claims

      (e)    Class 7      Palco Trade Claims and Palco General Unsecured Claims

      (f)    Class 8      Scopac Trade Claims

      (g)    Class 9      Scopac General Unsecured Claims

      (h)    Class 10    Inter-Debtor Claims

      (i)    Class 11    Non-Debtor Affiliate Claims

      (j)    Class 12    Interests in the Debtors

62.     Sections 4.3 through 4.12 of the MRC/Marathon Plan specify the treatment of Such Claims and Interests. Consequently, the MRC/Marathon Plan satisfies section 1123(a)(3) of the Bankruptcy Code.

63.     The MRC/Marathon Plan Provides for the Same Treatment for Claims or Interests Within the Same Class – 11 U.S.C. § 1123(a)(4). Section 1123(a)(4) of the Bankruptcy Code requires that a plan provide "the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). This provision provides creditors of the same class with a right to equality of treatment. Articles III and IV of the MRC/Marathon Plan provide for equality of treatment for each Claim or Interest within a particular Class. The MRC/Marathon Plan therefore complies with section 1123(a)(4) of the Bankruptcy Code.

64.     The MRC/Marathon Plan Provides Adequate Means for its Implementation – 11 U.S.C. § 1123(a)(5). Section 1123(a)(5) of the Bankruptcy Code requires a plan of reorganization to "provide adequate means for the plan's implementation" and sets forth several examples of such means, including retention by the debtor of property of the estate, sales of the debtor's property, satisfaction or modification of any lien and issuance of securities of the debtor in exchange for claims or interests. 11 U.S.C. § 1123(a)(5). The MRC/Marathon Plan contains adequate means for its implementation because it provides for:

(a)     Cash contributions of up to $225 million to Newco by MRC and Marathon, including $7.5 million allocated to improve the Mill;

(b)     Marathon's conversion of approximately $160 million of senior secured pre-petition and post-petition debt into equity;

(c)     Assumption of the Pension Plan;

(d)     Benefits from approximately $10 million annually in savings from synergies that will be realized as a result of MRC sharing its management, relationships and infrastructure with Newco;

31

(e)    Experienced management;

(f)    Newco to be run in an environmentally responsible manner;

(g)    Assumption of all environmental obligations, without any modification, including the HCP resulting from the Headwaters Agreement;

(h)    Reduction of the Debtors' debt obligations by approximately $625 million;

(i)    A $175 million cash payment to the Noteholders and the issuance of New Timber Notes in the principal amount of $325 million, as well as continued eligibility for further Distributions;

(j)    Payment in full of Allowed Administrative Claims and Allowed Priority Claims;

(k)    Payment in full of the Scopac Loan Claim with default interest being paid over time in monthly installments;

(l)    Establishment of a funded Litigation Trust to hold certain causes of action that will be liquidated for the benefit of Holders of Allowed Claims in Classes 7, 8, and 9;

(m)    Cancellation of all existing notes, instruments and Interests, except as required to allow the Indenture Trustee to make Distributions to Holders of Allowed Scopac Timber Note Claims;

(n)    Distributions of equity interests, cash and proceeds of certain assets to Holders of Allowed Claims; and

(o)    Assumption of certain executory contracts and rejection of any remaining executory contracts and unexpired leases, and payment of default amounts due on or prior to the Effective Date.

65.    The MRC/Marathon Plan Satisfies the Requirements of 11 U.S.C. § 1123(a)(6).

Section 1123(a)(6) of the Bankruptcy Code requires, among other things, that the MRC/Marathon Plan

> [P]rovide for the inclusion in the charter of the debtor, if the debtor is a corporation . . . of a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for

the election of directors representing such preferred class in the event of default in the payment of such dividends.

11 U.S.C. § 1123(a)(6).

66.     The MRC/Marathon Plan requires the Reorganized Entities' organizational documents to prohibit the issuance of non-voting equity securities. *See* MRC/Marathon Plan § 7.6.4. The MRC/Marathon Plan appropriately distributes a 100% equity interest in Townco to Marathon, an 85% of the equity interest in Newco to MRC, and a 15% equity interest in Newco to Marathon. None of the equity securities will have a preference over another Class with respect to dividends. *See* MRC/Marathon Plan § 7.6.1.

67.     The MRC/Marathon Plan is Consistent with the Interests of Creditors and with Public Policy – 11 U.S.C. § 1123 (a)(7). Section 1123(a)(7) of the Bankruptcy Code requires that the MRC/Marathon Plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."

68.     The identities of the officers and directors or managers of Newco and Townco are identified in Section 6 of the Disclosure Statement and the MRC/Marathon Plan Supplement. They have been selected based upon their experience and expertise. The MRC/Marathon Plan Supplement also provides a schedule of the annual compensation to be paid to persons serving as executives, officers and directors or managers as of the Effective Date. Successors will be determined in accordance with the Reorganized Entities' organizational documents.

69.     Section 8.6 of the MRC/Marathon Plan provides that the MRC/Marathon Plan Proponents and the Committee shall nominate the Litigation Trustee.[17]   The Committee shall also select the members of a three-person Litigation Trust Board, who will review actions by and advise the Litigation Trustee with respect to the liquidation and distribution of the Litigation Trust Assets in accordance with the Litigation Trust Agreement and the Confirmation Order. *See* MRC/Marathon Plan § 8.7.   The Litigation Trust Board may also remove the Litigation Trustee with approval of the Bankruptcy Court upon application for good cause shown.  *See* MRC/Marathon Plan § 8.11.

70.     The above provisions of the MRC/Marathon Plan and MRC/Marathon Plan Supplement,[18] which disclose key information with respect to officers and directors and provide for the involvement of the Committee, a Litigation Trust Board selected by the Committee, and interested parties with respect to the selection and removal of the Litigation Trustee, are consistent with the interests of creditors and with public policy.  Further, as shown in the Ballot Report, Classes 3, 4, and the overwhelming majority of General Unsecured Creditors in Classes 5, 7 and 8 support the MRC/Marathon Plan.  *See* Ballot Report, Exhibit A.  Therefore, section 1123(a)(7) of the Bankruptcy Code is satisfied.

71.     The MRC/Marathon Plan Complies with the Requirements of 11 U.S.C. § 1123(b).  Section 1123(b) of the Bankruptcy Code sets forth the permissive provisions that

---

[17]     In accordance with the MRC/Marathon Plan and the Disclosure Statement, on March 26, 2008, MRC, Marathon and the Committee filed the Notice of Nomination of Litigation Trustee Pursuant to First Amended Joint Plan of Reorganization for the Debtors Proposed by Mendocino Redwood Company, LLC and Marathon Structured Finance Fund L.P. [Docket No. 2549].

[18]     In accordance with the MRC/Marathon Plan and the Disclosure Statement, on March 15, 2008, MRC and Marathon filed the Plan Supplement to First Amended Joint Plan of Reorganization for the Debtors Proposed by Mendocino Redwood Company, LLC and Marathon Structured Finance Fund L.P. [Docket No. 2576] referred to herein as the "MRC/Marathon Plan Supplement."

may be incorporated into a Chapter 11 plan. The MRC/Marathon Plan is consistent with section 1123(b) of the Bankruptcy Code. Specifically, pursuant to Article III of the MRC/Marathon Plan, Classes 1 through 2 are Unimpaired and Classes 3 through 12 are Impaired, as contemplated by section 1123(b)(1) of the Bankruptcy Code. As contemplated by section 1123(b)(2) of the Bankruptcy Code, Article VI of the MRC/Marathon Plan provides for the assumption or rejection of the executory contracts and unexpired leases of the Debtors not previously assumed or rejected under section 365 of the Bankruptcy Code. As contemplated by section 1123(b)(3) of the Bankruptcy Code, Article VIII of the MRC/Marathon Plan provides for the retention and enforcement of claims by the Litigation Trustee. As contemplated by section 1123(b)(5) of the Bankruptcy Code, the MRC/Marathon Plan modifies the rights of holders of Scopac Timber Note Claims. *See* MRC/Marathon Plan § 4.6. Finally, the MRC/Marathon Plan's remaining provisions are not inconsistent with the Bankruptcy Code. *See* 11 U.S.C. § 1123(b)(6).

72.   Based upon the foregoing, the MRC/Marathon Plan complies fully with the requirements of sections 1122 and 1123 of the Bankruptcy Code and thus satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

**D.   The MRC/Marathon Plan Proponents Have Complied With the Provisions of 11 U.S.C. § 1129(a)(2)**

73.   Section 1129(a)(2) of the Bankruptcy Code requires the proponent of a plan to comply "with the applicable provisions of this title." Whereas section 1129(a)(1) of the Bankruptcy Code focuses on the form and content of a plan itself, section 1129(a)(2) of the Bankruptcy Code is concerned with the applicable activities of a plan proponent under the Bankruptcy Code. *See* 7 Collier On Bankruptcy ¶ 1129.03[2] at 1129-26 (15th ed. rev. 2007); *In*

re Drexel, 138 B.R. at 759 (noting that the legislative history of § 1129(a)(2) "explains that this provision embodies the disclosure and solicitation requirements under §§ 1125 and 1126").

74.     In determining whether a plan proponent has complied with section 1129(a)(2) of the Bankruptcy Code, courts focus on whether the disclosure and solicitation requirements adhere to sections 1125 and 1126 of the Bankruptcy Code. *See, e.g., Andrew v. Coopersmith (In re Downtown Inv. Club III)*, 89 B.R. 59, 65 (B.A.P. 9th Cir. 1988) ("The debtor did not comply with § 1125 as required by § 1129(a)(2)."); *In re Resorts Intern, Inc.*, 145 B.R. 412, 468 (Bankr. D.N.J. 1990) (applying section 1129(a)(2) only to disclosure requirements of Bankruptcy Code); *In re Johns-Manville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, 843 F.2d 636 (2d Cir. 1988) (stating that "[o]bjections to confirmation raised under § 1129(a)(2) generally involve the alleged failure of the plan proponent to comply with § 1125 and § 1126 of the Code"); *see also* S. Rep. No. 95-989, at 126 (stating that § 1129(a)(2) "requires that the proponent of the plan comply with the applicable provisions of Chapter 11, such as § 1125 regarding disclosure"); H.R. Rep. No. 95-595, at 412 (same).

75.     Pursuant to the Disclosure Statement Order,[19] the adequacy of the Disclosure Statement, and certain voting procedures were approved as satisfactory. As evidenced by the certificates of service filed with the Court, the Disclosure Statement Order has been complied with. Thus, the provisions of section 1129(a)(2) of the Bankruptcy Code have been complied with.

---

[19]     The Order Approving Joint Solicitation Procedures and Joint Disclosure Statement in Support of the Respective Plans of Reorganization Proposed By (1) Mendocino Redwood Company, LLC and Marathon Structured Finance Fund L.P.; (2) The Bank of New York Trust Company, N.A., Indenture Trustee for the Timber Notes; and (3) the Debtors and Maxxam Inc., Maxxam Group Holdings Inc., and Maxxam Group Inc. entered by this Court on February 29, 2008 [Docket No. 2387] is referred to herein as the "Disclosure Statement Order."

**E.     The MRC/Marathon Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law in Accordance With 11 U.S.C. § 1129(a)(3)**

76.     Section 1129(a)(3) of the Bankruptcy Code requires a plan proponent to propose a plan "in good faith and not by any means forbidden by law." "In order to satisfy the statutory requirement of good faith, a plan must be intended to achieve a result consistent with the objectives of the Bankruptcy Code." *Ryan v. Loui (In re Corey)*, 892 F.2d 829, 835 (9th Cir. 1989); *see also Hanson v. First Bank of South Dakota, N.A.*, 828 F.2d 1310, 1315 (8th Cir. 1987) (same); *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984) (holding that "the important point of inquiry is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code"); *In re Leslie Fay Companies, Inc.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) ("[A] plan is proposed in good faith 'if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code."), *quoting In re Texaco*, 84 B.R. 893, 907 (Bankr. S.D.N.Y. 1988); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) (same).

