

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

ENTERED
06/06/2008

| | | |
|---|---|---|
| | § | |
| IN RE: | § | JOINTLY ADMINISTERED |
| | § | Case No. 07-20027-C-11 |
| SCOTIA DEVELOPMENT LLC, | § | Chapter 11 |
| ET AL, | § | |
| Debtors. | § | |
| | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING (A)
CONFIRMATION OF MRC/MARATHON PLAN; (B) DENIAL OF
CONFIRMATION OF THE INDENTURE TRUSTEE PLAN AND
(C) DENIAL OF THE MOTION TO APPOINT A CHAPTER 11 TRUSTEE**

On this day came on for consideration confirmation of competing plans of reorganization filed herein. The Court, having heard the evidence and arguments of counsel, makes the following findings of fact and conclusions of law in support of (a) confirmation of the First Amended Joint Plan of Reorganization for the Debtors, as Further Modified, Proposed by Mendocino Redwood Company, LLC (together with certain of its affiliates, "MRC"), Marathon Structured Finance Fund L.P. ("Marathon"), and the Official Committee of Unsecured Creditors (the "Committee"), and (together with the MRC and Marathon, the "Plan Proponents"), [Docket No. 2902] (the "MRC/Marathon Plan"); (b) denial of confirmation of the First Amended Chapter 11 Plan for Scotia Pacific Company LLC Proposed by The Bank of New York Trust Company, N.A., Indenture Trustee for the Timber Notes (as Modified) [Docket No. 2774], (the "Indenture Trustee Plan"); and (c) denial of The Indenture Trustee's Motion to Appoint a

Chapter 11 Trustee Pursuant to Section 1104 of the Bankruptcy Code [Docket No. 2092]

(the "Motion to Appoint Chapter 11 Trustee"):[1]

## PRELIMINARY STATEMENT

On January 18, 2007, the Debtors herein filed their Voluntary Chapter 11

Bankruptcy petition. Together the Debtors own and operate 220,000 acres of redwood

forest (the "Timberlands"), timber milling operators, the town of Scotia, an Inn, and other

assets in Humbolt County, California.  The debtor Scotia Pacific Company LLC

("Scopac") was formed as a single purpose entity which owned the 220,000 acres of the

Timberlands.  The Timber Note Holders (the "Noteholders") are owed approximately

$800 million by Scopac, secured by the Timberlands.  The remaining Debtors own the

milling operation and the town of Scotia, California.

Following the lifting of exclusivity, five competing plans were filed, three of

which were withdrawn, leaving the First Amended Joint Plan of Reorganization as

Modified filed by Mendocino Redwood Company LLC (MRC), Marathon Structural

Finance Fund LP ("Marathon"), and the Official Committee of Unsecured Creditors (the

"Committee") (the "MRC/Marathon Plan") and the First Amended Chapter 11 Plan for

Scotia Pacific Company LLC proposed by the Bank of New York Trust Company, N.A.,

Indenture Trustee for the Timber Notes, as modified (the "Indenture Trustee Plan")

The MRC/Marathon Plan seeks to reorganize all of the Debtors by creating two

new corporations, one which would own and operate the Timberlands and the milling

---

[1]     Findings of fact shall be construed as conclusions of law and vice versa where appropriate.  *See* Fed. R. Bankr. P. 7052.  The Court's findings of fact and conclusions of law announced on the record in open court are hereby incorporated by reference herein.

operations and one which would own the town of Scotia, California. The plan pays the Noteholders the value of their secured claim in cash and separately classifies their deficiency unsecured claim. The new corporation is operated by MRC, an experienced, environmentally responsible operator with a proven track record, and whose experience in operating timberlands and working cooperatively with government regulators was uncontraverted at the confirmation hearing. MRC successfully operates a redwood forest of comparable size to the Timberlands in Mendocino County, the county directly South of Humboldt County, California. The MRC/Marathon Plan is supported by the creditors committee and essentially all creditors except the Noteholders.

The Indenture Trustee Plan seeks only to reorganize the debtor Scopac. It provides for the liquidation of Scopac. If confirmed, the mill would likely be shut down and liquidated, along with the town of Scotia and the Debtors' remaining assets, resulting in a loss of jobs for the community and a way of life in the town of Scotia. In addition, general unsecured creditors of the Debtors other than Scopac would likely receive no recovery on their claims.

The Indenture Trustee Plan contemplates a six month marketing period followed by an auction and sale of Scopac's assets that, as admitted by the Indenture Trustee, will not yield a price sufficient to pay the Noteholders in full and at which the Indenture Trustee will be required to credit bid unless the Indenture Trustee receives an instruction from a super-majority (66.67%). The Indenture Trustee has not received any such instruction. The Indenture Trustee's liquidation plan does not provide for an experienced and environmentally responsible operator for the Debtors' assets. Indeed, no operator has even been selected.

The Indenture Trustee Plan is premised upon a term sheet for a "stalking horse" bid from Scotia Redwood Foundation (an affiliate of the largest Noteholder, Beal Bank) for the possible offer to buy the Timberlands for $603 million. The term sheet contains numerous contingencies and raises substantial concerns about its genuiness. The term sheet was never accepted by the Indenture Trustee. In short, the term sheet appears to be a straw man for a foreclosure sale and not a serious bid to reorganize the Debtors or even Scopac. In addition, the Indenture Trustee did not meet its burden of proving that the Indenture Trustee Plan is feasible. Even if the Scotia Redwood Foundation term sheet was accepted, no evidence was presented to show that it could operate the Timberlands. Nor did the Indenture Trustee prove that Scotia Redwood Foundation was capable of performing under the term sheet.

Moreover, the Indenture Trustee Plan will likely be followed by further reorganization. The Timberlands are highly regulated by several departments of the State of California. Even transfer of ownership of the Timberlands requires State approval. While these approvals would not be unreasonably withheld, there has been no showing that either Scotia Redwood Foundation or the Noteholders could qualify to own the Timberlands nor that either could obtain permits to operate any logging operations in the forest. Without logging permits, logging operations will fail.

Finally, there was no showing of how the Noteholders would pay for the costs associated with credit bidding the bonds, including a $21 million break up fee to Scotia Redwood Foundation, Bank of America's approximate $36 million senior secured loan and Scopac's pre- and post-confirmation administrative expenses. The Indenture Trustee Plan is therefore not confirmable.

Because the Noteholders objected, confirmation of the MRC/Marathon Plan requires that the court find that the Plan complies with all of the provisions of 1129(b)(2)(A) of the Bankruptcy Code and can be "crammed down" on the Noteholders.

The Noteholders' claim exceeds the value of their collateral and thus it is under-secured. The Bankruptcy Code requires that the claim be dealt with under a Plan in one of two ways. First, Section 1111(b)(2) of the Code gives the Noteholders an election to treat their entire claim as secured. If they so elect, the Plan must provide a stream of payments secured by the Collateral (the Timberlands), the total of which must equal the total claim ($800 million), the present value of which must equal the value of the collateral. Although the MRC/Marathon Plan provides for an 1111 (b)(2) election, the Noteholders declined to make an 1111(b)(2) election. Second, the claim may be dealt with under the Plan in a manner which is "fair and equitable" as defined by the Code. Pursuant to section 506(a)(1) of the Bankruptcy Code, as an undersecured creditor, the Noteholders' claim is bifurcated into two claims: a secured claim to the extent the claim is secured by collateral, and an unsecured claim for the deficiency. See Klee, *All You Ever Wanted To Know About Cram Down Under the New Bankruptcy Code*, 53 Am. Bankr. L. J. 133,154 (1979).

The MRC/Marathon Plan proposes to pay the Note Holders cash on the effective date of the Plan in the amount of $530 million (subject to the Class 6 Distribution adjustment). The uncontroverted evidence at trial showed that the adjustment will be approximately $13 million, making the distribution approximately $517 million. Thus if the value of the Timberlands is equal to or less than the cash payment, the Noteholders will receive what they are entitled to under the Bankruptcy Code and have no legal

grounds to object to their treatment. As indicated below, the payment to the Noteholders must be at least $510 million.[2]

Under section 1129(b)(2)(A) of the Bankruptcy Code, a plan will be deemed fair and equitable and thus may properly be confirmed over the objection of a class of creditors, if it meets any one of three alternative requirements[3].

Specifically, the MRC/Marathon Plan is fair and equitable as to the secured claim of the Noteholders if it provides "for the realization by such holders of the indubitable equivalent of such claims." 11 U.S.C. § 1129(b)(2)(A)(iii). The Plan Proponents need only show by a preponderance of the evidence that under the Plan, the secured class will realize the indubitable equivalent of its secured claims. In order to provide indubitable equivalence under section 1129(b)(2)(A)(iii), a plan must provide a secured creditor with the value of its secured claim. *See In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1350 (5th Cir. 1989). To argue that the Code prohibits the payment in cash at confirmation of the full value of a secured claim would lead to an absurd conclusion because section 1129(b)(2)(A)(i) of the Code provides that a plan is fair and equitable to an undersecured

---

[2] At a hearing held on June 6, 2008, the Noteholders raised for the first time the net cash on hand in the Scopac accounts upon which the Noteholders hold a lien is not subject to the class 6 distribution adjustment. The MRC/Marathon Plan must also provide for accounting of those funds in calculating the net cash payment to the Noteholders.

[3] 1129(b)(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
    (A) With respect to a class of secured claims, the plan provides ---
        (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
            (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
        (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
        (iii) for the realization by such holders of the indubitable equivalent of such claims.

creditor if it provides for a note secured by the collateral which pays a claimant a stream of payments equal to the value of the collateral.

The Note Holders argue that the MRC/Marathon Plan is not fair and equitable because it denies the Note Holders the opportunity to credit bid their lien. This argument fails for several reasons.  First, the Plan contemplates transfer of the Timberlands and milling operations to a newly formed corporation as a part of a reorganization and not a sale.  Second, as noted above, 1129(b)(2)(A) defining "fair and equitable", is disjunctive and requires compliance with only one of its three subsections.  Third, exclusivity has been lifted.  Thus the Noteholders had equal opportunity to propose a confirmable plan which provided for credit bidding their lien.   The Noteholders were not required to propose a plan that reorganized the Timberlands and the milling operations.  It was no secret, however, that the citizens of California and the vast majority of creditors wanted a solution that preserved the operation of both Scopac and Palco debtors.   After the lifting of exclusivity, the Noteholders were in a significantly better position to propose a plan for both the Timberlands and the milling operations.  Despite the Court's urging them to do so, they chose not to.

The Noteholders also argue that the MRC/Marathon plan is an impermissible substantive consolidation of Scopac with Palco.  Substantive consolidation in a reorganization of two corporate debtors is inappropriate without proof of the legal requirements (e.g., co mingling of debts and asset, failing to observe corporate formalities, etc…) if the reorganization uses the assets of one corporation to pay the debts of another.  *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005).  Here, none of the assets of Scopac are being used to pay the debts of any other debtor with the exception of

the Plan provision that establishes a single litigation trust for the benefit of all the unsecured creditors.  While it is likely that the administrative cost savings by a single trust will result in the Noteholders' deficiency claim receiving a higher dividend, such provision is an impermissible substantive consolidation which the Court will allow to be cured in the confirmation order by agreeing to the separation of the Scopac litigation for the benefit of the Scopac unsecured creditors.

The Noteholders complain that the MRC/Marathon Plan impermissibly releases their lien on the Headwater's Litigation. Evidence at the confirmation hearing failed to establish the value of this litigation by a preponderance.  The MRC/Marathon Plan strips the Noteholder's lien on the litigation.  Absent proof of value, for the Court to confirm the Plan, it must allow the Noteholders to retain their lien on the Headwaters Litigation, to the extent that they have one.  Throughout this Bankruptcy case, every party but the Debtors have treated this litigation as a liability.  Even the bid of the Scotia Redwood Foundation was conditioned upon settlement of the litigation to its satisfaction. Scotia Redwood Foundation's representative testified that the continuation of the litigation might negatively affect its relationship with the California Regulatory Agencies.  The Court cannot confirm the MRC/Marathon Plan unless it provides for the Noteholders' retention of their lien on the Litigation. MRC/Marathon may modify their Plan to comply with this ruling in the confirmation order.

The ultimate issue in this case is value.  In *Bank of America National Trust and Savings Association v. 203 North La Salle Street Partnership*, 526 U.S. 434 (1999), the Supreme Court expressed concern about whether true value can be determined by a battle of competing experts, in the context of equity holders attempting to cram down a secured

creditor.  The Supreme Court stated that under a plan proposed during the debtor's period of exclusivity "making no provision for competing bids or competing plans, any determination that the price was top dollar would necessarily be made by a judge in bankruptcy court, whereas the best way to determine value is exposure to a market".  526 U.S. at 457. Here, the Court must make a factual determination of value, but it does so after exposure to the market. The Timberlands were marketed prior to the petition date. Exclusivity was lifted months ago.  The Noteholders had ample time to propose a plan that would guarantee they would receive more money for their secured claim.  They have not done so.

As discussed below, after carefully reviewing all the expert testimony as to value, the Court finds that the value of the Timberlands is not more than $510 million. The Court further finds that the MRC/Marathon Plan is confirmable, subject to the three technical corrections. First, the Plan must provide for the retention of whatever lien the Noteholders have on the Headwaters Litigation. Second, the Plan must provide for separation of any recovery from litigation in the Litigation Trust which belongs to Scopac for the benefit of Scopac unsecured creditors. Third, the Plan must guarantee the payment of $510 million for payment of the Class 6 Secured Timber Noteholder debt.

## FINDINGS OF FACT

### I.  BACKGROUND

#### A.  Marathon's Pre-Petition Loans to Palco

1.  On July 18, 2006, The Pacific Lumber Company ("Palco") and Britt Lumber Co., Inc. ("Britt") entered into a Term Loan Agreement with Marathon pursuant to which Marathon loaned Palco and Britt $85 million (the "Palco Term Loan

Agreement"). [MMX 8]. Palco and Britt also entered into a Revolving Credit Agreement with Marathon pursuant to which Marathon provided Palco and Britt a $60 million revolving line of credit ("Palco Revolving Credit Facility") (collectively with the Palco Term Loan Agreement, the "Pre-Petition Loans"). [MMX 7].

2. These Pre-Petition Loans were secured by senior security interests in substantially all of the assets of the Palco other than Palco's equity interest in Scotia Pacific Company LLC ("Scopac"), including the stock of Palco owned by MAXXAM Group, Inc. ("MAXXAM"). [MMX 2 ¶ 4]; (Tr. 4/8/08 188:15-189:8). Although the Pre-Petition Loans were not secured by Palco's equity interest in Scopac, Marathon was given a negative pledge over the Scopac stock owned by Palco. (Tr. 4/8/08 188:22-189:5). Palco owns 100% of the Scopac stock. [MMX 35 at 22].

### B.   Palco and Scopac File for Bankruptcy

3. On January 18, 2007 (the "Petition Date"), Palco, Britt, Scotia Development LLC, Salmon Creek LLC and Scotia Inn Inc. (collectively, the "Palco Debtors") and Scopac (together with the Palco Debtors, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") with the Court. [MMX 35 at 25].

4. As of the Petition Date, approximately $84 million remained outstanding under the Palco Term Loan Agreement and $40 million remained outstanding under the Palco Revolving Credit Agreement. [MMX 35 at 23-24].

5. On January 19, 2007, the Court ordered that the Debtors' Chapter 11 cases be procedurally consolidated and jointly administered pursuant to Federal Rule

of Bankruptcy Procedure 1015[4] and Local Rule of Bankruptcy Procedure 1015.  [Docket No. 21].

### C.  Marathon's Post-Petition Loans to Palco

6.     The Palco Debtors' financial projections indicated that their cash flow was not adequate to continue ongoing business operations during the pendency of the Cases.  Consequently, the Palco Debtors required the use of cash collateral and borrowings under a DIP loan to (1) pay rent, taxes, utilities, salaries, wages, and employee benefits, (2) purchase inventory and supplies, (3) make certain capital expenditures, and (4) continue the operation of their businesses without interruption. [Docket No. 7; Docket No. 17].

7.     On July 31, 2007, the Court entered an order authorizing the Palco Debtors to incur post-petition senior secured indebtedness.  [MMX 10].

8.     On August 6, 2007, the Palco Debtors entered into a Debtor-In-Possession Revolving Credit Agreement with Marathon pursuant to which Marathon loaned the Palco Debtors $75 million, reduced by certain reserves (the "Palco DIP Facility").  [MMX 9; MMX 2 ¶ 5].

9.     Loans extended under the Palco DIP Facility constitute Superpriority Administrative Expense Claims under section 364(c)(1) of the Bankruptcy Code, having priority over all other obligations, liabilities, and indebtedness of the Palco Debtors.  [MMX 9; MMX 10].   The Palco DIP Facility is secured by perfected first priority liens, mortgages, and security interests in substantially all of the assets of the Palco Debtors other than Palco's equity interest in Scopac, including the stock of Palco

---

[4]        The Federal Rules of Bankruptcy Procedure shall be referred to herein as the "Bankruptcy Rules."

owned by MAXXAM and a negative pledge over the Scopac stock owned by Palco. [MMX 9; MMX 10].

10.     The Palco DIP Facility was used to pay in full the $40 million outstanding on the Palco Revolving Credit Facility and to provide $35 million in additional financing to the Palco Debtors.  [MMX 2 ¶ 5].

11.     Palco and Britt owe Marathon approximately $85 million pursuant to the Palco Term Loan Agreement, plus accrued interest.  (Tr. 4/8/08 226:24-227:11).  In addition, the Palco Debtors owe Marathon approximately $75 million pursuant to the Palco DIP Loan, plus accrued interest.  (Tr. 4/8/08 226:24-227:11).  Thus, there is in excess of $160 million of senior secured pre-petition and post-petition debt owed to Marathon.  (Tr. 4/8/08 226:24-227:11); [MMX 2 ¶ 6].

### D.     The Court Terminates Exclusivity

12.     On January 4, 2008, the Court terminated the Debtors' exclusive period to file and solicit acceptances of a plan of reorganization.  Exclusivity was terminated with respect to Marathon, the Committee, and the Bank of New York as Indenture Trustee (the "Indenture Trustee") for the Holders of Scopac Timber Notes (the "Noteholders"), thereby allowing these parties in interest to file and solicit acceptances of Chapter 11 plans of reorganization for the Debtors.  The Court set January 30, 2008 as the deadline to file any such plans.  [Docket No. 2004].

### E.     The Indenture Trustee Seeks Appointment of a Trustee

13.     On January 14, 2008, the Indenture Trustee filed a Motion to Appoint Chapter 11 Trustee.  [Docket No. 2092].

14.     On February 22, 2008, the Court ordered that the hearing on the Motion to Appoint Chapter 11 Trustee be combined with the Confirmation Hearing. [Docket No. 2330].

**F.     Proposed Plans of Reorganization**

15.     On January 30, 2008, the following plans of reorganization were filed:

    a.  Joint Plan of Reorganization for the Debtors proposed by MRC and Marathon [Docket No. 2206];

    b.  Second Amended Joint Plan of Reorganization proposed by the Debtors [MMX 38];

    c.  First Alternative Plan of Reorganization for the Palco Debtors proposed by the Debtors [MMX 39];

    d.  First Alternative Plan of Reorganization for Scopac proposed by the Debtors [MMX 40]; and

    e.  Chapter 11 Plan for Scopac proposed by the Indenture Trustee [Docket No. 2211].

16.     On February 29, 2008, the Court approved the Joint Disclosure Statement containing the five plans of reorganization and approved solicitation of the same.  [MMX 34].

17.     On March 4, 2008, MRC and Marathon filed their First Amended Joint Plan of Reorganization for the Debtors.  [MMX 37].  That same day, the Indenture Trustee filed its First Amended Chapter 11 Plan for Scopac.  [MMX 36].

18.     On March 15, 2008, MRC and Marathon filed a Plan Supplement to the MRC/Marathon Plan.  [MMX 40].

19.     On March 20, 2008, the Debtors filed their Amended First Alternative Plan of Reorganization for Scopac.  [Docket No. 2502].

20.     On March 21, 2008, the Debtors filed their Third Amended Joint Plan of Reorganization.  [Docket No. 2507].

21.     On March 25, 2008, MRC and Marathon filed their Notice of Nomination of the Litigation Trustee Under the MRC/Marathon Plan.  [MMX 43].

22.     On April 28, 2008, the Indenture Trustee filed its First Amended Chapter 11 Plan for Scopac (as modified).  [Docket No. 2774].  The Indenture Trustee sought to further amend its Plan on May 1, 2008.  [Docket No. 2813].

23.     On May 1, 2008, MRC and Marathon, joined by the Committee as a Plan proponent, filed their First Amended Joint Plan of Reorganization, as Amended. [Docket No. 2800; MMX 77].

24.     On May 14, 2008, MRC and Marathon, joined by the Committee as a Plan proponent, filed their First Amended Joint Plan of Reorganization, as Further Amended, *i.e.*, the MRC/Marathon Plan.  [Docket No. 2902].

25.     The Noteholders were expressly provided the opportunity to make an election to be treated in accordance with section 1111(b)(2) of the Bankruptcy Code. [MMX 36].  The Noteholders declined to make the election.

26.     On May 7, 2008, the Debtors and MAXXAM filed a Notice of Withdrawal of (a) the Palco Alternative Plan of Reorganization, (b) the Scopac Alternative Plan of Reorganization, and (c) the Debtors' Joint Plan of Reorganization. [Docket No. 2846].

27.     As a result, only two plans remain to be considered for confirmation:  the MRC/Marathon Plan; and the Indenture Trustee Plan.  [MMX 35; Docket No. 2846].

II.   **THE MRC/MARATHON PLAN**

28.   The MRC/Marathon Plan proposes to reorganize the Debtors by integrating the commercial timberland and sawmill operations into a new entity, presently referred to as Newco.  [MMX 77; MMX 1 ¶ 23; MMX 2 ¶ 9].

29.   MRC and Marathon will contribute $580 million in cash to Newco. [MMX 77 § 4.6.2.1].  $7.5 million of these funds will be used to improve the operations of the Mill.  [MMX 1 ¶ 28].

30.   Marathon will also convert the more than $160 million of senior secured pre-petition and post-petition debt that it is owed by Palco into equity.  [MMX 1 ¶ 24; MMX 2 ¶¶ 6, 10].  Marathon is also contributing millions of dollars in assets and cash, specifically, the Mill, the Mill Working Capital, to Newco.  [Docket No. 2902]. Marathon will receive a 15% equity stake in Newco, a 100% equity stake in Townco and a promissory note from Newco in the aggregate principal amount equal to the amount of the Mill Working Capital and secured solely by Liens on the Mill Working Capital. [Docket No. 2902].

31.   MRC will manage Newco in a responsible and sustainable manner pursuant to a business plan developed by MRC.  Adopting an approach that is different than that used by Scopac, Newco will: (1) add capital to make the Mill better equipped to handle the logs produced by the commercial Timberlands (and together with the MMCAs, the "Timberlands") and reduce costs; (2) match production of the Mill to the harvest rate and size of the logs being harvested from the Timberlands; (3) change the strategy to produce what the market wants to buy; (4) rebuild customer relationships that have been frayed by poor customer service resulting from Debtors' historic up-and-down

operations; and (5) develop redwood lumber distribution capabilities to better market redwood lumber and better service customers.  [MMX 1 ¶ 28].

32.     Newco will benefit from approximately $10 million in savings on an annual basis that will be realized as a result of MRC sharing its management, business and regulatory relationships, and infrastructure with Newco.  [MMX 1 ¶ 24; MMX 2 ¶ 10].

