UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| In Re: § | |
| § | Case No. 07-20027-C-11 |
| SCOTIA DEVELOPMENT LLC, *et al*., § | Jointly Administered |
| § | (Chapter 11) |
| Debtors. § | |

**THE INDENTURE TRUSTEE'S POST-TRIAL LEGAL BRIEF IN SUPPORT OF MOTION TO GRANT INDENTURE TRUSTEE A SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO SECTION 507(B), AS AMENDED**
(Relates to Docket Numbers 2814 and 3254)

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The Bank of New York Trust Company, N.A., as Indenture Trustee for the Timber Notes (the "Indenture Trustee"), files this Post-Trial Brief (the "Post-Trial Brief") in support of its Motion to Grant to the Indenture Trustee a Superpriority Administrative Expense Claim Pursuant to Section 507(b), as Amended, and respectfully states as follows:

**BACKGROUND FACTS AND PROCEDURE**

1. On May 1, 2008, the Indenture Trustee filed its Motion to Grant Indenture Trustee a Superpriority Administrative Expense Claim Pursuant to Section 507(b) (the "Administrative Expense Motion") [Dkt. No. 2814].

2. On June 6, 2008, the Court entered its Findings of Fact and Conclusions of Law Regarding (a) Confirmation of MRC/Marathon Plan (b) Denial of Confirmation of the Indenture Trustee Plan and (c) Denial of the Motion to Appoint a Chapter 11 Trustee (the "Findings and Conclusions") [Dkt. No. 3088].

3. On June 29, 2008, the Indenture Trustee filed its Brief in Support of the Administrative Expense Motion (the "Administrative Expense Brief"). A more complete

70341047.8
- 1 -

recitation of the relevant facts is contained therein and, therefore, is not repeated in this Post-Trial Brief.

4. On June 30, 2008, Mendocino Redwood Company, LLC ("MRC"), Marathon Structured Finance Fund L.P., and the Official Committee of Unsecured Creditors (the "Committee," and together with MRC and Marathon, the "MRC/Marathon Plan Proponents") filed their Joint Supplement Objection in Opposition to the Administrative Expense Motion (the "Joint Objection") [Dkt. No. 3214].

5. Also on June 30, 2008, a three-day evidentiary hearing commenced on the Indenture Trustee's Administrative Expense Motion (the "Administrative Expense Hearing"). During the hearings on June 30, the Court granted the Indenture Trustee's oral motion for a trial amendment of its Administrative Expense Motion.

6. On July 2, 2008, the Indenture Trustee filed its Amended Administrative Expense Motion (Amendment and original hereinafter collectively referred to as the "Administrative Expense Motion") [Dkt. No. 3254].

7. On the same day, July 2, 2008, Bank of America, N.A. ("Bank of America") filed its Supplemental Objection to the Administrative Expense Motion [Dkt. No. 3245]. This late-filed Objection for the very first time raised the issue of whether the appropriate standard for valuation in connection with the determination of the Administrative Expense Motion should be foreclosure value as opposed to the going concern or fair market value utilized throughout the case, including by the Court in connection with its June 6, 2008 finding as to indubitable equivalent value and, indeed, by the MRC/Marathon Plan Proponents themselves and their appraiser throughout the three days of evidentiary hearings that began on June 30.

**POST-TRIAL BRIEF**

8. At the Court's invitation, the Indenture Trustee files this Post-Trial Brief to address certain limited, erroneous factual and legal arguments first presented by the MRC/Marathon Plan Proponents and Bank of America during the hearings of June 30 through July 2, 2008.[1] The Indenture Trustee's position on these issues is summarized as follows:

    a. The fair market value of the Indenture Trustee's interest in cash collateral has diminished by at least $40 million since the Petition Date.

    b. In determining fair market value as of the Petition Date, only information available as of that time (including market data) should be considered.

    c. Under the facts of this case, fair market/going concern value must be used in determining whether the Indenture Trustee is entitled to a section 507(b) administrative claim.

    d. The Cash Collateral Order and the **grant** of adequate protection therein are binding orders that fall squarely within the Court's authority under section 507(b) of the Bankruptcy Code.

