### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | **Case No. 07-20027-C-11** |
| **SCOTIA DEVELOPMENT LLC, *et al*.,** | § | **Jointly Administered** |
| | § | **(Chapter No. 11)** |
| Debtor. | § | |

### THE INDENTURE TRUSTEE'S EMERGENCY REQUEST FOR CERTIFICATION PURSUANT TO 28 U.S.C. § 158(d)(2) AND INTERIM RULE 8001(f) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

### NOTICE UNDER BLR 9013

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 20 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**THE INDENTURE TRUSTEE HAS SOUGHT EXPEDITED CONSIDERATION OF THIS MOTION.**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The Bank of New York Trust Company, N.A., as Indenture Trustee for the Timber Notes

(the "Indenture Trustee"), files this Emergency Request for Certification Pursuant to 28 U.S.C. §

158(d)(2) and Interim Rule 8001(f) of the Federal Rules of Bankruptcy Procedure (the

"Request"), which seeks direct certification of its appeal of this Courts "Judgment and Order (I) Confirming First Amended Joint Plan of Reorganization for the Debtors, As Further Modified, With Technical Amendments, Proposed by Mendocino Redwood Company, LLC, Marathon Structured Finance Fund L.P., and Official Committee of Unsecured Creditors, (II) Denying Confirmation of Indenture Trustee Plan, (III) Denying Motion to Appoint Chapter 11 Trustee" [Dkt. No. 3302] (the "Confirmation Order"), signed and entered by the Court on July 8, 2008.

## I.     <u>PRELIMINARY STATEMENT</u>

1.      Recent amendments to 28 U.S.C. § 158(d), in pertinent part, provide for a direct appeal to the Court of Appeals from a bankruptcy court or district court if the bankruptcy court or district court certifies that either (i) the order involves a question of law as to which there is no controlling decision <u>or</u> involves a matter of public importance; (ii) the order involves a question of law requiring resolution of conflicting decisions; or (iii) an immediate appeal from the order may materially advance the progress of the case.   While only one of the three circumstances under Section 158(d) must be present to mandate certification, all three circumstances are present here.   As the Court recalls, the Fifth Circuit previously took and decided a direct appeal essentially in this same case.

2.      First, the Confirmation Order threatens to have grave effects on financial markets in light of the Order's inherent disregard for the principle of corporate separateness.   Moreover, the fact that several government officials representing the public-at-large have already voiced their concern regarding the Debtors' reorganizations underscores the profound public importance of the Confirmation Order, which necessarily will impact the economies of Humboldt County, the town of Scotia, California and the State of California, the preservation and maintenance of one of the nation's most ecologically diverse forests, and a host of other environmental concerns.

3.      Further, the Confirmation Order fundamentally contravenes decades of well-settled bankruptcy jurisprudence and overlooks the irremediable flaws and legal inadequacies inherent in the MRC/Marathon Plan, which creates a conflict on several key questions of law, as enumerated in Section III, *infra*, which the Fifth Circuit must now have an immediate opportunity to address.

4.      Finally, a decision from the Fifth Circuit will instill a sense of confidence in the Confirmation Order, or its reversal, that will effectively end the contentious litigation in the Debtors' bankruptcy cases.  Therefore, and in the interests of justice this Court should certify the Indenture Trustee's request for immediate review by the Fifth Circuit.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

5.      In 1998, Scotia Pacific Company LLC ("Scopac") was established as a separate company to take ownership of the timberland holdings of The Pacific Lumber Company ("Palco") and certain other affiliated companies "to facilitate the sale of certain collateralized notes . . . (the "Timber Notes")."  *See* IT Exhibit 128 at ¶ 5 ("First Day Affidavit of Gary L. Clark").  This approach of creating a separate corporate entity was employed to obtain financing on terms and conditions that would otherwise have been unavailable had the timber assets remained combined with those of Palco in a single entity.

6.      After Scopac was formed, it issued Timber Notes in the initial aggregate principal amount of approximately $870 million, secured by essentially all of Scopac's assets, including its real estate and timber.  Approximately $714 million in principal and $26 million in interest (*i.e.*, a total of $740 million) was outstanding on the Timber Notes as of the Petition Date (defined below).  The Bank of New York Trust Company, N.A. is the Indenture Trustee and Collateral Agent for the holders of the Timber Notes (the "Timber Noteholders") pursuant to that

certain Indenture dated July 20, 1998, by and between Scopac and State Street Bank and Trust Company.

7.     On July 18, 2006, Palco and Britt Lumber Co., Inc. ("Britt") entered into a Term Loan Agreement with Marathon pursuant to which Marathon Structured Finance Fund L.P. ("Marathon") loaned Palco and Britt $85 million (the "Palco Term Loan Agreement").  Palco and Britt also entered into a Revolving Credit Agreement with Marathon, pursuant to which Marathon provided Palco and Britt a $60 million revolving line of credit ("Palco Revolving Credit Facility") (collectively with the Palco Term Loan Agreement, the "Pre-Petition Loans"). [MMX 7].  These Pre-Petition Loans were secured by senior security interests in substantially all of Palco's assets other than Palco's equity interest in Scotia Pacific Company LLC ("Scopac"), including the stock of Palco owned by MAXXAM Group, Inc. ("MGI"). [MMX 2 ¶ 4]; (Tr. 4/8/08 188:15-189:8). Although the Pre-Petition Loans were not secured by Palco's equity interest in Scopac, Marathon was given a negative pledge over the Scopac stock owned by Palco. (Tr. 4/8/08 188:22-189:5).  Palco owns 100% of Scopac's stock. [MMX 35 at 22].

8.     On January 18, 2007, Scopac, Palco, Scotia Development Company LLC, Britt, Salmon Creek LLC and Scotia Inn Inc. (collectively the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

9.     On January 4, 2008, this Court entered its Order Terminating Exclusivity and Establishing Dates for Filing of Plans of Reorganization and Disclosure Statement (the "Order Terminating Exclusivity") [Dkt. No. 2004].  Pursuant to the Order Terminating Exclusivity, the Court set January 30, 2008 as the deadline for parties-in-interest to file competing plans of reorganization for the Debtors.  The Court also set February 28, 2008 as the hearing date for

approving disclosure statements, and April 1, 2008 as the confirmation hearing date (the "Confirmation Hearing").

10.     On January 30, 2008, three separate sets of plan proponents (collectively, the "Plan Proponents") each proposed a plan or plans for reorganizing some or all of the Debtors. The three Plan Proponents are the following entities:

a.     The Bank of New York Trust Company, N.A., Indenture Trustee for the Timber Notes;

b.     Mendocino Redwood Company, LLC ("MRC") and Marathon Structured Finance Fund L.P. ("Marathon"); and

c.     Scotia Development, Palco, Britt, Salmon Creek, Scotia Inn, and Scopac, together with Maxxam, Maxxam Group Holdings Inc., and Maxxam Group Inc.

11.     In particular, on January 30, 2008, MRC and Marathon filed their Joint Plan of Reorganization for the Debtors (the "Original MRC/Marathon Plan") [Dkt. No. 2206]. Contemporaneously therewith, MRC and Marathon filed their Disclosure Statement in Support of the MRC/Marathon Plan (the "Original MRC/Marathon Disclosure Statement") [Dkt. No. 2207].

12.     That same day, the Debtors filed their Second Amended Joint Plan of Reorganization for the Debtors (the "Debtors' Joint Plan") [Dkt. No. 2208], and alternatively, the First Alternative Plan of Reorganization for the Palco Debtors (the "Palco Alternative Plan") [Dkt. No. 2209] and the First Alternative Plan of Reorganization for Scotia Pacific Company LLC  (the "Scopac Alternative Plan") [Dkt. No. 2210].   Contemporaneously therewith, the Debtors filed their Disclosure Statement in Support of the Debtors' Joint Plan, the Palco Alternative Plan and the Scopac Alternative Plan (the "Debtors' Disclosure Statement") [Dkt. No. 2214].

13.     Finally, on January 30, 2008, the Indenture Trustee filed its Amended Chapter 11 Plan for Scotia Pacific Company, LLC (the "Indenture Trustee Plan") [Dkt. No. 2211]. Contemporaneously therewith, the Indenture Trustee filed its Disclosure Statement in Support of the Indenture Trustee Plan (the "Indenture Trustee's Disclosure Statement") [Dkt. No. 2212].

14.     At a hearing on February 5, 2008, the Court requested that the Official Committee of Unsecured Creditors (the "Committee") work with the Plan Proponents on a joint disclosure statement for all plans.

15.     On February 25, 2008, the Committee filed a Joint Disclosure Statement in Support of the Respective Plans of Reorganization Proposed by (1) the Indenture Trustee; (2) MRC and Marathon; and (3) the Debtors and Maxxam, Inc., Maxxam Group Holdings Inc. and Maxxam Group Inc. (the "Joint Disclosure Statement") [Dkt. No. 2353].   Contemporaneously therewith, the Committee filed a Joint Motion to Approve Joint Solicitation Procedures and Joint Disclosure Statement (the "Motion to Approve Solicitation Procedures") [Dkt. No. 2354].

16.     On February 29, 2008, the Court entered its Order Approving Joint Solicitation Procedures And Joint Disclosure Statement in Support of the Respective Plans of Reorganization Proposed by (1) The Bank Of New York Trust Company, N.A. Indenture Trustee for the Timber Notes; (2) Mendocino Redwood Company, LLC and Marathon Structured Finance Fund L.P.; and (3) the Debtors and Maxxam Inc., Maxxam Group Holdings Inc., and Maxxam Group Inc. (the "Joint Disclosure Statement Approval Order") [Dkt. No. 2387].

17.     On May 14, 2008, MRC and Marathon, joined by the Committee as a Plan Proponent, filed their First Amended Joint Plan of Reorganization, as Further Amended (the "MRC/Marathon Plan") [Docket No. 2902].

18.     While the plans were pending confirmation, Scotia Redwood Foundation, a well-financed buyer, offered to purchase the Scopac timberlands for a minimum bid of $603 million in cash.  *See* IT Exhibit 207 (Amended Binding Term Sheet of Scotia Redwood Foundation); *see also* IT Exhibits 227 – 230, 238 (Consents, Resolutions and Bid Proposal); *see also* Testimony of Jacob Cherner, Apr. 11, 2008 Hr'g. Tr. at pg. 148:5 – 9 (stating that "I have authority necessary to close the transaction . . . ."); *id.* at pg. 211:6 – 8 (affirming that the Scotia Redwood Foundation bid was "a binding term sheet"); *id.* at pgs. 265:20 – 266:1 (stating that the Scotia Redwood Foundation bid was not subject to any financing contingencies that were not within its control).

19.     On March 31, 2008, Kathleen M. Logan, as Balloting Agent, filed her Declaration Certifying Voting on, and Tabulation of, Ballots Accepting and Rejecting the Respective Plans of Reorganization Proposed by (1) Mendocino Redwood Company, LLC and Marathon Structured Finance Fund LP; (2) The Bank of New York Trust Company, N.A., Indenture Trustee for the Timber Notes; and (3) the Debtors and Maxxam Inc., Maxxam Group Holding Inc., and Maxxam Group Inc. [Dkt No. 2581] (the "Balloting Agent's Declaration").

20.     On April 4, 2008, the Indenture Trustee filed its Objection to the Confirmation of the First Amended Joint Plan of Reorganization for the Debtors Proposed by Mendocino Redwood Company, LLC and Marathon Structured Finance Fund L.P. (the "Confirmation Objection") [Dkt. No. 2614].

21.     From April 8, 2008 through April 11, 2008, the Bankruptcy Court held a Confirmation Hearing with respect to the various plans of reorganization.  The Confirmation Hearing resumed on April 29, 2008 and continued through May 2, 2008.  The Court held closing arguments on May 15, 2008.

22.     On July 8, 2008, the Court entered its Judgment and Order (I) Confirming First Amended Joint Plan of Reorganization for the Debtors, As Further Modified, With Technical Amendments, Proposed by Mendocino Redwood Company, LLC, Marathon Structured Finance Fund L.P., and Official Committee of Unsecured Creditors, (II) Denying Confirmation of Indenture Trustee Plan, (III) Denying Motion to Appoint Chapter 11 Trustee [Dkt. No. 3302].

23.     The MRC/Marathon Plan proposes to "transfer" the newly-integrated timberland and sawmill operations into a new entity, referred to as Newco, [MMX 77; MMX 1 ¶ 23; MMX 2 ¶ 9], for $580 million in cash.  [MMX 77 § 4.6.2.1].  Under the MRC/Marathon Plan, $7.5 million of these funds will be used to improve the operations of the Palco mill. [MMX 1 ¶ 28].

24.     Palco and Britt owe Marathon approximately $85 million pursuant to the Palco Term Loan Agreement, plus accrued interest. (Tr. 4/8/08 226:24-227:11). In addition, the Palco Debtors owe Marathon approximately $75 million pursuant to the Palco DIP Loan, plus accrued interest. (Tr. 4/8/08 226:24-227:11). Thus, there is in excess of $160 million of senior secured pre-petition and post-petition debt owed to Marathon, which under the MRC/Marathon Plan, Marathon will convert into equity.  [MMX 1 ¶ 24; MMX 2 ¶¶ 6, 10].  In exchange, Marathon will receive a 15% equity stake in Newco, a 100% equity stake in Townco (defined below) and a promissory note from Newco in the aggregate principal amount equal to the amount of the Mill Working Capital and secured solely by liens on the Mill Working Capital. [Docket No. 2902]. MRC will manage Newco.

25.     The MRC/Marathon Plan also proposes to restructure the town of Scotia, which Palco currently owns, by forming an entity referred to as Townco. [MMX 1 ¶ 24; MMX 2 ¶ 9]. Townco will allow its residents to purchase their homes. [MMX 1 ¶ 24; MMX 2 ¶¶ 9, 10].

26.     Certain of the Debtors' litigation assets will be pursued by a litigation trust for the benefit of the unsecured creditors (the "Litigation Trust"). [MMX 1 ¶ 24; MMX 2 ¶ 10].  The MRC/Marathon Plan provides $500,000 in seed money for this Trust. [MMX 77 Article VIII].

27.     Importantly, while the trade creditors are projected to receive approximately $10.6 million in cash or 75%-90% of their claims and will be eligible for further distributions based on recoveries by the Litigation Trust, in which they will share *pro rata* with holders of Scopac General Unsecured Claims, [MMX 77 §§ 4.7, 4.8, 4.9; MMX 1 ¶ 24; MMX 2 ¶ 10], the Indenture Trustee will receive only $530 million in cash (less an adjustment) on account of its secured claim.  Thus, compared to the debt on the Petition Date—$740 million, which does not include growth of the debt in the intervening year, the Indenture Trustee will be left with a several hundred million dollar, unsecured deficiency claim against the estate.  The MRC/Marathon Plan also claims that the Indenture Trustee will be eligible for potential additional recoveries from the Litigation Trust on account of its unsecured deficiency claims. [MMX 77 §§ 4.6.2.1, 4.9.2].