77.     The good faith requirement "must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start." *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985). *See also In re Jasik*, 727 F.2d 1379, 1383 (5th Cir. 1984) ("[t]he 'good faith' of a reorganization plan must be 'viewed in light of the totality of the circumstances surrounding [confirmation]' of the plan"), *quoting Public Finance Corp. v. Freeman (In re Freeman)*, 712 F.2d 219, 221 (5th Cir. 1983).

78.     There is no quantitative payment obligation to the good faith requirement. *See In re Wiggles*, 7 B.R. 373, 381 (Bankr. N. D. Ga. 1980) ("[t]he overview and vote of the creditors in Chapter 11 . . . supplies both the assurance that the plan is a fair effort of the debtor to pay

unsecured creditors and another reason that the concept of a quantitative best effort . . . is not included in the meaning of good faith in . . . [section] 1129(a)(3)"). In addition, in determining whether a plan has been proposed in good faith, courts have recognized that they should avoid applying hard and inflexible rules, and should instead evaluate each case on its own merits. *See, e.g., In re Jasik*, 727 F.2d at 1383.

79. Further, the Fifth Circuit has held "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied." *In re Briscoe*, 994 F.2d at 1167 (citing *Matter of Sun Country Development, Inc.*, 764 F.2d 406, 408 (5th Cir. 1985)). In *Briscoe*, the Fifth Circuit approved the Bankruptcy Court's finding that the plan was proposed in good faith because it provided "a vehicle for restructuring the debt of the Property and preserving the Property for the benefit of both creditors and the . . . community." *Id.*

80. MRC and Marathon have met the good faith obligation imposed upon them under the Bankruptcy Code. The MRC/Marathon Plan is proposed with the honest purpose of reorganizing the Debtors in a manner that will (i) result in continued business operations through a profitable, environmentally responsible Newco; (ii) preserve jobs and pensions; (iii) provide for substantial recoveries to all creditors; and (iv) satisfy the key objectives outlined by Governor Schwarzenegger, Senator Feinstein, Congressman Thompson and the Eureka Chamber of Commerce. Further, Interest Holders will not retain anything under the MRC/Marathon Plan. When viewed in light of the totality of the circumstances and keeping in mind the purpose of the Bankruptcy Code, the MRC/Marathon Plan satisfies section 1129(a)(3) of the Bankruptcy Code's good faith requirement. The evidence presented at the Confirmation Hearing, particularly by

MRC's representative, Alexander L. Dean, and Marathon's representative, Matthew Breckenridge, will further demonstrate the good faith underlying the MRC/Marathon Plan.

**F.    The MRC/Marathon Plan Provides for Court Approval of Payment for Services and Expenses Pursuant to 11 U.S.C. § 1129(a)(4)**

81.     Section 1129(a)(4) of the Bankruptcy Code requires that "[a]ny payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Court as reasonable." 11 U.S.C. § 1129(a)(4).

82.     This section requires that any and all post-petition fees promised or received in the bankruptcy case be disclosed and subject to the court's review. *See In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").    Section 2.3 of the MRC/Marathon Plan requires all persons seeking Professional Compensation Claims to file applications for compensation for services rendered and reimbursement of expenses incurred through the Effective Date.  The MRC/Marathon Plan also requests Bankruptcy Court approval of the Litigation Trust Agreement, which provides for payment of the Litigation Trustee.  Accordingly, the MRC/Marathon Plan complies with section 1129(a)(4) of the Bankruptcy Code.

**G.    All Necessary Information Regarding Directors and the Officers of the Reorganized Entities Under the MRC/Marathon Plan Has Been Disclosed as Required by 11 U.S.C. § 1129(a)(5)**

83.     Section 1129(a)(5)(A)(i) - (ii) of the Bankruptcy Code require that a plan proponent disclose the "identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor," and require a

finding that "the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy." 11 U.S.C. §§ 1129(a)(5)(A)(i) - (ii).

84.     Article 6 of the Disclosure Statement and the MRC/Marathon Plan Supplement identify all individuals who will serve after confirmation of the MRC/Marathon Plan as a director or officer of Newco or Townco.  These individuals have been selected based upon their experience and expertise.  These individuals have significant management and/or directorial experience and their involvement with respect to Newco will result in significant cost-savings by allowing the Debtors to cease relying on consultants and forestry experts across the country.  The MRC/Marathon Plan Supplement also provides a schedule of the annual compensation to be paid to persons serving as executives, officers and directors or managers of Newco and Townco as of the Effective Date.  *See* Disclosure Statement, Article 6 and MRC/Marathon Plan Supplement. The MRC/Marathon Plan thus meets the requirements of section 1129(a)(5)(A) of the Bankruptcy Code.

85.     Section 1129(a)(5)(B) of the Bankruptcy Code further requires that a plan proponent disclose the "[identities] of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider." 11 U.S.C. § 1129(a)(5)(B).  No insiders, including existing officers and directors, will be employed or retained by Newco or Townco.  *See* Disclosure Statement, Article 6 and MRC/Marathon Plan Supplement.  The requirements of section 1129(a)(5)(B) of the Bankruptcy Code have thus been met.

**H.     The Requirements of 11 U.S.C. § 1129(a)(6) are Inapplicable**

86.     Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission having jurisdiction over the rates charged by a reorganized debtor in the operation of

its business approve any rate change provided for in the plan. Section 1129(a)(6) of the Bankruptcy Code is inapplicable to the MRC/Marathon Plan because no rate changes are provided for in the plan and no governmental regulatory commission has jurisdiction over the rates that the Debtors charge in the ordinary operation of their business.

## I.   The MRC/Marathon Plan is in the Best Interests of Creditors and Equity Interest Holders as Required by 11 U.S.C. § 1129(a)(7)

87.   Section 1129(a)(7) of the Bankruptcy Code codifies what is generally referred to as the "best interests of creditors test." Section 1129(a)(7) of the Bankruptcy Code requires that:

> With respect to each impaired class of claims or interests-
> (A)    each holder of a claim or interest of such class--
> (i)    has accepted the plan; or
> (ii)   will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of this title on such date . . .

11 U.S.C. § 1129(a)(7). The "best interests" test focuses on individual dissenting parties rather than classes. *See Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle St. P'ship (In re 203 North LaSalle St. P'ship)*, 526 U.S. 434, 441-42 (1999) (a plan may be found fair and equitable as to a dissenting class of impaired creditors if the allowed value of the claim of such creditors is to be paid in full or if any holders of claims which are junior will not receive or retain under the plan on account of such junior claim any interest or property); *see also In re Sierra-Cal.* 210 B.R. 168, 172 (Bankr. E.D. Cal. 1997) ("It stands as an individual guaranty to each creditor or interest holder that it will receive at least as much in a reorganization as it would in a liquidation.").

88.   In order for a plan to be in the best interests of creditors under section 1129(a)(7) of the Bankruptcy Code, the court must find that each dissenting creditor or equity security holder will receive or retain value under the plan that is not less than the amount such holder

would receive if the debtor was liquidated. *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. at 761 (the "best interests" test requires that each holder of a claim or interest either accept the plan or receive or retain property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7); *Corestates Bank, N.A. v. United Chemical Technologies, Inc. (In re United Chemical Technologies, Inc.)*, 202 B.R. 33, 55-56 (Bankr. E.D. Pa. 1996) (a court may confirm a plan notwithstanding the objection of an impaired creditor if the plan does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan). As section 1129(a)(7) of the Bankruptcy Code makes clear, the liquidation analysis applies only to non-accepting impaired claims or equity interests.

89.     In order to estimate what the members of each impaired class of claims or interests would receive if a debtor were liquidated under Chapter 7 of the Bankruptcy Code, the court must determine the liquidation value of the debtor's assets and the amount and priority of the allowed claims against the debtor. "Liquidation value" refers to the amount that would be available if the Chapter 11 case were converted to a case under Chapter 7 of the Bankruptcy Code and the debtor's assets were liquidated by a Chapter 7 trustee.

90.     In general, under the Debtors' Liquidation Analysis attached as Exhibit E to the Disclosure Statement, the pleadings filed in these Cases, the LaMont Valuation Report (as defined below), the Declaration of Alexander L. Dean, Jr. in Support of Confirmation of the MRC/Marathon Plan sworn to on April 4, 2008, and as will be shown at the Confirmation Hearing, a liquidation under Chapter 7 of the Bankruptcy Code would result in smaller distributions to creditors than provided for in the MRC/Marathon Plan because: (i) there would not be infusions of up to $225 million in cash to the Debtor's Estates; (ii) significant debt would

not be converted into equity; (iii) the MRC/Marathon Plan preserves going concern value with respect to the Debtors' operations and a Chapter 7 estate would lack such value; (iv) the rejection of the Debtors' Pension Plan, which would almost certainly occur in a liquidation, would significantly dilute any return to unsecured creditors; (v) the Debtor's Estates would suffer from duplicate administrative costs and expenses that would result from the appointment of a trustee or multiple trustees in a liquidation under Chapter 7; (vi) there would likely be significant delays attendant upon the administration of assets in Chapter 7; and (vii) priority claims would likely increase.

91.     The only creditors rejecting the MRC/Marathon Plan are, effectively, the Noteholders – their secured class (Class 6) and their unsecured deficiency claims (Class 9). Under the MRC/Marathon Plan, the Noteholders will receive $175 million in cash and $325 million in New Timber Notes on account of their secured claim. This aggregates $500 million in total consideration with respect to the secured portion of the Noteholders' Claims and is higher than the $430 million fair market value and the $260 million liquidation value reached in expert report prepared by Richard N. LaMont. *See* Appraisal of Richard N. LaMont of the Scotia Pacific Company LLC Timberlands dated March 11, 2008 (the "LaMont Valuation Report").[20] In fact, while MRC and Marathon disagree with the liquidation analysis of the Debtors, the value

---

[20]     Mr. Richard N. LaMont is a highly qualified, California Certified General Appraiser, AG043635. He is a professional forester and graduate of Oregon State University in Forest Management. He has been analyzing and valuing timberlands since 1982 and preparing appraisal reports since 1991. He has developed advanced harvest forecasting programs, timber inventory data management software, and numerous timber cruising software programs which allow him to create highly detailed models of the property. He has also assisted clients in the acquisition of large timberlands tracts (35,000-600,000 acres) in the Pacific Northwest, California and Idaho in the last 20 years and has worked as part of acquisition teams for the purchase of some of the largest timberland tracts (350,000-750,000 acres) sold in the Pacific Northwest in the last ten years. He annually appraises over 1,000,000 acres of timberland in Oregon, Washington, and California and is currently a Certified General Appraiser in the States of Oregon, Washington and California and has successfully completed all the educational requirements for the MAI designation from the Appraisal Institute.

to the Noteholders under the MRC/Marathon Plan also exceeds the Debtors' questionable estimate of $426,183,000 of net proceeds available for distribution to Scopac's creditors in a liquidation. *See* Disclosure Statement, Exhibit E.[21]

92.     Based on the foregoing, as well as testimony that will be presented at the Confirmation Hearing, the MRC/Marathon Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

**J.     The MRC/Marathon Plan Provides for Payment in Full of All Allowed Priority Claims Pursuant to 11 U.S.C. § 1129(a)(9)[22]**

93.     Section 1129(a)(9) of the Bankruptcy Code provides that, unless the holder of a particular claim agrees to a different treatment of such claim:

(a)     holders of claims entitled to priority under section 507(a)(2) or (3) of the Bankruptcy Code must receive cash in the allowed amounts of such claims on the effective date of the plan;

(b)     holders of claims entitled to priority under section 507(a)(1), (4),(5), (6) or (7) of the Bankruptcy Code must receive cash in the allowed amounts of such claims on the effective date of the plan if they do not accept the plan or, if they accept the plan, deferred cash payment of a value as of the effective date of the plan, equal to the allowed amounts of such claims;

(c)     holders of tax claims entitled to priority under section 507(a)(8) of the Bankruptcy Code must receive on account of such claims regular installment payments in cash – (i) of a total value as of the effective date of the plan, equal to the allowed amount of such claim; (ii) over a period ending not later than five years after the date of the order for relief under section 301, 302, or 303; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b) of the Bankruptcy Code); and

---

[21]     The value of the Scopac Timber Notes and the Noteholders' collateral is discussed in more detail below, discussing the Holders of the Scopac Timber Note Claims' receipt of the indubitable equivalence of their Claims.