33.     MRC will immediately seek Forest Stewardship Council ("FSC") certification of the Timberlands and will implement the same forestry practices on the Timberlands that have been successfully employed on MRC's 230,000 acres in Mendocino County over the last 10 years.  [MMX 1 ¶ 24; MMX 2 ¶ 10].

34.     The MRC/Marathon Plan assumes all Environmental Obligations without modification, including the Habitat Conservation Plan ("HCP") resulting from the Headwaters Agreement, thus ensuring that Newco will be run in an environmentally responsible manner.  [MMX 1 ¶¶ 40-42; MMX 2 ¶ 10].

35.     Newco will assume responsibility for the Debtors' Pension Plan. [MMX 1 ¶ 43; MMX 2 ¶ 10].

36.     The MRC/Marathon Plan also proposes to restructure the town of Scotia by forming an entity presently referred to as Townco.  [MMX 1 ¶ 24; MMX 2 ¶ 9].  Townco will allow its residents to purchase their homes.  [MMX 1 ¶ 24; MMX 2 ¶¶ 9, 10].

37.     Certain of the Debtors' litigation assets will be pursued by a Litigation Trust for the benefit of all unsecured creditors.  [MMX 1 ¶ 24; MMX 2 ¶ 10].

The MRC/Marathon Plan provides $500,000 in seed money for this Trust.  [MMX 77 Article VIII].

38.     The Noteholders will receive $530 million in cash (less an adjustment) on account of their secured claim and will be eligible for additional recoveries from the Litigation Trust on account of their unsecured claims.  [MMX 77 §§ 4.6.2.1, 4.9.2].

39.     Bank of America's claim against Scopac for approximately $37.6 million will be paid in full in cash on the Effective Date, except for the payment of any allowable default interest, which will be paid in 12 monthly installments.  [MMX 77 § 4.5.2; MMX 1 ¶ 24].

40.     All allowed administrative and priority claims of the Debtors will be paid in full.  [MMX 77 Article 2, 4; MMX 1 ¶ 24; MMX 2 ¶ 10].

41.     Trade creditors are projected to receive cash in the amount of approximately 75%-90% of their claims and will be eligible for further distributions based on recoveries by the Litigation Trust, in which they will share *pro rata* with holders of Scopac General Unsecured Claims.  [MMX 77 §§ 4.7, 4.8, 4.9; MMX 1 ¶ 24; MMX 2 ¶ 10].

42.     The Disclosure Statement and the MRC/Marathon Plan Supplement: (a) identify all individuals who will serve after confirmation of the MRC/Marathon Plan as a director or officer of Newco or Townco and their compensation, if any; (b) provide that no insiders, including existing officers and directors, will be employed or retained by Newco or Townco; and (c) ensures that their

appointment to office is consistent with the interest of creditors and equity security holders and public policy.  [MMX 35 Article 6; MMX 40].

43.    On March 26, 2008, the Plan Proponents filed their Notice of Nomination of Litigation Trustee Pursuant to First Amended Joint Plan of Reorganization for the Debtors Proposed by Mendocino Redwood Company, LLC and Marathon Structured Finance Fund L.P. [Docket No. 2549] (the "Notice of Litigation Trustee"). [MMX 43].  Pursuant to the Notice of Litigation Trustee, Julianne Viadro, President of Hickey & Hill, Inc., was appointed to serve as the Litigation Trustee. [MMX 43].  The Notice of Litigation Trustee identifies Ms. Viadro's compensation.  [MMX 43].

44.    On April 7, 2008, the Committee filed its Notice of Designation of Litigation Trust Board under First Amended Joint Plan of Reorganization for the Debtors Proposed by Mendocino Redwood Company, LLC and Marathon Structured Finance Fund L.P. [Docket No. 2627] (the "Notice of Litigation Trust Board").   [MMX 69]. Pursuant to the Notice of Litigation Trust Board, Miles T. Crail of Pacific Coast Trading, Inc., Steve Will of Steve Wills Trucking, and Kenneth "Jeff" Nelson of SHN Consulting Engineers & Geologists were appointed to serve on the Litigation Trust Board.  [MMX 69].

45.    The MRC/Marathon Plan can be immediately and fully implemented following Confirmation.  [MMX 1 ¶ 32; MMX 2 ¶ 11].  The new capital, experienced management team, and realistic business plan are ready to be put into operation.   [MMX 1 ¶ 32; MMX 2 ¶ 11].   There is no financing or due diligence contingency in the MRC/Marathon Plan and MRC has ample resources to fund the new capital.  [MMX 1 ¶ 32; MMX 2 ¶ 11].

III. **MRC IS AN EXPERIENCED AND RESPONSIBLE**
**OPERATOR OF TIMBERLAND, SAWMILL,**
**AND LUMBER DISTRIBUTION OPERATIONS**

A. **MRC's Experience**

46.     MRC owns approximately 230,000 acres of redwood timberlands located primarily in Mendocino County, California, the county directly south of Humboldt County, where the Timberlands are located.  [MMX 1 ¶ 9].  These timberlands were acquired by MRC from Louisiana Pacific in 1998.  [MMX 1 ¶ 4].  MRC has also owned and operated a sawmill and related lumber distribution business in Ukiah, California since June 1998.  [MMX 1 ¶ 9].  MRC's redwood timberlands, sawmill, and lumber distribution businesses, while held through related affiliates, operate as an integrated commercial forestry business.  [MMX 1 ¶ 9].

47.     MRC was originally funded and is presently owned primarily by the Fisher family from San Francisco.  [MMX 1 ¶ 10].  The Fisher family founded GAP, Incorporated, a leading American clothing retailer, and presently owns more than 30% of the company, which has a total market capitalization of approximately $15 billion. [MMX 1 ¶ 10].  Members of the Fisher family are supporters of various environmental organizations and wanted environmental stewardship to be an important element of the lands that were acquired by MRC.  [MMX 1 ¶ 10].  As a family held business, MRC has been and remains able to set financial and operational objectives designed to maximize long-term profits.  [MMX 1 ¶ 10].

48.     MRC's business philosophy, which is based on its own extensive business experience, is that the maximization of long-term profits in the California redwood timber industry requires an approach that produces sustainable and predictable

long-term harvesting yields while maintaining public and regulatory acceptance of the company's practices.  [MMX 1 ¶ 11].

49.    Forest Stewardship Council ("FSC") certification is an independent third party standard of exemplary forest management supported by leading environmental groups including the World Wildlife Fund, Natural Resources Defense Counsel and Greenpeace.  [MMX 1 ¶ 12 n.3].  FSC certified practices include foregoing traditional clear cutting, implementing an old growth policy, and reducing the level of harvesting.  [MMX 1 ¶ 56].  MRC's approach to managing regulation in California is based upon a combination of transparent communication with all stakeholders and managing by the exemplary standards as defined and validated by the FSC rather than regulatory bare minimum.  [MMX 1 ¶ 56].

50.    Over the past ten years, MRC successfully in managed its forest to a high standard of environmental stewardship as measured by specific ecological progress in the woods and public acceptance of its practices.  [MMX 1 ¶ 13].

51.    From an ecological perspective, for example, MRC's standing conifer timber inventory consisting of redwood and Douglas fir has increased by more than 25%, or 600/MMBF.  [MMX 1 ¶ 14].  In another example, 40,000 acres that was overgrown with tan oak as a result of legacy forest practices dating back as far as the 1850s have been treated so that robust conifer forest will again emerge in the next 30 to 40 years.  [MMX 1 ¶ 14].  Furthermore, MRC teamed up with restoration partners to invest $11 million in sediment and erosion control that prevented almost 700,000 cubic yards of sediment – the equivalent of almost 70,000 dump trucks – from fouling streams and rivers running through the MRC timberlands.  [MMX 1 ¶ 14].

52.     From a public support perspective, for example, the Mendocino County Board of Supervisors recently unanimously passed a resolution encouraging Humboldt County to weigh Mendocino County's "positive experiences with MRC" when considering alternatives for Palco.  [MMX 1 ¶ 15].  U.S. Congressman Mike Thompson commended MRC's operations in his Statement of Position in support of the MRC/Marathon Plan.  [MMX 25; MMX 26].  And many other members of the California community have endorsed the MRC/Marathon Plan based on their favorable views of MRC's policies and practices.  [MMX 1 ¶ 15].  Home Depot, which is serviced by MRC affiliate Mendocino Forest Products LLC ("MFP") named MFP its Environmental Partner of the Year.  [MMX 1 ¶ 16].

53.     On the business side, MRC has made acceptable cash profits from the combination of its timberlands, sawmill, and related distribution operations.  [MMX 1 ¶ 13].

54.     MFP successfully operates a sawmill and related distribution business in Ukiah, California.  [MMX 1 ¶ 16].  The success of MFP is a function of:  (a) matching the sawmill capacity to the harvest capacity of logs from MRC and other forest landowners in the region; (b) producing and maintaining lumber inventory in anticipation of market demand; and (c) providing just in time delivery service with a high degree of accuracy and dependability for wholesalers and retailers of redwood lumber.  [MMX 1 ¶ 17].  Although MFP's Ukiah sawmill is modest in size, it has been able to produce lumber on a cost per thousand basis of almost 50% less than the cost per thousand basis of the Scotia sawmill.  [MMX 1 ¶ 17].  MFP's Ukiah sawmill produced approximately

55/MMBF of redwood lumber in 2007 by operating one shift of production.  [MMX 1 ¶ 16].

### B. MRC Is Familiar With Palco And Scopac's Business

55.    MRC has extensive knowledge and understanding of the Debtors and their assets.  MRC shares a number of important geographical and other similarities to Palco and Scopac that make MRC both especially knowledgeable about the realistic value of those companies and especially suited to successfully implement a new business plan for their assets.  [MMX 1 ¶¶ 20-21].

56.    MRC's distribution business has been a customer of Palco since MRC was formed in 1998.  [MMX 1 ¶ 18].

57.    Furthermore, in 2004, at Palco's invitation, MRC began talking with Palco regarding a possible investment in or purchase of Palco.  [MMX 1 ¶ 18].  MRC held discussions on and off with Palco, Scopac, and MAXXAM from the fall of 2004 through early 2006 about a possible transaction.  [MMX 1 ¶ 18].  From January 2006, through the late spring of 2006, MRC conducted extensive due diligence on the Debtors' assets.  [MMX 1 ¶ 19].  Ultimately, no agreement was reached.  [MMX 1 ¶ 19].  In 2008, MRC undertook additional due diligence.  [MMX 1 ¶ 19].

### C. MRC's Business Plan For The Debtors

58.    Key business plan elements that MRC adopted as part of its approach to managing the Timberlands include: (1) eliminating traditional clear cutting; (2) implementing an old growth policy; (3) reducing the level of harvest; (4) investing to prevent sediment and dirt from fouling coastal streams running through the property; and (5) pursuing and attaining FSC certification.  [MMX 1 ¶ 12].

59.     MRC's business plan seeks to alleviate some of the physical and economic constraints that Scopac has experienced in harvesting on the Timberlands including but not limited to the following:

a.      Since the Headwaters Agreement, the Debtors employed a business strategy of maximizing the volume of timber that they harvest.  [MMX 1 ¶ 59]. From 2000 through 2005, Palco harvested an average of 160/MMBF each year by prioritizing short-term harvest efforts over long-term harvest planning.  [MMX 1 ¶ 59]. Put another way, the company temporarily achieved a 160/MMBF harvest rate by taking future years' harvests and moving them into the present.  [MMX 1 ¶ 59].  As a result, when Palco reset its long term harvest rate in 2005, it dropped significantly from 160/MMBF to 100/MMBF.   [MMX 1 ¶ 59].   In 2006, the harvest rate declined to 99/MMBF and in 2007, Palco harvested 74/MMBF.  [MMX 1 ¶ 63].

b.      Scopac has engaged in a practice of harvesting that leaves behind large numbers of "slivers," which are patches of trees less than 5 acres each. [MMX 1 ¶ 60].   MRC estimates that there are approximately 9000 acres containing 400/MMBF tied up in slivers, which can only be harvested economically when added to another adjacent harvest unit at an appropriate re-entry time in the future.  [MMX ¶ 61].

c.      California clear cuts cannot be completed immediately next to prior clear cuts until the prior clear cuts have seedlings that have reached a height of 5 feet or 5 years of age.  [MMX 1 ¶ 62].  Scopac has engaged in extensive use of clear cutting:  from 2002 through 2007, Scopac harvested almost 50% of its acres using clear cuts.  [MMX 1 ¶ 62].

60. MRC believes that a realistic model of harvest rates designed to maximize long term profits must take into account the regulatory and on-the-ground constraints affecting both the volume of trees that are eligible for harvesting and the rate at which trees can be harvested from within that volume. [MMX 1 ¶ 68]. MRC applied this philosophy to the inventory system to predict its harvest for the Debtors. [MMX 1 ¶¶ 69-70]. Based on the regulatory, economic, and physical constraints on the Timberlands, MRC determined that the total presently harvestable conifer volume is 777/MMBF out of 3.9/BBF total conifer volume. [MMX 1 ¶ 71].

61. MRC then divided the total harvestable timber by harvest cycle to determine the harvest volume for each year. [MMX 1 ¶ 74]. Based on its analysis, MRC anticipates an annual harvest volume of 55/MMBF for the first 10 years and 67/MMBF for years 11 through 15. [MMX 1 ¶¶ 74-76].

## IV.   THE INDENTURE TRUSTEE PLAN

62. The Indenture Trustee Plan is applicable to only one of the debtors, Scopac. It does not provide for the Palco Debtors' emergence from bankruptcy. [Docket No. 2774].

63. The Indenture Trustee Plan proposes to sell Scopac's assets at an auction. [Docket No. 2774 §§ 7.1, 7.2]. The Indenture Trustee will retain its right to credit bid on behalf of the Noteholders. [Docket No. 2774 § 5.2.2]. The Indenture Trustee indicated that if the Scopac assets are sold, it may be required to credit bid. (Tr. 4/29/08 122:16-122:22). In fact, under the Indenture, the Indenture Trustee must credit bid at a sale such as the one contemplated by the Indenture Trustee Plan unless it receives a contrary direction from two-thirds of the Noteholders. [IT Exhibit 112a § 7.18]; (Tr.

4/29/08 122:5-122:11).  To date, the Noteholders have not voted to relieve the Indenture Trustee of this obligation by voting in the requisite numbers. (Tr. 4/29/08 122:12-122:13).

64.  In the event of a credit bid by the Indenture Trustee, cash would be required to make up for the SAR deficiency and pay Bank of America's secured claim on the effective date of the Indenture Trustee Plan.  [Docket No. 2774 § 5.2.1]; (Tr. 4/29/08 111:19-112:7, 114:20-115:4).  No evidence was presented to prove what structure that the Indenture Trustee and Noteholders would employ to fund the shortfall in the SAR Account.

65.  Any proceeds from a sale at the Indenture Trustee's proposed auction flows through a series of waterfalls before payment is made to the Noteholders. (Tr. 4/29/08 74:16-75:3).  For example, deductions for certain expenses including but not limited to administrative claims, tax claims, Bank of America's claim to the extent that it exceeds the amount in the SAR account, and general unsecured creditors claims to the extent of $1.45 million, will be deducted from the auction proceeds before they filter down to the Noteholders.  (Tr. 4/29/08 74:21-74:25, 75:18-75:21, 76:9-77:1).  Only after all of the foregoing liabilities are paid will the remainder of sale proceeds go to Holders of the Timber Notes.  (Tr. 4/29/07 76:24-77:1).

66.  The Indenture Trustee has not seen any written estimates of the expenses required by its auction plan and did not provide any such information to the Court.  (Tr. 4/29/08 80:13-80:18).

67.  The Indenture Trustee Plan contemplates a lengthy sale process that will take at least 6 to 8 months.  (Tr. 4/29/08 81:11-81:14, 123:18-123:22).  Once a

winning bidder is selected under the auction contemplated by the Indenture Trustee Plan, that entity will have to seek and obtain regulatory approval.  (Tr. 4/29/08 81:15-81:19). J. Chris Matthews could not identify the period of time required for regulatory approval to be obtained.  (Tr. 4/29/08 81:20-83:19).

68.    The Indenture Trustee Plan requires that a "Plan Agent" be appointed to be responsible for managing Scopac's ongoing operations prior to the sale of Scopac's assets and to be responsible for conducting the sale of Scopac.  [Docket No. 2774 §§ 8.1, 8.5].  However, the Indenture Trustee has not gotten specific advice from its consultants confirming that it would have the ability to operate the Timberlands while waiting for completion of the contemplated sale by the Indenture Trustee Plan.  (Tr. 4/29/08 126:11-126:16).  Moreover, there is no requirement that the Plan Agent be qualified to manage and operate the Timberlands.  [Docket No. 2774 Article 8].

69.    The Plan Agent will also serve as the Litigation Trustee of a Litigation Trust and Liquidating Trustee of a Liquidating Trust.  [Docket No. 2774 §§ 8.5.2.8-9].

70.    The Indenture Trustee nominated former Governor Pete Wilson as the Plan Agent.  In light of the fact that the Plan Agent will also serve as the Litigation Trustee, Governor Wilson might be conflicted out of his position as Plan Agent because he negotiated the Headwaters Agreement for the State of California.  (Tr. 4/29/08 106:12-106:19).

71.    The Indenture Trustee Plan also requires that a "Special Plan Agent" be appointed to serve in the event that a conflict of interest prevents the Plan Agent from carrying out his duties.  [Docket No. 2774 § 8.1.1]; (Tr. 4/29/08 106:12-

106:19).  No such Special Plan Agent has been appointed by the Indenture Trustee.  (Tr. 4/29/08 106:20-106:25).

72.     Governor Wilson will receive $125,000 per month as the Plan Agent.  This expense, which in the marketing period could total in excess of $1 million, must also be paid before the Noteholders receive the proceeds of an auction.  [Tr. 4/29/08 110:11-110:18].  Likewise, the $125,000 monthly fee for the Special Plan Agent must also be paid, as would other expenses, including hiring an outside management company to run the timberlands and a fee to Houlihan Lokey Howard & Zukin ("Houlihan") for running the sale process that could be as high as $12-$18 million before the Noteholders receive any proceeds from an auction.  (Tr. 4/29/08 78:21-80:3, 110:19-110:24).

73.     The Indenture Trustee Plan, as modified, proposes to carve out from the proceeds of the sale or, if it is successful in a credit bid, fund up to $1.45 million for distribution to the Holders of Allowed Unsecured Claims. (Docket No. 2774 §§ 5.3.1-2).  Under a previous incarnation of the Indenture Trustee Plan, the Holders of Allowed Unsecured Claims did not  share recovery with other claimants.  [MMX 36 §§ 5.3.1-3]  However, these claimants are now subject to dilution by Holders of Secured Claims who have an Allowed General Unsecured Claim for a deficiency, other than the Noteholders, and other general unsecured creditors who will also be entitled to share in the $1.45 million carve-out.  [Docket No. 2774 §§ 5.3.2-3].  These include holders of intercompany claims, which are worth at least $2 million, and the Pension Benefit Guaranty Corporation, whose claim may exceed $20 million (Tr. 4/29/08 95:12-96:21, 97:1-97:21, 136:8-136:16, 136:25-137:21, 138:15-138:19).

74.     The Noteholders failed to provide evidence of a non-contingent stalking horse bidder. As discussed below, the Beal Term Sheet is so contingent as not to be a credible stalking horse bid.

## V.     CREDITORS OVERWHELMINGLY VOTED TO ACCEPT THE MRC/MARATHON PLAN

75.     The Balloting Agent complied with all the solicitation requirements for the proposed plans of reorganization.  [MMX 44].

76.     Classes 3, 4, 5, 7, and 8 voted overwhelmingly to accept the MRC/Marathon Plan.  [MMX 44 Exhibit A].  The MRC/Marathon Plan was accepted by more than 95% of unsecured creditors in number and by more than 99% of unsecured creditors in dollar amount, excluding the Noteholders.  [MMX 44 Exhibit A].

77.     The Indenture Trustee Plan was overwhelmingly rejected by Scopac's unsecured trade creditors.  Over 90% of the holders of Class 3 – representing over 99% of the dollar amount of their claims – voted to reject the Indenture Trustee Plan.  [MMX 44 Exhibit B].  As a result, the Indenture Trustee Plan is supported by merely one group – the constituency it represents – the Noteholders.

## VI.     GOVERNMENT OFFICIALS, REGULATORY AGENCIES, AND THE COMMUNITY SUPPORT THE MRC/MARATHON PLAN[5]

78.     On January 29, 2008, and April 4, 2008, Governor Arnold Schwarzenegger filed the State of California's Position in Support of the MRC/Marathon Plan.  [MMX 27; MMX 28].

79.     On February 11, 2008, California Trout, Conservation International, Pacific Forest Trust, Rainforest Alliance, Sustainable Conservation, and

---

[5] Of course the letters and statement submitted to the Court and placed on file are not evidence in this case, but do indicate the level of support for the MRC/Marathon Plan.

Trout Unlimited joined together to send a letter to the Court in support of the MRC/Marathon Plan. [MMX 32].

80.    On February 19, 2008, U.S. Senator Diane Feinstein filed a Statement of Position suggesting reorganization foals which the MRC/Marathon Plan fulfills, while the Indenture Trustee Plan does not.

81.    On February 22, 2008, and April 3, 2008, Congressman Thompson filed a Statement of Position in support of the MRC/Marathon Plan. [MMX 25; MMX 26].

82.    On March 11, 2008, the Board of Supervisors for the County of Humboldt sent a letter to the Court indicating that it supports any plans that "[m]aintain the Pacific Lumber Company in a single ownership as working commercial forestlands…Fulfill all commitments associated with the Habitat Conservation Plan that accompanied the Headwaters Agreement…Maintain the skilled work force…Acknowledge the standard of environmental stewardship…Continue the operation of the Mill…" [MMX 33].  The MRC/Marathon Plan fulfills these qualifications; the Indenture Trustee Plan does not.

83.    On March 18, 2008, twenty-five local families who own and manage over 400,000 acres of timberland in Humboldt and Mendocino Counties sent a letter to the Court to express their support for the MRC/Marathon Plan. [MMX 56].

84.    On March 20, 2008, the Greater Eureka Chamber of Commerce filed a Statement "strongly" recommending the MRC/Marathon Plan. [MMX 31].

85.    On April 4, 2008, the California State Agencies filed a Statement Of Support for the MRC/Marathon Plan. [MMX 29].

86.     On April 4, 2008, the Federal Wildlife Agencies filed comments on the proposed plans, noting that the MRC/Marathon Plan "is the most consistent with the existing Habitat Conservation Plan."  [MMX 30].

87.     The Environmental Protection Information Center, or EPIC, in Garberville, Humboldt County, supports the MRC/Marathon Plan, stating that the MRC/Marathon Plan "offers more promise and opportunity for sustainable timber production and employment than any other plan…offers a more realistic opportunity to engage the community, and creates sustainable jobs. This is the plan which should be confirmed."  [MMX 55].  EPIC has further stated that "[the] Marathon-MRC plan for PL's reorganization is the one that deserves the support of the public and confirmation by the bankruptcy court."  [MMX 65].

88.     The Times-Standard, the largest newspaper for the Scotia region, supports the MRC/Marathon Plan.  [MMX 52].  The newspaper has stated that "Mendocino/Marathon have the best plan."  [MMX 52].