## I. THE FAIR MARKET VALUE OF THE INDENTURE TRUSTEE'S INTEREST IN CASH COLLATERAL HAS DIMINISHED BY AT LEAST $40 MILLION SINCE THE PETITION DATE

9. In addition to the diminution of the Timberlands' fair market value between the Petition Date and June 6, 2007, the fair market value of the Indenture Trustee's cash collateral diminished significantly during the pendency of the case as well. This is best evidenced by the testimony of Scopac's chief financial officer, John Young, and related exhibits, including the May, 2008 Monthly Operating Report ("May MOR").[2]

---

[1] Indeed, as mentioned above, Bank of America filed its Supplemental Objection during the noon hour on July 2, 2008.

[2] Because the Court's Findings and Conclusions were issued on June 6, 2008, and the $510 million fair market value for the Timberlands was made as of that date, the May MOR is referred to herein. Mr. Young's Declaration, filed on June 28, 2008, attempted to bring the May MOR figures current through June 27, 2008.

10. The following chart illustrates the dramatic and significant diminution of portions of the Indenture Trustee's cash collateral since the Petition Date as reflected by the "Current Assets" portion of the latest Monthly Operating Report filed by Scopac:

|  | 1/07/07 | 5/30/08 |
|---|---|---|
| Cash | $46,888,930 | $5,047,057 |
| Inventory | $0 | $526,367 |
| Prepaid Restructuring (Retainers) | $0 | $514,671 |
| Investments (Auction Rate Securities/Timber Notes) | $0 | [$26,763,175] |
| Other | $0 | $702,093 |

11. The May MOR reflects, and Mr. Young so testified, that of the $26,763,175 in "Current Assets" classified as "Investments" as of May 30, 2008, $24,000,000 were auction rate securities (the "ARS") and $2,763,175 were "A-1 Timber Notes." *See* July 1, 2008 Hr'g Tr. at 249:11 – 250:19. According to Mr. Young, because of regulatory approval concerns regarding the A-1 Timber Notes, they can no longer be classified as cash or cash equivalents.[3] *See* July 1, 2008 Hr'g Tr. at 249:19 – 250:19. Further, according to Mr. Young's testimony, there is no current market for the ARS and, therefore, they cannot be considered "cash." *See* July 1, 2008 Hr'g Tr. at 250:20 – 253:14. Mr. Young testified that Scopac recently solicited bids for the ARS and did not receive a single firm bid. *See* July 1, 2008 Hr'g Tr. at 250:20 – 253:14. The uncontradicted testimony of Mr. Radecki, Scopac's macro economics markets expert, supported Mr. Young's testimony regarding the general current financial market for ARS. *See* June 30, 2008 Hr'g Tr. at 208:6-23. Thus, the only evidence provided at the Administrative Expense Hearing is that there **is no current market for the $24 million of ARS**.

---

[3] As of the Petition Date and for some time thereafter, the ARS were liquid and traded at par. Additionally, the ARS were readily marketable and could have been foreclosed upon and sold in a matter of weeks.

70341047.8 - 4 -

12. Based upon the evidence at trial, of the "Current Assets" as of May 30, 2008, only the "Inventory" and "Accounts Receivable" assets have any real value. But the Noteholders do not get any benefit from such "value," because the Class 6 Distribution Adjustment under the MRC/Marathon Plan[4] only provides value to the Indenture Trustee for any cash held in the SAR Account, once the cash in the SAR Account was transformed into other current assets, including "Inventory" and "Accounts Receivables," all value to the Indenture Trustee was lost because there is no working capital adjustment that increases the $510 million "floor" set by this Court to take into account such non-cash assets. Thus, the current fair market value of the Indenture Trustee's cash collateral has declined by at least $40 million.

13. The MRC Plan Proponents contend that, to the extent that cash collateral was used to pay postpetition attorneys' fees and interest to Bank of America, and the Indenture Trustee's professionals, that should not "count" as part of the diminution. This argument ignores the fact that, had the Collateral Agent been allowed to foreclose at the outset of the case, the substantial postpetition fees and interest paid to Bank of America would not have accrued or been paid because, pursuant to the "waterfall" provisions of the Indenture, the cash and cash equivalents of $46 million that existed on the Petition Date could have been foreclosed on quickly and used by the Trustee to pay off the $37 million in principal owed to Bank of America, leaving $9 million for Scopac to fund operations. This amount would have been more than