## III.   QUESTIONS PRESENTED ON APPEAL

28.     The Noteholder Group's appeal of the Confirmation Order presents the following legal questions:

➤ Whether the Court improperly confirmed a plan of reorganization, under Section 1129(b)(2)(A), which (i) divests a secured creditor of its liens on all of its collateral, (ii) sells the collateral without giving the secured creditor the right to credit bid, and (iii) fails to provide the secured creditor with a completely compensatory indubitable equivalent of its secured claim.

➤ Whether the Court improperly confirmed a plan of reorganization that violates the "absolute priority" rule by diverting the proceeds of a secured creditor's collateral to pay

(i) unsecured claimants and (ii) unsecured equity holders, whose rights with respect to the collateral are junior to those of the secured creditor.

➢ Whether the Court improperly confirmed a plan of reorganization that ignores the integrity of the Debtors' separate estates by substantively consolidating the Debtors' assets and paying creditors of the various estates with proceeds of the sale of the secured creditor's collateral before paying the secured creditor in full.

➢ Whether the Court improperly confirmed a plan of reorganization that improperly fails to provide for the payment of intercompany administrative claims and a secured creditor's administrative claims, in violation of Sections 1129(a)(9) and (a)(11) of the Bankruptcy Code.

➢ Whether the Court improperly confirmed a plan of reorganization in violation of Section 1129(a)(7) of the Bankruptcy Code, where the plan combines multiple Debtors' assets and pays creditors of the various estates with proceeds of the sale of the secured creditor's collateral before paying the secured creditor in full.

➢ Whether the Court improperly confirmed a plan of reorganization that places trade claims and deficiency claims in different classes, when no lawful reasons for separate classification are provided that are independent of a plan proponent's motivation to secure the vote of an impaired class of claims to support acceptance of the plan of reorganization.

➢ Whether the Court improperly confirmed a plan of reorganization that separately classifies claims of the same priority, and provides a difference in the plan's treatment of classes that results in a materially lower percentage recovery for unsecured deficiency claimants.

➢ Whether the Court improperly confirmed a plan of reorganization that artificially impairs a class of claims in order to secure the vote of an impaired class of claims to support acceptance of the plan of reorganization.

➢ Whether the Court improperly confirmed a plan of reorganization that contains an expansive Exculpation Clause which purports to release claims of non-consenting creditors against a multitude of parties that are not debtors before the Court.

➢ Whether the Court improperly confirmed a plan of reorganization because the plan fails to consider the potential impact of federal antitrust laws.

### IV.  RELIEF REQUESTED

29.     The Indenture Trustee requests that this Court certify the above-referenced questions for consideration by the Fifth Circuit under 28 U.S.C. § 158(d).

### V.  ARGUMENT

**A.  Overview of 28 U.S.C. § 158(d).**

30.     Pursuant to Section 1233 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Congress amended the Bankruptcy Code by streamlining bankruptcy appeals to provide for a fast-track access to the United States Courts of Appeal. Enacting 28 U.S.C. § 158(d), which works in conjunction with Rule 8001(f) of the Interim Federal Rules of Bankruptcy Procedure,[1] Congress provided that, upon consensual certification of the parties or certification by the relevant Bankruptcy Court or District Court, an appeal may be taken directly to the relevant United States Court of Appeals, if *any of three* circumstances exist:

---

[1] *See Ad Hoc Group of Timber Noteholders v. The Pac. Lumber Co. (In re Scotia Pac. Co., LLC)*, 508 F.3d 214, 219 (5th Cir. 2007) (stating that Interim Rule 8001(f) supplies the procedure for garnering certification under 28 U.S.C. § 158(d) and that Interim Rule 8001(f) has been adopted by the Southern District of Texas).

(i)      the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, *or* involves a matter of public importance;

(ii)     the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; *or*

(iii)    an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken . . . .

28 U.S.C. § 158(d)(2)(A) (emphasis added).  *See also Ad Hoc Group of Timber Noteholders v. The Pac. Lumber Co. (In re Scotia Pac. Co., LLC)*, 508 F.3d 214, 219 n.4 (5th Cir. 2007); *Ransom v. MBNA Am. Bank, N.A. (In re Ransom)*, 380 B.R. 809, 812 (B.A.P. 9th Cir. 2007). Thus, "[t]he focus of the statute is explicit: on appeals that raise controlling questions of law, concern matters of public importance, and arise under circumstances where a prompt, determinative ruling might avoid needless litigation." *Weber v. United States Tr.*, 484 F.3d 154, 158 (2d Cir. 2007).[2]

31.     Certification is mandatory where this Court determines that any of the three circumstances exists.  *Id.* 11 U.S.C. § 158(d)(2)(B) ("If the . . . court . . . determines that a

---

[2] Congress enacted this new appellate procedure to address problems related to the "time and cost factors attendant to the [previous] appellate system" and the fact that "decisions rendered by the district court as well as the appellate panel are generally not binding and lack stare decisis value." House Rep. No. 109-31, Pt. 1, 109th Cong. 1st Sess. 148-49 (2005).

circumstance specified in clause (i), (ii) or (iii) of subparagraph (A) exists . . . then the . . . court *shall* make the certification described in subparagraph (A)." (emphasis added)).[3]

32.     While only one of the three circumstances under § 158(d) must be present to mandate certification, all three circumstances are present here.

**B.     The Confirmation Order Relates to a Matter of Public Importance.**

33.     The Confirmation Order adjudicates issues of mammoth public importance. Among other things, the Confirmation Order potentially impacts the economies of Humboldt County, the town of Scotia, California and the State of California, financial debt markets worldwide, the preservation and maintenance of one of the nation's most ecologically diverse forests, greenhouse gas reduction effects, and a host of other ancillary environmental concerns. Accordingly, Arnold Schwarzenegger, Governor of the State of California, has tendered two letters probative of his strong interest in the Debtors' successful reorganization [Dkt. Nos. 2201 and 2601].  Moreover, no less than two members of Congress—Senator Dianne Feinstein [Dkt. No. 2312] and U.S. Representative Mike Thompson [Dkt. Nos. 2598 and 2335] and the Greater Eureka Chamber of Commerce [Dkt. No. 2529] have personally written to the Court expressing an interest in the provisions of the various plans of reorganization submitted to the Court. Notwithstanding the fact that the various persons who have expressed interest in the Debtors' reorganization communicated differing opinions regarding which plan of reorganization should be confirmed, signals of interest of this magnitude, alone, are unprecedented, even in major Chapter 11 bankruptcy cases.  Therefore, in light of the multitude of important public issues affected by the Confirmation Order, which will have an impact on a host of communities, this

---

[3] After certification by this Court, the Fifth Circuit may accept the certification appeal, which is contemplated by the Fifth Circuit's local rules. *See* 28 U.S.C. § 158(d)(2)(A) (providing appellate jurisdiction to the courts of appeals where there is lower court certification and the court of appeals "authorizes the direct appeal."); Fifth Cir. Local Rule 47.4.1 (contemplating "appeals from United States Bankruptcy Courts to this court.").

Court should certify the Indenture Trustee's appeal to the Fifth Circuit. *See, e.g., In re Virissimo*, 332 B.R. 208, 209 (Bankr. D. Nev. 2005), (facing the issue of whether BAPCPA's amendment to 11 U.S.C. § 522(p) was applicable to Nevada debtors, the court emphasized the significant importance that the decision would have to the Sunbelt region, and, in particular Nevada, in light of, *inter alia*, the unprecedented growth and real estate appreciation in that region).

34.     For example, in his first letter to the Court, Governor Schwarzenegger implored that, in addition to one of the Debtors' duties to the State of California under the historic 1999 Headwaters Forest Agreement,[4] the Debtors' successful reorganization was important to his constituents because the reorganization should

> ➢ Preserve the timberlands by maintaining a level of commercial harvest that will ensure sustainable, high-quality timber production over the long term while preserving and enhancing watershed and wildlife protection.

> ➢ Minimize adverse impacts to the local economy and preserve as many local employment opportunities as possible.

> ➢ Maximize the greenhouse gas reduction benefits that could be generated in timberland management.

State of California's Position by Governor Arnold Schwarzenegger for Proposed Plans of Reorganization at p. 1 [Dkt. No. 2201, filed Jan. 29, 2008]; *see also* Statement of Position of U.S. Congressman Mike Thompson [Dkt. No. 2335, filed Feb. 22, 2008] (stating that "[t]he timberlands and other assets held by [Debtors] represent a unique public trust for the citizens of

---

[4] "Headwaters [Forest] Agreement" means the agreement among Palco, Scopac, Salmon Creek, the United States, and California pursuant to which the companies transferred to the United States government 5,600 acres of timberlands in exchange for $300 million, approximately 7,700 acres of timberlands relative to federal and state government-approved habitat conservation and sustained yield plans.   Appendix A To MRC/Marathon First Amended Plan, As Modified at p. 5 [Dkt. No. 2800, filed May 1, 2008].

California and the nation"); Statement of Position of U.S. Senator Dianne Feinstein [Dkt. No. 2312, filed Feb. 19, 2008] (acknowledging that the 1999 Habitat Conservation Plan[5] that operates in conjunction with the Headwaters Agreement provides for public ownership of thousands of acres of timberlands, protection of the Marbled Murrelet Conservation Areas ("MMCAs") and other public resources which should be considered throughout the Debtors' bankruptcy cases, and especially upon plan confirmation).

35. Moreover, although Scopac was established in 1998 as a special purpose entity to take ownership of the timberland holdings of Palco and other affiliated companies to facilitate the sale of the Timber Notes, which were issued in the aggregate principal amount of $867.2 million, an approach that enabled Scopac, as a separate corporate entity, to garner financing on terms and conditions that would otherwise have been unavailable, the MRC/Marathon Plan eviscerates the corporate separateness of Scopac from the Palco Debtors by consolidating the two entities for purposes of paying its creditors. This is an unprecedented taking of private property interests. Because this decision could have dire effects on borrowers and credit markets worldwide, it presents an issue of gargantuan public importance. *See Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc.*, 713 F.2d 1477, 1486 (10th Cir. 1983) (acknowledging "the public interest in promoting investor confidence in the commodities markets"; *Volmar Distribs. v. New York Post Co.*, 152 F.R.D. 36, 40 (S.D.N.Y. 1993) ("The public certainly has an interest in the preservation of the integrity of competitive markets.").

---

[5] "[The Habitat Conservation Plan] means the Habitat Conservation Plan for the Properties of Pacific Lumber, Scotia Pacific, and Salmon Creek Corporation, dated February, 1999 approved in March 1999 in connection with consummation of the Headwaters Agreement, which covers multiple species and encompasses substantially all of the Timberlands." *Id.*

36.     This Court is issuing its direct appeal certification ruling in a commercial context; therefore, the Court should consider the impact of its decision on the capital markets.  In *Elliott Associates L.P. v. Banco de la Nacion*, 194 F.3d 363 (2nd Cir. 1999), for example, the Second Circuit, in reversing the trial court's interpretation of a statute, noted that while the trial court's ruling might benefit the debtors in the short run, it would have the long term adverse effect of increasing the cost of capital to certain types of borrowers generally.  *Id*. at 380.  Similarly, in *Enron Corp. v. Springfield Associates (In re Enron Corp.)*, 379 B.R. 425 (S.D.N.Y. 2007), the court, having granted an interlocutory appeal from the bankruptcy court's order based, in part, on a concern over the potential disruptive impact of the order on commercial markets, reversed the bankruptcy court's ruling.  There, the court noted that, "it is proper to consider the effect that the Court's interpretation would have on the markets," and observed that, "the unnecessary breadth of the Bankruptcy Court's decisions threaten to wreak havoc on the markets for distressed debt. That result has now been avoided."  *Id*. at 448.

37.     Confirmation of the MRC/Marathon Plan, if allowed to stand without prompt Fifth Circuit review, could have profound ramifications in corporate credit markets, as the Confirmation Order would send a clear signal that, despite the representations of an issuer of secured notes or the specific terms of their issuance, holders of secured notes cannot depend on, at least, the return of their collateral.  Rather, based on the precedent set by the Confirmation Order, investors would be subject to having their collateral used to pay the creditors of completely separate entities prior to the payment of their secured claims in full.  If such an incongruous result is allowed to stand, lenders will undoubtedly be less inclined to loan money (at reasonable prices), thus severely damaging an already shaky credit market.  Hence, if the Court's decision remains intact, untested by an appeal, it will jeopardize the availability of a

prevalent form of financing and potentially deprive borrowers of an avenue for obtaining financing on better terms.  This presents an exigent issue of public importance.

38.     In sum, in addition to the effect that the Confirmation Order threatens to have on financial markets, this Court should consider the vast array of potential externalities that the Order will have in the public sphere.  The fact that several government officials representing their constituents, the public-at-large, have voiced their concern regarding the Debtors' reorganizations is indicative of the public importance of the Confirmation Order, which necessarily will affect the local and national economies, financial debt markets worldwide, and a host of environmental concerns.  Therefore, the Court should certify the Indenture Trustee's appeal to the Fifth Circuit.

**C.     The Confirmation Order Unnecessarily Creates a Conflict on Several Questions of Law, Which Now Must Be Resolved by the Court of Appeals.**

> **(1)     Whether the Court improperly confirmed a plan of reorganization, under Section 1129(b)(2)(A), which (i) divests a secured creditor of its liens on all of its collateral, (ii) sells the collateral without giving the secured creditor the right to credit bid, and (iii) fails to provide the secured creditor with a completely compensatory indubitable equivalent of its secured claim.**

39.     Because the MRC/Marathon Plan did not garner the support of each impaired class, as required by Section 1129(a)(8) of the Code, it could be confirmed only over the objection of non-consenting creditors by resort to the "cram down" provisions of Section 1129(b).  To be crammed down, a plan must provide "fair and equitable" treatment of the classes of the non-consenting creditors.  Under Section 1129(b)(2)(A) of the Bankruptcy Code, fair and equitable treatment of a dissenting secured creditor class requires, at a *minimum*, that the plan provide:

- 17 -

(i) (I) that the holders of such claims <u>retain the liens</u> securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class <u>receive</u> on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of <u>at least the value of such holder's interest in the estate's interest in such property</u>;

(ii) for the <u>sale, subject to section 363(k)</u> of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the <u>indubitable equivalent</u> of such claims.

*See* 11 U.S.C. § 1129(b)(2)(A) (emphasis added).[6]  As described below, the MRC/Marathon Plan should not have been confirmed because MRC/Marathon failed to demonstrate that treatment of the Indenture Trustee is "fair and equitable" under any of the foregoing standards.  *See* 11 U.S.C. § 1129(b)(1).   Accordingly, because the Court confirmed the MRC/Marathon Plan, which is asserted to contravene the plain language of the Bankruptcy Code, the Indenture Trustee's appeal should be certified to the Fifth Circuit for resolution.