[22]     11 U.S.C. § 1129(a)(8) together with "cramdown" under 11 U.S.C. § 1129(b) are discussed below.

> (d) with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (c) above.

*See* 11 U.S.C. § 1129(a)(9).

94. Section 2.1 of the MRC/Marathon Plan provides for the payment of Allowed Administrative Expense Claims in accordance with section 1129(a)(9) of the Bankruptcy Code. Specifically, subject to the provisions of sections 330(a), 331, and 503(b) of the Bankruptcy Code, the MRC/Marathon Plan provides that each Holder of an Allowed Administrative Expense Claim shall receive the full amount thereof in cash, except to the extent that any Holder of an Allowed Administrative Expense Claim agrees to less favorable treatment thereof, as soon as practicable and after the later of (a) the Effective Date and (b) if such Claim is initially a Disputed Claim, when it becomes an Allowed Administrative Claim.

95. Section 2.4 of the MRC/Marathon Plan provides, in relevant part, that each Holder of an Allowed Priority Tax Claim (i.e., any Allowed Claim of a Governmental Unit of the kind specified in sections 502(1) and 507(a)(8) of the Bankruptcy Code)

> shall receive at the sole option of the Reorganized Entities, as applicable, as applicable, (a) on the Distribution Date, Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim, or (b) commencing on the Distribution Date and continuing over a period not exceeding five (5) years from and after the Petition Date, equal semi-annual Cash payments commencing on the first Semi-Annual Payment Date following the three-month anniversary of the Effective Date in an aggregate amount equal to the unpaid portion of such Allowed Priority Tax Claim, together with interest at the applicable rate under non-bankruptcy law, subject to the sole option of the Reorganized Entities, as applicable, to prepay the entire amount of the unpaid portion of Allowed Priority Tax Claim and in a manner not less favorable than the most favored nonpriority unsecured Claim provided for by the Plan.

MRC/Marathon Plan § 2.4.

96.     In addition, Section 3.21 of the MRC/Marathon Plan provides that each holder of

an Allowed Class 1 Other Priority Claim[23] (i.e., all claims entitled to priority under 11 U.S.C.

§ 507(a) other than Priority Tax Claims, Administrative Expense Claims, or Professional

Compensation Claims) shall receive:

> from the Reorganized Entities, in full satisfaction, release and
> discharge of and in exchange for such Claim, (i) payment of Cash
> in an amount equal to the unpaid portion of such Allowed Other
> Priority Claim, plus Post-petition Interest, or (ii) such other
> treatment that the Plan Proponents or the Reorganized Entities and
> such Holder shall have agreed upon in writing; provided, however,
> that such agreed-upon treatment shall not be more favorable than
> the treatment provided in subsection (i).

MRC/Marathon Plan § 3.21.

97.     The MRC/Marathon Plan thus satisfies the requirements of section 1129(a)(9) of

the Bankruptcy Code.

**K.      The MRC/Marathon Plan Has Been Accepted by at Least One Impaired Class That is Entitled to Vote as Required by 11 U.S.C. § 1129(a)(10)**

98.     Section 1129(a)(10) of the Bankruptcy Code requires that, if a class of claims is

impaired under a plan, at least one class of impaired claims that is not an insider must have voted

to accept the plan. *See In re Anderson Oaks (Phase I) Ltd. P'ship*, 77 B.R. 108, 111 (Bankr.

W.D. Tex. 1987) ("To achieve effective reorganization by way of a cramdown plan, there must

be at least one impaired class of creditors, not including insiders who vote for the plan."); *see

also In re Lakeside Global II, Ltd.*, 116 B.R. 499, 505-06 (Bankr. S.D. Tex. 1989) (emphasis

added) (citations omitted)  As shown in the Ballot Report, in respect of the Impaired Classes

entitled to vote on the MRC/Marathon Plan, Classes 3, 4, 5, 7 and 8, each of which is an

---

[23]     Sections 507(a)(1), (3) and (6) of the Bankruptcy Code are not applicable to these Cases as they relate to payment of domestic support obligations, involuntary bankruptcy cases and claims of persons engaged in the production or raising of grain and claims of United States' fisherman, respectively.

Impaired Class, voted to accept the MRC/Marathon Plan in sufficient number and amount. *See Ballot Report*, Ex. A. Accordingly, section 1129(a)(10) of the Bankruptcy Code is satisfied.

**L.      The MRC/Marathon Plan Is Feasible Under 11 U.S.C. § 1129(a)(11)**

99.      Section 1129(a)(11) of the Bankruptcy Code provides that a plan of reorganization may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).   This requirement encompasses two related but independent determinations:  (i) that the provisions of the plan can be consummated, and (ii) if consummated, the plan will enable the debtor to emerge from bankruptcy as a viable entity. *See In re Lakeside Global II, Ltd.*, 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989) ("[t]his definition [of feasibility] has been slightly broadened and contemplates whether [(i)] the debtor can realistically carry out its plan . . . and [(ii)] whether the plan offers a reasonable prospect of success and is workable") (citations omitted); *In re Rolling Green Country Club*, 26 B.R. 729, 734 (Bankr. D. Minn. 1982) ("[t]he court assumes that the word 'confirmation' in [§ 1129(a)(11)] contemplates as well as an execution or consummation of the plan, the real intendment of the subsection being to avoid confirmation of plans which even if consummated are fruitless as an instrument to reorganization").

100.      Courts generally have held that the first determination of the feasibility requirement contemplates "the probability of actual performance of the provisions of the plan." *In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985) *quoting In re Bergman*, 585 F.2d 1171, 1179 (2d Cir. 1978) (noting that "[t]he test [of feasibility] is whether the things which are to be done after confirmation can be done as a practical matter . . . "); *see also In re Seatco, Inc.*, 259 B.R. 279, 288 (Bankr. N.D. Tex. 2001) (noting that where the evidence shows that the debtor's

47

"financial projections are reasonable, take current market conditions into account, and that the Debtor will be able to perform the Plan in accordance with its terms," the plan meets feasibility requirements); *Leslie Fay*, 207 B.R. at 788-89 (for a plan to be feasible, it does not have to guarantee success, but only present a workable scheme of organization and operation from which there may be a reasonable expectation of success); *In re IPC Atlanta Ltd. P'ship.*, 142 B.R. 547, 560 (Bankr. N.D. Ga. 1992) ("[t]he Court will look to see whether the Debtor can realistically carry out the provisions of the plan, and whether the plan offers a reasonable prospect of success") (citations omitted.); *In re Orlando Investors L.P.*, 103 B.R. 593, 600 (Bankr. E.D. Pa. 1989) ("[f]easibility does not require that substantial consummation of the plan be guaranteed; rather, the plan proponent must demonstrate that there be a reasonable assurance of compliance with plan terms"); *In re Briscoe Enterprises*, 994 F.2d at 1165-66 (noting that a debtor's plan does not have to be a guarantee of success but only provide a reasonable assurance of commercial viability).

101.    The second determination – that the reorganized company, after consummation of the plan, is likely to reorganize as a successful, viable entity – does not require that success be guaranteed. *See* 7 Collier On Bankruptcy § 1129.03[11], *supra*, at 1129-64. Rather, the focus is on whether "the plan presents a workable scheme of organization and operation from which there may be a reasonable expectation of success." *In re Drexel Burnham Lambert Group*, 138 B.R. at 762, *quoting* 5 Collier On Bankruptcy § 1129.02[11] at 1129-54 (15th ed. 1991); *see also Kane v. Johns-Manville*, 843 F.2d 636, 649 (2d Cir. 1988)(noting that "[t]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *In re Mayer Pollock Steel Corp.*, 174 B.R. 414, 421 (Bankr. E.D. Pa. 1994) ("[w]e note that, except for [two cases], we have never relied on § 1129(a)(11) as a basis to deny confirmation of a

debtor's plan"); *In re Texaco Inc.*, 84 B.R. at 910 ("[a]ll that is required is that there be reasonable assurance of commercial viability").

102.    The feasibility requirement is not designed to prevent confirmation of a plan that offers a reasonable likelihood of success.  "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *Pizza of Hawaii, Inc. v. Shakey's Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (citations omitted.); *see also In re Drexel*, 138 B.R. at 762 ("[j]ust as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility.  The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required.").

103.    As set forth in the Disclosure Statement and the MRC/Marathon Plan and as will be demonstrated by testimony at the Confirmation Hearing, the Reorganized Entities and the Litigation Trust will have sufficient funds to make all of the cash payments required under the MRC/Marathon Plan.  MRC and Marathon are poised to contribute $225 million of cash and Marathon is prepared to convert $135 million of senior secured pre-petition and post-petition debt into equity.  Further, there is no financing or due diligence contingency under the MRC/Marathon Plan, the debt obligations of the Debtors will be reduced by approximately $625 million, and Newco will have the benefit of an experienced management team with a proven track record of success in the redwood forest and lumber business.  Consequently, unlike any of the other proposed plans, the MRC/Marathon Plan is feasible because no further reorganization or liquidation will be necessary.  The MRC/Marathon Plan thus satisfies section 1129(a)(11) of the Bankruptcy Code.

**M.  The MRC/Marathon Plan Provides for Full Payment of Statutory Fees Under 11 U.S.C. § 1129(a)(12)**

104.  Section 1129(a)(12) of the Bankruptcy Code requires that certain fees listed in 28 U.S.C. § 1930 be determined by the court at the confirmation hearing and be paid on the effective date of the plan.  Such fees incurred through confirmation of the MRC/Marathon Plan either have been paid by the Debtors during the pendency of these Cases and/or will be paid on or before the Effective Date.  The MRC/Marathon Plan also provides that any such fees payable after the Effective Date will be paid by the Litigation Trustee in accordance with the Litigation Trust Agreement.  The Litigation Trust will have adequate means to pay all such fees.  *See* MRC/Marathon Plan § 13.5.  The MRC/Marathon Plan therefore satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**N.  The Requirements of 11 U.S.C. § 1129(a)(13) Have Been Met**

105.  Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits, as defined in section 1114 of the Bankruptcy Code, be continued after the effective date of a plan "for the duration of the period the debtor has obligated itself to provide such benefits."  Pursuant to Article VI of the MRC/Marathon Plan and the MRC/Marathon Plan Supplement, all benefit plans, including agreements and programs subject to section 1114 of the Bankruptcy Code, which are in effect on the Effective Date, will be treated as though they are executory contracts that are assumed under the MRC/Marathon Plan.  The Debtors' obligations under such agreements and programs will survive the Effective Date.  As set forth in Section 6.5 of the MRC/Marathon Plan, on the Effective Date, the Reorganized Entities shall be deemed to have assumed the Debtors' Pension Plan pursuant to section 365(a) of the Bankruptcy Code.  Further, the Reorganized Entities shall continue to satisfy the minimum funding standards pursuant to 26 U.S.C. §§ 412 and 430 (as applicable) and 29 U.S.C. § 1082, and administer the Debtors'

Pension Plan in accordance with its terms and the provisions of Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 - 1461 (2000 & Supp. V 2005).   No provision of the MRC/Marathon Plan, or section 1141 of the Bankruptcy Code is to be construed to, discharge, release or relieve the Debtors or the Debtors' successors, including the Reorganized Entities, or any other party, in any capacity from liability with respect to such pension plans under any law or regulatory provision concerning the Debtors' Pension Plan or the Pension Benefit Guaranty Corporation (the "PBGC").   Neither the PBGC nor the Debtors' Pension Plan will be enjoined from enforcing such liability as a result of the provisions of the MRC/Marathon Plan.   In fact, the PBGC has objected to all of the Competing Plans, but not to the MRC/Marathon Plan.   See Consolidated Objections of Creditor Pension Benefit Guaranty Corporation to Confirmation of Certain Proposed Plans of Reorganization [Docket No. 2536]. Accordingly, the MRC/Marathon Plan complies with section 1129(a)(13) of the Bankruptcy Code.