89.     The North Coast Journal of Humboldt County, California has also voiced its support for the MRC/Marathon Plan as the best plan.  [MMX 53], stating that the MRC/Marathon Plan is supported by "the great majority" of its readers.  [MMX 53]. In particular, the North Coast Journal supports the plan because it will keep the Timberlands and Mill together, stop the cutting of old growth redwood and Douglas fir trees, make Newco eligible to be recognized by the FSC, and ensure that the pensioners are taken care of.  [MMX 53].

90.     The Eureka Reporter, another major Humboldt County paper, also believes that the MRC/Marathon Plan offers the solution.  The newspaper has stated

"Nevertheless, the judge, when he weighs all the factors, will be taking into consideration the effect of his decision on the livelihood of those who work at PALCO, the economy of Humboldt County and a petitioner's commitment to the integrity of the environment. We hope he chooses the MRC plan."  [MMX 54].

91.     The MRC/Marathon Plan has widespread support of the various governmental and regulatory agencies that oversee the Debtors and the Timberlands.

## VII.   THE VALUE OF THE TIMBERLANDS IS NO MORE THAN $510 MILLION

### A.     Richard N. LaMont

92.     Richard N. LaMont is a timberland appraiser and forestry expert who has conducted appraisals of over 200 timberland properties located in California, Idaho, Oregon, and Washington.   (Tr. 4/8/08 253:12-253:14, 253:21-253:25).   Mr. Lamont was retained by Marathon to conduct an appraisal of the Timberlands and MMCAs (collectively, the "Timberlands").  [MMX 4 ¶ 1].

93.     Mr. LaMont's analysis opines that as of April 30, 2008, the fair market value of the Timberlands is $430 million.  (Tr. 4/8/08 255:8-255:10); [MMX 4 ¶ 4].

94.     As part of his valuation of the Timberlands, Mr. Lamont determined that the highest and best use of the Timberlands is as a timber production zone.   (Tr. 4/8/08 255:18-255:23); [MMX 4 ¶ 15].   This conclusion is based on an analysis that considers whether particular uses of the property are legally permissible, physically possible, financially feasible, and will provide maximum productivity.  (Tr. 4/8/08 255:24-256:1); [MMX 4 ¶ 13].   The results of this analysis showed that the Timberlands are too steep and inaccessible for uses other than as timberlands, including

farming, residential, or industrial purposes.  (Tr. 4/8/08 256:1-256:8); [MMX 4 ¶ 14].  As a result, Mr. LaMont's conclusion that the Timberlands are worth $430 million is based on their use as timberlands.  [MMX 4 ¶ 15].

95.     Mr. LaMont utilized two methods to value the Timberlands: the Income Approach and the Sales Comparison Approach.  (Tr. 4/8/08 259:20-259:25); [MMX 4 ¶ 17].  A third approach, the Cost Approach, is not customarily used in the valuation of larger timberlands due to the natural mix and plantation stands.  [MMX 4 ¶ 17].

96.     For each method, Mr. LaMont used a 50-year forecast, which is "typical" industry practice.  (Tr. 4/8/08 270:24-271:8, 317:25-318:2, 353:2-353:10); [MMX 4 ¶ 21].  It is important that an analysis simulate the growth and harvest of the forest over at least one tree rotation, and it takes approximately 45 years for a redwood to grow enough to be harvested.  (Tr. 4/8/08 260:6-260:18, 352:13-353:1); [MMX 4 ¶ 24].  Thus, a 50-year forecast accounts for the length of time that it takes a tree to grow and be available for harvest.  (Tr. 4/8/08 260:6-260:18); [MMX 4 ¶ 24].

      a.      **<u>Income Approach</u>**

97.     Under the Income Approach, cash flows for a given period are projected and then discounted to create a present value.  This is known as a "discounted cash flow analysis." (hereinafter "DCF"). [MMX 4 ¶ 19].

      i.      **Harvest Forecasts**

98.     The first step in conducting a discounted cash flow analysis is to develop a harvest forecast to determine the harvest rate for the property.  [MMX 4 ¶ 20].

99.     Using computerized modeling to project harvests in larger properties is the industry standard.  (Tr. 4/8/08 271:9-271:73).  Computerized models ensure that the type of trees that the model projects to be harvested are actually available to be harvested, are of a proper age to be harvested, and are located in an area that can be harvested under the applicable regulations.  (Tr. 4/8/08 257:2-257:24); [MMX 4 ¶¶ 22-23].  In particular, there are several restrictions attached to the Timberlands that limit the harvest volume, including watershed restrictions.  (Tr. 4/8/08 257:11-257:14); [MMX 4 ¶ 23].

100.     In determining the harvest forecast, Mr. LaMont employed a widely-used computerized forecasting model for timberland modeling called "Woodstock".  (Tr. 4/8/08 256:16-260:1, 271:14-271:21); [MMX 4 (LaMont Report at 46)].  Mr. LaMont entered the total operable timber inventory provided by Scopac into the computerized models, which determined every individual stand in the Timberlands, as well as when each stand would be available for harvest.  (Tr. 4/8/08 256:16-260:1, 288:24-289:3).

101.     Using the computerized model and taking into account species mix of the trees, age distribution of the trees, types of harvest methods, growth rates, local market conditions, and regulatory constraints, Mr. LaMont developed three different harvest scenarios, each of which utilized a 50-year forecast.  [MMX 4 ¶ 21].  The three scenarios reflect what a likely owner of the Timberlands would harvest from the property and test the response of harvest levels to different management and harvesting philosophies.  (Tr. 4/8/08 294:14-294:22, 312:22-313:19); [MMX 4 ¶ 21].

102.    Each harvest scenario was run on a non-declining, even flow basis, which means that after Year 1, the harvest level does not decline over time.  (Tr. 4/8/08 289:18-290:7).  It can, however, increase.  (Tr. 4/8/08 290:14-290:16).

103.    None of the harvest scenarios propose cutting significant levels of Douglas fir in the first few years because the cost of harvesting Douglas fir is currently more than Douglas fir logs sell for, meaning that the harvest of Douglas fir has a negative cash flow.  (Tr. 4/8/08 350:3-350:10).  Douglas fir prices are currently at a historic all-time low. (Tr. 4/8/08 350:18-350:20).

104.    A comparison of each of Mr. LaMont's three harvest scenarios to James F. Fleming's and James R. Yerges's scenarios shows that Mr. LaMont is proposing to cut roughly the same amount of redwood in the first ten years as Mr. Fleming and Mr. Yerges.  (Tr. 4/8/08 314:25-316:4); [IT 4 Table 1].  However, Mr. LaMont took into consideration the negative cash flow associated with Douglas fir and therefore proposed cutting less Douglas fir in his scenarios as compared to Mr. Fleming and Mr. Yerges's scenarios.  (Tr. 4/8/08 315:5-315:13).

105.    Each of the harvest scenarios are based on harvest levels that are greater than those proposed under the MRC/Marathon Plan.  (Tr. 4/8/08 343:19-344:1).

106.    Mr. LaMont's first harvest scenario, Run 1, reflects the likely scenario for operators who are moving away from clear cutting and are allowing for additional planning to be completed with lower initial harvest levels.  [MMX 4 (LaMont Report at 59)].  Run 1 is based on a harvest rate of 60/MMBF for the first five years.  (Tr. 4/8/08 293:15-293:18); [MMX 4 (LaMont Report at 47)].  In years 6 through 10, Run 1 projects that 70/MMBF will be harvested.  [MMX 4 (LaMont Report at 47)].  Starting in

2017, Run 1 allows for harvesting at a rate that is greater then average growth rate. (Tr. 4/8/08 324:20-324:25); [MMX 4 (LaMont Report at 50)]. Run 1 is designed so that what is grown is harvested over the 50 years of the model. (Tr. 4/8/08 325:9-325:10).

107. Mr. LaMont's second harvest scenario, Run 2, is also based on a harvest rate of 60/MMBF for the first 5 years, though this harvest rate increases to 75/MMBF in years 6 through 10. [MMX 4 (LaMont Report at 47)]. It also reflects a move away from clear cutting. [MMX 4 (LaMont Report at 47)].

108. In Mr. LaMont's third harvest scenario, Run 3, the maximum harvest possible is calculated (Tr. 4/8/08 353:23-353:25). In this scenario, the computerized model selected 73/MMBF as the starting point for harvesting redwood. (Tr. 4/8/08 294:11-294:13, 309:24-310:1); [MMX 4 (LaMont Report at 47)]. Years 1 through 10 are based on a harvest rate of approximately 74/MMBF, a level that is sustainable. (Tr. 4/8/08 310:14-311:3); [MMX 4 (LaMont Report at 55)]. Run 3 calculates the maximum harvest possibility, whereas Run 1 and Run 2 take a more conservative approach to account for the time it would take new owners to acclimate to the property. (Tr. 4/8/08 353:11-353:25).

### ii.     Log Prices

109. The next step in conducting a discounted cash flow analysis is to apply log prices to the harvest forecast to determine total revenue. [MMX 4 ¶ 25]. Mr. LaMont developed log prices using historical California State Board of Equalization ("SBE") stumpage prices and historical Pacific Rim Market prices. (Tr. 4/8/08 257:25-258:12, 272:16-272:19); [MMX 4 (LaMont Report at 34, 38)].

110.    Stumpage pricing only calculates the value to the log grower and not the costs of cutting and hauling logs to a mill.   (Tr. 4/8/08 282:15-282:18). Therefore, Mr. LaMont adjusted the SBE values to account for the cost of cutting and hauling logs to a mill.  (Tr. 4/8/08 282:20-282:23).

111.    In the last six months, log prices have dropped significantly by as much as 10%-15%, particularly in young growth redwood.   (Tr. 4/8/08 258:13-258:258:22); [MMX 85; MMX 86].  Likewise, Douglas fir prices are at an all-time low. (Tr. 4/8/08 350:18-350:25).  This decrease in log prices is attributable to the economic slowdown, particularly in the housing market, which has resulted in a decline in building and remodeling activity.  (Tr. 4/8/08 258:23-259:5); [MMX 1 ¶ 78; MMX 4 ¶ 25].  Mr. LaMont's analysis accounts for this decline in pricing.  (Tr. 257:25-258:22); [MMX 4 (LaMont Report at 38)].

112.    Mr. LaMont priced redwood at $821-$878/MBF and Douglas fir at $485/MBF for the first year in his model.  [MMX 4 (LaMont Report at 38)].

113.    The uncontroverted testimony at the Confirmation Hearing demonstrated that current prices for young growth redwood is in the range of $800-$850/MBF.   (Tr. 4/8/08 263:21-264:5;  Tr. 4/11/08 173:13-173:19, 173:25-174:6; Tr. 4/30/08 309:13-309:20).

### iii.    Costs

114.    The next step in conducting a discounted cash flow analysis is to forecast the costs associated with harvesting timber over the 50-year forecast period and subtract them from total revenue.  [MMX 4 ¶ 26].

115.     In calculating costs over the 50-year forecast period, Mr. LaMont took into account the millions of dollars in cost to comply with the environmental regulations that the Timberlands are subject to, including the HCP and Timber Harvest Plans ("THPs"), which include requirements for certain road improvements, as well as capital expenditures for storm proofing.  (Tr. 4/8/08 286:17-287:11).  Compliance with these regulations leads to an increased cost in the first five years of any harvest scenario to allow new owners to catch up on the backlog created by Scopac, though these costs decrease after that.  (Tr. 4/8/08 331:7-332:19); [MMX (LaMont Report at 40)].

### iv.     Discount Rate

116.     The final step in conducting a discounted cash flow analysis is to develop a real rate of return to discount the cash flows back to present value.  [MMX 4 ¶ 27].  A real rate of return excludes inflation.  (Tr. 4/8/08 337:2-337:3); [MMX 4 ¶ 27].

117.     Mr. LaMont employed a discount rate of 7%.  (Tr. 4/8/08 297:21-297:23); [MMX 4 ¶ 28].  This discount rate was calculated based on cash flow data obtained from major timberland sales in Oregon and Washington in 2006-2007, which yielded a discount rate of 6%.  (Tr. 4/8/08 297:24-298:1); [MMX 4 ¶ 27].  This discount rate was then increased by 1% to 7% to account for the additional regulatory constraints and uncertainties associated with timberland property in Northern California.  (Tr. 4/8/08 261:20-262:4, 298:1-298:4); [MMX 4 ¶ 28].

118.     One such regulatory uncertainty is a bill pending in the California state legislature concerning clear cutting.  If passed, this legislation would reduce the amount of timber that could be harvested.  (Tr. 261:20-262:4); [MX 4 ¶ 28].

### v.   Results

119.    Using the discounted cash flow analysis, Mr. LaMont concluded that the fair market value of the Timberlands under Run 1 was $407 million, under Run 2 was $430 million, and under Run 3 was $446 million.  [MMX 4 ¶ 29].

120.    Based on the results of Runs 1 through 3, Mr. LaMont concluded that the fair market value of the Timberlands is $430 million.  (Tr. 4/8/08 255:8-255:10); [MMX 4 ¶¶ 4, 32].

### b.   **Comparable Sales Analysis**

121.    Mr. LaMont also conducted a comparable sales analysis based on log values.  (Tr. 4/8/08 299:3-299:8).

122.    During the last decade, there have been several significant timberland sales in the region that are useful to create a benchmark of market transactions.  [MMX 4 (LaMont Report at 62)].  These include: (1) Louisiana Pacific Corporation's ("LPC") sale of 224,466 acres of redwood and Douglas fir timberland for $240 million to MRC in Mendocino County in July 1998; (2) LPC's sale of 70,448 acres of redwood and Douglas fir timberland for $372 million to Simpson Investment Company in Humboldt County in July 1998; (3) Georgia Pacific Corporation's sale of 194,108 acres of acres of redwood and Douglas fir timberland for $397 million to Hawthorne Timber Company LLC ("Hawthorne") in Humboldt County in December 1999; (4) Stimson Lumber Company's sale of 24,772 acres of redwood and Douglas fir timberland for $62 million to Save the Redwoods League in Del Norte County in May 2002; (5) Pioneer Resources LLC's sale of 76,300 acres of redwood and Douglas fir timberland for $48 million to Coastal Ridges, LLC in Mendocino and Sonoma Counties

in December 2003; (6) Coastal Ridges LLC's sale of 23,780 acres of redwood and Douglas fir timberland for $17.5 million to the Conservation Fund in Mendocino County in February 2004; (7) Hawthorne's sale of 16,052 acres of predominantly redwood timberland with some river flats for $48 million to the Conservation Fund in Mendocino County in November 2006; and (8) Hawthorne's sale of 50,635 acres of predominantly redwood timberland for $65 million in Mendocino County in June 2007.  [MMX 4 (LaMont Report at 62-63)]

123.    To account for the varied nature and location of these properties, adjustments were made to make them comparable to the Timberlands.  [MMX 4 ¶ 21].

124.    The most important adjustment that was made to the properties to effectuate a valid sales comparison was for the regulatory restrictions imposed on the Timberlands.  (Tr. 4/8/08 360:2-360:9); [MMX 4 ¶ 32].

125.    The Timberlands are subject to various watershed requirements, THPs, and an HCP, which seeks to protect species found on the Timberlands, including some of those found on the national endangered species list.  [MMX 4 ¶ 32; MMX 4 (LaMont Report at 70)].  The HCP also significantly reduces the ability to harvest on the Timberlands.  [MMX 4 (LaMont Report at 70)].  Based upon the impact of the HCP and other restrictions on the harvest level, there has been a 33%-65% reduction in harvest.  [MMX 4 (LaMont Report at 70)].  However, none of the comparable properties are subject to an HCP.  (Tr. 4/8/08 360:2-360:9); [MMX 4 ¶ 32].

126.    Besides the Timberlands, the only other property that is for sale and is subject to an HCP is Green River, which is owned by Plum Creek Timber in Washington.  [MMX 4 (LaMont Report at 71)].  Although this property has been

marketed several times in the past three years, it has not sold because the offers have come in at levels that are 25%-30% lower than the seller's expectations.  [MMX 4 (LaMont Report at 71); MMX 11 ¶ 20; MMX 14; MMX 15; MMX 16].

127.    Other appropriate adjustments are made for inflation, time of sale, species composition, and site productivity.  [MMX 4 ¶ 31].

128.    Under the Sales Comparison Approach, Mr. Lamont found that the fair market value of the Timberlands is $425 million.  [MMX 4 ¶ 33].

### c. Liquidation Value

129.    Mr. LaMont also performed a discount cash flow analysis to determine the liquidation value of the Timberlands.  [MMX 4 ¶ 34].

130.    Mr. LaMont determined that the following are key features of a liquidation scenario for the Timberlands:

a.     The buyer will have little time – about 1-2 months – to complete due diligence;

b.     Log prices will be 10% lower than the current market conditions due to sale in a down pricing period;

c.     Debtors will be unable to complete 50% of their harvest plans because of harvest shut downs during the first year;

d.     The buyer will assume a 10% reduction in available acres due to environmental concerns, a lack of time for due diligence and net down analysis;

e.     The buyer will assume a 10% reduction in available volume due to poor quality and age of inventory data and a lack of time for due diligence and inventory validation;

f.     Non-declining, even flow, follow California SYP and other regulations, maintain current available softwood inventory levels;

g.     The primary harvest method will be utilized to reduce environmental and political pressure on the property; and

h.   There will be sequential even-flow for each watershed with caps on Humboldt and Eel River in accordance with all watershed regulations under the HCP, Tier 1 and 2, and Water Boards.

[MMX 4 ¶ 35].

131.   Taking these features into consideration in the discount cash flow analysis, Mr. LaMont determined that the liquidation value of the Timberlands is $260 million.  (Tr. 4/8/08 255:11-255:13); [MMX 4 ¶¶ 5, 36].

### d.   Conclusion

132.   Mr. LaMont is an experienced appraiser of timberlands.

133.   Mr. LaMont's analysis is persuasive, taking into account all relevant factors necessary to appraise the Timberlands, including appropriate harvest rates, costs, and regulatory limitations.

134.   Mr. LaMont is a credible witness whose testimony deserves significant weight, and whose conclusions are given great weight by the Court.

### B.   James E. Fleming

135.   James E. Fleming was retained by the Indenture Trustee to conduct an appraisal of the Timberlands.  (Tr. 4/10/08 16:9-16:13).  Other than beginning, but not completing, an appraisal of the Timberlands in 2005, the largest timberlands appraised by Mr. Fleming consisted of just 26,544 acres and took place in 1978.  (Tr. 4/10/08 102:24-103:5).

136.   Mr. Fleming opined that as of October 1, 2007, the fair market value of the Timberlands was $605 million.  (Tr. 4/10/08 16:16-16:18); [IT 1 ¶¶ 3, 62]. Mr. Fleming selected a value date of October 1, 2007 because it "seemed like a good date" and his data only went up to that date.  (Tr. 4/10/08 16:19-16:22, 34:21-34:22).

137.    If Mr. Fleming had data that was more recent than October 1, 2007, he would have used a more current valuation date in his analysis.  (Tr. 4/10/08 36:3-36:6).

138.    Like Mr. LaMont, Mr. Fleming determined that the highest and best use of the Timberlands is as a timber production zone.  (Tr. 4/8/08 255:18-255:23); [IT 1 ¶ 22].

### a.    <u>Income Approach</u>

139.    Mr. Fleming only utilized the Income Approach to value the Timberlands and did not utilize the Comparable Sale Approach.  [IT 1].

140.    Mr. Fleming is aware that other timberland appraisers utilize a 50-year forecast.  (Tr. 4/10/08 125:16-125:20).  Nevertheless, Mr. Fleming only used a 10-year forecast in his analysis because he thought that five years was "probably too short" and 15 years "involves too much uncertainty."  (Tr. 4/10/08 125:8-125:15); [IT 1 ¶ 29].

141.    Mr. Fleming did not use any computerized models in his analysis.  (Tr. 4/10/08 112:11-113:1).  Instead, he used a simple Excel spreadsheet.  (Tr. 4/10/08 113:5-113:9).

142.    Mr. Fleming does not use regression analysis in his appraisals, nor is he aware of others using it either.  (Tr. 4/10/08 111:12-112:10).

### i.    Harvest Forecasts

143.    Mr. Fleming ran only one harvest scenario.  [IT 1]

144.    In determining the harvest forecast, Mr. Fleming relied on the total operable timber inventory provided by Scopac.  [IT 1 ¶ 13].  Mr. Fleming did not use the GIS database.  (Tr. 4/10/08 150:3-150:13).

145.    Mr. Fleming conducted his analysis at a watershed level, not on a polygon by polygon basis.  (Tr. 4/10/08 116:1-116:7).

146.    Mr. Fleming's harvest scenario is based on an average harvest rate of 81/MMBF for the first nine years, and 100/MMBF in year 10.  (Tr. 4/10/08 45:7-45:17, 61:21-61:24); [IT 4 ¶ 34-37].  Mr. Fleming's harvest scenario does not determine which of those nine years would experience harvest rates below, above, or at 81/MMBF.  (Tr. 4/10/08 45:18-45:21).  It also does not determine how the 81/MMBF is broken up by stand or location each year.  (Tr. 4/10/08 147:23-148:9).  Mr. Fleming did not provide any analysis to show how he calculated an average harvest rate of 81/MMBF for the first nine years.  (Tr. 4/10/08 46:20-48:5).  Mr. Fleming did not consider the historical harvest rates of the company in selecting his harvest rates.  (Tr. 4/10/08 48:6-48:11).

147.    Mr. Fleming knows that the Mill is not currently milling Douglas fir, but he did not make any inquiries to determine if that is because harvesting Douglas fir is uneconomical.  (Tr. 4/10/08 80:18-81:6).  Mr. Fleming knows that Douglas fir prices have been down in recent years.  (Tr. 4/10/08 81:7-81:10); [IT 1 ¶¶ 42-44].  Nevertheless, he did not conduct any analysis to determine whether the cost of harvesting Douglas fir is more than the revenue generated from harvesting that species.  (Tr. 4/10/08 83:18-85:1).  Mr. Fleming projects 26.1% of his 81/MMBF harvest rate is attributed to Douglas fir.  [IT 1 ¶ 34].

148.    In Mr. Fleming's harvest scenario, the harvest rate jumps to 100/MMBF in year 10.  (Tr. 4/10/08 61:21-61:24).  Roughly 25% of this projected 100/MMBF is attributed to Douglas fir.  [IT 1 ¶ 36].

149.    There are adjacency restrictions attached to the Timberlands that impose limitations on what can be harvested from the Timberlands and where. (Tr. 4/10/08 49:18-50:10).  Mr. Fleming did not conduct any stand-by-stand allocations to determine whether his proposed harvest rate would violate the adjacency restrictions on the Timberlands. (Tr. 4/10/08 50:20-52:4, 153:6-153:14].

150.    Mr. Fleming did not consider the age of trees in determining the amount that he believes can be harvested from the Timberlands. (Tr. 4/10/08 57:15-57:24].

151.    Currently, the harvest level is approximately 74/MMBF annually. [MMX 4 (LaMont Report at 70)].  This means that Mr. Fleming is proposing to increase the harvest rate on average 10% for each of the first nine years. (Tr. 4/10/08 49:1-49:9).

152.    Mr. Fleming agrees that the annual growth rate of the Timberlands is dependant on the age class of the timber. (Tr. 4/10/08 67:10-67:15).  Nevertheless, Mr. Fleming used the same growth rate – 3.75% – across all age classes in his harvest scenario. (Tr. 4/10/08 67:16-67:18).  Moreover, Mr. Fleming did not apply different growth rates to different species of trees. (Tr. 4/10/08 86:15-86:17).