---

[4] Mr. Young testified that the current net outstanding receivable owed to Scopac by Palco was approximately $11 million. *See* July 1, 2008 Hr'g Tr. at 256:6-20. Under the MRC/Marathon Plan, "*Class 6 Distribution Adjustment*" means, subject to the limitation contained in 4.6.2.1, a reduction dollar for dollar by the amount determined by the following equation: (a) the sum of (i) the Allowed Scopac Loan Claim and (ii) any postpetition financing provided to Scopac and (iii) any other Secured Claim required to be paid by Scopac, in excess of the outstanding balance as of the Effective Date in the SAR Account; plus (b) the sum of accrued but unpaid Scopac Administrative Expense Claims in excess of $5,000,000, as such claims may be estimated as of the Effective Date; minus (c) any accrued but unpaid receivables arising after the Petition Date owed from Palco to Scopac net of any accrued but unpaid receivables owed from Scopac to Palco as of the Effective Date. This "credit" is of no value, because the Court has already decided that the Noteholders receive at least $510 million, which means that in no event could the Class 6 Distribution Adjustment exceed $20 million, even if the credit never existed.

adequate, since the evidence is clear that without the drain of the massive professional fees incurred in Scopac's chapter 11 case (which could not have been taken from the Indenture Trustee's cash collateral in the event of relief from the stay and a foreclosure), Scopac is cash positive. Moreover, had relief from stay been granted, the Indenture Trustee would not have incurred the millions of dollars in professional fees that have been paid out of its cash collateral—and millions more that has not been paid—in 18 months of active participation and frequent, often intense, litigation in this case.

14. The point is simple—the Indenture Trustee's cash collateral would not have been consumed to pay (i) millions of dollars in professional fees incurred by the estate in this case; (ii) millions more in professional fees incurred by the Indenture Trustee that would not have been incurred had relief from stay been granted; and (iii) millions of dollars more in professional fees and interest to Bank of America had the Collateral Agent been able to access the cash collateral at the outset of this case to pay off the principal and any prepetition interest to Bank of America and the automatic stay not prevented foreclosure on the non-cash collateral.

## II. WHEN DETERMINING THE FAIR MARKET VALUE OF COLLATERAL AS OF THE PETITION DATE, ONLY THE INFORMATION AVAILABLE AS OF THAT TIME SHOULD BE CONSIDERED

15. As argued during the opening statements presented on June 30, 2008, the Indenture Trustee respectfully submits that the Court's establishment of a Petition Date value of the Indenture Trustee's cash collateral and prepetition collateral must be conducted on a "snap-shot" basis as of such date. Therefore, the Court must consider only that data which was available as of January 18, 2007.

16. When valuing assets, it is a well-settled principle that hindsight should not cloud the mind of the appraiser. *See, e.g.*, *In re Heritage Org., L.L.C.*, 375 B.R. 230, 284 (Bankr. N.D. Tex. 2007) (holding that valuations should be accomplished "without the benefit of hindsight").

As Judge G. Schiff held in *WRT Creditors Liquidation Trust v. WRT Bankruptcy Litig. Master File (In re WRT Energy Corp.)*, 282 B.R. 343, 383 (Bankr. W.D. La. 2001), the "use of hindsight is inappropriate in determining value of assets at a particular point in time."

17. For example, bankruptcy courts commonly apply the "snap shot" approach when making determinations of insolvency, an analogous instance when bankruptcy courts look backwards in time to draw conclusions about valuation:

> The better approach, when possible, is to base the determination of insolvency on some form of seasonal appraisal of the assets. *See, e.g., In re Roblin Indus.*, 78 F.3d at 38; *In re Lamar Haddox*, 40 F.3d at 121-22. Although appraisals are not the exclusive or dispositive means for determining fair value, they do afford a court a more accurate snapshot of the market value of those assets at the time and under the circumstances when a debtor files in bankruptcy. *See, e.g., In re Roblin Indus.*, 78 F.3d at 38 (opining that appraisal is the better approach to determine fair valuation).

*In re Zeta Consumer Products Corp.*, 291 B.R. 336, 347 (Bankr. D.N.J. 2003).