> **(a)    The Confirmation Order ignored decades of jurisprudence that insists that a secured creditor has a right to credit bid in a sale of its collateral, and followed inapposite, outliers which deny a secured creditor the right to credit bid.**

40.    A plan's treatment of a secured claim is fair and equitable if it provides (a) for the sale of assets, (b) free and clear of liens with such liens to attach to the proceeds of such sale, (c) in which the secured creditor is allowed to credit bid up to the full amount of its allowed

---

[6] However, the fact that a plan meets these minimal conditions does not ensure that it is fair and equitable.  *In re Simons*, 113 B.R. 942, 946 (Bankr. W.D. Tex. 1990).  Rather, the bankruptcy court "must consider the entire plan in the context of . . . the particular facts and circumstances [of the case]." *In re D & F Construction, Inc.*, 865 F.2d 673, 675 (5th Cir. 1989).

claim.  11 U.S.C. § 1129(b)(2)(A)(ii).  Such an approach protects the secured creditor from a sale

of its collateral for too low a price and from the diversion of collateral proceeds to junior claims

and interests.   Because the MRC/Marathon Plan fails to comply with this provision of the

Bankruptcy Code, it should not have been confirmed, and the Fifth Circuit should immediately

review the Confirmation Order.

41.     In substance, the MRC/Marathon Plan provides for (i) the Scopac Noteholders'

Collateral to be sold by Scopac, free and clear of liens, to Newco (an entity to be capitalized by

MRC and Marathon) for a pre-determined bargain price, and (ii) the net proceeds of this forced

sale to be disbursed in part to the Scopac Noteholders, and in part diverted to unsecured creditors

of Scopac and Palco.  As such, the MRC/Marathon Plan involves a sale free and clear of liens,

the *precise* situation contemplated by Section 1129(b)(2)(A)(ii), but fails to provide the Scopac

Noteholders with the required opportunity to "credit bid" their claims for the collateral being

sold.  *See* 11 U.S.C. § 1129(b)(2)(A)(ii) (authorizing sale "subject to section 363(k)"); 11 U.S.C.

§ 363(k).

42.     The credit bid right incorporated into Section 1129(b)(2)(a)(ii) is a fundamental

protection that enables a secured creditor to protect its lien and collateral against an undervalued

free and clear sale.  It is an important and statutorily granted right and remedy.  Accordingly, in

discussing a sale pursuant to a plan of reorganization, *Collier* explains that:

> The sale must be subject to section 363(k). . . .  This gives the secured creditor
> protections against attempts to sell the collateral too cheaply; if the secured party
> thinks the collateral is worth more than the debtor is selling it for, it may
> effectively bid its debt and take title to the property.
>
> …
>
> [M]ost courts jealously protect the secured creditor's right to credit bid, and will
> deny confirmation if that right is significantly impaired. It also raises issues of
> fairness if the plan proponent structures the sale with conditions other than price
> that cannot be matched by the secured creditor. If this is done solely to deprive the
> secured creditor of its rights under section 363(k), not only will the plan not meet

the fair and equitable standard, it will probably fail the good faith test of section 1129(a)(3) as well.

7 Lawrence P. King, *et al. Collier on Bankruptcy* ¶ 1129.05[2][b][ii] at pp. 1129-148-49 (15th ed. rev. 2008).[7]

43.    Although some district courts have concluded that if an undersecured recourse creditor fails to elect, under Section 1111(b)(2), to have its claim treated as fully secured, then a failure to provide the creditor with the opportunity to credit bid its lien in a sale of collateral under the plan does not contravene the Bankruptcy Code's requirements under Sections 1129(b)(2)(A)(ii) and 363(k) (*see, e.g., In re Waterways Barge P'ship*, 104 B.R. 776, 782-83 (Bankr. N.D. Miss. 1989)), that position is untenable as a matter of straightforward statutory construction.  This disagreement, alone, constitutes cause for the Fifth Circuit to immediately review the Confirmation Order.  However, with regard to the merits, courts taking this approach have erroneously resorted to Section *1111(b)'s* legislative history[8] to construe Section *1129(b)(2)(A)(ii)*, in the face of the latter section's plain language, *which contains no such qualification,* and accordingly, have imported heightened and unwarranted strictures into Section 1129(b)(2)(A)(ii) that were not included by Congress.[9]    As noted above, Section

---

[7] *See John Hancock Mut. Life Ins. Co. v. Cal. Hancock, Inc. (In re Cal. Hancock, Inc.),* 88 B.R. 226, 230-31 (B.A.P. 9th Cir. 1988);  *Aetna Realty Inv., Inc. v. Monarch Beach Venture (In re Monarch Beach Venture),* 166 B.R. 428, 433 (C.D. Cal. 1993); *In re H & M Parmely Farms v. Farmers Home Admin.,* 127 B.R. 644, 648 (Bankr. D.S.D. 1990); *In re 222 Liberty Assocs.,* 108 B.R. 971, 979 (Bankr. E.D. Pa. 1990); *In re Realty Invs., Ltd. V,* 72 B.R. 143, 146, 16 C.B.C.2d 1128, 1132-33 (Bankr. C.D. Cal. 1987); *In re Woodridge N. Apartments, Ltd.,* 71 B.R. 189, 191-92 (Bankr. N.D. Cal. 1987); *In re Yagow,* 60 B.R. 543, 547 (Bankr. D.N.D. 1986), *aff'd sub nom. United States v. Yagow,* 860 F.2d 1086 (8th Cir. 1988), *cert. denied*, 489 U.S. 1068 (1989); *cf. Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship,* 248 B.R. 668, 679-80  (D. Mass. 2000) (no right to credit bid secured claim when security interest was in <u>assets</u> of debtor, and new value plan proposed to auction a different asset; namely, the <u>equity</u> in the reorganized debtor).

[8] Those courts declare that a review of Section 1111(b)'s legislative history confirms that a secured creditor who has the opportunity to protect his position by making a Section 1111(b) does not require the special protection of being allowed to bid in debt at the sale of his collateral.  *In re Waterways Barge P'ship,* 104 B.R. at 782.

[9]  As an aside, *Waterways Barge* ultimately denied confirmation on grounds related to improper separate classification, which had the effect of attributing no content or substance to the recourse creditor's deficiency claim. 104 B.R. at 783-86.  Similarly, as described herein, the MRC/Marathon Plan eliminates any content or substance

---

1129(b)(2)(A)(ii), which expressly incorporates Section 363(k), unambiguously mandates that a plan of reorganization that provides for the sale of collateral must afford the secured creditor the right to credit bid its claim in order for the plan to be considered "fair and equitable," without any limitation based on Section 1111(b), *and without even referring to Section 1111(b)*.  The Supreme Court has emphasized that "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."  *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004); *see also Wallace v. Rogers (In re Rogers)*, 513 F.3d 212, 225 (5th Cir. 2008).

44.    Second, in sharp contrast to Section 1129(b)(2)(A)(ii), where Congress has intended to tie the application of a confirmation requirement to the operation of Section 1111(b), *it has done so explicitly*.  Thus, although Congress, in Section 1129(a)(7)(B), specifically tied the operation of that provision to Section 1111(b), it chose not to limit section 1129(b)(2)(A)(ii)'s reach by referring to Section 1111(b), and accordingly did not limit the purview of section 1129(b)(2)(A)(ii) (and the mandatory application of section 363(k)) to situations where recourse creditors made the Section 1111(b) election.  Certainly, Congress is well aware of how to limit the reach of statutory provisions with reference to Section 1111(b) when it so desires, and under the principle of *inclusio unius est exclusio alterius*, the fact that it did not do so in this case indicates that it intended that Section 1129(b)(2)(A)(ii)'s requirement of the ability to credit bid carry full force without any limitation or qualification tied to Section 1111(b).  *See Rush Truck Ctrs. of Tex. L.P. v. Bouchie (In re Bouchie)*, 324 F.3d 780, 784 (5th Cir. 2003) (employing the doctrine of *inclusio unius est exclusio alterius*); *see also Rogers*, 513 F.3d at 225-26 ("Only after

---

from the Timber Noteholders' deficiency claims by separately classifying them and providing them with only a speculative, unknown recovery, while guaranteeing other unsecured creditors at least 75 cents on the dollar.

application of the principles of statutory construction, including the canons of construction, and after a conclusion that the statute is ambiguous may the court turn to the legislative history."). Moreover, because Section 363(k) applies to bankruptcies under all chapters, not just chapter 11, *see* 11 U.S.C. § 103(a), its far-reaching power is not circumscribed by Section 1111(b).  *See also In re Kent Terminal Corp.*, 166 B.R. 555, 566-67 (Bankr. S.D.N.Y. 1994) (supporting an *absolute* right to credit bid to protect secured creditors' rights).

45.     In light of the conflict among the Confirmation Order and leading case law under Section 1129(b)(2)(A)(ii) of the Bankruptcy Code, this Court should certify the Indenture Trustee's appeal to the Fifth Circuit.

> **(b)     The Confirmation Order ignores the plain language of the Bankruptcy Code that requires that the dissenting undersecured creditor class will (i) retain a lien on its collateral in an amount equal to the allowed amount of such claim, and (ii) receive cash payments, the total sum of which is at least equal to the allowed secured claim and of a value at least equal to the value of the secured creditor's interest in the estate's interest in the collateral as of the plan effective date.**

46.     The MRC/Marathon Plan should not have been confirmed because it fails to meet the requirements of Section 1129(b)(2)(A)(i).   To be fair and equitable under Section 1129(b)(2)(A)(i)(I), a plan must provide that the dissenting undersecured creditor class will (i) retain a lien on its collateral in an amount equal to the allowed amount of such claim, and (ii) receive cash payments, the total sum of which is at least equal to the allowed secured claim and of a value at least equal to the value of the secured creditor's interest in the estate's interest in the collateral as of the plan effective date.  *See United Savs. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 377 (1988) (noting that Section 1129(b)(2)(A)(i)(II) requires providing the present value of the collateral); *see also First Fed. Bank v. Weinstein (In re Weinstein)*, 227 B.R. 284, 293 (B.A.P. 9th Cir. 1998); *Travelers Ins. Co. v. Bryson Props.,*

*XVIII (In re Bryson Props., XVIII)*, 961 F.2d 496, 500 (4th Cir. 1992). The MRC/Marathon Plan could not possibly comply with Section 1129(b)(2)(A)(i) because it provides neither for the Indenture Trustee to retain its liens, nor for payments to the Timber Noteholders equal in value to *all* of the Indenture Trustee's Collateral.

47.    First, under the MRC/Marathon Plan, the Indenture Trustee will not retain its liens on *any* of the collateral, including its lien on the Headwaters Litigation.

48.    Second, the MRC/Marathon Plan proposes to make a cash payment of $530 million (subject to downward adjustments) to the Indenture Trustee, which payment does not even equal the value of the Scopac Timberlands, let alone the amount of the Indenture Trustee's allowed secured claim, since Scotia Redwood Foundation ("SRF"), a well-financed buyer, sought to purchase the timberlands for a minimum bid of $603 million cash. *See* IT Exhibit 207 (Amended Binding Term Sheet of Scotia Redwood Foundation); *see also* IT Exhibits 227 – 230, 238 (Consents, Resolutions and Bid Proposal); *see also* Testimony of Jacob Cherner, Apr. 11, 2008 Hr'g. Tr. at pg. 148:5 – 9 (stating that "I have authority necessary to close the transaction . . . ."); *id.* at pg. 211:6 – 8 (affirming that the SRF bid was "a binding term sheet"); *id.* at pgs. 265:20 – 266:1 (stating that the Scotia Redwood Foundation bid was not subject to any financing contingencies that were not within its control).

49.    Therefore, the Court should certify the Indenture Trustee's appeal to the Fifth Circuit to determine whether the MRC/Marathon Plan meets the requirements of Section 1129(b)(2)(A)(i).

      **(c)**     **The Court misapplied the legal standard associated with Section 1129(b)(2)(A)(iii), and erred in holding that the Plan Proponents' cash payment was the indubitable equivalent of the Indenture Trustee's claim.**

50.     As already demonstrated, the only remaining basis on which the MRC/Marathon Plan could satisfy any of the requirements of 11 U.S.C. § 1129(b)(2)(A) is to provide the Indenture Trustee with the "indubitable equivalent" of its secured claim as required by Section 1129(b)(2)(A)(iii).    Read in accordance with well-established principles of statutory construction, however, the plain language of Section 1129(b)(2)(A) precludes MRC/Marathon from using an "indubitable equivalent" loophole to eviscerate and render meaningless the credit bid requirement for a free and clear sale of the collateral securing the Indenture Trustee's claims specifically established under Section 1129(b)(2)(A)(ii).    Moreover, the Plan Proponents' attempt to cash out the Indenture Trustee's claims fails to completely compensate the Indenture Trustee for the full benefit of its bargain.    Therefore, this Court should certify the Indenture Trustee's appeal to the Fifth Circuit to determine whether Section 1129(b)(2)(A)(iii) can be employed to circumvent Section 1129(b)(2)(A)(ii), and whether a secured creditor can be cashed out under Section 1129(b)(2)(A)(iii) for a value that is less than what would be received under the remaining two prongs of Section 1129(b)(2)(A).

51.     The holdings in *Kent Terminal Corp., supra,* and *California Hancock, Inc., supra,* flow inexorably from two long-established principles of statutory construction which complement one another here.  First, "[a] specific provision controls over one of more general application." *Landmark Land Co. v. Office of Thrift Supervision*, 948 F.2d 910, 912 (5th Cir. 1991) (quoting *Gozlon-Peretz v. United States*, 498 U.S. 395 (1991)); *see also In re Balderas*, 328 B.R. 707, 720 n.18 (Bankr. W.D. Tex. 2005) ("The general rule of statutory construction applicable to the court's conclusion is that which states that, when statutory provisions appear to

conflict, the more specific provision should control over the more general."). Section 1129(b)(2)(A)(ii) deals specifically with a sale free and clear of liens and specifically prescribes the minimum steps required to satisfy the "fair and equitable" requirement when a secured creditor's collateral is sold free and clear of its lien, which include providing the secured creditor with an opportunity to protect itself by credit bidding. In contrast, Section 1129(b)(2(A)(iii) sets forth the much more general alternative of providing the secured creditor with the "indubitable equivalent" of its interest in the collateral, and does not specifically reference a sale free and clear of liens. Therefore, Section 1129(b)(2)(A)(ii) controls over Section 1129(b)(2)(A)(iii) with respect to free and clear sales under a plan, and an opportunity for the secured creditor to credit bid is required.