**O.**     **The Requirements of 11 U.S.C. § 1129(a)(14) through (16) are Inapplicable**

106.     Section 1129(a)(14) of the Bankruptcy Code requires a debtor to be current on all post-petition domestic support obligations; section 1129(a)(15) of the Bankruptcy Code is applicable to individuals only; and section 1129(a)(16) of the Bankruptcy Code requires that all transfers of property by nonprofit corporations under a plan be made in accordance with nonbankruptcy law.  None of these sections apply in these Cases.  The Debtors owe no domestic support obligations, are not individuals, and are not nonprofit corporations.

**P.**     **The MRC/Marathon Plan Satisfies the Requirements for Confirmation Over the Objection of Non-Consenting Classes ("Cramdown") Under 11 U.S.C § 1129(b)**

107.     Section 1129(b) of the Bankruptcy Code provides for the confirmation of a plan over the objection of non-consenting classes if all the subsections of section 1129(a) of the

Bankruptcy Code are satisfied except for subsection 1129(a)(8) (i.e., each class has accepted the plan). Therefore, unless each class accepts, section 1129(b) of the Bankruptcy Code requires, in essence, that the plan not discriminate unfairly and that it accord "fair and equitable" treatment to each dissenting impaired class. As demonstrated above, all subsections of section 1129(a) of the Bankruptcy Code except subsection (8) have been satisfied.

108.    Classes 6 and 9, therefore, did not vote to accept the MRC/Marathon Plan and are Impaired Classes. MRC and Marathon must, therefore, demonstrate that the MRC/Marathon Plan does not discriminate unfairly and provides "fair and equitable" treatment to those Classes. Class 6 provides for the payment to Holders of Allowed Scopac Timber Note Claims. Class 9 provides for the payment to holders of Scopac General Unsecured Claims and is dominated by the unsecured deficiency claims of the Noteholders. Thus, there is only one body of creditors – the Noteholders – subject to cramdown under the MRC/Marathon Plan.

109.    Unfair Discrimination. "Unfair discrimination is best viewed as a horizontal limit on non-consensual confirmation . . . Just as the fair and equitable requirement regulates priority among classes of creditors having higher and lower priorities, creating inter-priority fairness, so the unfair discrimination provision promotes intra-priority fairness, assuring equitable treatment among creditors who have the same level or priority." *In re Sentry Operating Co. of Tex. Inc.*, 264 B.R. 850, 863 (Bankr. S.D. Tex. 2001) (citation omitted). Discrimination is permissible, but unfair discrimination is not. *Id.*

110.    In determining whether discrimination is unfair, the following factors should be considered:

> (a)    the existence of a dissenting class and the existence of another class of the same priority; and

52

     (b)    plan treatment of the two classes in a way that results in a materially lower percentage recovery for the dissenting class or allocates materially greater risk to that class.

See *In re Greate Hotel & Casino Inc.*, 251 B.R. 213, 228 (Bankr. D.N.J. 2000); *In re Sentry Operating Co. of Tex. Inc.*, 264 B.R. at 863-64.

111.    The plan proponent may demonstrate that any discriminatory treatment is not unfair within the meaning of section 1129(b)(1) of the Bankruptcy Code by showing that the discriminatory treatment has a reasonable basis, is necessary for the plan, is proposed in good faith, and the discrimination is reasonable within that context. *See Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'Ship)*, 115 F.3d 650, 656 (9th Cir. 1997); *In re Genesis Health Ventures Inc.*, 266 B.R. 591, 611 (Bankr. D. Del. 2001); *In re Aztec Co.*, 107 B.R. 585, 590 (Bankr. M.D. Tenn. 1989); *In re Rochem Ltd.*, 58 B.R. 641, 643 (Bankr. D.N.J. 1985); *In re Buttonwood Partners Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990).

112.    The MRC/Marathon Plan does not discriminate against the Holders of Class 6 Claims as there is no other class of the same priority with the same collateral. As detailed above, the MRC/Marathon Plan has been proposed in good faith because it seeks to reorganize the Debtors and presents a strong likelihood of success. *See In re Briscoe*, 994 F.2d at 1167 ('[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement . . . is satisfied."). The proposed treatment is also necessary for the MRC/Marathon Plan because the MRC/Marathon Plan contemplates a continued enterprise (i.e., the timber must remain with the enterprise). As such, the MRC/Marathon Plan thus does not discriminate against the Holders of the Class 6 Claims as Holders of Class 6 Claims.

113.    The MRC/Marathon Plan also does not discriminate against Holders of Scopac's Class 9 General Unsecured Claims. The Holders of those Claims will receive a share in

Litigation Trust recoveries on par with other Holders of General Unsecured Claims. As discussed above, the proposed classification structure is necessary to ensure that Scopac Trade Creditors area put on par with Palco Trade Creditors because of their unique interests in the MRC/Marathon Plan and because of Newco's paramount interest in continuing to transact business with those creditors. The MRC/Marathon Plan is narrowly tailored as it provides for a small amount of funds to supplement to the Scopac Trade Creditors' recovery while also allowing Holders of Scopac General Unsecured Claims to share *pro rata* in the Litigation Trust recoveries. This is a reasonable solution that allows the holders of Scopac General Unsecured Claims to recover on par with similarly situated creditors (i.e., the Scopac Trade Creditors) after accounting for the paramount importance of trade creditors who have a continuing interest in the viability of the Reorganized Entities.

114.   <u>Fair and Equitable</u>.   The MRC/Marathon Plan provides fair and equitable treatment of Holders of Class 6 Claims (Scopac Timber Note Secured Claims). The Fifth Circuit has stated that when considering whether a plan is fair and equitable, should "consider the entire plan in the context of rights to creditors under state law and the particular facts and circumstances." *In re D&F Constr., Inc.*, 865 F.2d 673, 675 (5th Cir. 1989) (finding negative amortization and virtually no repayment of principal rendered plan not fair and equitable, but noting some negative amortization may be permissible). Here, the MRC/Marathon Plan provides that Holders of Scopac Timber Note Secured Claims will receive their pro rata share of a $175 million upfront cash payment and subsequent payments under the New Timber Notes with an aggregate original principal amount of $325 million. These New Timber Notes will be secured by the same collateral (the Timberlands) securing the existing Scopac Timber Notes. *See* MRC/Marathon Plan § 4.6.2. The testimony that will be presented at the Confirmation Hearing

will demonstrate that the New Timber Notes represent a reasonable structure for a number of reasons, including that (i) the proposed interest rate is in line with the appropriate risk factor; (ii) the proposed term does not exceed the life of the collateral; and (iii) the present value of the New Timber Notes, if discounted by a reasonable factor, is between $266 and $326 million.  When combined with the up front cash of $175 million, the Noteholders will receive a total of $441 – $501 million on account of their secured claim,.  This exceeds the $430 million value of the Timberlands securing such claims.  Further, testimony that will be presented at the Confirmation Hearing will demonstrate that the $225 million cash infusion by MRC and Marathon will allow for a reasonable debt load (i.e., $325 million rather than $500 million in New Timber Notes), which will provide greater security to Holders of Scopac Timber Note Secured Claims and also provide the best opportunity for Newco to succeed financially.

115.    In determining whether the MRC/Marathon Plan provides fair and equitable treatment, the Court should also consider the requirements of section 1129(b)(2) of the Bankruptcy Code.  Under that section, a plan is fair and equitable with respect to a secured class if it provides either

> (i)(I) that the holders of such claims retain the liens securing such claims . . . to the extent of the allowed amount of such claims; and
>
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; . . . or
>
> (iii) for the realization of the holders of the indubitable equivalent of such claims."

11 U.S.C. § 1129(b)(2)(A)(i) and (iii).

116.   <u>Section 1129(b)(2)(A)(i)</u>   The MRC/Marathon Plan meets the fair and equitable standard set forth under Section 1129(b)(2)(A)(i) of the Bankruptcy Code for the following reasons:

- First, the New Timber Notes will "be secured in the *same collateral* as the Scopac Timber Notes." MRC/Marathon Plan § 4.6.2.1(b)(ix) (emphasis added).

- Second, the MRC/Marathon Plan provides for an initial $175 million cash payment and further cash payments under the New Timber Note. MRC/Marathon Plan § 4.6.2.1(a).[24] The $175 million cash payment and the total aggregate cash payments under the New Timber Notes over the full term of the New Timber Notes will exceed $2 billion. This is well in excess of the balance of all Claims due under the Scopac Timber Notes, secured or otherwise. *See* Disclosure Statement §§ 1.5(b) (stating $713.8 in principal was outstanding on the Timber Notes as of the Petition Date) and 6.2(b) (stating Class 6 has estimated Claims of $800 million).

- Finally, the cash payment and the deferred cash payments under the New Timber Notes exceed the present value of the collateral. The present value of the payment stream need only exceed the present value of the collateral and not the present value of the total Claims asserted by the Noteholders. *See In re Arnold*, 806 F.2d 937, 940 (9th Cir. 1986) (upholding a plan that paid secured creditor $280,000, the present appraised value of the collateral, where total debt was $320,000).

117.   As set forth in the LaMont Valuation Report, the fair market value of the Timberland's is $430 million. Mr. LaMont is an expert timber appraiser who did a thorough analysis of the Timberlands, accounting for the current downturn in the housing market as well as the significant regulatory constraints imposed on the Timberlands that impact its value. Mr. LaMont's testimony at the Confirmation Hearing will clearly demonstrate the reliability of his conclusion that the current fair market value of the Timberlands is $430 million.

118.   By contrast, the Indenture Trustee's valuations do not hold up to scrutiny. As discussed above, Houlihan initially prepared a valuation of Scopac in September 2007 estimating a value between $290 million to $500 million. *See* Houlihan September 2007 Declaration. One

---

[24]      Under the MRC/Marathon Plan, a "Scopac Timber Note Claim" had the option to make an election under section 1111(b)(1)(A)(i) of the Bankruptcy Code. The Holders of Class 6 Claims did not make such an election.

month later, Houlihan cited UBS's conclusion that the Timberlands "could not support more than $300 million in debt." *See* Declaration of Christopher Di Mauro dated October 19, 2007 [Docket No. 1812]. Magically, as the competing plan process progressed, Houlihan revised the Scopac value range upwards to $575 million to $670 million, despite significant decline in the Debtors' business. *See* Houlihan 2008 Scopac Valuation. The Indenture Trustee's valuation is also highly suspect as Scopac has not been able to service its present debt despite the existence of a Master Log Purchase Agreement that requires Palco to purchase logs at well above market rates. *See* Clark Deposition at 117 ("hauling SBE price for Redwood is 954 a thousand. Market price is . . somewhere around 650 to 700 delivered").