153.    Mr. Fleming's harvest scenario is not accepted by the California Department of Forestry for Sustained Yield Planning (Option A) for large commercial timberlands. (Tr. 4/8/08 355:7-355:13); [MMX 4 ¶ 41].

### ii.    Log Prices

154.    Mr. Fleming priced young growth redwood at $975/MBF for the first year of his analysis. (Tr. 4/10/08 41:2-41:8); [IT 1 ¶ 38].  Mr. Fleming projects that each year, the price will increase by 3.5% so that in year two, the price of young growth

redwood will be 3.5% higher than $975/MBF, in year three, the price of young growth redwood will be 3.5% higher than that, and so on.  (Tr. 4/10/08 41:9-41:17).

155.    Mr. Fleming agreed that if his initial price of $975/MBF feet was inflated, that mistake would be compounded each year by the additional 3.5% projected growth increase.  (Tr. 4/10/08 41:18-42:7).

156.    Log prices have dropped significantly from October 1, 2007, through the present by as much as 10%-15%, particularly in young growth redwood.  (Tr. 4/8/08 258:13-259:5).  Recent market sales of young growth Redwood logs indicate that the price is more appropriately valued around $800-$850 per thousand board feet.  (Tr. 4/8/08 263:21-264:5).

157.    Mr. Fleming's appraisal is current only through October 1, 2007. (Tr. 4/10/08 37:15-37:18, 95:4-95:14).  Despite the considerable drop in log prices during the 6-month period from October 1, 2007, through the present time, Mr. Fleming made no efforts to update his findings to reflect the value of the Timberlands during this time. (Tr. 4/10/08 37:15-37:18, 95:4-95:14).    He did not know that redwood prices have declined since October 1, 2007, the date of his appraisal.  (Tr. 4/10/08 38:9–38:12).

158.    Changing only this one price of this one type of log to $800-$850/MBF and keeping all other aspects of Fleming's report the same reduces Fleming's valuation by $100-$153 million, dropping his fair market value of the timberlands from $605 million to $452 million.  (Tr. 4/8/08 264:6-264:19).

### iii.    Costs

159.    Mr. Fleming assumes a cost adjustment of 2.75%.  [IT 1 ¶ 46].

### iv.    Discount Rate

160.    Mr. Fleming used a real discount rate of 6.25% as compared to Mr. LaMont's discount rate of 7%.  (Tr. 4/10/08 68:1-68:4, 90:10-90:12).

161.    In calculating this discount rate, Mr. Fleming considered the corporate bond rate, treasury securities, and the prime rate, but did not consider alternative timber transactions.  (Tr. 4/10/08 69:20-70:8).  Mr. Fleming also considered "aspects of government and regulatory issues" among other "other considerations," but ultimately, "in my final analysis, I really don't have any specific adjustments for each individual category or consideration."  (Tr. 4/10/08 67:19-71:12).

162.    Adjusting Mr. Fleming's discount rate to 7% to account for California's regulatory climate would alone reduce Mr. Fleming's fair market value by approximately $75 million.  [MMX 4 ¶ 43].

### b.    <u>Conclusion</u>

163.    Mr. Fleming's analysis has significant flaws including the use of October 1, 2007, as his appraisal date, the failure to account for the recent and significant decline in redwood and Douglas fir prices and the failure to provide specific analysis or explanation for his harvest rate, growth projections and discount rate.

164.    Mr. Fleming was unable credibly to explain these flaws during his testimony at the Confirmation Hearing, and his valuation opinion is accorded little weight.

### C.   Glenn Daniel

#### a.   Lack of personal expertise

165.   Glenn Daniel of Houlihan, an expert for the Indenture Trustee, expressly admitted that:  he has no substantive timber experience whatsoever; he has never appraised timberlands; he is not a timber expert in any way; he has no training in forestry; he is not an expert on timber growth; he is not an expert on price appreciation for logs or timber forecasts; and he is not an expert on the unique California regulatory environment.  (Tr. 4/10/08 201:14-201:20, 202:10-202:21, 203:7-203:25, 204:1-204:16, 355:9-355:18).

166.   Mr. Daniel's opinions rely on what he understood to be Mr. Fleming's timber-related harvest, price, and cash flow opinions.  (Tr. 4/10/08 207:1-207:10). Mr. Daniel did not do any independent analysis of Mr. Fleming's harvest rate.  Therefore, as Mr. Daniel admitted, his opinions are wrong to the extent that Mr. Fleming's opinions have changed or are deemed unpersuasive.  (Tr. 4/10/08 208:20-210:10).

167.   Mr. Daniel's lack of personal expertise in timber valuation renders his opinions on this subject unreliable.

#### b.   Forced role and limited personal involvement

168.   The weight to be accorded to Mr. Daniel's opinion is further eroded because he was forced into presenting a valuation opinion that was developed by others at Houlihan.

169.   Mr. Daniel was essentially ordered by his superiors, over his objections, to provide the valuation opinion in this case.  (Tr. 4/10/08 215:24-222:23).

170.    If the Indenture Trustee Plan is confirmed, Houlihan expects to receive millions of dollars in fees for its work as sales agent under that plan.  (Tr. 4/10/08 215:16-215:23).

171.    Mr. Christopher DiMauro, the senior Houlihan employee on the matter, had previously provided a much lower valuation.   In September 2007, Mr. DiMauro, the most active Houlihan person on this matter, submitted a declaration stating that the value of the same assets covered by Mr. Daniel's report was $375 to $500 million based on the discounted cash flow ("DCF") analysis and $290 to $460 million based on the comparable companies analysis.   [MMX 11 ¶¶ 14, 15, 19]; (Tr. 4/10/08 211:2-213:17).   The clear inference is that the decision to have Mr. Daniel rather than Mr. DiMauro testify at the Confirmation Hearing was due to the fact that Mr. DiMauro had previously testified before the Court to a valuation much lower than that to which Houlihan is now opining.

172.    Houlihan essentially told Mr. Daniel the substance of the valuation opinion that it expected him to give.   Specifically, other individuals at Houlihan had already prepared a valuation report with a valuation number prior to Mr. Daniel becoming involved with this matter and Mr. Daniel was sent that report immediately after being ordered by his superiors to undertake the assignment.  (Tr. 4/10/08 222:24-225:12). Specifically, the valuation conclusions of that report were substantially the same as the final report and Mr. Daniel never changed the report he was sent.

173.    There are numerous other indicia confirming that Mr. Daniel's role in developing the opinion and the report was very limited.  First, Mr. Daniel did not start any work on the project until March 4, 2008, and the report was substantively complete

by March 11, 2008, just seven days later.  (Tr. 4/10/08 232:6-233:14).  Second, the report repeatedly refers to the valuation as Houlihan's valuation, not as Mr. Daniel's.  (Tr. 4/10/08 234:24-235:15).  Third, at his deposition, Mr. Daniel did not know that Scopac's harvest rate had declined dramatically over the past several years, even though that fact is highly material to a valuation analysis.  (Tr. 4/10/08 282:24-284:5).  Likewise, Mr. Daniel did not know that the report gave equal weight to certain preliminary bids as it did to two other methodologies,  a weighting that he testified would be inappropriate.  (Tr. 4/10/08 226:12-228:3).

**c.**     **Substantive flaws in Mr. Daniel's report and opinion**

**i.**     **Reliance on "Preliminary Bids"**

174.     The report relies on three "preliminary bids."  (Tr. 4/10/08 249:21-250:8).  The report gives those bids equal weight with the DCF and comparable companies analysis and it also uses those preliminary bids to help determine the discount rate and the cap rate used in the DCF methodology.  (Tr. 4/10/08 252:13-254:19).  The appraisal is inappropriate for several reasons.

175.     Preliminary bids are not used as a valuation methodology. Mr. Daniel admitted that he had never used them before in the hundreds of valuations he has issued and cannot recall ever seeing them used in one before.  (Tr. 4/10/08 359:17-361:13).  The accepted practice in performing valuations is not to use preliminary bids or similar statements of interest because they are not binding.  (Tr. 4/10/08 254:15-254:19).

176.     Mr. Daniel did not contact the entities that had submitted the preliminary bids and he had no personal knowledge of the extent or nature of their due diligence. Therefore had no way to know how firm (or not) the expressions of interest

were.  (Tr. 4/10/08 254:25-255:6, 362:3-362:15).   In addition, other employees at Houlihan had already been told by one of the three entities that it was going to reduce the amount it had stated, but the Houlihan employees did not reveal that to Mr. Daniel and specifically asked the entity not to put that new lower figure into writing.  (Tr. 4/10/08 255:25-266:15); [MMX 88D 67:14-68:15].  As for another of the entities, Mr. Daniel did no due diligence as to whether the entity could get financing for its expression of interest and was not aware that the entity had refused Houlihan's request that the entity sign a letter of intent.  (Tr. 4/10/08 273:8-276:11); [MMX 88E 19:15-19:21, 20:22-23:9, 21:18-22:5, 24:16-25:25, 60:11-61:22].

### ii.    Discounted Cash Flow ("DCF") Methodology

177.    To the extent Mr. Fleming's cash flow projections are inaccurate, Mr. Daniel's DCF projection is also incorrect.  (Tr. 4/10/08 282:12-282:17).

178.    Debtors' harvest trend has declined dramatically over the past several years (from 160 million to 100 million to 73 million), and their EBITDA has declined sharply as well (from 51 to 42 to 23).  However, the projections on which Mr. Daniel relied include an immediate 78% increase in EBITDA.  (Tr. 4/10/08 284:6-287:18).

179.    Mr. Daniel's valuation result was sharply increased by the use of much higher numbers for the terminal year, which provides more than half of Mr. Daniel's valuation.  (Tr. 4/10/08 289:4-291:13).  Specifically, the projected EBITDA jumps 30% from $52 million in 2016 to $68 million in 2017, a big increase.  (Tr. 4/10/08 289:4-291:13).  Likewise, the projected cash flow jumps from $46 million in 2016 to $61.78 million in 2017 – an increase obtained by excluding the storm proofing

expenditures and 25 percent of road construction costs in that terminal year.  (Tr. 4/10/08 290).

180.    Mr. Daniel's opinion relied on the three "preliminary bids" to derive a discount rate, but doing so required Mr. Daniel to make his own assumption about those entities' harvest rate and cash flow projections, since he never had any contact with them.  (Tr. 4/10/08 294:7-299:25).  Because Mr. Daniel has provided no reason to believe that those entities' projections were similar to those he assumed, his analysis is unreliable.

181.    Mr. Daniel employed an artificially low discount rate of 10.5%, which resulted in an artificially high valuation.  Mr. DiMauro's prior valuation used a discount rate of 11.5%.  (Tr. 4/10/08 302:13-302:18).  The weighted average cost of capital that Mr. Daniel calculated was 11.2%.  (Tr. 4/10/08 302:19-303:10).  Mr. Daniel admitted that his only justification for not employing those higher discount rates was the preliminary bid letters, which cannot reliably be used for deriving a discount rate.  (Tr. 4/10/08 305:8-305:13).

### iii.    Market Multiple Methodology

182.    Mr. Daniel's report utilized a run-rate EBITDA (an average of historical and expected future EBITDA).  Here, Mr. Daniel took an average of the EBITDA for the past six years, as well as for three future years.  (Tr. 4/10/08 316:18-316:25).

183.    Run-rate EBITDA is used very infrequently for valuations. Mr. Daniel has not used it for a valuation in at least five or 10 years.  (Tr. 4/10/08 314:3-315:1).

184.    For future years, Mr. Daniel's analysis used EBITDAs that the company itself does not expect to achieve for almost 10 years, and that Houlihan itself does not expect the company to achieve.  (Tr. 4/10/08 320:15-321:7).

185.    Mr. Daniel's report relied on an inflated multiple for the so-called comparable companies.  The multiples for all but one of the comparable companies were substantially below the multiple that Mr. Daniel employed.  (Tr. 4/10/08 322:6-325:18).  Mr. Daniel gave very little weight to those companies and instead used a multiple based almost entirely on the Plum Creek Timber Company.   (Tr. 4/10/08 325:19-326:6).  However, Plum Creek is not comparable because, unlike the Debtors, it (a) does not have timberland in California and thus is not subject to heavy California regulation, (b) does not harvest redwood, and (c) derives 28% of its revenue from manufacturing.   (Tr. 4/10/08 326:17-329:25).

### d.    Conclusion

186.    Taking all of these facts into account, the Court finds that the Houlihan valuation opinion proffered by Mr. Daniel should be accorded little weight.

## D.    Scopac's Experts

### a.    Dr. Kim Iles

187.    Dr. Kim Iles concluded that the Scopac 2001 inventory as updated to January 1, 2007, was accurate but the volume could be increased by approximately 2.4%.  [DX 41 ¶ 29].

188.    Dr. Iles' margin of error is 9.7%.  [DX 41 ¶ 30].  This means that the volume could be 7.2% smaller or 12.1% larger than Dr. Iles concluded.  (Tr. 4/30/08

91:8-91:13); [DX 41 ¶ 30].  However, Dr. Iles is 68% sure that this is not the case.  (Tr. 4/30/08 66:6-67:8).

190.    Dr. Iles measured the inventory on a gross conifer basis, not on a net basis, even though logs are bought and sold on a net basis and timber appraisals are typically conducted on a net basis.  (Tr. 4/30/08 53:5-55:9, 58:7-59:8); [DX 41 ¶ 21].  Dr. Iles concedes that in "most cases" net volume would be used.  (Tr. 4/30/08 85:22-86:10).

190.    In conducting his analysis, Dr. Iles did not distinguish (a) between areas of the forest owned by Scopac and Palco (Tr. 4/30/08 66:4-67:3), (b) among the various species, even though the species mix changes over time, (Tr. 4/30/08 58:16-58:24, 63:6-63:8), or (c) between areas of the forest that are harvestable and those areas that cannot be harvested, such as the MMCAs.  (Tr. 4/30/08 59:9-62:12, 62:19-63:15).

191.    Dr. Iles did not distinguish between the growth rates of the redwood cultivars, or genetically enhanced cloned redwood, and the growth rate of natural redwood.  (Tr. 4/30/08 40:9-40:24).  Likewise, Dr. Iles did not distinguish between growth rates for areas of the forest that are harvestable and those areas that cannot be harvested, such as the MMCAs.  (Tr. 4/30/08 59:9-62:12, 62:24-63:5, 65:22-66:3).

**b.      Dr. Reimer**

192.    Dr. Don R. Reimer is a forest biometrician and resource economist who was retained by Scopac to develop a harvest forecast for the Timberlands to be used in determining the fair market value of the Timberlands.  (Tr. 4/30/08 93:17-93:19); [DX 45 ¶ 2].  Other than an earlier engagement with Scopac and Palco, this is Dr. Reimer's

first foray into working with redwood.  (Tr. 4/30/08 116:3-116:7, 233:11-233:13).  Dr. Reimer is not a California-registered professional forester.  (Tr. 4/30/08 153:6-153:8).

193.   Dr. Reimer did not develop his harvest forecast to reflect what a likely buyer of the Timberlands would harvest from the property, nor did he make any effort to determine what a likely buyer would harvest from the property.  (Tr. 4/30/08 173:10-173:23).

194.   Dr. Reimer's harvest scenario was developed based on the Timberlands, excluding the MMCAs.  (Tr. 4/30/08 113:9-113:11); [DX 45 ¶ 3].  In his scenario, Dr. Reimer projects that 85/MMBF can be harvested each year from 2008 through 2012.  [DX 45 ¶ 48a].  This is a more than 10% increase from the actual 2007 harvest.  After that, the harvest rate increases until 100/MMBF is being harvested each year from 2021 through 2025.  [DX 45 ¶ 48b].  Thereafter, the harvest rates decline for 20 years and subsequently experience a sharp increase to 140/MMBF each year from 2046 through the end of the model.  [DX 45 ¶ 48c].  This is almost double the current harvest rate for the Timberlands.

195.   Currently, the species mix of the Timberlands is 57% redwood. (Tr. 4/30/08 159:13-159:16).  As Dr. Reimer knows, there are many areas of the Scopac land base that are not even suitable for growing redwood.  (Tr. 4/30/08 159:17-159:20). Moreover, Dr. Reimer is not aware whether Scopac has ever been able to accomplish a harvest level that is 99% redwood, nor is he familiar with any large land bases in which redwood comprised 99% of a harvest was ever accomplished.  (Tr. 4/30/08 163:14-163:22).  Nevertheless, in his harvest scenarios, Dr. Reimer assumes that when the harvest rate increases significantly in 2046, the harvest will be almost 100% redwood.

(Tr. 4/30/08 159:8-159:11).  In making this assumption, Dr. Reimer is presupposing that the Scopac land base could be managed in such a way that it would be possible to change the overall species mix to allow 140/MMBF of almost exclusively redwood to be harvest in 2046.  (Tr. 4/30/08 160:1-160:7).

196.    Dr. Reimer also assumes that the harvestable portions of the forest containing redwood will contain cultivars, or genetically enhanced redwood.  (Tr. 4/30/08 175:9-175:21].  Dr. Reimer believes that the genetically enhanced redwood will grow faster, taller, and in more volume such that when the harvest rate increases significantly in 2046, 15%-20% of the land base will be comprised of genetically enhanced redwood.  (Tr. 4/30/08 179:14-179:19, 259:12-259:18).

197.    Dr. Reimer does not know the growth rate for genetically enhanced redwood.  (Tr. 4/30/08 211:12-211:17).    Moreover, Dr. Reimer admits that he does not know for certain that the genetically enhanced redwood will grow as expected, as they are a new science.  (Tr. 4/30/08 187:3-187:7, 222:24-223:9).

198.    The harvest forecast generated by Dr. Reimer calls for dramatic shifts in the species to be harvested from year to year as the rate for Douglas fir increases and then decreases.  (Tr. 5/1/08 151:19-152:2).  According to Dr. Philip Tedder, this is impractical from a customer service standpoint because it means that consumers cannot be assured that there will be enough of a particular species to purchase from year to year.  (Tr. 5/1/08 152:3-153:2).  Dr. Jeffrey Barrett, Scopac's chief forestry scientist, testified that Scopac would have to abandon Dr. Reimer's model in certain respects to solve operational issues, including this one.  (Tr. 5/1/08 91:23-92:5, 92:14-92:21).

199.    There are other operations issues with Dr. Reimer's harvest forecast.  For instance, his model proposes harvesting certain slivers without accounting for the fact that it is not economical to harvest slivers.  (Tr. 4/30/08 213:4-213:24).  In 2010, he proposes harvesting 20 board feet of redwood by helicopter.  (Tr. 4/30/08 330:4-330:10).  In 2018, Dr. Reimer's harvest forecast proposes harvesting 4 board feet – roughly the size of a small table – using a helicopter.  (Tr. 4/30/08 331:18-331:21).  Mr. Yerges and Dr. Barrett testified that in these instances, Dr. Reimer's model would have to be abandoned.  (Tr. 4/30/08 330:4-330:10, 331:11-332:2; Tr. 5/1/08 91:23-92:5, 92:22-93:2).  Including the value of trees which no forester would ever be able to cut economically inflated the value of the commercial Timberlands.  [MMX 5 ¶ 13].

200.    Abandoning the model in these instances leads to a decrease in what is being harvested and an increase in costs.  (Tr. 5/1/08 153:7-153:23).

### c.    James R. Yerges

201.    James R. Yerges, a Principal in KPMG LLP's Economic and Valuation Services practice, was retained by Scopac to determine the fair market value of the commercial Timberlands.  (Tr. 4/30/08 277:24-278:1, 279:22-279:24); [DX 48 ¶¶ 2, 8].  Unlike the other valuation experts that testified on behalf of the Indenture Trustee and Marathon, Mr. Yerges is not a forester or an expert in forestry.  (Tr. 4/30/08 294:14-294:16, 305:8-305:10).  In fact, Mr. Yerges holds no certifications or licenses with respect to appraising real property and timberlands. (Tr. 4/30/08 294:14-294:18, 339:9-339:11).

202.    Mr. Yerges's report is not compliant with the Uniform Standards of Professional Appraisal Practice.  (Tr. 4/30/08 348:24-349:3).

203.    As Mr. Yerges acknowledges, to perform a discounted cash flow analysis, an appraiser needs "reliable harvest projections."  [DX 48 ¶ 17].  Lacking the expertise to develop his own, Mr. Yerges relied on Dr. Reimer's harvest projections in conducting his own discount cash flow analysis under the Income Approach.

204.    To determine the price of logs, Mr. Yerges testified that he used SBE pricing data as a starting point.  (Tr. 4/30/08 285:24-286:3); [DX 48 ¶ 23].  Yerges's SBE prices could not be verified and appeared to be much higher than the SBE prices. (Tr. 5/1/08 157:23-157:25).  In any event, the SBE prices do not fully account for the current market conditions as a starting point.  [MMX 1 ¶¶ 79-83].  Mr. Yerges's use of these prices resulted in a $200 million increase in his valuation price.  (Tr. 5/1/08 158:14-158:16).

205.    Mr. Yerges then made adjustments to determine the pricing growth rate of redwood to be a nominal rate of 4.5% or a real rate of 1.5%.  (Tr. 4/30/08 287:16-287:18).  The rate of inflation is 3%, meaning that Mr. Yerges is asserting that there will be an increase in redwood timber prices that is greater than the rate of inflation.  (Tr. 4/30/08 299:16-300:1, 306:9-306:12).  Because the 1.5% price increase compounds every year, by the time Mr. Yerges's harvest scenario ends, the price of redwood will increase by 111%.  (Tr. 4/30/08 322:12-324:22).

206.    However, redwood prices have been stagnant for over a decade. From 1992 through December 2007, the price has been flat.  (Tr. 4/30/08 309:13-309:16, 344:3-344:20).  Moreover, the price of redwood has experienced a recent decline due to the slowdown in the economy and the presence of competitor products on the market. (Tr. 4/30/08 309:17-309:20; Tr. 4/8/08 258:13-259:5); [MMX 4 ¶ 25].  This is significant

because a likely buyer of the timberlands will look at a short-term business cycle in evaluating log prices.  (Tr. 5/1/08 157:18-157:25).  As Mr. Yerges concedes, his inflated price increase results in a $150-$200 million increase in his valuation price.  (Tr. 4/30/08 306:13-307:8; Tr. 5/1/08 158:10-158:13).

207.    Mr. Yerges calculated a 6% discount rate based on four sources: the Weighted Average Cost of Capital of companies in the United States that own timberlands, transaction returns associated with timberlands, REITS, and a survey of market participants in the timber industry.  (Tr. 4/30/08 289:11-290:3); [DX 48 ¶ 25].  Of these four sources, Mr. Yerges relied primarily on the transaction returns and survey even though most of transactions did not involve redwood.  (Tr. 4/30/08 290:4-290:7, 291:4-291:5); [DX 48 ¶ 25].