18. Another analogous look-back valuation occurs when determining whether reasonably equivalent value was received. *Peltz v. Hatten*, 279 B.R. 710 (D. Del. 2002), *aff'd*, 60 Fed. App'x 401 (3d Cir. 2003) (denying the trustee's offered DCF-based valuation opinions and stating, "[w]hile the Liquidating Trustees' experts' views about the growth prospects for CT Tel may in hindsight be accurate, their views alone do not convince the court that at the time of the transaction, [the debtor's] contemporaneous DCF studies that supported the $68 million price were unreasonable"); *In re WRT Energy Corp.*, 282 B.R. at 383 (Judge G. Schiff found the fact that the properties did not actually contain the expected amount of oil and gas did not bear on the parties' valuation of those properties); *Krommenhoek v. Natural Resources Recovery, Inc. (In re Treasure Valley Opportunities, Inc.)*, 166 B.R. 701, 704 (Bankr. D. Idaho 1994) ("Subsequent appreciation or depreciation should not, and does not, transform a transfer for reasonably equivalent value into a fraudulent transfer.").

19. Therefore, the Court must consider the market data and future projections available as of the Petition Date to accurately assess the January 2007 value of the Indenture Trustee's collateral.

### III. FAIR MARKET VALUE, AS OPPOSED TO LIQUIDATION VALUE, IS THE APPROPRIATE VALUATION STANDARD IN THIS CASE.

20. During closing argument at the Administrative Expense Hearing, and after evidence of going concern value had come in without objection, Bank of America argued for the first time that foreclosure or liquidation value, and not fair market value, is the proper test for determining the Petition Date value of the Timberlands. MRC/Marathon agreed with that argument, after having themselves presented valuation testimony addressed to "fair market" and "going concern" value. This belated argument should be rejected for the foregoing reasons.

#### A. The Law Requires Using a Valuation Method that Reflects the Intended "Use" of the Collateral.

21. Section 507(b) of the Bankruptcy Code does not specifically provide which valuation model should be consulted when determining whether a diminution of collateral value has occurred. Instead, it is well established that valuation decisions must be made on a case-by-case basis. *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 799 (5th Cir. 1997) ("The Bankruptcy Code does not prescribe any particular method of valuing collateral, but instead leaves valuation questions to judges on a case-by-case basis."). "There is no clear cut formula or benchmark for valuing a creditor's collateral, and valuation depends upon the facts and evidence presented in each particular case." *In re Zersen*, 189 B.R. 732, 738 (Bankr. W.D. Wis. 1995) (citing *In re Owens*, 120 B.R. 487 (Bankr. E.D. Ark. 1990)).

### *The United States Supreme Court's Decision in* **Rash** *Requires That the Value of the Indenture Trustee's Collateral Be Determined on a Fair Market Basis*

22. Bank of America's and the MRC/Marathon Plan Proponents' arguments effectively ignore the Supreme Court's guidance for conducting this analysis in its holding that the proposed disposition or use of the collateral is of paramount importance to the valuation question. *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 962 (1997); *see also In re Preventive Maint. Servs.*, 359 B.R. 607, 610 (Bankr. W.D. La. 2007) ("[T]he valuation of collateral is to be determined in light of the purpose of the valuation and of the proposed disposition or use of the collateral.").

23. In *Rash*, the Supreme Court addressed the issue of whether a "cramdown" Chapter 13 plan requires valuation of the collateral (a truck) securing a creditor's claim based on a "foreclosure value" standard or a "replacement value" standard. *Id.* at 955. The Fifth Circuit had held that a bankruptcy court must use the "foreclosure value" standard because that was the secured creditor's state law remedy, and bankruptcy courts should resist departing from state law unless it was clearly compelled by the Bankruptcy Code. *See id.* at 958.

24. In reversing the Fifth Circuit, the Supreme Court held that, under Bankruptcy Code section 506(a), the appropriate valuation standard turns on the proposed use or disposition of the collateral. "As we comprehend § 506(a), the 'proposed disposition or use' is of paramount importance to the valuation question." *Id.* at 962. Because the debtor proposed to retain and use the truck, the appropriate valuation standard was "replacement value." *Id.* at 963-64.[5] Importantly, however, the valuation difference in *Rash* was that, because of market workings for the collateral in question (a used truck), the debtor would have had to pay more to replace the

---

[5] In a footnote, the Supreme Court explained that "replacement value" was consistent with "fair market value"—"the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition." *Rash*, 520 U.S. at 959 n.2.

collateral than the secured creditor would have received upon selling the collateral—which was a highly fungible product. In contrast, there is no reason to believe that, in the case of an asset as unique as the Timberlands, there would be any meaningful difference between what Scopac would have to pay to buy it, and what the Indenture Trustee could receive upon selling it.