52.     Second, "[i]t is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *In re Toro-Arcila*, 334 B.R. 224, 227 (Bankr. S.D. Tex. 2005) (quoting *TRW, Inc. v. Andrews*, 534 U.S. 19, 31, (2001)). Section 1129(b)(2)(A)(ii) deals *only* with sales free and clear of liens, and nothing else. If Section 1129(b)(2)(A)(iii) were read to provide that a plan which provides for a sale of collateral free and clear of liens - the *only* situation covered by Section 1129(b)(2)(A)ii) - may satisfy the "fair and equitable" requirement without including a corresponding opportunity for a secured creditor to credit bid, then Section 1129(b)(2)(A)(ii) would be eviscerated and rendered superfluous. *See generally, In re Edgewater Motel, Inc.*, 85 B.R. 989, 998 (Bankr. E.D. Tenn. 1988) ("Treatment which is less favorable than the treatment specified in section 1129(b)(A)(2)(i) and (ii) would not satisfy [section 1129(b)(2)(A)(iii)]."). In order to avoid reading Section 1129(b)(2)(A)(ii) out of the statute, free and clear sales must be held to be subject to the terms of this section (including

credit bid rights), and not authorized under the more general "indubitable equivalent" provisions of Section 1129(b)(2)(A)(iii).   Therefore, the Court should certify this question to the Fifth Circuit to determine which Bankruptcy Code provision applies to the MRC/Marathon Plan.

53.     Further, modern courts, including the Fifth Circuit, have interpreted the indubitable equivalent standard as requiring that (i) under the secured creditor's treatment in the plan, there is <u>no reasonable doubt</u> that the creditor will receive <u>the full value of what it bargained for</u> when it made its contract with the debtor; *B.M. Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 409 (5th Cir. 1985); *In re San Felipe @ Voss, Ltd.*, 115 B.R. at 529; and (ii) when a plan proposes to substitute or alter collateral, a secured creditor receives the indubitable equivalent of its claim only if the substituted collateral does not increase the creditor's exposure to risk.   *Id.*

54.     The MRC/Marathon Plan offers to pay the Indenture Trustee approximately $517 million in cash, thus attempting to put to rest questions about the riskiness of the *form* of payment.   However, this payment of a fixed (and insufficient) amount of cash deprives the Indenture Trustee of substantial rights that it currently has both to have its Collateral sold in a judicial sale in which other parties can bid and to credit bid if a judicial sale fails to bring an acceptable price.   The Indenture Trustee attracted a firm bid of $603 million that far exceeds MRC/Marathon's proposed payment and which would serve as the *floor* in such an auction.   *See* IT Exhibit 207 (Amended Binding Term Sheet of Scotia Redwood Foundation).   If permitted, actual bidding for Scopac's assets would likely yield a higher dollar amount.   Further, MRC/Marathon already increased their bid in response to only a single presumptive bidder — only an auction with multiple bidders will determine the highest price for the assets.

55.     Moreover, the MRC/Marathon Plan funds the Litigation Trust by recoveries from some of Scopac's causes of action which are subject to the Indenture Trustee's lien (*see* IT Exhibit 113 at section 3.1 (Deed of Trust)), but yet it requires the Indenture Trustee, as a beneficiary of the Litigation Trust, to share distributions pro rata with unsecured creditors of the Scopac and the Palco Debtors.   That is to say, the MRC/Marathon Plan forces the Indenture Trustee to share its collateral with unsecured creditors of its debtor and the creditors of another estate.

56.     Meanwhile, although the MRC/Marathon Plan transfers all of Scopac's assets, including encumbered claims in the Headwaters Litigation[10] and other causes of action, to Newco free and clear of liens, the proponents of that Plan presented no evidence of the value of any of the non-timberland portion of the Collateral that would enable the Court to make any finding of "indubitable equivalence" or whether the payment to the Scopac Noteholders is "completely compensatory."   The fact that a lawsuit may be harder to value than a forest does not excuse MRC/Marathon from *their burden* of proving that the value that they propose to provide in consideration for the purchase of all of Scopac's assets - all of which secure the Timber Notes - provides the Indenture Trustee with the "indubitable equivalent" of its secured

---

[10] The closest that Marathon's witness, Mr. Breckenridge, came to touching upon the value of the Headwaters Litigation was that, in response to the question of whether he ascribed any value to *Palco's* interest in that litigation, Mr. Breckenridge answered, "No" and explained that, "other than a cursory review by our lawyers, no.  Well, I should apologize.  Our lawyers told me to ascribe a zero value to it."   *See* Testimony of Matthew Breckenridge, Apr. 8, 2008 Hr'g Tr. at pg. 229:18-24.; *see also id.* at pg. 231:22 – 232:10 (Breckenridge testifying that he believes that MRC will resolve the Headwaters Litigation "quickly," but has no idea of the amount at which the claim will be resolved or "about what they mean when they're going to resolve it quickly.")   Moreover, although MRC's witness, Mr. Dean, testified that he had told the State that he did not think that the Headwaters Litigation had a lot of merit (*see* Testimony of Alexander Dean, Apr. 9, 2008 Hr'g Tr. at pg. 169:3-7) he did not claim that – and there was no evidence that – this statement was based on any meaningful analysis.  In fact, Mr. Dean admitted that he did not have enough information to know whether or not he wanted to "extinguish" the litigation:  "Again, I said that if we're successful here, we would review it, talk about it with lawyers who would know something about it, and then discuss it with the state and look to settle it."   *Id.* at pg. 170:6-10.  "Would review" is not the same as "did review."   No court would approve a compromise of the Headwaters Litigation based on such flimsy, foundationless and conclusory  testimony, and no court can approve a forced sale of the Headwaters Litigation based on such testimony.

claim, *i.e.*, the full value of *all* of the Collateral.  MRC/Marathon failed to meet their burden on that issue, because they presented *no probative evidence* of the value of any collateral other than the Scopac's timberlands.  *See generally* MMX Exhibit 4 (Proffer and Report of Richard La Mont) (ascribing a value of $430 million to the Scopac commercial timberlands alone).

57.     Because MRC/Marathon failed to adduce "competent evidence" to prove that the Scopac Noteholders will receive the full value of their interest in Scopac's non-timberland Collateral, including Scopac's claims in the Causes of Action, the MRC/Marathon Plan should not have been confirmed.  *See In re Salem Suede, Inc.* 219 B.R. 922, 935-36 (Bankr. D. Mass. 1998).  In *Salem Suede*, the debtor's plan proposed to provide judgment creditors that held a lien on the debtors' real property with a right to receive certain insurance proceeds in return for a release of the creditors' claims against the debtors and the insurer.  *See id.* at 926-27.  The debtors maintained that the plan met the "indubitable equivalence" standard, arguing that environmental contamination rendered the judgment creditor's existing real property collateral worthless.  Rejecting this contention, the bankruptcy court found that the debtors failed to provide the court with sufficient evidence to satisfy the "indubitable equivalence" standard, because their contention had not been proven with sufficient certainty.  *Id*. at 936.

58.     Similarly, *In re Thurston,* 130 B.R. 541 (Bankr. W.D. Mo. 1991), reinforces the point that, on the record before it, this Court should not have eviscerated the Scopac Noteholders' rights in the Headwaters Litigation collateral "for free."  In *Thurston*, the bankruptcy court rejected the debtor's argument that because a life insurance policy that secured a bank's claim had no cash surrender value, the policy's value was zero and the bank's lien should be avoided.  Although the court could not determine the value of the insurance policy because neither party had provided evidence as to value, *id*. at 542, the "collateral clearly has

substantial value to the Bank" and the court would not treat any portion of the bank's claim as unsecured. *Id.* Here, too, while MRC/Marathon presented no evidence of the value of the Headwaters Litigation, there is uncontradicted valuation evidence related to Scopac's claims in the Headwaters Litigation (*see* Testimony of Thomas Lumsden, Apr. 30, 2008 Hr'g Tr. at pg. 393:4-8). Those claims obviously have value to MRC; otherwise, why would MRC insist on acquiring them? Even if MRC intends only to trade those claims to the State for concessions, the litigation has meaningful economic value.

59.     The MRC/Marathon Plan, therefore, fails to satisfy any of the three possible treatments of the Indenture Trustee's secured claim required for cramdown under Section 1129(b)(2)(A), and should not have been confirmed over the Timber Noteholders overwhelming vote to reject it. Based on the Confirmation Order's conflict with leading case law and the plain meaning of the Bankruptcy Code, the Court should certify the Indenture Trustee's Request for immediate appeal to the Fifth Circuit.

> **(2)     Whether the Confirmation Order improperly confirmed a plan of reorganization that violates the "absolute priority" rule by diverting the proceeds of a secured creditor's collateral to pay (i) unsecured claimants and (ii) unsecured equity holders, whose rights with respect to the collateral are junior to those of the secured creditor.**

60.     The MRC/Marathon Plan also violates the "fair and equitable" requirement of Section 1129(b) as to Class 6, because it disregards the long-established "absolute priority" rule by diverting the proceeds of the Timber Noteholders' collateral to pay (i) unsecured claims against Scopac, whose rights with respect to that collateral are junior to those of the Indenture Trustee, and (ii) unsecured claims against Palco, Scopac's equity holder, whose rights as to Scopac's assets are even more junior. Because the Court should not have confirmed the

MRC/Marathon Plan, which entails a double violation of the absolute priority rule, the Fifth Circuit should be given the opportunity to immediately review the Confirmation Order.

61.     The requirement that a plan be "fair and equitable" predates the enactment of the Bankruptcy Code by decades.  That requirement – using the precise words "fair and equitable" – was included in the reorganization provisions of Chapter X of the former Bankruptcy Act.  *See* Bankruptcy Act § 221(2) *codified* in former 11 U.S.C. § 621(2).  Although the term "fair and equitable" was not defined in the prior statute, courts read that requirement to incorporate the "absolute priority" rule – a rule that has its roots in decades of jurisprudence.  *See, e.g., Consol. Rock Prod. Co. v. Du Bois*, 312 U.S. 510, 527-29 (1941) (plan of reorganization involving three debtors (a holding company and its two subsidiaries) was not fair and equitable to the secured creditors of two of the three debtors, because it violated the "absolute priority" rule; secured creditors "*must receive . . . compensation for the senior rights which they are to surrender.*  If they receive less than that full compensatory treatment, some of their property rights will be appropriated for the benefit of stockholders without compensation.  That is not permissible.") (emphasis added).

62.     A leading treatise on Chapter X of the former Bankruptcy Act, Collier on Bankruptcy (14th edition), explained the absolute priority rule as follows:

> Under the absolute priority rule, a plan is not "fair and equitable" unless it provides participation for claims and interests *in complete recognition of their strict priorities,* . . .   Any arrangement by which a junior class receives value allocable to senior class comes within judicial denunciation.  Beginning with the topmost class of claims against the debtor, each class in descending rank must receive full and complete compensation for the rights surrendered before the next class may properly participate.  *Thus the principle is applied as between senior and junior secured creditors, [and] between secured creditors and unsecured creditors . . . .*

6A COLLIER ON BANKRUPTCY, ¶ 11.06 at 210-211 (14th ed. 1977) (discussing "fair and equitable" provisions of section 221(2) of chapter X of the Bankruptcy Act) (emphasis added);

*see In re Day & Meyer, Murray & Young, Inc.*, 93 F.2d 657, 658 (2d Cir. 1938) (arguments in favor of approving a plan of reorganization "do not justify requiring the present bondholders to lose their lien to an extent of 50 per cent and to give up equity in the property, secured by their lien, for the benefit of unsecured creditors"); *Mokava Corp. v. Dolan*, 147 F.2d 340, 345 (2d Cir. 1945) ("The lower court erred in approving that part of the plan which provided for full payment of cash of the unsecured Merchandise Brokerage claim; such a provision, in a plan which did not provide full compensation in some form, for the second mortgage bonds, was clearly wrong.").

63.     The "fair and equitable" requirement under Section 1129(b) of the Code requires no less than did the "fair and equitable" requirement  under Chapter X of the former Bankruptcy Act.  "When . . . judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as well." *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998); *see Lindahl v. Office of Personnel Mgmt.*, 470 U.S. 768, 782 n. 15 (1985).  In the context of the Bankruptcy Code, this principle is reinforced by the Supreme Court's admonition that "[w]e will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure." *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. at 552.  "[I]f Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific.  The Court has followed this rule with particular care in construing the scope of bankruptcy codifications." *Midlantic Nat'l Bank v. N. J. Dep't of Envtl. Protection*, 474 U.S. 494, 501 (citations omitted).

64.     Thus, Bankruptcy Code Section 1129(b) retained the rule that a plan is not "fair and equitable" to a dissenting class of secured creditors if it violates the "absolute priority" rule. *See In re Kennedy*, 158 B.R. 589, 599 (Bankr. D.N.J. 1993) (The "fair and equitable rule, borne

as a special term of art applying the absolute priority rule, is an amorphous concept which was purposely left undefined in the Bankruptcy Code to avoid statutory complexity and to preserve judicial application of certain fundamental pre-Code factors to insure fair and equitable treatment of dissenting classes.") (internal quotations and citations omitted); *In re Wieberg*, 31 B.R. 782, 785 (Bankr. E.D. Mo. 1983), (plan's treatment of a secured claim violated the "fair and equitable" rule, because it provided for collateral securing such claim to be paid to general unsecured claims even though secured creditor was not paid in full); *In re Tipps*, 39 B.R. 149, 155 (Bankr. S.D. Ohio 1984).[11]

65.     Here, the source of the financing for the payments to unsecured creditors under the MRC/Marathon Plan is based on the assets of the combined entity which consists almost entirely of the assets of Scopac.  The MRC/Marathon Plan provides no separate mechanism to use *Palco's* assets to pay *Palco's* unsecured creditors.  Therefore, the MRC/Marathon Plan violates the absolute priority rule by diverting a portion of the proceeds of the sale of the Timber Noteholders' Collateral to pay unsecured claims against Scopac and unsecured claims against Palco, its equity holder.

66.     As described in the MRC/Marathon Plan, Marathon will receive, in exchange for its secured DIP loan and its secured pre-petition loan, plus a cash contribution to Newco, (i) all of the equity of Townco; (ii) a 15% equity interest in Newco; and (iii) a promissory note from Newco equal to the amount of the Mill Working Capital secured by any liens on the Mill

---

[11] The rule that an undersecured creditor must not be forced to fund payment of unsecured claims from the collateral securing its claim applies even with respect to unsecured administrative and other priority claims.  *See In re Flagstaff Foodservice Corp.*, 739 F.2d 73, 75 (2d Cir. 1984) (except with respect to the narrowly construed provisions of Bankruptcy Code section 506(c), collateral securing creditor's claim may not be used to pay administrative priority expenses where secured creditor's claim is not paid in full); *In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir. 1985) (collateral securing creditor's claim may not be used to pay unsecured priority taxes where secured creditor's claim is not paid in full even though debtor's management might be personally liable for such taxes).