119.   The Indenture Trustee's other valuation, the Appraisal Report of J.E. Fleming & Associates dated October 12, 2007 (the "Fleming Report"), also has many deficiencies. Most significantly, Mr. Fleming's appraisal is as of October 1, 2007, and he has made no effort to update his analysis. It is undisputed in the six months since his appraisal log prices, the most significant driver of Timberland valuation, have declined precipitously – approximately 20%. The testimony at the Confirmation Hearing will demonstrate that adjusting for the current prices alone would reduce Mr. Fleming's valuation by over $150 million. Further, Mr. Fleming uses a discount rate that fails to adequately take into account of the regulatory uncertainty associated with harvesting timber in Northern California and the current regulations including the Habitat Conservation Plan to which the Timberlands are subject. Correcting this major flaw would further reduce Mr. Fleming's valuation by approximately $75 million. In addition, Mr. Fleming failed to use any model to test the viability of his projected harvest levels. He simply has no basis for his assumptions that the species he projects to be harvested can be harvested as a

practical matter. These, and other flaws, in Mr. Fleming's analysis will be detailed as part of the testimony at the Confirmation Hearing.

120.    The Indenture Trustee and the Debtors assert that the New Timber Notes must be highly discounted. The analysis in the Houlihan 2008 Scopac Valuation, and the Blackstone Securities Valuation[25], however, is remarkably deficient. Houlihan and Blackstone (i) do not use proper comparable pricing; (ii) improperly increase the risk profile of the New Timber Notes; and (iii) ignore the significance of the collateral provided with respect to the New Timber Notes under the MRC/Marathon Plan, and the fact that they will have a first priority lien on such collateral.

121.    Neither the Houlihan 2008 Scopac Valuation nor the Blackstone Securities Valuation use proper comparable pricing. For example, Houlihan 2008 Scopac Valuation cites recent financings in the transportation, oil and gas, retail and supermarket, general manufacturing and automotive industries as comparable transactions, none of which are specific to the timber/lumber market. *See* Houlihan 2008 Scopac Valuation at 14. Similarly, four of the five companies listed by Mr. Zelin in his comparable company debenture analysis are not companies comparable to Newco, thereby understating his valuation of the New Timber Notes. *See* Zelin Securities Valuation at 3. The evidence at the Confirmation Hearing will demonstrate that using the cost of long term debt for timber-related companies more similar in nature to Newco results in a significantly lower cost of debt and consequently a higher valuation of the New Timber Notes.

---

[25]    The Affidavit of Steven M. Zelin of Blackstone Advisory Services, L.P. Regarding (A) The Impact of Credit Bidding Under the Plan of Reorganization Proposed by the Bank of New York Trust Company, N.A., Indenture Trustee for the Timber Notes (the "Noteholder Plan") and (B) The Market Value of the New Timber Notes Offered Under the Plan Proposed by Mendocino Redwood Company, LLC and Marathon Structured Finance Fund L.P. (the "MRC/Marathon Plan"), executed on March 14, 2008, shall be referred to herein as the "Blackstone Securities Valuation."

122.    With respect to the risk profile, Houlihan's analysis improperly increases the risk profile as it ignores the significant cash infusions from MRC and Marathon, the expertise of MRC's management and the significantly reduced debt obligations under the MRC/Marathon Plan. Further, the analysis does not take into account the fact that the principal amount of the New Timber Notes is less than half of the amount of the Scopac Timber Notes, which are greatly undersecured. This is improper. *See In re Mirant*, 334 B.R. 800, 822 (Bankr. N.D.Tex. 2005) ("As noted in *Till*, the advantages of bankruptcy, such as the requirement of a court determination of feasibility, the benefits of court supervision, disclosure requirements and limits on debt are not given sufficient recognition by the market.").

123.    With respect to the significance of the collateral, the New Timber Notes will be more than adequately secured by a first lien on collateral estimated to worth more than $100 million more than the principal amount due on the New Timber Notes.

124.    The New Timber Notes are also reasonable. The proposed term does not exceed the useful life of the collateral. The proposed interest of 5.5% per annum is appropriate considering the discount factor that should be applied in these cases. Until recently, some courts employed a market rate to determine the proper discount factor. *See In re Lambert*, 194 F.3d 679, 681 (5th Cir. 1999) (discount rate is rate of interest which could be earned on a new loan in the region with the same terms as those provided for under the plan with respect to a secured creditor). Other courts employed a formula approach and added an appropriate risk factor to a base rate, such as the prime rate. *See, e.g., In re Fowler*, 903 F.2d 694, 697 (9th Cir. 1990). In 2004, however, the Supreme Court adopted the formula approach in a chapter 13 case starting with the prime rate and adding a risk factor, which it noted was usually in the range of 1% to 3%. *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004). The Bankruptcy Court for the Northern District

of Texas has stated that the *Till* decision provides instruction with respect to establishing an appropriate risk factor in a chapter 11 case. *See In re Mirant Corp.*, 334 B.R. at 820-21 "[b]ecause Till instructs what return a secured creditor is entitled to for cram down purposes, Till effectively determines what cash flow is necessary to satisfy that creditor. . . What the market would pay to purchase a debtor's loan from creditors is not the proper measure of whether a given plan treatment meets the requirements for cram down. Rather, value of what is offered to satisfy a claim for cram down purposes is determined through the bankruptcy court's objective inquiry."). Testimony at the Confirmation Hearing will demonstrate compliance with these guidelines.

125. <u>Section 1129(b)(2)(A)(iii)</u>. The MRC/Marathon Plan also meets the fair and equitable standard set forth under section 1129(b)(2)(A)(iii) of the Bankruptcy Code (i.e., provides the indubitable equivalent of the Class 6 Claims). With respect to indubitable equivalence, if a plan "proposes to satisfy an allowed secured claim with anything other than the secured creditor's collateral, a court must examine (1) whether the substituted security is completely compensatory and (2) the likelihood that the secured creditor will be paid." *In re San Felipe Voss, Ltd.*, 115 B.R. 526, 529 (S.D. Tex. 1990) (citations omitted). The Bankruptcy Code does not require a cash payment. In fact, "several courts have held that the indubitable equivalence standards contemplates non-monetary satisfaction of claims." *Id.* at 529.

126. The present value of the collateral also must be determined under section 1129(b)(2)(A)(iii) of the Bankruptcy Code. *See Assocs. Comm. Corp. v. Rash*, 520 U.S. 953 (1997). As discussed above, the present value of the Timberlands is $430 million.

127. This value is significant for two reasons. First, based upon the present value of the collateral, Holders of Class 6 Claims are likely to be fully compensated for the secured

portion of their Claims. The MRC/Marathon Plan provides that the Indenture Trustee will receive a $175 million cash payment plus the New Timber Notes. The total consideration thus aggregates $500 million. As detailed above, even if the New Timber Notes are discounted in a reasonable manner, this exceeds the full value of the $430 million in collateral securing the Scopac Timber Note Secured Claims.

128.    Second, the collateral securing the New Timber Notes is the same collateral currently securing the Scopac Timber Notes. Thus, the $325 million in New Timber Notes will be secured by the Timberlands and there will be a significant cushion. The cushion is critical with respect to establishing indubitable equivalence. For example, in *In re Sun Country Development*, 764 F.2d 406 (5th Cir. 1985), a secured creditor had a lien on 200 acres of land. The plan substituted the secured creditor's lien with a lien on 21 secured notes secured by collateral that was valued at $287,500, an amount greatly exceeding the secured creditor's claim. *Id.* at 409. The notes, however, exceeded the debt of $153,777.06 by just $200. *Id.* The bankruptcy court found that the present value of the notes exceeded the amount owed to the secured creditor and confirmed the plan. The secured creditor appealed and its arguments on appeal included the following: (a) the present value of the notes barely exceeded the secured debt, (b) the present value calculation was also incorrect as it failed to account for potential defaults by obligors on the notes and their history of failing to keep their payments current, (c) the value placed on the lots securing the notes was too high, and (d) the lender would incur greater expense (i.e., 21 foreclosure actions) in the event of a default. The Fifth Circuit affirmed in large part because, even if the debtors defaulted on the notes, "the value of the land securing the notes . . . appears sufficient to cover the additional expense of foreclosing . . ." *Id.* The

61

MRC/Marathon Plan thus provides the Holders of Scopac Timber Note Claims the indubitable equivalent of their Claims.

129.     Similarly, in *In re San Felipe*, the District Court for the Southern District of Texas found that a package of cash, stock and guaranties constitute the indubitable equivalent of a secured claim created through a lien on real property. In re *San Felipe*, 115 B.R. at 528-29. While the *San Felipe* case pertained to issuance of equity rather than the secured debt, the case provides important guidance. The court found that "a bankruptcy court can guard against any potential instability in the value or in the securities market generally through the use of a margin between the value of the securities and the secured creditor's allowed claim." *Id.* at 530. The bankruptcy court found a 32.8 percent margin was sufficient and the district court found that a 21 percent margin was sufficient with respect to the value of equity given to a secured creditor in exchange for its claim. *Id.* at 531. This provides further support for the proposition that the value of the new collateral securing a creditors claim is key, particularly in the present case where the $430 million in collateral provides more than a 30% cushion over the $325 million in New Timber Notes.

130.     <u>Fair and Equitable Treatment of Class 9 Claims</u>. The MRC/Marathon Plan is also fair and equitable with respect to the Holders of Scopac General Unsecured Claims, which is overwhelmingly dominated by the Noteholders' unsecured deficiency claims. A plan is fair and equitable with respect to an unsecured class if "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . ." 11 U.S.C. § 1129(b)(2)(B)(ii). Under the MRC/Marathon Plan, no junior claim or interest holder will receive or retain any property until the holders of Scopac General Unsecured Claims are paid in full with interest.

131.    The MRC/Marathon Plan thus accords fair and equitable treatment to the Holders of Class 9 Claims because the absolute priority rule is satisfied.  The treatment of Class 9 satisfies the requirements of section 1129(b)(2)(B)(ii) of the Bankruptcy Code.

## VI.

## THE COMPETING PLANS SHOULD NOT BE CONFIRMED

132.    The Court is faced with the task of approving a plan that meets the requirements for confirmation under the Bankruptcy Code and, if more than one plan meets those requirements, determine which plan is in the best interests of the Debtors and their creditors, considering the preferences of creditors.  *See* 11 U.S.C. § 1129(b)(2)(C).  Regardless of whether any other plan is confirmable (which MRC and Marathon believe is not the case), the MRC/Marathon Plan should be regarded as the best option.  The MRC/Marathon Plan is the only plan that maximizes value and the Debtors' prospects for success by infusing $225 million in cash, converting $135 million of secured debt into equity, and replacing current management with an experienced team.  Only the MRC/Marathon Plan proposes to abide by the current environmental restrictions on the timberlands and to seek Forest Stewardship Council Certification of the Timberlands.  Further, setting aside the Debtors' unconfirmable plans, the MRC/Marathon Plan is the only plan that provides for continued sawmill operations at the Mill. For those reasons and others, the MRC/Marathon Plan is the only plan that has far reaching support, including support from political leaders, the press, the local community, and unsecured trade creditors.  The Debtors' general unsecured creditors (Noteholders aside), overwhelmingly indicated that they preferred the MRC/Marathon Plan over the Competing Plans.  *See* Ballot Report, Exhibit E.  The MRC/Marathon Plan thus remains the superior option regardless of whether the Court finds that any other proposed plan is confirmable.

## A.     **The Debtors' Plan**

133.    As stated above, Debtors' counsel has admitted before the Court and in the Disclosure Statement, that the Debtors Plan cannot be confirmed without, among others, Marathon's consent.  *See* Disclosure Statement § 8.3.  Further, the Indenture Trustee has stated that it too will not consent to the Debtors Plan.  *See* Disclosure Statement, Exhibit B-2.  Thus, the Debtors Plan is not confirmable as a matter of law and is, proverbially, "dead on arrival."