208.    Mr. Yerges considered the regulatory constraints on the property in establishing his discount rate but ultimately decided not to increase his discount rate since he believed that any increase was canceled out by the downward adjustments that he believed should be made because the commercial Timberlands consist mainly of redwood, which is scarce, grows fast, and is resistant to fire damage and bugs.  (Tr. 4/30/08 291:4-292:14); [DX 48 ¶ 37].  According to Dr. Tedder, Mr. Yerges did not appropriately account for the HCP and other regulatory constraints in calculating his discount factor or he would have raised the discount factor by 1% to 7%.  (Tr. 5/1/08 218:20-219:2).  Mr. Yerges's use of a deflated discount rate is a $53 million increase in his valuation price.  (Tr. 5/1/08 158:17-158:19).

d.    **Dr. Mundy**

209.    The MMCAs were established in September 1999 as part of the Headwaters Agreement between the State of California, the United States, and Palco. [DX 115 ¶ 11; IT 235 ¶ 9].  The MMCAs are comprised of 6 separate parcels totaling approximately 6600 acres.  [DX 115 ¶ 10; IT 235 ¶ 9].  The parcels are as follows: Elkhead Residual, Lower North Fork Elk, Bell Lawrence/Booth Run, Shaw Gift Complex, Allen Creek, and Cooper.  [DX 115 ¶ 10].

210.    There exist significant   regulatory constraints attached to the MMCAs, including:

a.    The HCP, incidental take permit, and associated implementation agreement restricting commercial timber harvesting in the MMCAs for a 50-year period;

b.    AB 1986, a state law restricting commercial timber harvesting in the MMCAs for a 50-year period as a condition of funding of the original Headwaters transaction;

c.    An agreement between Palco, Scopac, state and federal agencies contractually committing the companies to the restriction on commercial timber harvesting in the MMCAs set forth in AB 1986 and prohibiting any amendments to the HCP that are inconsistent with AB 1986; and

d.    Covenants, conditions, and restrictions recorded against the Debtors' lands, which incorporate restrictions on commercial timber harvesting.

[IT 235 ¶ 10].

211.    These constraints on harvesting timber apply generally for the next 40 years, through 2049.  [IT 235 ¶ 10].  Between 1999 and 2049, only limited timber management activities that are not "detrimental" to the marbled murrelet are permitted on the MMCAs.  [IT 235 ¶ 11].

212.    Dr. Mundy compared the MMCAs to other sales that took place in Humboldt County and/or near the MMCAs and concluded that the MMCAs could sell for $60,000 per acre, or a total price of $400 million.  [DX 115 ¶¶19-23].  However, Dr. Mundy based this value on sales that were not even subject to a HCP.  [IT 234 ¶¶ 11, 12].

213.    Dr. Mundy believes that a likely buyer of the MMCAs would be motivated by preservation or conservation issues and could include foundations, conservation groups, wealthy individuals, or the state or federal government.  [DX 115 ¶ 24].  He believes that the MMCAs could sell within 2 or 3 years.  [DX 115 ¶¶ 23, 27]. However, Dr. Mundy has not made any contacts with any potential conservationists to determine their level of interest in the MMCAs for $400 million.  [IT 234 ¶ 16].

214.    Conservationists will not typically pay more than the fair market value in the absence of a strong political impetus, such as a situation where the property is at high risk for development or harvesting.  [IT 234 ¶ 17].

215.    Mr. Fleming, who was retained by the Indenture Trustee to valuate the MMCAs, determined that the fair market value of the MMCAs is $2427 per acre for a total price of $16,110,000.  [IT 1 ¶ 61; IT 234 ¶ 18].  In 2005, UBS, acting on behalf of Scopac, attempted to market the MMCAs to many of the same prospective purchasers that Dr. Mundy identifies, but was unable to generate indications of interest that were greater than $15-$30 million.  [*Id*. ¶ 16].

216.    Moreover, conservationists – whether governmental or private – prioritize their acquisitions of land by the level of threat, making it unlikely that any would pay a premium for the MMCAs, which are already protected from commercial timber operations for the next 41 years.  [IT 234 ¶ 14].

217.     The $400 million valuation of the MMCAs is equal to the $400 million that the State of California spends for all of its conservation acquisitions in a given year.  [IT 234 ¶¶ 10, 14].

e.     **Conclusion**

218.     Based on the foregoing, and the testimony of Dr. Tedder, an expert Timberland appraiser, [MMX 5], the valuation opinions of Debtors' experts are entitled to little weight.

E.     **FINAL VALUATION CONCLUSION**

Having carefully weighed the expert testimony presented, the Court finds the value of the

Timberlands to be not more than $510 million.

VIII.   **Headwaters Litigation**

219.     Some evidence was presented at the Confirmation Hearing regarding the Headwaters Litigation.

220.     Mr. Alexander L. Dean, Jr. testified that the Headwaters Litigation has no merit.  (Tr. 4/9/08 167:20-169:7).

221.     The evidence presented by the California State Agencies was that the Headwaters Litigation was of no merit and thus has no value. (Cal. Exhibit 7, 8 and 9).

222.     Thomas Lumsden was the only expert to testify with respect to the Headwaters Litigation.  He testified that he had no opinion as to the likelihood of success on the merits of the litigation, and was not qualified to render any such opinion.  (Tr. 4/30/08 408:11-408:22).     Further, he testified that the outcome of the Headwaters

Litigation is so uncertain that it would violate generally accepted accounting principles to include it as an asset on the Debtors' balance sheet and, in fact, it is not on the balance sheet. (Tr. 4/30/08 414:11-415:10; Tr. 5/1/08 44:10-44:25).

223. Gary Clark, the CFO of Palco and former CFO of Scopac agreed that the Headwaters Litigation is too contingent to be placed on the Debtors' balance sheet and has not been placed on the Debtors' balance sheet for that reason. (Tr. 5/1/08 44:10-44:25).

224. Jacob Cherner, representing a potential bidder under the Indenture Trustee Plan, agreed that the Headwaters Litigation should be resolved quickly because it interferes with the operation of the Timberlands, thereby suggesting it has limited value. (Tr. 4/11/08 190:9-190:16; 253:14-254:9).

225. Indeed, the Headwaters Litigation value issue was an afterthought, which explains the lack of evidence on the issue. Nevertheless, without further proof, the Court cannot find that the Headwaters Litigation has no value.

226. The Debtors filed an adversary proceeding asserting that neither the Indenture Trustee nor the Noteholders have a perfected lien in the Headwaters Litigation or its proceeds. [Docket No. 2628; Adversary No. 08-02014]. However, that issue was not before the Court at the confirmation hearing. Until determined otherwise, in order to give Noteholders the indubitable equivalent value, they must retain their lien on the Headwaters Litigation. The Court finds that this is a technical change to the Plan which can be resolved in the Order Confirming the Plan.

## IX.    Debtors' Operations

### A.    The Success of the Debtors Depends on Keeping the Timberlands and Mill Together

227.    Operating the Mill and Timberlands as one entity is beneficial to both entities from an administrative and corporate governance standpoint.  (Tr. 4/11/08 67:23-68:9).

228.    It would be more costly for Scopac to sell its logs to a third party rather than to Palco.  There are four other mills in the area, but they cannot absorb the additional volume of 74/MMBF generated by Scopac.  (Tr. 5/1/08 67:13-67:22).   If Scopac were to sell its logs to a mill or mills that are further away, the hauling costs would increase and Scopac's return would be diminished.  (Tr. 4/11/08 68:21-69:6).   If Scopac's logs were put into the marketplace, this would have the effect of driving redwood log prices down.  (Tr. 5/1/08 70:25-71:8, 72:17-72:19).

229.    Likewise, if the Indenture Trustee Plan were confirmed and Palco was left without a plan of reorganization, Palco would not have the liquidity to continue operations and the Mill would likely close within a very short period of time.  (Tr. 5/1/08 53:23-54:16).

### B.    Palco and Scopac Have Significant Liquidity Problems

230.    Scopac only has sufficient liquidity to meet its financial obligations through the end of June.  (Tr. 5/1/08 52:22-53:2).

231.    Scopac's budget contemplates dipping into the SAR account in May in the amount of $2 million.  (Tr. 5/1/08 83:22-84:3).  Without doing so, Scopac will not have enough cash to operate through May.  (Tr. 5/1/08 83:17-83:22).

232.    Scopac has already drawn $2 million from the SAR account in May, meaning that there is a $4 million shortfall coming from the SAR account in the month of May.  (Tr. 5/1/08 83:24-84:7).

233.    Scopac's cash flow is at its lowest during the months of July, August, September, and October.  (Tr. 5/1/08 54:19-55:5, 56:5-56:7, 84:22-84:25).  Even if it does not have to pay professional fees, Scopac will come up $2.5-$3 million short in those months.  (Tr. 5/1/08 85:5-85:8, 337:7-337:17).

234.    If the Indenture Trustee Plan is confirmed, the marketing process required under that plan would run through those months when Scopac's cash flow needs are at their peak.  (Tr. 5/1/08 56:8-17).  As a result, Scopac will have to dip further into its SAR account in order to continue operations.  (Tr. 5/1/08 56:18-56:21, 85:1-85:4).

235.    However, the SAR account is expected to run out of cash at the end of June.  (Tr. 5/1/08 334:10-334:12, 335:19-335:23).  After that, the only assets in the SAR account will be $21.5 million in auction rate securities.  (Tr. 5/1/08 334:13-334:21, 335:24-336:2).  There has been some dislocation in the auction rate securities market and it is unlikely that Scopac will be able to convert those securities into cash.  (Tr. 5/1/08 334:25-335:6, 336:3-336:5).  For example, in the last several weeks, Scopac attempted to auction some securities out of the SAR account, but the transactions did not clear.  (Tr. 5/1/08 336:18-336:20).  Therefore, Scopac will run out of money and have to cease operations at the end of June.  (Tr. 5/1/08 52:22-53:2).

236.    Palco only has sufficient liquidity to meet its financial obligations through the end of May.  (Tr. 5/1/08 53:15-53:18, 81:8-81:10).

237.    It costs approximately $6 million per month to run Palco.  (Tr. 5/1/08 81:4-81:5).

238.    Palco has no source of income other than the sale of logs, lumber, and gravel.  (Tr. 5/1/08 81:15-81:20).  Palco does not have a SAR account.  (Tr. 5/1/08 81:11-81:14).

239.    Palco is not currently paying its professionals.  (Tr. 5/1/08 81:24-81:25).  Even so, Palco will come up short by more than $1 million in May.  (Tr. 5/1/08 82:3-82:13, 83:1-83:3).

240.    In June, Palco will come up short by $2-$3 million.  (Tr. 5/1/08 83:4-83:8).  It is expected that these shortfalls will continue in the months thereafter.  (Tr. 5/1/08 83:15-83:16).  Therefore, Palco will run out of money and have to cease operations at the end of May unless the MRC/Marathon Plan is confirmed or a dramatic change in operations occurs.  (Tr. 5/1/08 53:15-53:18, 81:8-81:10).

C.    **The Success of the Debtors Depends on
Maintaining Good Relations With Trade Creditors**

241.    The Scopac Trade Claims (Class 8) are general unsecured claims for goods, supplies, equipment, or services utilized by Scopac in the operation of its business.  [MMX 1 ¶ 103].  The Holders of these Claims are small, local creditors in a close knit and insulated timber community.  [MMX 1 ¶ 103].

242.    The goodwill of these trade creditors is important for the successful future operation of Scopac's businesses because there is a limited market in which to obtain these goods and services.  [MMX 1 ¶ 103].  Thus, if the holders of Allowed Scopac Trade Claims do not receive a substantial cash recovery as part of the reorganization, Scopac's operations will suffer.  [MMX 1 ¶ 103].

243.     These trade creditors will also look to continuing operations as a source of their own future business, particularly for some of the smaller enterprises, for whom Scopac's business represents a significant portion of their revenues.  [MMX 1 ¶ 103]; (Tr. 5/1/08 133:17-134:1).

244.     Class 9 is not comprised of trade creditors with whom the Debtors intend on maintaining business relationships, but rather primarily represents the unsecured deficiency claim of the Noteholders with whom there is not currently and will be no ongoing business relationship.  [MMX 1 ¶ 103].

### D.     There Are Many Regulatory Constraints On Harvesting Timberlands In California

245.     Forestry in California is a highly regulated activity, much more so than in other states.  [MMX 1 ¶ 50].  Not only does California have substantially stricter state law regulations, but federal environmental laws are enforced in a substantially more aggressive manner.  [MMX 1 ¶ 50].

246.     The following non-exhaustive list of federal, state, and local regulatory agencies with authority over the Debtors and forestry operations in general:

a.     **Federal**

- US Fish and Wildlife Service

- National Marines Fisheries Service (NOAA)

- Army Corp of Engineers

- Federal Environmental Protection Agency

b.     **State**

- Cal Fire

- California State and Regional Water Quality Control Boards

- California State and Regional Air Quality Control Boards

- California State Environmental Protection Agency

- Cal Trans

- California Department of Fish And Game

- California Department of Mines and Geology

- California Board of Forestry

c.      **County**

- County Planning Departments

- County Transportation Departments

- County AG Commissioner's Office

[MMX 1 ¶ 51].

247.    Before harvesting timber in California, companies must obtain the approval of Cal Fire for a detailed THP for the area to be harvested.  [MMX 1 ¶ 53].  A THP must be submitted by a Regional Professional Forester and must include, among many other things, information regarding the method of proposed timber operations, whether the operations will have any adverse impact on the environment and, if so, the mitigation measures to be used to reduce the impact.  [MMX 1 ¶ 53].  Cal Fire's review of the THP incorporates, among other things, its review and analysis of the various regulators, as well as public comments.  [MMX 1 ¶¶ 53, 54].

248.    The Debtors' own history illustrates the constraints on harvesting imposed by California regulators.  [MMX 1 ¶ 55].  Examples of friction between the

Debtors and their regulators include: (a) challenges associated with implementing the HCP; (b) the passage of SB 810, a bill that gave the State Water Boards an unappealable veto power over THPs which was enacted in response to tensions over Palco's harvesting; (c) litigation over the alleged breach of the Headwaters Agreement; and (d) ongoing disagreements about sediment discharge with the North Coast Regional Quality Control Board, which led that Board in 2005 to impose limits on harvesting in the Freshwater Creek and Elk River drainages which, in turn, led to declines in the harvest from approximately 48/MMBF in 2005 to 15/MMBF in 2006.  [MMX 1 ¶ 55].

### E.     Prior Marketing Efforts Were Unsuccessful

249.     The Debtors' enterprise was thoroughly, but unsuccessfully, marketed in several different ways prior to their bankruptcy filing.  [MMX 11; MMX 14; MMX 15; MMX 16; IT 90].

250.     Houlihan cited UBS Securities LLC's prior efforts to market Scopac in late 2004 as evidence of its low value:

> Despite conducting a broad and thorough process and contacting 111 parties, including conservation groups, financial sponsors, high net worth individuals and strategic buyers, the UBS marketing effort was unable to generate any offer in excess of the value of the Timber Notes and was abandoned.

[MMX 11 ¶ 20].

251.     Moreover, UBS, acting on behalf of Scopac, attempted to market the MMCAs in 2005 to many of the same prospective purchasers that Dr. Mundy identified in his valuation of the MMCAs, but was unable to generate indications of interest that were greater than $15-$30 million.  [IT 234 ¶ 16].  Indeed, Mr. Fleming valued the MMCAs at approximately $16 million.  [IT 1 ¶ 2].

252.    Other bidders have been present throughout the plan process in the Debtors' cases, and the Indenture Trustee's financial advisor actively sought other bidders throughout this time.  (Tr. 4/29/08 55:12-57:1).  However, no one has presented a binding offer for more value than provided through the MRC/Marathon Plan.  (Tr. 4/10/08 249:8-250:7).

253.    The Court's termination of the Debtors' exclusive right to propose a plan of reorganization, the marketing efforts by UBS, the transparency and publicity of the bankruptcy process and the various expressions of interest presented, have provided an ample market test for the Debtors' assets.

## F.    Redwood Competes With Other Products

254.    Almost 90% of all redwood lumber produced is consumed in the construction of residential decks and fences.  (Tr. 4/9/08 192:8-192:10); [MMX 1 ¶ 78].

255.    On a nationwide basis, redwood accounts for less than 5% of the market for decking and fencing materials.  [MMX 1 ¶ 78].

256.    Alternative products are available to consumers which provide a vast selection of materials to use in creating decks and fences.  (Tr. 4/8/08 357:7-357:21; Tr. 4/9/08 192:10-192:13).  The principal materials competing with redwood include: (1) pressure-treated lumber, such as southern yellow pine, which garnered 72.4% of the national decking market in 2006; (2) wood/plastics composites, such as Trex, which enjoyed 11.8% of the national decking market in 2006; (3) Western red cedar, which earned 6.4% of the national decking market in 2006; (4) plastics, such as eOn, which captured 2.7% of the national decking market in 2006; and (5) tropical hardwoods,

including ipe, cumaro, mahogany, and teak, which comprised 2.1% of the national decking market in 2006. (Tr. 4/8/08 357:7-357:21); [MMX 1 ¶ 80; MMX 35].

257.    Redwood has very little pricing power due to the presence of substitute products in the marketplace.  (Tr. 4/9/08 192:15-192:18).  When the price of redwood increases, consumers turn to these alternative products for their decking and fencing needs.  (Tr. 4/8/08 357:7-357:12).

258.    In the face of these competitive products, redwood prices remain flat.  (Tr. 4/8/08 357:12-357:21).  The increased presence of well-marketed competing products will serve to limit future increases in the prices of redwood logs.  [MMX 1 ¶ 80].

## X.    **Other Bidders**

### A.    **Beal**

259.    Beal Bank, including Mr. Andrew Beal, holds approximately 37%-38% of the Timber Notes and is the largest Noteholder.  [Tr. 4/11/08 120:8-121:9].

260.    Beal Bank is a member of the Steering Committee of Noteholders with which the Indenture Trustee corresponds.  (Tr. 4/29/08 27:2-7).  The Steering Committee is an ad hoc committee without any bylaws.  (Tr. 4/29/08 42:1-42:9).  Beal Bank is an active member of this committee.  (Tr. 4/29/08 40:25-41:2).

261.    On April 7, 2008, Scotia Redwood Foundation ("SRF"), a Beal Bank affiliate, delivered a term sheet ("Beal Term Sheet") for the purchase of the Timberlands to the Indenture Trustee.  [IT Exhibit 207].  SRF was formed for the purpose of making this acquisition.  (Tr. 4/11/08 122:17-122:23).

262.     The Indenture Trustee has not accepted the Beal Term Sheet.  (Tr. 4/29/08 99:15-101:1).   In fact, the Beal Term Sheet could not be accepted by the Indenture Trustee unless it received a two-third vote from the Noteholders instructing it to do so.  (Tr. 4/29/08 102:13-102:23).

263.     The Beal Term Sheet is not binding, but rather, subject to significant conditions.   [IT 219].   For instance, the Beal Term Sheet requires the settlement of both Palco and Scopac's claims in the Headwaters Litigation in Beal's sole discretion.  [IT 219 Exhibit A at 2].  The purchaser of the Timberlands would have no authority to settle Palco's claims in the Headwaters Litigation.  (4/11/08 188:15-189:6).

264.     Further, SRF conditioned its obligation to close upon receipt of all required governmental consents and approvals to the conveyance and assignment of Scotia's assets to it.  [IT Exhibit 207].  SRF also conditioned its obligation to close upon the execution of an acceptable Acquisition Agreement.   [IT Exhibit 207].   No such agreement was presented to the Court during the Confirmation Hearing, and Mr. Matthews testified that he had not seen a draft of one.  [Tr. 4/30/08 122:25-123:8].  All of the conditions described herein remain unsatisfied.

265.     The Beal Term Sheet further provided that the sale to SRF would be funded with approximately $420 million in equity and two-year debt from related entities, with the buyer reserving the right to obtain additional first or second lien debt.  [IT 219 Exhibit A at 3].  The source of the balance of the $183 million needed to finance such a sale was not known to Mr. Matthews.  (Tr. 4/29/08 69:1-69:9).  The Timberlands would have to generate sufficient revenue in order to make the interest payments and any amortization on such undisclosed amount of debt that would thus encumber the

Timberlands if the SRF were the successful bidder at the Indenture Trustee's proposed auction. (Tr. 4/29/08 69:10-69:13). Mr. Matthews testified that the Indenture Trustee had not seen any specific information that would allow the Indenture Trustee to conclude that SRF would be able to operate the Timberlands in such a way as to service its debt in connection with the proposed acquisition by SRF. (Tr. 4/29/08 71:5-71:10).

266.   The Beal Term Sheet also included a provision by which SRF would enter into an evergreen supply agreement, terminable upon 18 month's notice by either party, under which SRF would be required to sell 50% of the harvest from the Timberlands at market terms to Palco or the owner of Palco's assets, with such volumes and terms to be arrived at quarterly by mutual agreement. [IT 219 Exhibit A at 5].

267.   The Beal term Sheet requires a break-up fee of 3.5%, which exceeds the 3.0% break up fee allowed in the bid procedures under the Indenture Trustee Plan. [IT 219 Exhibit A at 4; IT 104 Exhibit B at 6]. In the event of a successful credit bid by the Indenture Trustee that topped the bid contained in the Beal term sheet, a breakup fee of $21,105,000 (the "Breakup Fee") would be due to SRF. [IT 219 Exhibit A at 4]. Since the credit bid would be made without using any cash, there would be no sale proceeds with which to pay the Breakup Fee, creating an immediate breach of the Beal Term Sheet. (Tr. 4/29/08 157:8-158:11). The Indenture Trustee has not received an instruction not to credit bid from two-thirds of the Noteholders despite being in touch with approximately 75% of the Noteholders.

268.   Moreover, several dates and deadlines in the Beal Term Sheet have now lapsed, without being satisfied. [IT 219 Exhibit A at 3, 5].

269.    Despite the passage of weeks since producing his term sheet, Beal has not executed a binding asset purchase agreement setting forth all of the terms and conditions of his offer.  (Tr. 4/11/08 197:3-197:16).

270.    SRF has just two employees, Mr. Cherner and Mr. Beal.  (Tr. 4/11/08 127:8-127:14).   Only Mr. Cherner, rather than Mr. Beal, testified at the Confirmation Hearing.  Mr. Cherner frequently acknowledged that certain matters were in Mr. Beal's sole purview.  (Tr. 4/11/08 148:13-149:6).

271.    Beal Bank has never owned a redwood forest, nor is Beal Bank an experienced timber operator.   (Tr. 4/11/08 126:8-127:4).   The only prior timber experience possessed by Beal Bank as a whole involved a forest it owned in Estonia.  (Tr. 4/11/08 126:12-126:19).  Beal Bank has no foresters as employees.  (Tr. 4/11/08 127:2-127:4).  Moreover, Beal has had no meaningful contact with California regulators even though the sale pursuant to the Indenture Trustee Plan would be subject to regulatory approvals.  (Tr. 4/11/08 186:14-187:10).

272.    Beal would not disclose his proposed harvest rate to the Court and has not disclosed it to regulators.  (Tr. 4/11/08 239:12-240:22).

**B.    Harvard Management Company**

273.    Harvard Management Company's ("Harvard") January 2008 preliminary expression of interest in the Timberlands was contingent on various factors and never progressed to a binding offer.  [MMX 21 100:20-100:22, 109:24-110:21].  No asset purchase agreement was drafted or agreed upon nor had Harvard finalized a partner to run the Mill.   [MMX 21 39:24-40:22, 102:13-102:21].   Harvard also had no

conversations with any regulatory agency about purchasing or operating the Timberlands. [MMX 21 102:22-103:24].

274.    Moreover, after further diligence, Harvard revised its offer and intended to decrease its offer. [MMX 21 55:11-55:23, 110:22-111:2].  In fact, the Letter of Intent prepared for Harvard's signature left the price blank, at the request of the Indenture Trustee's advisor Houlihan [MMX 21 30:20-30:22, 108:17-109:13].  That was because Houlihan knew that HMC intended to lower its offer price.  [MMX 21 67:14-68:15, 69:3].