25. Additionally, section 506(a) of the Bankruptcy Code provides for valuation of secured claims, stating, in relevant part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed secured claim. **Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest**.

11 U.S.C. § 506(a)(1) (emphasis added). As noted by the Supreme Court, "[t]he phrase 'value of such creditor's interest' in § 506(a) means 'the value of the collateral.'" *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 373 (1988) (citing H.R. Rep. No. 95-595, pp. 181, 356 (1977)).[6]

---

[6] Notably, cases that hold that, for purposes of section 507(b), collateral should be valued according to its foreclosure or liquidation value are inapposite. Courts utilizing liquidation value typically do so in cases in which liquidation of the collateral – often the depreciating vehicle of an individual debtor – has either already occurred or is imminent. *See United Missouri Bank of Kansas City, N.A. v. Federman (In re Modern Warehouse, Inc.)*, 74 B.R. 173, 177 (Bankr. W.D. Mo. 1987) (stating that, when "liquidation is the ultimate event which must be contemplated," liquidation value is appropriately considered). Sensibly, when the back-end value of property has already been fixed by liquidation, a court should determine diminution from a front-end liquidation value. *See id.; In re Ralar Distribs.*, 166 B.R. 3, 5 (Bankr. D. Mass. 1994), *aff'd sub nom. Baybank-Middlesex v. Ralar Distribs. (In re Ralar Distribs.)*, 182 B.R. 81 (D. Mass. 1995), *aff'd*, 69 F.3d 1200 (1st Cir. 1995). Accordingly, where, as here, a back-end fair market valuation has been determined, fair market value of the collateral should likewise serve as the starting point for the analysis.

### B. All Stages of this Case have Transpired While the Debtors Were in Continuous Operation of their Businesses; Thus Fair Market Value Underlies Every Decision Relating to Value.

26. Throughout this case, the focus of all consideration relating to value, beginning with the entry of the first cash collateral order through the entry of the Findings and Conclusions, has been the Timberlands' "fair market value." Most recently, during the extensive confirmation hearings held in this case during April and May, the evidence of value presented for purposes of cramdown all centered around fair market value of the Timberlands. This was and is appropriate because Scopac and Palco have been in continuous operation and each of the proposed plans of reorganization—including the Indenture Trustee's Plan—contemplated and provided for such continued operation and were either predicated upon or calculated to derive a fair market value of the going concern Timberlands. "Liquidation value" was only mentioned in connection with its relation to section 1129(a)(7), the so-called Chapter 7 or "best interests of creditors" test.

27. For instance, each of the Court's "Final Cash Collateral Orders" granted the Indenture Trustee "a superpriority cost of administration priority claim under 11 U.S.C. § 507(b) to the extent of postpetition diminution of its interests in the Prepetition Collateral and the Cash Collateral." *See, e.g.,* Scopac's Final Order Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code [Dkt. No. 454] at pg. 10. Scopac's business was operating at the time when each of the Final Cash Collateral Orders was entered. Therefore, any suggestion that the adequate protection orders contemplated a diminution or calculation based on a future, potential liquidation of Scopac is simply not true. Importantly, had the Indenture Trustee moved for relief from the stay, the case law is clear that its Timberlands collateral would have been valued based on a "fair market" or "going concern" valuation—not liquidation value.

28. Furthermore, in its Findings and Conclusions, the Court found that the value of

the Timberlands was $510 million as of June 6, 2008.[7] *See, e.g.,* Findings and Conclusions at pg. 114 ("The Court determined that the **fair market value** of the Timberlands is not greater than $510 million.") (emphasis added). Additionally, all of the experts in this case have valued the Timberlands based upon fair market value. *See, e.g.,* Findings and Conclusions at pg. 31 ("Mr. LaMont's analysis opines that as of April 30, 2008, the fair market value of the Timberlands is $430 million.");[8] pg. 41 ("Mr. Fleming opined that as of October 1, 2007, the fair market value of the Timberlands was $605 million."); pg. 53 ("Dr. Don R. Reimer is a forest biometrician and resource economist who was retained by Scopac to develop a harvest forecast for the Timberlands to be used in determining the fair market value of the Timberlands."). This is significant because the MRC/Marathon Plan does not provide for a sale by the Debtors pursuant to a negotiated sale agreement with representations and warranties by the seller. Instead, like the sale that would result after the Collateral Agent obtained ownership of the Timberlands through a credit bid at a foreclosure, the sale (or "transfer") to Newco under the MRC/Marathon Plan includes no representations or warranties—or even participation—by the debtor, Scopac, which opposed confirmation of the MRC/Marathon Plan and does so to this day. In a very real sense, the MRC/Marathon Plan involuntarily "forecloses out" Scopac's interest in the collateral.