Working Capital.  MRC/Marathon Plan at 5-6 (§ 4.4.2); *see also* IT Exhibit 102a at pg. 49 (Joint Disclosure Statement).  Thus, *all* of the consideration attributable to the "Townco" assets, the Mill and the Mill Working Capital flows to Marathon, and not to anyone else.  Marathon, an *undersecured* creditor of Palco, is taking *all* of its collateral and is not "gifting" anything to Palco's unsecured creditors.

67.     By process of elimination, the only other assets that Newco is "purchasing" are the Scopac assets which secure the Noteholders' claims.  Newco is not, however, paying only $530 million (subject to adjustment) earmarked for distribution to the Timber Noteholders for those assets.  Newco will also provide the funds to pay an estimated $7.3 million in unsecured administrative claims against *Palco* (*see* IT Exhibit 102a at pg. 47 (Joint Disclosure Statement)); approximately $900,000 to pay unsecured priority tax claims against *Palco* (*id.* at pg. 48); and $10.1 million to pay general unsecured claims against *Palco* (*id.* at pg. 51).  Since Newco is not in the business of making gifts, and since Marathon – an undersecured creditor at Palco – is receiving all of the value attributable to the Townco assets, the Mill and the Mill Working Capital,[12] it follows inexorably that the consideration that flows from Newco to creditors of Palco – an equity holder of Scopac – represents additional consideration for Newco's purchase of the *Scopac* assets.  This forced an impermissible diversion of value from the Timber Noteholders to unsecured creditors of Scopac and Palco plainly violates the absolute priority rule.  Because the law squarely prohibits this result, the MRC/Marathon Plan should not have been confirmed, and the Indenture Trustee's Request should be certified.

(3)     **Whether the Confirmation Order improperly confirmed a plan of reorganization that ignores the integrity of the Debtors'**

---

[12]  Although Marathon is contributing $25 million of cash, that cash is not being used to repay Palco unsecured creditors.  That cash, together with the Mill and working capital, are being exchanged for stock in Newco.

**separate estates by substantively consolidating the Debtors' assets and paying creditors of the various estates with proceeds of the secured creditor's collateral before paying the secured creditor in full.**

68.     The MRC/Marathon Plan should not have been confirmed because, although that plan asserts that it provides for a "post-confirmation merger," in substance, it is a prohibited attempt at *de facto* substantive consolidation.  Specifically, the MRC/Marathon Plan combines Scopac's valuable, money-making assets with the money-losing business of Palco, to enable Marathon and the other creditors of the Palco Debtors' estates, at the expense of Scopac's creditors, to fare much better than they would in a stand-alone reorganization of the Palco Debtors.

69.     The effect of substantive consolidation of corporate entities has been described as follows:  "[T]he intercompany claims of the debtor companies are eliminated, the assets of all debtors are treated as common assets and claims of outside creditors against any of the debtors are treated as against the common fund . . ."  *Chem. Bank N. Y. Trust Co. v. Kheel,* 369 F.2d 845, 847 (2d Cir. 1966); *see also F.D.I.C. v. Colonial Realty Co.*, 966 F.2d 57, 58-59 (2d Cir. 1992).[13] This is precisely what the MRC/Marathon Plan proposes.  Although the phrase "substantive consolidation" is absent in the MRC/Marathon Plan, assets of Scopac will be pooled with assets of Palco, the interdebtor claims will be cancelled and the claims of the respective creditors will be paid by Newco—the blended, surviving company.  Further, under the MRC/Marathon Plan, Palco's unsecured creditors will be paid from the assets of Palco's subsidiary, Scopac, without first using those assets to pay Scopac's creditors. *See* Testimony of Matthew Breckenridge, Apr.

---

[13] *See also Eastgroup Props. v. Southern Motel Assocs., Ltd.*,  935 F.2d 245, 248 (11th Cir. 1991) ("[Substantive consolidation] involves the pooling of the assets and liabilities of two or more related entities; the liabilities of the entities involved are then satisfied from the common pool of assets created by consolidation."); *In re Augie/Restivo Baking Co.,* 860 F.2d 515, 518 (2d Cir. 1988).

8, 2008 Hr'g. Tr. at pgs. 199:22 – 200:5 (acknowledging that the MRC/Marathon Plan pools the assets of Scopac and the Palco Debtors to pay all of the creditors).

70.     Bankruptcy decisions generally recognize that substantive consolidation is an extraordinary remedy vitally affecting substantive rights, which, because of the potential inequities caused by the redistribution of value among the creditors of consolidated entities, should only rarely be granted. *In re Owens Corning*, 419 F.3d 195, 208-09 (3d Cir. 2005) (stating that "there appears nearly unanimous consensus that [substantive consolidation] is a remedy to be used 'sparingly'");  *In re Augie/Restivo Baking Co.,* 860 F.2d at 515 518; *Kheel,* 369 F.2d  at 847.[14]

71.     Importantly, merely furthering a reorganization effort is not, in the absence of the more traditional factors (including proof of lack of prejudice to a creditor and absence of creditor reliance on "individual entities"), enough to warrant substantive consolidation:

> [W]e do not believe that a proposed reorganization plan alone can justify substantive consolidation.  Where, as in the instant case, creditors such as Union and MHTC knowingly made loans to separate entities and no irremediable commingling of assets has occurred, a creditor cannot be made to sacrifice the priority of its claims against its debtor by fiat based on the bankruptcy court's speculation that it knows the creditor's interests better than does the creditor itself.

---

[14] *In re Snider Bros., Inc.*, 18 B.R. 230, 234 (Bankr. D. Mass. 1982) ("[S]ubstantive consolidation, in almost all instances, threatens to prejudice the rights of creditors….This is so because separate debtors will almost always have different ratios of assets to liabilities.") (citations omitted); *In re Huntco Inc.*, 302 B.R. 35 (Bankr. E.D. Mo. 2003) (stating that "[b]ecause substantive consolidation usually harms some creditors, courts should apply the doctrine sparingly").  Indeed, recent Supreme Court authority severely limits the power of a bankruptcy court, absent some form of inequitable conduct, to categorically reorder creditor priorities, as is indirectly done with substantive consolidation of estates, in contravention of the priority scheme established by Congress in the Bankruptcy Code. *U.S. v. Noland*, 517 U.S. 535, 536 (1996) (holding that "bankruptcy courts may not equitably subordinate claims on a categorical basis in derogation of Congress' scheme of priorities"); *U.S. v. Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. 213, 229 (1996) (stating that "[c]ategorical reordering of priorities that takes place at the legislative level of consideration is beyond the scope of judicial authority to order equitable subordination under § 510(c)").

*Augie/Restivo,* 860 F.2d at 520.[15]

72.     In the more recent bankruptcy case of *Adelphia Communications Corp.*, in addressing the appellant bondholders' likelihood of success on the merits in the context of a motion for a stay pending appeal, the court determined that the bondholders had a "substantial possibility of success" on their claim that the bankruptcy court erroneously approved an improper substantive consolidation and improperly treated intercompany claims.   *ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 361-62 (S.D.N.Y. 2007).   The bondholders successfully argued that the bankruptcy court confirmed a plan that could be read as implicitly imposing substantive consolidation and ignoring the integrity of the debtors' separate estates to the bondholders' detriment. *Id.* at 359-

---

[15] In addition to the re-affirmation by Gary Clark, Vice President of Finance & Administration and Chief Financial Officer of Scopac, that Scopac continues to maintain its corporate separateness (*see* IT Exhibit 128 (First Day Affidavit)), *inter alia*, the following factors included in the Scotia LLC Agreement demonstrate Scopac's separateness and independence from Palco: (a) Scopac will not engage in any business or activity other than those set forth in the Indenture [*see* IT Exhibit 111 (Scopac LLC Agreement)]; (b) Scopac's funds and other assets shall not be commingled with those of Palco; (c) all actions taken by Scopac shall be taken pursuant to authority granted by the Board of Managers of Scopac, to the extent required by law or by the LLC Agreement; (d) Scopac shall maintain records and books of account separate from those of Pacific Lumber in accordance with generally accepted accounting principles; (e) Scopac shall conduct its business at an office or offices that are identifiably segregated from the offices of Pacific Lumber and shall have telephone numbers, a mailing address, stationery and other business forms separate from Pacific Lumber; (f) Scopac shall conduct its business solely in its own name and shall not knowingly or negligently mislead any other Person as to the identity or authority of Scopac; (g) all oral and written communications of Scopac shall be made solely in the name of Scopac; (h) Scopac shall provide for all of its operating expenses and liabilities from its own separate funds; (i) Scopac shall maintain correct minutes of the meetings and other proceedings of its members and the Board of Managers and otherwise comply with the formalities required by law; and (j) Scopac shall not hold itself out or knowingly permit itself to be held out as having agreed to pay or as being liable for any indebtedness of Pacific Lumber.  Moreover, *inter alia*, the following additional indices of corporate separateness exist: (a) Scopac submits any conflicts with affiliates to a special committee composed of its two independent managers [*see* IT Exhibit 128 (First Day Affidavit)]; (b) Scopac is solely responsible for payment of any and all amounts owing on the Timber Notes and the Scopac Line of Credit [*see id.*]; (c) the Timber Notes are senior secured obligations of Scopac and are not obligations of, or guaranteed by, Pacific Lumber or any other person [*see* Maxxam Form 10-Q, Amendment No. 3 to Form S-4]; (d) all employees, agents, contractors and subcontractors hired by either Scopac or Pacific Lumber pursuant to the various intercompany agreements, shall not be deemed to be the employees, agents, contractors and subcontractors of the other, and all salaries and compensation payable to them shall be the exclusive responsibility of either Scopac or Pacific Lumber as specifically provided therein [*see* IT Exhibits 113 (Master Purchase Agreement) and 114 (New Services Agreement)]; and (e) the failure of Scopac (1) to observe the separateness covenants, and (2) to maintain at least two Independent Managers constitutes an Event of Default under the Indenture [*see* IT Exhibit 112a (Indenture)].

60. The court emphasized that "[c]onsolidation should be undertaken deliberately and sparingly, for it is a measure vitally affecting substantive rights," *id*. at 359 (internal quotations and citations omitted), and criticized the bankruptcy court for confirming a plan that obfuscated the issues of the value and treatment of various claims, including (as here) which estate's assets would be used to pay a host of allowed claims. *Id*. at 360.

73. In *In re Owens Corning*, 419 F.3d 195, 215 (3d Cir. 2005) the Third Circuit cautioned that, "substantive consolidation should be used defensively to remedy identifiable harms, not offensively to achieve advantage over one group in the plan negotiation process (for example, by deeming assets redistributed to negate plan voting rights). . . ." *See also Wells Fargo Bank of Tex. N.A. v. Sommers (In re Amco Ins.)*, 444 F.3d 690 (5th Cir. 2006) (vacating a bankruptcy court's substantive consolidation order due to, *inter alia*, inequities resulting therefrom).

74. Similarly, in this case, the Court should not have confirmed the MRC/Marathon Plan as to Scopac "on the back" of the Timber Noteholders merely because the creditors (or employees) of the *Palco* Debtors stand to gain thereby, regardless of whether non-Scopac creditors clamor for such a result.

75. In sum and substance, the *sub rosa* substantive consolidation affected by the MRC/Marathon Plan entails the transfer of Scopac and Palco assets (other than the "Townco" assets, which Marathon will effectively receive) to Newco; the receipt by Marathon of the value of the Palco assets being transferred to Newco (the Mill and the Mill Working Capital); and the use of the balance of the consideration paid by Newco, *all of which is allocable to Scopac's assets* by simple process of elimination, to pay millions of dollars of unsecured claims against the *Palco Debtors*. What is more, the MRC/Marathon Plan enables Marathon – a Palco-only

creditor – to "capture" part of the value of Scopac's assets by receiving an inflated value of the Mill from Newco, and by sharing in the benefit of Newco's coercive purchase of Scopac's assets at a bargain price not tested by the market.  This is precisely the type of "offensive" use of substantive consolidation that the Third Circuit recently condemned in *Owens Corning*, 419 F.3d at 215.

76.     Because the Confirmation Order flies in the face of the clear guidance of the principles set forth in *Owens-Corning* and *Augie/Restivo*, the proposed *de facto* substantive consolidation is contrary to the law, and should be immediately reviewed by the Fifth Circuit.

> **(4)     Whether the Confirmation Order improperly confirmed a plan of reorganization that improperly fails to provide for the payment of intercompany administrative claims and a secured creditor's administrative claims, in violation of Sections 1129(a)(9) and (a)(11) of the Bankruptcy Code.**

77.     One of the fundamental requirements for confirmation is that a plan provide for the payment of  all administrative claims in cash on the Effective Date unless the holder of a claim has agreed otherwise.  11 U.S.C. § 1129(a)(9).  This Court's docket reflects that Scopac has unpaid administrative claims against Palco.  As amply demonstrated above, Scopac's accounts receivable, including its administrative claims against Palco, are subject to the Indenture Trustee's lien.  Instead of paying those administrative intercompany claims in cash as required by Section 1129(a)(9) of the Bankruptcy Code, the MRC/Marathon Plan cancels them for no consideration.

78.     The MRC/Marathon Plan classifies Scopac's claim against Palco as a Class 10 Inter-Debtor Claim which is defined as "any Claim held by any Debtor against any other Debtor." Appendix A to MRC/Marathon Plan at pg. 6.  The MRC/Marathon Plan provides that "Inter-Debtor Claims shall be discharged and the Holders of Class [10] Inter-Debtor Claims are entitled to no Distributions under this Plan."  MRC/Marathon Plan, at section 4.10.2.  The Plan

fails to provide a limitation or exception for the Debtors' administrative claims against each other, and there is no provision for paying the proceeds of Scopac's administrative claim against Palco over to the Indenture Trustee on account of its lien thereon.

79.    The MRC/Marathon Plan's cancellation of Inter-Debtor Claims violates the fundamental requirement embodied in Section 1129(a)(9) of the Bankruptcy Code since no effective agreement to waive these administrative claims has been made.[16]  Therefore, the MRC/Marathon Plan should not have been confirmed, and the Court should immediately certify the Indenture Trustee's appeal to the Fifth Circuit so that Court can assess the conflict created by the Confirmation Order.

80.    Moreover, the MRC/Marathon Plan fails to comply with Section 1128(a)(9) because it does not make provision for the payment of the Indenture Trustee's superpriority administrative claim of over $20 million based on the failure of adequate protection.  Since the MRC/Marathon Plan pays the Indenture Trustee less than $530 million, the Indenture Trustee is substantially undersecured on its $740 million pre-petition claim.  Thus, the adequate protection promised to the Indenture Trustee based on an equity cushion of collateral value has failed, and the Indenture Trustee has a superpriority administrative claim of over $20 million for the cash collateral that has been depleted by Scopac during the case.  In light of the diminution of value in its collateral, on May 1, 2008, the Indenture Trustee filed its Motion to Grant Indenture Trustee a Superpriority Administrative Expense Claim Pursuant to Section 507(b) based on the failure of the adequate protection initially offered to the Indenture Trustee.  *See* Dkt. No. 2814.  The

---

[16] The "netting motion" pending before the Bankruptcy Court that would substitute payment of Scopac "in kind" by Palco [Dkt. No. 2511] has been objected to by the Indenture Trustee and, regardless of its mere filing, does not constitute an effective waiver of all payments in cash.  Moreover, even if that motion is granted over the Indenture Trustee's objection, provisions must be made for an administrative claim in the event of a reversal.