134.    For the sake of clarity, however, the Debtors' Plan is not confirmable as a matter of law for a number of other reasons, including, without limitation the following:

(a)    ***The DIP Loan Will Not Be Repaid In Full In Cash On The Effective Date*** - Rather than paying the DIP Loan in full in cash on the Effective Date as required by the DIP Order (DIP Order, Ex. A § 14(b)) and the Bankruptcy Code (sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code), the Debtors Plan proposes to give Marathon equity in satisfaction of the DIP Loan (*See* Disclosure Statement § 8.2(b));

(b)    ***The Debtors' Seek To Improperly Cram Down The Term Loan Claim In A Manner Prohibited By Court Order*** - The Debtors Plan proposes to satisfy Marathon's Palco Term Loan Claim through a distribution of equity and assets, which is unacceptable to Marathon.  Under the express terms of the DIP Order, Marathon's Palco Term Loan Claim may not be crammed down in this manner. *See* DIP Order, Ex. A §15(d);

(c)    ***The Court Should Not Confirm A Plan That Has Contingent Exit Financing*** - There is not a reasonable likelihood that the Debtors Plan will obtain exit financing.  Despite significant efforts the Debtors' have failed to show that exit financing is in place to fund the Debtors Plan.  The Debtors Plan contemplates that Reorganized Palco and Reorganized Scopac will obtain exit financing totaling $90 million.  The anticipated Palco Exit Facility will be a $40 million revolver secured by the Mill and the anticipated Scopac Exit Facility will be a $50 million revolver secured by a lien on all of Scopac's assets.  *See* Section 8.18 of the Disclosure Statement ("The Debtors and the MAXXAM Entities, along with the Debtors' Financial Advisors and Greenfield, are working diligently to obtain exit financing."); and

(d)     **The Debtors Plan May Not Be Confirmed Because It Is Based Upon Unsubstantiated Assumptions** - The Debtors' assumptions with respect to the Preserve Project are nothing more than highly speculative and unsubstantiated guesses with respect to future real estate values based upon currently unpermitted residential use. The project, at best, will take years to accomplish. It is also undisputed that (a) the land is subject to numerous restrictive regulations, (b) the Debtors have not obtained any necessary permits, and (c) there are no indications of a single, viable offer to purchase any portion of the subject property as residential real estate.

**B.     The Palco Alternative Plan**

### 1.   The Palco Alternative Plan May Not Be Confirmed Because It Lacks A Consenting Impaired Class

135.    The Palco Alternative Plan lacks a consenting impaired class necessary to permit confirmation. The non-insider Impaired Classes under the Palco Alternative Plan, Classes 3, 4, and 8, have unanimously voted to reject the Palco Alternative Plan. No parties in Class 6 submitted a vote. Further, Class 5 (Palco Inter-Debtor Claims), Class 6 (Scopac Claims), and Class 7 (Palco Non-Debtor Claims) are composed of claims of "insiders" and their votes may not be included in determining whether at least one class of impaired claims has accepted the Palco Alternative Plan.

136.    "Section 1129(a)(10) requires that if a class of claims is impaired under the plan, at least one impaired class, *with the exception of insiders*, must accept the plan in order for the plan to be confirmable." *In re Lakeside*, 116 B.R. at 505-06 (emphasis added) (citations omitted). "To achieve effective reorganization by way of a cramdown plan, there must be at least one impaired class of creditors, not including insiders who vote for the plan." *See In re Anderson Oaks (Phase I) Ltd. P'ship*, 77 B.R. at 111; *see also In re Ingleside Assocs.*, 136 B.R. 955, 961 (Bankr. E.D. Pa. 1992) (plan could not be confirmed where only impaired class consisted of insiders); *In re Allegheny Int'l, Inc.* 118 B.R. 282, 297-99 (Bankr. W.D. Pa. 1990) (proponent of competing plan was "insider" and ineligible to vote for purposes of cramdown).

65

All "affiliates," including the Holders of the Palco Inter-Debtor Claims, the Scopac Claims and the Palco Non-Debtor Claims here, are "insiders" under the Bankruptcy Code. *See* 11 U.S.C. § 101(31) ("The term 'insider' includes . . . affiliate, or insider of an affiliate if such affiliate were the debtor"). All of the claimants either indirectly or directly own or control, or are indirectly or directly owned or controlled by, Scopac or one of the Palco debtors. *See* 11 U.S.C. § 101(2). This is an uncontroversial fact as the labeling of the claims themselves impliedly recognizes their status as affiliate claims. As insiders, the affirmative vote of these claimants may not be used for purposes of cramdown.

137. The Palco Alternative Plan thus can not be confirmed under the requirements of section 1129(a)(10) of the Bankruptcy Code.

## 2. *The Palco Alternative Plan Is Not Confirmable Because It Seeks To Cram Down Marathon's Palco Term Loan Claim In A Manner Prohibited By Court Order*

138. The Palco Alternative Plan is not confirmable because it also provides for cramdown of Marathon's Palco Term Loan Claim in a manner prohibited by the express terms of the DIP Order. The Palco Alternative Plan proposes to satisfy the Marathon Term Loan Claim through a transfer of equity and assets. Pursuant to the DIP Order, except for one circumstance not applicable here, the Debtors are prohibited from seeking any cramdown of the Term Loan under section 1129(b) of the Bankruptcy Code. *See* DIP Order, Ex. A §15(d). Marathon does not, and will not, consent to the treatment of the Term Loan Claim under the Palco Alternative Plan.

## 3. *The Palco Alternative Plan May Not Be Confirmed Because Its Proposed Exit Financing Is Speculative At Best*

139. Under the Palco Alternative Plan, the anticipated exit financing will be a $110 million revolver secured. As discussed above, the Debtors have failed to acquire any commitment for exit financing after months of effort. Creditors are entitled to know if an exit

facility is truly possible or whether it is illusory. A plan that is "contingent on exit financing" is not "sufficiently concrete as to be feasible." *See In re Made In Detroit, Inc.*, 299 B.R. 170 (Bankr. E.D. Mich. 2003), *aff'd*, 414 F.3d 576 (6th Cir. 2005) (denying confirmation of plan where there was no reasonable assurance that loan would ever close). The plan cannot be based upon "wishful thinking" and "visionary promises." *Id.* Based upon the Debtors' failure to secure financing, the Court must assume that there is no reasonable likelihood that the Palco Alternative Plan will be funded and deny confirmation of the Palco Alternative Plan.

## C.  **The Scopac Alternative Plan**

### *1.  The Scopac Alternative Plan Is Not Fair and Equitable With Respect to Unsecured Creditors*

140.   The Scopac Alternative Plan is not confirmable because holders of equity interests in Scopac, Palco and, indirectly, MAXXAM, are permitted to retain their Interests without being required to contribute even a peppercorn to the new enterprise. The Scopac Alternative Plan is based on the extreme position that the commercial Timberlands, standing alone, are worth more than the $800 million owed to the Noteholders. However, the evidence at the Confirmation Hearing will demonstrate that the value of the commercial Timberlands is in fact approximately $430 million. Accordingly, as unsecured creditors will not received payment in full on account of their claims, while equity is permitted to retain its Interests without contributing any value, the Scopac Alternative Plan violates the "absolute priority rule", is not fair and equitable and is not confirmable.

### *2.  The Scopac Alternative Plan Is Inferior To The MRC/Marathon Plan*

141.   General Unsecured Creditors voted overwhelmingly to **reject** the Scopac Alternative Plan. As set forth in the Ballot Report, Classes 3, 5, and 8 of the Scopac Alternative Plan, all but one of the non-insider impaired classes under the Scopac Alternative Plan voted to

reject the Scopac Alternative Plan. *See* Ballot Report, Exhibit E. In addition, the Scopac Alternative Plan has all the flaws of the Indenture Trustee Plan. In short, neither the Scopac Alternative Plan nor the Indenture Trustee Plan proposes any reorganization of Palco. Moreover, these competing plans would separate the commercial Timberlands from the Mill, thereby imperiling the town of Scotia and the Mill.

142. The only vote in favor of the Scopac Alternative Plan was Bank of America who would get the same treatment under the MRC/Marathon Plan, and who also voted in favor of the MRC/Marathon Plan. *See* Ballot Report, Exhibits A and E. The Scopac Alternative Plan is thus, at a minimum, a less desirable plan than the MRC/Marathon Plan which has the overwhelming support of trade creditors, political leaders, the community, and even George O'Brien, the current Chief Executive Officer of Palco and Scopac.

**D.     The Indenture Trustee Plan**

### 1.   *The Indenture Trustee Plan May Not Be Confirmed Because It Does Not Assume The Debtors' Pension Plan*

143. As raised by the PBGC, the Indenture Trustee Plan does not state its intentions with respect to the Debtors' Pension Plan. Instead, the Indenture Trustee blatantly ignores the fact that Scopac is a wholly-owned subsidiary of Palco and, as such, is a member of the same controlled group with respect to the Pension Plan and is jointly and severally responsible for the Pension Plan liabilities, including making premium payments and minimum funding contributions. Further, the Indenture Trustee Plan seeks to reject "all agreements between Scopac and the Palco Debtors related to pension liability." Indenture Trustee Plan § 6.4. This renders the Indenture Trustee Plan unconfirmable.

144. The Pension Plan qualifies as a "retiree benefit" under section 1114 of the Bankruptcy Code ("the term 'retiree benefits' means payments to any entity or person for the

purpose of providing or reimbursement payments for retired employees . . . for medical, surgical, or hospital care benefits, *or benefits in the event of sickness, accident, disability,* or death under any plan, fund or program maintained or *established in whole or in part by the debtor* prior to the filing a petition commencing a case under this title" (emphasis added).  As discussed above, section 1129(a)(13) of the Bankruptcy Code requires that any plan must provide "for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title . . . for the duration of the period the debtor has obligated itself to provide such benefits."

145.    The Indenture Trustee Plan does not so provide despite Scopac's being a member of the control group.  The Indenture Trustee Plan is thus not confirmable under the Bankruptcy Code.

## 2.    *The Indenture Trustee Plan Does Not Result In The Best And Highest Value For Creditors*

146.    The Indenture Trustee Plan assumes the best and highest value will be attained through a liquidation of Scopac's assets.  This is clearly not the case.  UBS's prior marketing efforts have already shown the extraordinary challenge in marketing the Debtors' assets.  Further, the Indenture Trustee's proposed auction process does not require a lead bidder.  In addition, the auction process does not set a price beyond which the Indenture Trustee will agree to refrain from placing a credit bid.  Thus, any potential bidders who are not willing to pay the full amount of the Scopac Timber Notes will be discouraged from coming forward.  The Indenture Trustee Plan has no provision for funding operations during the many months that are proposed to again market the Timberlands.   Given the current state of business, there is simply no assurance that the business will do anything but collapse while this process is ongoing.

147.    More importantly, the liquidation may also lead to severe adverse consequences with respect to the economic stability of the town of Scotia, employees and creditors of Scopac and the Palco Debtors, the residents of Scotia, and the environment.  Under the Indenture Trustee Plan, the Mill will be separated from the Timberlands.  As stated by Dr. Barrett, "a decoupling of timberlands from the Mill would ultimately be a very bad outcome for Scopac."  Barrett Deposition at 169.  In fact, decoupling the Mill from the Timberlands would be disastrous for just about all parties in interest.  The Mill could be required to cease operations, log prices would fall for Scopac based upon the lack of demand, employees would lose their jobs and pensions (as the Pension Plan would be rejected), the town of Scotia would ultimately fail, and there is no guarantee that the ultimate purchaser of the Timberlands would abide by any of the present environmental restrictions.