275.    Harvard appeared before the Court through counsel on May 1, 2008.  Right after MRC announced that the MRC/Marathon Plan was being amended to pay the Indenture Trustee $530 million cash, subject to adjustments, its counsel stated the following:

> Harvard came here today prepared to submit an offer that was higher than the prior MRC/Marathon offer . . . [t]he managing director of Harvard is with me but I think, though, before we proceed further with this discussion, we really need to see the revised proposal and the economics of it and study it and see if an auction makes sense.

(Tr. 5/1/08 31:18-32:4).  By 1:45 p.m. that same day, it was apparent that Harvard was no longer in the courthouse.  No further appearances were made by Harvard at the Confirmation Hearing.

## C.    The Nature Conservancy

276.    Counsel for the Indenture Trustee made reference in his opening statement to an expression of interest from The Nature Conservancy ("TNC") regarding the purchase of the Timberlands.  (Tr. 4/8/08 68:14-68:18).

277.     The deposition testimony of George Yandell entered into the record makes clear that TNC's "expression of interest" was neither a bid nor an offer. [MMX 22 11:25-12:6; MMX 88E 24:20-25:25].  Additionally, TNC has no agreement with Conservation Forestry or its consortium to obtain as much as $400 million needed to fund TNC's expression of interest.  (MMX 22 19:15-19:21). Bank of America has not agreed to fund the transaction described in TNC's expression of interest.  (MMX 22 20:22-21:1).  Bank of America has not agreed in writing to commit to fund any amounts in the transaction described in Yandell Exhibit 1 in any capacity, as an investor, lender or equity holder.  (MMX 22 22:1-22:5).  Mr. Yandell further testified that TNC had "a lot of work left to do" and that it would need to expend about $500,000 in due diligence expenses before funding a purchase transaction for the Timberlands.  (MMX 22 25:10-25:15).  Any transaction such as that contemplated by the TNC expression of interest would have to be approved by TNC's worldwide board of directors, and no such approval has yet been sought or obtained.  (MMX 22 27:23-28:18).

## XI.     BUSINESS VALUATION OF JEFFREY JOHNSTON

### A.     The Noteholders Will Receive More Under The MRC/Marathon Plan Than Under The Beal Term Sheet

278.     Jeffrey Johnston, an Accredited Business Valuation specialist and Managing Director of AlixPartners, conducted an analysis of what the Noteholders are likely to receive if Scopac's assets are sold pursuant to the Indenture Trustee Plan. [MMX 78 ¶¶ 1-3].  Mr. Johnston concluded that even if the SRF proposal contained in the Beal term Sheet were to actually close, the Noteholders would receive substantially less than $603 million as a result of the fees and expenses of the sale and distributions to

claimants that must be paid before any distributions can be made to the Noteholders. [MMX 78 ¶ 7].

279.    There are various fees associated with any sale pursuant to the Indenture Trustee Plan, including the costs of the sales and marketing process, fees of the Indenture Trustee Plan Agent and Special Plan Agent, fees of the Sales Agent, and professional fees.  [MMX 78 ¶¶ 7, 9, 10].

280.    Mr. Johnston conservatively estimates that Houlihan, as Sales Agent, would receive a transaction fee of approximately $6.1 million.  [MMX 78 ¶ 9]. That amount is much lower than the $12-$18 million fee cited by Mr. Matthews.  [MMX 78 ¶ 9]; (Tr. 4/30/08 78:21-80:3110:19-24).

281.    A sale under the Indenture Trustee Plan will not close for at least 8 months and could take up to 12 months to be final.  [MMX 78 ¶ 8].  There will be a 6-8 month marketing process and then there will be additional time for Bankruptcy Court approval of the prospective buyer.  [MMX 78 ¶ 8].  The prospective buyer will then need to obtain regulatory approval before it could close the sale, which conservatively will take an additional 2-4 months.  [MMX 78 ¶ 8].  A reasonable estimate of the time it will take from confirmation of the Indenture Trustee Plan until closing of a sale of the Timberlands is 10 months.  [MMX 78 ¶ 8].

282.    The Plan Agent will receive $125,000 per month and the Special Plan Agent will receive $25,000.   [MMX 78 ¶ 10].   Considering that it will take 10 months to close, these fees will total $1.5 million.  Professional fees are estimated to be $3.75 million.  [MMX 78 ¶ 10].

283.    Under the Indenture Trustee Plan, the proceeds are distributed via "waterfall."  [MMX 78 ¶ 12].  Administrative expenses totaling $10 million, tax claims, the senior secured claim of Bank of America, along with several other classes of claims, must be paid out of the proceeds of any sale before the Noteholders receive any payment. [MMX 78 ¶¶ 12, 14].   Mr. Johnston concluded that these expenses could total approximately $28.2 million prior to the Noteholders receiving anything. [MMX 78 ¶¶ 12-14].

284.    Due to the time delay before the Noteholders will receive any payment under the Indenture Trustee Plan, it is necessary to calculate a present value of the proceeds the Noteholders can expect to receive in the future.  [MMX 78 ¶ 15].  Mr. Johnston concluded that based on the time delay and risks of not closing the transaction, without any deduction for the risk of the prospective buyer not obtaining regulatory approval, an appropriate discount rate to be used in the present value analysis is 14%. [MMX 78 ¶¶ 18-19].

285.    Based on this analysis, Mr. Johnston concluded that the present value of the proceeds to the Noteholders of a sale under the Indenture Trustee Plan based on the Beal term sheet is $505.2 million.  [MMX 78 ¶ 21].

286.    The MRC/Marathon Plan provides the Noteholders with an immediate cash payment of $530 million, less a slight adjustment estimated to be $13 million, for a total of $517 million. [MMX 78 ¶ 25].

287.    Based on the analysis of Mr. Johnston, the Court finds that the Noteholders will receive more under the MRC/Marathon Plan than a sale pursuant to the Beal Term Sheet under the Indenture Trustee Plan.

**B.**  **The Noteholders Will Receive More Under The**
**MRC/Marathon Plan Than In A Chapter 7 Liquidation**

288.    Mr. Johnston also conducted an analysis of what the Noteholders are likely to receive if the Scopac bankruptcy case was converted to a Chapter 7 liquidation, based on his experience and the Liquidation Analysis in the Disclosure Statement.  [MMX 78 ¶ 4].

289.    In a Chapter 7 liquidation, assets typically sell at a significant discount, often up to 50%, due to the fire-sale nature of the liquidation process.  [MMX 78 ¶ 23].  Given this, Mr. Johnston believes that it is unlikely that SRF would pay $603 million for the Timberlands in a liquidation sale.  [MMX 78 ¶ 26].

290.    Based on the liquidation analysis in the Disclosure Statement, Mr. Johnston concluded that the Noteholders would receive approximately $389 million in a Chapter 7 liquidation.  [MMX 78 ¶ 24; MMX 35 Exhibit E].

291.    Even if SRF purchased the Timberlands for $603 million in a Chapter 7 liquidation, many deductions would apply to reduce the amount actually received by the Noteholders.  [MMX 78 ¶ 26].  In addition, a Chapter 7 trustee would receive 3% of the sale proceeds, incur a professional advisor fee of approximately $3.75 million and would retain an investment banker at an estimated cost of $6.1 million. [MMX 78 ¶ 26].  Accounting for these adjustments, as well as the risks associated with closing the transaction, Mr. Johnston concluded that the Noteholders would receive approximately $501 million of the $603 million.  [MMX 78 ¶¶ 26-28].  This is without any deduction for the regulatory risk that the transaction could not be consummated. [MMX 78 ¶¶ 26-28].

292.    Under the MRC/Marathon Plan the Noteholders will receive approximately $517 million of $530 million. [MMX 78 ¶ 25].

293.    Based on the analysis of Mr. Johnston, the Court finds that the Noteholders will receive more under the MRC/Marathon Plan than they would in a Chapter 7 liquidation.

### C.    The Value of Newco is $540 Million

294.    Mr. Johnston calculated the enterprise value of Newco using two widely accepted valuation methodologies, the Income Approach and the Market Approach. [MMX 3 Exhibit A at 4].

#### a.    The Income Approach

295.    Under the Income Approach, Mr. Johnston discounted the cash flows expected to be generated by Newco back to the Effective Date of the MRC/Marathon Plan.  Mr. Johnston used a 6.06% discount rate.  [MMX 3 Exhibit A ¶ 6].

296.    Based on this analysis Mr. Johnston concluded that the enterprise value of Newco as of the Effective Date of the MRC/Marathon Plan is $540 million. [MMX 3 ¶ 6].

#### b.    The Market Approach

297.    Mr. Johnston also checked his enterprise valuation against comparable companies.  [MMX 3 Exhibit H].  The results of this comparable company analysis were within the range of the value determined using the Income Approach. [MMX 3 Exhibit A at 8].

298.    Mr. Daniel's valuation of Scopac failed to account for the tax efficient nature of Scopac, thereby resulting in an overvaluation by Mr. Daniel of Scopac by approximately $164 million. [MMX 3 Exhibit B at 7-8].

299.    Mr. Daniel also overstated the value of Scopac in his income approach and comparable company analysis by $64 million and $122 million, respectively.  [MMX 3 Exhibit B at 7-8].

300.    The Court finds that the enterprise value of Newco is $540 million.

## XII.    NEW EVIDENCE

301.    On May 15, 2008, the Court reopened the record of the Confirmation Hearing to allow the Noteholders to present evidence from A.A. (Red) Emmerson, President of Sierra Pacific Industries ("Sierra Pacific") and Daniel Kamensky, a Senior Vice President of Lehman Brothers Inc. ("Lehman").

302.    The Court also took judicial notice of a docket entry entitled "Notice of Interest in Purchase of Timberlands" [Docket No. 2904] (the "Notice").

### A.    Sierra Pacific

303.    The evidence from Mr. Emmerson is that Sierra Pacific would like to make an offer to purchase certain of Palco's assets.  [Docket No. 2900].

304.    The possible purchase is subject to title and environmental due diligence, the entry of a log purchase agreement with the Plan Agent under the Indenture Trustee Plan, definitive acquisition documents, and a limited material adverse change provision. [Docket No. 2900 ¶ 6].

305.    Prior to any such sale, Marathon would have to fund Palco's operations because Palco lacks the liquidity to operate pending the sale process.

306.    The term sheet reflecting this possible purchase of Palco's assets was negotiated with the Indenture Trustee, who is not a creditor of Palco, and not Palco itself, the owner of the assets.  [Docket No. 2900 ¶ 7].  Palco objected in open Court.

307.    The Court finds that the possible bid set forth in the additional evidence is highly speculative and the additional evidence should be given little weight. Nothing in the additional evidence affects the foregoing findings of the Court.

**B.**     **The Notice**

308.    The Notice provides that any purchase contemplated therein is subject to due diligence, financing and execution of documentation.  [Docket No. 2904].

309.    The Court finds that the possible bid set forth in the Notice is highly speculative and the additional evidence should not be given any weight.  Nothing in the additional evidence affects the foregoing findings of the Court.

**C.**     **Lehman**

310.    Mr. Kamensky proposed that Lehman may provide financing to the Plan Agent under the Indenture Trustee Plan in an amount up to $20 million.  [Docket No. 2901 ¶ 3].

311.    The Lehman term sheet states that it is "not a binding agreement" and requires, among other things, internal approval of the proposed lenders and documentation.  [Docket No. 2900 Exhibit B p 1].

312.    The Court finds that the possible financing set forth in the additional evidence is highly speculative and the additional evidence should not be given any weight. Nothing in the additional evidence affects the foregoing findings of the Court.

## CONCLUSIONS OF LAW

### I.      GENERAL CONCLUSIONS

#### A.      Venue; Core Proceeding; Exclusive Jurisdiction

The Debtors were qualified and are qualified to be debtors pursuant to section 109(d) of the Bankruptcy Code.  Venue was proper as of the Petition Date and continues to be proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The Debtors continue to manage and operate their respective businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. Confirmation of the MRC/Marathon Plan is a core proceeding under 28 U.S.C. § 157(b)(2).  The Court has jurisdiction over the Cases pursuant to 28 U.S.C. §§ 157 and 1334, and the Court has exclusive jurisdiction to determine whether the MRC/Marathon Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

#### B.      Judicial Notice

The Court takes judicial notice of the docket in the Cases maintained by Clerk of the Court and/or its duly-appointed agent, including all pleadings and other documents filed, all Orders entered, and all evidence introduced (unless withdrawn) and arguments made at the hearings held before the Court during the Cases, including the hearings to consider the adequacy of the Disclosure Statement and the Confirmation Hearing.

#### C.      Solicitation and Notice

As evidenced by the Affidavits of Service, and as required by the Disclosure and Solicitation Order, adequate notice has been provided of the Confirmation

Hearing and Ballots have been solicited accepting or rejecting the MRC/Marathon Plan and indicating preferences, as applicable, by timely transmitting the Disclosure and Solicitation Order, the Disclosure Statement, the MRC/Marathon Plan, the Confirmation Hearing Notice, and, as appropriate, Ballots to accept or reject the MRC/Marathon Plan to all holders of Claims and Interests, in accordance with the Disclosure and Solicitation Order, the Bankruptcy Code, the Bankruptcy Rules, and Orders of the Court.   Due, adequate, and sufficient notice of the Disclosure Statement, the MRC/Marathon Plan, the Confirmation Hearing, as well as all deadlines for voting on or filing objections to the MRC/Marathon Plan, has been given to all known holders of Claims and Interests in accordance with Bankruptcy Rules 2002(b), 3017(d), (e), and (f), and the procedures set forth in the Disclosure and Solicitation Order.   The Disclosure Statement, MRC/Marathon Plan, Ballots, Solicitation Order, Confirmation Hearing Notice, MRC/Marathon Plan Supplement, Notice of Filing of Plan Supplements, Notice of Litigation Trustee and Notice of Litigation Trust Board were transmitted and served in substantial compliance with the Disclosure and Solicitation Order and the Bankruptcy Rules, and such transmittal and service were adequate and sufficient.   Adequate and sufficient notice of the Confirmation Hearing, the MRC/Marathon Plan, cure claim estimates, injunctions and third party releases, bar dates, and other hearings described in the Disclosure and Solicitation Order and the MRC/Marathon Plan was given in compliance with the Bankruptcy Code, the Bankruptcy Rules and the Disclosure and Solicitation Order, and no other or further notice is or shall be required.

D.    **MRC/Marathon Plan Modifications**

Section 1127(a) of the Bankruptcy Code provides, with respect to chapter

11 plan modifications, as follows:

> The proponent of a plan may modify such plan at any time
> before confirmation, but may not modify such plan so that
> such plan as modified fails to meet the requirements of
> Sections 1122 and 1123 of this title.  After the proponent of
> a plan files a modification of such plan with the court, the
> plan as modified becomes the plan.

11 U.S.C. §1127(a).  In addition, Bankruptcy Rule 3019 provides as follows:

> In a chapter 9 or chapter 11 case, after a plan has been
> accepted and before its confirmation, the proponent may
> file a modification of the plan.  If the court finds after
> hearing on notice to the trustee, any committee appointed
> under the Code, and any other entity designated by the
> court that the proposed modification does not adversely
> change the treatment of the claim of any creditor or the
> interest of any equity security holder who has not accepted
> in writing the modification, it shall be deemed accepted by
> all creditors and equity security holders who have
> previously accepted the plan.

Fed. R. Bankr. P. 3019.

The only substantive modifications set forth in the MRC/Marathon Plan

improve the treatment for the Holders of such Claims or Interests, and such changes with

respect to particular Claims or Interests do not effect, or materially adversely affect, or

change the treatment of any other Claims or Interests and require no additional or further

balloting.  Such modifications do not materially negatively impact the treatment of,

and/or Distributions to, Holders of Allowed Claims under the MRC/Marathon Plan.  All

other modifications to the MRC/Marathon Plan constitute non-material changes.

Accordingly, pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule

3019, the modifications to the MRC/Marathon Plan do not require additional disclosure

under section 1125 of the Bankruptcy Code or re-solicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that Holders of Claims or Interests be afforded an opportunity to change any previously cast acceptances or rejections of the MRC/Marathon Plan.

      E.      **<u>Good Faith Solicitation</u>**

      Votes for acceptance and rejection of the MRC/Marathon Plan and indications of preference, as applicable, were solicited and sought in good faith and in compliance with the Bankruptcy Code (including sections 1125, 1126 and 1129 of the Bankruptcy Code), the Bankruptcy Rules (including Bankruptcy Rules 3017 and 3018), the Disclosure and Solicitation Order, and all other applicable statutes, rules, laws and regulations. Based on the record in the Cases, (i) the Plan Proponents, (ii) the Administrative Agent and the lenders under the Term Loan Agreement, dated as of July 18, 2006, (iii) the Administrative Agent and the lenders under the Revolving Credit Agreement, dated as of July 18, 2006, (iv) the Administrative Agent and lenders under the Debtor-In-Possession Revolving Credit Agreement dated as of August 6, 2007, (v) the Reorganized Entities, and the respective officers, directors, professionals, members, agents and employees and any of their respective current members, partners, officers, directors, employees, affiliates, agents and advisors (including any attorneys, financial advisors, investment bankers, accountants and other professionals retained by such Persons) of the foregoing and (vi) the Committee, its members and Professionals, have acted in "good faith" and in compliance with the applicable provisions of the Bankruptcy Code, within the meaning of section 1125(e) of the Bankruptcy Code, are entitled to the protections thereof, and are entitled to the protections contained in Sections 10.3 and 10.4

of the MRC/Marathon Plan, which are reasonable and appropriate under the circumstances.

### F.   Failure of Class 6 to Timely Elect Section 1111(b) Election

As ordered by the Court on February 28, 2008, as required by section 1111(b) of the Bankruptcy Code and Bankruptcy Rule 3014, and by agreement of the Plan Proponents and the Indenture Trustee, notice of opportunity for Class 6 (Scopac Timber Note Secured Claims) to elect the application of section 1111(b)(2) of the Bankruptcy Code prior to March 2, 2008 (the "Agreed 1111(b) Election Deadline"), was adequate and sufficient. Class 6 failed to elect the application of section 1111(b)(2) of the Bankruptcy Code prior to the Agreed 1111(b) Election Deadline. Accordingly, Holders of Allowed Scopac Timber Note Secured Claims, as of the Record Date, are entitled to the treatment provided in Section 4.6.2.1 of the MRC/Marathon Plan. For the avoidance of doubt, Holders of Allowed Scopac Timber Note Secured Claims, as of the Record Date, are not entitled to the treatment provided in Section 4.6.2.2 of the MRC/Marathon Plan as they failed to elect the application of section 1111(b)(2) of the Bankruptcy Code prior to the Agreed 1111(b) Election Deadline in accordance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, agreement of the Plan Proponents and the Indenture Trustee and the Order of the Court.

### G.   Acceptances to the MRC/Marathon Plan

As evidenced by the Declaration of Kathleen M. Logan Certifying Voting On, and Tabulation of, Ballots Accepting and Rejecting the Respective Plans of Reorganization Proposed by (1) Mendocino Redwood Company, LLC and Marathon Structured Finance Fund L.P.; (2) The Bank of New York Trust Company, N.A.,

Indenture Trustee for the Timber Notes; and (3) the Debtors and Maxxam Inc., Maxxam Group Holdings Inc., and Maxxam Group Inc. [Docket No. 2581] (the "Ballot Tabulation"), pursuant to sections 1124 and 1126 of the Bankruptcy Code, impaired Classes 3, 4, 5, 7 and 8, five out of the seven Classes entitled to vote on the MRC/Marathon Plan, have accepted the MRC/Marathon Plan. In addition, the Palco Debtors and MAXXAM (Holders of the Class 11 Claims and Class 12 Interests in the Debtors) support confirmation of the MRC/Marathon Plan.

**H.   Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases**

The provisions of Article VI of the MRC/Marathon Plan governing the assumption, assumption and assignment, or rejection of executory contacts and unexpired leases, including without limitation, the right of the MRC/Marathon Plan Proponents and the Reorganized Entities, at any time prior to the Effective Date, to amend the MRC/Marathon Plan Supplement to: (a) delete any Assumed Contract listed therein, thus providing for its rejection pursuant to this Plan; or (b) add any executory contract or unexpired lease thereto, thus providing for its treatment as an Assumed Contract pursuant to this Plan, satisfy the requirements of all applicable provisions of section 365 of the Bankruptcy Code. Under the MRC/Marathon Plan, reasonable business judgment has been exercised in determining whether to assume, assume and assign, or reject each of the Debtors' executory contracts and unexpired leases as set forth in the MRC/Marathon Plan and MRC/Marathon Plan Supplement.

**I.   Cure**

The Debtors or the Reorganized Entities, as applicable, have cured, or provided adequate assurance that the Reorganized Entities will cure, defaults (if any)

under or relating to each of the Assumed Contracts which are being assumed pursuant to the MRC/Marathon Plan. Due and proper notice of the MRC/Marathon Plan Proponents' estimate of the cure costs for each Assumed Contract was provided in the MRC/Marathon Plan Supplement, and no other or further notice is required. To the extent the non-debtor parties to such executory contract or unexpired lease did not object to such estimated cure costs prior to the commencement of the Confirmation Hearing, or such later date as may be ordered by the Court, such parties are deemed to have consented to the cure amount as estimated in the MRC/Marathon Plan Supplement (as such may be modified or amended in accordance with the terms of the MRC/Marathon Plan), which amount shall be the sole amount required to cure any default or compensate for any actual pecuniary loss to such party resulting from any such default.

### J.   Adequate Assurance of Future Performance

The Debtors or the Reorganized Entities, as applicable, have provided adequate assurance of future performance under each of the Assumed Contracts which are being assumed pursuant to the MRC/Marathon Plan.

### K.   No Substantive Consolidation

The MRC/Marathon Plan is not based on, nor does it seek the approval of, any substantive consolidation of Palco, Scopac or any of the other Debtors or their Estates. Rather, the MRC/Marathon Plan calls for the Restructuring Transactions provided for pursuant to Section 7.6 of the MRC/Marathon Plan to occur in accordance with section 1123(a)(5)(B) of the Bankruptcy Code, all to occur *after* the Effective Date, which does not constitute substantive consolidation.

However, the Litigation Trust commingles potential recoveries of litigation belonging to Scopac with those belonging to other Debtors and distributes it to all unsecured creditors without regard to the ownership of the recovery. Such allocation is an impermissible use of litigation assets of Scopac, over the Noteholders' objection, for the potential benefit of other Debtors' unsecured creditors. *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005). However this is a technical flaw which can easily be cured by either separating the litigation into two trusts or by separately accounting for recovery within one trust. Moreover, such amendments may be made in the Order Confirming the Plan.

### L.   **Litigation Trust**

The creation of the Litigation Trust is an essential element of the MRC/Marathon Plan.  The Litigation Trust may also be known as the "PLC Litigation Trust".  On and after the Effective Date, all pleadings and other papers filed in the Cases shall be captioned "In re:  PLC Litigation Trust."  Entry into the Litigation Trust Agreement is in the best interests of the Debtors, their Estates and their creditors.  The establishment of the Litigation Trust, the selection Julianna Viadro, President of Hickey & Hill, Inc., to serve as Litigation Trustee, the designation of the Litigation Trust Board on April 7, 2008 and the form of the proposed Litigation Trust Agreement, as the same may subsequently be amended or modified, are appropriate and in the best interests of creditors.  Upon its execution, the Litigation Trust Agreement shall be valid, binding and enforceable in accordance with its terms.  The vesting in the Litigation Trust of the Litigation Trust Assets, as specified in the MRC/Marathon Plan, is a material component of the MRC/Marathon Plan, and nothing in this Order, the MRC/Marathon Plan, or the

Disclosure Statement shall be deemed or construed to prejudice or preclude the full assertion of such rights.