---

[7] The Court specifically found the Timberlands' value as of June 6, 2008, to be "not more than $510 million"; however, the Court further found that the payments to the Indenture Trustee "must be at least $510 million" and so the Indenture Trustee assumes that is the Court's valuation of the Timberlands as of June 6, 2008. *See* Finding and Conclusions at pg. 6.

[8] Although Mr. La Mont also offered opinions as to the liquidation value of Scopac, those opinions were clearly not integral to the MRC/Marathon Plan Proponents' case in chief nor the Court's ultimate Findings and Conclusions other than for perhaps the limited purpose of making findings under 11 U.S.C. § 1129(a)(7). *See* Findings and Conclusions at pg.'s 40 and 105-06.

### C. In the Administrative Expense Hearing, the Court Did Not Reconsider Its "Confirmation Value," and Limited the Indenture Trustee to Proving Correlative Fair Market Value as of the Petition Date.

29. The Administrative Expense Hearing was conducted on an expedited basis.[9] At the June 9, 2008 status hearing, at which time the Administrative Expense Hearing was scheduled, the Court made it clear that no new evidence would be considered regarding the Timberlands' valuation as determined by the Court in its Findings and Conclusions as of the Confirmation Hearing. For instance, the following exchange with the Court took place:

> THE COURT: Now, are we going to just consider the testimony concerning at confirmation as to values as to be considered as the testimony that's being presented on the value as of the date of confirmation?
>
> MR. STRUBECK: Yes. I had understood, Your Honor, I was here earlier and I'm going to talk about that in a little bit as well, but I understood you to say you did not want to get into any issues of reconsideration of value decisions that you made pursuant to the confirmation hearings. So with that in mind, we have assumed for purposes of this motion and we have reserved all of our rights with respect to whether this moves into another direction, that the findings you made are the findings that apply as to the values as of the confirmation hearing, if that helps.
>
> THE COURT: All right. Thank you.

*See* June 30, 2008 Hr'g Tr. at 32:22 - 3:14.

30. Thus, with the Court's fair market valuation of the Timberlands on June 6, 2008, as the back end starting point, in order to compare "apples to apples," the Indenture Trustee and all of the other parties who presented evidence—including the MRC/Marathon Plan Proponents—presented evidence of the correlative fair market value of the Indenture Trustee's collateral as of the Petition Date (which, as provided above, is the only correct measure of value

---

[9] The Motion was originally scheduled to be heard on July 18, 2008. The hearing date was expedited, *sua sponte*, by the Court in response to MRC/Marathon's modification of their Plan which conditioned the Plan's Effective Date on the entry of a Final Order determining that the Indenture Trustee had no superpriority administrative expense claim.

because of the intended disposition of Scopac's assets).[10]  Notwithstanding Bank of America's last minute Supplemental Objection, the case that was actually tried by the Indenture Trustee and the MRC/Marathon Plan Proponents from June 30 through July 2, 2008 was all about fair market value.  Furthermore, the MRC/Marathon Plan Proponents and, indeed, Bank of America itself, never once objected to the relevancy of the Indenture Trustee's presentation of fair market value evidence, and, in fact, MRC and Marathon's witnesses (particularly Mr. La Mont) offered rebuttal testimony relating to fair market value, not liquidation value.  In fact, not until closing arguments did any party argue that liquidation value was the proper (and only) valuation standard for proving a section 507(b) diminution claim.  *See* July 2, 2008 Hr'g Tr. at 275:13 - 278:3.  Therefore, the MRC/Marathon Plan Proponents have waived and/or should be estopped from relying on any such objection.  *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990) (applying estoppel "where intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum designed for suitors seeking justice," and noting the estoppel doctrine's intent to "protect the courts rather than the litigants."); *see also De Saracho v. Custom Food Mach., Inc.*, 206 F.3d 874, 879-80 (9th Cir. 2000) (finding that the failure to object to testimony at trial waives evidentiary objections); *Zayre Corp. v. S.N. & R. Co.*, 882 F.2d 1145, 1150 (7th Cir. 1989); *Doria v. Terrell*, 2008 U.S. Dist. LEXIS 37641 *1, at *5-*6 n.1 (E.D. Cal. May 7, 2008) (finding, absent objection, evidentiary defects are waived).