Indenture Trustee may also, in the future, file other applications for the payment of administrative expense claims.

81.     The MRC/Marathon Plan makes no provision for payment of this superpriority administrative claim, and thus fails to comply with Section 1129(a)(9) which requires that such claims be paid in cash on the Effective Date.  MRC/Marathon put on no evidence about the impact of the necessity to pay an additional $20 million superpriority administrative claim on the Effective Date or the availability of any financing to make such a payment.  In the absence of such evidence, there is a substantial question whether Newco will have sufficient capital to operate and avoid either liquidation or the need for further financial reorganization.  Thus, because the MRC/Marathon Plan fails to comply with Section 1129(a)(11) requiring that any plan be feasible, the Confirmation Order should be reviewed by the Court of Appeals.

82.     Moreover, the MRC/Marathon Plan pays the Indenture Trustee approximately $530 million in cash for its claim but then improperly reduces that sum dollar-for-dollar by the amount of any unsecured administrative claims owed by Scopac, which includes the Indenture Trustee's superpriority claims for the Debtors' failed adequate protection.[17]  That Plan does so, even as it provides for distributions to be made to unsecured creditors, including general unsecured creditors.

---

[17] The MRC/Marathon Plan offers the Indenture Trustee $530 million in cash less a "Class 6 Distribution Adjustment."  The Plan defines the "Class 6 Distribution Adjustment" as:

> a reduction dollar for dollar by the amount determined by the following equation: (a) the sum of (i) the Allowed Scopac Loan Claim and (ii) any postpetition financing provided to Scopac and (iii) any other Secured Claim required to be paid by Scopac, in excess of the outstanding balance as of the Effective Date in the SAR Account; plus (b) the sum of accrued but unpaid Scopac Administrative Expense Claims in excess of $5,000,000, as such claims may be estimated as of the Effective Date; minus (c) any accrued but unpaid receivables arising after the Petition Date owed from Palco to Scopac net of any accrued but unpaid receivables owed from Scopac to Palco as of the Effective Date.

*See* Appendix A to MRC/Marathon Plan at pg. 3.

83.     Such a result is clearly improper.  In *In re SunCruz Casinos, LLC*, 298 B.R. 833 (Bankr. S.D. Fla. 2003), secured lenders objected to the confirmation of the debtors' proposed chapter 11 plan, because, *inter alia*, the plan improperly reduced the amounts of the secured lenders' claims by the amount of adequate protection payments made by the debtors to the secured lenders.  The court noted that it is well settled that:

> "[I]f the collateral does depreciate, the application of adequate protection payments to payment obligations under the plan [*i.e.*, to reduction of the secured claim] would give the debtor 'double credit' and would deny the creditor the compensation to which it is entitled."

*Id.* at 854 (quoting *Confederation Life Ins. Co. v. Beau Rivage Ltd.*, 126 B.R. 632, 639 (N.D. Ga. 1991) (alternation in original) (citations omitted).  The Indenture Trustee's claim for an administrative expense under Section 507(b) cannot offset the Indenture Trustee's secured claim because adequate protection has failed.

84.     With regard to the reimbursement of any other administrative expenses that the Indenture Trustee may seek, courts have reasoned that "[g]eneral administrative expenses of reorganization . . . are not usually regarded as a charge against a secured claim holder whose property was sold in the process of reorganization. . ."  *In re Perret*, 63 B.R. 978, 984 (Bankr. N.D.N.Y. 1986);  *New Orleans Pub. Serv., Inc. v. First Fed. Savs. & Loan Ass'n of Warner Robins (In re Delta Towers, Ltd.)*, 924 F.2d 74, 76 (5th Cir. 1991) ("Generally, administrative expenses . . . are satisfied out of the bankruptcy estate."); *Rubenstein v. Nourse*, 70 F.2d 482, 484-85 (8th Cir. 1934) (determining that the referee erroneously deducted costs of administration from a secured creditor's claim).  In *In re Delta Towers, Ltd.*, 924 F.2d 74, 76 (5th Cir. 1991), the Fifth Circuit concluded that administrative expense claims for electrical service for an office building whose owners had filed bankruptcy could not be charged against the debtor's secured creditor because the lienholder had no interest in its continued operation and never requested or

consented to the provision of utility services.  *See also French Market Homestead, FSA v. P.C., Ltd. (In re P.C., Ltd.)*, 929 F.2d 203, 205-06  (5th Cir. 1991).

85.    Moreover, case law and the Bankruptcy Code distinguish between allowed secured claims and reimbursable fees.  *See e.g.*, *Kord Enters. II v. Cal. Commerce Bank (In re Kord Enters. II)*, 139 F.3d 684, 687 (9th Cir. 1998).[18]  Because the Indenture Trustee's existing and potential administrative expense claims share a different priority than the underlying secured claim, the administrative expense claims should not offset the amount of the Indenture Trustee's secured claim.  As the Confirmation Order, again, conflicts with clear case law, the Court should certify the Indenture Trustee's appeal so that the Fifth Circuit can assess the conflict created by the Order.

> **(5)    Whether the Confirmation Order improperly confirmed a plan of reorganization in violation of Section 1129(a)(7) of the Bankruptcy Code, when the plan combines multiple Debtors' assets and pays creditors of the various estates with proceeds of the sale of the secured creditor's collateral before paying the secured creditor in full.**

86.    The Bankruptcy Code expressly provides that a plan cannot be confirmed unless, as to each holder of a claim in an impaired class who has not accepted the plan, such holder "will receive or retain under the plan on account of such claim or interest property of a value . . . that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date."  11 U.S.C. § 1129(a)(7).  Thus, absent consent, a creditor or interest holder must receive property that has a present value equal to that participant's hypothetical chapter 7 distribution if the debtor were liquidated instead of

---

[18] At the risk of oversimplifying a complex statutory scheme under the Bankruptcy Code, generally, assets of a debtor's estate are distributed in the following order: secured creditors whose liens are perfected and unavoidable receive either their collateral or its "indubitable equivalent;" unsecured administrative priority claimants in the specified order of their relative priorities established under 11 U.S.C. §§ 503 and 507; unsecured general creditors; and last (very infrequently) the excess, after payment in full to holders of allowed claims, is refunded to the debtor.

reorganized on the plan's effective date.  *See* Lawrence P. King, COLLIER ON BANKRUPTCY ¶ 1129.03[7][b] (15th ed. rev. 2008).  Accordingly, Section 1129(a)(7) "is an individual guaranty to each creditor or interest holder that it will receive at least as much in reorganization as it would in liquidation."  *Id*. at ¶ 1129.03[7].  Because the MRC/Marathon Plan failed to meet this standard, it should not have been confirmed and this Court should immediately certify the Indenture Trustee's appeal to the Fifth Circuit so that Court can assess the conflict created by the Confirmation Order.

87.    In the event of a conversion to a chapter 7 case, and based on Scopac's lack of equity for the Scopac estate in the Collateral (as established by the evidence at trial), the Indenture Trustee would be entitled to relief from the automatic stay to foreclose on all of its Collateral and would not have to sell it through the chapter 7 trustee.  *See* 11 U.S.C. § 362(d)(2).[19]  Accordingly, the Indenture Trustee would not be subject to the payment of trustee

---

[19] In a chapter 7 case, where the debtor has no equity in the property, the automatic stay must be lifted.  *In re Roxrun Estates, Inc.*, 74 B.R. 997, 1003 (Bankr. S.D.N.Y. 1987); *see also In re McGaughey*, 24 F.3d 904, 906 (7th Cir. 1994) ; *In re Preuss*, 15 B.R. 896, 898 (B.A.P. 9th Cir. Cal. 1981) ("There being no equity for the benefit of the Chapter 7 estates of Mr. and Mrs. Preuss, it was incumbent on the court to dissolve the automatic stay."); *In re Jankowski*, No. 05-90879, 2008 Bankr. LEXIS 1040, at *3 (Bankr. C.D. Ill. Apr. 11, 2008) ("Additionally, the Court finds that, pursuant to 11 U.S.C. § 362(d)(2), the stay must be lifted as it has been shown that the Debtors have no equity in their real estate, and, given that the Debtors have filed for Chapter 7 relief, the real estate is not necessary for a reorganization."); *In re Booth*, 289 B.R. 665, 667 (Bankr. N.D. Ill. 2003) (citing *In re Rosemond*, 105 B.R. 8, 10 (Bankr. W.D. Pa. 1989), for the proposition that, if there is no equity in the collateral, relief from the automatic stay must be granted in Chapter 7); *In re May*, No. 4:02-bk-14785 E, 2002 Bankr. LEXIS 1847, at *8 (Bankr. E.D. Ark. July 18, 2002) ("However, if a creditor proves that there is no equity in the subject property in a Chapter 7 case, the stay should be lifted because there can be no question that the property is not necessary for an effective reorganization where the debtor only seeks to liquidate her assets."); *In re Knight Jewelry*, 168 B.R. 199, 203 (Bankr. W.D. Mo. 1994) ("Under § 362(d)(2) the stay must be lifted if debtor has no equity in the property and the property is not necessary for an effective reorganization. . . .  [S]ince the case was converted to Chapter 7 at the end of the hearing, the property is not necessary for a reorganization."); *In re Rosemond*, 105 B.R. 8, 10 (Bankr. W.D. Pa. 1989) ("AHRCO established that Debtor is in substantial default, has no equity in the leasehold, and does not need it to reorganize because this proceeding is a Chapter 7 liquidation.  Thus, relief from the automatic stay must be granted." (internal citations omitted)); *Hoyt v. United States (In re Hoyt)*, 93 B.R. 540, 544 (Bankr. S.D. Iowa 1988) ("Once the creditor establishes that there is no equity in the property (a fact which will be evident from the debtors' move to void the undersecured portion of the creditor's lien) and that the property is not necessary to an effective reorganization (which, in a chapter 7, is also evident), the court has no discretion to lift or not lift the automatic stay. The court must lift the automatic stay so that the secured creditor may pursue his remedy against the liened property for whatever benefit he may perceive." (internal quotation omitted)).

fees, professional fees, or any other fees associated with a chapter 7 case for Scopac or the unpaid chapter 11 administrative claims against Scopac.   Moreover, in contrast to what is proposed in the MRC/Marathon Plan, value attributable to Scopac's assets would not be diverted to pay over $18 million in unsecured claims against the Palco Debtors.   It is frivolous to suggest that a chapter 7 trustee for Scopac would use Scopac's assets for the benefit of the Palco Debtors' creditors and, in any event, a foreclosure by the Indenture Trustee in a chapter 7 case would eliminate any risk of this occurring.   To suggest that this very course of action, as proposed in the MRC/Marathon Plan, is in the best interest of Scopac's creditors is equally frivolous.

88.     As noted above, the uncontradicted evidence at trial established that the Indenture Trustee had received an offer to purchase its timberland collateral for $603 million in cash. Scotia Redwood Foundation, the bidder, indicated that it would offer that same amount if the case were converted to chapter 7.  *See* Testimony of Jacob Cherner, Apr. 11, 2008 Hr'g. Tr. at pg. 265:13 – 18.  Even absent any overbid at an auction, and even allowing for the time that it would take to complete a non-judicial, power of sale foreclosure under California law, liquidation under chapter 7 would result in the Indenture Trustee's receipt of more than the $517 million offered under the MRC/Marathon Plan.   Thus, a hypothetical liquidation under chapter 7 would result in the Indenture Trustee's receipt of more than the $517 million offered under the MRC/Marathon Plan, and each dissenting Timber Noteholder would fare materially better than it would under the MRC/Marathon Plan.

89.     Additionally, in a chapter 7 case, unlike under the MRC/Marathon Plan, the Indenture Trustee would retain its liens on all of the non-timberland assets of Scopac (including litigation claims).   MRC/Marathon had the burden of demonstrating the value of that Collateral

(or at least a range of values), so that the Court could compare the Timber Noteholders' recovery in a hypothetical chapter 7 case where they would retain the benefit of those assets, to the result under the MRC/Marathon Plan that transfers all of the non-timberland Collateral to Newco, free and clear of liens, for essentially nothing.  Because MRC/Marathon did not present any such evidence, they failed to meet their burden on this issue and confirmation should have been denied.

90.      In light of the foregoing analysis, the Confirmation Order is in clear conflict with the plain meaning of the Bankruptcy Code and case law, such that the Indenture Trustee's Request should be granted, permitting immediate review by the Fifth Circuit.

> **(6)  Whether the Confirmation Order improperly confirmed a plan of reorganization that places trade claims and deficiency claims in different classes, when no reasons for separate classification are provided that are independent of a plan proponent's motivation to secure the vote of an impaired class of claims to support acceptance of the plan of reorganization.**

91.      MRC/Marathon impermissibly separated the unsecured Scopac Trade Claims (Class 8), whose 26 (out of 27) votes to accept the MRC/Marathon Plan totaled $241,382, from the Scopac General Unsecured Claims (Class 9) consisting entirely of the unsecured deficiency claim of the holders of Timber Notes, whose 124 (out of 130) votes to reject the MRC/Marathon Plan totaled $688,729,517 on their face (over $200 million in deficiency claims per the terms of the MRC/Marathon Plan).  *See* IT Exhibit 101 (Declaration of Balloting Agent).  Undoubtedly, MRC/Marathon separated unsecured Scopac Trade Claims from the Scopac General Unsecured Claims to ensure that the anticipated "no" vote of the Timber Noteholders' Class 9 deficiency claims would not preclude confirmation, *i.e.* to ensure that there would be an impaired accepting class.  This transparent attempt to gerrymander the unsecured claims to obtain an accepting impaired class rendered the MRC/Marathon Plan unconfirmable.  Therefore, the Confirmation

Order should be reviewed immediately by the Fifth Circuit because it directly conflicts with well-settled case law.

92.     In the landmark Fifth Circuit case regarding gerrymandering, *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274 (5th Cir. 1991), the Fifth Circuit interpreted Section 1122 to mean that claims sharing common priority and rights against the debtor's estate should generally be placed in the same class.  *Id*. at 1278.[20]   The Fifth Circuit explained that, "if § 1122(a) permits classification of 'substantially similar' claims in different classes, such classification may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims."  *Id.* at 1279.   In rejecting the debtor's argument that the separate classification was meant to preserve its good will and standing in the trade community, *id.* at 1280, the court emphasized that the debtor's purported business reasons were not supported by sufficient evidence:[21]

> There is no evidence in the record of a limited market in Austin for trade goods and services. Nor is there any evidence that Greystone would be unable to obtain any of the trade services if the trade creditors did not receive preferential treatment under the Plan. Thus, the bankruptcy court's finding that there were good business reasons for separate classification is without support in the record and must be set aside as clearly erroneous.