### 3.  *The Indenture Trustee Plan May Not Be Confirmed To The Extent It Requires Assumption Of The New Master Purchase Agreement*

148.    The Indenture Trustee Plan anticipates the assumption of the New Master Purchase Agreement between Scopac and Palco dated July 20, 1998 (as modified) that sets forth the terms of the sale of timber from Scopac to Palco and all existing Log Purchase Agreements entered into in the ordinary course of business in connection therewith.  *See* Indenture Trustee Plan § 7.2.1.1.  However, none of the plans for the Palco Debtors provide for assumption of that agreement.  The Indenture Trustee Plan is not confirmable to the extent the Palco Debtors reject the New Master Purchase Agreement, which rejection is likely to occur.

## CONCLUSION

WHEREFORE, Marathon and MRC respectfully requests that this Court confirm the MRC/Marathon Plan under section 1129(a) of the Bankruptcy Code, sustain the aforementioned objections to the Competing Plans, and grant MRC and Marathon such other and further relief as this Court deems just and proper.

Dated: April 4, 2008

**COUNSEL TO MENDOCINO REDWOOD COMPANY, LLC AND MARATHON STRUCTURED FINANCE FUND L.P.:**

| | |
|---|---|
| **HAYNES AND BOONE, LLP**<br><br>  /s/ John D. Penn<br>John D. Penn<br>Texas State Bar No. 15752300<br>Trey A. Monsour<br>Texas State Bar No. 14277200<br>201 Main Street, Suite 2200<br>Fort Worth, Texas 76102<br>Direct Telephone: (817) 347-6610<br>Direct Telecopy: (817) 348-2300<br><br>     -and-<br><br>**WINSTON & STRAWN LLP**<br><br>  /s/ David Neier<br>David Neier<br>Steven Schwartz<br>Carey D. Schreiber<br>Justin Rawlins<br>200 Park Avenue<br>New York, New York  10166-4193<br>Direct Telephone: (212) 294-5318<br>Telecopy: (212) 294-4700 | **PERKINS COIE LLP**<br><br>Kenneth M. Crane<br>Peter G. Lawrence<br>131 South Dearborn Street, Suite 1700<br>Chicago IL 60603-5559<br>Telephone: (312) 324-8400<br>Facsimile: (312) 324-9400<br><br>     -and-<br><br>**GOODWIN PROCTER LLP**<br><br>  /s/ Allan S. Brilliant<br>Allan S. Brilliant<br>Craig P. Druehl<br>599 Lexington Avenue<br>New York, NY 10022<br>Telephone: (212) 813-8800<br>Facsimile:  (212) 355-3333 |

# Exhibit A

# Mendocino/Marathon have the best plan

**Times-Standard**
**Eureka Times Standard**

Article Launched:03/30/2008 01:37:50 AM PDT

The Pacific Lumber bankruptcy case is a complicated one, with many stakeholders elbowing each other to get the nod from the federal bankruptcy judge in Texas.

This week, former California Gov. Pete Wilson weighed in to push a proposal by the creditors of Scotia Pacific, the Palco subsidiary now controlled by Maxxam Corp. Then there are three recovery plans offered by Palco itself, and a joint proposal by Mendocino Redwood Co. and Marathon Structured Finance Fund, the key Palco creditor.

There are a lot of ways to look at the decision faced by Judge Richard Schmidt. We prefer to examine the plans from the perspective of what's best for the community and the environment, and thus -- along with Palco's unsecured creditors -- we support Mendocino Redwood's proposal because:

* The company knows the redwood business, proposing to manage the timberlands in a sustainable way and keep the Scotia mill open as well. It has promised to meet the same strict standards for certification by the Forest Stewardship Council that it has in Mendocino.

* It plans to invest $7.5 million in improving the mill, and anticipates employing at least 250 workers -- jobs vitally needed in the Eel River Valley. Also, during the mill's refitting, local millworkers may have an opportunity to work at Mendocino Redwood's Ukiah mill.

* The company appears to have done its homework, much more so than the other plans on the table. Their long-term plans for forest management and short-term marketing strategy for the mill's lumber give us greater faith that this company will keep Pacific Lumber -- founded in 1863 -- a viable member of the community till its bicentennial and beyond.

That has not been the case since the hostile takeover of Palco by Charles Hurwitz's Maxxam in 1986. The company has gone from debt-free to bankrupt in 22 years -- years that have been filled with conflict and strife. Any judgment that gets Maxxam out of the picture will be a good one.

As for the noteholders, they look to get control of the timberlands, and the future is left uncertain. We have no confidence in their ability to manage Humboldt County's most precious natural assets, and in fact anticipate they would sell the land to third parties to be named later. And their plan doesn't address Palco itself -- the sawmill, the town of Scotia, the employees.

For the sale of our North Coast communities, we encourage Judge Schmidt to give his highest consideration to the Mendocino Redwood/Marathon plan.

# Exhibit B



## journal
OF POLITICS, PEOPLE AND ART

**ON THE COVER  |  NEWS & VIEWS  |  THE TOWN DANDY**
**OFF THE PAVEMENT  |  POEM  |  IN REVIEW**
**GARLICK'S NOTEBOOK  |  MOVIES**
**TABLE TALK  |  THE HUM  |  CALENDAR**

# March 27, 2008

in the



*the*

*dandy*

# The $85 Question

### by Hank Sims

**W**e got quite a few responses to our "Palco Bankruptcy Contest," in which readers were invited to lobby us and try to influence our vote in the Pacific Lumber bankruptcy case. If you recall, the North Coast Journal is a participant in the case; subsidiary Britt Lumber of Arcata — since shuttered — owed us $85 when the company finally went belly-up in January of last year. Small potatoes when set next to the billion-odd dollars of total debt carried on the books of Pacific Lumber and its various sister companies, but that $85 write-off gave us a small, squeaky voice in the outcome of the case and therefore the future of Humboldt County.

For that we are grateful. Money well spent, we believe.

The ballots are all in now, and the next real action begins on Tuesday, April 8. That's the start of the "confirmation hearing," the legal proceeding that marks the end of the bankruptcy case. At the close of confirmation, there's two possible outcomes, broadly speaking. Either one of the four post-bankruptcy reorganization plans currently on the table will be chosen (likely) or the whole case will be deemed hopeless and everything will start over again, the last year-and-a-quarter of bankruptcy having served no other purpose than to rapidly dig the company even further in debt. Obviously, no one wants to see that happen.

When we announced the contest two weeks ago, we stated our prejudice up front. We were inclined to support the plan sponsored by the Marathon Capital Group and the Mendocino Redwood Company. That plan would keep Pacific Lumber together as a company and scale way back on the often insane rate of cut that the Houston-based Maxxam Corp. has imposed on the people of Humboldt County and the state of California. It would stop the cutting of old-growth redwood and Douglas fir trees, and it would make the company eligible to be recognized by the Forest Stewardship Council, the industry leader in sustainable forestry certification. At the same time, it would keep the mill operational and ensure that the Pacific Lumber pensioners are taken care of.

As it happened, the great majority of readers backed us up on our initial decision. "It makes the most sense to me," wrote an education professional who wished to remain anonymous. "I think it is the best plan for the workers, the forests and the North Coast region."

**Shirley Shelburn** of Eureka, a veteran Palco watcher, cited Mendocino Redwoods' experience in turning around overcut Louisiana-Pacific lands in Mendocino County. "It looks like the only way to escape from Maxxam's stranglehold is to vote for the Marathon/Mendocino Redwoods plan," she wrote, "which fortunately does seem to be based on successful experience in bringing formerly abused timberlands up to Forest Stewardship Council standards in less than 10 years."

Fisheries biologist **Pat Higgins**, a member of the board of commissioners of the Humboldt Bay District, seconded Shelburn's vote, but, like Shelburn, he took a moment to wax wistful about an alternative outcome that neither of them thought likely. That is, both of them wished for some

way for the much talked-about coalition of environmentalists and high financiers led by the Nature Conservancy to get into the game. Though never completely fleshed out, various outlines of the plan seemed to promise everything that Mendo Redwoods is promising and more — permanent Nature Conservancy stewardship of the most ecologically valuable lands, local input into forestry planning, creative strategies for revenue generation. But the Nature Conservancy coalition's chances depend upon a risky (for locals) reorganization plan sponsored by the Wall Street-based owners of Pacific Lumber's "timber bonds," who want to put the timber land, which secures their notes, up for auction. At that point, the Nature Conservancy could bid, if it is indeed real. But so could any number of greedhead capitalists of the **Hurwitz** stripe. Who wins? (Dr. **Ken Miller**, a Maxxam foe, acknowledged this bleak scenario in a letter to the *Journal* advocating no plan in particular, but hoping for some level of community control.) Furthermore, the auction would sever ties between the land and the mill.

So although love for Mendocino Redwoods is far from universal — witness the letter from Karen Pickett of the Bay Area Coalition for Headwaters in our March 14 issue — most everyone seems to believe it's the best option on the table. Forest activist **Jeff Muskrat** thinks so. The Environmental Protection Information Center thinks so. The Greater Eureka Chamber of Commerce thinks so. And if the Eureka Chamber of Commerce and EPIC agree on something, than it's pretty fair to assume that that thing has widespread support.

To our knowledge, absolutely no one at all outside of Maxxam has voiced any support whatsoever for the plans promulgated by Pacific Lumber itself, each of the various permutations of which would depend on massive residential development in the hills outside Fortuna and sales of land to the government at extortionary prices. But Maxxam's last hope is that strife and disagreement amongst the company's creditors will lead to the judge "cramming down" their plan upon all the creditors, and against their objections.

So there we were, pen poised over ballot, ready to tick the box indicating our approval of the Mendocino Redwoods plan and no others. Then the computer dinged, indicating that we had mail. It was a letter from **Jesse Noell**, a resident of the Elk River neighborhood. Noell, we knew, lives downstream from Pacific Lumber land in that troubled watershed, and had long been active in the legal battle to stop the flooding of his and his

neighbors' lands. Noell's letter was titled "Vote NO on bankruptcy plans."

"Because none of the proposed plans will stop the threats to health, safety and property, the *NCJ* should vote against all of the plans," Noell wrote. "If you vote for any of the plans, please assume the financial responsibility for our damaged property in Elk River and establish a fund to cover the lost wages and motel bills of scores of people who are repeatedly trapped by the flood waters."

This letter, we admit, was sort of a buzzkill. It took all the fun out of the voting process. It seemed to threaten legal action against us. Furthermore, we weren't entirely certain it was logically flawed. Wasn't Noell asking us to assume the role of the state regulatory agencies who oversee timber harvesting operations, and who are theoretically tasked with preventing the damage he is talking about? When we gave a call to clarify this point, Noell told us not to hold our breath.

"The government has failed us," Noell said. He said that even though the water quality agencies have placed watershed-wide limits on logging and sedimentation in Elk River and elsewhere, he fully expected the bulk of Mendocino Redwoods' harvesting over the next few years to take place in his neighborhood — it held the most marketable trees, he said.

"By voting on these plans, you're voting on our future," he said. "Your vote can be much more powerful if you throw it away in order to raise an ethical and moral issue."

Well, consider the issue raised. But when we returned to our ballot we decided that this was not so different than any other election. We don't get to vote on the candidate or policies of our dreams. We get a list of boxes — a, b, c or d — and there's no point coloring outside the lines. As always, we were doomed to live in the world as it exists, rather than the world we might like it to be. So we pulled the lever for Mendocino Redwoods with just a tiny twinge of conscience.

TOP

**ON THE COVER** | **NEWS & VIEWS** | **THE TOWN DANDY**
**OFF THE PAVEMENT** | **POEM** | **IN REVIEW**
**GARLICK'S NOTEBOOK** | **MOVIES**
**TABLE TALK** | **THE HUM** | **CALENDAR**

Comments? Write a letter!