### M.   Exit Financing Facility

There is no exit financing condition to the MRC/Marathon Plan. However, to the extent that any MRC/Marathon Plan Proponent takes advantage of any exit financing (the "Exit Financing Facility"), entry into such Exit Financing Facility is in the best interests of the Debtors' Estates. The entities entering into such Exit Financing Facility exercised reasonable business judgment in determining to enter into same.  Such Exit Financing Facility was negotiated in good faith and at arm's-length, and any credit extended, letters of credit issued for the account of, loans made to any Reorganized Entity, creation of any mortgage, deed of trust, lien, pledge or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Exit Financing Facility shall be deemed to be extended, issued, and made in good faith.

## II.   THE MRC/MARATHON PLAN SATISFIES THE CONFIRMATION REQUIREMENTS IN SECTION 1129(a) OF THE BANRKUPTCY CODE

### A.   Burden of Proof

The Plan Proponents have the burden of proving the requirements for confirmation of the MRC/Marathon Plan by a preponderance of the evidence.  *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1163-65 (5th Cir. 1993), ("preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown"); *see also In re Monarch Beach Venture, Ltd.*, 166 B.R. 428, 432 (C.D. Cal. 1993) (same); *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 937 (Bankr. S.D.N.Y. 1994) ("a plan proponent must

demonstrate that its plan satisfies § 1129(b) by a preponderance of the evidence"). The Plan Proponents satisfied their burden of proof with respect to confirmation of the MRC/Marathon Plan.

**B.      Standing**

Section 1121 of the Bankruptcy Code provides who may file a plan of reorganization. Pursuant to section 1121(b) of the Bankruptcy Code, the debtor has the exclusive right to file a plan during the first 120 days of the case commencing on the Petition Date. Section 1121(c) of the Bankruptcy Code provides that after the expiration of the debtor's exclusivity period, "[a]ny party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may file a plan…" 11 U.S.C. § 1121(c).

Each of the Plan Proponents of the MRC/Marathon Plan, the Committee, MRC and Marathon, are proper parties and have standing to file and prosecute confirmation of the MRC/Marathon Plan in each of the Cases pursuant to sections 1121(c) and (d) of the Bankruptcy Code. The Court terminated exclusivity for certain parties including the Committee and Marathon. As set forth in the Court's Exclusivity Termination Order, and within the Committee's general mandate and standing under section 1121(c) of the Bankruptcy Code, the Committee has standing, and is authorized, to file a plan and disclosure statement in the Debtors' Cases. See 11 U.S.C. § 1121(c) ("Any party in interest, including the debtor, the trustee, a creditor's committee, an equity security holder's committee, a creditor, an equity security holder, or an indenture trustee may file a plan  . . . "); 11 U.S.C. § 1103(c) ("A committee… may… (3) participate in the

formulation of a plan… and collect and file with the court acceptances or rejections of a plan.").

Alternatively, Marathon is, by itself, a party in interest with standing to propose a plan in the Debtors' Cases under section 1121(c) of the Bankruptcy Code because Marathon was the pre-petition and DIP lender to the Palco Debtors and Palco owns the equity in Scopac.  Further, the financial reorganizations of Palco and Scopac are linked due in part to the fact that Palco is currently Scopac's sole customer for timber, making Marathon a sufficient party in interest in the Scopac Case.

Furthermore, the Indenture Trustee waived its rights to object to the standing of MRC and Marathon to file a plan in the Debtors' Cases by failing to object on standing grounds to the Court's Order Terminating Exclusivity, pursuant to which the Court expressly permitted MRC and Marathon to "seek to file a competing plan of reorganization for the Debtors," which includes the Palco Debtors and Scopac, and by failing to object to the Disclosure and Solicitation Order permitting solicitation of the MRC/Marathon Plan.

### C.   11 U.S.C. § 1129(a)(1)

The MRC/Marathon Plan complies with all applicable provisions of the Bankruptcy Code.

### 1.   11 U.S.C. § 1122

Each Claim or Interest placed in a particular Class under the MRC/Marathon Plan is substantially similar to the other claims or interests in that Class. In addition, valid business, legal and factual reasons exist for the separate classification of each of the Classes of Claims and Interests created under the MRC/Marathon Plan and

set forth in Sections 3.2 and 3.3 of the MRC/Marathon Plan in that there is no improper gerrymandering or unfair discrimination between or among holders of Claims and Interests, and sub-classification of Claims pursuant to Section 3.3 of the MRC/Marathon Plan is not required.  With regard to Classes 7, 8, and 9, reasonable business reasons exist for separately classifying the Palco Trade Claims and Palco General Unsecured Claims (Class 7), the Scopac Trade Claims (Class 8), and the Scopac General Unsecured Claims (Class 9).  Separately classifying such Claims reflects the different legal rights of these Holders.  Further, the Holders of Scopac Trade Claims in Class 8 have a different stake in the future viability of the ongoing business than do the Claimants in Class 9 (primarily the unsecured deficiency claim of the Noteholders).

The classification scheme in the MRC/Marathon Plan was not an attempt to obtain an Impaired consenting Class.  Even if separate classification of Classes 8 and 9 was not appropriate there are other impaired consenting Classes of creditors, and thus any improper separate classification does not render the MRC/Marathon Plan unconfirmable. *See Matter of Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991); *Beal Bank S.S.B. v. Waters Edge Ltd. Partnership*, 248 B.R. 668, 90-91 (D. Mass. 2000).

Thus, the MRC/Marathon Plan satisfies section 1122 of the Bankruptcy Code.

### 2.    **11 U.S.C. § 1123**

#### a.    **11 U.S.C. § 1123(a)(1)**

Section 1123(a)(1) of the Bankruptcy Code requires that a plan designate classes of claims, other than claims of a kind specified in sections 507(a)(2) (administrative expense claims), 507(a)(3) (claims arising during the "gap" period in an

involuntary case), or 507(a)(8) (priority tax claims) of the Bankruptcy Code.  *See* 11 U.S.C. § 1123(a)(1); *see also In re Eagle Bus. Mfg., Inc.,* 134 B.R. 584, 596 (Bankr. S. D. Tex. 1991), *aff'd*, 158 B.R. 421 (S. D. Tex. 1993) ("Administrative and Priority Tax Claims are not classified because section 1123(a)(1) of the Bankruptcy Code does not require the classification of such Claims, and because they must receive the treatment specified in section 1129(a)(9) of the Bankruptcy Code and cannot be otherwise impaired.").  Articles III and IV of the MRC/Marathon Plan classify Claims and Interests into twelve different Classes, eleven Classes of Claims and one Class of Interests, all other than the specified Administrative Claims and Tax Claims, and therefore complies with section 1123(a)(1) of the Bankruptcy Code.

### b.  <u>11 U.S.C. § 1123(a)(2)</u>

Section 1123(a)(2) of the Bankruptcy Code requires that a plan "specify any class of claims or interests that is not impaired under the plan."  11 U.S.C. § 1123(a)(2).  Article IV of the MRC/Marathon Plan specifies the Classes of Claims and Interests that are Unimpaired.  The following Classes of Claims are classified as Unimpaired under the MRC/Marathon Plan:  Class 1 (Other Priority Claims); and Class 2 (Secured Tax Claims and Other Secured Claims).  MRC/Marathon Plan §§ 4.1 and 4.2.  The requirements of section 1123(a)(2) of the Bankruptcy Code therefore have been satisfied.

### c.  <u>11 U.S.C. § 1123(a)(3)</u>

Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify the treatment of any class of claims or interests that are impaired under the plan."  11 U.S.C. § 1123(a)(3).  The following Classes of Claims and Interests are classified as

Impaired under the MRC/Marathon Plan: Class 3 (Palco DIP Loan Claim); Class 4 (Palco Term Loan Claim); Class 5 (Scopac Loan Claim); Class 6 (Scopac Timber Note Secured Claims); Class 7 (Palco Trade Claims and Palco General Unsecured Claims); Class 8 (Scopac Trade Claims); Class 9 (Scopac General Unsecured Claims); Class 10 (Inter-Debtor Claims); Class 11 (Non-Debtor Affiliate Claims); and Class 12 (Interests in the Debtors). MRC/Marathon Plan §§ 4.3 through 4.12. Article IV of the MRC/Marathon Plan specifies the treatment of such Claims and Interests. *Id.* Consequently, the MRC/Marathon Plan satisfies section 1123(a)(3) of the Bankruptcy Code.

### d.   **11 U.S.C. § 1123(a)(4)**

Section 1123(a)(4) of the Bankruptcy Code requires that a plan provide "the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). This provision provides creditors of the same class with a right to equality of treatment. Articles III and IV of the MRC/Marathon Plan provide for equality of treatment for each Claim or Interest within a particular Class. The MRC/Marathon Plan therefore complies with section 1123(a)(4) of the Bankruptcy Code.

### e.   **11 U.S.C. § 1123(a)(5)**

Section 1123(a)(5) of the Bankruptcy Code requires a plan of reorganization to "provide adequate means for the plan's implementation" and sets forth several examples of such means, including retention by the debtor of property of the estate, transfer of the debtor's property, satisfaction or modification of any lien and issuance of securities of the debtor in exchange for claims or interests. 11 U.S.C. §

1123(a)(5). The credible and persuasive evidence adduced at the Confirmation Hearing demonstrates that the MRC/Marathon Plan contains adequate means for its implementation because it provides for, among other things:

- Cash contributions of up to $580 million to Newco by MRC and Marathon, including $7.5 million allocated to improve the Mill;

- Marathon's conversion of approximately $160 million of senior secured pre-petition and post-petition debt into equity;

- Assumption of the Pension Plan;

- Benefits from approximately $10 million annually in savings from synergies that will be realized as a result of MRC sharing its management, relationships and infrastructure with Newco;

- Experienced management;

- Newco to be run in an environmentally responsible manner;

- Assumption of all environmental obligations, without any modification, including the HCP resulting from the Headwaters Agreement;

- Obtaining requisite regulatory approvals for ownership and operation of the Timberlands;

- A $530 million cash payment to the Noteholders, as well as continued eligibility for further Distributions;

- Payment in full of Allowed Administrative Claims and Allowed Priority Claims;

- Payment in full of the Scopac Loan Claim with any allowable default interest being paid over time in monthly installments;

- Provide $10.6 million in cash for the benefit of Holders of Allowed General Unsecured Claims in Classes 7 and 8;

- Establishment of a funded Litigation Trust to hold certain causes of action that will be liquidated for the benefit of Holders of Allowed Claims in Classes 7, 8, and 9;

- Cancellation of all existing notes, instruments and Interests, except as required to allow the Indenture Trustee to make Distributions to Holders of Allowed Scopac Timber Note Claims;

- Distributions of equity interests, cash and proceeds of certain assets to Holders of Allowed Claims; and

- Assumption of certain executory contracts and rejection of any remaining executory contracts and unexpired leases, and payment of default amounts due on or prior to the Effective Date.

### f.      11 U.S.C. § 1123(a)(6)

Section 1123(a)(6) of the Bankruptcy Code requires, among other things, that a plan

> provide for the inclusion in the charter of the debtor, if the debtor is a corporation . . . of a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends.

11 U.S.C. § 1123(a)(6).

The MRC/Marathon Plan requires the Reorganized Entities' organizational documents to prohibit the issuance of non-voting equity securities. MRC/Marathon Plan § 7.6.4.  The MRC/Marathon Plan appropriately distributes a 100% equity interest in Townco to Marathon, 85% of the equity interest in Newco to MRC, and a 15% equity interest in Newco to Marathon.  MRC/Marathon Plan § 7.6.1.  None of the equity securities will have a preference over another Class with respect to dividends. MRC/Marathon Plan § 7.6.1.  Accordingly, the MRC/Marathon Plan satisfies section 1123(a)(6) of the Bankruptcy Code.

### g.      11 U.S.C. § 1123 (a)(7)

Section 1123(a)(7) of the Bankruptcy Code requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security

holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." 11 U.S.C. § 1123(a)(7). The provisions of the MRC/Marathon Plan, the MRC/Marathon Plan Supplement, the Notice of Litigation Trustee, and the Notice of Litigation Trust Board, which disclose key information with respect to officers, directors or managers of the Reorganized Entities and the Litigation Trust, including without limitation the identities and any compensation of the officers and directors or managers of Newco and Townco, the Litigation Trustee and Litigation Trust Board, are consistent with the interests of creditors and with public policy. Further, as shown in the Ballot Report, Classes 3, 4, and the overwhelming majority of General Unsecured Creditors in Classes 5, 7 and 8 support the MRC/Marathon Plan. Virtually all of the government and environmental organizations connected to the Timberlands also support the MRC/Marathon Plan. The Palco Debtors and MAXXAM Holders of the Class 11 Claims and Class 12 Interests in the Debtors support the MRC/Marathon Plan. Therefore, section 1123(a)(7) of the Bankruptcy Code is satisfied.

### h.      11 U.S.C. § 1123(b)

Section 1123(b) of the Bankruptcy Code sets forth the permissive provisions that may be incorporated into a chapter 11 plan. The MRC/Marathon Plan contains permissive provisions which are appropriate pursuant to section 1123(b) of the Bankruptcy Code, and which are not inconsistent with the Bankruptcy Code. Specifically, pursuant to Article III of the MRC/Marathon Plan, Classes 1 through 2 are Unimpaired and Classes 3 through 12 are Impaired, as contemplated by section 1123(b)(1) of the Bankruptcy Code. As contemplated by section 1123(b)(2) of the

Bankruptcy Code, Article VI of the MRC/Marathon Plan provides for the assumption or rejection of the executory contracts and unexpired leases of the Debtors not previously assumed or rejected under section 365 of the Bankruptcy Code.  As contemplated by section 1123(b)(3) of the Bankruptcy Code, Article VIII of the MRC/Marathon Plan provides for the retention and enforcement of claims by the Litigation Trustee.  As contemplated by section 1123(b)(5) of the Bankruptcy Code, the MRC/Marathon Plan modifies the rights of Holders of Scopac Timber Note Claims.  Finally, the MRC/Marathon Plan's remaining provisions are not inconsistent with the Bankruptcy Code and are consistent with section 1123(b) of the Bankruptcy Code.

### 3.    11 U.S.C. § 1124

The Impaired Classes of Claims and Interests under the MRC/Marathon Plan, including, without limitation, Class 5 (Scopac Loan Claim), are properly impaired within the meaning of section 1124 of the Bankruptcy Code.  *See Matter of Southland Corp*, 160 F.3d 1054, 1059 (5th Cir. 1998); *In re Block Shim Dev. Company-Irving*, 118 B.R. 450, 454 (N.D. Tex. 1990); *aff'd*, 939 F.2d 289 (5th Cir. 1991); *In re Ace-Texas, Inc.*, 217 B.R. 719, 726-27 (Bankr. D. Del. 1998).   The MRC/Marathon Plan does not artificially "manufacture" the impairment of any Impaired Claims or Interests or Class of Impaired Claims or Interests under the MRC/Marathon Plan.  Further, even if Class 5 was unimpaired several other Impaired Classes voted to accepted the MRC/Marathon Plan and thus, the MRC/Marathon Plan would still be confirmable.  *See Beal Bank, S.S.B. v. Waters Edge Ltd P'ship*, 248 B.R. 668, 690-691 (Bankr. D. Mass. 2000).

**4.**     **11 U.S.C. § 506(a)/Absolute Priority Rule**

Marathon is not receiving or retaining any property under the MRC/Marathon Plan on account of Palco's Equity Interests in Scopac. Specifically, Marathon is receiving no consideration from Scopac in respect of Marathon's Claims against the Palco Debtors. Rather, Marathon is contributing assets and cash, specifically, the Mill, the Mill Working Capital, its $160 million of senior secured pre-petition and post-petition debt and an additional $35 million in cash, to Newco. In exchange, Marathon will receive a 15% equity stake in Newco, a 100% equity stake in Townco and a promissory note from Newco in the aggregate principal amount equal to the amount of the Mill Working Capital and secured solely by Liens on the Mill Working Capital. Moreover, Marathon is not receiving property with a value equal to or greater than the sum of the Allowed amount of its Claims and the amount of its cash contribution; rather, upon the Effective Date of the MRC/Marathon Plan, Marathon will waive its deficiency claims pursuant to the MRC/Marathon Plan. Thus, the MRC/Marathon Plan does not violate the absolute priority rule as codified pursuant to section 1129(b)(2)(B)(ii) of the Bankruptcy Code, or Section 506(a) of the Bankruptcy Code.

**D.**     **11 U.S.C. § 1129(a)(2)**

Section 1129(a)(2) of the Bankruptcy Code is concerned with whether the disclosure and solicitation requirements and applicable activities of a plan proponent comply with and adhere to sections 1125 and 1126 of the Bankruptcy Code. *See* 7 Collier on Bankruptcy ¶ 1129.03[2] at 1129-26 (15th ed. rev. 2007); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 759 (Bankr. S.D.N.Y. 1992) (noting that the legislative history of § 1129(a)(2) "explains that this provision embodies the

disclosure and solicitation requirements under §§ 1125 and 1126").   In determining whether a plan proponent has complied with section 1129(a)(2) of the Bankruptcy Code, courts focus on whether the disclosure and solicitation requirements adhere to sections 1125 and 1126 of the Bankruptcy Code.  *See, e.g., In re Downtown Inv. Club III)*, 89 B.R. 59, 65 (B.A.P. 9th Cir. 1988) ("The debtor did not comply with § 1125 as required by § 1129(a)(2)."); *In re Resorts Int'l, Inc.*, 145 B.R. 412, 468 (Bankr. D.N.J. 1990) (applying section 1129(a)(2) only to disclosure requirements of Bankruptcy Code); *In re Johns-Manville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, 843 F.2d 636 (2d Cir. 1988) (stating that "[o]bjections to confirmation raised under § 1129(a)(2) generally involve the alleged failure of the plan proponent to comply with § 1125 and § 1126 of the Code"); *see also* S. Rep. No. 95-989, at 126 (stating that § 1129(a)(2) "requires that the proponent of the plan comply with the applicable provisions of Chapter 11, such as § 1125 regarding disclosure"); H.R. Rep. No. 95-595, at 412 (same).

As evidenced by the affidavits of service filed with the Court, the Disclosure and Solicitation Order has been complied with.  The Plan Proponents have complied with all of the Bankruptcy Code's applicable provisions, including, without limitation, conducting the solicitation of acceptances and rejections of the MRC/Marathon Plan in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Disclosure and Solicitation Order.  Thus, the provisions of section 1129(a)(2) of the Bankruptcy Code have been complied with.

E.     **11 U.S.C. § 1129(a)(3)**

The MRC/Marathon Plan Proponents have proposed the MRC/Marathon Plan in good faith and not by any means forbidden by law.  Among other things, the MRC/Marathon Plan, the Restructuring Transactions (including without limitation additional Restructuring Transactions described in Section 7.6.5 of the MRC/Marathon Plan), and the Exit Financing set forth in, and permitted by, the MRC/Marathon Plan, and have the objective of ensuring that economic stakeholders of the Debtors' Estates realize the best possible recovery under the circumstances.  The credible and persuasive evidence adduced at the Confirmation Hearing, including the testimony of Mr. Dean and Mr. Matthew Breckenridge, established that the MRC/Marathon Plan was proposed with the legitimate and honest purpose of reorganizing and maximizing the value of each of the Debtors and the recovery to Holders of Claims and Interests under the circumstances of these Cases and does not constitute an effort to either acquire the assets of the Debtors for less than their fair and reasonable value or to eliminate a competitor of MRC.  *See In re Sun Country Dev. Inc.*, 764 F.2d 406, 408 (5th Cir. 1985); *In re Jasik*, 727 F.2d 1379, 1383 (5th Cir. 1984).

The MRC/Marathon Plan is not forbidden by law because it requires compliance with all non-bankruptcy environmental laws with regard to the regulatory approvals of ownership and operation, and it provides for the assumption of all Environmental Obligations.

The evidence at the Confirmation Hearing does not support a conclusion that the transactions contemplated by the MRC/Marathon Plan raise any antitrust

concerns.   Accordingly, the MRC/Marathon Plan satisfies section 1129(a)(3) of the Bankruptcy Code.

   **F.**      **11 U.S.C. § 1129(a)(4)**

         Section 1129(a)(4) of the Bankruptcy Code requires that "[a]ny payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Court as reasonable."  11 U.S.C. § 1129(a)(4).  Section 1129(a)(4) of the Bankruptcy Code thus requires that any and all post-petition fees promised or received in the bankruptcy case be disclosed and subject to the court's review.  *See In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

         Section 2.3 of the MRC/Marathon Plan requires all persons seeking Professional Compensation Claims to file applications for compensation for services rendered and reimbursement of expenses incurred through the Effective Date.   The Notice of Nomination of Litigation Trustee sets forth the proposed compensation of the proposed Litigation Trustee at her customary rate set forth therein ($300/hour).   The MRC/Marathon Plan requests Bankruptcy Court approval of the Litigation Trust Agreement, which provides for payment of the Litigation Trustee which payment is subject to the oversight of a Litigation Trust Board.   In addition, the Court retains jurisdiction over matters related to the Litigation Trust.   Accordingly, the MRC/Marathon Plan appropriately provides for Court approval of all payments for services in connection

with the Cases including, without limitation, those of the Litigation Trustee, and therefore satisfies section 1129(a)(4) of the Bankruptcy Code.

###    G.    11 U.S.C. § 1129(a)(5)

Section 1129(a)(5)(A) of the Bankruptcy Code requires that a plan proponent disclose the "identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor," and requires a finding that "the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy."  11 U.S.C. §§ 1129(a)(5)(A)(i) - (ii).  Section 1129(a)(5)(B) of the Bankruptcy Code further requires that a plan proponent disclose the "[identities] of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider." 11 U.S.C. § 1129(a)(5)(B).

Article 6 of the Disclosure Statement and the MRC/Marathon Plan Supplement properly identify all individuals who will serve after confirmation of the MRC/Marathon Plan as a director or officer of Newco or Townco, provide that no insiders, including existing officers and directors, will be employed or retained by Newco or Townco, and that their appointment to office is consistent with the interest of creditors and equity security holders and public policy.  *See* Disclosure Statement, Article 6 and MRC/Marathon Plan Supplement.  Pursuant to the Notice of Nomination of Litigation Trustee, Ms. Julianne Viadro, President of Hickey & Hill, Inc., was nominated to serve as the Litigation Trustee.  Similarly, on April 7, 2008, the Notice of Designation of Litigation Trust Board was filed.

Accordingly, the MRC/Marathon Plan, Disclosure Statement, Plan Supplement and evidence at the Confirmation Hearing establish that the Plan Proponents complied with section 1129(a)(5) of the Bankruptcy Code.

**H.**     **11 U.S.C. § 1129(a)(6)**

The requirements of section 1129(a)(6) of the Bankruptcy Code are not applicable to the MRC/Marathon Plan because no rate changes are provided for in the plan and no governmental regulatory commission has jurisdiction over the rates that the Debtors charge in the ordinary operation of their businesses.