---

[10] The valuation process "is not an exact science[,] and the Court must consider approximations founded upon opinions and assumptions." *La Jolla Mortgage Fund v. Rancho El Cajon Assocs.,* 18 B.R. 283, 288 (Bankr. S.D. Cal. 1982).  But the Supreme Court has made clear that the Court must select one general method for determining value and cannot combine multiple approaches.  *See Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 964 (1997).  This Court has correctly selected fair market value.  Of course, if the Court concludes that the fair market value of the Indenture Trustee's collateral declined between the Petition Date and June 6, 2008, there can be no question that the liquidation value of the collateral likewise declined.

**D.    Any Reasonably Contemplated Final Disposition of the Collateral Will Result in Obtaining Fair Market Value.**

31.     Putting aside the fair market value foundation rooted in the Court's Findings and Conclusions, Cash Collateral Orders and grants of adequate protection and presentation of evidence, the eventual disposition of Scopac and its assets will result in the payment of fair market value (even if characterized as the "indubitable equivalent" of the Indenture Trustee's claims),[11] which necessitates using fair market value to determine whether a section 507(b) claim exists. *See Rash*, 520 U.S. at 962 (stating that the "proposed disposition or use is of paramount importance to the valuation question" (internal quotations omitted)).

32.     Here, the Court has already issued its Findings and Conclusions providing for the sale (or "transfer") of Scopac's assets to Newco valued as a going concern, even though this is not a voluntary sale by the Debtor, involves no sale agreement or participation by the Debtor, and is devoid of any representations or warranties by the Debtor.  Scopac's assets are not being liquidated.  Furthermore, if the MRC/Marathon Plan is deemed unconfirmable, Scopac has proposed a section 363 sale of the Timberlands as a going concern.  Indeed, on information and belief, this proposed 363 sale by Scopac would include agreements with SPI (Sierra Pacific Industries) for the continued operation of Palco, if necessary.  There is no basis to believe that a sale of the Timberlands by the Collateral Agent after a credit-bid foreclosure which, like the MRC/Marathon Plan, would not involve the cooperation of the Debtors or any representations or warranties, would produce something different than fair market value.  Thus, it is unforeseeable under these facts that "liquidation" value would accurately describe the probable disposition of

---

[11] Clearly, the Indenture Trustee disagrees with the MRC/Marathon Plan Proponents' expert opinions and the Court's resultant conclusion as to value in this case, and in fact believes that, in light of recently discovered evidence, the Court has fallen victim to "bogus" valuation testimony. However, there can be no doubt, and it would be disingenuous for the opposing parties to argue, that the Court's Findings and Conclusions do not result in a finding of fair market value.

the Indenture Trustee's collateral. Consequently, using a fair market value standard is required in this case; indeed, given the procedural status of the case and the Court's prior findings and pronouncements, a fair market standard should be, in effect, the law of the case.

33. As the Court observed, this is not the standard section 503(b) or 507(b) case. The Indenture Trustee is not a lessor trying to recoup lease payments. It does not have a lien on a consumer vehicle or a business debtor's tractor-trailer (for which the replacement value, if the debtor tried to buy and keep it, is very different from its value if the debtor tried to sell it in a fungible used vehicle market). This case does not involved a personal property lien on accounts receivable, inventory and equipment that would likely be disposed of on a piecemeal basis in a foreclosure. The Indenture Trustee in this case seeks a determination of the amount of its superpriority administrative claim, a claim and protection expressly provided to it by the Court, for the diminution of the value of its cash and prepetition collateral—assets which in any conceivable scenario would be disposed of as a whole, on a going concern basis. Based on the facts and circumstances of this case in its current procedural posture, that determination is most appropriately made on a going concern, fair market value basis.