---

[20] The Court wrote as follows:

> [i]t is true that § 1122(a) in terms only governs permissible inclusions of claims in a class rather requiring that all similar claims be grouped together. . . . A fair reading of both subsections [1122(a) and 1122(b)] suggests that ordinarily 'substantially similar claims,' **those which share common priority and rights against the debtor's estate**, should be placed in the same class.

*Id.* at 1278 (emphasis added).   Section 1129(a)(1) of the Bankruptcy Code states that the Court may confirm a plan of reorganization only if the plan "complies with the applicable provisions of [Title 11]." Section 1129(a)(1) includes the provisions of Bankruptcy Code Sections 1122 and 1123 concerning classification.

[21] It is the Plan Proponent's burden to establish that good business reasons support separate classification. *In re Trimm*, No. B-97-16637-C-11D, 2000 WL 33673795, *6 (M.D.N.C. Feb. 17, 2000) ("The burden is on the plan proponent to prove the existence of a 'legitimate business reason.'").

*Id.* at 1281.  Since the Fifth Circuit handed down *Greystone*, courts have continued to stress (now) Chief Judge Jones's pithy edict: "<u>thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan.</u>"  *See, e.g., In re Nw. Timberline Enters., Inc.*, 348 B.R. 412, 438 (Bankr. N.D. Tex. 2006) (quoting *Greystone*, 995 F.2d at 1279) (emphasis added).

93.      As in *Greystone*, no evidence was presented at trial of a limited market in Humboldt County for goods and services for timberland operators; nor was evidence presented that Scopac's timber operation - the second largest timber operation in Humboldt County - would be unable to obtain needed trade services if the trade creditors did not receive preferential treatment under a plan.  In fact, the primary criteria for an unsecured creditor's classification as "trade" debt under the MRC/Marathon Plan clearly is not whether the creditor is continuing to do business with Scopac, or will refuse to do so if not separately classified and treated preferentially; rather, the primary criteria for an unsecured creditor's classification as a Class 8 "trade" debt appears to be nothing other than not being a deficiency claim.  Thus, Class 8 is a hodgepodge of claims that includes claims of former employees who have not worked for Scopac for over one year; claims of national vendors as to which there is no reason to believe that they will stop "vending" if not treated preferentially; and local trade creditors whose economic well-being requires that they deal with the second-largest timber operator in Humboldt County.  This case, therefore, cannot be compared to cases in this Circuit that have permitted the separate classification of claims of equal priority.  *See e.g., Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II),* 994 F.2d 1160 (5th Cir. 1993) (holding that the city of Fort Worth could be classified separately because its interest in and contribution to a low income housing complex was different from that of the other creditors); *In*

*re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109, 114 (Bankr. N.D. Tex. 2002) (finding that the debtor, a piano consignment outfit, had met the good business reason test where the debtor presented evidence that was not rebutted about the small size of the market and the current and future effects that it would incur if it did not accelerate payment to its consignment creditors).

94.     In light of the foregoing analysis, the Confirmation Order is in clear conflict with Fifth Circuit jurisprudence, such that the Indenture Trustee's Request should be granted, permitting immediate review by the Fifth Circuit.

> **(7)     Whether the Confirmation Order improperly confirmed a plan of reorganization that separately classifies claims of the same priority, and provides a difference in the plan's treatment of classes that results in a materially lower percentage recovery for unsecured deficiency claimants.**

95.     As a threshold matter, it is important to clarify that even if the Court correctly determined that the separate classification of Class 8 claims and Class 9 claims is appropriate, the MRC/Marathon Plan proponents still failed to demonstrate that the MRC/Marathon Plan does not discriminate unfairly between the separate classes of unsecured creditors.  *See In re Mortgage Inv. Co. of El Paso, Texas*, 111 B.R. 604, 614 (Bankr. W.D. Tex. 1990) ("A finding that the plan classification scheme is proper does not necessarily resolve the question of unfair discrimination.") (emphasis omitted).   "[A] dissident class must . . . receive treatment which allocates value to the class consistent with the treatment afforded other classes with similar legal claims." *Id.*

96.     In *In re Sentry Operating Co. of Texas*, 264 B.R. 850 (Bankr. S.D. Tex. 2001), the Court adopted the following test for determining whether a plan discriminates unfairly:

> [A] Chapter 11 plan is *presumptively* subject to denial of confirmation on the basis of unfair discrimination, even through it provides fair and equitable treatment for all classes, when there is (1) a dissenting class; (2) another class of the same priority, and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting

class . . . or (b) . . . an allocation under the plan of materially greater risk to the dissenting class. . . .

*Id.* at 863-64 (adopting proposed test presented by then-Professor and now-Bankruptcy Judge Bruce A. Markell in his article *A New Perspective on Unfair Discrimination in Chapter 11*, 72 AM. BANKR. L.J 227 (1998)) (emphasis added).  This presumption can only be overcome by proof that "a lower recovery for the dissenting class is consistent with the results that would obtain outside of bankruptcy, or that a greater recovery for the other class is offset by contributions from that class to the reorganization."  *Sentry Operating Co.*, 264 B.R. at 864.

97.    The MRC/Marathon Plan presumptively discriminates unfairly against Class 9 under the *Sentry Operating* standard, because (1) Class 9 is a dissenting class, having rejected the MRC/Marathon Plan; (2) claims in Class 8 are of the same priority (*i.e.*, non-priority general unsecured claims) as claims in Class 9; and (3) the MRC/Marathon Plan's treatment of the two classes results in "a materially lower percentage recovery for the dissenting class," *i.e.*, Class 9, because, as set forth of page 51 of the Joint Disclosure Statement, Scopac Trade Claims in Class 8 will receive, in addition to their applicable Litigation Trust Participation, cash which MRC/Marathon expect will provide Class 8 creditors with a 75%-90% recovery on their claims. *See* IT Exhibit 102a (Joint Disclosure Statement).   In contrast, Scopac General Unsecured Claims in Class 9 will receive only their applicable Litigation Trust Participation, with no additional cash, resulting in a recovery estimated as "unknown."  *See id.*   Joint Disclosure Statement, at 51.   There can be no serious question that an uncertain distribution of an "unknown" amount, with no minimum cash distribution, results in a "materially lower percentage recovery" than a minimum cash distribution of 75%-90% of Allowed Claims.  Thus, the MRC/Marathon Plan presumptively discriminates unfairly against Class 9.   Moreover, MRC/Marathon failed to present *any* evidence to overcome this presumption.

98.     Importantly, there seems to be a conflict between the tests that bankruptcy courts employ to determine whether a presumption of unfair discrimination arises, which serves as an independent basis for granting the Indenture Trustee's Request.  However, even were this Court to reject *Sentry Operating Company* and adopt the standard used by some courts outside of the Southern District, the result would be the same.  Some courts apply the following test to determine whether discrimination is unfair:

(1)   Whether the discrimination is supported by a reasonable basis;

(2)   Whether the debtor can confirm and consummate a plan without the discrimination;

(3)   Whether the discrimination is proposed in good faith; and

(4)   The treatment of the classes discriminated against.

*Mortgage Inv. Co. of El Paso,* 111 B.R. at 614.  In other words, "for payment to be preferred to one creditor or class over others, the Court must find an articulable basis for the preference."  *Id.* at 615; *see Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 656 (9th Cir. 1997); *In re Snyder Drug Stores, Inc.*, 307 B.R. 889, 894-95 (Bankr. N.D. Ohio 2004) (citing cases).

99.     In *Snyder Drug Stores*, the bankruptcy court held that a plan that separately classified lease rejection claims (Class 12) from unsecured trade creditor claims, claims of service providers, and claims of landlords of ongoing operating locations (Class 10), resulted in unfair discrimination.  In language that resonates here, the court explained:

There was no evidence to prove that trade and service creditors included in class 10 would refuse to deal with the reorganized debtor on acceptable terms going forward absent some preferential payment under the plan.  Class 10 is not, therefore, reasonably tailored to foster only those relationships that are critical to the success of the reorganized debtor.  The plan proponents did not prove that there was a reasonable basis for the discrimination.

307 B.R. at 895.  The court further explained that, notwithstanding "testimony that it would be quite time-consuming to narrow the class 10 creditors further, . . . it is the plan proponents' burden to do so."  *Id.* at 895 n. 9.

100.    As in *Snyder Drug Stores*, MRC/Marathon have not discharged that burden and have failed to offer any substantively distinguishable characteristics between Class 8 and Class 9 such that the difference in treatment under the Plan is warranted.  *See also Oxford Life Ins. Co. v. Tuscon Self-Storage, Inc.* (*In re Tucson Self-Storage, Inc.)*, 166 B.R. 892, 898 (B.A.P. 9th Cir. 1994) (citing numerous cases that "have denied confirmation of chapter 11 plans that proposed widely disparate treatment of similarly situated creditors as unfairly discriminatory," the court rejected the theory that "a recognized 'public policy' to pay for actual goods and services in full" justified disparate treatment); *In re Eisenbarth*, 77 B.R. 228, 235 (Bankr. D.N.D. 1987) determining that a (plan unfairly discriminated against unsecured deficiency claims by proposing to pay such claims only 10% of their claims but paying "local businesses in full"); *In re Simmons*, 288 B.R. 737, 743 n.12 (Bankr. N.D. Tex. 2003).

101.    For all of the reasons set forth above, the Court should grant the Indenture Trustee's Request to appeal directly to the Fifth Circuit to determine which test should be employed to consider whether classification unfairly discriminates against creditors and to determine if the MRC/Marathon Plan unfairly discriminates against the Indenture Trustee.

**(8)      Whether the Court improperly confirmed a plan of reorganization that artificially impairs a class of claims in order to secure the vote of an impaired class of claims to support acceptance of the plan of reorganization.**

102.    The MRC/Marathon Plan provides that Class 5, consisting of banks (whose agent is Bank of America) holding secured claims under the "Scopac Line of Credit" facility, was

impaired.  However, when Scopac filed for bankruptcy relief, it was not in default under the Scopac Line of Credit.  Moreover, throughout Scopac's bankruptcy, the debtor has continued to pay Bank of America according to the loan's terms, including the payment of its attorney's fees. Therefore, Bank of America's treatment under the MRC/Marathon Plan—payment in cash in full plus unpaid accrued interest at the non default rate plus unpaid default interest in twelve monthly installments—does not render Class 5 an impaired class as Bank of America is not entitled to the default interest.

103.    In *Great Western Bank & Trust v. Entz-White Lumber and Supply, Inc. (In re Entz-White Lumber and Supply, Inc.)*, 850 F.2d 1338 (9th Cir. 1988), the debtor and its lender entered into a loan agreement specifying default and non-default rates of interest.  The debtor defaulted under the loan by failing to pay it on its maturity date.  Thereafter, it filed a chapter 11 petition.  850 F.2d at 1339.  The debtor's plan of reorganization proposed to leave the creditor's claim unimpaired by paying the principal amount of the claim in full with pendency interest calculated at the non-default rate.  The creditor objected and argued that the plan impaired its claim because it was entitled to be paid pendency interest at the default rate.  *Id*.

104.    The bankruptcy court overruled the objection and confirmed the plan, finding that the "cure" nullified any consequences of the default, including a higher post-maturity interest rate. *Id*. at 1340.  The district court affirmed, and was in turn affirmed by the Ninth Circuit. *Id*. The court found that the debtor's plan effected a "cure" pursuant to § 1124(2)  by paying the creditor in full on confirmation, plus pendency interest at the non-default rate.  Consequently, the creditor was not entitled to the default rate of interest.  *Id*. at 1338.

105.    Here, because the payment of Bank of America under the MRC/Marathon Plan effects a full cure, it nullifies all consequences of a default (to the extent that one ever existed),

and accordingly Bank of America and the other Class 5 claimants are unimpaired and should be deemed to accept the plan without the necessity of a vote. Consequently, the Plan Proponents have manufactured impairment of this class under the MRC/Marathon Plan in an attempt to obtain the vote of an impaired accepting class.

> **(9)     Whether the Confirmation Order improperly confirmed a plan of reorganization that contains an expansive Exculpation Clause which purports to release claims of non-consenting creditors against a multitude of parties that are not debtors before the Court.**

106.   The MRC/Marathon Plan contains an expansive "Exculpation Clause" which purports to release claims of non-consenting creditors against a multitude of parties that are not debtors before this Court, including MRC's and Marathon's "officers, directors, professionals, members, agents and employees;" and the Committee's "members and Professionals." *See* Appendix A to MRC/Marathon Plan, definition of "Exculpated Parties." Furthermore, the Exculpation Clause releases all Exculpated Parties for any acts or omissions (except for their willful misconduct or gross negligence) "at any time prior to the Effective Date. . . ." This forced third party release of creditor claims against non-debtors rendered the MRC/Marathon Plan non-confirmable because it violates Sections 1129(a)(1) and 524(e) of the Bankruptcy Code.

107.   Section 524 of the Bankruptcy Code provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). According to Fifth Circuit precedent, a chapter 11 plan of reorganization may not release a creditor's claims against a nondebtor if the affected creditor timely files an objection. *See In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 777-78 (Bankr. N.D. Tex. 2007) (refusing to confirm plan that included third-party, non-consensual release after considering the five factor approach espoused in *Master Mortgage Inv. Fund, Inc.)*

In particular, a plan proponent may not achieve through an overbroad exculpation clause that which is prohibited by Section 524(e) of the Bankruptcy Code.  *Simmons v. Acquisition Corp.*, No. 2:05-CV-169, 2005 U.S. Dist. LEXIS 28419, at *10 (E.D. Tex. Nov. 9, 2005) (finding that, because nothing in an exculpation clause may be construed or applied to violate applicable law, Section 524 of the Bankruptcy Code prohibited the release of plaintiffs' claim against a nondebtor holding company); *In re Wool Growers Cent. Storage Co.*, 371 B.R. at 776 (citing *In re Zale Corp.*, 62 F.3d at 760).

108.    Even under a more forgiving analysis, the Exculpation Clause renders the MRC/Marathon Plan unconfirmable.  Some courts consider a set of five factors when determining whether a nondebtor may be released over the objection of a creditor, as follows:

(1)    identity of interest between the debtor and the third-party,

(2)    substantial contribution of assets to reorganization,

(3)    release is necessary to the reorganization,

(4)    majority of affected creditors have overwhelmingly accepted plan treatment, and

(5)    plan provides payment of all, or substantially all, of affected classes' claims.

*In re Wool Growers Cent. Storage Co.*, 371 B.R. at 777 (citing *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 934 (W.D. Mo. 1994)); *In re Zale Corp.*, 62 F.3d at 760 (citing various distinguishable cases).