© Copyright 2008, North Coast Journal, Inc.

# Exhibit C

March 18, 2008

The Honorable Judge Richard Schmidt
United States Bankruptcy Court
Southern District of Texas
1133 North Shoreline Boulevard
Corpus Christi, Texas 78401-2042

Re: Chapter 11 Case No. 0-7-20027 through 07-20032
Debtors: Scotia Development, LLC
The Pacific Lumber Company
Britt Lumber Co., Inc.
Salmon Creek, LLC
Scotia Inn, Inc.,
Scotia Pacific Company, LLC

Dear Honorable Judge Schmidt:

This letter represents the interests of 25 families (hereafter Families) who own and manage over 400,000 acres of timberland in Humboldt and Mendocino Counties. By this letter these Families wish to express their support for the Mendocino Redwood Company (MRC)/Marathon plan to acquire the assets of The Pacific Lumber Company.

It is necessary for the group who succeeds in the action before your court to understand the business of growing and harvesting redwood timber, managing in accordance with Federal, State and local environmental policy, building community support and marketing unique forest products. MRC understands this approach, successfully operating 230,000 acres of Mendocino County timberlands, along with associated sawmill and distribution operations, which they purchased from Louisiana-Pacific Corporation in 1998. MRC is perfectly positioned to do the same in Humboldt County.

The MRC plan includes operating the sawmill located in Scotia, California, thereby ensuring hundreds of primary and secondary jobs are maintained. Other proposals intend to break up the assets and sell them independently thereby creating severe economic impacts that will be felt by the entire North Coast of California.

Preserving The Pacific Lumber Company business as an integrated enterprise is critical to the health and wellbeing of the local community and economy. Additionally, ensuring an ongoing, well-managed sawmill operation in Humboldt County is essential to our Families timber management business. MRCs plan provides an opportunity to bring stability and long term health to The Pacific Lumber Company and forestland owners throughout the redwood region.

-2-

The Families listed below have all agreed to support the MRC plan. In order to hasten delivery of this letter to the Court original signatures are not included here, but are available upon request.

Respectfully,

| | |
|---|---|
| Danny Walsh<br>Walsh Timber | C. Robert Barnum<br>Barnum Timber Company |
| John R. Braun | Rogan Coombs |
| Francis Carrington<br>Carrington Family Trust | Leslie P. Barnwell<br>Chalk Mountain Ranch |
| Graham Cotrell<br>Cotrell Ranch | Eureka Forest Products |
| John Rice<br>Fort Baker Ranch | Robert McKee |
| Mark and Dina J. Moore | Robert D. Prior |
| Wileeta Philbrick<br>Fernbridge Ranch | Gene Lucas<br>.Eaton Rough Ranch Partnership |
| H. James Holmes<br>Soper-Wheeler Company | Joe Russ<br>Russ Ranch & Timber |
| Steve Hackett<br>Agland Engineering, Inc. | Arthur M. Stover<br>Stover Ranch |
| Richard Dorn | George Brightman |
| Bill Branstetter | Chuck Wagner |
| Peggy Satterlee<br>Ft. Seward Ranch | William R. McBride |
| | Edith Fearrien<br>Fearrien Ranch |

Signed,

Danny Walsh
Walsh Timber

C. Robert Barnum
Barnum Timber Company

# Exhibit D

**MIKE THOMPSON**
1st District, California

**COMMITTEE ON WAYS AND MEANS**
Subcommittee on Health
Subcommittee on Select
Revenue Measures

**PERMANENT SELECT
COMMITTEE ON INTELLIGENCE**
Chairman, Subcommittee on Terrorism,
Human Intelligence, Analysis and
Counterintelligence
Subcommittee on Intelligence Community
Management



## CONGRESS OF THE UNITED STATES
HOUSE OF REPRESENTATIVES
WASHINGTON, DC 20515

District Offices:
1040 Main Street, Suite 101
Napa, CA 94559
(707) 226-9898

317 Third Street, Suite 1
Eureka, CA 95501
(707) 269-9595

Post Office Box 2208
Fort Bragg, CA 95437
(707) 962-0933

712 Main Street, Suite 101
Woodland, CA 95695
(530) 662-5272

Capitol Office:
231 Cannon House Office Building
Washington, DC 20515
(202) 225-3311

Web: http://mikethompson.house.gov

April 3, 2008

United States Bankruptcy Court
for the Southern District of Texas
Corpus Christi Division
Clerk of Court
1133 N Shoreline
Corpus Christi, TX 78401-2042

To the Clerk of Court:

Enclosed please find for filing a statement regarding the case of *In re Scotia Development LLC, et al.* (Case Nos. 07-20027 through 07-20032, Jointly Administered).

Sincerely,

**MIKE THOMPSON**
Member of Congress

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

In RE:

|  |  |  |
|---|---|---|
| SCOTIA DEVELOPMENT LLC, | ) | |
| THE PACIFIC LUMBER COMPANY, | ) | Chapter 11 |
| BRITT LUMBER CO., INC., | ) | Case Nos. 07-20027 through 07-20032 |
| SALMON CREEK LLC, | ) | (Jointly Administered) |
| SCOTIA INN, INC., AND | ) | |
| SCOTIA PACIFIC COMPANY LLC, | ) | |
|     DEBTORS | | |

## STATEMENT OF POSITION OF U.S. CONGRESSMAN MIKE THOMPSON

To the Court and All Plan Proponents:

For the past 17 years, I have represented Humboldt County as either a California State Senator or a member of the U.S. House of Representatives. I am writing to support the Mendocino Redwoods Company plan which is before the court.

There are several compelling reasons to support the MRC proposal: 1) MRC has put forth the most comprehensive plan that addresses both management of the timberlands and operations at the Scotia sawmill; 2) the creditors committee, made up of Humboldt County businesses, vendors and individuals, voted overwhelmingly in support of the MRC plan – of the 227 unsecured creditors, 222 voted in support; 3) the MCR plan does not rely upon additional expenditures of state and federal funds.

In addition, I understand the general consensus by attendees at a meeting called by California Resources Secretary Mike Chrisman in Sacramento two weeks ago supported the MRC plan. The attendees heard presentations by representatives of the three plans before the court. The state and federal regulators and other stakeholders, including a Humboldt County supervisor and my Eureka, CA district staff person, concluded the MRC proposal provided the best protection for the land and protected the greatest number of jobs – adhering most closely to the principals you outlined to the bankruptcy court in January.

Mendocino Redwoods Company is a proven and trusted California operator, with a good reputation in Mendocino and Humboldt Counties. They have portrayed exemplary forest practices on their existing properties, earning Forest Stewardship Council (FSC) certification on the lands that they manage in Mendocino County. They are industrial timberland owners, they operate a sawmill, and they know the business. Their plan provides a level of assurance the people of Humboldt County can rely upon, rather than decisions driven by the board rooms of New York or Houston.

Finally, there is further concern that if the case goes to auction, the mill will be forced to shut down during the 5-7 months it takes to complete the sale. The local job loss and loss of revenue would be very difficult to overcome for any future operator.

The citizens of California and the citizens of the United States have already expended considerable tax dollars on this property. The historic Headwaters Agreement of 1999 involved the expenditure of over $380 million in federal and state dollars to permanently protect the Headwaters Forest. It set aside important wildlife habitat vital for the protection of endangered species, and provided a framework for Pacific Lumber Company to continue harvesting their timberlands at sustainable levels as outlined in the Habitat Conservation Plan. The Mendocino Redwoods Company proposal would not use any additional state or federal dollars, and it has committed to carrying out the Habitat Conservation Plan, as outlined in the original 1999 Headwaters agreement, in its entirety.

Thank you for your time and consideration. If you have any questions or comments, please contact me anytime.

Sincerely,

**MIKE THOMPSON**
Member of Congress

# Exhibit E



BOARD OF SUPERVISORS

# COUNTY OF HUMBOLDT

825 5TH STREET

EUREKA, CALIFORNIA 95501-1153   PHONE (707) 476-2390   FAX (707) 445-7299

March 11, 2008

The Honorable Judge Richard Schmidt
United States Bankruptcy Court
Southern District of Texas
1133 North Shoreline Blvd.
Corpus Christi, Texas 78401-2042

Re:  Chapter 11 Case Nos. 07-20027 through 07-20032

Scotia Development, LLC
The Pacific Lumber Company
Britt Lumber Company, Inc.
Salmon Creek, LLC
Scotia Inn, Inc.
Scotia Pacific Company, LLC

Dear Honorable Judge Schmidt:

The Humboldt County Board of Supervisors respectfully submits this letter approved on March 11 for your consideration as you weigh the qualities of the various responses to the Pacific Lumber bankruptcy. We are pleased Governor Schwarzenegger, Senator Feinstein and Congressman Thompson have provided their input, much of which is similar to ours.

As we have written in the past about our concerns, we are confident you are cognizant of the importance Pacific Lumber Company's assets and its work force to our entire county. While the long PL history has been important to the welfare of our community, it has also been the focal point for many controversial topics of local and national fame. Our Board during the last 20+ years of Maxxam ownership has had many different hearings, agenda issues, and pointed public testimony covering the many sides of PL ownership practices. To say we and the residents of Humboldt County have a definite interest in the outcome of the bankruptcy proceedings would be an understatement.

The Board has not taken a position of one proposal over the other. We do, however, with this letter wish to indicate the principles we believe are important in considering each proposal. These principles reflect what we believe are the heart felt standards most county residents would believe are necessary in considering our economy and environment.

### Maintain the Pacific Lumber Company Forests in a single ownership as working commercial forestlands

The financial health of our communities are tied to permanent sustainable working forests that can have predictable outcomes over time. Large broad base landscapes provide the best opportunity for the success of this principle. Therefore, for being able to have a viable economic return for each of the economic factors, this is a very critical and important factor.

### Fulfill all commitments associated with the Habitat Conservation Plan that accompanied the Headwaters Agreement

The significant public investment in protecting certain old growth stand conditions, providing the ability for public access to appreciate these legacies, the efforts to create as nearly as possible conditions that protect endangered species have totaled in the millions of public dollars; are all of national worth and need to be secured in whatever plan is chosen.

### Maintain the skilled work force

In whichever proposal is chosen, the County cannot underscore enough how important the trained labor force is to both the operation of the company but to the community as a whole. The timber labor dollar earned is often one of the highest private sector wage rates in our county. Our local economy is critically dependent upon the values associated with good stewardship, values our local labor force hold dear.

### Acknowledge the standards of environmental stewardship with certification of quality practices

Again, in recognition of the significant public funds invested in PL, and the focus and scrutiny of environmental stewardship placed upon PL; it is clear a measurement of success in this model of private and public partnership investments would be through management practices that can stand the test of audit and adaptive management. Certification would then provide public awareness of this achievement and lend more hope and credibility for long term sustainability.

### Continue the operation of the Scotia Mill

The Scotia mill fills a critical role for the County as the foundation for the town of Scotia, an important provider of good jobs, as well as an important outlet for timber for small landowners. Valued added products are the obvious economic development outputs that reflect off of our natural forest offerings. The mill, therefore, is important to both the community and its members as well as to the company operation.

Thank you for considering our concerns in weighing the merits of each of the proposals. Humboldt County communities are very concerned about the future of PL and just as important for the future of the valuable assets and employment opportunities that will emanate from yours and others decision.  If you have any questions for us please do not hesitate to contact us.

Sincerely,

Jill Geist, Chair
Humboldt County Board of Supervisor

JG:kh

cc:      Governor Arnold Schwarzenegger
         Senator Diane Feinstein
         Congressman Mike Thompson
         President, Pacific Lumber Company
         Mendocino Redwood Company
         Marathon Structured Finance Fund
         The Bank of New York Trust Company
         The Nature Conservancy