**I.**     **11 U.S.C. § 1129(a)(7)**

Each entity that holds a Claim or Interest in a Class that is impaired under the MRC/Marathon Plan either:  (a) has accepted the MRC/Marathon Plan; or (b) will receive or retain under the MRC/Marathon Plan property of a value, as of the Effective Date, that is not less than that entity would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Classes 3, 4, 5, 7 and 8 are Impaired under the MRC/Marathon Plan and have accepted the MRC/Marathon Plan.  Classes 6, 9, 10, 11 and 12 also are Impaired under the MRC/Marathon Plan and either voted to reject, or are conclusively presumed to have rejected, the MRC/Marathon Plan.  However, the liquidation value set forth in testimony of Mr. Lamont and Mr. Johnston during the Confirmation Hearing, as well as the liquidation analysis attached to the Disclosure Statement, and the other evidence adduced at the Confirmation Hearing establish that the requirements of section 1129(a)(7) of the Bankruptcy Code are satisfied with respect to (i) Classes 6 and 9 because the value of the Distributions to creditors in Classes 6 and 9 is not less than the amount that such Holders would receive or retain if the Debtors were

liquidated under chapter 7, and (ii) with respect to Classes 10, 11, and 12 because Holders of Claims in Classes 10 and 11 and Interests under Class 12 are not receiving any Distribution under the MRC/Marathon Plan and would not receive or retain any value in a chapter 7 case. Holders of Class 11 Claims and Class 12 Interests have also now consented to confirmation of the MRC/Marathon Plan. Thus, the MRC/Marathon Plan satisfies section 1129(a)(7) of the Bankruptcy Code.

J.      **11 U.S.C. § 1129(a)(8)**

Section 1129(a)(8) of the Bankruptcy Code provides that, with respect to a class of claims or interests, the plan may only be confirmed if (i) such class votes to accept the plan, or (ii) such class is unimpaired under the plan. Classes 1 (Other Priority Claims) and 2 (Secured Tax Claims and Other Secured Claims) are each unimpaired and thus each such Class is deemed to have accepted the MRC/Marathon Plan pursuant to section 1126(f) of the Bankruptcy Code. Classes 3 (Palco DIP Loan Claim), 4 (Palco Term Loan Claim), 5 (Scopac Loan Claim), 7 (Palco Trade Claims and Palco General Unsecured Claims) and 8 (Scopac Trade Claims) are Impaired under the MRC/Marathon Plan and have voted to accept the MRC/Marathon Plan. Classes 6 (Scopac Timber Note Secured Claims) and 9 (Scopac General Unsecured Claims) are Impaired under the MRC/Marathon Plan and have voted to reject the MRC/Marathon Plan. Classes 10 (Inter-Debtor Claims), 11 (Non-Debtor Affiliate Claims) and 12 (Interests in the Debtors) are Impaired and, because the Holders of such Claims and Interests will neither receive nor retain any property pursuant to the MRC/Marathon Plan, such Classes are deemed to have rejected the MRC/Marathon Plan pursuant to section 1126(g) of the Bankruptcy Code. Thus, the MRC/Marathon Plan does not satisfy section 1129(a)(8) of the

Bankruptcy Code.  Nevertheless, section 1129(b)(1) of the Bankruptcy Code provides that if a plan satisfies all of the requirements of section 1129(a) of the Bankruptcy Code other than the acceptance requirement set forth in section 1129(a)(8) of the Bankruptcy Code, a plan may still be confirmed if:  (i) the plan does not discriminate unfairly, and (ii) the plan is fair and equitable with respect to such class of claims or interests that is impaired under, and has not accepted, the plan.  *See* 11 U.S.C. § 1129(b)(1).  As set forth below, the MRC/Marathon Plan satisfies the cramdown requirements of sections 1129(b)(1) and 1129(b)(2) of the Bankruptcy Code.

### K.  11 U.S.C. § 1129(a)(9)

The MRC/Marathon Plan requires that all Allowed Administrative Expense Claims and Priority Claims will be paid in accordance with section 1129(a)(9) of the Bankruptcy Code, including any Professionals with respect to Professional Compensation Claims pursuant to Section 2.3 of the MRC/Marathon Plan.  The MRC/Marathon Plan thus satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

### L.  11 U.S.C. § 1129(a)(10)

Section 1129(a)(10) of the Bankruptcy Code requires that, if a class of claims is impaired under a plan, at least one class of impaired claims that is not an insider must have voted to accept the plan.  *See In re Anderson Oaks (Phase I) Ltd. P'ship*, 77 B.R. 108, 111 (Bankr. W.D. Tex. 1987) ("To achieve effective reorganization by way of a cramdown plan, there must be at least one impaired class of creditors, not including insiders who vote for the plan."); *see also In re Lakeside Global II, Ltd.*, 116 B.R. 499, 505-06 (Bankr. S.D. Tex. 1989).

As set forth in the Ballot Tabulation, Classes 3, 4, 5, 7 and 8, each of which is Impaired and entitled to vote on the MRC/Marathon Plan, have voted to accept the MRC/Marathon Plan, without including any acceptance of the MRC/Marathon Plan by any insider as such term is defined in section 101(31) of the Bankruptcy Code. Accordingly, the MRC/Marathon Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

### M.   11 U.S.C. § 1129(a)(11)

The MRC/Marathon Plan is feasible as required by section 1129(a)(11) of the Bankruptcy Code because (a) it is not likely to be followed by liquidation or the need for further financial reorganization, (b) it requires compliance with all non-bankruptcy environmental laws with regard to the regulatory approvals of ownership and operation, and (c) it provides for the assumption of all Environmental Obligations.  The credible and persuasive evidence at the Confirmation Hearing establishes that the Reorganized Entities are reasonably expected to be stable, creditworthy, able to pay their debts as they mature, able to comply with all non-bankruptcy environmental laws with regard to the regulatory approvals of ownership and operation, and assume all Environmental Obligations. Further, there are no financing or due diligence contingencies and the transactions contemplated by the MRC/Marathon Plan can be consummated promptly after confirmation.  Accordingly, the MRC/Marathon Plan is feasible and has a reasonable likelihood of success, and that confirmation of the MRC/Marathon Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or the Reorganized Entities.

Upon the occurrence of the Effective Date and after taking into account the transactions contemplated by the MRC/Marathon Plan, including without limitation the Restructuring Transactions and Distributions, on a consolidated basis, (a) the present fair saleable value of the property of the Reorganized Entities will be not less than the amount that will be required to pay the probable liabilities on the Reorganized Entities' then-existing debts as they become absolute and matured considering all financing alternatives and potential asset sales reasonably available to the Reorganized Entities, (b) the Reorganized Entities' capital is neither unreasonably small in relation to their existing business nor any contemplated or undertaken transaction, and (c) all Restructuring Transactions are being entered into for fair value.

Accordingly, the requirements of section 1129(a)(11) of the Bankruptcy Code are satisfied in all respects.

### N.   **11 U.S.C. § 1129(a)(12)**

Section 1129(a)(12) of the Bankruptcy Code requires that certain fees listed in 28 U.S.C. § 1930 be determined by the court at the confirmation hearing and be paid on the effective date of the plan.  The Debtors have paid or will pay their quarterly fees during the Cases.  Pursuant to Section 13.5 of the MRC/Marathon Plan, all fees payable pursuant to Section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date.  Section 13.5 of the MRC/Marathon Plan also provides that any such fees payable after the Effective Date will be paid by the Litigation Trustee in accordance with the Litigation Trust Agreement.  The Plan Proponents have demonstrated that the Litigation Trust will have adequate means to pay

all such fees.  Accordingly, the MRC/Marathon Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

    **O.**      **11 U.S.C. § 1129(a)(13)**

        Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits, as defined in section 1114 of the Bankruptcy Code, be continued after the effective date of a plan "for the duration of the period the debtor has obligated itself to provide such benefits."  Pursuant to Article VI of the MRC/Marathon Plan and the MRC/Marathon Plan Supplement, all benefit plans, including agreements and programs subject to section 1114 of the Bankruptcy Code, in effect on the Effective Date will be treated as though they are executory contracts that are assumed under the MRC/Marathon Plan, and the Debtors' obligations under such agreements and programs will survive the Effective Date.  Moreover, as set forth in Section 6.5 of the MRC/Marathon Plan, on the Effective Date, the Reorganized Entities shall be deemed to have assumed the Debtors' Pension Plan pursuant to section 365(a) of the Bankruptcy Code and shall continue to satisfy the minimum funding standards pursuant to 26 U.S.C. §§ 412 and 430 (as applicable) and 29 U.S.C. § 1082, and administer the Debtors' Pension Plan in accordance with its terms and the provisions of Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 - 1461 (2000 & Supp. V 2005).  No provision of the MRC/Marathon Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code will, or will be construed to, discharge, release or relieve the Debtors or the Debtors' successors, or any other party, including the Reorganized Entities, in any capacity from liability with respect to such pension plans under any law or regulatory provision with respect to the Debtors' Pension Plan or the Pension Benefit Guaranty

Corporation (the "PBGC").  Neither the PBGC nor the Debtors' Pension Plan are or will be enjoined from enforcing such liability as a result of the provisions of the MRC/Marathon Plan and the Confirmation Order providing for satisfaction, release and discharge of Claims.  The PBGC did not object to the MRC/Marathon Plan. Accordingly, the MRC/Marathon Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

> ### P.        11 U.S.C. § 1129(a)(14), (15) and (16)

Sections 1129(a)(14), (15) and (16) of the Bankruptcy Code are inapplicable in these Cases as the Debtors do not owe domestic support obligations, are not individuals, and are not nonprofit corporations.

## III.     THE MRC/MARATHON PLAN SATISFIES THE CRAM DOWN REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE

Classes 6 (Scopac Timber Note Secured Claims) and 9 (Scopac General Unsecured Claims) are Impaired under the MRC/Marathon Plan and have voted to reject the MRC/Marathon Plan.  Classes 10 (Inter-Debtor Claims), 11 (Non-Debtor Affiliate Claims) and 12 (Interests in the Debtors) are Impaired and, because the Holders of such Claims and Interests will neither receive nor retain any property pursuant to the MRC/Marathon Plan, such Classes are deemed to have rejected the MRC/Marathon Plan pursuant to section 1126(g) of the Bankruptcy Code.  Confirmation of the MRC/Marathon Plan, notwithstanding the rejection of the MRC/Marathon Plan by Classes 6 and 9 and the deemed rejection of the MRC/Marathon Plan by Classes 10, 11 and 12, is appropriate pursuant to section 1129(b) of the Bankruptcy Code.

In determining whether any discrimination is unfair, the Court should consider the existence of a dissenting class; the existence of another class of the same

priority; and plan treatment of the two classes.  *In re Sentry Operating Co. of Texas, Inc.*, 264 B.R. 850, 863-64 (Bankr. S.D. Tex. 2001).  Discrimination is permissible, but unfair discrimination is not.  *Id.* at 863.

The plan proponent may demonstrate that any discriminatory treatment is not unfair within the meaning of section 1129(b)(1) of the Bankruptcy Code by showing that the discriminatory treatment has a reasonable basis, is necessary for the plan, is proposed in good faith, and the discrimination is reasonable within that context.  *See In re Ambanc La Mesa Ltd. P'ship,* 115 F.3d 650, 656 (9th Cir. 1997); *In re Genesis Health Ventures Inc.,* 266 B.R. 591, 611 (Bankr. D. Del. 2001); *In re Aztec* Co., 107 B.R. 585, 590 (Bankr. M.D. Tenn. 1989); In *re Rochem Ltd.,* 58 B.R. 641, 643 (Bankr. D.N.J. 1985); *In re Buttonwood Partners, Ltd.,* 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990).

### 1.     The MRC/Marathon Plan Does Not Discriminate Unfairly Against Class 6 or 9

It is undisputed that the MRC/Marathon Plan does not discriminate at all against Class 6 Claims, much less discriminate unfairly, because there is no other class of the same priority with the same collateral.  Further, as the Court previously found, the MRC/Marathon Plan was proposed in good faith with a strong likelihood of success.

Similarly, there is no unfair discrimination of Class 9 because as the Court previously found, the classification structure and different treatment of Class 8 and Class 9 were necessary to the reorganization and were not done for the purpose of gerrymandering an impaired consenting class.

2. **The MRC/Marathon Plan is Fair and Equitable to Class 6 and Class 9**

Undersecured creditors such as the Noteholders are entitled only to (a) payment in full in the value of the secured claim and (b) an unsecured deficiency claim. *See In re Lakeside Global II,* 116 B.R. 499, 512 (S.D. Tex. 1989); 11 U.S.C. § 506(a). Pursuant to section 1129(b)(2)(A) of the Bankruptcy Code, a plan is fair and equitable, and thus confirmable over the objection of a class of secured creditors, if it meets one of the three alternatives in subsections (i)-(iii). *See Matter of Briscoe Enters., Ltd, II)*, 994 F. 2d 1160, 1168 (5th Cir. 1993). A plan complies with 11 U.S.C. § 1129(b)(2)(A)(iii) requiring the indubitable equivalent of the secured claim by providing the secured creditor the value of its collateral. *See Matter of  Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1350 (5th Cir. 1989).

In conducting an inquiry into indubitable equivalence, a court must examine (i) whether the treatment that an impaired, non-consenting secured creditor receives under the plan is "completely compensatory," and (ii) the likelihood that the secured creditor will receive payment. *In re San Felipe @ Voss, Ltd.,* 115 B.R. 526, 529 (S.D. Tex. 1990). Courts routinely find that cash or cash equivalent in an amount equal to the value of the secured creditors' collateral are completely compensatory and constitute the indubitable equivalent. *See, e.g., In re Wiersma*, 324 B.R. 92, 112 (9th Cir. B.A.P. 2004), rev'd. on other grounds, 483 F.3d 933 (9th Cir. 2007) (recognizing that with respect to indubitable equivalence, "cash is king."); *In re San Felipe @ Voss, Ltd.,* 115 B.R. at 529 (noting that section 1129(b)(2)(A)(iii) does not contain a requirement of strict cash equivalence, thereby implying that strict cash equivalence would  satisfy that section); *In re Keller,* 157 B.R. 680, 684 (Bankr. E.D. Wash. 1993)(annuity contract, which is a cash

equivalent, was indubitable equivalent of partial release of secured creditor's lien on real estate.

The Court determined that the fair market value of the Timberlands is not greater than $510 million.  The MRC/Marathon Plan provides the Noteholders with an immediate cash payment of $530 million, less adjustments. Accordingly if the Plan provides a minimum of $510 million to the Noteholders and maintains the Noteholders' lien on the Headwaters Litigation, if any, provides the Noteholders with the indubitable equivalent of their secured claim in compliance with the cram down provisions of the Bankruptcy Code, and is thus fair and equitable to Class 6.  The MRC/Marathon Plan is also fair and equitable to Class 9 (consisting primarily of the Noteholders' unsecured deficiency claim) because no Holder of any Claim or Interest junior to Class 9 will receive or retain any property.  *See* 11 U.S.C. 1129(b)(2)(B)(ii).  The same is true for Classes 10, 11 and 12 under the MRC/Marathon Plan.

### 3. The Noteholders Do Not Have a Right to Credit Bid Under the MRC/Marathon Plan

By complying with section 1129(b)(2)(A)(iii) of the Bankruptcy Code, the MRC/Marathon Plan is confirmable over the objection of the Noteholders.  No additional right to credit bid is required under this provision.  *See In re Criimi Mae, Inc.*, 251 B.R. 796, 806 (Bankr. D. Md. 2000); *In re Broad Assocs. Ltd. P'ship*, 125 B.R. 707, 711 (Bankr. D. Conn. 1991).

The MRC/Marathon Plan constitutes a transfer of assets under section 1123(a)(5)(B) of the Bankruptcy Code and thus any right to credit bid in a sale is not implicated.  The Bankruptcy Code provides protection for undersecured creditors in this situation by giving them the right to make an election under section 1111(b)(2) of the

Bankruptcy Code.  As the Court previously found, the Noteholders had the right to make such election, but chose not to avail themselves of that protection and cannot now claim a right to credit bid.  *See Broad Associates*, 125 B.R. at 712.

No additional marketing of the Timberlands is necessary to satisfy the Bankruptcy Code.  The marketing done pre-petition, the termination of exclusivity and the various expressions of interest of other potential bidders are a sufficient market test. *See Bank of America Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999).

The treatment of Classes 6, 9, 10, 11 and 12 satisfies the requirements of section 1129(b) of the Bankruptcy Code; such treatment does not discriminate unfairly, and is fair and equitable within the meaning of section 1129(b)(2)(A), 1129(b)(2)(B) and 1129(b)(2)(C) of the Bankruptcy Code, as applicable.

## IV.    THE REQUIREMENTS OF SECTION 1129(c) OF THE BANKRUPTCY CODE ARE MET BY CONFIRMING THE MRC/MARATHON PLAN

As set forth below, the Indenture Trustee Plan fails to meet the requirements for confirmation set forth in section 1129(a) and (b) of the Bankruptcy Code.  It is well settled that reorganization plans are preferred to liquidation plans.  *See, e.g., In re Valley View Shopping Center, L.P.*, 260 B.R. 10, 40-41 (Bankr. D. Kan. 2001) (competing liquidation plan was unconfirmable, but if it were confirmable, the court would confirm the reorganization plan over the liquidating plan) (citations omitted); *In re Holley Garden Apartments, Ltd.*, 238 B.R. 488, 495 (Bankr. M.D. Fla. 1999) (confirming debtor's reorganization plan over alternative liquidating plan despite preference of creditors).  The Indenture Trustee Plan is a liquidation of Scopac and will result in the liquidation of the Palco Debtors.  The MRC/Marathon Plan provides for the

reorganization of all of the Debtors.  Even if the Indenture Trustee Plan met the requirements of section 1129(a) and (b) of the Bankruptcy Code, as required by section 1129(c) of the Bankruptcy Code, (i) the preferences of the Debtors' Creditors and Equity Interest Holders for the MRC/Marathon Plan demonstrate that the MRC/Marathon Plan is preferred over the Indenture Trustee Plan, and (ii) as indicated by the statements of support by the various governmental and regulatory agencies, the public is overwhelmingly in favor of the MRC/Marathon Plan over the Indenture Trustee Plan. Therefore, the MRC/Marathon Plan should be confirmed.

## V.    THE MRC/MARATHON PLAN COMPLIES WITH SECTION 1129(d) OF THE BANKRUPTCY CODE

The principal purpose of the MRC/Marathon Plan is neither the avoidance of taxes nor the avoidance of Section 5 of the Securities Act of 1933, and no party has objected to the confirmation of the Plan on any such grounds.  Accordingly, the MRC/Marathon Plan satisfies section 1129(d) of the Bankruptcy Code.[6]

## VI.    THE DISCHARGES, RELEASES, EXCULPATIONS, INJUNCTIONS AND RELATED PROVISIONS IN THE MRC/MARATHON PLAN ARE APPROPRIATE

Pursuant to section 1123(b)(3) of the Bankruptcy Code, the discharges, releases, exculpations and injunctions set forth in the MRC/Marathon Plan, including, without limitation, Article X of the MRC/Marathon Plan, and implemented by the Confirmation Order, constitute good faith compromises and settlements of the matters covered thereby.  Such compromises and settlements are made in exchange for substantial consideration and are hereby approved as fair, equitable, reasonable and in the

---

[6]    Section 1129(e) of the Bankruptcy Code is not relevant because this is not a small business case within the meaning of the Bankruptcy Code.

best interests of the Debtors, the Estates, the Reorganized Entities, the Plan Proponents, the Litigation Trustee, Creditors and Equity Interest Holders.  The releases contained in Article X of the MRC/Marathon Plan are, under the circumstances presented, fair, reasonable and necessary to the successful effectuation of the MRC/Marathon Plan and justified by the substantial consideration contributed under the MRC/Marathon Plan for the benefit of the Holders of Allowed Claims.   Each of the discharge, release, indemnification, and exculpation provisions set forth in the MRC/Marathon Plan:

- is within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), (b), and (d);

- is an essential means of implementing the MRC/Marathon Plan pursuant to section 1123(a)(5) of the Bankruptcy Code;

- is an integral element of the settlements and transactions incorporated into the MRC/Marathon Plan;

- confers material benefit on, and is in the best interests of, the Debtors, their estates, and the holders of Claims and Interests;

- is important to the overall objectives of the MRC/Marathon Plan to finally resolve all Claims among or against the parties-in-interest in the Cases with respect to the Debtors, their organization, capitalization, operation, and reorganization; and

- is consistent with 11 U.S.C. §§ 105, 1123, and 1129, and other applicable provisions of the Bankruptcy Code.

The failure to effect the discharge, release, indemnification, and exculpation provisions described in Article X of the MRC/Marathon Plan would seriously impair the MRC/Marathon Plan Proponents' ability to confirm the MRC/Marathon Plan.

Accordingly, the discharges, and the releases of the Released Parties and the exculpation of the Exculpated Parties as set forth in the MRC/Marathon Plan are

consistent with sections 105, 524, 1123, and 1129 of the Bankruptcy Code and applicable law in the Fifth Circuit.

## VII.   CONFIRMATION OF THE MRC/MARATHON PLAN

Subject to the three technical corrections required herein, the MRC/Marathon Plan complies with all of the requirements of the Bankruptcy Code and should be confirmed.

## VIII.   DENIAL OF CONFIRMATION OF THE INDENTURE TRUSTEE PLAN

The Indenture Trustee Plan is not proposed in good faith as required by section 1129(a)(3) of the Bankruptcy Code because it is laden with conflicts of interest between Beal, the largest Noteholder, and the other Noteholders.  Further, the Indenture Trustee Plan is not designed to facilitate a reorganization of Scopac's business but rather to effectuate a foreclosure of the Timberlands.  *See In re Sun Country*, 764 F.2d at 408.

The Indenture Trustee Plan is not feasible as required by section 1129(a)(11) of the Bankruptcy Code because there is no evidence of how Debtors' operations, which are suffering from negative cash flow, will be funded during the 10 month marketing and sale process contemplated by the Indenture Trustee Plan.

Further, there is no certainty as to the ultimate buyer.  Thus, there is no reasonable likelihood that the necessary regulatory approval will be obtained.

The prospect of a purchase offer from Beal, Harvard or The Nature Conservancy or any other bidder that would yield more to the Indenture Trustee or to any of the Debtors' Estates, jointly or severally, on a present value basis than what is being offered under the MRC/Marathon Plan is highly speculative.

Finally, the Indenture Trustee Plan, as amended, requires resolicitation because the amendments dramatically reduced the recovery to unsecured creditors, including the unsecured deficiency claim of the Noteholders.

Confirmation of the Indenture Trustee Plan should be denied.

## IX.  DENIAL OF CONFIRMATION OF THE DEBTORS' PLAN, PALCO ALTERNATIVE PLAN AND SCOPAC ALTERNATIVE PLAN

The Debtors' Plan, the Palco Alternative Plan and the Scopac Plan have each been voluntarily withdrawn.  [Docket No. 2846].  Accordingly, confirmation of each of these plans should be denied.

## X.  DENIAL OF THE MOTION TO APPOINT CHAPTER 11 TRUSTEE

The Indenture Trustee's Motion to Appoint a Chapter 11 Trustee Pursuant to section 1104 of the Bankruptcy Code [Docket No. 2092] should be denied because the Indenture Trustee has failed to meet its burden.  Further, the Court concludes that the MRC/Marathon Plan should be confirmed and, accordingly, the Indenture Trustee's Motion to Appoint Chapter 11 Trustee should be denied as moot.

Dated: 06/06/2008

_____
RICHARD S. SCHMIDT
United States Bankruptcy Judge