34. This Court has used fair market value as the appropriate valuation methodology throughout this case, and would have used that same standard had the Indenture Trustee moved for relief from the stay in order to foreclose. That is why both the Indenture Trustee and the MRC/Marathon Plan Proponents took that approach in the appraisal and valuation evidence which they presented to the Court over the three-day section 507(b) hearing.

### IV. ADEQUATE PROTECTION SHOULD BE HONORED AS ORDERED.

35. In each of the Court's "Final Cash Collateral Orders," it provided the Indenture Trustee with "a superpriority cost of administration priority claim under 11 U.S.C. § 507(b) to the extent of postpetition diminution of its interests in the Prepetition Collateral and the Cash

Collateral." *See, e.g.,* Scopac's Final Order Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code [Dkt. No. 454] at pg. 10. Now, in the Joint Objection and in closing argument, the MRC/Marathon Plan Proponents have implied that the Final Cash Collateral Orders exceed the scope of the law by "rewrit[ing] Section 507(b)" and thus should be ignored. To the contrary, determinations of appropriate adequate protection are discretionary to the Court. *See* 11 U.S.C. § 361; *Resolution Trust Corp. v Swedeland Dev. Group (In re Swedeland Dev. Group)*, 16 F.3d 552, 564 (3d Cir. 1994) (citing *In re O'Connor*, 808 F.2d 1393, 1397 (10th Cir. 1987)). In this case, involving several Cash Collateral Orders, Marathon, MRC and the Committee had several opportunities to object both to the Debtor's Motions for Use of Cash Collateral as well as the language of each of the Orders entered thereon—but they failed to do so. Those Orders are now all final and non-appealable and should be honored and enforced. Therefore, the adequate protection ordered in this case and the precise, unqualified measure of the Indenture Trustee's section 507(b) claim, as repeatedly ordered by this Court, should be enforced as written. It is too late to change the terms of the long-final orders to accommodate the MRC/Marathon Plan Proponents.

36. Additionally, the cases cited by MRC *et al.* in the Joint Brief are wholly distinguishable. The cases relate to stipulations between the parties that contain factual inaccuracies or unfulfilled conditions precedent. *See, e.g.*, *In re Nordyke*, 43 B.R. 856, 860 (Bankr. D. Ore. 1984) (finding stipulation between a creditor and Chapter 11 debtor-farmers for cross-collateralization of the debtors' crop contained mistakes of law and fact regarding the level of depreciation and ultimate value of the crop); *In re Callister*, 15 B.R. 521, 533 (Bankr. D. Utah 1981) (finding inaccurate stipulation as to value was error borne by the creditor (*i.e.*, depreciation of tractor exceeded creditor's expectations) but eventually concluding that failure of

grant of adequate protection *was enforceable* as an administrative expense claim (*i.e.*, loss due to debtors failure to insure collateral)).

37. Also cited in the Joint Objection is *In re Becker*, 51 B.R. 975 (Bankr. D. Minn. 1985). Interestingly, the *Becker* court ruled that the creditor (holding collateral rights in various tractors) was not limited to the failed adequate protection payments contained in its stipulation with the debtor, but instead was granted a superpriority claim for the entire amount of its actual losses proven at trial. This case emphasizes the important equity function of adequate protection: to provide to the relenting secured creditor sufficient damages to make it whole.

38. Accordingly, the Indenture Trustee respectfully requests that the Court enforce the adequate protection ordered by this Court to provide the Indenture Trustee the diminution of its cash and prepetition collateral.

Dated: Houston, Texas
       July 6, 2008

Respectfully submitted,

**FULBRIGHT & JAWORSKI L.L.P.**

By: *William Greendyke*
Zack A. Clement       (SBTX 04361550)
William Greendyke    (SBTX 08390450)
R. Andrew Black       (SBTX 02375110)
Jason L. Boland        (SBTX 24040542)
Mark A. Worden        (SBTX 24042194)
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone: (713) 651-5151
Facsimile: (713) 651-5246

-and-

Toby L. Gerber        (SBTX 07813700)
Louis R. Strubeck, Jr. (SBTX 12425600)
O. Rey Rodriguez     (SBTX 00791557)
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-2784

Telephone: (214) 855-8000
Facsimile: (214) 855-8200

Counsel for The Bank of New York Trust Company N.A., as Indenture Trustee for the Timber Notes