109.    Here, the Exculpation Clause clearly flunks each element of this test.  First, there is no "identity of interest between the debtor [Scopac] and the third-party," because neither Marathon nor MRC is a creditor, equity holder, officer or director of Scopac.  Marathon is a creditor of Scopac's parent, Palco, and MRC is simply a self-described "hostile acquirer." Second, there is no "substantial contribution of assets to reorganization."  MRC and Marathon

are contributing nothing to the reorganization of Scopac; they are simply engaged in a forced sale of Scopac's assets at a hypothetical value which has not been tested by the market.  Third, the Exculpation Clause is not necessary to the "reorganization" of Scopac, because there is no "reorganization" – Scopac's assets are being sold, and Scopac will be dissolved.  A sale of the Scopac timberlands to Newco involves no more of a "reorganization" than a sale to any other purchaser, since any purchaser of the timberlands would presumably purchase them in order to continue to operate them.  Fourth, the "majority of the affected creditors" (*i.e.*, the Scopac Timber Noteholders) categorically rejected the MRC/Marathon Plan.  Finally, the MRC/Marathon Plan does not provide for "payment of all, or substantially all, of affected classes' claims;" rather, it pays only about 70% of the Noteholders' claims, which is less than they would obtain simply by selling Scopac's assets to Scotia Redwood Foundation.

110.    In addition, the Court erred in confirming the MRC/Marathon Plan because it failed to comply with the provisions of the Indenture and the Trust Indenture Act of 1939, 15 U.S.C. § 77, *et seq.*, by, *inter alia*, by failing to provide for compliance with the required procedures upon cancellation of the Indenture, including discharge and release of the Indenture Trustee.

111.    Based on the forgoing, the Court erred in concluding that the MRC/Marathon Plan complied with Sections 1129(a)(1) and 524(e) of the Bankruptcy Code.  Therefore, because the Confirmation Order is in clear conflict with the plain meaning of the Bankruptcy Code and the applicable case law, the Indenture Trustee's Request should be granted, permitting immediate review by the Fifth Circuit.

> (10)   **Whether the Confirmation Order improperly confirmed a plan of reorganization because the plan fails to consider the potential impact of federal antitrust laws.**

112.    A chapter 11 plan is not feasible and cannot be confirmed if the plan is likely to be followed by further reorganization.  11 U.S.C. § 1129(a)(11).  A reorganized business must be economically viable.  *United Savs. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, Ltd., 484 U.S. 365, 378 (1988).  A plan that violates nonbankruptcy law, particularly if the violation is one of substance that negatively impacts the core business of the reorganized debtor, is not a viable plan and may not be confirmed pursuant to Section 1129(a)(11) of the Bankruptcy Code.  *See In re Food City Inc.*, 110 B.R. 808, 812 n. 10 (Bankr. W.D. Tex. 1990) (finding that an illegal provision in a proposed plan is a relevant consideration in the confirmation process and, if substantive, could affect the plan's feasibility and "indeed undermine the bona fides of the plan's proposal"); *In re Frascella Enters, Inc.*, 360 B.R. 435, 445, 455-56 (Bankr. E.D. Pa. 2007) (citing with approval analysis in *Food City, Inc.*) (finding proposed plan not confirmable where legal risk was not accounted for in financial projections, and not reaching issue of whether business model violates Pennsylvania usury law); *In re Jartran Inc.*, 44. B.R. 331, 385 n. 116 (Bankr. N.D. Ill. 1984) (expressing concerns for antitrust implications that may have resulted from sale of the estate to potential purchaser).

113.    Similarly, Section 1123 of the Bankruptcy Code provides that "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide adequate means for the plan's implementation. . . ."  11 U.S.C. § 1123(a)(5).  A proposed plan of reorganization cannot be adequately implemented if the foundation of the scheme of reorganization is prohibited by state or federal law.  *See Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1104 (9th Cir. 2005) (citing *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1157-58 (5th Cir. 1988)) (recognizing potential noncompliance with 11 U.S.C. §§ 1123(a)(3) and (5) where proposed plan violates federal

antitrust law); *In re Pac. Gas & Elec. Co.*, 273 B.R. 795, (Bankr. N.D. Cal. 2002) ("[N]onbankruptcy law such as state and federal antitrust laws may place carefully tailored limits on mergers under Paragraph (C) of Section 1123(a)(5)."), *rev'd on other grounds*, 350 F.3d 932 (9th Cir. 2003).

114. The MRC/Marathon Plan is neither feasible nor premised on a lawful business strategy because there is a substantial risk that the reorganization will ultimately be found to violate Section 7 of the Clayton Act, 15 U.S.C. § 18 (2000 & Supp. V 2005), and that implementation of the Plan will be enjoined due to antitrust concerns. The DOJ or FTC may investigate and challenge the transaction, even if the transaction is not "reportable" under the HSR Act. In addition, a state agency, or even a private party, ultimately might seek to enjoin implementation of the plan. Section 7 of the Clayton Act, the primary federal statute governing antitrust review of mergers and acquisitions, prohibits mergers and acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." *Id.*

115. In 1992, the FTC and DOJ jointly issued the Horizontal Merger Guidelines ("the Guidelines"), which provide guidance with respect to market definition and other considerations used by these agencies in evaluating mergers and acquisitions under Section 7. U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (1992) (with Apr. 8, 1997 revisions to § 4), reprinted in 4 Trade Reg. Rep. (CCH) 13, 104 (Apr. 8, 1997). The Guidelines aim to identify mergers and acquisitions that are likely to harm competition through "unilateral effects" by creating or enhancing market power, which is the ability to raise prices or reduce output, or through "coordinated effects" by facilitating collusion among competitors.

116.    In reviewing a proposed merger, the DOJ or FTC will first endeavor to define the relevant market in terms of product and geography.  The Guidelines define a product market and a geographic market as follows:

> A market is defined as a product or group of products and a geographic area in which it is produced or sold such that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future producer or seller of those products in that area likely would impose at least a 'small but significant and nontransitory' increase in price, assuming the terms of sale of all other products are held constant.  A relevant market is a group of products and a geographic area that is no bigger than necessary to satisfy this test.

Guidelines, § 1.0.  The DOJ or FTC will consider the likely customer response if a hypothetical monopolist of a specific product or service in a specific geographic area increased its price by a "small but significant and nontransitory" amount, such as 5 to 10 percent, to determine whether customers would use substitutes for the product and whether they would be able to purchase the product from another geographic area.

117.    After defining the relevant market, the DOJ or FTC identifies all participants in the relevant market.  Market participants include current sources of the product as well as those that could quickly and easily enter the market at current prices or if prices were to rise 5 to 10 percent.  The DOJ or FTC then calculates the market shares of the market participants.  Under the Guidelines, market shares are calculated based on each market participant's total sales or capacity.  After calculating market shares, the DOJ or FTC uses the Herfindahl-Hirschman Index ("HHI") to compute market concentration, which is a function of the number of participants in the relevant market and their respective market shares.  The HHI is the sum of the squares of each firm's market share.  Thus, the HHI of a market with just two participants, each with a 50 percent share, would be 5000 (or 2500 plus 2500).  In general, the more concentrated the market, the higher the HHI score and the greater the antitrust scrutiny.

118. If the post-merger HHI is below 1000, the FTC and DOJ generally regard the relevant market as "unconcentrated" and view the proposed merger as unlikely to pose antitrust concerns. If the post-merger HHI is between 1000 and 1800, the relevant market will be viewed as "moderately concentrated." If the post-merger HHI is above 1800, the relevant market is viewed as "highly concentrated." The Guidelines expressly state that where the post-merger HHI is above 1800, it will be "presumed that mergers producing an increase in the HHI of more than 100 points are likely to create or enhance market power or facilitate its exercise." Guidelines, § 1.51.

119. The presumption of anticompetitive effects may be rebutted by showing that circumstances in the market make the exercise of market power unlikely despite the high levels of concentration. Ordinarily, the most important such factor is barriers to entry. If there are no significant barriers to entry into the relevant market, a price increase could precipitate the entry of competitors, thereby reducing the likelihood of the exercise of market power. Conversely, the presence of high barriers to entry amplifies concerns about anticompetitive effects in the relevant market.

120. Applying these guidelines to the MRC/Marathon Plan, the combination of MRC and Scopac's commercial timberland assets is likely to reduce competition substantially in redwood timber and lumber in the Pacific Northwest United States, and therefore, the FTC or DOJ likely will seek to enjoin implementation of the Plan. Redwood timberland in the Pacific Northwest is a relevant antitrust market in which to assess the effects of the combination. *See Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*, 411 F.3d 1030 (9th Cir. 2005) (holding that Pacific Northwest input market for alder saw-logs was relevant antitrust market in which to analyze monopolization and attempted monopolization claims), vacated and remanded

on other grounds sub nom. *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 127 S. Ct. 1069 (U.S. 2007).  Redwood has several unique characteristics, such as durability, superior resistance to rot, insects and fire, and high dimensional stability.  Given its uniqueness and beauty, the price of redwood lumber carries a premium over the price of other types of lumber.  Consequently, for applications such as redwood paneling and certain outdoor uses, there are no suitable alternatives.  Even if prices of redwood were to increase 5 to 10 percent, it is unlikely that customers for these applications would turn to other materials.

121.    The Pacific Northwest is the relevant geographic scope of the market, because in the event of an increase in the price of redwood timber or lumber, customers would be unable to turn to other areas for supply because redwood is not found in commercially viable quantities in any other region of the world.  Jeff Barrett, Vice President of Scopac, has testified that, "[t]he northern California forests are unique in having the redwoods.  Redwood forests have an extremely limited geographic range, from approximately Big Sur to the Oregon border, so one would have to be in northern California to work in redwoods."  *See* Deposition of Jeffrey C. Barrett, Ph.D., Oct. 1, 2007 at pg. 16:13-17.  Furthermore, barriers to entry are high because new redwood plantings would take at least 35 years to grow to a size suitable for logging, and redwood will only grow in commercially viable quantities within their existing limited range, much of which is already owned by Scopac and MRC.

122.    The Pacific Northwest redwood market is highly concentrated and would become even more highly concentrated if the MRC/Marathon Plan is implemented.  According to Debtors' estimates, total commercial and private ownership of redwood timberland in the Pacific Northwest is estimated at 1.3 million acres.  Nearly 80 percent – or 993,000 acres – of this timberland is in the hands of just four firms – Scopac, MRC, Green Diamond, and Hawthorne

Timber Co.   Scopac owns 210,000 acres, MRC owns 230,000 acres, Green Diamond owns 440,000 acres, and Hawthorne Timber owns 113,000 acres.  Joint Disclosure Statement at pg. 58.  Based on these figures, the pre-merger HHI is over 1800, not even accounting for the market shares of the smaller players holding the remaining 307,000 acres.  The increase in HHI would be over 575, resulting in a post-merger HHI of approximately 2400.  Not only is that a highly concentrated market, but the combination of Scopac and MRC's timberland would combine the second and third largest owners to create the largest owner.  Under the Guidelines, therefore, the DOJ and FTC will presume that implementation of the Plan is likely to create or enhance market power or facilitate its exercise.  Indeed, the increase in concentration that would result from the proposed transaction is over five times the level of increase that the DOJ and FTC have stated will create a presumption of competitive harm.  When coupled with the high barriers to entry that are present, it is unlikely that MRC/Marathon will be able to rebut the presumption that the transaction would cause competitive harm.

123.   The likelihood that the combination of MRC and Scopac would reduce competition in the redwood lumber and timber market in the Pacific Northwest creates a substantial risk that the FTC or DOJ or even a state agency or private party would seek to enjoin implementation of the Plan.

124.   Accordingly, because there is a substantial risk that the MRC/Marathon Plan violates the federal antitrust laws and would be enjoined by a federal or state agency or private party, the Court erred in concluding that the MRC/Marathon Plan was feasible and provided for adequate means of implementation.  Therefore, the Court should grant the Indenture Trustee's Request, thus permitting immediate review by the Fifth Circuit.

D.      **An Immediate Appeal from the Confirmation Order Will Materially Advance the Progress of the Debtors' Cases.**

125.    The Debtors and the creditors, including the Indenture Trustee, all deserve the finality of either realizing the Debtors' rehabilitation, reorganization and/or liquidation in accordance with the principles of the Bankruptcy Code.   In this case, plan confirmation represents the paradigmatic conclusion of the antagonistic and acrimonious disputes that have marked the Debtors' bankruptcy proceedings.   Courts have reasoned that where a bankruptcy court has made a ruling which will essentially determine the result of future litigation, immediate review should be granted.   *Weber v. United States Tr.*, 484 F.3d 154, 158 (2d Cir. 2007) (acknowledging that if adversely affected parties might "very well fold up their tents if convinced that the ruling has the approval of the court of appeals, but will not give up until that becomes clear[,]" immediate review is advisable).   Importantly, in *Ransom v. MBNA Am. Bank, N.A. (In re Ransom)*, 380 B.R. 809, 812-13 (B.A.P. 9th Cir. 2007), a case involving a Section 158(d)(2) request in which the bankruptcy court denied confirmation of the debtor's Chapter 13 plan, the court concluded that "if the court of appeals agrees with [the Debtor] and disagrees with the bankruptcy court and with us, then [the Debtor] should be able to obtain confirmation of his plan, materially advancing to conclusion the challenges to that plan."   In this case, the same conclusion applies to the Indenture Trustee.   Thus, plan confirmation has been recognized as materially advancing a case to its conclusion.   Therefore, the Indenture Trustee's request for direct certification should be granted so that the parties can gain closure regarding the substantial and open questions of law inherent in the Confirmation Order.

VI.   **CONCLUSION**

WHEREFORE, PREMISES CONSIDERED, the Indenture Trustee respectfully requests that this Court certify the Indenture Trustee's appeal directly to the Fifth Circuit and grant such further relief as the Indenture Trustee may be entitled, either in law or equity.

Dated: Houston, Texas
      July 9, 2008

Respectfully submitted,

**FULBRIGHT & JAWORSKI L.L.P.**

By: _/s/ Zack A.Clement_

| | |
|---|---|
| Zack A. Clement | (SBTX 04361550) |
| William R. Greendyke | (SBTX 08390450) |
| R. Andew Black | (SBTX 02375110) |
| Jason L. Boland | (SBTX 24040542) |
| Mark A. Worden | (SBTX 24042194) |

Fulbright Tower
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone:  (713) 651-5151
Facsimile:  (713) 651-5246

-and-

| | |
|---|---|
| Toby L. Gerber | (SBTX 07813700) |
| Louis R. Strubeck, Jr. | (SBTX 12425600) |
| O. Rey Rodriguez | (SBTX 00791557) |

2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-2784
Telephone:  (214) 855-8000
Facsimile:  (214) 855-8200

**Counsel for The Bank of New York Trust Company N.A., as Indenture Trustee for the Timber Notes**